1   Charles S. LiMandri, SBN 110841          Harmeet K. Dhillon (SBN: 207873)
2   Paul M. Jonna, SBN 265389                Mark P. Meuser (SBN: 231335)
    Jeffrey M. Trissell, SBN 292480          Gregory R. Michael (SBN: 306814)
3   LIMANDRI & JONNA LLP                     DHILLON LAW GROUP INC.
    P.O. Box 9120                            177 Post Street, Suite 700
4   Rancho Santa Fe, CA 92067                San Francisco, CA 94108
5   Telephone: (858) 759-9930                Telephone: (415) 433-1700
    Facsimile: (858) 759-9938                Facsimile: (415) 520-6593
6   cslimandri@limandri.com                  harmeet@dhillonlaw.com
7   pjonna@limandri.com                      mmeuser@dhillonlaw.com
    jtrissell@limandri.com                   gmichael@dhillonlaw.com
8
9   Thomas Brejcha, *pro hac vice**          Attorneys for Plaintiffs
    Peter Breen, *pro hac vice**
10  THOMAS MORE SOCIETY
    309 W. Washington St., Ste. 1250
11  Chicago, IL 60606
12  Tel: (312) 782-1680
    tbrejcha@thomasmoresociety.org
13  pbreen@thomasmorsociety.org
14  *Application forthcoming
15  Attorneys for Plaintiffs
16

17                  UNITED STATES DISTRICT COURT

18                SOUTHERN DISTRICT OF CALIFORNIA

19  SOUTH BAY UNITED                   Case No.: '20CV865 AJB MDD
20  PENTECOSTAL CHURCH, a California
    nonprofit corporation, BISHOP ARTHUR   **COMPLAINT FOR
21  HODGES III, an individual, RABBI        DECLARATORY AND
    MENDEL POLICHENCO, an individual,       INJUNCTIVE RELIEF**
22
                    Plaintiffs,
23
    v.                                      **JURY TRIAL DEMANDED**
24
25  GAVIN NEWSOM, in his official capacity
    as the Governor of California; XAVIER
26  BECERRA, in his official capacity as the
    Attorney General of California, SONIA
27  ANGELL, in her official capacity as
    California Public Health Officer, WILMA J.
28

1 WOOTEN, in her official capacity as Public
2 Health Officer, County of San Diego,
HELEN ROBBINS-MEYER, in her official
3 capacity as Director of Emergency Services,
WILLIAM D. GORE, in his official
4 capacity as Sheriff of the County of San
5 Diego, KEVIN FAULCONER, in his
official capacity as Mayor of the City of San
6 Diego, and DAVID NISLEIT, in his official
7 capacity as the Chief of Police of the City of
San Diego,

8
                    Defendants.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister? The Commonwealth has no good answers. While the law may take periodic naps during a pandemic, we will not let it sleep through one.*

Maryville Baptist Church, Inc. v. Beshear,
No. 20-5427 (6th Cir. May 2, 2020)

## INTRODUCTION

1.  It is time. California is one of only eight states whose response to the COVID-19 pandemic has included no accommodation for—hardly even a mention of—the religious rights of its citizens. Now, with the pandemic stabilizing, California has moved from "Stage 1" to "Stage 2." In the first part of Stage 2, beginning on Friday, May 8, retail and manufacturing may begin reopening—but not places of worship. In the latter part of Stage 2, within a "few weeks," shopping malls, car washes, pet grooming, offices, dine-in restaurants, schools may reopen—but again, not places of worship. No, churches will be allowed to reopen months later in "Stage 3," at the same time as salons, tattoo parlors, gyms, bars, and movie theaters. But worship is not frivolous entertainment: it is the first right protected in the First Amendment. To be sure, "[t]here is no instruction book for a pandemic. The threat evolves. Experts reevaluate." *On Fire Christian Ctr., Inc. v. Fischer*, --- F. Supp. 3d ---, 2020 WL 1820249, at *10 (W.D. Ky. 2020). And now it is time to reevaluate California's approach of dismissing the religious rights of its citizens.

2.  This new regime, where manufacturing, schools, offices, and childcare facilities can reopen—but places of worship cannot—is mindboggling. The churches and pastors of California are no less "essential" than its retail, schools, and offices to the health and well-being of its residents. More confusing is the placement of worship in Stage 3, alongside hair salons, nail salons, and tattoo parlors.

3.  There is no attempt at tailoring in California's new regime, much less

1

narrow tailoring. Every church in the state has been shuttered, and every pastor and congregant placed under house arrest, save for "essential" non-religious activities. This has now gone on for almost a month and a half, with several more months to come, and with no true end in sight. No consideration has been made for church size. No allowance has been made in relation to particular individuals' risk factors for coronavirus.

4.     Defendants have thus intentionally denigrated California churches and pastors and people of faith by relegating them to third class citizenship. Defendants have no compelling justification for their discriminatory treatment of churches and pastors and people of faith, nor have they attempted in any way to tailor their regulations to the least restrictive means necessary to meet any arguable compelling interest.

5.     In light of this denigration, this Action presents facial and as-applied challenges to the Governor of California's March 19, 2020, Executive Order N-33-20, April 28, 2020, Essential Workforce memorandum, and May 7, 2020, Resilience Roadmap (the "State Orders");[1] the County of San Diego's April 30, 2020, Order of the Health Officer and Emergency Regulations (the "County Order");[2] and the Mayor of San Diego's March 16, March 30, and April 30, 2020, Executive Orders Nos. 2020-1, 2020-2, and 2020-3 (the "City Orders")[3]—each of which violate the

---

[1] Attached hereto as Exhibits 1-1, 1-2, 1-3, and 1-4:
https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf;
https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf;
https://covid19.ca.gov/roadmap/;
https://www.gov.ca.gov/2020/05/07/governor-newsom-releases-updated-industry-guidance/
[2] Attached hereto as Exhibits 2-1 and 2-2:
https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/HealthOfficerOrderCOVID19.pdf;
https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/covid19/SOCIAL_DISTANCING_AND_SANITATION_PROTOCOL_04022020_V1.pdf
[3] Attached hereto as Exhibits 3-1, 3-2, and 3-3:

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

constitutional rights of Plaintiffs and the people of California (collectively, the "Orders" or the "Reopening Plan").

## JURISDICTION AND VENUE

6. This action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Plaintiffs' constitutional rights to freedom of religion, speech, and assembly, due process, and equal protection rights under the First and Fourteenth Amendments to the U.S. Constitution. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction over the claims asserting violations of the California Constitution through supplemental jurisdiction under 28 U.S.C. § 1367(a). This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

7. The Southern District of California is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is the District in which Defendants maintain offices, exercise their authority in their official capacities, and will enforce the Orders; and it is the District in which substantially all of the events giving rise to the claims occurred.

## THE PARTIES

8. Founded in 1956, Plaintiff South Bay United Pentecostal Church is a California non-profit corporation, located in Chula Vista, California. The Church sues in its own capacity and on behalf of its congregants. It is a multi-national, multi-cultural congregation. The majority of its members are Hispanic, with the balance consisting of Filipino, Caucasian, African-American, and other ethnic groups. It is an

---

https://www.sandiego.gov/sites/default/files/mayoralexecutiveorder_covid19.pdf; https://www.sandiego.gov/sites/default/files/mkf_executive_order_2020-2_-_3-30-2020_1.pdf; https://www.sandiego.gov/sites/default/files/mkf_executive_order_2020-04-30-2020_3.pdf

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

open and accepting community that believes all humans are children of God.

9.      Plaintiff Bishop Arthur Hodges III is a resident of the County of San Diego, California. He has served as the Chief Executive Officer and Senior Pastor of the South Bay United Pentecostal Church for thirty-five years. He also serves as Superintendent for the SoCal District of the United Pentecostal Church International.

10.     Plaintiff Rabbi Mendel Polichenco is a resident of the County of San Diego, California. He serves as rabbi and director of Chabad of Carmel Valley, located in the City of San Diego, California. He also serves as director of Chabad Without Borders, which operates fifteen Chabad branches in Mexico and three branches in San Diego County.

11.     Defendant Gavin Newsom is sued in his official capacity as the Governor of California. The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const. Art. V, § 1. Governor Newsom signed the State Orders.

12.     Defendant Xavier Becerra is the Attorney General of California. As the State's chief law enforcement officer, Becerra is responsible for executing the State's police powers. He is sued in his official capacity.

13.     Defendant Sonia Angell is California's Public Health Officer. Under the authority of the State Order, Angell decided which employees in the State are to be "Essential Critical Infrastructure Workers." She is sued in her official capacity.

14.     Defendant Wilma J. Wooten is San Diego County's Public Health Officer. Wooten signed the County Order. She is sued in her official capacity.

15.     Defendant Helen Robbins-Meyer is made a party to this Action in her official capacity as the Director of Emergency Services, County of San Diego. She signed the County Orders.

16.     Defendant William D. Gore is made a party to this Action in his official capacity as Sheriff of the County of San Diego. He is responsible for enforcing the State Orders and the County Order.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

17. Defendant Kevin Faulconer is the Mayor of San Diego, California. As "the chief executive officer of the City," he is empowered "[t]o execute and enforce all laws, ordinances, and policies of the City." S.D. Charter Art. XV, § 265. Mayor Faulconer signed the City Orders. He is sued in his official capacity.

18. Defendant David Nisleit is sued in his official capacity as the Chief of Police of the City of San Diego. He is responsible for enforcing the State Orders and the City Orders.

19. Each and every Defendant acted under color of state law with respect to all acts or omissions herein alleged.

## FACTUAL ALLEGATIONS

### INTRODUCTION

20. On or about March 13, 2020, President Donald J. Trump proclaimed a National State of Emergency as a result of the threat of the emergence of a novel coronavirus, COVID-19.[4] Fear of the coronavirus epidemic has gripped California, the nation, and the world. The coronavirus outbreak has turned the world upside-down, causing profound damage to the lives of all Americans and to the national economy.

21. In response to the virus, many states imposed "stay-at-home" orders to "flatten the curve" of the spread of the virus. In the vast majority of states, these stay-at-home orders protected the constitutional rights of churches and religious believers during the coronavirus pandemic.[5] When those orders did not protect their

---

[4] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/

[5] According to a recent article, only nine states did not have religious exemptions from their stay-at-home orders. *See* Chris Field, *9 states still prohibit religious gatherings during pandemic. All others have religious exemptions for stay-at-home orders*, THE BLAZE (Apr. 28, 2020); https://www.theblaze.com/news/states-prohibit-religious-gatherings-pandemic (listing states with no religious protections as: Alaska, California, Idaho, Illinois, Minnesota, New Jersey, New York, Vermont, Washington.) On May 1, 2020, in response to a lawsuit, Illinois removed itself from that list. *See* Tina Sfondeles, *Freedom to worship? Pritzker adds 'free exercise of religion'*

constitutional rights, the Courts quickly corrected them. *See, e.g., Maryville Baptist Church, Inc. v. Beshear*, --- F.3d ---, 2020 WL 2111316 (6th Cir. 2020) (enjoining order that restricted attendance at religious services); *On Fire Christian Ctr., Inc. v. Fischer*, --- F. Supp. 3d ---, 2020 WL 1820249 (W.D. Ky. 2020) (same); *First Baptist Church v. Kelly*, --- F. Supp. 3d ---, 2020 WL 1910021 (D. Kan. 2020) (same).

22.    Those states recognized that, during this pandemic, Americans need the Spirit of Almighty God even more to help them weather these dark times—and that this need is no less "essential" than any other need. They understood that the rules of constitutional interpretation are not as rigidly fixed in a time of national emergency. *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). "But[, they understood,] even under *Jacobson*, constitutional rights still exist. Among them is the freedom to worship as we choose." *On Fire Christian Ctr.*, 2020 WL 1820249, at *8 (citing *Jacobson*, 197 U.S. at 31).

23.    Those states had it right. *See, e.g.,* Statement of Attorney General William P. Barr on Religious Practice and Social Distancing (Apr. 14, 2020);[6] Memorandum for the Assistant Attorney General for Civil Rights and All United States Attorneys (Apr. 27, 2020).[7]

24.    "To be sure, individual rights secured by the Constitution do not disappear during a public health crisis." *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020). Fundamental and unalienable rights are, by their very nature, "essential"— they are the essential rights which led to the founding of this country and this state. For, "[h]istory reveals that the initial steps in the erosion of individual rights are usually excused on the basis of an 'emergency' or threat to the public. But the

---

*as 'essential' activity in new order—but not large gatherings*, CHICAGO SUN-TIMES (Apr. 30, 2020, 9:58 p.m.), https://chicago.suntimes.com/2020/4/30/21243640/illinois-stay-at-home-order-jb-pritzker-free-exercise-religion.

[6] https://www.justice.gov/opa/pr/attorney-general-william-p-barr-issues-statement-religious-practice-and-social-distancing-0

[7] https://www.justice.gov/opa/page/file/1271456/download

1  ultimate strength of our constitutional guarantees lies in the unhesitating application
2  in times of crisis and tranquility alike." *United States v. Bell*, 464 F.2d 667, 676 (2d
3  Cir. 1972) (Mansfield, J., concurring).

4      25.     For more than four hundred years, people have come to America in a
5  quest for religious freedom. Like the Puritans, most of these pilgrims were fleeing
6  religious persecution in Europe. They understood that "*[n]o* place, not even the
7  unknown, is worse than *any* place whose state forbids the exercise of your sincerely
8  held religious beliefs." *On Fire Christian Ctr.*, 2020 WL 1820249, at *2.

9      26.     Stretching back to the formation of colonies like Pennsylvania and
10 Rhode Island, where citizens could practice religion in a way that would not be
11 impeded by the government, this basic freedom that was sought by so many colonists
12 was enshrined in the constitutions of the states and, most importantly, in the First
13 Amendment to the United States Constitution: "Congress shall make no law
14 respecting the establishment of religion or prohibiting the free exercise thereof."
15 U.S. Const. amend I. This religious heritage is evident even today in the names of
16 California's cities, and specifically the City of San Diego, whose founding 250 years
17 ago by Fray St. Junípero Serra, the City celebrated just last year.

18     27.     Yet in March of this year, the Golden State criminalized all religious
19 assembly and communal religious worship. With the pandemic as justification,
20 Governor Newsom and the County and City of San Diego expanded their authority
21 by extraordinary lengths, depriving all Californians of fundamental rights protected
22 by the U.S. and California Constitutions, including freedom of religion, speech, and
23 assembly, and due process and equal protection under the law.

24     28.     Unlike forty-two other states issuing stay-at-home orders, California did
25 not mention religion or churches in its executive order. At the State level, the only
26 reference to religious rights was a single line in a 23-page memorandum that clergy are
27 "essential" for "faith-based services that are provided through streaming or other
28 technologies that support physical distancing and state public health guidelines." (Ex.

1-2, at 16.) At the County level, the orders make no reference to religion. (Ex. 2-1, Ex. 2-2.) And at the City level, the Mayor "prohibited" "any event or convening that brings together 50 or more people in a single room or a single space at the same time, such as a[] . . . church." (Ex. 3-1, at 1.)

29.  Oddly "mental health workers" could keep their business open for in-person counseling and services." (Ex. 1-2, at 2.) Thus, California apparently recognized the benefit of providing mental health and substance abuse support services—as long as they are ***not*** provided by pastors and churches.

30.  At the same time as criminalizing worship—each of the Orders had a paragraph threatening criminal enforcement—the State Order (adopted and expanded upon by the County and City Orders) allowed citizens to gather at liquor stores, pot-dispensaries, Planned Parenthood, Walmart, CVS, Costco, Home Depot, and many other locations deemed "essential." The State Order deemed the entirety of the "entertainment industries" essential. (Ex. 1-2, at 23.)

31.  This was not a hypothetical situation from an Orwellian novel describing a bleak future—this was the current and very real nightmare endured by millions of religious citizens who maintained the conviction that the faithful practice of regularly gathering together was absolutely "essential." But those citizens decided to wait anyway. Religious Americans are no less patriotic than any other Americans, and are absolutely willing to do their part to "flatten the curve." But they are not willing to have their faith denigrated, demeaned, and compared to attending a movie theater.

### The History of the Executive Orders

32.  On March 4, 2020, California Governor Gavin Newsom proclaimed a State of Emergency as a result of the threat of COVID-19.[8]

33.  On March 19, 2020, California Governor Newsom issued Executive Order No. N-33-20 in which he ordered that "all residents are directed to

---

[8] https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.

Complaint for Declaratory & Injunctive Relief

immediately heed the current State public health directives." (Ex. 1-1.)

34.    The state public health directive requires "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors. . . ."[9]

35.    On March 22, 2020, the California Public Health Officer designated a list of "Essential Critical Infrastructure Workers." (Ex. 1-2.) Included on the list of the "essential workforce" are "faith based services that are provided through streaming or other technology."

36.    Accordingly, this list prohibits all religious leaders from conducting in-person and out-of-home religious services, regardless of the measures taken to reduce or eliminate the risk of the virus spreading. Meanwhile, the list deems the continuity of services provided by coffee baristas, burger flippers, and laundromat technicians to be so necessary for society that these activities are permitted to continue under the State Order, despite the existence of the very same risk Defendants rely on to stymie the exercise of fundamental rights.

37.    On April 30, 2020, the County of San Diego issued an Order of the Health Office and Emergency Regulations. (Ex. 2-1.) That order incorporated Governor Newsom's Executive Order No. N-33-20, and set further guidelines for essential businesses operating in San Diego County. Specifically, that order promulgated the County of San Diego "Social Distancing and Sanitation Protocol" that all essential businesses were required to fill out and adhere to. (Ex. 2-2.) The order also banned all gatherings of "more than one person" except at essential businesses or transit places. (Ex. 2-1, at 4.)

38.    On April 30, 2020, the City of San Diego issued Executive Order No. 2020-3. (Ex. 3-3.) That order expressly incorporated the State and County orders: "All City residents shall comply with all current direction issued by Executive Order of the Governor of California and by directive of the County Public Health Officer."

[9] The State Public Health Directive was included in the text of the State Order.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

1  It also extended prior City of San Diego Orders. (Ex. 3-1; Ex. 3-2.)

2  39.     The state public health directive, included in Executive Order No. N-33-
3  20, provides that its directives "shall stay in effect until further notice."

4  40.     On April 28, 2020, Governor Newsom held a press conference in which
5  he announced California's current four stage Reopening Plan, and his intention on
6  how he will modify his Executive Order No. N-33-20. That plan relegates religious
7  services to the bottom of the pile, next to attending the cinema, and prioritizes
8  reopening manufacturing and offices.

9  41.     On May 4, 2020, Governor Newsom published a press release in which
10  he announced that Stage 2 of the Reopening Plan—where offices and manufacturing
11  will re-open—will begin, in part, on Friday, May 8, 2020.

12  42.     On May 7, 2020, Governor Newsom published his Resilience Roadmap,
13  which provided the means of beginning of Stage 2 of the Reopening Plan on Friday,
14  May 8, 2020. (Ex. 1-3.)

15
16  ### Bishop Arthur Hodges and the South Bay United Pentecostal Church

17  43.     South Bay Pentecostal Church is a reflection of the Chula Vista
18  community. It is a multi-national, multi-cultural congregation. The majority of its
19  members are Hispanic, with the balance consisting of Filipino, Caucasian, African-
20  American, and other ethnic groups. The congregation represents a cross-section of
21  society, from rich to poor and encompassing people of all ages. The congregation also
22  includes members and visitors who run the gamut of essential workers. These
23  essential workers and service providers receive spiritual support, comfort, guidance,
24  and shelter from our ministry. The Church is an open and accepting community that
25  believes all humans are children of God.

26  44.     Bishop Hodges has served as senior Pastor and Bishop of the South Bay
27  Pentecostal Church for thirty-five years. He also serves as a District Superintendent
28  of the United Pentecostal Church International. He oversees more than two-hundred

10

pastors and ministers, representing more than one-hundred churches across Southern California.

45.    Bishop Hodges' vocation was settled from an early age. He is the son of a Pentecostal Pastor. His father repeatedly built churches from scratch, establishing the community and moving on to repeat the same process in another town.

46.    At the age of ten, he felt God calling him to the same ministry. However, sensing the labors of his Father, who was tasked with raising a family, maintaining his electrician business, and serving as a Pastor all at the same time, he understood the tremendous sacrifice that pastors are expected to make. At that age, he was frightened by the burden. As such, he was reluctant to accept God's call.

47.    When he was twelve, he attended a youth class. The teacher of that particular class was very passionate about the power of prayer. Frequently, he would end those classes in prayer meetings. At one prayer meeting, Bishop Hodges heard God asking him, "Are you willing to be my preacher? Will you be my minister?" In that moment, he said yes, and the fear of his father's burden finally left him. However, it would be a number of years before he would make good on that promise.

48.    Upon graduating from high school, Bishop Hodges believed he would become an airline pilot. However, his father requested that he honor his sacrifices in raising him and asked him to give Bible College a chance. Out of a sense of filial duty, Bishop Hodges enrolled at the Apostolic Bible Institute in St. Paul, Minnesota. While at the Institute, God's call became too loud to ignore. With a missionary's zeal, he threw himself into full-time ministry. He began preaching at youth camps, conferences, and other venues, traveling from city to city and state to state, sharing God's Word with all who would open their hearts to listen.

