1  Charles S. LiMandri (SBN: 110841)    Harmeet K. Dhillon (SBN:207873)
   Paul M. Jonna (SBN: 265389)           Mark P. Meuser (SBN: 231335)
2  Jeffrey M. Trissell (SBN: 292480)     Gregory R. Michael (SBN: 306814)
3  LIMANDRI & JONNA LLP                  DHILLON LAW GROUP INC.
   P.O. Box 9120                         177 Post Street, Suite 700
4  Rancho Santa Fe, CA 92067             San Francisco, CA 94108
   Telephone: (858) 759-9930             Telephone: 415-433-1700
5  Facsimile: (858) 759-9938             Facsimile: 415-520-6593
6  cslimandri@limandri.com               harmeet@dhillonlaw.com
   pjonna@limandri.com                   mmeuser@dhillonlaw.com
7  jtrissell@limandri.com                gmichael@dhillonlaw.com
8
   Thomas Brejcha, *pro hac vice**       Attorneys for Plaintiffs
9  Peter Breen, *pro hac vice**
10 THOMAS MORE SOCIETY
   309 W. Washington St., Ste. 1250
11 Chicago, IL 60606
   Telephone: (312) 782-1680
12 tbrejcha@thomasmoresociety.org
13 pbreen@thomasmoresociety.org
   *Application forthcoming
14
15 Attorneys for Plaintiffs

16

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTH BAY UNITED PENTECOSTAL CHURCH, a California non-profit corporation; and BISHOP ARTHUR HODGES III, an individual,<br><br>          Plaintiffs,<br>     v.<br><br>GAVIN NEWSOM, in his official capacity as the Governor of California, *et al.*,<br><br>          Defendants. | Case No. 3:20-cv-00865-AJB-MDD<br><br>**Declaration of George Delgado, M.D. in Support of Application for a Temporary Restraining Order, and Order to Show Cause Re: Preliminary Injunction** |

GEORGE DELGADO, M.D. DECL.

I, George Delgado, M.D., declare and state as follows:

1. I am a physician, licensed by the Medical Board of the State of California since 1989. I submit this declaration in support of Plaintiffs' Application for a Temporary Restraining Order, and Order to Show Cause Re: Preliminary Injunction. I have personal knowledge of the matters set forth below, and could and would testify competently to them if called upon to do so.

### BACKGROUND

2. I graduated from St. Mary's College of California with a Bachelor of Science degree, summa cum laude and received my Doctor of Medicine degree from the University of California, Davis. I completed my family residency at Santa Monica Hospital/UCLA and I am board certified in family medicine, hospice, and palliative medicine.

3. Since 2005, I have been the medical director of a family medical group. Additionally, I am the chief medical officer of a large hospice.

4. Post-residency I have practiced medicine in the State of California for 29 years. During that time, I have treated many people with infectious diseases, including viral illnesses such as influenza, which tend to occur in epidemics. I have been intimately involved in planning for the current coronavirus disease 2019 (COVID-19) pandemic, caused by the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) for my family medical group and hospice.

### MONTE CARLO SIMULATION OF COVID-19 INFECTION DATA

5. While planning for the pandemic, I have been providing medical support and direction to a COVID-19 planning group headed by William Goyette, an aerospace engineer. Mr. Goyette has long experience with using Monte Carlo simulations in order to solve complex problems in the areas of physics and electrical engineering. He noticed that most of the models that were being used to predict the pandemic's course were close form models that essentially fit data to a curve. The Monte Carlo model has proven to be more accurate than the models more commonly

1
GEORGE DELGADO, M.D. DECL.

being used to predict the impact of the COVID-19 pandemic.

6. It is clear that due to mitigation measures carried throughout California, the trajectory of the COVID-19 pandemic has been altered; the "curve has been flattened." Mitigation measures, like any medical treatment, have untoward consequences, some foreseeable, some not. When they are imprecise, they can lead to civil liberty infringements. Furthermore, the "treatment" that got us to where we are now, is not the "treatment" that is indicated for us now.

7. In the clinical practice of medicine, we acknowledge that people have spiritual, psychological and physical dimensions. We know that spiritual and psychological stress and trauma can lead to physical problems, including immune system dysfunction. Arbitrarily declaring religious services to be "non-essential," besides being unconstitutional, also carries with it certain profound spiritual and psychological risks that, ironically, could actually lead to an increase in mortality from COVID-19 by negatively impacting immune function and by destabilizing the support systems of vulnerable people.

8. Different data sets related to the pandemic demonstrate similar curves when graphed over time. The peaks of those curves often follow a predictable sequence, especially when testing is not readily available for a large percentage of the population. Actual cases will peak first, followed by positive tests (in the case of COVID-19, PCR viral RNA tests), followed by hospitalizations, followed by intensive care unit (ICU) admissions, followed by deaths and recovery.

9. It is important to keep in mind that positive tests can be misleading when you are still testing relatively low numbers of a population, i.e., you are "catching up." The more tests preformed, the greater the increase in new cases that will be recorded.

10. Hospitalizations and deaths are both lagging indicators. In fact, deaths reflect infections that started approximately three weeks prior to the death. Except in certain geographic pockets where flare-ups may occur, level or decreasing

hospitalizations and death rates are very reassuring indicators that we have reached a plateau or are seeing a decrease in the number of new infections.