49.    Two years later, Bishop Hodges' father invited him to serve as Assistant Pastor at South Bay Pentecostal Church. Sensing that life on the road was no place to grow a family, and with his wife pregnant with their first child, he agreed to accept the position. The passage of time brought change, and his father once more felt the

1 | call to move on to a new church. In his stead, Bishop Hodges was unanimously voted
2 | to take his place at South Bay, where he has served ever since.

3 |      50.     Bishop Hodges is a sincere, strong believer that the Bible is the infallible
4 | and immutable word of God. This belief is one that he shares with South Bay
5 | Pentecostal Church. They believe that there is one God—the creator of all. They
6 | practice as best they know how and can according to their abilities and understanding
7 | of Scripture. "Not forsaking the assembling of ourselves together, as the manner of
8 | some is; but exhorting one another: and so much the more, as ye see the day
9 | approaching." (Hebrews 10:25.)

10 |      51.     The South Bay Pentecostal Church's model is the New Testament
11 | church founded and described in the book of the Acts of the Apostles: "And when
12 | the day of Pentecost was fully come, they were *all with one accord in one place*." (Acts
13 | 2:1 [emphasis added].) They believe that "all" being gathered in "one place" is
14 | fundamental in order to fulfill Christ's final charge that "you will be my witnesses."
15 | (Acts 1:8.) Thus, at the Church's very beginning, they believe that the foundational
16 | function of the church, all gathering together with one accord, was established.

17 |      52.     The Book of Acts, which chronicles the founding of the Church, uses
18 | the word "together" thirty-one times, thus providing thirty-one reasons for the
19 | church to come together with one accord. Being "together" spiritually and physically
20 | is key in their preaching, teaching, and worship practice. This experience of
21 | worshipping together occurs *both* in the home *and* in the communal setting,
22 | "continuing daily with one accord *in the temple*, and breaking bread *from house to*
23 | *house*." (Acts 2:46–47 [emphasis added].)

24 |      53.     In observance of this sacred charge and sincerely held religious belief,
25 | South Bay Pentecostal Church holds between three and five services each Sunday. The
26 | average attendance at some of these services lies between two-hundred and three-
27 | hundred congregants. The Church's sanctuary can hold up to six-hundred people.

28 |      54.     The services focus on the scriptural charge to be "together"—both

spiritually and physically. Services begin with Bible classes spread across different ages and groups. Each class may have between ten and one-hundred participants. When these classes conclude, congregants gather together with one accord for praise and worship. Those with special needs or sickness come forward and stand around the altar, where hands are laid upon them and they are then anointed. This sacrament observes the Scriptural charge to "let them pray over him, anointing him with oil in the name of the LORD." (James 5:14.)

55. The Church believes that the act of laying on hands also assists in conferring, in a real sense, the gift of the Holy Ghost: "And when Paul had laid his hands on them, the Holy Ghost came on them." (Acts 19:6.) The service concludes with preaching followed by a challenge to physical action, where the congregation is challenged to approach the altar to "come believing, come praying." As mandated by Scripture, the service concludes with fellowship both inside and outside the sanctuary: "And they continued steadfastly in the apostles' doctrine and fellowship, and in the breaking of bread, and in prayers." (Acts 2:42.)

56. South Bay Pentecostal Church also perform baptisms, funerals, weddings, and other religious ceremonies.

57. They believe Scripture exhorts them to "[r]epent, and be baptized every one of you in the name of Jesus Christ for the remission of sins, and ye shall receive the gift of the Holy Ghost." (Acts 2:38.) They believe this sacrament of "new birth" cannot be performed on one's own, or by staying at home. One may repent on their own, but they *cannot baptize themselves*. They believe there is no justifiable reason for postponing the sacrament of baptism, as it is a necessary part of salvation.

58. Since the Orders prohibiting physical religious assembly were put in place, the Church's ability to carry out its ministry has been dramatically curtailed. Bishop Hodges has neither experienced symptoms of nor been diagnosed with COVID-19.

59. These orders forbid the assembly required to come together with one

accord. These orders forbid baptism, gathering around the altar, and any form of "being together" that is *both* physical and spiritual.

60.    "Zoom Meetings" and other tele-conferencing applications are inadequate substitutes as they curtail a minister's ability to lay hands upon a congregant or perform a baptism. They also curtail the congregation's ability to approach the altar, which is central to their experience of faith.

61.    As a result of the Orders, South Bay Pentecostal Church is prohibited from holding the services mandated by Scripture. These include the important milestone services that mark life events and even the end of a life.

62.    South Bay Pentecostal Church desires to hold services in a manner that properly protects its congregants so that they may observe the inviolable precepts of Scripture and encourage and comfort one another during these troubling times of the COVID-19 outbreak. The Church's congregation needs to connect with one another in order to receive the hope and encouragement they need to heal and grow in their faith and in order to observe the Scriptural requirement of gathering together with one accord.

63.    The Orders' outright ban on religious services are overbroad and unnecessary because Sunday services, baptisms, and funerals may be held in a manner consistent with the social distancing guidelines. If restaurants, auto mechanics, and marijuana dispensaries are capable of following these guidelines, the congregation of South Bay Pentecostal Church is certainly capable.

64.    As the below photo demonstrates, South Bay Pentecostal Church possesses a large sanctuary that provides ample room to accommodate the six feet of social distancing required by the County and CDC requirements. Moreover, should the amount of congregants threaten to overwhelm the social distancing guidelines, additional services can be added to accommodate smaller gatherings that would satisfy those guidelines.

65.   In addition, the Church can integrate masks, gloves, screens, veils, and other screening mechanisms in order to protect congregants and inhibit the spread of COVID-19 during all services, including Sunday worship, baptisms, and funerals. Furthermore, the Church will encourage anyone uncomfortable with gathering during the pandemic to stay at home. The Church will also require that anyone who is sick or has symptoms to stay at home.

66.   In other words, the Church can and will abide by the County's Social Distancing and Sanitation Protocol, and any other necessary guidelines, just like any other organization.

67.   These services are essential for the spiritual health of the congregation so that the congregants can exhort one another and the will of God during these difficult times.

68.   The Church has previously demonstrated its ability to adopt and enforce suitable guidelines for social distancing practices through its work as what may be the largest food distributor to needy people in the South Bay region of San Diego County. Since the closure orders were placed, the Church worked with the Chula Vista Police Department to develop a drive-through food distribution system so that hundreds of cars may drive into and around the Church parking lot. Volunteers are provided masks and gloves and deliver groceries, contact-free, directly into each driver's trunk or cargo area. During any given week, the Church distributes between three and twelve tons of food. The Church has also been publicly fêted for its efforts by the Mayor of Chula Vista.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF



69.     If the Church is capable of demonstrating and implementing proper social distance protocols for the purposes of food distribution, it is clearly capable of demonstrating and implementing similar protocols when engaging in its Scripturally mandated worship practices.

### Rabbi Mendel Polichenco

70.     Rabbi Mendel Polichenco is a rabbi of the Jewish faith. It is his mission to educate and inspire passion for Judaism in his congregants. He serves as rabbi and director of Chabad of Carmel Valley, located in San Diego, California. He also serves as director of Chabad Without Borders.

71.     Rabbi Polichenco's life's mission was lovingly formed in the embrace of Argentina's vibrant Jewish community. From a young age, he knew that it was his vocation to follow in the footsteps of his father. Rabbi Polichenco's father was a rabbi and prominent leader in their faith community and was responsible for opening a number of Jewish day schools and high schools in their native Buenos Aires.

72.     In the coming years, Rabbi Polichenco concluded that he must make an absolute commitment to follow in his father's footsteps. Therefore, he not only became a rabbi, but he also became a builder of communities. Soon after he was

ordained, he became the rabbi for the Jewish Community of Tijuana—the first official representative of the Chabad movement in Mexico. As rabbi, he also founded the first and only Jewish Day School in the state of Baja California, which remained open for seven years. Believing that spiritual sustenance must nourish mind, soul *and* body, he also opened a Kosher restaurant, bakery, and catering service, which operates to this day. Over the coming years, he expanded his activities in Baja California and, ultimately, into the United States.

73.     Rabbi Polichenco is a sincere, strong believer in the Torah's mitzvahs. He holds sacred the Torah's command that "[a]ccording to the law [the rabbinical courts] instruct you and according to the judgment they say to you, you shall do; you shall not divert from the word they tell you, either right or left." (Deuteronomy 17:11.)

74.     In observance of these precepts and his sincerely held religious beliefs, Rabbi Polichenco holds weekly Shabbat services at Chabad of Carmel Valley in San Diego, California. Approximately three-hundred adults worship at Shabbat. Moreover, he holds midweek Shacharit services. Approximately twenty adult attendees congregate at these weekday services.

75.     He also performs funerals, Bar Mitzvahs, Bat Mitzvahs, weddings, and other religious ceremonies.

76.     Jewish services and ceremonies require a quorum of ten men to be present in the same physical space in order for the service or ceremony to commence. This quorum requirement applies to Shabbat, Shacharit, funerals, Bar Mitzvahs, Bat Mitzvahs, and weddings.

77.     Rabbi Polichenco also teaches weekly classes on the Torah for teenagers and adults. In addition, he offers social services and counseling.

78.     He serves a congregation that is multi-racial and represents a cross-section of society, from rich to poor and encompassing people of all ages. His congregation also includes members and visitors who run the gamut of essential

workers. These essential workers and service providers receive spiritual support, comfort, guidance, and shelter from his ministry.

79. He is also the director of Chabad Without Borders, which operates fifteen Chabad branches in Mexico and three branches in San Diego County.

80. Since the Orders prohibiting physical religious assembly were put in place, Rabbi Polichenco's ability to carry out his ministry has been dramatically curtailed. He has been forced to curtail his ministry, as well as that of Chabad of Carmel Valley and Chabad Without Borders, despite the fact that he has neither experienced symptoms of nor been diagnosed with COVID-19.

81. These orders forbid the assembly required to hold Shabbat, Shacharit, funerals, Bar Mitzvahs, Bat Mitzvahs, and weddings. This is because allowing a quorum of at least ten men to gather in the same physical space is facially prohibited by the Orders.

82. "Zoom Meetings" and other tele-conferencing applications are insufficient for amassing the required quorum to commence a Shabbat or Shacharit service because the rabbinical mitzvahs require that at least ten men be *physically* present in the same space. If this minimum threshold is not met, a service cannot occur.

83. As a result of the Orders, Rabbi Polichenco is prohibited from holding the services mandated by the Jewish faith. These also include the important milestone services that mark life events and even the end of a life.

84. It is particularly heartbreaking and tragic for a congregant to lose a parent or child and not be able to say the special prayers of comfort and healing that a Jewish funeral provides. Because the Orders prohibit religious assembly, the required quorum of ten men cannot be marshalled. As a result, Rabbi Polichenco is unable to hold any funerals, and members of his congregation are left to nurse their heartbreak in silence.

85. In addition, the orders have forced Rabbi Polichenco to cancel Bar

Mitzvahs. As part of the service, a teenage boy is expected to recite extensive portions of the Torah. This requires a full year's study to memorize these substantial portions for recitation at the Bar Mitzvah service. Such a recitation can only occur on one specific day, depending on the boy's birthday. Because the Orders prohibit religious assembly, the required quorum of ten men cannot be marshalled. As a result, Rabbi Polichenco is unable to hold any Bar Mitzvahs, and the boys' years of hard study are wasted.

86.     Rabbi Polichenco desires to hold services in a manner that properly protects his congregants so that they may observe the inviolable precepts of the mitzvahs, and encourage and comfort one another during these troubling times of the COVID-19 outbreak. His congregation needs to connect with one another in order to receive the hope and encouragement they need to heal and grow in their Jewish faith.

87.     The Orders are overbroad and unnecessary because Shabbat, Shacharit, funerals, Bar Mitzvahs, Bat Mitzvahs, and weddings may be held in a manner consistent with the social distancing guidelines. If restaurants, auto mechanics, and marijuana dispensaries are capable of following these guidelines, his congregation is certainly capable.

88.     Chabad of Carmel Valley possesses a very large sanctuary that can accommodate social distances beyond the six feet required by the County and CDC requirements. Chabad of Carmel Valley can accommodate distances of up to ten feet per person.

89.     Chabad of Carmel Valley also provides space for open air services in a very large garden. This garden can also accommodate social distance requirements.

90.     In addition, regardless of whether services are held indoors or outdoors, the Chabad can integrate masks, gloves, screens, veils, and other screening mechanisms in order to protect congregants and inhibit the spread of COVID-19. Rabbi Polichenco will also encourage anyone uncomfortable with gathering during the pandemic to stay at home. He will also require that anyone who is sick to stay at

home.

91.    In other words, Rabbi Polichenco can, and will abide by the County's Social Distancing and Sanitation Protocol, and any other necessary guidelines, just like any other organization.

92.    These services are essential for the spiritual health of the congregation so that the congregants can exhort one another and the will of God during these difficult times.

## The Current State of the Pandemic

93.    Due to the unified efforts of the American people, efforts to curb the coronavirus have proven successful.

94.    The flattening of the curve has been well documented by a medical expert, Dr. George Deglado, M.D., who has been providing medical support and direction to a COVID-19 planning group using Monte Carlo simulations to create accurate planning models—models which have been consistently more accurate than the State's models. According to Dr. Delgado:

> It is clear that due to mitigation measures carried out throughout California, the trajectory of the COVID-19 pandemic has been altered; the "curve has been flattened." . . .

> Hospitalizations and deaths are both lagging indicators. In fact, deaths reflect infections that started approximately three weeks prior. Except in certain geographic pockets where flare-ups may occur, level or decreasing hospitalizations and death rates are reassuring that we have reached a plateau or even a decrease in the number of new infections.

> In California, the statistics support the flattening of the curve. Hospitalizations have remained at a relatively steady level and ICU admissions have trended downward. Deaths have been at a plateau since early April 6 with the daily death count from April 6 to May 2 ranging from 31 to 115 per day. Only one of those days had 100 or more deaths. Eight of those days had

counts less than 50. Again, deaths are the last lagging indicator.

Los Angeles County has reported about 1,200 deaths (out of California's approximate total of 2,200). The curve of new deaths has flattened, similar to the California curve. The Monte Carlo model predicts that total deaths in Los Angeles County will be approximately 1,900, for this year.

The measure R0 ("R naught") gives an indication of how many additional persons an infected person can infect. When R0 drops below one, an outbreak loses steam and begins to subside. Our model shows that in Los Angeles County R0 decreased to less than one in early April.

95.   The flattening is also well documented by Kevin Systrom and Mike Krieger, the founders of Instagram, who have created a website called Rt.live to track the transmission rate nationwide. Like Dr. Delgado, their website shows that the curve has effectively flattened.[10]

96.   This flattening is also illustrated by a review of the death rates in California. According to publicly available documents, as of July 1, 2019, the population of California is estimated to be 39,512,223 persons.[11] As of May 2, 2020, there are a total of only 2,215 deaths in California.[12] Thus, the probability of dying of COVID-19 in California is 5.6 out of 100,000. A comparison of California with other states by the Statista.com shows that California is doing amazingly well.[13]

97.   The flattening is also well corroborated by reports that California hospitals are laying off their staff because they have very few COVID-19 patients and they are precluded from performing elective procedures (*i.e.*, cancer surgery, heart

---

[10] https://www.vox.com/recode/2020/4/21/21227855/coronavirus-spreading-by-state-instagram-effective-reproduction-rate

[11] https://www.census.gov/quickfacts/fact/table/CA/PST045219

[12] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx#COVID-19%20by%20the%20Numbers.

[13] https://www.statista.com/statistics/1109011/coronavirus-covid19-death-rates-us-by-state/

surgery).[14]

98.    Finally, the flattening of the curve was impressively illustrated in a graphic published[15] by Elon Musk:

## CALIFORNIA'S FOUR STAGE REOPENING PLAN

99.    As a result of their unified efforts, Americans began anticipating the day when they could reap the benefits of their hard work—their sacrifice. They began anticipating a lessening of the extreme measures imposed on them by their Governors, and began pushing for that lessening to come soon.

---

[14] https://www.kusi.com/palomar-health-to-lay-off-317-employees-citing-lack-of-revenue/; https://calmatters.org/health/coronavirus/2020/05/health-care-workers-layoffs-california-coronavirus-nurses-furloughs-pay-cuts-hospitals/.
[15] https://twitter.com/elonmusk/status/1255678979043778560

100.   In response to that pressure, on Tuesday, April 27, 2020, Governor Newsom held a press conference in which he outlined how we "have not only bent the curve in the state of California, but stabilized it."[16] As a result, "[t]he reality is, we are just a few weeks away, not months away, from making measurable and meaningful changes to our stay-at-home order."[17] This was supported by Governor Newsom's later recitation of the statistics:

> The number of hospitalizations, 1.4% increase. Um, again, we're seeing some stabilization, decrease, modest increase, decrease, modest increase, uh, in the total number of people hospitalized. The number of people in ICU's basically flat from yesterday, just one individual, uh, more than in the last 24 hours in the ICU—so again, stabilization.[18]

Towards the end of the press conference, Governor Newsom announced that during a press conference on the next day, he would outline the forthcoming "measurable and meaningful changes to our stay-at-home order."

101.   On Wednesday, Aril 28, 2020, Governor Newsom announced that those "meaningful modifications" would come in the form of a four stage plan—with the present situation representing Stage 1.[19] During the press conference, Governor Newsom stressed that "the foundational point of emphasis we want to advance today is phase 2 . . . is in weeks not months, phase 3 and 4, months not weeks."[20]

102.   During the press conference, Dr. Sonia Angell—the Director of the California Department of Public Health—explained Stage 2 as follows, and showed the following graphic:

> In stage 2, we're going to really start focusing on lower risk workplaces, that means gradually opening some of those workplaces with adaptions. These include things like:

---

[16] https://www.facebook.com/CAgovernor/videos/239711700434134/ at 6:03.
[17] *Id*. at 6:40.
[18] *Id*. at 25:04.
[19] https://www.facebook.com/CAgovernor/videos/524013811808326/
[20] *Id*. at 48:43.

Complaint for Declaratory & Injunctive Relief

Retail, allowing for curbside pickup; Manufacturing, which can include things like toys, clothing, other things, furniture, that was not a part of the essential sector; Talking about offices, this can include things like PR firms, and consulting, and other places where telework is not possible, but by modifying the environment itself, it can make it lower risk for individuals; and then ultimately talking about opening more public spaces, things like parks and trails, that may have historically been limited because of our concerns, trying to think about how we can modify that to make them safer for individuals to enjoy the outdoor spaces because we know physical activity is so important to our health, and this is also about health, clearly.[21]

103. Dr. Angell then described Stage 3 and 4 as follows: "The third stage is when we get into those areas that may be higher risk, those sectors that we think will take a lot more modification to adapt in a way that can make them places where people can move with lower risk."[22] "Those are things like getting your hair cut, uh getting your nails done, doing anything that has very close inherent relationships with other people, where the proximity is very close."[23] "And then ultimately, the space that we

[21] *Id*. at 37:29.
[22] *Id*. at 35:22.
[23] *Id*. at 35:52.

all look forward to, someday as we move forward and work diligently together, is Stage 4, which would be the end of the stay-at-home order. And that's when we'd be opening all of our highest risk workplaces without modification necessary at that time, because at that time we will know that we have identified a way that we can keep people safe from COVID-19.[24]

104.    Then, on May 4, 2020, Governor Newsom issued a press release in which he stated that Stage 2 will begin, in part, on Friday, May 8, 2020. According to that press release, only some businesses will be allowed to reopen, like "bookstores, clothing stores, florists and sporting goods stores," but not yet "offices, seated dining at restaurants, shopping malls or schools."[25]

105.    On May 7, 2020, Governor Newsom held a press conference to announce the beginning of Stage 2, and the publication of his Resilience Roadmap (Ex. 1-3.) During that press conference, Governor Newsom was asked by a journalist why schools were being prioritized over places of worship. The following exchange followed:

---

[24] *Id*. at 46:49.
[25] https://www.gov.ca.gov/2020/05/04/governor-newsom-provides-update-on-californias-progress-toward-stage-2-reopening/

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

Q: Thank you Governor. Can you clarify why churches and salons are in Stage 3 and not Stage 2. Um, what makes them more high risk than schools, for example? Uh, what factors are you weighing here when you decide what goes into what phase?

A: Yeah, we're, we're looking at the science, epidemiology, looking again at frequency, duration, time, uh, and looking at low risk-high reward, low risk-low reward, looking at a series of conditions and criteria, as well as best practices uh from other states and nations.[26]

In other words, places of worship are being sidelined because they provide a "low reward" in the eyes of California.

106. On May 7, 2020, Governor Newsom also published his Resilience Roadmap online. (Ex. 1-3.) That Roadmap identifies the industries that may open immediately (retail for curbside pickup, manufacturing and logistics), those that will open in a few weeks (shopping malls, car washes, schools, restaurants), and those that cannot open for several months, until Stage 3 is announced (salons, tattoo parlors, gyms, bars, movie theaters, and places of worship). (Ex. 1-3, at 9). For each industry that will be allowed to open in Stage 2, the Roadmap also linked to industry-specific Pandemic Guidance that the industry must comply with. The industry must both comply with the guidance, and certify to the state that it is in compliance. The Guidance for two industries opening immediately—manufacturing and logistics—is included in Exhibits 1-3. At the same time, Governor Newsom published a press release announcing the Resilience Roadmap, and explaining the same. (Ex. 1-4.)