11. In California, the statistics support the flattening of the curve. Hospitalizations have remained at a relatively steady level and ICU admissions have trended downward. Deaths have been at a plateau since April 6, with the daily death count from April 6 to May 2 ranging from 31 to 115 per day. Only one of those days had 100 or more deaths. Eight of those days had counts less than 50. Again, deaths are the last lagging indicator.

12. Los Angeles County has reported about 1,200 deaths (out of California's approximate total of 2,200). There too, however, the curve of new deaths has flattened, similar to the California curve. The Monte Carlo model predicts that total deaths in Los Angeles County will be approximately 1,900, for this year.

13. The measure R0 ("R naught") provides an indication of how many additional persons an infected person can infect. When R0 drops below one, an outbreak loses steam and begins to subside. Our model shows that in Los Angeles County R0 decreased to less than one in early April.

### RESUMPTION OF RELIGIOUS SERVICES WILL NOT JEOPARDIZE PUBLIC HEALTH

14. I am confident that a resumption of religious services can take place in a manner that does not jeopardize public health. In fact, I feel that going to one's church, synagogue or mosque should be much safer than going to the grocery store.

15. One could easily compare an average grocery store, which serves 1,000 customers per day, to a house of worship in terms of risk of contagion. Even with planned flow of foot traffic, the movement of people in the grocery store remains relatively uncontrolled. The aisles are not designed to allow six-foot social distancing. People touch merchandise that they will never buy. By the time a person puts an item in his or her cart, it may have been touched by several, if not hundreds of people in the three previous days (the coronavirus can survive up to three days on smooth

surfaces). The cart may have had its handle sanitized but the carriage itself likely was not. Next, the items are placed on a conveyer belt which has contacted hundreds of items that others have touched. The clerk wears gloves but does not change gloves between customers. He touches nearly every item as well as money.

16. The house of worship, on the other hand will likely have far fewer than 1,000 attendees and services may even be held outdoors. The participants will be stationary for all or most of their services and their movements can be very controlled, planned, and prescribed, as opposed to the uncontrolled movements in grocery stores. Worshipers will not be touching multiple items. There will be time after each service to thoroughly clean the chairs or pews that they do touch.

17. We can calculate the risk of contagion at the house of worship if the guidelines listed below are followed, compared to a grocery store. A relative value greater than 1 makes the house of worship riskier, while a relative risk less than 1 makes the house of worship safer.

18. *Being in the same building with others at any one time: relative risk is 4 (100 in the house of worship 25 in grocery store)

19. *People touching multiple objects: relative risk is 0.25. People touch far fewer things in the house of worship; 1,000 people per day touch many things in the grocery store. Chairs and pews can be sanitized after services. It is impracticable, if not impossible, to sanitize all items in a store.

20. *Close contact with others: relative risk is 0.25. Worshipers are stationary and socially distanced. They enter and exit in a controlled, spaced manner. Shoppers move about as they wish, even if flow is one way.

21. Therefore, the calculation is: **Risk in House of Worship =** Risk in Grocery Store x **4** x **0.25** x **0.25** = **0.25**, which is less than 1.

22. **Therefore, the calculated risk of contracting COVID-19 at the house of worship is 0.25 or 25% the risk at the grocery store,** and no one is arguing that going to the grocery store is not safe.

23. The following commonsense recommendations will facilitate a safe return to meaningful, spiritually rich religious services for the millions of Californians who cherish their religion and do not deem its practice unessential:

A. Have a questionnaire that the attendees self-administer before entering. Any who have symptoms of COVID-19 or contact with someone who is infected should be told not to enter.

B. All who enter the house of worship should sanitize their hands.

C. More services should be offered to allow limiting congregation sizes. There should be no arbitrary limit on congregation size, however, as long as six-foot social distancing can be maintained.

D. Shorter sermons and shorter services will allow clergy to offer more services while maintaining their spiritual and physical stamina.

E. If feasible, outdoor services should be offered. Alternatively, houses of worship should be well-ventilated, with many doors and windows open. There is less chance of contagion in well-ventilated areas.

F. During services, people should sit together as families, with six feet between families. Only allow seating in every other pew or row, leading to six-foot spacing.

G. Face coverings or face masks should be worn by attendees. The clergy person, being greater than six feet away from congregants, need not wear a face covering.

H. No singing by the assembly should be allowed, as singing can aerosolize the virus. Chanting by the minister should be allowed.

I. Where communion is offered, lines can be spaced with families at six-foot intervals, just like in the supermarket.

J. The minister who distributes communion should sanitize his or her hands and take great care not to touch any recipient's mouth or hand. If an inadvertent contact occurs, the minister should re-sanitize the hands,

5
GEORGE DELGADO, M.D. DECL.

     immediately.

K. No hugging, kiss of peace, hand shaking or hand holding should be allowed.

L. Worship aids and prayers should be projected, if possible. Reusable prayer books should be removed from the building.

M. Foot traffic entering and exiting the worship area should be designed as a one-way flow loop.

N. Entrance should be in orderly stages, from front to back, in order to avoid close physical contact between worshipers.

O. Likewise, egress should be row by row, beginning with the row closest to the exit door.

P. After each service, chairs, benches and pews should be sanitized.

I declare until penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed on May 6, 2020.

                                        George Delgado, M.D.