## CONCLUSION

107. In full understanding of the public and private danger posed by the coronavirus, churches and people of faith have conducted themselves, and intend to continue conducting themselves, in a manner that adheres to CDC and California guidelines on social distancing and safe gatherings. There is no generic protocol

---

[26] https://www.facebook.com/CAgovernor/videos/260976601615609/, at 50:36.

published by the State of California, but the County of San Diego's Order includes a requirement that essential businesses complete and comply with its Social Distancing and Sanitation Protocol. (Ex. 2-2.) Plaintiffs are fully willing to comply with this Protocol—and any reasonable Guidance mandated by the state—but they cannot abide by an indefinite shut down of their churches.

108.   To be blunt, California's present regime, which mandates that Californians who need the Spirit of Almighty God settle for the lesser spirits dispensed out of California's liquor stores, is demeaning and denigrating to all persons of faith. Plaintiffs contend that, at least for their congregants, their assemblies *are* an "essential service" and should therefore, because of fundamental First Amendment Protections, be treated equal to Stage 2 "essential" businesses.

109.   California's targeting of religious adherents and total ban from religious assembly, even in a manner consistent with governmental social distancing guidelines, while permitting similar (and at times even more intimate) social interaction to continue unabated in retail and commercial establishments, flouts the protections of the U.S. and California Constitutions.

110.   Thus, Plaintiffs bring this case to highlight the troubling erosion of fundamental and cherished liberties wrought by the imposition of the Orders and the Four Stage Reopening Plan, and their unconstitutional enforcement by the California Attorney General and San Diego police.

111.   Plaintiffs do not seek to discredit or discard the government's unquestionable interest in doing that task for which it was instituted—protecting the citizenry. But, as is often true in times of crisis and fear, Plaintiffs respectfully submit that to uphold its sworn duties, California has—perhaps unwittingly, perhaps not— stepped over a line the U.S. and California Constitutions do not permit. Plaintiffs thus bring this action to ensure that this Court safeguard the cherished liberties for which millions have fought, bled, and died. For, "[i]f the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may

1   as well be discarded." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 483 (1934)

2   (Sutherland, J., dissenting).

## FIRST CLAIM FOR RELIEF

### Free Exercise Clause of First Amendment to U.S. Constitution

*(By all Plaintiffs against All Defendants)*

6   112.   Plaintiffs incorporate by reference all allegations contained in the

7   preceding paragraphs as though fully set forth herein.

8   113.   The Orders and Defendants' enforcement thereof violate the First

9   Amendment, both facially and as-applied to Plaintiffs. The First Amendment of the

10  Constitution protects the "free exercise" of religion. Fundamental to this protection

11  is the right to gather and worship. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S.

12  624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain

13  subjects from the vicissitudes of political controversy, to place them beyond the reach

14  of majorities and officials and to establish them as legal principles to be applied by the

15  courts . . . [such as the] freedom of worship and assembly."). The Free Exercise

16  Clause applies to the states through the Due Process Clause of the Fourteenth

17  Amendment. *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

18  114.   As the Supreme Court has noted, "a law burdening religious practice

19  that is not neutral or not of general application must undergo the most rigorous of

20  scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993).

21  "A law is not generally applicable if its prohibitions substantially underinclude non-

22  religiously motivated conduct that might endanger the same governmental interest

23  that the law is designed to protect." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1079

24  (9th Cir. 2015) (citing *Lukumi*, 508 U.S. at 542–46). "In other words, if a law pursues

25  the government's interest 'only against conduct motivated by religious belief,' but

26  fails to include in its prohibitions substantial, comparable secular conduct that would

27  similarly threaten the government's interest, then the law is not generally

28  applicable." *Id.*

115.   The Orders and Reopening Plan are neither neutral nor of general application. Defendants' restrictions have specifically and explicitly targeted religious and "faith-based" services and are thus not neutral on their face. Defendants have prohibited certain public and private gatherings deemed "non-essential," including out-of-home religious services, while exempting a laundry list of industries and services purportedly "essential" to the government's various interests, including medical cannabis dispensaries and other medical providers, courts, public utilities, daycare and childcare, and "necessary" shopping.

116.   In addition to relegating all faith activities to a third-class status (at best), Defendants have threatened criminal penalties for holding in person services, and have thus substantially burdened Plaintiffs' religious exercise. Defendants have forced Plaintiffs to choose between their sincerely held religious beliefs and their desire to follow secular rules, in many cases imposed by unelected officials.

117.   Laws and government actions that burden religious practice and are either not neutral or not generally applicable must satisfy a compelling governmental interest and be narrowly tailored to achieve that end.

118.   Defendants' mandates are not "narrowly tailored" to further any compelling governmental interest. Defendants have granted numerous special exemptions to their bans on public gatherings and conduct, including for purportedly "essential" businesses and activities, provided that social distancing practices are observed. Since these gatherings may be permitted, there can be no doubt that Defendants must permit Plaintiffs to engage in religious activities and services provided that Plaintiffs also adhere to the social distancing guidelines currently in place.

119.   Requiring Plaintiffs to abstain from religious gatherings, despite substantial modifications to satisfy the public health interests at stake, violates Plaintiffs' Constitutional right to free exercise of religion. The state does not have the power under our Constitutional scheme to decree that as to faith activities,

"streaming" (for those congregations and parishioners with the wealth and technological acumen to partake of such truncated substitutes) is "good enough" when at the same time the state protects the entertainment industry and media organizations' First Amendment rights while denying the Plaintiffs their First Amendment rights.

120.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

121.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

122.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF

### Free Exercise of Religion of Article I, Section 4, of the Cal. Constitution

*(By all Plaintiffs against All Defendants)*

123.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

124.   In California "[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed." Cal. Const. Art. 1, §4.

125.   "In general, the religion clauses of the California Constitution are read more broadly than their counterparts in the federal Constitution." *Carpenter v. City and County of San Francisco*, 93 F.3d 627, 629 (9th Cir. 1996). Courts "therefore review [a] challenge. . . under the free exercise clause of the California Constitution in the same way [they] might have reviewed a similar challenge under the federal Constitution after *Sherbert*, and before *Smith*. In other words, we apply strict scrutiny." *Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527, 562

1   (2004) (citations omitted).

2   126.   For the reasons stated in Plaintiffs' First Claim for Relief, requiring

3   Plaintiffs to abstain from its religious gatherings, despite substantial modifications to

4   satisfy the public health interests at stake, violates Plaintiffs' free exercise rights

5   under the California Constitution as well.

6   127.   Plaintiffs have no adequate remedy at law and will suffer serious and

7   irreparable harm to their constitutional rights unless Defendants are enjoined from

8   implementing and enforcing the Orders, or are enjoined from at least finding religious

9   services to be stage-two "essential."

10   128.   Plaintiffs have found it necessary to engage the services of private

11   counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an

12   award of attorney fees and costs pursuant to California Code of Civil Procedure

13   Section 1021.5.

## THIRD CLAIM FOR RELIEF

### Establishment Clause of First Amendment to U.S. Constitution

*(By all Plaintiffs against All Defendants)*

17   129.   Plaintiffs incorporate by reference all allegations contained in the

18   preceding paragraphs as though fully Set forth herein.

19   130.   The Orders and Defendants' enforcement thereof violate the First

20   Amendment, both facially and as-applied to Plaintiffs. The Establishment Clause of

21   the "First Amendment mandates governmental neutrality between religion and

22   religion, and between religion and nonreligion." *McCreary Cty., Ky. v. Am. Civil*

23   *Liberties Union of Ky.*, 545 U.S. 844, 860 (2005) (*citing Epperson v. Arkansas*, 393 U.S.

24   97, 104 (1968)). The Establishment Clause applies to the states through the Due

25   Process Clause of the Fourteenth Amendment. *Everson v. Board of Ed. of Ewing*, 330

26   U.S. 1 (1947).

27   131.   The Orders, as stated, advance no secular purpose. Defendants have

28   made numerous exceptions to their Orders, permitting the same conduct

(counseling) if performed by secular practitioners but not religious ministers. Defendants have also distinguished between religions, permitting services that can be performed via livestream to proceed, but banning all Jewish services that require in-person participation. It is not for Defendants to determine which faiths may have their services proceed.

132.   The Orders and Defendants' *ad hoc* enforcement of them have the primary effect of inhibiting religious activity.

133.   Defendants have failed to avoid excessive government entanglement with religion. Defendants permit only some forms of religious observance, such as livestreamed, at-home religious activities.

134.   There is no historical precedent in the United States for inhibiting religious practices on terms more restrictive than those imposed on identical secular activities, as Defendants do now.

135.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

136.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

137.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### FOURTH CLAIM FOR RELIEF

#### Free Speech Clause of First Amendment to U.S. Constitution

*(By all Plaintiffs against All Defendants)*

138.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully Set forth herein.

139.   The Orders and Defendants' enforcement thereof violate the First

Amendment, both facially and as-applied to Plaintiffs.

140. Under Defendants' Orders, public gatherings and church services are prohibited.

141. Plaintiffs engage in protected speech through worship, religious discussions, singing hymns, and praying with their congregation.

142. Defendants' imposition of the Orders is unreasonable and has a chilling effect on protected speech by outright banning in-person church services at the pain of criminal penalty. Additionally, the City Orders state that "[e]ach individual officer should use their discretion in enforcing this order and always keep the intent of the order in mind." But the City Orders fail to provide any guidance as to what violations would be prioritized, leaving it up to the officers' unfettered discretion to decide which violations to enforce. Such a lack of standards along with a grant of such discretion renders the Orders unconstitutional both facially and as they are applied.

143. The Orders are unconstitutionally overbroad, and therefore void as a matter of law, both on their faces, and as it is applied.

144. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

145. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

146. Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## FIFTH CLAIM FOR RELIEF

### Freedom of Speech of Article I, Section 2, of the Cal. Constitution

*(By all Plaintiffs against All Defendants)*

147. Plaintiffs incorporate by reference all allegations contained in the

33

preceding paragraphs as though fully set forth herein.

148.   In California, "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Cal. Const. Art. 1, §2.

149.   "The California Supreme Court has recognized that the California Constitution is 'more protective, definitive and inclusive of rights to expression and speech' than the First Amendment to the United States Constitution." *Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142, 1167 (9th Cir. 2007).

150.   For the reasons stated in Plaintiffs' Fourth Claim for Relief, requiring Plaintiffs to abstain from their religious gatherings, despite substantial modifications to satisfy the public health interests at stake, violates Plaintiffs' liberty of speech rights under the California Constitution as well.

151.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

152.   Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

## SIXTH CLAIM FOR RELIEF

### Violation of First Amendment Freedom of Assembly Clause

*(By all Plaintiffs against All Defendants)*

153.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

154.   The Orders and Defendants' enforcement thereof violate the First Amendment, both facially and as-applied to Plaintiffs. The First Amendment of the Constitution protects the "right of the people peaceably to assemble." The Freedom of Assembly Clause was incorporated against the states in *De Jonge v. Oregon*, 299

U.S. 353 (1937).

155.   "The right of free speech, the right to teach, and the right of assembly are, of course, fundamental rights." *Whitney v. California*, 274 U.S. 357, 373 (1927). When a government practice restricts fundamental rights, it is subject to "strict scrutiny" and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available. *See, e.g.*, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973); *Dunn v. Blumstein*, 405 U.S. 330 (1972).

156.   By denying Plaintiffs the ability to conduct services, Defendants are in violation of the Freedom of Assembly Clause. Defendants cannot meet the no-less-restrictive-alternative test. The CDC's and the County's social distancing guidelines are appropriate to limit the spread of COVID-19. Imposing more restrictive requirements that target churches while at the same time allowing manufacturing, logistics, offices, retail, and restaurants to open is not the least restrictive means of achieving Defendants' public safety goals.

157.   Requiring Plaintiffs to abstain from religious gatherings, despite substantial modifications to satisfy the public health interests at stake, violates Plaintiffs' Constitutional right to peaceably assemble.

158.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

159.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

160.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

///

## SEVENTH CLAIM FOR RELIEF

**Freedom of Assembly of Article I, Section 3, of the California Constitution**

*(By all Plaintiffs against All Defendants)*

161.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

162.   In California "[t]he people have the right to . . . assemble freely to consult for the common good." Cal. Const. Art. 1, §3.

163.   For the reasons stated in Plaintiffs' Sixth Claim for Relief, requiring Plaintiffs to abstain from their religious gatherings, despite substantial modifications to satisfy the public health interests at stake, violates Plaintiffs' right to assemble freely under the California Constitution as well.

164.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

165.   Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

## EIGHTH CLAIM FOR RELIEF

**Right to Liberty of Article I, Section 1, of the California Constitution**

*(By all Plaintiffs against All Defendants)*

166.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

167.   In California, "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. Art. 1, §1.

168.   California courts have found that Public Health Officials could not

quarantine 12 blocks of San Francisco Chinatown because of nine deaths due to bubonic plague. *See Jew Ho v. Williamson*, 103 F. 10 (C.C. Cal. 1900); *Wong Wai v. Williamson,* 103 F. 1 (C.C. Cal. 1900).

169.   In *Jew Ho* and *Wong Wai*, the California courts found that there were more than 15,000 people living in the twelve blocks of San Francisco Chinatown who were to be quarantined. The courts found it unreasonable to shut down the ability of over 15,000 people to make a living because of nine deaths. This was one death for every 1,666 inhabitants of Chinatown.

170.   In *Jew Ho*, the court stated that it was "purely arbitrary, unreasonable, unwarranted, wrongful, and oppressive interference with the personal liberty of complainant" who had "never had or contracted said bubonic plague; that he has never been at any time exposed to the danger of contracting it, and has never been in any locality where said bubonic plague, or any germs of bacteria thereof, has or have existed." *Jew Ho*, 103 F. 10.

171.   California courts have instead focused on the necessity of there being "reasonable grounds [] to support the belief that the person so held [quarantined] is infected." *Ex parte Martin*, 83 Cal. App. 2d 164 (1948). Public Health Officials must be able to show "probable cause to believe the person so held has an infectious disease. . . ." *Id.* "[A] mere suspicion [of a contagious disease], unsupported by facts giving rise to reasonable or probable cause, will afford no justification at all *for depriving persons of their liberty* and subjecting them to virtual imprisonment under a purported order of quarantine." *Ex parte Arta*, 52 Cal. App. 380, 383 (1921) (emphasis added).

172.   As stated above, as of May 2, 2020, COVID-19 is responsible for 2,215 deaths in California. As of July 1, 2019, the population of California is estimated to be 39,512,223 persons. Thus, the probability of dying of COVID-19 in California is 5.6 out of 100,000.

173.   Plaintiffs have never had or contracted said coronavirus, and have not

had any contact with individuals who have tested positive.

174.   Requiring Plaintiffs to abstain from all religious gatherings, despite substantial modifications to satisfy the public health interests at stake, violates their California Constitutional liberty rights.

175.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

176.   Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

### NINTH CLAIM FOR RELIEF

**Violation of Substantive Rights in the Due Process Clause of**

**Fourteenth Amendment to U.S. Constitution**

*(By all Plaintiffs against All Defendants)*

177.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

178.   The Orders and Defendants' enforcement thereof violate Plaintiffs' substantive due process rights secured by the Fourteenth Amendment to the U.S. Constitution. Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law." The fundamental liberties protected by this Clause include most of the rights enumerated in the Bill of Rights. *See Duncan v. Louisiana*, 391 U.S. 145, 147–149 (1968). In addition, these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs. *See, e.g.*, *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972); *Griswold v. Connecticut*, 381 U.S. 479, 484–486 (1965).

179.   Plaintiffs' rights to freedom of religion, assembly, speech, and travel are

1  fundamental rights protected by the U.S. Constitution. *See, e.g.*, *Aptheker v. Secretary*
2  *of State*, 378 U.S. 500, 520 (1964); *Kent v. Dulles*, 357 U.S. 116, 127 (1958).

3      180.   When a government practice restricts fundamental rights such as the
4  right to practice religion freely, assemble peacefully, speak, and travel, it is subject to
5  "strict scrutiny" and can be justified only if it furthers a compelling government
6  purpose, and, even then, only if no less restrictive alternative is available. *See, e.g.*
7  *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 257–58 (1974); *Dunn v.*
8  *Blumstein*, 405 U.S. 330, 339-341 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 89
9  (1969), *Maher v. Roe*, 432 U.S. 464, 488 (1977).

10      181.   Strict scrutiny applies to Plaintiffs' claims because the Orders mandate
11  that Plaintiffs stay at home, impinging on their fundamental rights to freedom of
12  religion, assembly, speech, and travel. These Orders do not permit Plaintiffs to
13  exercise these rights, even while conforming to the CDC and County guidelines for
14  social distancing, unless Defendants deem them "essential" or as participating in
15  "essential" activities.

16      182.   Defendants' mandates are not "narrowly tailored" to further any
17  compelling governmental interest. Defendants have granted numerous special
18  exemptions to their bans on public gatherings, including for purportedly "essential"
19  businesses and activities, provided that social distancing practices are observed; and
20  even for out-of-home religious services during Easter, an important day of religious
21  significance for Christians. Since these gatherings can be permitted, there can be no
22  doubt that Defendants may, and therefore must, permit Plaintiffs to engage in
23  equivalent constitutionally-protected activities provided that Plaintiffs also adhere to
24  the social distancing guidelines.

25      183.   Plaintiffs have no adequate remedy at law and will suffer serious and
26  irreparable harm to their constitutional rights unless Defendants are enjoined from
27  implementing and enforcing the Orders.

28      184.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to

declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

185.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### TENTH CLAIM FOR RELIEF

**Equal Protection Clause of Fourteenth Amendment to U.S. Constitution**

*(By all Plaintiffs against All Defendants)*

186.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

187.   The Orders and Defendants' enforcement thereof violate the Fourteenth Amendment, both facially and as-applied to Plaintiffs. The Fourteenth Amendment of the Constitution provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." Equal protection requires the state to govern impartially—not draw arbitrary distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objection.

188.   Defendants intentionally and arbitrarily categorize individuals and conduct as either "essential" or "non-essential." Those persons classified as "essential," or as participating in essential services, are permitted to go about their business and activities provided certain social distancing practices are employed. Those classified as "nonessential," or as engaging in non-essential activities, are required to stay in their residence, unless it becomes necessary for them to leave for one of the enumerated "essential" activities.

189.   Strict scrutiny under the Equal Protection Clause applies where, as here, the classification impinges on a fundamental right, including the right to practice religion freely, the right to free speech and assembly, and the right to travel, among others.

190.   Defendants cannot satisfy strict scrutiny, because their arbitrary classifications are not narrowly tailored measures that further compelling government interests, for the reasons stated above.

191.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

192.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

193.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## ELEVENTH CLAIM FOR RELIEF

### Vagueness in Violation of the Due Process Clause of
### Fourteenth Amendment to U.S. Constitution

*(By all Plaintiffs against All Defendants)*

194.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

195.   The Orders and Defendants' enforcement thereof violate the Due Process Clause of the Fourteenth Amendment, both facially and as-applied to Plaintiffs.

196.   A regulation is constitutionally void on its face when, as matter of due process, it is so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application" *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926); *People ex rel. Gallo v. Acuna*, 14 Cal.4th 1090, 1115 (1997). The void for vagueness doctrine is designed to prevent arbitrary and discriminatory enforcement. The problem with a vague regulation is that it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and

subjective basis. . . ." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

197. Defendants' Orders are void for vagueness for the following reasons:

    a. The State Order provides that individuals are ordered to "heed" State public health directives. The word "heed" is defined by Webster's Dictionary to mean "to give consideration or attention to"—not specifically to adhere to those directives. Yet, the State Order is widely reported in the media and cited by local and state officials, including the County and City Orders, as compelling compliance with State public health directives to shelter in place unless conducting essential business. The State Order also includes the text of the public health directive, which includes language that ostensibly "order[s]" compliance, creating further ambiguity as to whether Plaintiffs must comply with, or merely heed, the public health directive. Accordingly, the State Order is vague as to what precisely is being ordered, and what actions may result in criminal penalties, fines, or imprisonment.

    b. The City Orders both prohibit all gatherings, including at churches, while also stating the following: "I hereby issue a strong recommendation, consistent with Centers of Disease Control guidance from March 16, 2020 to avoid non-essential gatherings to the extent possible, to the leaders of the City's houses of worship and urge them, in the strongest possible terms, to limit gatherings on their premises and to explore and implement ways to practice their respective faiths while observing social distancing practices." It is ambiguous whether ignoring this "recommendation" will result in prosecution.

    c. All of the Orders, when issued, were surrounded by statements in press conferences or press releases stating that they can be enforced,

but will not always be enforced. And that citizens should police themselves, and that officers should exercise good faith judgment. Thus, without guidance, no reasonable person would know whether his conduct is going to subject him to prosecution. In a March 19, 2020, press conference, Governor Newsom stressed that there will be *no* police enforcement of the State Orders.[27] In March 18, 2020, press conference, the County's Dr. Wilma Wooten stressed that she was only expecting 80%-90% compliance—which would be sufficient.[28] And in a March 20, 2020 press conference, the City's Police Chief Nisleit stated that "the approach that we are taking" is simply "asking for compliance."[29]

198.   As a result of these ambiguities, no reasonable person could understand what conduct violates the Orders and might subject that person to criminal penalties.

199.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

200.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

201.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

///

///

///

---

[27] https://www.facebook.com/CAgovernor/videos/494465634769746/, at 4:00 and 34:00.
[28] https://youtu.be/sogjrotTCSw, at 1:10:15.
[29] https://youtu.be/zIXUA3lrJYk, at 9:33, 14:45.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for judgment against Defendants and request the following relief:

A. An order and judgment declaring that the Orders, facially and as-applied to Plaintiffs, violate the First and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 1, 2, and 4 of the California Constitution;

B. An order temporarily, preliminarily, and permanently enjoining and prohibiting Defendants from enforcing the Orders except as to requiring Plaintiffs to comply with the County of San Diego's Social Distancing and Sanitation Protocol, and any other reasonable protocol;

C. For attorneys' fees and costs; and

D. Such other and further relief as the Court deems appropriate and just.

Respectfully submitted,

LiMANDRI & JONNA LLP

Dated: May 8, 2020            By: _____
                                  Charles S. LiMandri
                                  Paul M. Jonna
                                  Jeffrey M. Trissell
                                  Attorneys for Plaintiffs

THOMAS MORE SOCIETY

Dated: May 8, 2020            By: _____
                                  Thomas Brejcha
                                  Peter Breen
                                  Attorneys for Plaintiffs

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

DHILLON LAW GROUP INC.

Dated: May 8, 2020                    By: _____

Harmeet K. Dhillon
Mark P. Meuser
Gregory R. Michael
Attorneys for Plaintiffs

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

**EXHIBIT 1-1**

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** in a short period of time, COVID-19 has rapidly spread throughout California, necessitating updated and more stringent guidance from federal, state, and local public health officials; and

**WHEREAS** for the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Public Health.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8627, and 8665 do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1) To preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all, and prioritizing those at the highest risk and vulnerability, all residents are directed to immediately heed the current State public health directives, which I ordered the Department of Public Health to develop for the current statewide status of COVID-19. Those directives are consistent with the March 19, 2020, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, found at: https://covid19.ca.gov/. Those directives follow:

ORDER OF THE STATE PUBLIC HEALTH OFFICER<br>March 19, 2020

To protect public health, I as State Public Health Officer and Director of the California Department of Public Health order all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. In addition, and in consultation with the Director of the Governor's Office of Emergency Services, I may designate additional sectors as critical in order to protect the health and well-being of all Californians.

Pursuant to the authority under the Health and Safety Code 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this order is to go into effect immediately and shall stay in effect until further notice.

The federal government has identified 16 critical infrastructure sectors

that Californians working in these 18 critical infrastructure sectors may continue their work because of the importance of these sectors to Californians' health and well-being.

This Order is being issued to protect the public health of Californians. The California Department of Public Health looks to establish consistency across the state in order to ensure that we mitigate the impact of COVID-19. Our goal is simple, we want to bend the curve, and disrupt the spread of the virus.

The supply chain must continue, and Californians must have access to such necessities as food, prescriptions, and health care. When people need to leave their homes or places of residence, whether to obtain or perform the functions above, or to otherwise facilitate authorized necessary activities, they should at all times practice social distancing.

2) The healthcare delivery system shall prioritize services to serving those who are the sickest and shall prioritize resources, including personal protective equipment, for the providers providing direct care to them.

3) The Office of Emergency Services is directed to take necessary steps to ensure compliance with this Order.

4) This Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 19th day of March 2020.

_____
GAVIN NEWSOM
Governor of California

**ATTEST:**

**EXHIBIT 1-2**

April 28, 2020

# ESSENTIAL WORKFORCE

On March 19, 2020, Governor Newsom issued Executive Order N-33-20 directing all residents immediately to heed current State public health directives to stay home, except as needed to maintain continuity of operations of essential critical infrastructure sectors and additional sectors as the State Public Health Officer may designate as critical to protect health and well-being of all Californians.

In accordance with this order, the State Public Health Officer has designated the following list of "Essential Critical Infrastructure Workers" to help state, local, tribal, and industry partners as they work to protect communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security.

**Sector Index:**

1. Health and Public Health Sector
2. Emergency Services Sector
3. Food and Agriculture Sector
4. Energy Sector
5. Water and Wastewater Sector
6. Transportation and Logistics Sector
7. Communications and Information Technology Sector
8. Government Operations and Other Community-Based Essential Functions
9. Critical Manufacturing Sector
10. Financial Services Sector
11. Chemical Sector
12. Defense Industrial Base Sector
13. Industrial, Commercial, Residential and Sheltering Facilities and Services

**Relevant Guidance For All Sectors:**

- Face Coverings Guidance
  - Orientación Sobre el Uso de Mascarillas de Tela
- Self-Isolation for Older Adults and Those Who Have Elevated Risk
  - Aislamiento para Adultos Mayores y Personas que Tienen un Riesgo Elevado
- Employers, health care workers and workers in general industry

April 28, 2020

# 1. HEALTHCARE / PUBLIC HEALTH

**Sector Profile**

The Healthcare and Public Health (HPH) Sector is large, diverse, and open, spanning both the public and private sectors. It includes publicly accessible healthcare facilities, research centers, suppliers, manufacturers, and other physical assets and vast, complex public-private information technology systems required for care delivery and to support the rapid, secure transmission and storage of large amounts of HPH data.

**Essential Workforce, if remote working is not practical:**

1. Health care providers and caregivers (including physicians, dentists, psychologists, mid-level practitioners, nurses, assistants, and aids; infection control and quality assurance personnel; pharmacists; physical, respiratory, speech and occupational therapists and assistants; social workers and providers serving individuals with disabilities including developmental disabilities; optometrists; speech pathologists; chiropractors; diagnostic and therapeutic technicians; and radiology technologists).
2. Workers required for effective clinical, command, infrastructure, support service, administrative, security and intelligence operations across the direct patient care and full healthcare and public health spectrum, including accounting, administrative, admitting and discharge, engineering, accrediting, certification, licensing, credentialing, epidemiological, source plasma and blood donation, food service, environmental services, housekeeping, medical records, information technology and operational technology, nutritionists, sanitarians; emergency medical services workers; prehospital workers including but not limited to urgent care workers; inpatient and hospital workers; outpatient care workers; home care workers; workers at long-term care facilities, residential and community-based providers; workplace safety workers).
3. Workers needed to support transportation to and from healthcare facilities and provider appointments.
4. Workers needed to provide laundry services, food services, reprocessing of medical equipment, and waste management.
5. Vendors and suppliers (including imaging, pharmacy, oxygen services, durable medical equipment)
6. Workers who perform critical clinical research, development, and testing needed for COVID-19 response.
7. Workers in other medical and life science facilities (including Ambulatory Health and Surgical, Blood Banks, Clinics, Community Mental Health, Comprehensive Outpatient rehabilitation, End Stage Renal Disease, Health Departments, Home Health care, Hospices, Hospitals, Long Term Care, Organ Pharmacies, Procurement Organizations, Psychiatric, Residential, Rural Health Clinics and Federally Qualified Health Centers, and retail facilities specializing in medical goods and supplies, including cannabis).
8. Workers for health manufacturing (including life science companies, and companies that have shifted production to medical supplies), materials and parts suppliers, technicians, logistics and warehouse operators, printers, packagers, and distributors of medical equipment (including those who test and repair), personal protective equipment (PPE), isolation barriers, medical

2

gases, pharmaceuticals (including materials used in radioactive drugs, and cannabis products), dietary supplements, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, personal hygiene products, and tissue and paper towel products.

9. Public health / community health workers, including those who compile, model, analyze and communicate public health information.

10. Behavioral and mental health workers responsible for coordination, outreach, engagement, and treatment to individuals in need of mental health and/or behavioral services.

11. Donors of blood bone marrow, blood stem cell, or plasma and the workers of the organizations that operate and manage related activities.

12. Workers that manage health plans, billing, and health information.

13. Workers who conduct community-based public health functions, conducting epidemiologic surveillance, compiling, analyzing and communicating public health information.

14. Workers performing IT and cybersecurity functions at healthcare and public health facilities.

15. Workers performing security, incident management, and emergency operations functions at or on behalf of healthcare entities including healthcare coalitions.

16. Pharmacy employees, including workers necessary to maintain uninterrupted prescription filling.

17. Workers in retail facilities specializing in medical goods and supplies.

18. Public health and environmental health workers, including workers specializing in environmental health that focus on implementing environmental controls, sanitary and infection control interventions, healthcare facility safety and emergency preparedness planning, engineered work practices, and developing guidance and protocols for appropriate PPE to prevent COVID-19 disease transmission; Public health/ community health workers (including call center workers) who conduct community- based public health functions, conducting epidemiologic surveillance and compiling, analyzing, and communicating public health information.

19. Mortuary services providers, including workers performing mortuary, funeral, cremation burial, cemetery, and related services, including funeral homes, crematoriums, cemetery workers and coffin makers.

20. Workers who coordinate with other organizations to ensure the proper recovery, handling, identification, transportation, tracking, storage, and disposal of human remains and personal effects; certify cause of death; and facilitate access to behavioral and mental health services to the family members, responders, and survivors of an incident.

21. Workers supporting veterinary hospitals and clinics.

**Relevant Sector Guidance:**

- All Facility Letters for health care facilities, including long-term care facilities
- Health care facilities, Skilled Nursing Facilities
- Individuals with Access and Functional Needs
- Medical Waste Management - Interim Guidelines
- Outpatient Healthcare Facility Infection Control Recommendations for Suspect COVID-19 Patients
- Prioritization of Patients for Laboratory Testing for COVID-19
- Veterinary Professionals and Premises
- Regional Centers:
  - Visits to Licensed Residential Facilities
  - Risk Mitigation Strategies for ARFPSHN, ICF/DD-CN
- Adult and Senior Care Facilities

3

April 28, 2020

- Cuidado a los Adultos Mayores
- Community care facilities, including assisted living facilities and child care
- Medi-Cal Managed Care Health Plans: COVID – 19 Screening and Testing
- Coverage Options Fact Sheet
  - Opciones De Cobertura
- Department of Managed Health Care All Plan Letter
- California Department of Insurance Bulletin

April 28, 2020

## 2. EMERGENCY SERVICES SECTOR

**Sector Profile**

The Emergency Services Sector (ESS) is a community of highly-skilled, trained personnel, along with the physical and cyber resources, that provide a wide range of prevention, preparedness, response, and recovery services during both day-to-day operations and incident response. The ESS includes geographically distributed facilities and equipment in both paid and volunteer capacities organized primarily at the federal, state, local, tribal, and territorial levels of government, such as city police departments and fire stations, county sheriff's offices, Department of Defense police and fire departments, and town public works departments. The ESS also includes private sector resources, such as industrial fire departments, private security organizations, and private emergency medical services providers.

**Essential Workforce, if remote working is not practical:**

1. Public, private, and voluntary personnel (front line and management) in emergency management, law enforcement, fire and rescue services, emergency medical services, corrections, rehabilitation and reentry, search and rescue, hazardous material response, and technicians supporting maritime and aviation emergency response.
2. Public Safety Answering Points and 911 call center employees; personnel involved in access to emergency services including the emergency alert system and wireless emergency alerts.
3. Fusion Center employees
4. Workers who support weather disaster / natural hazard monitoring, response, mitigation, and prevention, including personnel conducting, supporting, or facilitating wildfire mitigation activities
5. Workers – including contracted vendors -- who maintain, manufacture, or supply equipment and services supporting law enforcement, fire, EMS, and and emergency service response operations (including safety equipment, electronic security, and uniforms)
6. Workers responding to abuse and neglect of children, elders and dependent adults.
7. Animal control officers and humane officers
8. Security staff to maintain building access control and physical security measures
9. Workers and contracted vendors who maintain and provide services and supplies to public safety facilities, including emergency communication center, public safety answering points, public safety communications centers, emergency operation centers, fire and emergency medical services stations, police and law enforcement stations and facilities.

**Relevant Sector Guidance:**

- Public Health Guidance about COVID-19 for California State Prisons
- First responders, including paramedics and EMTs

April 28, 2020

# 3. FOOD AND AGRICULTURE

**Sector Profile**

The Food and Agricultural (FA) Sector is composed of complex production, processing, and delivery systems and has the capacity to feed people and animals both within and beyond the boundaries of the United States. Beyond domestic food production, the FA Sector also imports many ingredients and finished products, leading to a complex web of growers, processors, suppliers, transporters, distributors, and consumers. This sector is critical to maintaining and securing our food supply.

**Essential Workforce, if remote working is not practical:**

1. Workers supporting groceries, pharmacies, convenience stores, and other retail that sells food or beverage products, and animal/pet food, retail customer support service, information technology support staff, for online orders, pickup/takeout or delivery.
2. Workers supporting restaurant carry-out and quick serve food operations, including food preparation, carry-out and delivery food employees.
3. Food manufacturer employees and their supplier employees to include those employed in food ingredient production and processing facilities; aquaculture and seafood harvesting facilities; livestock, poultry, seafood slaughter facilities; pet and animal feed processing facilities; human food facilities producing by-products for animal food; beverage production facilities; and the production of food packaging, including recycling operations and processing.
4. Farmers, farm and ranch workers, and agribusiness support services to include those employed in auction and sales; grain and oilseed handling, storage, processing and distribution; animal food, feed, and ingredient production, packaging, and distribution; manufacturing, packaging, and distribution of veterinary drugs; truck delivery and transport.
5. Farmers, farm and ranch workers, support service workers and their supplier employees producing food supply domestically and for export to include those engaged in raising, cultivating, harvesting, packing, storing, or delivering to storage or to market or to a carrier for transportation to market any agricultural or horticultural commodity for human consumption; those engaged in producing and harvesting field crops; cannabis growers; agricultural and commodity inspection; fuel ethanol facilities; storage facilities; biodiesel and renewable diesel facilities; and other agricultural inputs
6. Employees and firms supporting food, feed, and beverage distribution and ingredients used in these products including warehouse workers, vendor-managed inventory controllers, and blockchain managers.
7. Workers supporting the sanitation of all food manufacturing processes and operations from wholesale to retail.
8. Workers supporting the growth and distribution of plants and associated products for home gardens.
9. Workers in cafeterias used to feed workers, particularly worker populations sheltered against COVID-19
10. Workers in animal diagnostic and food testing laboratories
11. Workers essential for assistance programs and government payments
12. Government, private, and non-governmental organizations' workers essential for food assistance programs (including school lunch programs) and government payments.

6

April 28, 2020

13. Employees of companies engaged in the production, storage, transport, and distribution of chemicals; medicines, including cannabis; vaccines; and other substances used by the food and agriculture industry, including seeds, pesticides, herbicides, fertilizers, minerals, enrichments, and other agricultural production aids.

14. Animal agriculture workers to include those employed in veterinary health (including those involved in supporting emergency veterinary or livestock services); raising of animals for food; animal production operations; livestock markets; slaughter and packing plants, manufacturers, renderers, and associated regulatory and government workforce.

15. Transportation supporting animal agricultural industries, including movement of animal medical and reproductive supplies and material, animal vaccines, animal drugs, feed ingredients, feed, and bedding, live animals, animal medical materials; transportation of deceased animals for disposal; and associated regulatory and government workforce

16. Workers who support sawmills and the manufacture and distribution of fiber and forest products, including, but not limited to timber, paper, and other wood and fiber products

17. Employees engaged in the manufacture and maintenance of equipment and other infrastructure necessary to agricultural production and distribution

18. Workers at animal care facilities that provide food, shelter, veterinary and/or routine care and other necessities of life for animals.


**Relevant Sector Guidance:**

- Food, Beverage, Other Services
  - Alimentos, Bebidas y Otros Sitios de Servicios Relacionados
- Food Industry and Food Supply Chain

April 28, 2020

# 4. ENERGY

**Sector Profile**

The Energy Sector consists of widely diverse and geographically dispersed critical assets and systems that are often interdependent of one another. This critical infrastructure is divided into three interrelated segments or subsectors—electricity, oil, and natural gas—to include the production, refining, storage, and distribution of oil, gas, and electric power. The Energy Sector supplies fuels to the transportation industry, electricity to households and businesses, and other sources of energy that are integral to growth and production across the Nation. In turn, it depends on the Nation's transportation, information technology, communications, finance, water, and government infrastructures.

**Essential Workforce, if remote working is not possible:**

1. Workers supporting the energy sector, regardless of the energy source, segment of the system, or infrastructure the worker is involved in, or who are needed to monitor, operate, engineer, and maintain the reliability, safety, environmental health, physical and cyber security of the energy system, including power generation, transmission and distribution.
2. Workers supporting the energy sector, regardless of the energy source, needed for construction, manufacturing, transportation and logistics, maintenance, and permitting.
3. IT and OT technology for essential energy sector operations including support workers, customer service operations, call centers, and emergency response and customer emergency operations; energy management systems, control systems, Supervisory Control and Data Acquisition SCADA systems, and energy sector entity data centers; cybersecurity engineers; and cybersecurity risk management.
4. Workers providing services related to energy sector fuels and supply chains, supporting the procurement, mining, drilling, processing, refining, manufacturing, refueling, construction, logistics, transportation (including marine transport, terminals, rail and vehicle transport), permitting operation and maintenance, security, waste disposal, storage, and monitoring of support for resources;
5. Workers supporting environmental remediation and monitoring.
6. Workers supporting manufacturing and distribution of equipment, supplies, and parts necessary to maintain production, maintenance, restoration, and service at energy sector facilities across all energy sectors, and regardless of the energy source.
7. Workers at Independent System Operators and Regional Transmission Organizations, and Network Operations staff, engineers and technicians to manage the network or operate facilities.
8. Workers at Reliability Coordinator, Balancing Authorities, and primary and backup Control Centers, including but not limited to independent system operators, regional transmission organizations, and balancing authorities; and workers involved in energy commodity trading and scheduling.
9. Mutual assistance personnel, which may include workers from outside of the state or local jurisdiction
10. Retail fuel centers such as gas stations and truck stops, and the distribution systems that support them.

April 28, 2020

# 5.  WATER AND WASTEWATER

**Sector Profile**

The Water and Wastewater Sector is a complex sector composed of drinking water and wastewater infrastructure of varying sizes and ownership types. Multiple governing authorities pertaining to the Water and Wastewater Sector provide for public health, environmental protection, and security measures, among others.

**Essential Workforce, if remote working is not practical:**

Employees needed to operate and maintain drinking water and wastewater/drainage infrastructure, including:

1. Operational staff at water authorities
2. Operational staff at community water systems
3. Operational staff at wastewater treatment facilities
4. Workers repairing water and wastewater conveyances and performing required sampling or monitoring
5. Operational staff for water distribution and testing
6. Operational staff at wastewater collection facilities
7. Operational staff and technical support for SCADA Control systems
8. Chemical disinfectant suppliers for water and wastewater and personnel protection
9. Workers that maintain digital systems infrastructure supporting water and wastewater operations

April 28, 2020

# 6. TRANSPORTATION AND LOGISTICS

**Sector Profile**

The Transportation Systems Sector consists of seven key subsectors, or modes:

- Aviation includes aircraft, air traffic control systems, and airports, heliports, and landing strips. Commercial aviation services at civil and joint-use military airports, heliports, and sea plane bases.  In addition, the aviation mode includes commercial and recreational aircraft (manned and unmanned) and a wide variety of support services, such as aircraft repair stations, fueling facilities, navigation aids, and flight schools.

- Highway and Motor Carrier encompasses roadway, bridges, and tunnels. Vehicles include trucks, including those carrying hazardous materials; other commercial vehicles, including bicycles, commercial motor coaches and school buses; vehicle and driver licensing systems; taxis, transportation services including Transportation Network Companies, and delivery services including Delivery Network Companies; traffic management systems; AND cyber systems used for operational management.

- Maritime Transportation System consists of coastline, ports, waterways, and intermodal landside connections that allow the various modes of transportation to move people and goods to, from, and on the water.

- Mass Transit and Passenger Rail includes terminals, operational systems, and supporting infrastructure for passenger services by transit buses, trolleybuses, monorail, heavy rail—also known as subways or metros—light rail, passenger rail, and vanpool/rideshare.

- Pipeline Systems consist of pipelines carrying natural gas hazardous liquids, as well as various chemicals. Above-ground assets, such as compressor stations and pumping stations, are also included.

- Freight Rail consists of major carriers, smaller railroads, active railroad, freight cars, and locomotives.

- Postal and Shipping includes large integrated carriers, regional and local courier services, mail services, mail management firms, and chartered and delivery services.

**Essential Workforce, if remote working is not practical:**

1. Employees supporting or enabling transportation functions, including truck drivers, bus drivers, dispatchers, maintenance and repair technicians, warehouse workers, truck stop and rest area workers, towing and recovery services, roadside assistance workers, intermodal transportation personnel, and workers that maintain and inspect infrastructure
2. Working supporting or providing services that enable logistics operations for essential sectors, wholesale and retail sale, including warehousing, cooling, storing, packaging, and distributing products for wholesale or retail sale or use.
3. Workers supporting maintenance and operation of essential highway infrastructure, including roads, bridges, and tunnels.

10

April 28, 2020

4. Workers of firms providing services, supplies, and equipment that enable warehouse and operations, including cooling, storing, packaging, and distributing products for wholesale or retail sale or use.

5. Mass transit workers providing critical transit services and/or performing critical or routine maintenance to mass transit infrastructure or equipment.

6. Employees supporting personal and commercial transportation services, including taxis, bicycle services, Transportation Network Companies, and delivery services including Delivery Network Companies

7. Workers responsible for operating dispatching passenger, commuter and freight trains and maintaining rail infrastructure and equipment

8. Maritime transportation and inland waterway workers – to include maintenance and repair – including port authority and commercial facility personnel, dredgers, port workers, mariners, ship crewmembers, ship pilots and tugboat operators, ship supply, chandler, and equipment operators.

9. Workers who support the operation, inspection, and maintenance of essential dams, locks, and levees.

10. Workers who support the inspection and maintenance of aids to navigation and other government-provided services that ensure continued maritime commerce.

11. Workers supporting transportation of chemicals, hazardous, medical, waste and recyclable materials to support critical sectors and infrastructure.

12. Automotive repair, maintenance, and transportation equipment manufacturing and distribution facilities.

13. Transportation safety inspectors, including hazardous material inspectors and accident investigator inspectors

14. Manufacturers and distributors (to include service centers and related operations) of lighting and communication systems, specialized signage and structural systems, emergency response equipment and support materials, printers, printed materials, packaging materials, pallets, crates, containers, and other supplies needed to support manufacturing, packaging staging and distribution operations

15. Postal, parcel, courier, last-mile delivery, and shipping workers, to include private companies who accept, process, transport, and deliver information and goods.

16. Workers who supply equipment and materials for maintenance of transportation equipment.

17. Employees who repair and maintain vehicles, aircraft, rail equipment, marine vessels, bicycles, and the equipment and infrastructure that enables operations that encompass movement of cargo and passengers

18. Workers who support air transportation for cargo and passengers, including operation distribution, maintenance, and sanitation. This includes air traffic controllers, flight dispatchers, maintenance personnel, ramp workers, fueling agents, flight crews, airport safety inspectors and engineers, airport operations personnel, aviation and aerospace safety workers, security, commercial space personnel, operations personnel, accident investigators, flight instructors, and other on- and off-airport facilities workers.

19. Workers critical to the manufacturing, distribution, sales, rental, leasing, repair, and maintenance of vehicles and other transportation equipment (including electric vehicle charging stations) and the supply chains that enable these operations, subject to adhering public health guidance issued by CDPH.

20. Workers who support the operation, inspection, and maintenance of essential public works facilities and operations, including bridges, water and sewer main breaks, fleet maintenance personnel, construction of critical or strategic infrastructure, construction material

April 28, 2020

suppliers,  traffic signal maintenance, emergency location services for buried utilities, maintenance of digital systems infrastructure supporting public works operations, and other emergent issues

21. Workers who support, such as road and line clearing, to ensure the availability of needed facilities, transportation, energy and communications.

# 7. COMMUNICATIONS AND INFORMATION TECHNOLOGY

**Sector Profile**

The Communications Sector provides products and services that support the efficient operation of today's global information-based society. Communication networks enable people around the world to contact one another, access information instantly, and communicate from remote areas. This involves creating a link between a sender (including voice signals) and one or more recipients using technology (e.g., a telephone system or the Internet) to transmit information from one location to another. Technologies are changing at a rapid pace, increasing the number of products, services, service providers, and communication options. The national communications architecture is a complex collection of networks that are owned and operated by individual service providers. Many of this sector's products and services are foundational or necessary for the operations and services provided by other critical infrastructure sectors. The nature of communication networks involves both physical infrastructure (buildings, switches, towers, antennas, etc.) and cyber infrastructure (routing and switching software, operational support systems, user applications, etc.), representing a holistic challenge to address the entire physical-cyber infrastructure.

The IT Sector provides products and services that support the efficient operation of today's global information-based society and are integral to the operations and services provided by other critical infrastructure Sectors. The IT Sector is comprised of small and medium businesses, as well as large multinational companies. Unlike many critical infrastructure Sectors composed of finite and easily identifiable physical assets, the IT Sector is a functions-based Sector that comprises not only physical assets but also virtual systems and networks that enable key capabilities and services in both the public and private sectors.

**Essential Workforce – Communications, if remote working is not practical:**

1. Maintenance of communications infrastructure- including privately owned and maintained communication systems- supported by technicians, operators, call-centers, wireline and wireless providers, cable service providers, satellite operations, Internet Exchange Points, Network Access Points, back haul and front haul facilities, and manufacturers and distributors of communications equipment.
2. Workers performing functions related to undersea cable infrastructure and support facilities, including cable landing sites, beach manhole vaults and covers, submarine cable depots, and submarine cable ship facilities
3. Government and private sector employees supporting Department of Dense internet and communications facilities.
4. Workers who support radio, television, and media service, including, but not limited to front line news reporters, studio, and technicians for newsgathering, reporting, and publishing news.
5. Network Operations staff, engineers and/or technicians to include IT managers and staff, HVAC & electrical engineers, security personnel, software and hardware engineers, and database administrators that manage the network or operate facilities
6. Workers responsible for infrastructure construction and restoration, including contractors for construction and engineering of fiber optic cables, buried conduit, small cells, other wireless facilities, and other communications sector-related infrastructure. This includes construction of

April 28, 2020

new facilities and deployment of new technology required to address congestion or customer usage on remote services.

7. Installation, maintenance and repair technicians that establish, support or repair service as needed.

8. Central office personnel to maintain and operate central office, data centers, and other network office facilities, and critical support personnel assisting front line employees

9. Customer service and support staff, including managed and professional services as well as remote providers of support to transitioning employees to set up and maintain home offices, who interface with customers to manage or support service environments and security issues, including payroll, billing, fraud, logistics and troubleshooting

10. Workers providing electronic security, fire, monitoring, and life safety services, and who ensure physical security, cleanliness, and the safety of facilities and personnel, including those who provide temporary licensing waivers for security personnel to work in other States or Municipalities.

11. Dispatchers involved with service repair and restoration

12. Retail customer service personnel at critical service center locations for onboarding customers, distributing and repairing equipment and other supply chain personnel, to support individuals' remote emergency communications needs;

13. External Affairs personnel to assist in coordinating with local, state, and federal officials to address communications needs supporting COVID-19 response, public safety, and national security.

14. Workers responsible for ensuring that persons with disabilities have access to and the benefits of various communications platforms, including those involved in the provision of telecommunication relay services, closed captioning of broadcast television for the deaf, video relay services for deaf citizens who prefer communication via American Sign Language over text, and audio-description for television programming.

**Essential Workforce - Information Technology, if remote working is not practical:**

15. Workers who support command centers, including, but not limited to Network Operations Command Centers, Broadcast Operations Control Center and Security Operations Command Centers

16. Data center operators, including system administrators, HVAC & electrical engineers, security personnel, IT managers and purchasers, data transfer solutions engineers, software and hardware engineers, and database administrators

17. Workers who support client service centers, field engineers, and other workers supporting critical infrastructure, as well as manufacturers and supply chain vendors that provide hardware and software, support services, research and development, information technology equipment (to include microelectronics and semiconductors), and HVAC and electrical equipment  for critical infrastructure and test labs and certification agencies that qualify such equipment for critical infrastructure.

18. Workers needed to pre-empt and respond to cyber incidents involving critical infrastructure,, and entities supporting the functioning of critical infrastructure sectors

19. Suppliers, designers, transporters and other workers supporting the manufacture, distribution, and construction of essential global, national and local infrastructure for computing services (including cloud computing services and teleworking capabilities), business infrastructure, financial transactions, web-based services, and critical manufacturing

April 28, 2020

20. Workers supporting communications systems, information technology, and work from home solutions

21. Employees required to support Software as a Service businesses that enable remote working, performance of business operations, distance learning, media services, and digital health offerings, or required for technical support crucial for business continuity and connectivity.

## 8. GOVERNMENT OPERATIONS AND OTHER COMMUNITY-BASED ESSENTIAL FUNCTIONS

**Essential Workforce, if remote working is not practical.**

1. Critical government workers, as defined by the employer and consistent with Continuity of Operations Plans and Continuity of Government plans.
2. County workers responsible for determining eligibility for safety net benefits
3. The Courts, consistent with underline[guidance] released by the California Chief Justice
4. Workers who support administration and delivery of unemployment insurance programs, income maintenance, employment service, disaster assistance, workers' compensation insurance and benefits programs, and pandemic assistance
5. Workers to ensure continuity of building functions, including but not limited to security and environmental controls, the manufacturing and distribution of the products required for these functions, and the permits and inspection for construction.
6. Elections personnel
7. Federal, State, and Local, Tribal, and Territorial employees who support Mission Essential Functions and communications networks
8. Trade Officials (FTA negotiators; international data flow administrators)
9. Weather forecasters
10. Workers that maintain digital systems infrastructure supporting other critical government operations
11. Workers who support necessary credentialing, vetting and licensing operations for critical sector workers and operations.
12. Workers who are critical to facilitating trade in support of the national, state, and local emergency response supply chain
13. Workers supporting public and private childcare establishments, pre-K establishments, K-12 schools, colleges, and universities for purposes of distance learning, provision of school meals, or care and supervision of minors to support essential workforce across all sectors
14. Staff at government offices who perform title search, notary, and recoding services in support of mortgage and real estate services and transactions;
15. Workers and instructors supporting academies and training facilities and courses for the purpose of graduating students and cadets that comprise the essential workforce for all identified critical sectors
16. Clergy for essential support and faith-based services that are provided through streaming or other technologies that support physical distancing and state public health guidelines.
17. Human services providers, especially for at risk populations, including home delivered meal providers for older adults, people with disabilities, and others with chronic health conditions; home-maker services for frail, homebound, older adults; personal assistance services providers to support activities of daily living for older adults, people with disabilities, and others with chronic health conditions who live independently in the community with supports and services; home health providers who deliver health care services for older adults, people with disabilities, and others with chronic health conditions who live independently in the community with supports and services.
18. Government entities, and contractors that work in support of local, state, and federal public health and medical mission sets, including but not limited to supporting access to healthcare and associated payment functions, conducting public health functions, providing medical care,

16

April 28, 2020

supporting emergency management, or other services necessary for supporting the COVID-19 response.

**Relevant Sector Guidance:**

- Schools and institutions of higher education
    - Guidance for schools (PDF)
    - Directrices para las escuelas sobre el nuevo coronavirus o COVID-19 (PDF)
    - Guidance for colleges and universities
    - Directrices para las instituciones de educación superior sobre el nuevo coronavirus o COVID-19
- Guidance for K-12 Schools: Distance Learning, School Meals, Child Care and Student Supervision
- Guidance for Using Disinfectants at Schools and Child Cares
    - Recordatorios para el uso de desinfectantes en las escuelas y guarderías
- Community care facilities, including assisted living facilities and child care

17

April 28, 2020

# 9.  CRITICAL MANUFACTURING

**Sector Profile**

The Critical Manufacturing Sector identifies several industries to serve as the core of the sector: Primary Metals Manufacturing, Machinery Manufacturing, Electrical Equipment, Appliance, and Component Manufacturing, Transportation Equipment Manufacturing Products made by these manufacturing industries are essential to many other critical infrastructure sectors.

**Essential Workforce, if remote working is not practical**

1.  Workers necessary for the manufacturing of metals, industrial minerals, semiconductors, materials and products needed for supply chains of the critical infrastructure sectors.
2.  Workers necessary for the manufacturing of materials and products needed to manufacture medical equipment and personal protective equipment
3.  Workers necessary for mining and production of critical minerals, materials and associated essential supply chains, and workers engaged in the manufacture and maintenance of equipment and other infrastructure necessary for mining production and distribution.
4.  Workers who produce or manufacture parts or equipment that supports continued operations for any essential services and increase in remote workforce, including computing and communication devices, semiconductors, and equipment such as security tools for Security Operations Centers (SOCs) or data centers.
5.  Workers manufacturing or providing parts and equipment that enable the maintenance and continued operation of essential businesses and facilities.

# 10.   FINANCIAL SERVICES

**Sector Profile**

The Financial Services Sector includes thousands of depository institutions, providers of investment products, insurance companies, other credit and financing organizations, and the providers of the critical financial utilities and services that support these functions. Financial institutions vary widely in size and presence, ranging from some of the world's largest global companies with thousands of employees and many billions of dollars in assets, to community banks and credit unions with a small number of employees serving individual communities. Whether an individual savings account, financial derivatives, credit extended to a large organization, or investments made to a foreign country, these products allow customers to: Deposit funds and make payments to other parties; Provide credit and liquidity to customers; Invest funds for both long and short periods; Transfer financial risks between customers.

**Essential Workforce, if remote working is not practical:**

1. Workers who are needed to process and maintain systems for processing financial transactions and services, including payment, clearing, and settlement; wholesale funding; insurance services; and capital markets activities
2. Workers who are needed to maintain orderly market operations to ensure the continuity of financial transactions and services.
3. Workers who are needed to provide business, commercial, and consumer access to banking and non-bank financial and lending services, including ATMs, lending money transmission, and to move currency, checks, securities, and payments
4. Workers who support financial operations, such as those staffing call, data and security operations centers, managing physical security, or providing accounting services.
5. Workers supporting production and distribution of debit and credit cards.
6. Workers providing electronic point of sale support personnel for essential businesses and workers.

April 28, 2020

## 11.   CHEMICAL & HAZARDOUS MATERIALS

**Sector Profile**

The Chemical Sector—composed of a complex, global supply chain—converts various raw materials into diverse products that are essential to modern life. Based on the product produced, the sector can be divided into five main segments, each of which has distinct characteristics, growth dynamics, markets, new developments, and issues: Basic chemicals; Specialty chemicals; Agricultural chemicals; Pharmaceuticals; Consumer products.

**Essential Workforce, if remote working is not practical:**

1. Workers supporting the chemical and industrial gas supply chains, including workers at chemical manufacturing plants, workers in laboratories, workers at distribution facilities, workers who transport basic raw chemical materials to the producers of industrial and consumer goods, including hand sanitizers, food and food additives, pharmaceuticals, textiles, building materials, plumbing, electrical and paper products.
2. Workers supporting the safe transportation of chemicals, including those supporting tank truck cleaning facilities and workers who manufacture packaging items
3. Workers supporting the production of protective cleaning and medical solutions, personal protective equipment, disinfectants, and packaging that prevents the contamination of food, water, medicine, among others essential products
4. Workers supporting the operation and maintenance of facilities (particularly those with high risk chemicals and/ or sites that cannot be shut down) whose work cannot be done remotely and requires the presence of highly trained personnel to ensure safe operations, including plant contract workers who provide inspections
5. Workers who support the production and transportation of chlorine and alkali manufacturing, single-use plastics, and packaging that prevents the contamination or supports the continued manufacture of food, water, medicine, and other essential products, including glass container manufacturing
6. Workers at nuclear facilities, workers managing medical waste, workers managing waste from pharmaceuticals and medical material production, and workers at laboratories processing test kits
7. Workers who support hazardous materials response and cleanup
8. Workers who maintain digital systems infrastructure supporting hazardous materials management operations
9. Workers who support the removal, storage, and disposal of residential and commercial solid waste and hazardous waste, including landfill and recycling operations.

April 28, 2020

## 12.    DEFENSE INDUSTRIAL BASE

**Sector Profile**

The Defense Industrial Base Sector is the worldwide industrial complex that enables research and development, as well as design, production, delivery, and maintenance of military weapons systems, subsystems, and components or parts, to meet U.S. military requirements. The Defense Industrial Base partnership consists of Department of Defense components, Defense Industrial Base companies and their subcontractors who perform under contract to the Department of Defense, companies providing incidental materials and services to the Department of Defense, and government-owned/contractor-operated and government-owned/government-operated facilities. Defense Industrial Base companies include domestic and foreign entities, with production assets located in many countries. The sector provides products and services that are essential to mobilize, deploy, and sustain military operations.

**Essential Workforce, if remote working is not practical:**

1. Workers who support the essential services required to meet national security commitments to the federal government and U.S. Military, including, but are not limited to, space and aerospace workers, nuclear matters workers, mechanical and software engineers (various disciplines), manufacturing and production workers, IT support, security staff, security personnel, intelligence support, aircraft and weapon system mechanics and maintainers, and sanitary workers who maintain the hygienic viability of necessary facilities.
2. Personnel working for companies, and their subcontractors, who perform under contract or sub-contract to the Department of Defense (DoD) and the Department of Energy (DoE) (on nuclear matters), as well as personnel at government-owned/contractor operated facilities, and who provide materials and services to the DoD and DoE (on nuclear matters), including support for weapon systems, software systems and cybersecurity, defense and intelligence communications, surveillance, sale of U.S. defense articles and services for export to foreign allies and partners (as authorized by the U.S. government), and space systems and other activities in support of our military, intelligence, and space forces.

21

April 28, 2020

## 13.    INDUSTRIAL, COMMERCIAL, RESIDENTIAL, and SHELTERING FACILITIES AND SERVICES

**Essential Workforce, if remote working is not practical:**

1. Construction Workers who support the construction, operation, inspection, and maintenance of construction sites and construction projects (including housing, commercial, and mixed-use construction); and workers who support the supply chain of building materials from production through application/installation, including cabinetry, fixtures, doors, cement, hardware, plumbing, electrical, heating/cooling, refrigeration, appliances, paint/coatings, and employees who provide services that enable repair materials and equipment for essential functions.

2. Workers such as plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, construction material sources, and essential operation of construction sites and construction projects (including those that support such projects to ensure the availability of needed facilities, transportation, energy and communications; and support to ensure the effective removal, storage, recycling and disposal of solid waste and hazardous waste)

3. Workers such as plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, businesses, and buildings such as hospitals and senior living facilities, including any facility supporting COVID-19 response.

4. Workers who support the supply chain of building materials from production through application and installation, including cabinetry, fixtures, doors, cement, hardware, plumbing (including parts and services), electrical, heating and cooling, refrigeration, appliances, paint and coatings, and workers who provide services that enable repair materials and equipment for essential functions.

5. Workers in hardware and building materials stores, consumer electronics, technology and appliances retail, and related merchant retailers, wholesalers and distributors that support essential workforce functions where sales and operations cannot be conducted online

6. Warehouse operators, including vendors and support personnel critical for business continuity (including heating, ventilation, and air conditioning (HVAC) and electrical engineers, security personnel, and janitorial staff), e-commerce or online commerce, and customer service for essential functions.

7. Workers supporting the operations of commercial buildings that are critical to safety, security, and the continuance of essential activities, such as on-site property managers, building engineers, security staff, fire safety directors, janitorial personnel, and service technicians (e.g., mechanical, HVAC, plumbers, electricians, and elevator).

8. Workers supporting ecommerce through distribution, warehouse, call center facilities, and other essential operational support functions, that accept, store, and process goods, and that facilitate their transportation and delivery

9. Workers distributing, servicing, repairing, installing residential and commercial HVAC systems, boilers, furnaces and other heating, cooling, refrigeration, and ventilation equipment.

10. Workers managing or servicing hotels or other commercial and residential buildings that are used for COVID-19 mitigation and containment measures, treatment measures, provide accommodation for essential workers, or providing housing solutions, including measures to protect homeless populations.

11. Workers responsible for the leasing of residential and commercial properties to provide individuals and families with ready access to available housing.
12. Residential and commercial real estate workers, limited to scheduled property viewings to a potential buying party. This does not extend to open-house viewings, nor viewings with more than one buying party at a time.
13. Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities and critical sector services
14. Workers responsible for handling property management, maintenance, and related service calls who can coordinate the response to emergency "at-home" situations requiring immediate attention, as well as facilitate the reception of deliveries, mail, and other necessary services.
15. Workers supporting the entertainment industries, studios, and other related establishments, provided they follow covid-19 public health guidance around physical distancing.
16. Workers that provide or determine eligibility for food, shelter, in-home supportive services, child welfare, adult protective services and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals (including family members)
17. Workers performing services in support of the elderly and disabled populations who coordinate a variety of services, including health care appointments and activities of daily living.
18. Workers who provide support to vulnerable populations to ensure their health and well-being including family care providers.
19. Workers providing dependent care services, particularly those whose services ensure essential workers can continue to work.
20. Workers who support food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, such as those residing in shelters.
21. Workers in laundromats, laundry services, and dry cleaners.
22. Workers providing disinfection services, for all essential facilities in essential sectors
23. Workers necessary for the installation, maintenance, distribution, and manufacturing of water and space heating equipment and its components.
24. Support required for continuity of services, including commercial disinfectant services, janitorial/cleaning personnel, and support personnel functions that need freedom of movement to access facilities in support of front-line employees.

**Relevant Sector Guidance:**

- Cleaning & Waste Management for Residences 2/2020
- Essential/Emergency Personnel Providing Critical In-Home Services
- Home cleaning with COVID-19 positive individuals
- Recommended Strategic Approaches for COVID-19 Response for Individuals Experiencing Homelessness
- Flow Chart: COVID-19 Recommended Protocol for People Experiencing Homelessness
- Homeless Assistance Providers
- Immigrant Communities
  - Las Comunidades de Inmigrantes
- Pets & People

EXHIBIT 1-3

 California Coronavirus (COVID-19) Response

Search

Select language

# Resilience Roadmap

Last updated May 7, 2020 at 12:34 PM

## ☰ Menu

Californians have been staying home and saving lives since the start of our statewide stay-at-home order issued on March 19, 2020. These efforts have allowed the state to move forward on our roadmap for modifying the statewide order.

We are now moving into **Stage 2,** where some lower-risk workplaces can gradually open with adaptations. The state is issuing guidance to help these workplaces reopen safely.



**STAGE 1:**
**Safety and preparedness**

Make workplaces safe for our essential workers.
(Current stage)



**STAGE 2:**
**Lower-risk workplaces**

Gradually reopen retail (curbside only), manufacturing & logistics. Later, relax retail restrictions, adapt & reopen schools, child care, offices & limited hospitality, personal services.



**STAGE 3:**
**Higher-risk workplaces**

Adapt and reopen movie theaters, religious services, & more
personal & hospitality services.



**STAGE 4:**
**End of Stay Home Order**

Reopen areas of highest risk: e.g. Concerts, conventions, sports arenas.

When modifications are advanced and the state's six indicators show we've made enough progress, we can move to the next stage of the roadmap.

Stage 2 expansion will be phased in gradually. Some communities may move through Stage 2 faster if they are able to show greater progress and counties that have met the readiness criteria and worked with the California Department of Public Health can open more workplaces as outlined in the County Variance Guidance.

# Industry guidance to reduce the risk

California will move into Stage 2 of modifying the state's Stay-at-Home order on May 8, 2020. Our progress in achieving key public health metrics will allow a gradual re-opening of California's economy.

We recognize the impact of economic hardship. We must get our economy roaring once again and put paychecks in people's pockets. But the risk of COVID-19 infection is still real for all Californians and continues to be fatal.

That is why every business should take every step humanly possible to reduce the risk of infection:

- Make radical changes within the workplace
- Adjust practices by employees and help educate customers

Below are guidance for each early Stage 2 business to follow. The goal is a safe, clean environment for workers and customers. Businesses may use effective alternative or innovative methods to build upon the guidance.

Review the guidance that is relevant to your workplace, prepare a plan based on the guidance for your industry, and put it into action.

When complete, you can post the industry-specific checklist (below) in your workplace to show your customers and your employees that you've reduced the risk and open for business.

Before, reopening, all facilities **must:**

1. Perform a detailed risk assessment and implement a site-specific protection plan
2. Train employees on how to limit the spread of COVID-19, including how to [screen themselves for symptoms](#) and stay home if they have them
3. Implement individual control measures and screenings
4. Implement disinfecting protocols
5. Implement physical distancing guidelines

To provide your input on future industry guidance, fill out the [California Recovery Roadmap survey](#).

It is critical that employees needing to self-isolate because of COVID-19 are encouraged to stay at home, with sick leave policies to support that, to prevent further infection in your workplace. Additional information on government programs supporting sick leave and worker's compensation for COVID-19 can be found [here](#).

## ⏽♟ Agriculture and livestock

The [guidance for the agriculture and livestock industry](#) provides guidelines to create a safer environment for workers.
Review the guidance, prepare a plan, and post the [checklist for the agriculture and livestock industry](#) in your workplace to show customers and employees that you've reduced the risk and are open for business.

## 🚗 Auto-dealerships

The [guidance for the automobile dealerships and rental operators industry](#) provides guidelines to create a safer environment for workers.
Review the guidance, prepare a plan, and post the [checklist for the automobile dealerships and rental operators](#) industry in your workplace to show customers and employees that you've reduced the risk and are open for business.

## 📱 Communications infrastructure

The [guidance for the communications infrastructure industry](#) provides guidelines to create a safer environment for workers.
Review the guidance, prepare a plan, and post the [checklist for the communications infrastructure industry](#) in your workplace to show customers and employees that you've reduced the risk and are open for business.

## 🚧 Construction

This [guidance for the construction industry](#) provides guidelines to create a safer environment for workers.
Review the guidance, prepare a plan, and post the [checklist for the construction industry](#) in your workplace to show customers and employees that you've reduced the risk and are open for business.

## 🛵 Delivery services

The [guidance for the delivery services industry](#) provides guidelines to create a safer environment for workers.
Review the guidance, prepare a plan, and post the [checklist for the delivery](#)

services industry in your workplace to show customers and employees that
you've reduced the risk and are open for business.

## ⚠ Energy and utilities

The guidance for the energy and utilities industry provides guidelines to create a
safer environment for workers.
Review the guidance, prepare a plan, and post  the checklist for the energy and
utilities industry in your workplace to show customers and employees that
you've reduced the risk and are open for business.

## ▽ Food packing

The guidance for facilities that process or pack meat, dairy,  provides guidelines
to create a safer environment for workers.
Review the guidance, prepare a plan, and post the checklist for facilities that
process or pack meat, dairy or produce in your workplace to show customers
and employees that you've reduced the risk and are open for business.

## 🏢 Hotels and lodging

The guidance for the hotels and lodging industry provides guidelines to create a
safer environment for workers.
Review the guidance, prepare a plan, and post the checklist for the hotels and
lodging industry in your workplace to show customers and employees that
you've reduced the risk and are open for business.

## ⚛ Life sciences

The guidance for the life sciences industry  provides guidelines to create a safer

Review the guidance, prepare a plan, and post the checklist for the life sciences industry in your workplace to show customers and employees that you've reduced the risk and are open for business.

## ⛩ Logistics and Warehousing Facilities

The guidance for businesses operating in the logistics/warehousing industry provides guidelines to create a safer environment for workers.
Review the guidance, prepare a plan, and post  the checklist for the logistics/warehousing industry in your workplace to show customers and employees that you've reduced the risk and are open for business.

## Manufacturing

The guidance for the manufacturing industry provides guidelines to create a safer environment for workers.
Review the guidance, prepare a plan, and post the checklist for the manufacturing industry in your workplace to show customers and employees that you've reduced the risk and are open for business.

## 📖 Mining and logging

The guidance for the mining and logging industries provides guidelines to create a safer environment for workers.
Review the guidance, prepare a plan, and post the checklist for the mining and logging industries in your workplace to show customers and employees that you've reduced the risk and are open for business.

## 🏢 Office workspaces

The [guidance for businesses operating in office workspaces](#) provides guidelines to create a safer environment for workers.

Review the guidance, prepare a plan, and post  the [checklist for office workspaces](#) in your workplace to show customers and employees that you've reduced the risk and are open for business.

## ◐ Ports

This [Guidance for the port industry](#) provides guidelines to create a safer environment for workers.

Review the guidance, prepare a plan, and post the [checklist for the port industry](#) in your workplace to show customers and employees that you've reduced the risk and are open for business.

## ▬ Public Transit and Intercity Passenger Rail

This [guidance for public transit agencies](#) provides guidelines to create a safer environment for workers.

Review the guidance, prepare a plan, and post the [checklist for public transit agencies](#) in your workplace to show customers and employees that you've reduced the risk and are open for business.

## ◐ Real estate transaction

This [Guidance for businesses operating in the real estate industry](#) provides guidelines to create a safer environment for workers.

Review the guidance, prepare a plan, and post the [checklist for the real estate industry](#) in your workplace to show customers and employees that you've reduced the risk and are open for business.

## 💳 Retail

This [guidance for retailers](#) provides guidelines to create a safer environment for workers.
Review the guidance, prepare a plan, and post the [checklist for retailers](#) in your workplace to show customers and employees that you've reduced the risk and are open for business.

# Customers and individuals

Customers and individuals are encouraged to stay home if they have a fever or other COVID-19 symptoms. Those with symptoms or elevated temperatures should not shop, get services in person, go to work or congregate with others. If you're not sure if this applies to you, check your symptoms with this [Symptom Screener](#).

Higher risk individuals should continue to stay home until Stage 4.

# Roadmap for Reopening Businesses

Before re-opening, all facilities **must** first perform a detailed risk assessment and implement a site-specific protection plan. Adaptations need to be made before Stage 2 workplaces can open – currently that includes modifications like curbside pickup at retail locations.

## STAGE 1: Safety and Preparedness



### Only essential businesses and workplaces are open

See the full list of essential workforce designations on the essential workforce page.

## STAGE 2: Lower-risk workplaces



## Can open with modifications

- Curbside retail, including but not limited to: Bookstores, jewelry stores, toy stores, clothing stores, shoe stores, home and furnishing stores, sporting goods stores, antique stores, music stores, florists. **Note:** this will be phased-in, starting first with curbside pickup and delivery only until further notice.
- Supply chains supporting the above businesses, in manufacturing and logistical sectors

## Can open later in Stage 2:

- Destination retail, including shopping malls and swap meets.
- Personal services, limited to: car washes, pet grooming, tanning facilities, and landscape gardening.
- Office-based businesses (telework remains strongly encouraged)
- Dine-in restaurants (other facility amenities, like bars or gaming areas, are not permitted)
- Schools and childcare facilities
- Outdoor museums and open gallery spaces

## NOT in Stage 1 or 2: Higher-risk Workplaces

- Personal services such as nail salons, tattoo parlors, gyms and fitness studios
- Hospitality services, such as bars and lounges
- Entertainment venues, such as movie theaters, gaming facilities, and pro sports
- Indoor museums, kids museums and gallery spaces, zoos, and libraries

- Religious services and cultural ceremonies
- Nightclubs
- Concert venues
- Festivals
- Theme parks

Department of Public Health

Governor's Newsroom

Statewide COVID19 Hotline

Accessibility

Privacy Policy

Feedback

Official California State Government Website





# COVID-19 INDUSTRY GUIDANCE:

## Manufacturing

May 7, 2020

covid19.ca.gov



# OVERVIEW

On March 19, 2020, the State Public Health Officer and Director of the California Department of Public Health issued an order requiring most Californians to stay at home to disrupt the spread of COVID-19 among the population.

The impact of COVID-19 on the health of Californians is not yet fully known. Reported illness ranges from very mild (some people have no symptoms) to severe illness that may result in death. Certain groups, including people aged 65 or older and those with serious underlying medical conditions, such as heart or lung disease or diabetes, are at higher risk of hospitalization and serious complications. Transmission is most likely when people are in close contact with an infected person, even if that person does not have any symptoms or has not yet developed symptoms.

Precise information about the number and rates of COVID-19 by industry or occupational groups, including among critical infrastructure workers, is not available at this time. There have been multiple outbreaks in a range of workplaces, indicating that workers are at risk of acquiring or transmitting COVID-19 infection. Examples of these workplaces include long-term care facilities, prisons, food production, warehouses, meat processing plants, and grocery stores.

As stay-at-home orders are modified, it is essential that all possible steps be taken to ensure the safety of workers and the public.

Key prevention practices include:
- ✓ physical distancing to the maximum extent possible,
- ✓ use of face coverings by employees (where respiratory protection is not required) and customers/clients,
- ✓ frequent handwashing and regular cleaning and disinfection,
- ✓ training employees on these and other elements of the COVID-19 prevention plan.

In addition, it will be critical to have in place appropriate processes to identify new cases of illness in workplaces and, when they are identified, to intervene quickly and work with public health authorities to halt the spread of the virus.

# Purpose

This document provides guidance for the manufacturing industry to support a safe, clean environment for workers. The guidance is not intended to revoke or repeal any employee rights, either statutory, regulatory or collectively bargained, and is not exhaustive, as it does not include county health orders, nor is it a substitute for any existing safety and health-related regulatory requirements such as those of Cal/OSHA.[1] Stay current on changes to public health guidance and state/local orders, as the COVID-19 situation continues. Cal/OSHA has additional safety and health guidance on their Cal/OSHA COVID-19 Infection Prevention for Logistics Employers and Employees

webpage. CDC has additional information on their guidance for businesses and employers.

 # Worksite Specific Plan

- Establish a written, worksite-specific COVID-19 prevention plan at every facility, perform a comprehensive risk assessment of all work areas, and designate a person at each facility to implement the plan.

- Identify contact information for the local health department where the facility is located for communicating information about COVID-19 outbreaks among employees.

- Train and communicate with employees and employee representatives on the plan.

- Regularly evaluate the workplace for compliance with the plan and document and correct deficiencies identified.

- Investigate any COVID-19 illness and determine if any work-related factors could have contributed to risk of infection. Update the plan as needed to prevent further cases.

- Identify close contacts (within six feet for 10 minutes or more) of an infected employee and take steps to isolate COVID-19 positive employee(s) and close contacts.

- Adhere to the guidelines below. Failure to do so could result in workplace illnesses that may cause operations to be temporarily closed or limited.

 # Topics for Employee Training

- Information on COVID-19, how to prevent it from spreading, and which underlying health conditions may make individuals more susceptible to contracting the virus.

- Self-screening at home, including temperature and/or symptom checks using CDC guidelines.

- The importance of not coming to work if employees have a frequent cough, fever, difficulty breathing, chills, muscle pain, headache, sore throat, recent loss of taste or smell, or if they or someone they live with have been diagnosed with COVID-19.

3

- To seek medical attention if their symptoms become severe, including persistent pain or pressure in the chest, confusion, or bluish lips or face. Updates and further details are available on CDC's webpage.

- The importance of frequent handwashing with soap and water, including scrubbing with soap for 20 seconds (or using hand sanitizer with at least 60% ethanol or 70% isopropanol when employees cannot get to a sink or handwashing station, per CDC guidelines).

- The importance of physical distancing, both at work and off work time (see Physical Distancing section below).

- Proper use of face coverings, including:

  o Face coverings do not protect the wearer and are not personal protective equipment (PPE).

  o Face coverings can help protect people near the wearer, but do not replace the need for physical distancing and frequent handwashing.

  o Employees should wash or sanitize hands before and after using or adjusting face coverings.

  o Avoid touching eyes, nose, and mouth.

  o Face coverings should be washed after each shift.

 # Individual Control Measures and Screening

- Provide temperature and/or symptom screenings for all workers at the beginning of their shift and any personnel entering the facility. Make sure the temperature/symptom screener avoids close contact with workers to the extent possible. Both screeners and employees should wear face coverings for the screening.

- Encourage workers who are sick or exhibiting symptoms of COVID-19 to stay home.

- Employers should provide and ensure workers use all required protective equipment. Employers should consider where disposable glove use may be helpful to supplement frequent handwashing or use of hand sanitizer; examples are for workers who are screening others for symptoms or handling commonly touched items.

- Face coverings are strongly recommended when employees are not required to wear respirators for other hazards and are in the vicinity of others. Workers should have face coverings available and wear them

4

when at work, in offices, or in a vehicle for work-related travel with others. Face coverings must not be shared.

- Non-employees entering the facility should be restricted to only those classified as essential by management and they must complete a temperature and/or symptom screening before entering. Contractors, vendors, and all others entering the facility are strongly recommended to wear face coverings.

 # Cleaning and Disinfecting Protocols

- Perform thorough cleaning on high traffic areas such as break rooms, lunch areas, and changing areas, and areas of ingress and egress including, stairways and stairwells, handrails, and elevators controls. Frequently disinfect commonly used surfaces, including, doorknobs, toilets, and handwashing facilities.

- Clean touchable surfaces between shifts or between users, whichever is more frequent, including but not limited to working surfaces, tools, handles and latches, and controls on stationary and mobile equipment, including surfaces in the cabs of all vehicles.

- Avoid sharing phones, office supplies, other work tools, or handheld mobile communications equipment wherever possible. Individually-assigned peripheral equipment (keyboards, handsets, headsets, chairs, etc.) should be provided wherever possible. If necessary, clean and disinfect them before and after each use. Never share PPE.

- Provide sufficient time for workers to implement cleaning practices before, during, and after shifts. If cleaning is assigned to the worker, they must be compensated for that time.

- Ensure sanitary facilities restrooms and handwashing stations with soap and hand sanitizer are provided at all sites. Ensure that sanitary facilities stay operational and stocked at all times and provide additional soap, paper towels, and hand sanitizer when needed.

- Stagger breaks and provide additional sanitary facilities (including portable toilets and handwashing stations) if feasible and necessary to maintain physical distancing during scheduled breaks. No-touch sinks, soap dispensers, sanitizer dispensers, and paper towel dispensers should be installed whenever possible.

- When choosing cleaning chemicals, employers should use product approved for use against COVID-19 on the Environmental Protection Agency (EPA)-approved list and follow product instructions. Use disinfectant labels labeled to be effective against emerging viral

5

pathogens, diluted household bleach solutions (5 tablespoons per gallon of water), or alcohol solutions with at least 70% alcohol that are appropriate for the surface. Provide employees training on manufacturer's directions and Cal/OSHA requirements for safe use. Workers using cleaners or disinfectants should wear gloves as required by the product instructions.

- Employees must be provided and use protective equipment when offloading and storing delivered goods. Employees should inspect deliveries and perform disinfection measures prior to storing goods in warehouses and facilities, when deliveries appear tampered with.

- Require that hard hats and face shields be sanitized at the end of each shift. Clean the inside of the face shield, then the outside, then wash hands.

- Clean delivery vehicles and equipment before and after delivery routes, carry additional sanitation materials during deliveries, and use clean personal protective equipment for each delivery stop.

- For delivery drivers, normally accessible restrooms on routes (e.g., restaurants, coffee shops) may be closed. Employers should provide employees alternative restroom locations and allow time for employees to use them.

- Consider installing portable high-efficiency air cleaners, upgrading the building's air filters to the highest efficiency possible, and making other modifications to increase the quantity of outside air and ventilation in work and break areas.

- Modify offerings in on-site cafeterias, including using prepackaged foods, and safe options for drink, condiment, and flatware dispensing.



# Physical Distancing Guidelines

- Implement measures to ensure physical distancing of at least six feet between workers. This can include use of physical partitions or visual cues (e.g., floor markings, or signs to indicate to where workers should stand).

- Adjust safety or other in-person meetings, including interviews, to ensure physical distance and use smaller individual meetings at facilities to maintain physical distancing guidelines.

- Utilize work practices, when feasible, to limit the number of workers on site at one time. This may include scheduling (e.g., staggering shift

start/end times) or rotating access to a designated area during a shift. Stage facilities to stagger work and limit overlap of work crews.

- Stagger employee breaks, within compliance with wage and hour regulations, to maintain physical distancing protocols. Reassign lockers or limit/stagger locker use to increase distance between employees.

- Place additional limitations on the number of workers in enclosed areas, to ensure at least six feet of separation to limit transmission of the virus.

- Close breakrooms, use barriers, or increase distance between tables/chairs to separate workers and discourage congregating during breaks. Where possible, create outdoor break areas with shade covers and seating that ensures physical distancing.

- Workers should consider bringing a lunch made at home or purchase take out or delivery where available as long as they can avoid congested areas.

- Use the following hierarchy to prevent transmission of COVID-19 in work areas especially where physical distancing is difficult to maintain: engineering controls, administrative controls, and PPE.

  o Engineering controls include creating physical or spatial barriers between employees such as Plexiglas or other sturdy and impermeable partitions.

  o Administrative controls include increasing the number of shifts to reduce the number of personnel present at one time and ensure adequate physical distancing.

  o PPE includes face shields, some masks, and impermeable gloves. Note that some disposable equipment such as some face shields and respirators are prioritized for health care workers and workers that handle pathogens and should not otherwise be used.

- Install production transfer-aiding materials, such as shelving and bulletin boards, to reduce person-to-person production hand-offs.

- Designate separate entrance and exits and post signage to this effect.

---

[1]Additional requirements must be considered for vulnerable populations. The manufacturing industry must comply with all Cal/OSHA standards and be prepared to adhere to its guidance as well as guidance from the Centers for Disease Control and Prevention (CDC) and the California Department of Public Health (CDPH). Additionally, employers must be prepared to alter their operations as those guidelines change.

**covid19.ca.gov**  





# COVID-19 INDUSTRY GUIDANCE:

## Logistics and Warehousing Facilities

May 7, 2020

covid19.ca.gov



# OVERVIEW

On March 19, 2020, the State Public Health Officer and Director of the California Department of Public Health issued an order requiring most Californians to stay at home to disrupt the spread of COVID-19 among the population.

The impact of COVID-19 on the health of Californians is not yet fully known. Reported illness ranges from very mild (some people have no symptoms) to severe illness that may result in death. Certain groups, including people aged 65 or older and those with serious underlying medical conditions, such as heart or lung disease or diabetes, are at higher risk of hospitalization and serious complications. Transmission is most likely when people are in close contact with an infected person, even if that person does not have any symptoms or has not yet developed symptoms.

Precise information about the number and rates of COVID-19 by industry or occupational groups, including among critical infrastructure workers, is not available at this time. There have been multiple outbreaks in a range of workplaces, indicating that workers are at risk of acquiring or transmitting COVID-19 infection. Examples of these workplaces include long-term care facilities, prisons, food production, warehouses, meat processing plants, and grocery stores.

As stay-at-home orders are modified, it is essential that all possible steps be taken to ensure the safety of workers and the public.

Key prevention practices include:
- ✓ physical distancing to the maximum extent possible,
- ✓ use of face coverings by employees (where respiratory protection is not required) and customers/clients,
- ✓ frequent handwashing and regular cleaning and disinfection,
- ✓ training employees on these and other elements of the COVID-19 prevention plan.

In addition, it will be critical to have in place appropriate processes to identify new cases of illness in workplaces and, when they are identified, to intervene quickly and work with public health authorities to halt the spread of the virus.

# Purpose

This document provides guidance for businesses operating in the logistics/warehousing industry to support a safe, clean environment for employees. The guidance is not intended to revoke or repeal any employee rights, either statutory, regulatory or collectively bargained, and is not exhaustive, as it does not include county health orders, nor is it a substitute for any existing safety and health-related regulatory requirements such as those of Cal/OSHA.[1] Stay current on changes to public health guidance and state/local orders, as the COVID-19 situation continues. Cal/OSHA has more safety and health guidance on their Cal/OSHA COVID-19 Infection Prevention for Logistics Employers and Employees webpage. CDC has additional requirements in their guidance for businesses and employers and specific guidance for mail and parcel delivery.



# Worksite Specific Plan

- Establish a written, worksite-specific COVID-19 prevention plan at every facility, perform a comprehensive risk assessment of all work areas, and designate a person at each facility to implement the plan.

- Identify contact information for the local health department where the facility is located for communicating information about COVID-19 outbreaks among employees.

- Train and communicate with employees and employee representatives on the plan.

- Regularly evaluate the workplace for compliance with the plan and document and correct deficiencies identified.

- Investigate any COVID-19 illness and determine if any work-related factors could have contributed to risk of infection. Update the plan as needed to prevent further cases.

- Identify close contacts (within six feet for 10 minutes or more) of an infected employee and take steps to isolate COVID-19 positive employee(s) and close contacts.

- Adhere to the guidelines below. Failure to do so could result in workplace illnesses that may cause operations to be temporarily closed or limited.



# Topics for Employee Training

- Information on COVID-19, how to prevent it from spreading, and which underlying health conditions may make individuals more susceptible to contracting the virus.

- Self-screening at home, including temperature and/or symptom checks using CDC guidelines.

- The importance of not coming to work if employees have a frequent cough, fever, difficulty breathing, chills, muscle pain, headache, sore throat, recent loss of taste or smell, or if they or someone they live with have been diagnosed with COVID-19.

- To seek medical attention if their symptoms become severe, including persistent pain or pressure in the chest, confusion, or bluish lips or face. Updates and further details are available on CDC's webpage.

3

- The importance of frequent handwashing with soap and water, including scrubbing with soap for 20 seconds (or using hand sanitizer with at least 60% ethanol or 70% isopropanol when employees cannot get to a sink or handwashing station, per CDC guidelines).

- The importance of physical distancing, both at work and off work time (see Physical Distancing section below).

- Proper use of face coverings, including:

  o Face coverings do not protect the wearer and are not personal protective equipment (PPE).

  o Face coverings can help protect people near the wearer, but do not replace the need for physical distancing and frequent handwashing.

  o Employees should wash or sanitize hands before and after using or adjusting face coverings.

  o Avoid touching eyes, nose, and mouth.

  o Face coverings should be washed after each shift.

 # Individual Control Measures and Screening

- Provide temperature and/or symptom screenings for all workers at the beginning of their shift and any personnel entering the facility. Make sure the temperature/symptom screener avoids close contact with workers to the extent possible. Both screeners and employees should wear face coverings for the screening.

- Encourage workers who are sick or exhibiting symptoms of COVID-19 to stay home.

- Employers should provide and ensure workers use all required protective equipment. Employers should consider where disposable glove use may be helpful to supplement frequent handwashing or use of hand sanitizer; examples are for workers who are screening others for symptoms or handling commonly touched items.

- Face coverings are strongly encouraged when employees are in the vicinity of others. Workers should have face coverings available and wear them when at work, in offices, or in a vehicle for work-related travel with others. Face coverings must not be shared.



# Cleaning and Disinfecting Protocols

- Perform thorough cleaning on high traffic areas such as break rooms, lunch areas, and changing areas, and areas of ingress and egress including stairways and stairwells, handrails, elevator controls.  Frequently disinfect commonly used surfaces, including tables, amenities, doorknobs, toilets, and handwashing facilities.

- Clean touchable surfaces between shifts or between users, whichever is more frequent, including but not limited to working surfaces, machinery, tools, equipment, shelves, storage rooms, handles, latches and locks, and controls on stationary and mobile equipment.

- Require employees to wash hands or use sanitizer between use of shared equipment, such as time clocks and forklifts, and allow work time to do so. Avoid sharing phones, other work tools, or equipment wherever possible. Never share PPE.

- Clean delivery vehicles and equipment before and after delivery, carry additional sanitation materials during deliveries, and use clean personal protective equipment for each delivery stop.

- For delivery drivers, normally accessible restrooms on routes (e.g., restaurants, coffee shops) may be closed. Employers should provide employees alternative restroom locations and allow time for employees to use them.

- Provide time for workers to implement cleaning practices before and after shifts. If cleaning is assigned to the worker, they must be compensated for that time.

- Ensure that sanitary facilities stay operational and stocked at all times and provide additional soap, paper towels, and hand sanitizer when needed.  Provide additional sanitary facilities (portable toilets and handwashing stations) if necessary and practical.

- Stagger breaks if feasible to ensure physical distancing and the chance to clean restrooms frequently.

- When choosing cleaning chemicals, employers should use products approved for use against COVID-19 included on the Environmental Protection Agency (EPA)-approved list and follow product instructions. Use disinfectants labeled to be effective against emerging viral pathogens, diluted household bleach solutions (5 tablespoons per gallon of water), or alcohol solutions with at least 70% alcohol that are appropriate for the surface. Provide employees training on

5

manufacturer's directions and Cal/OSHA requirements for safe use. Workers using cleaners or disinfectants should wear gloves as required by the product instructions.

- Employees should be provided and use protective equipment when offloading and storing delivered goods. Employees should inspect deliveries and perform disinfection measures prior to storing goods in warehouses and facilities when deliveries appear tampered with.

- Consider installing portable high-efficiency air cleaners, upgrading the building's air filters to the highest efficiency possible, and making other modifications to increase the quantity of outside air and ventilation in work and break areas.



# Physical Distancing Guidelines

- Implement measures to ensure physical distancing of at least six feet between workers, including transportation personnel. These can include use of physical partitions or visual cues such as floor markings, colored tape, or signs to indicate to where workers should stand.

- Minimize transaction time between warehouse employees and transportation personnel. Perform gate check-ins and paperwork digitally if feasible. Require employees to put on face coverings prior to interfacing with transportation personnel and other people entering and exiting the facility.

- Redesign workspaces and shared outdoor spaces to allow for at least six feet between employees.

- Use the following hierarchy to prevent transmission of COVID-19 in work areas especially where physical distancing is difficult to maintain: engineering controls, administrative controls, and PPE.

  o Engineering controls include creating physical or spatial barriers between employees such as Plexiglas or other sturdy and impermeable partitions.

  o Administrative controls include increasing the number of shifts to reduce the number of personnel present at one time and ensure adequate physical distancing.

  o PPE includes face shields, some masks, and impermeable gloves. Note that some disposable equipment such as some face shields and respirators are prioritized for health care workers and workers that handle pathogens and should not otherwise be used.

- Adjust safety and other meetings to ensure physical distance and conduct smaller individual meetings at facilities to maintain physical distancing guidelines.

- Utilize work practices, when feasible, to limit the number of workers on the jobsite at one time. This may include scheduling (e.g., staggering shift start/end times) or rotating crew access to a designated area during a shift. Stage the jobsite to stagger work and limit overlap of work crews.

- Place additional limitations on the number of workers in enclosed areas, where six feet of separation may not be sufficient to limit transmission of the virus.

- Stagger employee breaks, in compliance with wage and hour regulations, to maintain physical distancing protocols.

- Close breakrooms, use barriers, or increase distance between tables/chairs to separate workers and discourage congregating during breaks. Where possible, create outdoor break areas with shade covers and seating that ensures physical distancing.

- Close common areas where personnel are likely to congregate and interact (e.g., kitchenettes, break rooms, etc.). Discourage employees from congregating in high traffic areas.

---

[1]Additional requirements must be considered for vulnerable populations. The logistics and warehousing industry must comply with all Cal/OSHA standards and be prepared to adhere to its guidance as well as guidance from the Centers for Disease Control and Prevention (CDC) and the California Department of Public Health (CDPH). Additionally, employers must be prepared to alter their operations as those guidelines change.

**covid19.ca.gov**  

**EXHIBIT 1-4**

Case 3:20-cv-00865-BAS-AHG   Document 1   Filed 05/08/20   PageID.102   Page 102 of 128

- Following guidance from the state administration, modifying the stay at home order on Friday, May 8, Governor G... updated industry guidance – including for retail, manufacturing and logistics – to begin reopening with modifications that m... environment for workers and customers.

...e the new guidance.

...working together, have flattened the curve. Because of that work, our health data tells us that California can enter the next st... gradually begin to restart portions of our economy," said Governor Newsom. "It's critical that businesses and employers und... the risk of transmission and better protect their workers and customers. COVID-19 will be present in our communities unti... apeutic, and it will be up to all of us to change our behavior and eliminate opportunities for the disease to spread."

...dmap

...e flattening the curve as part of the stay at home order issued on March 19, 2020. These efforts have allowed the state to mov... r modifying the statewide order. The Resilience Roadmap stages that California is using to guide its gradual reopening proc...

...ty and Preparedness
...er-Risk Workplaces
...her-Risk Workplaces
...of Stay at Home Order

...tions are advanced and the state's six indicators show we've made enough progress, we can move to the next stage of the ro... g into Stage 2, where some lower-risk workplaces can gradually open with adaptations. Stage 2 expansion will be phased in... ...ities may move through Stage 2 faster if they are able to show greater progress, and counties that have met the readiness cr... ...e California Department of Public Health can open more workplaces as outlined in the County Variance Guidance.

# ...y Guidance to reduce the risk

...move into Stage 2 of modifying the state's stay at home order on May 8, 2020. The state's progress in achieving key **public he**... ...ow a gradual reopening of California's economy.

...nizes the impact of economic hardship, but the risk of COVID-19 infection is still real for all Californians and continues to be...

...ry business should take every step possible to reduce the risk of infection:

...pare for reopening
... changes within the workplace
...ces by employees and help educate customers

...utlined guidance for each early Stage 2 business to follow. The goal is a safer environment for workers and customers. Busi... ...ative or innovative methods to build upon the guidance.

...should review the guidance that is relevant to their workplace, prepare a plan based on the guidance for their industry, and...

...e, businesses can post the industry-specific checklist (below) in their workplace to show customers and employees that they... e open for business.

...ng, all facilities should:

should minimize transaction time between warehouse employees and transportation personnel. Perform gate check-ins an...
asible.

workers should clean delivery vehicles and equipment before and after delivery, carry additional sanitation materials during
n personal protective equipment for each delivery stop.

###

**EXHIBIT 2-1**



# County of San Diego

**NICK MACCHIONE, FACHE**
AGENCY DIRECTOR

**HEALTH AND HUMAN SERVICES AGENCY**
PUBLIC HEALTH SERVICES
3851 ROSECRANS STREET, MAIL STOP P-578
SAN DIEGO, CA 92110-3134
(619) 531-5800 • FAX (619) 542-4186

**WILMA J. WOOTEN, M.D.**
PUBLIC HEALTH OFFICER

## ORDER OF THE HEALTH OFFICER
## AND EMERGENCY REGULATIONS
### (Effective May 1, 2020)

Pursuant to California Health and Safety Code sections 101040, 120175, and 120175.5 (b) the Health Officer of the County of San Diego (Health Officer) **ORDERS AS FOLLOWS**:

Effective 12:00 a.m. on Friday, May 1, 2020, and continuing until further notice, the following will be in effect for San Diego County (county):

1. All persons are to remain in their homes or at their place of residence, except for employees or customers travelling to and from essential businesses or activities as defined in section 18a, below, or to participate in individual or family outdoor activity as allowed by this Order.

2. All public or private "gatherings," as defined in section 19b below, are prohibited.

3. All businesses not meeting the definition of essential business in section 19 are referred to in this Order as "non-essential businesses" and shall be and remain closed for the duration of this Order. All essential businesses must comply with the requirements of this Order. Notwithstanding the foregoing, a non-essential business may remain open if its employees and owners can provide its services from home, including by telecommuting, without direct contact with the public.

4. All public or private schools, colleges, and universities shall not hold classes or other school activities where students gather on the school campus. Parents of minor children shall take steps to ensure said children are not participating in activities prohibited by this Order.

5. Child daycare and childcare providers shall make best efforts to operate under the following conditions: i) childcare should be carried out in stable groups of 10 or fewer ("stable" means that the same 10 or fewer children are in the same group each day); ii) children should not change from one group to another; iii) if more than one group of children is cared for at one facility, each group should be in a separate room; iv) groups should not mix with each other; and v) childcare providers should remain solely with one group of children. Employees of such businesses, but not the children being cared for, shall wear face coverings as described in section 9. Child daycare and childcare providers shall establish health check and temperature

screening requirements to ensure children and employees with a temperature of 100 degrees or above do not enter the facility.

6. "Non-essential personnel," as defined in section 19d below, are prohibited from entry into any hospital or long-term care facility.  All essential personnel who are COVID-19 positive or show any potential signs or symptoms of COVID-19 are strictly prohibited from entry into hospitals or long-term care facilities. Notwithstanding the foregoing, individuals requiring medical care for COVID-19 or related conditions may be admitted to hospitals or other medical facilities if the hospital or medical facility is appropriate for treating COVID-19 and has adequate precautions in place to protect its patients, medical personnel and staff.

7. Hospitals and healthcare providers shall take measures to preserve and prioritize resources. Hospitals and healthcare providers may authorize and perform non-emergent or elective surgeries or procedures based on their determination of clinical need and supply capacity, and where consistent with State guidance.

8. Hospitals, healthcare providers, and commercial testing laboratories shall report all COVID-19 test results to the Public Health Officer immediately after such results are received.

9. All persons two year old or older who are present in the county shall have possession of a face covering described in California Department of Public Health Face Covering Guidance issued on April 1, 2020, (available at: https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Face-Coverings-Guidance.aspx ), when they leave their home or place of residence and shall wear the face covering whenever they are in a business or within six feet of another person who is not a member of their family or household.  Persons with a medical or mental health condition, or developmental disability that prevents wearing a face covering shall be exempt from this requirement.

10. All essential businesses that allow members of the public to enter a facility must prepare and post a "Social Distancing and Sanitation Protocol" on the form attached to this Order (and available at:https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/covid19/SOCIAL_DISTANCING_AND_SANITATION_PROTOCOL_04022020_V1.pdf ), or on a form required by another governmental entity requiring substantially similar information, for each of their facilities open to the public in the county. The Social Distancing and Sanitation Protocol must be posted at or near the entrance of the relevant facility, and shall be easily viewable by the public and employees.  A copy of the Social Distancing and Sanitation Protocol must also be provided to each employee performing work at the facility.  All essential businesses shall implement the Social Distancing and Sanitation Protocol and provide evidence of its implementation to any authority enforcing this Order upon demand.  The Social Distancing and Sanitation Protocol must ensure all required measures are implemented and must identify and require measures necessary to implement social distancing are implemented at each facility that will ensure social distancing and sanitation at that particular facility.  If the measures identified and implemented are not effective in maintaining proper social distancing

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

and sanitation, the business shall promptly modify its Social Distancing and Sanitation Protocols to ensure proper social distancing and sanitation. Any business failing to successfully implement social distancing and sanitation shall be closed.

11. Effective 12:00 a.m. on Friday, May 8, 2020, each essential business shall require all employees to wear a face covering in compliance with section 9 above.

12. For Parks Only - Each public park and recreation area, shall operate in compliance with the Protocol found at https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/covid19/parks-beaches-social-distancing-protocol.pdf created and implemented by the operator of the park.   The public shall not congregate or participate in active sport activities at a park with the   exception of members of a single family or household if authorized pursuant to the Protocol applicable to the park.   Any park at which the Protocol requirements cannot be effectively implemented shall close. Recreational boating shall be allowed provided all occupants of a boat are from the same household.

13. For Beaches Only - All parking lots at public beaches shall be closed.  Beaches shall be used solely for walking, running, hiking, equestrian or bicycle riding (where allowed).  The public shall not congregate or participate in active sport activities at said facilities. Swimming, body surfing, boogie boarding, surfing, kite surfing, paddle boarding, kayaking, snorkeling and scuba diving from the shore may be allowed in the ocean and bays connected thereto. Beaches where social distancing requirements cannot be effectively implemented shall close.  All other restrictions applicable to beaches pursuant to other sections of this Order shall remain in effect.

14. To enhance recreational opportunities in the county, private and public golf courses may be open for limited use provided the owner or operator of the golf course has completed and fully implements a Golf Course Physical Distancing & Safety Plan for San Diego County and submitted a copy of the completed form to the Public Health Officer at least two days prior to opening.  Golf courses shall conduct temperature screening of all employees and customers and anyone with a temperature of 100 degrees or higher shall not be permitted to enter the facility.

15. All essential businesses that remain in operation in accordance with the Order shall make every effort to use telecommuting for their workforces.

16. A strong recommendation is made that all persons who are 65 years old or older, have a chronic underlying condition, or have a compromised immune system self-quarantine themselves at home or other suitable location.

17. All persons arriving in the county from international locations identified on the Centers for Disease Control and Prevention (CDC) Warning Level 2 or 3 Travel Advisory (available at: https://wwwnc.cdc.gov/travel/notices) shall be subject to 14-day home or other suitable location quarantine and self-monitoring.

18. Persons who have been diagnosed with COVID-19, or who are likely to have COVID-19, shall comply with the Order of the Health Officer titled: "Isolation of All Persons with or Likely to have COVID-19", or as subsequently amended.  Persons who have a close contact with a person who either has COVID-19, or is likely to have COVID-19, shall comply with the Order of the Health Officer titled: "Quarantine of Persons Exposed to COVID-19," or as subsequently amended.  Both orders are available at: https://www.sandiegocounty.gov/content/sdc/hhsa/programs/phs/community_epidemiology/dc/2019-nCoV/health-order.html.  If a more specific isolation or quarantine order is issued to a person, that order shall be followed.

19. For purposes of this Order:
    a. "Essential business" is any business or activity (or a business/activity that employs/utilizes workers) designated by the State Public Health Officer as "Essential Critical Infrastructure Workers" set forth in: https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf) as that list may be updated from time-to-time, and referenced in Executive Order N-33-20 issued by the Governor of the State of California.  For the purposes of this Order, the following businesses in the Food and Agriculture Sector are considered "groceries" or "other retail that sells food and beverages": grocery stores, corner stores and convenience stores, liquor stores that sell food, farmer's markets, food banks, farm and produce stands, supermarkets, big box stores that sell groceries and essentials, or similar business that sell food so long as the store has a current permit related to the sale of food and/or beverages from the San Diego County Department of Environmental Health.
    b. "Gathering" is any event or convening that brings together more than one person in a single room or single indoor or outdoor space at the same time, including people in multiple vehicles in one location.  A gathering does not include:
        i. A gathering consisting only of members of a single family or household.
        ii. Operations at airports, public transportation or other spaces where persons in transit are able to practice social distancing.
        iii. Operations at essential businesses as defined in section 18a above and where the other requirements set forth in this Order are followed.
    c. "Long term care facility" is a facility serving adults that require assistance with activities of daily living, including a skilled nursing facility, and that is licensed by the California Department of Community Care and Licensing, or the California Department of Public Health.
    d. "Non-essential personnel" are employees, contractors, or members of the public who do not perform treatment, maintenance, support, or administrative tasks deemed essential to the healthcare mission of the long-term care facility or hospital.  Non-essential personnel do not include first responders, nor State, federal, or local officials, investigators, or medical personnel carrying out lawful duties.  Non-essential personnel do not include visitors to hospitals and long-term care facilities who are granted entry by the facility's director, or designee, because they are family or friends who are visiting a resident in an end of life or similar situation, are parents or guardians visiting a child who is a patient, or because of any other circumstances deemed appropriate by the facility director, or designee, and where appropriate precautions by the facility that

Page 4 of 7
ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

follow federal, State, and local public health guidance regarding COVID-19 are followed.

e. "Social distancing" is maintaining a six-foot separation from all persons except for household members, first responders and medical providers or employees conducting temperature screening.

20. This Order is issued as a result of the World Health Organization's declaration of a worldwide pandemic of COVID-19 disease, also known as "novel coronavirus."

21. This Order is issued based on scientific evidence regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect vulnerable members of the public from avoidable risk of serious illness or death resulting from exposure to COVID-19. The age, condition, and health of a significant portion of the population of the county places it at risk for serious health complications, including death, from COVID-19. Although most individuals who contract COVID-19 do not become seriously ill, persons with mild symptoms and asymptomatic persons with COVID-19 may place other vulnerable members of the public— such as older adults, and those with underlying health conditions—at significant risk.

22. The actions required by this Order are necessary to reduce the number of individuals who will be exposed to COVID-19, and will thereby slow the spread of COVID-19 in the county. By reducing the spread of COVID-19, this Order will help preserve critical and limited healthcare capacity in the county and will save lives.

23. This Order is issued in accordance with, and incorporates by reference: a) the Declaration of Local Health Emergency issued by the Health Officer on February 14, 2020; b) the Proclamation of Local Emergency issued by the County Director of Emergency Services on February 14, 2020; c) the action of the County Board of Supervisors to ratify and continue both the local health emergency and local emergency on February 19, 2020; d) the Proclamation of a State of Emergency issued by the Governor of the State of California on March 4, 2020; e) Executive Order N-25-20 issued by the Governor of the State of California on March 12, 2020 which orders that "All residents are to heed any orders and guidance of state and local health officials, including but not limited to the imposition of social distancing measures, to control COVID-19"; f) Proclamation 9984 regarding COVID-19 issued by the President of the United States on March 11, 2020; g) Executive Order N-33-20 issued by the Governor of the State of California on March 19, 2020; h) the "Interim Additional Guidance for Infection Prevention and Control for Patients with Suspected or Confirmed COVID-19 in Nursing Homes" issued by the CDC; and i) COVID-19 guidance issued by the California Department of Public Health on including, but not limited to the Face Coverings Guidance issued on April 1, 2020.

24. This Order is issued to prevent circumstances often present in gatherings that may exacerbate the spread of COVID-19, such as: 1) the increased likelihood that gatherings will attract people from a broad geographic area; 2) the prolonged time period in which large numbers of people are in close proximity; 3) the difficulty in tracing exposure when large numbers of people

attend a single event or are at a single location; and 4) the inability to ensure that such persons follow adequate hygienic practices.

25. This Order is issued to provide additional protections from the spread of COVID-19 to the public who are taking advantage of opportunities for recreational activities, employees of essential businesses and their customers/clients by increasing facial covering requirements and health checks and temperature screening.

26. This Order comes after the release of substantial guidance from the Health Officer, the California Department of Public Health, the CDC, and other public health officials throughout the United States and around the world.

27. Pursuant to Health and Safety Code section 120175.5 (b) all governmental entities in the county shall take necessary measures within the governmental entity's control to ensure compliance with this Order and to disseminate this Order to venues or locations within the entity's jurisdiction where gatherings may occur.

28. Violation of this Order is subject to fine, imprisonment, or both. (California Health and Safety Code section 120295.)

29. To the extent necessary, this Order may be enforced by the Sheriff or chiefs of police pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029.

30. Once this Order takes effect it shall supersede the Amended Order of the Health Officer and Emergency Regulations dated April 24, 2020.

**IS SO ORDERED:**

Date April 30, 2020

Wilma J. Wooten, M.D., M.P.H.
Public Health Officer
County of San Diego

---

## EMERGENCY REGULATIONS

As Director of Emergency Services for the County of San Diego, I am authorized to promulgate regulations for the protection of life and property pursuant to Government Code Section 8634 and San Diego County Code section 31.103. The following shall be in effect for the duration of the Health Officer Order issued above which is incorporated in its entirety by reference:

> The Health Officer Order shall be promulgated as a regulation for the protection of life and property.

Any person who violates or who refuses or willfully neglects to obey this regulation is subject to fine, imprisonment, or both.  (Government Code section 8665.)

Date: April 30, 2020

Helen Robbins-Meyer
Chief Administrative Officer
Director of Emergency Services

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

**EXHIBIT 2-2**

# SOCIAL DISTANCING AND SANITATION PROTOCOL

Business Name:

Facility Address:

*Businesses must implement all mandatory measures listed in A, B, and F below. Businesses shall select applicable measures listed in C, D, and E below and be prepared to explain why any measure that is not implemented is inapplicable to the business.*

**A. Signage (Mandatory):**

☐ Signage at each public entrance of the facility to inform all employees and customers that they should: avoid entering the facility if they have a cough or fever; maintain a minimum six-foot distance from one another; and not shake hands or engage in any unnecessary physical contact.

☐ Signage posting a copy of the Social Distancing Protocol at each public entrance to the facility.

**B. Measures To Protect Employee Health (Mandatory):**

☐ Everyone who can carry out their work duties from home has been directed to do so.

☐ All employees have been told not to come to work if sick.

☐ All desks or individual work stations are separated by at least six feet.

☐ Break rooms, bathrooms, and other common areas are being disinfected frequently, on the following schedule:

    ☐ Breakrooms:

    ☐ Bathrooms:

    ☐ Other:      : 

☐ Disinfectant and related supplies are available to all employees at the following location(s):

☐ Hand sanitizer effective against COVID-19 is available to all employees at the following location(s):

REV 04/02/2020
County of San Diego

# SOCIAL DISTANCING AND SANITATION PROTOCOL

**B.  Measures To Protect Employee Health (Mandatory) Continued:**

☐  Soap and water are available to all employees at the following location(s):

☐  Copies of the Protocol have been distributed to all employees.

**C.  Measures To Prevent Crowds From Gathering (Check all that apply to the facility):**

☐  Limit the number of customers in the store at any one time to ⬚ which allows for customers and employees to easily maintain at least six-foot distance from one another at all practicable times.

☐  Ensure an employee is at the door to monitor that the maximum number of customers in the facility set forth above is not exceeded.

☐  Placing per-person limits on goods that are selling out quickly to reduce crowds and lines.

☐  Optional – Describe other measures:

**D.  Measures To Keep People At Least Six Feet Apart (Check all that apply to the facility):**

☐  Placing signs outside the store reminding people to be at least six feet apart, including when in line.

☐  Placing tape or other markings at least six feet apart in customer line areas inside the store and on sidewalks at public entrances with signs directing customers to use the markings to maintain distance.

☐  Separate order areas from delivery areas to prevent customers from gathering.

☐  All employees have been instructed to maintain at least six feet distance from customers and from each other, except employees may momentarily come closer when necessary to accept payment, deliver goods or services, or as otherwise necessary.

☐  Optional – Describe other measures:

REV 04/02/2020
County of San Diego

## SOCIAL DISTANCING AND SANITATION PROTOCOL

**E.  Measures To Prevent Unnecessary Contact (Check all that apply to the facility):**

☑ Preventing people from self-serving any items that are food-related.

  ☑ Lids for cups and food-bar type items are provided by staff; not to customers to grab.

  ☑ Bulk-item food bins are not available for customer self-service use.

☑ Not permitting customers to bring their own bags, mugs, or other reusable items from home.

☑ Providing for contactless payment systems or, if not feasible, sanitizing payment systems regularly. Describe below:

☑ Optional – Describe other measures (e.g., providing senior-only hours):

**F. Measures To Increase Sanitization (Mandatory):**

☑ Disinfecting wipes that are effective against COVID-19 are available near shopping carts and shipping baskets.

☑ Employee(s) assigned to disinfect carts and baskets regularly.

☑ Hand sanitizer, soap, and water, or effective disinfectant is available to the public at or near the entrance of the facility, at checkout counters, and anywhere else inside the store or immediately outside where people have direct interactions.

☑ Disinfecting all payment portals, pens, and styluses after each use.

☑ Disinfecting all high-contact surfaces frequently.

**G. Hospitals/Health Care Facility Only:**

☑ Symptoms/temperature checks to ensure any staff or visitors (allowed pursuant to Section 2c of the Order) entering the facility are not ill.

*Any additional measures not included here should be listed on separate pages, which the business should attach to this document.

**You may contact the following person with any questions or comments about this protocol:**

Name: _____     Phone Number: _____

**Date of Form Completed:** _____

REV 04/02/2020
County of San Diego

**EXHIBIT 3-1**



City of San Diego
EXECUTIVE ORDER NO. 2020-1
By the Mayor

On March 12, 2020, I issued a proclamation of local emergency in preparation and response to the spread of the COVID-19 virus in our community. On March 13, 2020, I ordered measures to be taken across the City to protect members of the public and City employees from an undue risk of contracting the COVID-19 virus including closure of libraries and recreation centers. It is imperative that the City of San Diego, under my authority as the Mayor, implement locally all guidance and directives currently available from federal, state, and local public health officials to stem the spread of the virus and protect public safety and welfare. The measures outlined in this order pertain to matters reasonably related to the protection of life and property.

On January 31, 2020, United States Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the United States to aid the nation's healthcare community in responding to COVID-19. On February 19, 2020, the County of San Diego Board of Supervisors ratified the Declaration of Local Health Emergency. On March 11, 2020, the World Health Organization declared the COVID-19 outbreak. On March 13, 2020, President Donald J. Trump issued a Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease, COVID-19, Outbreak.

The City of San Diego is bolstering efforts to promote sanitation and social distancing measures. We must do everything we can to slow the pace of community spread and avoid unnecessary strain on our medical system. To aid in our efforts, under the emergency authorities vested in my office under the laws of the City of San Diego, today I am ordering that a series of temporary restrictions be placed on certain establishments throughout our City in which large numbers of people gather and remain in close proximity.

By virtue of authority vested in me as Mayor of the City of San Diego pursuant to the provisions of the City Charter, San Diego Municipal Code section 51.0105, and California Government Code section 8634 to promulgate, issue, and enforce rules, regulations, and orders, I hereby declare the following orders to be necessary for the protection of life and property and I hereby order, effective at 11:59 p.m. tonight, until March 31, 2020 at 12:00 p.m., that:

1. All public or private gatherings, to be defined as any event or convening that brings together 50 or more people in a single room or single space at the same time, such as an auditorium, stadium, arena, theater, church, casino, large conference room, meeting hall, cafeteria, or any other indoor or outdoor space, are prohibited. All non-essential social gatherings of any size are strongly discouraged.



City of San Diego
EXECUTIVE ORDER NO. 2020-1
By the Mayor

2. All bars, adult entertainment establishments, and nightclubs in the City of San Diego shall be closed to the public and all restaurants and business establishments that serve food in the City of San Diego shall be prohibited from serving food and beverage for consumption on premises. Restaurants and business establishments that serve food may continue to operate for purposes of preparing and offering food to customers via delivery service, to be picked up, or by drive-thru. For those establishments offering food pick-up options, proprietors are directed to establish social distancing practices for those patrons in the queue for pick-up. Facilities expressly exempted from this order include cafeterias, commissaries, and restaurants located within hospitals, skilled nursing facilities, and other healthcare facilities; grocery stores; pharmacies; and food banks.

3. Trucks and other vehicles engaged in the delivery of grocery items to grocery stores, when such items are to be made available for sale to the public, are hereby exempt from having to comply with any City rules and regulations that limit the hours for such deliveries.

4. All City of San Diego public buildings are to be closed to the general public.

5. City Departments will execute their Continuity of Operations Plans to maintain appropriate levels of essential services. The City will continue to provide these services including Police, Fire, Water, Wastewater and Trash Disposal.

6. The City of San Diego will enact a moratorium on utility shutoffs for utilities provided by the City of San Diego Public Utility Department and the City may develop a program for payment deferrals.

7. The City of San Diego will limit parking enforcement and issuance of citations to holiday or Sunday enforcement regulations, including no longer enforcing parking meters, yellow commercial zones, short-term green zones and 1- to 2-hour time parking zones. Red, white, blue, and other all-time enforcement areas will continue to be enforced to maintain public safety.

Any violation of the above prohibitions may be referred for prosecution to the fullest extent of the law. Each individual officer should use their discretion in enforcing this order and always keep the intent of the order in mind.



City of San Diego
EXECUTIVE ORDER NO. 2020-1
By the Mayor

In addition, I hereby issue a strong recommendation, consistent with Centers of Disease Control guidance from March 16, 2020 to avoid non-essential gatherings to the extent possible, to the leaders of the City's houses of worship and urge them, in the strongest possible terms, to limit gatherings on their premises and to explore and implement ways to practice their respective faiths while observing social distancing practices.

This order may be extended before it expires on March 31, 2020.

Dated: March 16, 2020

Mayor Kevin L. Faulconer

**EXHIBIT 3-2**



City of San Diego
EXECUTIVE ORDER NO. 2020-2
By the Mayor

On March 12, 2020, I issued a proclamation of local emergency in preparation and response to the spread of the COVID-19 virus in our community, which our City Council ratified on March 17, 2020. The local emergency will continue until its termination by the Council.

On March 16, 2020, I executed Executive Order No. 2020-1, directing measures to be taken across the City to protect members of the public and City employees from an undue risk of contracting the COVID-19 virus. That Executive Order, initially intended to expire March 31, 2020, is extended until April 30, 2020, as it is imperative that the City of San Diego, continue to implement locally all guidance and directives currently available from federal, state, and local public health officials to stem the spread of the virus and protect public safety and welfare. The measures outlined in this order fall within City jurisdiction and pertain to matters reasonably related to the protection of life and property.

In Executive Order N-28-20, issued March 16, 2020, the Governor waived the time limitation set forth in Penal Code section 396, subdivision (f), concerning protections against residential eviction through May 31, 2020. On March 25, 2020, the City Council adopted an ordinance strengthening protections for residential and commercial tenants during this local declared emergency and imposed limitations on evictions for nonpayment of rent arising out of a documented, substantial decrease in income or substantial out-of-pocket medical expenses caused by COVID-19 or by any local, state, or federal government response. The City also took action to provide relief for small businesses that have been financially impacted by complying with public health orders that promote sanitation and social distancing to prevent the spread of the virus through the creation of a Small Business Relief Fund.

In Executive Order N-33-20, issued March 19, 2020, the Governor directed all California residents to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, under the Order of the State Public Health Officer issued on March 19, 2020. The County Public Health Officer issued orders directing the public to take certain actions to protect the public health from COVID-19 on March 12, 2020, amended several times and in effect until March 31, 2020, unless extended. This Order further directs local governments to enforce social distancing at all parks and beaches, and reinforces the City's commitment to promote social distancing, self-quarantine, and self-isolation necessary to protect public health.

By virtue of authority vested in me as Mayor of the City of San Diego pursuant to the provisions of the City Charter, San Diego Municipal Code section 51.0105, and California Government Code section 8634 to promulgate, issue, and enforce rules, regulations, and orders, I hereby



City of San Diego
EXECUTIVE ORDER NO. 2020-2
By the Mayor

declare the following orders to be necessary for the protection of life and property and I hereby order, effective immediately until April 30, 2020, that:

1.  All of the requirements contained in Executive Order No. 2020-1, dated March 16, 2020, except those superseded here or by order of the Governor or Public Health Official are still in effect and are hereby extended until April 30, 2020.

2. All City residents shall comply with all current direction issued by Executive Order of the Governor of California and by directive of the County Public Health Officer.

3. In accordance with California Government Code sections 3100 and 3101, all City employees are declared to be Disaster Service Workers (DSW), subject to disaster service activities as may be assigned to them by their superiors or by law. "Disaster Service" means all activities authorized by and carried on under the California Emergency Services Act, including approved and documented training necessary or proper to engage in such activities. Each DSW in any classification, without regard to a formal designation or assignment, is considered to be acting within the scope of disaster service activities while assisting any unit of the City of San Diego Emergency Operations Center (EOC), performing any act contributing to the protection of life or property, or mitigating the effects of an emergency or potential emergency. As part of this Order, Department Directors will take all necessary steps to ensure compliance with State of California DSW guidelines, San Diego Municipal Code sections 51.0101 through 51.0108 related to Public Emergency Procedures, and other applicable provisions.

4. Trucks and other vehicles engaged in the delivery of medical supplies to any health care operations in the City, or engaged in the delivery of grocery items to grocery stores, when such items are made available for sale to the public, are hereby exempt from having to comply with any City rules and regulations that limit the hours for such deliveries.

5. All City landlords shall comply with the provisions of the emergency ordinance adopted by the City Council on March 25, 2020 adopting a temporary moratorium on evictions of residential and commercial tenants in the City of San Diego if the tenant demonstrates an inability to pay rent due to substantial economic hardship caused by COVID-19.

6. All City parks, beaches, trails, boardwalks, and bays shall remain closed to the public to further limit public gatherings and slow the spread of COVID-19. This order ensures compliance with the Governor's Executive Order N-33-20 and the County of San Diego's Public Health



City of San Diego
EXECUTIVE ORDER NO. 2020-2
By the Mayor

Order, and it is consistent with their intent of discouraging gatherings of any size by requiring residents to remain home.

7. The City of San Diego Library Department shall make all 3D printers available to produce any parts or equipment requested by the health care community, specifically hospital facilities, in response to COVID-19.  Additionally, the City shall offer up all available City property (vacant and surplus) to the State for surge capacity.

8. The City established a Small Business Relief Fund to help businesses continue their operations and aid employee retention. The Small Business Relief Fund will reallocate existing City funds to provide grants and forgivable and low-interest loans to businesses of 100 employees or less that have seen their operations impacted by COVID-19.

9. The City will work with City lessees, with particular attention to businesses of 100 employees or less, on flexible lease payment arrangements.

10.  All Building Permit Applications will remain open for an extended period of 180 days, consistent with the Building Official's determination that the COVID-19 emergency constitutes circumstances beyond the control of the applicants. The time to utilize a building permit shall be extended 180 days, consistent with the Building Official's determination that the COVID-19 emergency constitutes circumstances beyond the control of the permit holder, which prevented completion of the work.

11. All fees associated with Business Tax Certificates (BTC), and any business-related fees, permits, and assessments, will be deferred for up to 120 days. A one-year forgiveness period in BTC penalties and surcharges will also apply for businesses in need of reestablishing their accounts.

12. The City will suspend until further notice the discontinuation or shut off of water service for residents and businesses for non-payment of water and sewer bills and the imposition of late payment penalties or fees for delinquent water and/or sewer bills. The City will develop a program for payment deferrals.

Any violation of the above prohibitions may be referred for prosecution to the fullest extent of the law. Each individual officer should use their discretion in enforcing this order and always keep the intent of the order in mind.



City of San Diego
EXECUTIVE ORDER NO. 2020-2
By the Mayor

Dated: March 30, 2020

_____
**Mayor Kevin L. Faulconer**

EXHIBIT 3-3



City of San Diego
EXECUTIVE ORDER NO. 2020-3
By the Mayor

On March 12, 2020, I issued a proclamation of local emergency in preparation and response to the spread of the COVID-19 virus in our community, which our City Council ratified on March 17, 2020.  The local emergency will continue until its termination.

On March 19, 2020, in Executive Order N-33-20, the Governor directed all California residents to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, under the Order of the State Public Health Officer until further notice.

On March 12, 2020, the County Public Health Officer issued orders directing the public to take certain actions to protect the public health from COVID-19.  The Public Health Order was amended several times and is in effect until further notice, unless extended.  On April 26, 2020, the County Public Health Order was updated to include modifications to beach and park closures as well as a countywide facial covering order.  On April 30, 2020, the County Public Health Order was further amended to allow additional limited recreational activities in parks and waterways and to provide additional guidelines regarding face coverings.

On March 16, 2020, I executed Executive Order No. 2020-1, directing measures to be taken across the City to protect members of the public and City employees from an undue risk of contracting the COVID-19 virus.  On March 30, 2020, I executed Executive Order No. 2020-2, to reinforce the City's commitment to promote social distancing, self-quarantine, and self-isolation necessary to protect public health.  On April 21, 2020, I directed the limited reopening of neighborhood parks for passive use by individuals in accordance with public health rules.

Executive Order No. 2020-1 and Executive Order No. 2020-2, both of which expire on April 30, 2020, are hereby extended to May 31, 2020, as it is imperative that the City of San Diego continue to implement locally all guidance and directives currently available from federal, state, and local public health officials to stem the spread of the virus and protect public safety and welfare.  The closures and restrictions in these orders were and remain necessary because of the propensity of the virus to spread person to person and also because COVID-19 physically causes property loss and damage.  The measures outlined in this order fall within City jurisdiction and pertain to matters reasonably related to the protection of life and property.



City of San Diego
EXECUTIVE ORDER NO. 2020-3
By the Mayor

By virtue of authority vested in me as Mayor of the City of San Diego pursuant to the provisions of the City Charter, San Diego Municipal Code section 51.0105, and California Government Code section 8634 to promulgate, issue, and enforce rules, regulations, and orders, I hereby declare the following orders to be necessary for the protection of life and property and I hereby order, effective immediately until May 31, 2020, that:

1. All of the requirements contained in Executive Order No. 2020-1, dated March 16, 2020, except those superseded here or by order of the Governor or Public Health Official are still in effect and are hereby extended until May 31, 2020.

2. All of the requirements contained in Executive Order No. 2020-2, dated March 30, 2020, except those superseded here or by order of the Governor or Public Health Official are still in effect and are hereby extended until May 31, 2020.

3. All City residents shall comply with all current direction issued by Executive Order of the Governor of California and by directive of the County Public Health Officer.

4. City of San Diego community and neighborhood parks, as well as certain trails in Open Space parks, are open for limited use by individuals (walking, running, hiking, biking, equestrian). The public shall not congregate or participate in active sport activities at a park with the exception of members of a single family or household. Visitors must practice all social distancing guidelines in accordance with the public health orders. Shoreline parks, regional parks, and Balboa Park's Central Mesa and museums remain closed. City of San Diego golf courses are open with specific safety protocols. This order is in accordance with the County of San Diego Public Health Order, as amended on April 30, 2020.

5. City of San Diego beaches and bays are open for limited use by individuals, including walking, running, hiking, biking, equestrian, swimming, body surfing, boogie boarding, surfing, kite surfing, paddle boarding, kayaking, snorkeling, and scuba diving from the shore (where allowed). Boating is allowed by members of a single family or household. Mission Bay is not open for swimming at this time. Beach parking lots and boardwalks remain closed. The public shall not congregate or participate in active sport activities. Visitors must practice all social distancing guidelines in accordance with the public health orders. This order is in accordance with the County of San Diego Public Health Order, updated April 30, 2020.



City of San Diego
EXECUTIVE ORDER NO. 2020-3
By the Mayor

6.  All City of San Diego residents two years of age or older shall be in possession of a face covering when they leave their home or place of residence and shall wear it when they are in a business or within six feet of another person who is not a member of their family or household.  Persons with medical or mental health conditions, or a developmental disability that prevents them from wearing a face covering, shall be exempt from this requirement.  Additionally, effective May 8, 2020, each essential business shall require employees to wear a face covering.  This order is in accordance with the County Public Health Order as amended on April 30, 2020.

7.  The San Diego Convention Center will remain temporarily in use as an emergency homeless shelter to support Operation Shelter to Home and prevent the spread of COVID-19 among San Diego's homeless population.

Any violation of the above prohibitions may be referred for prosecution to the fullest extent of the law. Each individual officer should use their discretion in enforcing this order and always keep the intent of the order in mind.

Dated: April 30, 2020

Mayor Kevin L. Faulconer