Charles S. LiMandri (SBN: 110841)   Harmeet K. Dhillon (SBN:207873)
Paul M. Jonna (SBN: 265389)   Mark P. Meuser (SBN: 231335)
Jeffrey M. Trissell (SBN: 292480)   Gregory R. Michael (SBN: 306814)
LIMANDRI & JONNA LLP   DHILLON LAW GROUP INC.
P.O. Box 9120   177 Post Street, Suite 700
Rancho Santa Fe, CA 92067   San Francisco, CA 94108
Telephone: (858) 759-9930   Telephone: 415-433-1700
Facsimile: (858) 759-9938   Facsimile: 415-520-6593
cslimandri@limandri.com   harmeet@dhillonlaw.com
pjonna@limandri.com   mmeuser@dhillonlaw.com
jtrissell@limandri.com   gmichael@dhillonlaw.com

Thomas Brejcha, *pro hac vice**   Attorneys for Plaintiffs
Peter Breen, *pro hac vice**
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Telephone: (312) 782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmoresociety.org
*Application forthcoming

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTH BAY UNITED PENTECOSTAL CHURCH, a California non-profit corporation; and BISHOP ARTHUR HODGES III, an individual, | Case No. 3:20-cv-00865-AJB-MDD |
| Plaintiffs, v. | **Declaration of Jeffrey M. Trissell, Esq. in Support of Application for a Temporary Restraining Order, and Order to Show Cause Re: Preliminary Injunction** |
| GAVIN NEWSOM, in his official capacity as the Governor of California, *et al.*, | Judge: Anthony J. Battaglia Courtroom: 4A |
| Defendants. | Oral Argument Requested |

I, Jeffrey M. Trissell, Esq., declare and state as follows:

1. I am an attorney at law duly licensed to practice in the State of California and in the Southern District of California, and am counsel for Plaintiffs South Bay United Pentecostal Church and Bishop Arthur Hodges III. As such, I have personal knowledge of the matters set forth below and could and would testify thereto if called upon to do so.

## The Need for *Ex Parte* Relief

2. On Friday, May 8, 2020, Plaintiffs filed their complaint seeking declaratory and injunctive relief for violations of their constitutional rights. On the same day, Plaintiffs filed an ex parte application for a temporary restraining order permitting them to hold worship services on the weekend of May 16–17, 2020.

3. On Monday, May 11, 2020, Plaintiffs decided to file a First Amended Complaint omitting Mayor Faulconer and Police Chief Nisleit, and including the County of San Diego's May 10, 2020, health order. As a result, the only remaining Defendants are those affiliated with the County of San Diego and the State of California—not the City of San Diego.

4. On Monday, May 11, 2020, at 1:00 p.m., counsel for Plaintiffs held a meet and confer conference call with counsel for the County-affiliated Defendants (Timothy White) and counsel for the State-affiliated Defendants (Lisa Plank and Todd Grabarsky). On the call, defense counsel made clear that they were not in a position to stipulate to the relief sought by the ex parte application. The County Defendants stated that their Orders were predicated on the State Orders, which they could not violate. The State Defendants stated that they could not agree to the relief sought.

5. Because Plaintiffs seek relief by the weekend, Plaintiffs now move for that relief on an ex parte basis. The parties also discussed the possibility of a stipulated briefing schedule. At the time of this filing, however, the parties, could not agree on one. As a result, Plaintiffs will be filing ex parte to set such a schedule.

## The Executive Orders Prior to Reopening

6.     On March 4, 2020, California Governor Gavin Newsom proclaimed a State of Emergency as a result of the threat of COVID-19. A true and correct copy of that proclamation is attached hereto as **Exhibit A.**

7.     On March 19, 2020, California Governor Newsom issued Executive Order No. N-33-20 in which he ordered that "all residents are directed to immediately heed the current State public health directives." A true and correct copy of that executive order is attached to the Complaint as **Exhibit 1-1**.

8.     On March 22, 2020, the California Public Health Officer designated a list of "Essential Critical Infrastructure Workers." Included on the list of the "essential workforce" are "faith based services that are provided through streaming or other technology." A true and correct copy of that list is attached to the Complaint as **Exhibit 1-2.**

9.     I watched Governor Newsom's March 19, 2020, press conference, about his Executive Orders. In that press conference, Governor Newsom stressed that there will be *no* police enforcement of the State Orders. A recording of that press conference is available online here: https://www.facebook.com/CAgovernor/videos/494465634769746/. The statements were made at approximately the 4:00 and 34:00 minute marks.

10.     I watched the relevant portions of San Diego County Public Health Officer Wilma Wooten's March 18, 2020, press conference about the County Orders. In that press conference, Dr. Wooten stressed that she was only expecting 80%-90% compliance—which would be sufficient. A recording of that press conference is available online here: https://youtu.be/sogjrotTCSw. The statements were made at approximately the 1:10:15 minute mark.

11.     I watched the relevant portions of the City of San Diego's Police Chief Nisleit's March 20, 2020, press conference about the City Orders. In that press conference, Chief Nisleit stated that "the approach that we are taking" is simply

"asking for compliance," and not using police enforcement. A recording of that press conference is available online here: https://youtu.be/zIXUA3lrJYk. The statements were made at approximately the 9:33 and 14:45 minute marks.

12.     I viewed on the Fox 5 website the article titled "Palomar Health to Lay off 317 employees," dated Aril 28, 2020, 01:30 PM. As the title indicates, the article reports on a significant layoff of medical personnel due a decline in patient visits. That article is available online here: https://fox5sandiego.com/news/health/palomar-health-to-lay-off-317-employees/. A true and correct copy of that article is attached hereto as **Exhibit B**.

13.     I viewed on the CalMatters website the article titled "Wanted: Health care workers. Wait! Never mind…," dated May 6, 2020. The article states that 49% of medical practices in California have had to lay off or furlough staff. It further states that hospitals are now seeking a bailout from the California government. The article is available online here: https://calmatters.org/health/coronavirus/2020/05/health-care-workers-layoffs-california-coronavirus-nurses-furloughs-pay-cuts-hospitals/. A true and correct copy of that article is attached hereto as **Exhibit C**.

### Governor Newsom's Reopening Plan

14.     On Tuesday, April 27, 2020, Governor Newsom held a press conference relating to the coronavirus pandemic. A recording of it is available online here: https://www.facebook.com/CAgovernor/videos/239711700434134/. I watched that press conference in full. During the press conference, the Governor's main these was how Californians had done a good job during this pandemic, and as a result, have greatly stabilized the spread of the virus.

15.     This stabilization is corroborated by (1) the website Rt.live; (3) the following page on the Statista.com website: https://www.statista.com/statistics/1109011/coronavirus-covid19-death-rates-us-by-state/; (3) the laying off of health-care workers shown in the articles attached as Exhibits B and C; and (4) the graphic published by Elon Must: https://twitter.com/elonmusk/status/

1255678979043778560.

16. Based on my personal transcription of the April 27, 2020, press conference, at 6:03, Governor Newsom stated that we "have not only bent the curve in the state of California, but stabilized it."

17. At 6:40, Governor Newsom stated that "[t]he reality is, we are just a few weeks away, not months away, from making measurable and meaningful changes to our stay-at-home order."

18. At 25:04, Governor Newsom stated the following:

> The number of hospitalizations, 1.4% increase. Um, again, we're seeing some stabilization, decrease, modest increase, decrease, modest increase, uh, in the total number of people hospitalized. The number of people in ICU's basically flat from yesterday, just one individual, uh, more than in the last 24 hours in the ICU—so again, stabilization.

19. I also had a certified transcript made of the recording of that April 27, 2020, press conference. That transcript is attached hereto **Exhibit D**.

20. On Wednesday, April 28, 2020, Governor Newsom held another press conference relating to the coronavirus pandemic. A recording of it is available online here: https://www.facebook.com/CAgovernor/videos/524013811808326/. I also watched that press conference in full. During the press conference, the Governor's main theme was outlining his four stage Reopening Plan. As part of that plan, Stage 1 is the period from the issuance of his March 16 executive order until it is modified, Stage 2 and 3 are periods when some businesses will begin opening up, and Stage 4 is when there is no executive order in place.

21. Based on my personal transcription, at 48:43, Governor Newsom stated that "the foundational point of emphasis we want to advance today is phase 2 . . . is in weeks not months, phase 3 and 4, months not weeks."

22. During the press conference, at 37:29, Dr. Sonia Angell—the Director of the California Department of Public Health—showed the following graphic and

explained Stage 2 as follows:

> In stage 2, we're going to really start focusing on lower risk workplaces, that means gradually opening some of those workplaces with adaptions. These include things like: Retail, allowing for curbside pickup; Manufacturing, which can include things like toys, clothing, other things, furniture, that was not a part of the essential sector; Talking about offices, this can include things like PR firms, and consulting, and other places where telework is not possible, but by modifying the environment itself, it can make it lower risk for individuals; and then ultimately talking about opening more public spaces, things like parks and trails, that may have historically been limited because of our concerns, trying to think about how we can modify that to make them safer for individuals to enjoy the outdoor spaces because we know physical activity is so important to our health, and this is also about health, clearly.



23.     At 35:22, Dr. Angell then described Stage 3 as follows: "The third stage is when we get into those areas that may be higher risk, those sectors that we think will take a lot more modification to adapt in a way that can make them places where people can move with lower risk."

24.     At 35:52, Dr. Angell further described Stage 3 as follows: "Those are things like getting your hair cut, uh getting your nails done, doing anything that has

very close inherent relationships with other people, where the proximity is very close."

25.    At 46:49, Dr. Angell described Stage 4 as follows: "And then ultimately, the space that we all look forward to, someday as we move forward and work diligently together, is Stage 4, which would be the end of the stay-at-home order. And that's when we'd be opening all of our highest risk workplaces without modification necessary at that time, because at that time we will know that we have identified a way that we can keep people safe from COVID-19.

26.    During this time, Dr. Angell showed the following graphic:



27.    I also had a certified transcript made of the recording of that April 28, 2020, press conference. That transcript is attached hereto **Exhibit E**. The slides are also available online here: https://www.gov.ca.gov/wp-content/uploads/2020/04/Update-on-California-Pandemic-Roadmap.pdf.

28.    On May 4, 2020, Governor Newsom issued a press release in which he stated that Stage 2 will begin, in part, on Friday, May 8, 2020. According to that press release, only some businesses will be allowed to reopen, like "bookstores, clothing stores, florists and sporting goods stores," but not yet "offices, seated dining at restaurants, shopping malls or schools." A true and correct copy of that press release is attached hereto as **Exhibit F**.

29.    On May 7, 2020, Governor Newsom held a press conference to

announce the beginning of Stage 2, and the publication of his Resilience Roadmap. A recording of it is available online here: https://www.facebook.com/CAgovernor/videos/260976601615609/. I also watched that press conference in full. During that press conference, at 50:36, Governor Newsom was asked by a journalist a why schools were being prioritized over places of worship. Based on my personal transcript, the following exchange followed:

> Q: Thank you Governor. Can you clarify why churches and salons are in Stage 3 and not Stage 2. Um, what makes them more high risk than schools, for example? Uh, what factors are you weighing here when you decide what goes into what phase?

> A: Yeah, we're, we're looking at the science, epidemiology, looking again at frequency, duration, time, uh, and looking at low risk-high reward, low risk-low reward, looking at a series of conditions and criteria, as well as best practices uh from other states and nations.

30. On May 7, 2020, Governor Newsom also published his Resilience Roadmap online. That Roadmap identifies the industries that may open immediately (retail for curbside pickup, manufacturing and logistics), those that will open in a few weeks (shopping malls, car washes, schools, restaurants), and those that cannot open for several months, until Stage 3 is announced (salons, tattoo parlors, gyms, bars, movie theaters, and places of worship). A true and correct copy of a printout of the webpage containing that Roadmap is attached to the Complaint as **Exhibit 1-3**.

31. Under the Roadmap, for each industry that will be allowed to open in Stage 2, the Roadmap also provides industry-specific Pandemic Guidance that the industry must comply with. The industry must both comply with the guidance, and certify to the state that it is in compliance. True and correct copies of the Guidance for two industries opening immediately—manufacturing and logistics—is attached to the Complaint as part of **Exhibit 1-3**.

32. At the same time, Governor Newsom published a press release

announcing the Resilience Roadmap, and explaining the same. A true and correct copy of that press release is attached to the Complaint as **Exhibit 1-4**.

33. On May 10, 2020, the County of San Diego issued an Order of the Health Office and Emergency Regulations. That order incorporated Governor Newsom's Executive Order No. N-33-20 (Ex. 1-1), and set further guidelines for "essential" and "reopening" businesses operating in San Diego County. A true and correct copy of the County of San Diego order is attached to the Complaint as **Exhibit 2-1**.

34. The County order promulgated the County of San Diego "Social Distancing and Sanitation Protocol" that all essential businesses were required to fill out and adhere to. The County order also promulgated the County of San Diego "Safe Reopening Plan" Protocol that all new businesses that were allowed to reopen were required to fill out and adhere to. The order also banned all gatherings of "more than one person" except at essential businesses or transit places. A true and correct copy of the "Social Distancing and Sanitation Protocol" is attached to the Complaint as **Exhibit 2-2**. A true and correct copy of the "Safe Reopening Plan" Protocol is attached to the Complaint as **Exhibit 2-3**.

### Additional Helpful Exhibits

1. Attached hereto as **Exhibit G** is a true and correct copy of the opinion of the Sixth Circuit in *Maryville Baptist Church, Inc. v. Beshear*, as downloaded from Westlaw at 2020 WL 2111316.

2. Attached hereto as **Exhibit H** is a true and correct copy of the opinion of the Western District of Kentucky in *On Fire Christian Ctr., Inc. v. Fischer*, as downloaded from Westlaw at 2020 WL 1820249.

3. Attached hereto as **Exhibit I** is a true and correct copy of the opinion of the District of Kansas in *First Baptist Church v. Kelley*, as downloaded from Westlaw at 2020 WL 1910021.

4. Attached hereto as **Exhibit J** is a true and correct copy of the opinion of

the Eastern District of Kentucky in *Tabernacle Baptist Church, Inc. of Nicholasville, Kentucky v. Beshear*, as downloaded from Westlaw at 2020 WL 2305307.

5.     Attached hereto as **Exhibit K** is a true and correct copy of the Statement of Attorney General William P. Barr on Religious Practice and Social Distancing, dated April 14, 2020.

6.     Attached hereto as **Exhibit L** is a true and correct copy of the Attorney General's Memorandum for the Assistant Attorney General for Civil Rights and All United States Attorneys, dated April 27, 2020.

7.     Attached hereto as **Exhibit M** is a true and correct copy of the U.S. Department of Justice's Statement of Interest filed in *Temple Baptist Church v. City of Greenville*, No. 4:20-cv-64-DMB-JMV (N.D. Miss. Apr. 14, 2020), at ECF No. 6.

8.     Attached hereto as **Exhibit N** is a true and correct copy of the U.S. Department of Justice's Statement of Interest filed in *Lighthouse Fellowship Church v. Northam*, No. 2:20-cv-00204-AWA-RJK (E.D. Va. May 3, 2020), at ECF No. 19.

9.     Additional **Exhibits O and P** are attached to the Declaration of Jeffrey M. Trissell in Support of Plaintiffs' Requests for Judicial Notice.

I declare until penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed on May 11, 2020.

_____
Jeffrey M. Trissell, Esq.

EXHIBIT A

### PROCLAMATION OF A STATE OF EMERGENCY

**WHEREAS** in December 2019, an outbreak of respiratory illness due to a novel coronavirus (a disease now known as COVID-19), was first identified in Wuhan City, Hubei Province, China, and has spread outside of China, impacting more than 75 countries, including the United States; and

**WHEREAS** the State of California has been working in close collaboration with the national Centers for Disease Control and Prevention (CDC), with the United States Health and Human Services Agency, and with local health departments since December 2019 to monitor and plan for the potential spread of COVID-19 to the United States; and

**WHEREAS** on January 23, 2020, the CDC activated its Emergency Response System to provide ongoing support for the response to COVID-19 across the country; and

**WHEREAS** on January 24, 2020, the California Department of Public Health activated its Medical and Health Coordination Center and on March 2, 2020, the Office of Emergency Services activated the State Operations Center to support and guide state and local actions to preserve public health; and

**WHEREAS** the California Department of Public Health has been in regular communication with hospitals, clinics and other health providers and has provided guidance to health facilities and providers regarding COVID-19; and

**WHEREAS** as of March 4, 2020, across the globe, there are more than 94,000 confirmed cases of COVID-19, tragically resulting in more than 3,000 deaths worldwide; and

**WHEREAS** as of March 4, 2020, there are 129 confirmed cases of COVID-19 in the United States, including 53 in California, and more than 9,400 Californians across 49 counties are in home monitoring based on possible travel-based exposure to the virus, and officials expect the number of cases in California, the United States, and worldwide to increase; and

**WHEREAS** for more than a decade California has had a robust pandemic influenza plan, supported local governments in the development of local plans, and required that state and local plans be regularly updated and exercised; and

**WHEREAS** California has a strong federal, state and local public health and health care delivery system that has effectively responded to prior events including the H1N1 influenza virus in 2009, and most recently Ebola; and

**WHEREAS** experts anticipate that while a high percentage of individuals affected by COVID-19 will experience mild flu-like symptoms, some will have more serious symptoms and require hospitalization, particularly individuals who are elderly or already have underlying chronic health conditions; and

**WHEREAS** it is imperative to prepare for and respond to suspected or confirmed COVID-19 cases in California, to implement measures to mitigate the spread of COVID-19, and to prepare to respond to an increasing number of individuals requiring medical care and hospitalization; and

**WHEREAS** if COVID-19 spreads in California at a rate comparable to the rate of spread in other countries, the number of persons requiring medical care may exceed locally available resources, and controlling outbreaks minimizes the risk to the public, maintains the health and safety of the people of California, and limits the spread of infection in our communities and within the healthcare delivery system; and

**WHEREAS** personal protective equipment (PPE) is not necessary for use by the general population but appropriate PPE is one of the most effective ways to preserve and protect California's healthcare workforce at this critical time and to prevent the spread of COVID-19 broadly; and

**WHEREAS** state and local health departments must use all available preventative measures to combat the spread of COVID-19, which will require access to services, personnel, equipment, facilities, and other resources, potentially including resources beyond those currently available, to prepare for and respond to any potential cases and the spread of the virus; and

**WHEREAS** I find that conditions of Government Code section 8558(b), relating to the declaration of a State of Emergency, have been met; and

**WHEREAS** I find that the conditions caused by COVID-19 are likely to require the combined forces of a mutual aid region or regions to appropriately respond; and

**WHEREAS** under the provisions of Government Code section 8625(c), I find that local authority is inadequate to cope with the threat posed by COVID-19; and

**WHEREAS** under the provisions of Government Code section 8571, I find that strict compliance with various statutes and regulations specified in this order would prevent, hinder, or delay appropriate actions to prevent and mitigate the effects of the COVID-19.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes, including the California Emergency Services Act, and in particular, Government Code section 8625, **HEREBY PROCLAIM A STATE OF EMERGENCY** to exist in California.

**IT IS HEREBY ORDERED THAT:**

1. In preparing for and responding to COVID-19, all agencies of the state government use and employ state personnel, equipment, and facilities or perform any and all activities consistent with the direction of the Office of Emergency Services and the State Emergency Plan, as well as the California Department of Public Health and the Emergency Medical Services Authority. Also, all residents are to heed the advice of emergency officials with regard to this emergency in order to protect their safety.

2. As necessary to assist local governments and for the protection of public health, state agencies shall enter into contracts to arrange for the procurement of materials, goods, and services needed to assist in preparing for, containing, responding to, mitigating the effects of, and recovering from the spread of COVID-19. Applicable provisions of the Government Code and the Public Contract Code, including but not limited to travel, advertising, and competitive bidding requirements, are suspended to the extent necessary to address the effects of COVID-19.

3. Any out-of-state personnel, including, but not limited to, medical personnel, entering California to assist in preparing for, responding to, mitigating the effects of, and recovering from COVID-19 shall be permitted to provide services in the same manner as prescribed in Government Code section 179.5, with respect to licensing and certification. Permission for any such individual rendering service is subject to the approval of the Director of the Emergency Medical Services Authority for medical personnel and the Director of the Office of Emergency Services for non-medical personnel and shall be in effect for a period of time not to exceed the duration of this emergency.

4. The time limitation set forth in Penal Code section 396, subdivision (b), prohibiting price gouging in time of emergency is hereby waived as it relates to emergency supplies and medical supplies. These price gouging protections shall be in effect through September 4, 2020.

5. Any state-owned properties that the Office of Emergency Services determines are suitable for use to assist in preparing for, responding to, mitigating the effects of, or recovering from COVID-19 shall be made available to the Office of Emergency Services for this purpose, notwithstanding any state or local law that would restrict, delay, or otherwise inhibit such use.

6. Any fairgrounds that the Office of Emergency Services determines are suitable to assist in preparing for, responding to, mitigating the effects of, or recovering from COVID-19 shall be made available to the Office of Emergency Services pursuant to the Emergency Services Act, Government Code section 8589. The Office of Emergency Services shall notify the fairgrounds of the intended use and can immediately use the fairgrounds without the fairground board of directors' approval, and

notwithstanding any state or local law that would restrict, delay, or otherwise inhibit such use.

7. The 30-day time period in Health and Safety Code section 101080, within which a local governing authority must renew a local health emergency, is hereby waived for the duration of this statewide emergency. Any such local health emergency will remain in effect until each local governing authority terminates its respective local health emergency.

8. The 60-day time period in Government Code section 8630, within which local government authorities must renew a local emergency, is hereby waived for the duration of this statewide emergency. Any local emergency proclaimed will remain in effect until each local governing authority terminates its respective local emergency.

9. The Office of Emergency Services shall provide assistance to local governments that have demonstrated extraordinary or disproportionate impacts from COVID-19, if appropriate and necessary, under the authority of the California Disaster Assistance Act, Government Code section 8680 et seq., and California Code of Regulations, Title 19, section 2900 et seq.

10. To ensure hospitals and other health facilities are able to adequately treat patients legally isolated as a result of COVID-19, the Director of the California Department of Public Health may waive any of the licensing requirements of Chapter 2 of Division 2 of the Health and Safety Code and accompanying regulations with respect to any hospital or health facility identified in Health and Safety Code section 1250. Any waiver shall include alternative measures that, under the circumstances, will allow the facilities to treat legally isolated patients while protecting public health and safety. Any facilities being granted a waiver shall be established and operated in accordance with the facility's required disaster and mass casualty plan. Any waivers granted pursuant to this paragraph shall be posted on the Department's website.

11. To support consistent practices across California, state departments, in coordination with the Office of Emergency Services, shall provide updated and specific guidance relating to preventing and mitigating COVID-19 to schools, employers, employees, first responders and community care facilities by no later than March 10, 2020.

12. To promptly respond for the protection of public health, state entities are, notwithstanding any other state or local law, authorized to share relevant medical information, limited to the patient's underlying health conditions, age, current condition, date of exposure, and possible contact tracing, as necessary to address the effect of the COVID-19 outbreak with state, local, federal, and nongovernmental partners, with such information to be used for the limited purposes of monitoring, investigation and control, and treatment and coordination of care. The

notification requirement of Civil Code section 1798.24, subdivision (i), is suspended.

13. Notwithstanding Health and Safety Code sections 1797.52 and 1797.218, during the course of this emergency, any EMT-P licensees shall have the authority to transport patients to medical facilities other than acute care hospitals when approved by the California EMS Authority. In order to carry out this order, to the extent that the provisions of Health and Safety Code sections 1797.52 and 1797.218 may prohibit EMT-P licensees from transporting patients to facilities other than acute care hospitals, those statutes are hereby suspended until the termination of this State of Emergency.

14. The Department of Social Services may, to the extent the Department deems necessary to respond to the threat of COVID-19, waive any provisions of the Health and Safety Code or Welfare and Institutions Code, and accompanying regulations, interim licensing standards, or other written policies or procedures with respect to the use, licensing, or approval of facilities or homes within the Department's jurisdiction set forth in the California Community Care Facilities Act (Health and Safety Code section 1500 et seq.), the California Child Day Care Facilities Act (Health and Safety Code section 1596.70 et seq.), and the California Residential Care Facilities for the Elderly Act (Health and Safety Code section 1569 et seq.). Any waivers granted pursuant to this paragraph shall be posted on the Department's website.

**I FURTHER DIRECT** that as soon as hereafter possible, this proclamation be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this proclamation.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 4th day of March 2020

GAVIN NEWSOM
Governor of California

**ATTEST:**

ALEX PADILLA
Secretary of State

**EXHIBIT B**

 72° 

SAN DIEGO (CNS) – Palomar Health announced Tuesday that it is laying off 317 employees effective Wednesday, citing significant patient visit declines and loss of revenue as a result of the COVID-19 pandemic.

According to the hospital, it has seen a 45% to 50% decrease in overall patient visits since the coronavirus outbreak began, absorbing a $5.7 million operating loss in March, "with losses in April expected to be worse, yet hard to estimate given the uncertainty of the virus."

Palomar Health, which operates multiple medical centers and clinics in north San Diego County in San Marcos, Poway, Escondido, Ramona and Rancho Bernardo, is far from the only health care provider feeling the impact.

UCSD Health Center has lost more than $50 million in revenue since March, Voice of San Diego reported Tuesday.

The 317 positions represent 5% of Palomar's workforce and the majority are part-time workers. The number includes 50 clinical RNs. The remaining 267 positions are spread across the organization, ranging from clerical staff to technicians.

Employees who are affected will receive a severance package and are immediately eligible for unemployment and health insurance coverage through their severance period, Palomar Health officials said.

San Diego County gave the green light last week to hospitals to begin performing elective procedures, if the facility's resources can handle it.

Palomar Health "will resume surgical procedures based on the availability of personal protective equipment and virus testing, but the loss of revenue from shutting down elective surgeries for the past six weeks cannot be recovered quickly," according to a hospital statement.

 

occupies two formerly vacant floors of Palomar Medical Center Escondido.

Hospital officials noted that future patient visits may also be negatively impacted by the uncertainties of the economy as patients may lose insurance due to unemployment and delay non-emergency surgeries for more prosperous times.

"These are extremely tough decisions that are taken very seriously because we know they affect the livelihood of our employees," said Palomar Health President and CEO Diane Hansen. "However, the sooner we make these tough decisions, the sooner we will be able to stabilize our business and get back on the road to recovery. It is our responsibility to ensure Palomar Health provides high-quality medical care to our community during and after this pandemic."

**Suggest a Correction**

**SHARE THIS STORY**

    

**YOU MAY LIKE**

Sponsored Links by Taboola

**Protective Cloth Masks with PM2.5 Filter**

Brave New Look

**Before You Renew Amazon Prime, Read This**

Wikibuy

**Eat Clean In 2020 - Wild Caught Fish To Your Door**

Wild Alaskan Company

**MD: If You Have Toenail Fungus, Do This Immediately (Watch}**

Fungus Clear Supplements

**EXHIBIT C**

**CORONAVIRUS**    HEALTH    LABOR

# Wanted: Health care workers. Wait! Never mind...

BY ANA B. IBARRA

PUBLISHED: MAY 6, 2020



Medical staff walk into work as first responders show gratitude by clapping and cheering them on at Santa Clara Valley Medical Center in San Jose on April 15, 2020. Photo by Randy Vazquez / Bay Area News Group

 **CAL MATTERS**



## Public service journalism for the health of our public.

**DONATE NOW >**

**IN SUMMARY**

California health care workers face layoffs, furloughs and pay cuts in the coronavirus pandemic, as hospitals and medical practices say they're financially bleeding.

When Aimee Paulson, a nurse practitioner, learned in late March she was being temporarily laid off from the private family practice she'd worked at for the last three years, she was disappointed but not surprised. Patient visits in the San Ramon office had gone down by almost 80% as the coronavirus outbreak kept people at home.

She called her patients, many of whom followed her from her previous workplace, and told them she hoped to be back by June.



**Support our coronavirus coverage**

In the midst of a public health crisis, Paulson and other health care workers are learning they aren't immune to layoffs, furloughs and pay cuts. It's an ironic twist to the pandemic: When the health care system seems to need workers the most, it can't afford to keep them all. A recent

survey of more than 3,200 physicians by the California Medical Association, for example, found that 49% of practices have had to lay off or furlough staff.

Now providers and state lawmakers are searching for ways to keep hospitals, clinics and private practices afloat and its workers employed – or face the prospect of a deeper medical jobs shortage months or years from now.

This week, California hospitals are planning to ask the state for $1 billion before June 30 to help with immediate revenue losses, said Carmela Coyle, the CEO of the California Hospital Association. An injection of cash from the state could help hospitals avoid or reduce pay cuts and layoffs, she said. California hospitals so far have received $3 billion in aid from the federal government, she added.

Hospitals have also asked that health insurance plans accelerate payments for claims within 30 days during the pandemic. Currently, claims can take up to 90 days to process, but "we need to move those dollars more quickly," Coyle said during an Assembly budget hearing on Monday.

Coyle said hospitals have done their best to keep their staff, but furloughs and layoffs have begun. "And that is because 60 percent of hospital spending is for labor," she told lawmakers.

At the outset of the pandemic, the state asked hospitals to prepare for a surge and make room for about 40,000 more patients at once. "And we did that, we answered that call. We emptied California's hospitals to make way. That means canceling surgeries and procedures and more," she said. "But as we begin to assess the damage, the toll is enormous."

In late April, Gov. Gavin Newsom allowed hospitals to resume some elective surgeries, which is the bread and butter for many facilities. But some hospitals, especially smaller ones or those in rural areas, are already in a deep hole.

Meanwhile, clinics and doctors' offices continue to struggle with a drop in revenue as patients are advised to avoid non-emergency in-person visits.

This week, the Legislature's Latino Caucus sent a letter to the Newsom administration also warning that many of the state's health centers will not be able to remain open much longer "without significant financial support from the state."

Laying off and furloughing staff is a "recipe for disaster," said Stephanie Roberson with the California Nurses Association. Last month, for instance, about 150 registered nurses in San Jose

and San Diego were temporarily laid off because of department closures and the cancellation of elective procedures, Roberson said.

Her organization has been protesting these layoffs. On Thursday, another union, SEIU-United Healthcare Workers West, will be protesting a 20% pay cut at Stanford Health Care.

"It is a weird dichotomy," said Joanne Spetz, associate director of research at the Healthforce Center at the University of California, San Francisco. The labor challenge for health systems, she said, is that not all positions transfer smoothly into surge preparedness. A nurse in a primary care office or one who specializes in orthopedic care, for example, perhaps wouldn't be the best fit to care for a coronavirus patient on a ventilator, she explained.

"So you have furloughs happening in community health centers and in certain departments of hospitals, while at the same time there is concern about a surge and we're hearing these calls for things like a health corps," she said.

In late March, Gov. Gavin Newsom announced the California's Health Corps, whose members would tend to coronavirus patients in alternate care facilities. But that surge in anticipated volume hasn't occurred and these facilities across the state remain mostly empty. Out of the approximately 94,000 people who have applied to the state's backup medical reserve, 551 have been accepted into the program.

Of these Health Corps members, 233 are on call to staff the Sleep Train Arena, the former Sacramento Kings playing venue which was prepped for up to 400 patients with mild or moderate cases of COVID-19. As of Tuesday, only five patients were being treated there. Workers are taking turns as needed, according to the state's Department of Health and Human Services. The rest are being used to staff nursing homes that need temporary or emergency support.

Democratic Assemblyman Jim Wood of Healdsburg said it makes more sense to look at laid off workers first for Health Corps jobs, rather than hire people who need to be retrained and recredentialed. "My rationale is they're going to go on unemployment, and then we turn around and pay someone else," Wood said.

The California Department of Health and Human Services confirmed that currently laid off workers are not prioritized for these jobs. Hiring is based on need and geography, according to the agency.

Paulson, the nurse practitioner, applied to the state's Health Corps and was recently offered a position at a clinic in Berkeley. She didn't take it. On Wednesday, she returned to the San Ramon

practice after her employer qualified for a Paycheck Protection Program loan. She'll be working partial hours until patient visits pick up again, she said.

Others may not be as fortunate. Assemblyman Wood said he believes the pandemic is "going to be a breaking point for some offices and clinics." He said he is concerned about the loss of primary care doctors, especially in rural districts like his that already struggle to attract and retain them.

"This will hasten the retirement of some folks, or the closing of practices," he said.

# More on the coronavirus in California:



### Tracking coronavirus hospitalizations in California by county

CalMatters is tracking positive and suspected cases of COVID-19 in patients who are hospitalized throughout the state, broken down by county.

**EXHIBIT D**

TRANSCRIPTION OF

GOVERNOR GAVIN NEWSOM'S COVID-19 PRESS CONFERENCE

APRIL 27, 2020

CERTIFIED COPY

**Transcribed by:**
**RENAE E. LOPEZ**
**CSR 12142**
**No. 20-90688A**


THE SULLIVAN GROUP
OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM
PHONE 855.525.3860 | 323.938.8750

1                    TRANSCRIPTION OF

2    GOVERNOR GAVIN NEWSOM'S COVID-19 PRESS CONFERENCE

3                    APRIL 27, 2020

4

5

6                                        CERTIFIED COPY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
     Transcribed by:
24   RENAE E. LOPEZ
     CSR 12142
25   No. 20-90688A

```
1    APPEARANCES:

2       Gavin Newsom, Governor of the State of California

3       Mark Ghaly, M.D., Secretary, California Health and
         Human Services Agency
4

5    Members of the Press:

6       Jonathan Ayestas, KCRA News
         Elex Michaelson, Fox 11
7       Stephanie Baer, BuzzFeed News
         David Baker, Bloomberg News
8       Jeremy White, Politico
         Jim Roope, Westwood One News
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                    I N D E X

1

2   SPEAKER                                   PAGE

3   Governor Gavin Newsom                       4

4   Jonathan Ayestas                           21

5   Mark Ghaly, M.D.                           24

6   Elex Michaelson                            26

7   Stephanie Baer                             27

8   David Baker                                30

9   Jeremy White                              33

10  Jim Roope                                  34

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      APRIL 27, 2020

 2                            ***

 3

 4

 5

 6            GOVERNOR NEWSOM:  Well, good afternoon,

 7    everybody.

 8            I just want to begin by extending, again,

 9    gratitude to 40 million Californians that, over the

10    course of the last number of weeks, have not only bent

11    the curve in the State of California, but stabilized

12    it.

13            We have made real progress in this state

14    over the course of the last number of weeks, and that's

15    why I want to just confront the topic that is top of

16    mind, and those are the images we saw over the weekend,

17    the images down in Orange County and Ventura County on

18    our beaches.

19            Those images are an example of what not to

20    see, people, what not to do, if we're going to make the

21    meaningful progress that we've made in the last few

22    weeks extend into the next number of -- number of

23    weeks.

24            The reality is we are just a few weeks away,

25    not months away, from making measurable and meaningful
```

1    changes to our stay-at-home order.  That is a very

2    optimistic point to emphasize; however, that's driven

3    by data.  It's driven by behavior, and as we change our

4    behavior, we can impact the science, the health, and

5    the data.

6            This virus doesn't take the weekends off.

7    This virus doesn't go home because it's a beautiful,

8    sunny day around our coasts.  The likelihood of having

9    a virus-free world is not realistic in the next number

10   of months.  We'll look forward to that day, as herd

11   immunity comes into effect, that we have a vaccine that

12   we can distribute and make available to hundreds and

13   millions of people across this country, billions around

14   the rest of the globe.

15           Until then, we have to manage it.  We have

16   to manage risks.  We have to manage and augment our

17   behavior, and that's why I cannot impress upon you

18   more, to those Californians watching, that we can't see

19   the images like we saw, particularly on Saturday in

20   Newport Beach and elsewhere in the State of California.

21           Look, I'm not naive.  The overwhelming

22   majority of our coastline was appropriately advanced,

23   meaning the stay-at-home orders were advanced.  The

24   physical distancing, the social distancing on those

25   beaches was appropriate.  You didn't see those images

```
 1  in L.A. beaches and San Diego beaches and Northern
 2  California, around San Mateo County, up further north
 3  towards Eureka, because we had strong guidelines that
 4  were not only adopted, but were abided by, and we had
 5  local partners that supported those efforts and helped
 6  create the conditions on those hard park closures that
 7  allowed people to continue to conduct themselves
 8  appropriately.
 9            Unfortunately, there were these exceptions,
10  on Saturday in particular, little less so on Sunday,
11  and we've got to confront that.  And I'm encouraged.  I
12  want to acknowledge that -- Newport Beach, I want to
13  acknowledge their City Council.  I want to acknowledge
14  the County Board of Supervisors in Orange County.
15            I'm told they are looking to consider some
16  augmentations and some more deliberative engagement to
17  address the conditions and those concerns that were
18  highlighted over the course of the weekend, but I want
19  folks to know this as well:  We're doing the same at
20  the State level, the California Highway Patrol, with
21  our stakes park -- State parks patrol with other
22  partners, and we will avail ourselves to more
23  aggressive enforcement of the stay-at-home order, of
24  the social distancing, of the guidelines and procedures
25  that we expect to be followed all across the State of
```

California.

I -- I deeply respect localism.  I deeply respect local decision making.  I deeply respect the work that elected officials do, all up and down this state, of all political stripes, and I recognize your anxiety, and I recognize the pressures.  As a former county supervisor, as a former mayor, I understand those local pressures intimately.

And I deeply understand the broader public sentiment about their need to get some clarity and get some confidence that we'll go back to whatever modified sense of normalcy that we hope to see, that we'll see that advance sooner than later, but I cannot impress upon people more, the only thing that will set us back is our behavior.  The only thing that will set us back is people stopping to practice physical distancing and appropriate social distancing.  That's the only thing that's going to slow down our ability to reopen this economy, our re- -- ability to adapt and modify the stay-at-home order, as I said, weeks, not months, if the data continues to be as stable as it has been over the course of the last few weeks.  The only thing that can stop that is more images, again, like we saw over this weekend.

So I'm looking forward to working with those

1    local government agencies, working much more
2    aggressively on the enforcement side, and continue to
3    believe that we have remarkable capacity in the State
4    to stabilize this curve and make the kind of
5    modifications that all of us are eager to make, again,
6    none more eager than I am, and I just want to extend to
7    that point tomorrow, we will be laying out more detail.
8            Last week on Wednesday, we laid out details
9    on one of our six indicators.  That was on the issues
10   of testing, on tracing, on tracking, on social
11   isolation that is done with economic justice framework,
12   and the issues around quarantine.
13           Tomorrow, we're going to break down the
14   number five indicator, which goes to our business
15   environment, goes to schools and childcare facilities
16   and the like, and, again, the hope and expectation is
17   that we'll be in a position, in a number of weeks, to
18   make meaningful modifications, but, again, the data
19   will guide that.  The indicators will guide that, and
20   the only thing that could disrupt that, to set us back,
21   to slow down our capacity to start to reopen our
22   economy, is behavior that's inconsistent with the
23   statewide guidelines.
24           So I just want to make that clear up top,
25   and, again, just want to thank all the incredible work

1   that was done over the weekend by parks and by our
2   public partners, and by large cities that really
3   conducted themselves appropriately and truly did
4   justice to the guidelines that, not only they set
5   locally, but that the State of California has set.
6           And we'll have a little work to do to
7   improve upon Saturday in particular, but I'm confident
8   that we can do so, and, again, look forward to robust
9   conversations this week, in that respect.
10          Also am very honored that we had some robust
11  conversations with State of Nevada and the State of
12  Colorado over the last week, and those two states have
13  joined our Western States coalition, addition to
14  Colorado and to Nevada, of course, the partners --
15  partnership that was formed a few weeks back with
16  Washington State and Oregon.  This now allows all five
17  states to begin to work even more closely and more
18  collaboratively.
19          I must say it is a wonderful thing when
20  chiefs of staff, all the governors get on the phone and
21  are comparing and contrasting best practices in
22  realtime, are -- are sharing data, sharing information.
23  This partnership has already become very, very
24  meaningful, and -- and I just, again, want to extend my
25  deep gratitude to Mayor Brown, Mayor Inslee, to

1  Mayor Sisolak, and to Mayor Polis -- or, rather,

2  Governors Polis, Sisolak, Inslee, and Brown for their

3  outstanding leadership and their support in this

4  broader Western States agenda.

5           Also want to update you, just briefly, on a

6  new strategy that we'll also be employing, in terms of

7  getting to the next phase, as it relates to meaningful

8  modifications of our stay-at-home order.

9           As you may know, a few weeks back, we

10  announced a new economic advisory body, a new recovery

11  body.  It was some of the best and the brightest minds

12  we can source in the State of California that are

13  advising us on our recovery efforts, short-term,

14  medium, and long-term strategies; long-term around

15  reinventing, reimagining the future.

16           One of the conversations that came out of

17  this task force was the importance of breaking down by

18  sector.  We are certainly looking regionally in the

19  State, but also looking by sector, and really drilling

20  down on the specific and unique needs of every sector

21  of our economy.

22           In an effort to further that cause, and to

23  do so with some transparency, we're inviting the press

24  and others in on a series of digital roundtables that

25  I'll be hosting with leaders in small businesses,

medium, and large businesses, by sector, also bringing
in customers, and bringing in experts from our advisory
committee to help guide the conversations, to really
start to break down, not just broad strokes hospitality
or retail, but by type of retail, by type of sector
within the broader sector of hospitality, bars,
restaurants, and the unique nature of -- of dining
experiences with tablecloths, without tablecloths, and
the issues of bars and restaurants that are combined,
issues of different types of licenses and different
types of retail, those that could do curbside pickup,
those that aren't necessarily afforded that, because of
the way their physical construction works, are they in
a shopping mall, are they with multiple other
businesses, or on they -- a second floor?

All of these things will be broken down, and
we'll start to socialize those conversations starting
tomorrow, again, bringing the press in, into those
digital roundtables, and, again, it's not just about
the immediacy of working to get specific language on
guidance for meaningful modifications of our
stay-at-home order in the short term, but it's really
about talking about the future and what that retail
experience may look like a year from now, two, three
years from now.

And so having this dynamic process, these
two-way conversations in a more granular level, we
think, is not only appropriate, but will be absolutely
determinative, in terms of how and when those
guidelines are put out over the course of the next few
weeks, and so that was something else we wanted to
preview.  Again, tomorrow, we'll be having that first
digital roundtable and inviting people in to
participate in that.

        We're also pleased as well that we made some
progress over the course of the last number of days.
As you know, I'm apt to remind you of the -- all the
N95 masks, procedure masks, and other PPE that we've
procured.  We have distributed some 43.7 million and 95
masks to date in the State of California.  We have also
distributed roughly three million procedural masks --
or, rather, four million, excuse me, procedural masks.
Over the course of the weekend, we were able to procure
3.1 million additional procedure masks, so we'll go
from four to over seven million masks that will be
distributed.

        That's very -- (video freezes briefly) -- we
continue the physical distancing, we appropriate
ourselves in public by putting on face coverings when
we are in contact or proximate to other people, and

1  make sure that we continue to advance our stay-at-home
2  orders.
3  I get the data, by the way. Every morning,
4  we have a dashboard that's provided on movement, a
5  number of companies we are working with that provide
6  that. We made those public a few months ago. We
7  actually showed some of that data here a few weeks
8  back.
9  It says what we all know. Not only did we
10  see an increase in movement and mobility over the
11  weekend, but we've seen, week to week, particularly in
12  the last two weeks, a modest increase. The vast
13  majority of you are still socially distancing and --
14  and are abiding by the stay-at-home order, and not
15  everybody that's moving, even an increase of movement,
16  are doing so inappropriately, but it does suggest,
17  again, that we are seeing movement all across the State
18  of California, and, boy, it wasn't just anecdotal.
19  Those photographs from those two county and the beaches
20  this weekend, we saw, specifically, data and movement
21  to the beaches that only reinforced that data, from a
22  very statistical perspective.
23  But, again, data and science and health will
24  drive our decision making, and if we continue to make,
25  again, the kind of progress we've made over the last

few weeks, the next few weeks, I think we can be in a
much better place than some had imagined and hoped for.
But, again, let's abide by these rules and abide by
these guidances.

Let me also, just briefly, before I get into
the daily numbers, mention one other sector.  We've
been working very hard on these unemployment insurance
claims.  Some 4.4 billion dollars has been distributed,
4.4 billion dollars since March 15th, just since March
15th.  It's unprecedented amount of money that has been
distributed.  4.3 million checks have been cut, and we
continue to see claims increase -- increase.  The rate
of growth is a little more modest than we saw a few
weeks ago, but, again, in record territory.

People have rightly commented about the call
center needing to be opened up beyond the 8:00 a.m. to
noon.  We did so a week ago, 8:00 to 8:00, seven days a
week.  People then rightly commented they're having a
hard time getting -- because of the call volume,
getting a human being to answer and have expressed
frustration.

We have acknowledged that frustration on
multiple occasions, and we've leaned in.  We announced
1,340 people have been redeployed to help support our
unemployment insurance claim process, including

1    supporting the call center.  Just for the purposes of
2    additional information and advancing that conversation
3    further, we added 600 additional people to that task in
4    the last few days.
5                Later this week, we will be putting text
6    capacity to answer question by text, so SMS.  That will
7    go into place in the next few days.  We put a new
8    chatbot up a few days ago on the most frequently asked
9    questions, again, all about reducing the stress,
10   reducing the volume.
11               I mentioned, just before the weekend, that
12   we were integrating some of the work around call
13   centers and making sure that we're putting different
14   protocols in place.  That substantially started to take
15   shape over the weekend.
16               We're not out of the woods, by any stretch
17   of the imagination.  Let me tell you why.  Fifteen --
18   just last week, fifteen million calls came in to that
19   call center.  Fifteen million, and over one million
20   minutes were spent, one million minutes with a human
21   being answering questions.
22               So one of the things we recognize we need to
23   do is reduce that call volume.  We think the SMS, the
24   text -- texting will help in that efforts.  These
25   chatbots will certainly, we believe, help in that

effort.

And we're also looking at some of the rules and regulation, to loosen them up, in terms of the need to make as many inquiries.  That's also an important thing that we started doing, late last week into the weekend, and, hopefully, it will be bearing fruit later this week.

So just know, we get it.  We're doing everything in our power to get it done.  I'm not going to sit here and complain about old IT systems, except we have an old IT system, and let me just acknowledge, head on, that's not the only old IT system in government.

Interestingly, this has long been a point of passion for me, a large-scale IT procurement, and while we were making some progress over this last year, we recognize, you know, a lot more progress that needs to be made, including the Department of Motor Vehicles, lest I not remind you of their infamous IT system.

These things can't change overnight, but know we're working day and night to begin to do justice to your expectations and your rightful demands for performance from the State of California and all of our partners at the local level, and we're committed to doing better every single day.

```
 1            So I just wanted to update you on

 2   unemployment insurance claims as well.

 3            As we do every day, I also want to update

 4   you on some trend lines before they're headlines, as it

 5   relates to the data that comes in on the number of

 6   deaths, hospitalization, number of positives in the

 7   State of California.

 8            Over the weekend, we started to see a modest

 9   decline from that peak last week in the number of lives

10   lost.  Over the last 24 hours, 45 lives lost.  Tragic.

11   Again, human beings, not just numbers, not just

12   statistic, but encouraging sign, nonetheless, over the

13   course of the last number of days, from that peak into

14   last week.

15            We'll see where it goes in the next few

16   days.  Always a point of caution, lagging indicator,

17   but that number down from over a hundred, just a number

18   of days ago.  We did see 1300 new individuals test

19   positive for COVID-19, but we're also seeing

20   substantial improvement in our total testing.  Now over

21   553,000 tests have been performed in the State of

22   California.

23            We're starting to hit those benchmarks that

24   we laid out to you, in terms of substantially

25   increasing our testing.  I should just note, we're also
```

1   seeing those benchmarks of commitments I made last week

2   on those 80 new testing sites from OptumServe, first

3   one up there now in Humboldt, focusing on rural

4   Californians, others going out in realtime today and

5   through the next week.

6            Also, Verily, the partnership with

7   Verily, we talked about a number of weeks ago with

8   Google, they're also focusing on places like East L.A.,

9   inner city California, not just in the rural parts of

10  the State.

11           So not only are we increasing the numbers of

12  tests, I just want to make sure people understand where

13  we are testing is becoming more appropriate to the

14  needs of 40 million Californians, and so we're trying

15  to meet people where they are, as opposed to demanding

16  they meet where we are.

17           Again, lot of progress in that place, and

18  that progress will certainly help us with those green

19  lights of indicators of moving forward with these

20  meaningful modifications of the stay-at-home order that

21  all of us are looking forward to.

22           So that's the number of positives, over 1300

23  more in the last 24 hours.  The number of

24  hospitalizations, 1.4 percent increase.  Again, we're

25  seeing some stabilization, decrease, modest increase,

1   decrease, modest increase in the whole number of people

 2   hospitalized.  The number of people in ICU is basically

 3   flat from yesterday, just one individual more than in

 4   the last 24 hours in the ICU.

 5             So, again, stabilization, but let's keep it

 6   that way.  That's why I began talking about the

 7   beaches.  Why run that -- I know, I'll say it again --

 8   that 90-yard dash?  Who does that?  You're so close

 9   when you've been making so much progress.  Let's just

10   get through this thing together, so that we can go so

11   much farther, so much quicker.

12             The worst thing we do is we start, sort of

13   rest on our laurels, thinking somehow the virus has

14   decided to take a break or go on vacation.  Virus is as

15   present -- prevalent as it's ever been.  It's as

16   transmissible as it's ever been.  Nothing's changed, in

17   that respect.  The only thing that changed is our

18   behavior, for the better, and that mitigated the spread

19   and has provided us the opportunity to build a

20   foundation where we can then begin to make the

21   modifications.

22             And so, again, I just want to encourage

23   people to continue in that spirit, and advance in that

24   space, six feet apart minimum, practicing social

25   distancing, physical distancing, abiding by the

```
 1    stay-at-home, and we'll do our part to make adjustments
 2    and amendments when the data shows those green lights,
 3    and the data provides us the indication that we can
 4    move there.  Hope it's in the next few weeks.  I
 5    believe it will be, but that's based on our behaviors
 6    in the next few weeks.
 7            So let's get there together, and let's get
 8    there in a much stronger way than we otherwise could.
 9            So that's, broad strokes, the updates
10    for the day, and I, again, want to just express great,
11    great gratitude to -- to all of you that continue to do
12    everything you can to -- to -- to really meet the
13    spirit that this moment requires, and -- and that
14    spirit includes all of you that have signed up for the
15    Californiansforall.ca.gov website to contribute your
16    time, your passion, and your expertise to volunteer.
17    It is just a wonderful thing to see those numbers
18    continue to grow and continue to expand, in terms of
19    every part of this state, people participating,
20    contributing, supporting their neighbors, supporting
21    one another at this incredibly important time.  Let's
22    also keep that spirit of contribution going as well.
23            With that, happy to take questions.
24            FEMALE SPEAKER:  Jonathan Ayestas, KCRA
25    News.
```

1            MR. AYESTAS:  Hi, Governor.  Thank you for

2    taking my question.

3            Earlier, you had mentioned that you had

4    possibly wanted to work with law enforcement agencies

5    to be a little more aggressive with any enforcement.

6    At least in our area, we haven't heard of any

7    citations.

8            Does this mean you're wanting to take a step

9    more towards that, or is the goal still education about

10   social distancing guidelines versus enforcement?

11           GOVERNOR NEWSOM:  Yeah, I appreciate it.

12   No, the predominant focus is education.  We did a lot

13   of PSAs.  We did paid media.  I was very explicit last

14   Thursday, little bit on Friday about our concerns and

15   the expectation, particularly in these two counties

16   that had soft openings, as opposed to hard closures,

17   and it manifested, as we were concerned, though I think

18   because of the great work the State parks and their

19   parks patrol and our partners at the local level did,

20   it was mitigated.

21           Look, there were thousands of contacts,

22   particularly on Saturday, substantially less so on

23   Sunday, for multitude of reasons.  There were no

24   citations or arrests.  There were a few warnings,

25   scattered all throughout the State of California.

1       I think that's a better approach.  I don't
2  want to be punitive.  My gosh, someone who's lost their
3  job, last thing they want to do is walk their dog,
4  they're with their kids, and they've got cabin fever,
5  and they just want to take a rest on the beach, and all
6  of a sudden, they get a citation.  I don't want -- I
7  don't want to see that happen.  You don't want to see
8  that happen.
9       None of us do, but if there are people
10 thumbing their nose and abusing it, putting their lives
11 at risk, because they're impacting the lives of others,
12 and ultimately setting back the cause of reopening the
13 economy as quickly as we'd like to, I think we may have
14 to do a little bit more.
15       And so I mentioned it a moment ago, let me
16 mention it again, and to -- to answer your question a
17 little more specifically.  We have a all-hands
18 meeting -- we have a lot of these meetings, but with
19 this as the principal topic, with the Police Chiefs
20 Association, our County Sheriffs' Association, CSAC,
21 that's our -- our county partners, and others to see if
22 we can work even more closely together over the course
23 of this next week and the next few weeks, so that we
24 can keep this momentum going and not see a setback.
25       And everybody's saying the right things.  I

1  think they want to do the right thing, including those

2  local officials that -- that wanted to open up the

3  beaches, I -- I think, to their credit, they saw what

4  happened.  They've listened to the concerns, and --

5  and -- and some of the criticism that all of us have

6  received, and -- and -- and I think there's an

7  understanding and willingness to work collaborative,

8  together.

9           By the way, extends not just to enforcement.

10 It's also some strategic considerations.  When we talk

11 about hard closures, it's primarily these parking

12 facilities.  Soft closures include parking facilities,

13 but you broaden some of the parking restrictions even

14 beyond the formal parking areas, you begin to further

15 the efforts to mitigate a surge of visitors.

16          So there's -- there's some other things we

17 can do, and we will be doing a lot more of those things

18 in the next number of days and weeks.

19          FEMALE SPEAKER:  Angela Hart, Kaiser Health

20 News.

21          MS. HART:  Thanks, Governor.  On this

22 testing ramp up that you've discussed, you've talked a

23 lot about increasing -- increasing testing in rural

24 towns and -- and communities of color that have seen

25 inadequate testing, but what we're hearing a lot about

1   is of -- of challenges when it comes to testing and the

2   uninsured population.

3           So can you talk about that, and to the

4   extent with which California's testing goals are being

5   complicated by a lack of health coverage?

6           GOVERNOR NEWSOM:  Yeah, I have -- Dr. Ghaly

7   here could talk more specifically about that.  That

8   should not, absolutely should not be an impediment, for

9   a multitude of reasons that we have announced,

10  regardless of your status in the State of California,

11  but for a multitude of reasons, that should not be an

12  issue, but Dr. Ghaly can fill in, more specifically,

13  the blanks, in terms of what those actions have been

14  and why he feels confident that that's not an

15  impediment.

16          DR. GHALY:  Thank you, Governor.

17          We do continue to stand up sites across the

18  State, targeting areas that haven't had enough testing,

19  haven't had any testing in some areas, and certainly,

20  as we look at our data to target those neighborhoods

21  and communities where we know there's disparities in

22  outcomes with COVID-19, to make sure those populations

23  receive the testing, in a quantity that they deserve.

24  We're building towards that, and -- and we're making

25  new strides every day.

1        Early on in our response, the Governor made
2   some very important moves, indications that our
3   commercial health plans should and will support the
4   payment for COVID-19 testing, regardless of where an
5   individual is or what plan they're a part of.  He
6   directed our team at the Department of Healthcare
7   Services, who run the Medi-Cal program, to ensure that
8   no individual, Medi-Cal beneficiary, would experience
9   any economic harm while they seek testing.
10        We have worked with our clinic partners to
11  make sure that there's clarification on how that
12  billing arrangement and payment arrangement can be
13  made, so that we don't have any issues getting an
14  individual tested, and for those who do not have either
15  commercial insurance or Medi-Cal, those who are
16  uninsured, that we make sure that anyone who runs a
17  test on an uninsured Californian is able to get
18  reimbursed adequately, so that does not become an
19  impediment.
20        We expect to see these questions more and
21  more, as individual clinics and individual settings
22  that begin to do more testing begin to ask the
23  question, and we look forward to demonstrating how they
24  can get payment for those tests, so that the community
25  message across California is if you think you need to

1    be tested, especially as we change our prioritization

2    in testing guidelines of who should and can be tested,

3    that there is no impediment to getting that done.

4            We see it as a very important part of

5    opening or modifying our stay-at-home orders in the

6    weeks to come, so we are dogged in working hard with

7    our county partners, health plan partners to make sure

8    that this and any other testing impediment is cleared.

9            GOVERNOR NEWSOM:  And, Angela, as always,

10   PPE is an issue as well, accessibility, testing, but

11   you got to have the appropriate amount of personal

12   protective equipment, and so that's why we continue to

13   work so aggressively to make sure we get these masks,

14   in particular, but not just masks, gowns, shields,

15   gloves, and other PPE distributed as quickly and

16   assuredly as we receive them.

17           FEMALE SPEAKER:  Elex Michaelson, Fox 11.

18           MR. MICHAELSON:  Governor, thanks for taking

19   my call.  There -- a lot of people, business owners,

20   employees, are grateful for all the government

21   assistance, grateful for all the charity work, but what

22   they really want to do is get back to work.  So in

23   terms of what are the types of businesses that you're

24   looking at that could potentially reopen first?  Are we

25   looking at maybe retail businesses with proper social

1  distancing?  Give employees and business owners sort of

2  a -- a sense of what is to come.

3              GOVERNOR NEWSOM:  The good news is we'll be

4  laying that out in detail tomorrow.  We'll be

5  highlighting Indicator 5 of our six indicators.  That

6  indicator is specific to business.  We'll talk

7  regional, regions.  We'll talk sectors.  We'll lay out

8  a strategy for phasing those things, and, as I said,

9  preview, based upon the data to date, and based upon

10  the importance of continuing to practice social

11  distancing and physical distancing.

12              If the data leads us further, and the

13  indicators continue to hold, that in the next few

14  weeks, we'll start making some meaningful

15  modifications, not the next few months.  That's why,

16  Elex, I just talked about importance of not seeing what

17  we saw this weekend on our beaches, because the only

18  thing that could set us back is our individual and

19  collective behavior.

20              FEMALE SPEAKER:  Stephanie Baer, BuzzFeed

21  News.

22              MS. BAER:  Hi, Governor.  I have a few

23  questions about the State's contact tracing plan.  Is

24  the State working with any tech companies to automate

25  contact tracing through a phone app or other

1  technology?

2  And then last week, you said that the

3  State's goal was to build a contact tracing workforce

4  of 10,000 people.  How many people has the State hired

5  so far, what are their backgrounds, and how is the

6  State going about paying them?

7  GOVERNOR NEWSOM:  Yeah, it was just

8  announced a few -- literally a few days ago, but we did

9  our survey.  Twenty-two counties have robust tracing

10  capacity that's already in place.  We're building off

11  that existing workforce.

12  We are going to announce -- I don't want to

13  get ahead of myself, but partner with a well-known

14  brand in the State of California, but not tech brand

15  yet.  This is more of a well-known medical institution

16  in the State of California, guide our efforts.

17  As I specifically said last week, we had

18  done that survey, not just of the counties, but of our

19  existing workforce, on allowing people to fill out

20  forms about what their unique skill set is, so that we

21  can then redeploy that workforce.  That will be

22  redeployed from, again, a bottom-up perspective,

23  building on the existing capacity and the expertise and

24  workforce at the county level, supplementing at a State

25  level, and then building capacity of partnerships

1   institution that we're very, very shortly going to

2   announce that we'll be doing -- substantially doing the

3   training that's required for the workforce.

4           We're well on our way of meeting our

5   internal goals, and over the next few weeks, you're

6   going to see thousands and thousands of people well on

7   our way to hit that 10,000 goal, sooner than actually

8   some of us had even anticipated when we made the

9   announcement last week.  And, again, that's based upon

10  the extraordinarily robust existing infrastructure

11  that's in place.

12          May not be the total numbers, but it's the

13  quality of those local efforts that are consistent, by

14  the way, even in this crisis, and this is important to

15  remind people.  We've been doing contact tracing for

16  years and years and years, decades in the State of

17  California, TB, measles.  Substantively, you'll see a

18  lot of work in this space on STDs, some gonorrhea

19  outbreaks in the last number of years, HIV and AIDS

20  brought to a whole 'nother level.

21          And some counties are more enriched in this

22  space than others, so we're building off that local

23  expertise that already exists and then expanding it

24  with this surge workforce, based on the surveys that we

25  had conducted a number of months back, probably almost

1   two months ago, seven or so weeks, when this crisis

2   first took shape, and we started those surveys.

3          And then we'll augment on those efforts

4   through this online portal and training program that

5   we're just about to announce, and I want to do it

6   today, but I -- I don't want to get ahead of myself,

7   and so know, in the next day or two, we'll be even more

8   specific, including the answer to your question on what

9   the tech platform.

10         We have a -- multiple choices in this.  I

11  just want to make sure we don't pick one too soon and

12  unnecessarily and lock ourselves in, but we are very

13  close to having that platform set up as well.

14         FEMALE SPEAKER:  David Baker, Bloomberg

15  News.

16         MR. BAKER:  Yes, hello, Governor.  You had,

17  last week, talked about how the federal government, and

18  President Trump in particular, had promised the State a

19  hundred thousand swabs, testing swabs last week, which

20  then got ratcheted back a little bit to -- to 90,000,

21  and 250,000 this week.

22         Did you, indeed, get the 90,000 last week?

23  Are you assured that you will get the 250,000 coming up

24  this week?  And, if so, are there any other testing

25  bottlenecks out there in the majorit- -- in the

different bottlenecks you described last week, like
with reagents and things like that?

GOVERNOR NEWSOM:  Yeah, thank you.  We
received the 90,000, distributed 90,000.  Nothing to
believe -- it's Monday -- that this week, we won't
receive 260,000.  They're promising to make up for the
10-, but when that comes in, I'll let you know, and --
and there's nothing to suggest it won't happen.

We'll still need multiples of that, and so,
by no stretch of the imagination, is that enough.
Remember, it's not just the total number of tests.  We
want to continue to increase the number of times an
individual is tested, including the types of tests, the
serology tests, not just the traditional PCR tests, and
therein lies answer to the second part of your
question.

Every week, we tend to shut one concern
down, there's another concern that -- that rears its
head.  And so you're correct, it was, for a while,
reagents, and then it was specifically RNA extraction
kits, and then it was swabs in this last few weeks, but
there's also transport media, which I mentioned in the
survey of the 251 largest vendors that we have,
including our private and public labs, our private
partners and public labs, that continue to be a

1  problem.

2          Remember, I said in that survey, 50 to 55

3  percent, the 251 largest testing providers said swabs

4  was the number one issue.  Fifty percent said some of

5  the testing kits, the -- the transport media, the tubes

6  were also a problem.  So that continues to be a space

7  where we're doing more and working, not just our

8  federal partners, but working to procure directly those

9  specific supplies.  But, look, substantial progress is

10 being made, but by no stretch of the imagination does

11 everybody have ample supplies, including, again, PPE,

12 which is critical, in terms of making sure that these

13 tests are conducted at an appropriate level.

14          OptumServe -- forgive me for being a little

15 more longwinded, but I want to be precise.  OptumServe

16 and those 80 sites we announced last week, those are

17 end-to-end tests, all locked in, all fully loaded, in

18 terms of supply and diagnostic capacity, and Verily has

19 substantially made progress on the six additional sites

20 that we announced last week, in terms of their supply

21 chain.

22          So we're confident in those new

23 announcements that supplies, for the moment, are --

24 are -- are -- are ample.  And I'll remind you, 1.5

25 million serology tests that Abbott has committed to,

and we have procured, those are going to sites where
the machines are already in place, and we're confident
that those also are fully loaded commitments.

FEMALE SPEAKER: Jeremy White, Politico.

MR. WHITE: Hey, Governor, thanks for taking
my question. I wanted to ask you about the two states
that joined the regional pact today, Nevada and
Colorado, as you mentioned.

The Governor of Nevada noted how many
customers -- excuse me, visitors from other Western
states come to visit Las Vegas, for example. I'm
curious to know the regional framework you're
contemplating with other governors, would it
potentially include policing the borders between those
states, to limit the people crossing those borders,
depending on how different governors are rolling back
or keeping in place these orders?

GOVERNOR NEWSOM: Yeah, I think, look, you
scope a potential. That's a potential, but I can say
this, just based on my personal conversations, many of
these governors, we have not had that conversation, so
that is not our current scoping.

Frankly, our current scoping is on what
meaningful modifications look like, comparing and
contrasting conditions at the local level, recognizing

the regional variance, even within our states.

Tomorrow, again, we'll be laying out more detail on our roadmap in our specific Indicator Number 5 and what the phased-in approach will look like. You'll see conversations that we've had with other governors, where we have taken some of their counsel and advice and incorporated into the presentation we'll be providing you tomorrow. It's just a proof point of the collaboration and the sharing of best practices back and forth.

But, look, if we're at a different phase in this, and there's other concerns, I imagine that's a scoping potential of -- of the purpose of the Western States Compact is some consideration and some collaboration, some heads up, some coordination on something along the lines that you suggest, but not at the moment.

FEMALE SPEAKER: Final question, Jim Roope, Westwood One News.

MR. ROOPE: Thank you very much. Good afternoon. Governor, I like you, and most people do right now, but I have a question for Dr. Ghaly, if that's okay.

GOVERNOR NEWSOM: My gosh, you've broken my heart, or not. You've elevated me, so, Dr. Ghaly?

```
 1              MR. ROOPE:  Sorry.  Thank you very much.
 2              Doctor, we've been seeing a lot of
 3    documentation, hearing a lot of information about how
 4    the virus lives on surfaces, so on and so forth, but we
 5    understand -- at least what I've understand -- -stood
 6    now, through all of these briefings, is that the virus
 7    is a protein, and in a droplet, it'll survive for a
 8    little bit.  Once that droplet drys up, while the virus
 9    could be still detected, its DNA would still be there,
10    it's not necessarily infectious.
11              So we have information on how long that
12    virus can live on somewhere, how long it can be
13    detected, but do we have information about how long the
14    virus is actually infectious on these surfaces, or do I
15    have all of that wrong?
16              DR. GHALY:  No, you -- thank you for the
17    question.  I think it's an important one.  Many people
18    are asking.  We talk about how it's transmitted from
19    person to person.  We're talking about six feet apart,
20    and what about the surfaces that that person that you
21    don't normally interact with was just standing at, and
22    we are learning more and more about how the
23    transmission of COVID-19 takes place.
24              I think we're learning, based on what other
25    countries are publishing in the literature, what we're
```

1    learning in some of those major epicenters in -- in the
2    states of where they've had many, many cases, and I
3    would say that because we are not a hundred percent
4    certain how -- how it lives on surfaces, whether it
5    transmits off of those surfaces, that we continue to
6    push out those very basic guidelines, wash your hands
7    frequently.  Don't touch your face, if you can avoid
8    it, mainly, your eyes, mouth, and nose.  Make sure you
9    cover your cough.  Keep physical distancing as much as
10   possible.  Stay at home, when you're able to, and if
11   you must leave your house to go to a necessary
12   essential visit, to the store or the pharmacy, to use a
13   face covering, and to keep as far apart as possible.

14            I think as we learn more and more whether
15   it's an hour on a surface, six hours on a surface,
16   whether that transmits and is actually infective,
17   transmissible, and can cause someone to contract
18   COVID-19, we want to be abundantly cautious with all of
19   our citizens around California in giving that
20   consistent, strong guidance of what to do now.

21            As we learn more and more about the science,
22   we will share that with you, try to be clear about what
23   it means and how it might change our requirements or
24   recommendations around how we behave, but, for the time
25   being, we continue to stick to the initial message

1   around physical distancing and doing the basic

2   common-sense things around covering your cough, washing

3   your hands, and taking normal measures to protect

4   yourself, your families, and your communities.

5           GOVERNOR NEWSOM:  Thanks for asking the

6   person who went to medical school that question.

7           And let me just extend appreciation to

8   everybody, all the good work you've done to suppress

9   the spread in the State of California, and good work

10  has provided us the opportunity tomorrow to give you an

11  update on our indicator.

12          Again, six indicators.  We did the update

13  last Wednesday on testing, tracking, tracing, isolation

14  and quarantine.  Tomorrow, we'll be talking about

15  opportunity to begin to modify, and potentially the

16  course of the next few weeks, not months, modifications

17  to the stay-at-home order that are -- go to the

18  question of businesses, and sectors, and regions in the

19  State of California, but that's because of your good

20  work.

21          If the data starts to show different things,

22  the spread is not suppressed, if we go back to our

23  behaviors, pre-COVID-19 behaviors, too quickly, then

24  these announcements, these guidances, our ability to

25  get back to modified normalcy will simply be delayed.

```
 1              And so, again, it's in the spirit of
 2    collaboration, spirit of expectation, and in the spirit
 3    that has defined the last few weeks that I just, well,
 4    implore you to continue to do the great work you've
 5    done and continue to tell your friends and family,
 6    particularly younger folks, that that work is not over.
 7              The virus is as transmissible as it's ever
 8    been, and, again, it doesn't take the weekend off.  It
 9    doesn't take any time off.  It is ubiquitous.  It is
10    invisible, and it remains deadly.  Ask the 45 families
11    who lost a loved one in the last 48 hours.
12              Please, please continue physical distancing,
13    social distancing, continue to abide by your local and
14    the State guidances, and continue in that spirit of
15    contribution.
16              And, as always, I'll end, just reminding you
17    if you feel the urge to contribute your time, your
18    energy, your passion, your expertise,
19    Californiansforall.ca.gov.
20              Take care, everybody.
21                            ***
22
23
24
25
```

1           I, RENAE E. LOPEZ, a Certified Shorthand

2      Reporter of the State of California, do hereby certify:

3              That a record of the audio proceedings was

4      made by me using machine shorthand, which was

5      thereafter transcribed under my direction; that the

6      foregoing transcript is a true record of the audio

7      transcription.

8              I further certify that I am neither

9      financially interested in the action nor a relative or

10     employee of any attorney or any party to this action.

11              IN WITNESS WHEREOF, I have this date

12     subscribed my name.

13

14     Dated: May 5, 2020

15                              _____
                               Renae E. Lopez
16                             CSR No. 12142

17

18

19

20

21

22

23

24

25

**-**

**-stood**
35:5

**1**

**1,340**
14:24

**1.4**
18:24

**1.5**
32:24

**10,000**
28:4 29:7

**10-**
31:7

**11**
26:17

**12142**
39:16

**1300**
17:18 18:22

**15th**
14:9,10

**2**

**2020**
4:1 39:14

**24**
17:10 18:23 19:4

**250,000**
30:21,23

**251**
31:23 32:3

**260,000**
31:6

**27**
4:1

**3**

**3.1**
12:19

**4**

**4.3**
14:11

**4.4**
14:8,9

**40**
4:9 18:14

**43.7**
12:14

**45**
17:10 38:10

**48**
38:11

**5**

**5**
27:5 34:4 39:14

**50**
32:2

**55**
32:2

**553,000**
17:21

**6**

**600**
15:3

**8**

**80**
18:2 32:16

**8:00**
14:16,17

**9**

**90,000**
30:20,22 31:4

**90-yard**
19:8

**95**
12:14

**A**

**a.m.**
14:16

**Abbott**
32:25

**abide**
14:3 38:13

**abided**
6:4

**abiding**
13:14 19:25

**ability**
7:18,19 37:24

**absolutely**
12:3 24:8

**abundantly**
36:18

**abusing**
22:10

**accessibility**
26:10

**acknowledge**
6:12,13 16:11

**acknowledged**
14:22

**action**
39:9,10

**actions**
24:13

**adapt**
7:19

**added**
15:3

**addition**
9:13

**additional**
12:19 15:2,3 32:19

**address**
6:17

**adequately**
25:18

**adjustments**
20:1

**adopted**
6:4

**advance**
7:13 13:1 19:23

**advanced**
5:22,23

**advancing**
15:2

**advice**
34:7

**advising**
10:13

**advisory**
10:10 11:2

**afforded**
11:12

**afternoon**
4:6 34:21

**agencies**
8:1 21:4

**agenda**
10:4

**aggressive**
6:23 21:5

**aggressively**
8:2 26:13

**ahead**
28:13 30:6

**AIDS**
29:19

**all-hands**
22:17

**allowed**
6:7

**allowing**
28:19

**amendments**
20:2

**amount**
14:10 26:11

**ample**
32:11,24

**anecdotal**
13:18

**Angela**
23:19 26:9

**announce**
28:12 29:2 30:5

**announced**
10:10 14:23 24:9 28:8
32:16,20

**announcement**
29:9

**announcements**
32:23 37:24

**answering**
15:21

**anticipated**
29:8

**anxiety**
7:6

**app**
27:25

**appreciation**
37:7

**approach**
22:1 34:4

**appropriately**
5:22 6:8 9:3

**APRIL**
4:1

**apt**
12:12

**area**
21:6

**areas**
23:14 24:18,19

**arrangement**
25:12

**arrests**
21:24

**assistance**
26:21

**Association**
22:20

**assured**
30:23

**assuredly**

26:16

**attorney**
39:10

**audio**
39:3,6

**augment**
5:16 30:3

**augmentations**
6:16

**automate**
27:24

**avail**
6:22

**avoid**
36:7

**Ayestas**
20:24 21:1

---

**B**

**back**
7:11,14,15 8:20 9:15
10:9 13:8 22:12 26:22
27:18 29:25 30:20
33:16 34:10 37:22,25

**backgrounds**
28:5

**Baer**
27:20,22

**Baker**
30:14,16

**bars**
11:6,9

**based**
20:5 27:9 29:9,24 33:20
35:24

**basic**
36:6 37:1

**basically**
19:2

**beach**
5:20 6:12 22:5

**beaches**
4:18 5:25 6:1 13:19,21
19:7 23:3 27:17

**bearing**
16:6

**beautiful**
5:7

**began**
19:6

**begin**
4:8 9:17 16:21 19:20
23:14 25:22 37:15

**behave**
36:24

**behavior**
5:3,4,17 7:15 8:22
19:18 27:19

**behaviors**
20:5 37:23

**beings**
17:11

**benchmarks**
17:23 18:1

**beneficiary**
25:8

**bent**
4:10

**billing**
25:12

**billion**
14:8,9

**billions**
5:13

**bit**
21:14 22:14 30:20 35:8

**blanks**
24:13

**Bloomberg**
30:14

**Board**
6:14

**body**
10:10,11

**borders**
33:14,15

**bottlenecks**
30:25 31:1

**bottom-up**
28:22

**boy**
13:18

**brand**
28:14

**break**
8:13 11:4 19:14

**breaking**
10:17

**briefings**
35:6

**briefly**
10:5 12:22 14:5

**brightest**
10:11

**bringing**
11:1,2,18

**broad**
11:4 20:9

**broaden**
23:13

**broader**
7:9 10:4 11:6

**broken**
11:16 34:24

**brought**
29:20

**Brown**
9:25 10:2

**build**
19:19 28:3

**building**
24:24 28:10,23,25
29:22

**business**
8:14 26:19 27:1,6

**businesses**
10:25 11:1,15 26:23,25
37:18

**Buzzfeed**
27:20

## C

**cabin**
22:4

**California**
4:11 5:20 6:2,20 7:1 9:5
10:12 12:15 13:18
16:23 17:7,22 18:9
21:25 24:10 25:25
28:14,16 29:17 36:19
37:9,19 39:2

**California's**
24:4

**Californian**
25:17

**Californians**
4:9 5:18 18:4,14

**Californiansforall.ca.
gov**
20:15

**Californiansforall.ca.
gov.**
38:19

**call**
14:15,19 15:1,12,19,23
26:19

**calls**
15:18

**capacity**
8:3,21 15:6 28:10,23,25
32:18

**care**
38:20

**cases**
36:2

**caution**
17:16

**cautious**
36:18

**center**
14:16 15:1,19

**centers**
15:13

**Certified**
39:1

**certify**
39:2,8

**chain**
32:21

**challenges**
24:1

**change**
5:3 16:20 26:1 36:23

**changed**
19:16,17

**charity**
26:21

**chatbot**
15:8

**chatbots**
15:25

**checks**
14:11

**chiefs**
9:20 22:19

**childcare**
8:15

**choices**
30:10

**citation**
22:6

**citations**
21:7,24

**cities**
9:2

**citizens**
36:19

**city**
6:13 18:9

**claim**
14:25

**claims**
14:8,12 17:2

**clarification**
25:11

**clarity**
7:10

**clear**
8:24 36:22

**cleared**
26:8

**clinic**
25:10

**clinics**
25:21

**close**
19:8 30:13

**closely**
9:17 22:22

**closures**
6:6 21:16 23:11,12

**coalition**
9:13

**coastline**
5:22

**coasts**
5:8

**collaboration**
34:9,15 38:2

**collaborative**
23:7

**collaboratively**
9:18

**collective**
27:19

**color**
23:24

**Colorado**
9:12,14 33:8

**combined**
11:9

**commented**
14:15,18

**commercial**
25:3,15

**commitments**
18:1 33:3

**committed**
16:24 32:25

**committee**
11:3

**common-sense**
37:2

**communities**
23:24 24:21 37:4

**community**
25:24

**Compact**
34:14

**companies**
13:5 27:24

**comparing**
9:21 33:24

**complain**
16:10

**complicated**
24:5

**concern**
31:17,18

**concerned**
21:17

**concerns**
6:17 21:14 23:4 34:12

**conditions**
6:6,17 33:25

**conduct**
6:7

**conducted**
9:3 29:25 32:13

**confidence**
7:11

**confident**
9:7 24:14 32:22 33:2

**confront**
4:15 6:11

**consideration**
34:14

**considerations**
23:10

**consistent**
29:13 36:20

**construction**
11:13

**contact**
12:25 27:23,25 28:3
29:15

**contacts**

21:21

**contemplating**
33:13

**continue**
6:7 8:2 12:23 13:1,24
14:12 19:23 20:11,18
24:17 26:12 27:13
31:12,25 36:5,25 38:4,
5,12,13,14

**continues**
7:21 32:6

**continuing**
27:10

**contract**
36:17

**contrasting**
9:21 33:25

**contribute**
20:15 38:17

**contributing**
20:20

**contribution**
20:22 38:15

**conversation**
15:2 33:21

**conversations**
9:9,11 10:16 11:3,17
12:2 33:20 34:5

**coordination**
34:15

**correct**
31:19

**cough**
36:9 37:2

**Council**
6:13

**counsel**
34:6

**counties**
21:15 28:9,18 29:21

**countries**
35:25

**country**
5:13

**county**
4:17 6:2,14 7:7 13:19
22:20,21 26:7 28:24

**cover**
36:9

**coverage**
24:5

**covering**
36:13 37:2

**coverings**
12:24

**COVID-19**
17:19 24:22 25:4 35:23
36:18

**create**
6:6

**credit**
23:3

**crisis**
29:14 30:1

**critical**
32:12

**criticism**
23:5

**crossing**
33:15

**CSAC**
22:20

**CSR**
39:16

**curbside**
11:11

**curious**
33:12

**current**
33:22,23

**curve**
4:11 8:4

**customers**
11:2 33:10

**cut**
14:11

**D**

**daily**
14:6

**dash**
19:8

**dashboard**
13:4

**data**
5:3,5 7:21 8:18 9:22
13:3,7,20,21,23 17:5
20:2,3 24:20 27:9,12
37:21

**date**
12:15 27:9 39:11

**Dated**
39:14

**David**
30:14

**day**
5:8,10 16:21,25 17:3
20:10 24:25 30:7

**days**
12:11 14:17 15:4,7,8
17:13,16,18 23:18 28:8

**deadly**
38:10

**deaths**
17:6

**decades**
29:16

**decided**
19:14

**decision**
7:3 13:24

**decline**
17:9

**decrease**
18:25 19:1

**deep**
9:25

**deeply**
7:2,3,9

**defined**
38:3

**delayed**
37:25

**deliberative**
6:16

**demanding**
18:15

**demands**
16:22

**demonstrating**
25:23

**Department**
16:18 25:6

**depending**
33:16

**deserve**
24:23

**detail**
8:7 27:4 34:3

**details**
8:8

**detected**
35:9,13

**determinative**
12:4

**diagnostic**
32:18

**Diego**
6:1

**digital**
10:24 11:19 12:8

**dining**
11:7

**directed**
25:6

**direction**
39:5

**directly**
32:8

**discussed**
23:22

**disparities**
24:21

**disrupt**
8:20

distancing
5:24 6:24 7:16,17 12:23
13:13 19:25 21:10 27:1,
11 36:9 37:1 38:12,13

distribute
5:12

distributed
12:14,16,21 14:8,11
26:15 31:4

DNA
35:9

Doctor
35:2

documentation
35:3

dog
22:3

dogged
26:6

dollars
14:8,9

drilling
10:19

drive
13:24

driven
5:2,3

droplet
35:7,8

drys
35:8

dynamic
12:1

---

**E**

eager
8:5,6

Earlier
21:3

Early
25:1

East
18:8

economic
8:11 10:10 25:9

economy
7:19 8:22 10:21 22:13

education
21:9,12

effect
5:11

effort
10:22 16:1

efforts
6:5 10:13 15:24 23:15
28:16 29:13 30:3

elected
7:4

elevated
34:25

Elex
26:17 27:16

emphasize
5:2

employee
39:10

employees
26:20 27:1

employing
10:6

encourage
19:22

encouraged
6:11

encouraging
17:12

end
38:16

end-to-end
32:17

energy
38:18

enforcement
6:23 8:2 21:4,5,10 23:9

engagement
6:16

enriched
29:21

ensure

25:7

environment
8:15

epicenters
36:1

equipment
26:12

essential
36:12

Eureka
6:3

everybody's
22:25

exceptions
6:9

excuse
12:17 33:10

existing
28:11,19,23 29:10

exists
29:23

expand
20:18

expanding
29:23

expect
6:25 25:20

expectation
8:16 21:15 38:2

expectations
16:22

experience
11:24 25:8

experiences
11:8

expertise
20:16 28:23 29:23
38:18

experts
11:2

explicit
21:13

express
20:10

expressed
14:20

extend
4:22 8:6 9:24 37:7

extending
4:8

extends
23:9

extent
24:4

extraction
31:20

extraordinarily
29:10

eyes
36:8

---

**F**

face
12:24 36:7,13

facilities
8:15 23:12

families
37:4 38:10

family
38:5

farther
19:11

federal
30:17 32:8

feel
38:17

feels
24:14

feet
19:24 35:19

FEMALE
20:24 23:19 26:17
27:20 30:14 33:4 34:18

fever
22:4

fifteen
15:17,18,19

Fifty

32:4

**fill**
24:12 28:19

**Final**
34:18

**financially**
39:9

**flat**
19:3

**floor**
11:15

**focus**
21:12

**focusing**
18:3,8

**folks**
6:19 38:6

**force**
10:17

**foregoing**
39:6

**forgive**
32:14

**formal**
23:14

**formed**
9:15

**forms**
28:20

**forward**
5:10 7:25 9:8 18:19,21
25:23

**foundation**
19:20

**Fox**
26:17

**framework**
8:11 33:12

**Frankly**
33:23

**freezes**
12:22

**frequently**
15:8 36:7

**Friday**
21:14

**friends**
38:5

**fruit**
16:6

**frustration**
14:21,22

**fully**
32:17 33:3

**future**
10:15 11:23

---

**G**

**Ghaly**
24:6,12,16 34:22,25
35:16

**give**
27:1 37:10

**giving**
36:19

**globe**
5:14

**gloves**
26:15

**goal**
21:9 28:3 29:7

**goals**
24:4 29:5

**gonorrhea**
29:18

**good**
4:6 27:3 34:20 37:8,9,
19

**Google**
18:8

**gosh**
22:2 34:24

**government**
8:1 16:13 26:20 30:17

**Governor**
4:6 21:1,11 23:21 24:6,
16 25:1 26:9,18 27:3,22
28:7 30:16 31:3 33:5,9,
18 34:21,24 37:5

**governors**
9:20 10:2 33:13,16,21
34:6

**gowns**
26:14

**granular**
12:2

**grateful**
26:20,21

**gratitude**
4:9 9:25 20:11

**great**
20:10,11 21:18 38:4

**green**
18:18 20:2

**grow**
20:18

**growth**
14:13

**guidance**
11:21 36:20

**guidances**
14:4 37:24 38:14

**guide**
8:19 11:3 28:16

**guidelines**
6:3,24 8:23 9:4 12:5
21:10 26:2 36:6

---

**H**

**hands**
36:6 37:3

**happen**
22:7,8 31:8

**happened**
23:4

**happy**
20:23

**hard**
6:6 14:7,19 21:16 23:11
26:6

**harm**
25:9

**Hart**
23:19,21

**head**
16:12 31:19

**headlines**
17:4

**heads**
34:15

**health**
5:4 13:23 23:19 24:5
25:3 26:7

**Healthcare**
25:6

**heard**
21:6

**hearing**
23:25 35:3

**heart**
34:25

**helped**
6:5

**herd**
5:10

**Hey**
33:5

**highlighted**
6:18

**highlighting**
27:5

**Highway**
6:20

**hired**
28:4

**hit**
17:23 29:7

**HIV**
29:19

**hold**
27:13

**home**
5:7 36:10

**honored**
9:10

**hope**
7:12 8:16 20:4

**hoped**

14:2

**hospitality**
11:4,6

**hospitalization**
17:6

**hospitalizations**
18:24

**hospitalized**
19:2

**hosting**
10:25

**hour**
36:15

**hours**
17:10 18:23 19:4 36:15
38:11

**house**
36:11

**human**
14:20 15:20 17:11

**Humboldt**
18:3

**hundred**
17:17 30:19 36:3

**hundreds**
5:12

**I**

**ICU**
19:2,4

**images**
4:16,17,19 5:19,25 7:23

**imagination**
15:17 31:10 32:10

**imagine**
34:12

**imagined**
14:2

**immediacy**
11:20

**immunity**
5:11

**impact**
5:4

**impacting**
22:11

**impediment**
24:8,15 25:19 26:3,8

**implore**
38:4

**importance**
10:17 27:10,16

**important**
16:4 20:21 25:2 26:4
29:14 35:17

**impress**
5:17 7:13

**improve**
9:7

**improvement**
17:20

**inadequate**
23:25

**inappropriately**
13:16

**include**
23:12 33:14

**includes**
20:14

**including**
14:25 16:18 23:1 30:8
31:13,24 32:11

**inconsistent**
8:22

**incorporated**
34:7

**increase**
13:10,12,15 14:12
18:24,25 19:1 31:12

**increasing**
17:25 18:11 23:23

**incredible**
8:25

**incredibly**
20:21

**indication**
20:3

**indications**
25:2

**indicator**
8:14 17:16 27:5,6 34:3
37:11

**indicators**
8:9,19 18:19 27:5,13
37:12

**individual**
19:3 25:5,8,14,21 27:18
31:13

**individuals**
17:18

**infamous**
16:19

**infectious**
35:10,14

**infective**
36:16

**information**
9:22 15:2 35:3,11,13

**infrastructure**
29:10

**initial**
36:25

**inquiries**
16:4

**Inslee**
9:25 10:2

**institution**
28:15 29:1

**insurance**
14:7,25 17:2 25:15

**integrating**
15:12

**interact**
35:21

**interested**
39:9

**Interestingly**
16:14

**internal**
29:5

**intimately**
7:8

**invisible**
38:10

**inviting**
10:23 12:8

**isolation**
8:11 37:13

**issue**
24:12 26:10 32:4

**issues**
8:9,12 11:9,10 25:13

**J**

**Jeremy**
33:4

**Jim**
34:18

**job**
22:3

**joined**
9:13 33:7

**Jonathan**
20:24

**justice**
8:11 9:4 16:21

**K**

**Kaiser**
23:19

**KCRA**
20:24

**keeping**
33:17

**kids**
22:4

**kind**
8:4 13:25

**kits**
31:21 32:5

**L**

**L.A.**
6:1 18:8

**labs**
31:24,25

**lack**
24:5

**lagging**
17:16

**laid**
8:8 17:24

**language**
11:20

**large**
9:2 11:1

**large-scale**
16:15

**largest**
31:23 32:3

**Las**
33:11

**late**
16:5

**laurels**
19:13

**law**
21:4

**lay**
27:7

**laying**
8:7 27:4 34:2

**leaders**
10:25

**leadership**
10:3

**leads**
27:12

**leaned**
14:23

**learn**
36:14,21

**learning**
35:22,24 36:1

**leave**
36:11

**level**
6:20 12:2 16:24 21:19
28:24,25 29:20 32:13
33:25

**licenses**
11:10

**lies**
31:15

**lights**
18:19 20:2

**likelihood**
5:8

**limit**
33:15

**lines**
17:4 34:16

**listened**
23:4

**literally**
28:8

**literature**
35:25

**live**
35:12

**lives**
17:9,10 22:10,11 35:4
36:4

**loaded**
32:17 33:3

**local**
6:5 7:3,8 8:1 16:24
21:19 23:2 29:13,22
33:25 38:13

**localism**
7:2

**locally**
9:5

**lock**
30:12

**locked**
32:17

**long**
16:14 35:11,12,13

**long-term**
10:14

**longwinded**
32:15

**loosen**
16:3

**Lopez**
39:1,15

**lost**
17:10 22:2 38:11

**lot**
16:17 18:17 21:12
22:18 23:17,23,25
26:19 29:18 35:2,3

**loved**
38:11

---

**M**

**machine**
39:4

**machines**
33:2

**made**
4:13,21 12:10 13:6,25
16:18 18:1 25:1,13 29:8
32:10,19 39:4

**major**
36:1

**majorit-**
30:25

**majority**
5:22 13:13

**make**
4:20 5:12 8:4,5,18,24
13:1,24 16:4 18:12
19:20 20:1 24:22 25:11,
16 26:7,13 30:11 31:6
36:8

**making**
4:25 7:3 13:24 15:13
16:16 19:9 24:24 27:14
32:12

**mall**
11:14

**manage**
5:15,16

**manifested**
21:17

**March**
14:9

**masks**
12:13,15,16,17,19,20
26:13,14

**Mateo**

**6:2**

**mayor**
7:7 9:25 10:1

**meaning**
5:23

**meaningful**
4:21,25 8:18 9:24 10:7
11:21 18:20 27:14
33:24

**means**
36:23

**measles**
29:17

**measurable**
4:25

**measures**
37:3

**Medi-cal**
25:7,8,15

**media**
21:13 31:22 32:5

**medical**
28:15 37:6

**medium**
10:14 11:1

**meet**
18:15,16 20:12

**meeting**
22:18 29:4

**meetings**
22:18

**mention**
14:6 22:16

**mentioned**
15:11 21:3 22:15 31:22
33:8

**message**
25:25 36:25

**Michaelson**
26:17,18

**million**
4:9 12:14,16,17,19,20
14:11 15:18,19,20
18:14 32:25

**millions**
5:13

**mind**
4:16

**minds**
10:11

**minimum**
19:24

**minutes**
15:20

**mitigate**
23:15

**mitigated**
19:18 21:20

**mobility**
13:10

**modest**
13:12 14:13 17:8 18:25
19:1

**modifications**
8:5,18 10:8 11:21 18:20
19:21 27:15 33:24
37:16

**modified**
7:11 37:25

**modify**
7:19 37:15

**modifying**
26:5

**moment**
20:13 22:15 32:23
34:17

**momentum**
22:24

**Monday**
31:5

**money**
14:10

**months**
4:25 5:10 7:20 13:6
27:15 29:25 30:1 37:16

**morning**
13:3

**Motor**
16:18

**mouth**
36:8

**move**
20:4

**movement**
13:4,10,15,17,20

**moves**
25:2

**moving**
13:15 18:19

**multiple**
11:14 14:23 30:10

**multiples**
31:9

**multitude**
21:23 24:9,11

**N**

**N95**
12:13

**naive**
5:21

**nature**
11:7

**necessarily**
11:12 35:10

**needing**
14:16

**neighborhoods**
24:20

**neighbors**
20:20

**Nevada**
9:11,14 33:7,9

**Newport**
5:20 6:12

**news**
20:25 23:20 27:3,21
30:15 34:19

**NEWSOM**
4:6 21:11 24:6 26:9
27:3 28:7 31:3 33:18
34:24 37:5

**night**
16:21

**nonetheless**
17:12

**noon**
14:17

**normal**
37:3

**normalcy**
7:12 37:25

**north**
6:2

**Northern**
6:1

**nose**
22:10 36:8

**note**
17:25

**noted**
33:9

**nother**
29:20

**Nothing's**
19:16

**number**
4:10,14,22 5:9 8:14,17
12:11 13:5 17:5,6,9,13,
17 18:7,22,23 19:1,2
23:18 29:19,25 31:11,
12 32:4 34:3

**numbers**
14:6 17:11 18:11 20:17
29:12

**O**

**occasions**
14:23

**officials**
7:4 23:2

**online**
30:4

**open**
23:2

**opened**
14:16

**opening**
26:5

**openings**
21:16

**opportunity**
19:19 37:10,15

**opposed**
18:15 21:16

**optimistic**
5:2

**Optumserve**
18:2 32:14,15

**Orange**
4:17 6:14

**order**
5:1 6:23 7:20 10:8
11:22 13:14 18:20
37:17

**orders**
5:23 13:2 26:5 33:17

**Oregon**
9:16

**outbreaks**
29:19

**outcomes**
24:22

**outstanding**
10:3

**overnight**
16:20

**overwhelming**
5:21

**owners**
26:19 27:1

**P**

**pact**
33:7

**paid**
21:13

**park**
6:6,21

**parking**
23:11,12,13,14

**parks**
6:21 9:1 21:18,19

part
20:1,19 25:5 26:4 31:15

participate
12:9

participating
20:19

partner
28:13

partners
6:5,22 9:2,14 16:24
21:19 22:21 25:10 26:7
31:25 32:8

partnership
9:15,23 18:6

partnerships
28:25

parts
18:9

party
39:10

passion
16:15 20:16 38:18

patrol
6:20,21 21:19

paying
28:6

payment
25:4,12,24

PCR
31:14

peak
17:9,13

people
4:20 5:13 6:7 7:14,16
12:8,25 14:15,18,24
15:3 18:12,15 19:1,2,23
20:19 22:9 26:19 28:4,
19 29:6,15 33:15 34:21
35:17

percent
18:24 32:3,4 36:3

performance
16:23

performed
17:21

person
35:19,20 37:6

personal
26:11 33:20

perspective
13:22 28:22

pharmacy
36:12

phase
10:7 34:11

phased-in
34:4

phasing
27:8

phone
9:20 27:25

photographs
13:19

physical
5:24 7:16 11:13 12:23
19:25 27:11 36:9 37:1
38:12

pick
30:11

pickup
11:11

place
14:2 15:7,14 18:17
28:10 29:11 33:2,17
35:23

places
18:8

plan
25:5 26:7 27:23

plans
25:3

platform
30:9,13

pleased
12:10

point
5:2 8:7 16:14 17:16
34:8

Police
22:19

policing
33:14

Polis
10:1,2

political
7:5

Politico
33:4

population
24:2

populations
24:22

portal
30:4

position
8:17

positive
17:19

positives
17:6 18:22

possibly
21:4

potential
33:19 34:13

potentially
26:24 33:14 37:15

power
16:9

PPE
12:13 26:10,15 32:11

practice
7:16 27:10

practices
9:21 34:9

practicing
19:24

pre-covid-19
37:23

precise
32:15

predominant
21:12

present
19:15

presentation
34:7

President
30:18

press
10:23 11:18

pressures
7:6,8

prevalent
19:15

preview
12:7 27:9

primarily
23:11

principal
22:19

prioritization
26:1

private
31:24

problem
32:1,6

procedural
12:16,17

procedure
12:13,19

procedures
6:24

proceedings
39:3

process
12:1 14:25

procure
12:18 32:8

procured
12:14 33:1

procurement
16:15

program
25:7 30:4

progress
4:13,21 12:11 13:25
16:16,17 18:17,18 19:9
32:9,19

**promised**
30:18

**promising**
31:6

**proof**
34:8

**proper**
26:25

**protect**
37:3

**protective**
26:12

**protein**
35:7

**protocols**
15:14

**provide**
13:5

**provided**
13:4 19:19 37:10

**providers**
32:3

**providing**
34:8

**proximate**
12:25

**PSAS**
21:13

**public**
7:9 9:2 12:24 13:6
31:24,25

**publishing**
35:25

**punitive**
22:2

**purpose**
34:13

**purposes**
15:1

**push**
36:6

**put**
12:5 15:7

**putting**

12:24 15:5,13 22:10

**Q**

**quality**
29:13

**quantity**
24:23

**quarantine**
8:12 37:14

**question**
15:6 21:2 22:16 25:23
30:8 31:16 33:6 34:18,
22 35:17 37:6,18

**questions**
15:9,21 20:23 25:20
27:23

**quicker**
19:11

**quickly**
22:13 26:15 37:23

**R**

**ramp**
23:22

**ratcheted**
30:20

**rate**
14:12

**re-**
7:19

**reagents**
31:2,20

**real**
4:13

**realistic**
5:9

**reality**
4:24

**realtime**
9:22 18:4

**rears**
31:18

**reasons**
21:23 24:9,11

**receive**
24:23 26:16 31:6

**received**
23:6 31:4

**recognize**
7:5,6 15:22 16:17

**recognizing**
33:25

**recommendations**
36:24

**record**
14:14 39:3,6

**recovery**
10:10,13

**redeploy**
28:21

**redeployed**
14:24 28:22

**reduce**
15:23

**reducing**
15:9,10

**regional**
27:7 33:7,12 34:1

**regionally**
10:18

**regions**
27:7 37:18

**regulation**
16:3

**reimagining**
10:15

**reimbursed**
25:18

**reinforced**
13:21

**reinventing**
10:15

**relates**
10:7 17:5

**relative**
39:9

**remains**
38:10

**remarkable**
8:3

**Remember**
31:11 32:2

**remind**
12:12 16:19 29:15
32:24

**reminding**
38:16

**Renae**
39:1,15

**reopen**
7:18 8:21 26:24

**reopening**
22:12

**Reporter**
39:2

**required**
29:3

**requirements**
36:23

**requires**
20:13

**respect**
7:2,3 9:9 19:17

**response**
25:1

**rest**
5:14 19:13 22:5

**restaurants**
11:7,9

**restrictions**
23:13

**retail**
11:5,11,23 26:25

**rightful**
16:22

**rightly**
14:15,18

**risk**
22:11

**risks**
5:16

**RNA**

31:20

**roadmap**
34:3

**robust**
9:8,10 28:9 29:10

**rolling**
33:16

**Roope**
34:18,20 35:1

**roughly**
12:16

**roundtable**
12:8

**roundtables**
10:24 11:19

**rules**
14:3 16:2

**run**
19:7 25:7

**runs**
25:16

**rural**
18:3,9 23:23

------

**S**

**San**
6:1,2

**Saturday**
5:19 6:10 9:7 21:22

**scattered**
21:25

**school**
37:6

**schools**
8:15

**science**
5:4 13:23 36:21

**scope**
33:19

**scoping**
33:22,23 34:13

**sector**
10:18,19,20 11:1,5,6
14:6

**sectors**
27:7 37:18

**seek**
25:9

**sense**
7:12 27:2

**sentiment**
7:10

**series**
10:24

**serology**
31:14 32:25

**Services**
25:7

**set**
7:14,15 8:20 9:4,5
27:18 28:20 30:13

**setback**
22:24

**setting**
22:12

**settings**
25:21

**shape**
15:15 30:2

**share**
36:22

**sharing**
9:22 34:9

**Sheriffs'**
22:20

**shields**
26:14

**shopping**
11:14

**short**
11:22

**short-term**
10:13

**shorthand**
39:1,4

**shortly**
29:1

**show**

37:21

**showed**
13:7

**shows**
20:2

**shut**
31:17

**side**
8:2

**sign**
17:12

**signed**
20:14

**simply**
37:25

**single**
16:25

**Sisolak**
10:1,2

**sit**
16:10

**sites**
18:2 24:17 32:16,19
33:1

**skill**
28:20

**slow**
7:18 8:21

**small**
10:25

**SMS**
15:6,23

**social**
5:24 6:24 7:17 8:10
19:24 21:10 26:25
27:10 38:13

**socialize**
11:17

**socially**
13:13

**soft**
21:16 23:12

**sooner**
7:13 29:7

**sort**
19:12 27:1

**source**
10:12

**space**
19:24 29:18,22 32:6

**SPEAKER**
20:24 23:19 26:17
27:20 30:14 33:4 34:18

**specific**
10:20 11:20 27:6 30:8
32:9 34:3

**specifically**
13:20 22:17 24:7,12
28:17 31:20

**spent**
15:20

**spirit**
19:23 20:13,14,22 38:1,
2,14

**spread**
19:18 37:9,22

**stabilization**
18:25 19:5

**stabilize**
8:4

**stabilized**
4:11

**stable**
7:21

**staff**
9:20

**stakes**
6:21

**stand**
24:17

**standing**
35:21

**start**
8:21 11:4,17 19:12
27:14

**started**
15:14 16:5 17:8 30:2

**starting**
11:17 17:23

**starts**
37:21

**state**
4:11,13 5:20 6:20,21,25
7:5 8:3 9:5,11,16 10:12,
19 12:15 13:17 16:23
17:7,21 18:10 20:19
21:18,25 24:10,18
27:24 28:4,6,14,16,24
29:16 30:18 37:9,19
38:14 39:2

**State's**
27:23 28:3

**states**
9:12,13,17 10:4 33:6,
11,15 34:1,14 36:2

**statewide**
8:23

**statistic**
17:12

**statistical**
13:22

**status**
24:10

**Stay**
36:10

**stay-at-home**
5:1,23 6:23 7:20 10:8
11:22 13:1,14 18:20
20:1 26:5 37:17

**STDS**
29:18

**step**
21:8

**Stephanie**
27:20

**stick**
36:25

**stop**
7:23

**stopping**
7:16

**store**
36:12

**strategic**
23:10

**strategies**
10:14

**strategy**
10:6 27:8

**stress**
15:9

**stretch**
15:16 31:10 32:10

**strides**
24:25

**stripes**
7:5

**strokes**
11:4 20:9

**strong**
6:3 36:20

**stronger**
20:8

**subscribed**
39:12

**substantial**
17:20 32:9

**substantially**
15:14 17:24 21:22 29:2
32:19

**Substantively**
29:17

**sudden**
22:6

**suggest**
13:16 31:8 34:16

**Sunday**
6:10 21:23

**sunny**
5:8

**supervisor**
7:7

**Supervisors**
6:14

**supplementing**
28:24

**supplies**
32:9,11,23

**supply**

32:18,20

**support**
10:3 14:24 25:3

**supported**
6:5

**supporting**
15:1 20:20

**suppress**
37:8

**suppressed**
37:22

**surface**
36:15

**surfaces**
35:4,14,20 36:4,5

**surge**
23:15 29:24

**survey**
28:9,18 31:23 32:2

**surveys**
29:24 30:2

**survive**
35:7

**swabs**
30:19 31:21 32:3

**system**
16:11,12,19

**systems**
16:10

---

**T**

**tablecloths**
11:8

**takes**
35:23

**taking**
21:2 26:18 33:5 37:3

**talk**
23:10 24:3,7 27:6,7
35:18

**talked**
18:7 23:22 27:16 30:17

**talking**
11:23 19:6 35:19 37:14

**target**
24:20

**targeting**
24:18

**task**
10:17 15:3

**TB**
29:17

**team**
25:6

**tech**
27:24 28:14 30:9

**technology**
28:1

**tend**
31:17

**term**
11:22

**terms**
10:6 12:4 16:3 17:24
20:18 24:13 26:23
32:12,18,20

**territory**
14:14

**test**
17:18 25:17

**tested**
25:14 26:1,2 31:13

**testing**
8:10 17:20,25 18:2,13
23:22,23,25 24:1,4,18,
19,23 25:4,9,22 26:2,8,
10 30:19,24 32:3,5
37:13

**tests**
17:21 18:12 25:24
31:11,13,14 32:13,17,
25

**text**
15:5,6,24

**texting**
15:24

**thing**
7:14,15,17,22 8:20 9:19
16:5 19:10,12,17 20:17
22:3 23:1 27:18

**things**
11:16 15:22 16:20
22:25 23:16,17 27:8
31:2 37:2,21

**thinking**
19:13

**thousand**
30:19

**thousands**
21:21 29:6

**thumbing**
22:10

**Thursday**
21:14

**time**
14:19 20:16,21 36:24
38:9,17

**times**
31:12

**today**
18:4 30:6 33:7

**told**
6:15

**tomorrow**
8:7,13 11:18 12:7 27:4
34:2,8 37:10,14

**top**
4:15 8:24

**topic**
4:15 22:19

**total**
17:20 29:12 31:11

**touch**
36:7

**towns**
23:24

**tracing**
8:10 27:23,25 28:3,9
29:15 37:13

**tracking**
8:10 37:13

**traditional**
31:14

**Tragic**
17:10

**training**
29:3 30:4

**transcribed**
39:5

**transcript**
39:6

**transcription**
39:7

**transmissible**
19:16 36:17 38:7

**transmission**
35:23

**transmits**
36:5,16

**transmitted**
35:18

**transparency**
10:23

**transport**
31:22 32:5

**trend**
17:4

**true**
39:6

**Trump**
30:18

**tubes**
32:5

**Twenty-two**
28:9

**two-way**
12:2

**type**
11:5

**types**
11:10,11 26:23 31:13

**U**

**ubiquitous**
38:9

**ultimately**
22:12

**understand**
7:7,9 18:12 35:5

**understanding**
23:7

**unemployment**
14:7,25 17:2

**uninsured**
24:2 25:16,17

**unique**
10:20 11:7 28:20

**unnecessarily**
30:12

**unprecedented**
14:10

**update**
10:5 17:1,3 37:11,12

**updates**
20:9

**urge**
38:17

**V**

**vacation**
19:14

**vaccine**
5:11

**variance**
34:1

**vast**
13:12

**Vegas**
33:11

**Vehicles**
16:18

**vendors**
31:23

**Ventura**
4:17

**Verily**
18:6,7 32:18

**versus**
21:10

**video**
12:22

**virus**
5:6,7 19:13,14 35:4,6,8,

12,14 38:7

**virus-free**
5:9

**visit**
33:11 36:12

**visitors**
23:15 33:10

**volume**
14:19 15:10,23

**volunteer**
20:16

**W**

**walk**
22:3

**wanted**
12:6 17:1 21:4 23:2
33:6

**wanting**
21:8

**warnings**
21:24

**wash**
36:6

**washing**
37:2

**Washington**
9:16

**watching**
5:18

**website**
20:15

**Wednesday**
8:8 37:13

**week**
8:8 9:9,12 13:11 14:17,
18 15:5,18 16:5,7 17:9,
14 18:1,5 22:23 28:2,17
29:9 30:17,19,21,22,24
31:1,5,17 32:16,20

**weekend**
4:16 6:18 7:24 9:1
12:18 13:11,20 15:11,
15 16:6 17:8 27:17 38:8

**weekends**

5:6

**weeks**
4:10,14,22,23,24 7:20,
22 8:17 9:15 10:9 12:6
13:7,12 14:1,14 18:7
20:4,6 22:23 23:18 26:6
27:14 29:5 30:1 31:21
37:16 38:3

**well-known**
28:13,15

**Western**
9:13 10:4 33:10 34:13

**Westwood**
34:19

**WHEREOF**
39:11

**White**
33:4,5

**willingness**
23:7

**wonderful**
9:19 20:17

**woods**
15:16

**work**
7:4 8:25 9:6,17 15:12
21:4,18 22:22 23:7
26:13,21,22 29:18 37:8,
9,20 38:4,6

**worked**
25:10

**workforce**
28:3,11,19,21,24 29:3,
24

**working**
7:25 8:1 11:20 13:5
14:7 16:21 26:6 27:24
32:7,8

**works**
11:13

**world**
5:9

**worst**
19:12

**wrong**
35:15

### Y

**year**
11:24 16:16

**years**
11:25 29:16,19

**yesterday**
19:3

**younger**
38:6

**EXHIBIT E**

TRANSCRIPTION OF

GOVERNOR GAVIN NEWSOM'S COVID-19 PRESS CONFERENCE

APRIL 28, 2020

CERTIFIED COPY

Transcribed by:
RENAE E. LOPEZ
CSR 12142
No. 20-90688B



THE SULLIVAN GROUP
OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM
PHONE 855.525.3860 | 323.938.8750

1                          TRANSCRIPTION OF

2      GOVERNOR GAVIN NEWSOM'S COVID-19 PRESS CONFERENCE

3                          APRIL 28, 2020

4

5

6                                              CERTIFIED COPY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
       Transcribed by:
24     RENAE E. LOPEZ
       CSR 12142
25     No. 20-90688B

APPEARANCES:

   Gavin Newsom, Governor of the State of California

   Sonia Angell, M.D., Director, California Department
   of Health

   Mark Ghaly, M.D., Secretary, California Health and
   Human Services Agency


Members of the Press:

   Mariana Dale, KPCC
   Doug Sovern, KCBS Radio
   Sophia Bollag, Sacramento Bee
   Carla Marinucci, Politico

                        I N D E X

SPEAKER                                        PAGE

Governor Gavin Newsom                            4

Sonia Angell, M.D.                              20

Mariana Dale                                    42

Doug Sovern                                     44

Mark Ghaly, M.D.                                47

Sophia Bollag                                   50

Carla Marinucci                                 51

1      APRIL 28, 2020

2                    ***

3

4

5

6           GOVERNOR NEWSOM:  Two weeks ago today, we

7    laid out a roadmap, a roadmap for reopening the

8    California economy, in a phased and thoughtful

9    approach.  We specifically put forth six indicators

10   that will drive our decision making.

11           Politics will not drive our decision making.

12   Protests won't drive our decision making.  Political

13   pressure will not drive our decision making.  The

14   science, the data, public health will drive our

15   decision making.

16           We set forth, a week ago, a deep dive on one

17   particular indicator, around testing and tracing,

18   tracking, issues of isolation and quarantine.  Today, I

19   want to update you on another indicator, and that's

20   specific to businesses, schools, and childcare

21   facilities, but first I want to remind all of you what

22   those six indicators are.

23           Mentioned testing as one of the principal

24   indicators.  We've made real progress in that space,

25   not nearly where we want to go and need to be, but real

1   progress, we are now seeing in this space.  Some
2   578,000 tests have been conducted in the State of
3   California.  We are averaging over 20,000 tests a day,
4   and we are well on our way to meeting our 25,000
5   testing goal and getting to 60- to 80,000 very shortly
6   thereafter.
7              I mentioned, just yesterday, OptumServe that
8   was doing these end-to-end tests, being deployed at 80
9   additional locations, primarily focused on rural
10  California.  I can announce today that we are putting
11  those tests, end-to-end tests, in Sutter County and
12  Shasta County, as specific proof points of the movement
13  in that space.  All of those testing sites will be up
14  and operational by Monday.
15             Verily, also focusing on expanding their
16  testing on a socioeconomic -- with a socioeconomic lens
17  to diverse communities, not just in rural California,
18  but inner city California, so real progress in that
19  place.
20             Yesterday, we updated you as well on some of
21  our efforts to train workforce, starting Phase 1,
22  10,000 tracers throughout the State of California,
23  partnerships that we're forming in that space and
24  capacity building that is also well underway.
25             We talked broadly about other indicators,

1   one of the most important being how we protect the most

2   vulnerable Californians, how we protect people in

3   congregate care facilities, at our skilled nursing

4   facilities, assisted living facilities, other adult and

5   senior licensed facilities throughout the State of

6   California.  We have well in excess of 8500 of these

7   facilities in the State.  The SNFs, the skilled nursing

8   facilities represent 1,224, but thousands more in home

9   settings, as many as two, three people, some six or

10  seven in size, all throughout the State of California.

11          We've updated you, on a consistent basis,

12  about our efforts in that place and the sincere

13  concerns we have, demonstrable concerns we have about

14  protecting our seniors in those facilities.  We

15  continue to focus on that, above and beyond anything

16  else, as it relates to the data that comes in every

17  morning, because of the vulnerability of those

18  populations, but real strategies, real plans in that

19  place give us some more confidence that we're moving in

20  the right direction.

21          Accordingly, we're doing the same for our

22  homeless population, another sensitive-needs population

23  that we have, as you know, advanced a series of

24  announcements, particularly Project Roomkey,

25  partnership with FEMA, to provide 15,000 hotel rooms.

We already have acquired 12,500 hotel rooms in that
portfolio, thousands of individuals off the streets,
out of congregate shelters, into these isolated units,
support on site, particularly, three meals a day being
provided.

This is among many, many different homeless
strategies throughout the State of California. It's
just one we have consistently highlighted in that
space.

We are doing more as well on another
indicator, and that's obviously securing the search
capacity within the hospital system and outside of the
hospital system, these alternative care sites that we
have brought up.

We've talked about the FMS sites, close to
2,000 rooms we were able to draw down, with support of
the federal government, the work that we have been
doing collectively and collaboratively with cities and
counties all up and down the State, to provide assets
as -- as points of surge, if necessary to address any
increase in hospitalization, increase in need for
isolation of vulnerable populations.

And we feel we have done justice in that
effort, and because of your good work on physical
distancing, social distancing, because you have

overwhelmingly abided by the stay-at-home order, you bought us time to put together those assets, not only those physical assets, but begin the process of procuring a workforce through that health core adaptation in the workforce that we have now identified for a potential surge. Those individuals that have come back from retirement or willing to come back from retirement, or people that have particular job skills that they believe can be transferred to meet the needs, we've got a matching system, and we've got that capacity now in place. So physical sites, human resource sites.

And now some more good news on PPE. Yesterday, we announced the 3.1 million masks that arrived on Saturday night. We have distributed 2.87 million of those 3.1 million masks to our regional sites throughout the State of California. Another plane is literally taking off today, will be landing tomorrow, and we will get a subsequent shipment. So PPE is beginning to loosen up. Not even close to where it needs to be, and I recognize that, and I can just assure you the reason we put 2.7 -- 2.87 million masks out yesterday is that was backorders just in the healthcare space.

We want to broaden that beyond just the

| | |
|---|---|
| 1 | healthcare space, provide those masks and protective |
| 2 | gear for people that are doing testing, and make sure |
| 3 | they're adequately supplied, make sure people that are |
| 4 | on the front lines, grocery workers, are adequately |
| 5 | supplied.  Clearly, our skilled nursing homes, in-home |
| 6 | supportive services, and across the panoply of our |
| 7 | sectors that we'll talk about in a moment, to make sure |
| 8 | that they have adequate supplies, but progress in that |
| 9 | indicator is also being made. |
| 10 | We talked about another indicator, |
| 11 | therapeutics, and I just want to remind folks that |
| 12 | California, like Massachusetts, New Jersey, like a few |
| 13 | states, is well-endowed, well-resourced in the |
| 14 | therapeutics space.  I'll remind people, in California |
| 15 | and outside California, that the State of California is |
| 16 | the birthplace of biotech.  Our life science capacity |
| 17 | is second to none, biotherapeutics, bioinnovation, |
| 18 | medical devices, San Diego, the Bay Area, we are very |
| 19 | blessed.  The number of National Institute of Health |
| 20 | funded facilities in this state is a point of envy for |
| 21 | many other parts of the globe, not just across this |
| 22 | country. |
| 23 | As a consequence, we are in advanced trials |
| 24 | with our partners in the private sector, working with |
| 25 | our UC medical centers and other medical centers, and |

1    there's real progress, in terms of at least
2    understanding, the capacity of understanding in this
3    space.
4            I'm not going to promote any particular drug
5    or particular trial, but just as an example, Remdesivir
6    and their advanced trials happening in this state, in
7    partnership with Gilead, who's a State-based
8    headquartered company.  Genentech and others in this
9    space, we are making progress, at least in
10   understanding what's real, what's not in the
11   therapeutic space, with, again, points of
12   consideration, always caution in that space.  But
13   that's one of our other indicators that's important.
14           Today, again, we'll highlight the issues
15   around business and schools and childcare centers, but
16   before I get to that, briefly, I want to just mention
17   that other indicator, that sixth indicator, and that is
18   if we pull back, and we modify our stay-at-home order
19   too early, and we start to see an increase in surge in
20   cases, hospitalizations and spread, then we have to
21   have the ability to toggle back.  We have to have the
22   ability to adjust.  We have to have the ability to fix
23   it.  And so that's a foundational indicator, number
24   six, in terms of our capacity to deliver on the
25   promise, what we're promoting today in this roadmap for

reopening.

So forgive me for being longwinded in that space, but I wanted, again, contextualize the framework. Six indicators. When those turn green, when they move from red to yellow, it guides our decision making. It allows us to make determinations. Dates don't, but data does.

And so let me, as now I introduce this fifth indicator -- again, none are prioritized, but it happens to be the fifth indicator around businesses and around issues of our schools and childcare centers. I want to make this clear. We believe we are weeks, not months away from making meaningful modifications to that indicator and in this space. Weeks, not months.

You'll ask me, well, is weeks one week or three weeks? Weeks, not months. Again, based upon the data, based upon the indicators. We'll talk specifically about hospitalizations and ICUs and community spread.

Dr. Angell will come up in a moment, and she'll show you our model, the graph of actuals, so you can see the stability in that space, but we're still, by no stretch of the imagination, out of the woods there. It's just stable. We're not seeing substantial declines, but, again, California and Californians know

we never experienced the big surge that other parts of
the globe, and, certainly, other parts of our country
had.  But the stabilization is a point of some cautious
optimism, and that indicator allows us to make the
presentation that we're making today.

So let's talk specifically about what we're
talking about over the course of the next few weeks, to
think about and to consider, and, more importantly, to
plan for in realtime.  Those are areas of our
economy -- let's talk with business, around
manufacturing of non-essential materials, logistics for
non-essential movement, areas around retail, IE,
curbside, retail for non-essential items, the issues
that have been broadly defined around the need to
address our kids in schools.

We clearly have shut down -- people well
aware of this, the schools are shut down for the
remainder of the school year.  Learning continues at
home, distance learning and the like, but we recognize
there's been a learning loss, because of this
disruption.  We're concerned about that learning loss,
even into the summer, and so we are considering the
prospect of an even earlier school year into the fall,
as early as late July, early August.  So we are
beginning to socialize that.

1      We have made no decisions, definitively, in
2  that space, but I just want folks to know the concern
3  around learning loss and the concern about waiting
4  until late -- later in the year into the fall for the
5  new school year.  As a parent myself, and having talked
6  to many other parents and educators, even the kids, I
7  think we might want to consider getting that school
8  year moved up a little bit.

9      And so that's one of the things that we want
10  to begin to socialize in this indicator.  We need to
11  prepare for that.  We need to start preparing for the
12  physical changes in the schools and the environmental
13  changes in the schools that are necessary, in order to
14  advance that conversation and make it more meaningful,
15  accordingly, in the childcare space itself.

16      We are able to make these, again,
17  announcements and begin to have a more public
18  conversation with you about opening up, with adaptation
19  and with modification, meaningful changes to our
20  stay-at-home order, again, because people have taken
21  seriously, overwhelmingly, the stay-at-home orders and
22  physical distancing.

23      But I want to caution everybody if we pull
24  back too quickly, and we walk away from our incredible
25  commitment, to not only bend this curve, but to stop

1    the spread and suppress the spread of this virus, it

2    could start a second wave that could be even more

3    damaging than the first and undo all of the good work

4    and progress that you've made, and that can happen like

5    this.

6            Virus has not gone away.  Its virulence is

7    still as acute.  Its ability to be transmitted still is

8    dominant, and so we, by no stretch, are out of the

9    woods.  There's durability to this virus, and there may

10   be, we'll see, seasonality, and so we could be lulled

11   into this quiet sense of confidence, change our

12   behavior, put ourselves at risk, and put this broader

13   agenda of reopening with modification at risk.

14           So, again, I caution everybody, as I will be

15   doing, I assure you, on a daily basis, of the

16   importance of our individual behavior, not just

17   governmental behavior, individual behavior, and, to the

18   extent business is making decisions and modifications,

19   of our business leaders, men and women on the front

20   lines, entrepreneurs, not just organized business

21   advocates of the importance and power of their

22   individual decision making in -- in this space as well.

23           We need to protect not just the business

24   community, but customers of those businesses.  One

25   thing to open a business, but if there's no demand,

it's a false promise.  And as someone who's had the

privilege of starting many, many businesses, I -- I

recognize that I'm not a job creator.  It's our

consumers, it's the people spending the money that

create the opportunity for growth and job creation, and

so I deeply want to emphasize the importance of

protecting customers.  And, of course, one of the

business's foundational resources, most fundamental,

and that's workers, at the same time we're protecting

businesses, as entities, in the abstract.

      But, again, I'm deeply sensitive to the

needs for the business community to at least get some

clarity, and we're trying to provide that over the next

few weeks, so they can start to plan and look at their

own supply chains, look at their own ability to change

the physical, environmental conditions in their

businesses, and look at the guidelines that we'll be

advancing, very specifically and prescriptively, sector

by sector, for guidance on what we can do and what we

can't do at this stage.

      We are not going back to the way things were

until we get the kind of immunity that all of us look

forward to, or vaccine that we look forward to.  So one

has to be cautious in this space, but also patient in

this space as well.  But in patience, we recognize in

the imperative to meet that impatience in a pragmatic

and thoughtful way is why Dr. Angell will be up in a

moment to talk more specifically about phase -- these

new phases that we'll be rolling out with this

indicator.

Let me briefly introduce those phases, as I

introduce Dr. Angell.  We have looked at this

indicator, and we looked at it through the prism of

four phases.  Phase 1, we're currently in, which is

planning, workflow, focusing, again, on supply chains,

physical and environmental considerations, the planning

to do what we need to do on PPE, the planning we need

to do to make sure the conditions are set, so that we

can move forward with modifications of the stay-at-home

for businesses, as one example.

As we move into Phase 2, where businesses

can begin to reopen, we need to make sure that that

guidance is abided by and it is organized in a very

deliberative way.  That's the job of Dr. Angell.  She

runs Department of Public Health in the State of

California.  It's her statewide guidelines that will

drive the decision making.

Same time, though, we want to drive

localism.  I've often said, forgive me for repeating

myself again on this, and that is localism is

determinative. In this respect, I recognize the
regionality in this State, the variance in different
parts of the State, but I also recognize, in that
respect, local health departments have points of view
that must be considered as well.

And so, for example, the Bay Area announced
today extending their stay-at-home order through the
end of the month. I am not here, as Governor, to make
an announcement preempting their right, at the local
level, to be even more stringent. I'm going to respect
that, and I want folks to know, not just in those six
Bay Area counties, a few extra cities, that's the case,
but all across the State of California.

Accordingly, we have a regional variance
that we also want to recognize for people that want to
go even sooner, based upon regional conditions, and I
am well aware, having received many letters, most of
them very publicly provided to me in tweets and public
pronouncements, even before I had the privilege of
reading them.

Personally, I recognize a lot of those
regions are -- are moving forward, making their
recommendations. Dr. Angell will talk about what the
expectations we have of making any regional
augmentations. They're going to be stringent. We're

not -- just because people think they're ready to
reopen, even loose -- more loosely than the State
guidelines, we're not going to just blithely do that,
without, for example, community surveillance
obligations that are attached to those regional
efforts.

Dr. Angell could talk more about the seven
that are currently underway, the five that we will be
doing very soon in 12 different counties in total, but
community surveillance becomes foundational if we're
going to loosen, on a regional basis, any of these new
guidelines that we'll be rolling out over the next few
weeks.

So that's Phase 1 and Phase 2.  Again,
retail, logistics, manufacturing, non-essentials,
schools that we begin in the summer and preparation in
the early fall, childcare facilities and centers with
strict physical distancing and environmental
considerations at hand, workforce protections,
customer, consumer protections.

There's a third and fourth phase.  Just four
phases.  The third phase is personal care.  It's the
areas around, you know, well, a lot of discussion
around gyms and spas and nail salons, and people
wanting to get haircuts, all of us.  Those would fall

into the third phase category.  Dr. Angell, again, will lay out some details on that.

And then, of course, ultimately, the fourth phase, which are these highest risk activities, not the higher risk activities in Stage 3, the highest risk activities.  That's the larger public venues, the conventions, the concerts, the larger entertainment venues with crowds that would be in that category.

Don't want to get ahead of myself.  She'll walk you through those four phases.  Phase 2 is really the phase that is upon us, we believe, in the next few weeks, and perhaps most important, in terms of at least getting everybody's attention and focus, so that we can prepare for it, and realtime.

I'll just close, before I put Dr. Angell up, and just say this:  When I say prepare in realtime, what we're doing, I mentioned yesterday, I'll be doing it right after this press conference and this presentation, we'll be meeting, sector by sector, with our recovery -- economic recovery team.  We'll be meeting today on the retail sector with some of the biggest retailers, some of the well-known brands, like the Gap CEO will join us, but with small businesses, small retail sector, to help them help us work on the guidelines for this second phase that, again, we're

1    hoping to advance in the next few weeks.

2              So that's just an example of the work we're

3    going to have to do, sector by sector, every day over

4    the next days and weeks, in order to prepare for this

5    augmentation, this modification to the stay-at-home

6    order.

7              So I've spoken long enough.  Forgive me, a

8    lot of what I said will be said much more definitively

9    and -- and succinctly, and most likely eloquently by

10   Dr. Angell, who I'm proud is here to make her

11   presentation.  We'll follow up, of course, with

12   questions, and I'll do my daily update as briefly as I

13   possibly can.

14             With that, Dr. Angell.

15             DR. ANGELL:  Thank you, Governor.  It's a

16   pleasure to join you today with a message of what I

17   would described (sic) as cautious optimism, as we've

18   just heard, optimism that's based upon us looking at

19   the data and understanding where we are today, and

20   giving you some insight into the way that we're

21   thinking about where we might be, within potentially

22   weeks and the months to come, as -- as our governor has

23   just mentioned.

24             Again, we're guided by the data, and so I'm

25   pleased to share with you a little more insight as to

1  thinking about how we're moving forward, anchored in
2  that.
3       So I'd like to start, first, with a reminder
4  of what we shared with you two weeks ago when we came
5  and shared with you our original roadmap, and that was
6  to discuss with you that everything that we do will be
7  a reflection upon six indicators.  These indicators
8  reflect sort of domains of work that we know are
9  inherently important, as we think about moving forward
10 in ways to modify our stay-at-home order, in a way that
11 minimizes risk.
12      Now, remember, this is not about a process
13 that is going to remove the risk from all of us, but it
14 will be a process in which we can think about, until
15 that time when we are all protected from COVID --
16 COVID-19, at that time where we either have broad-scale
17 immunity, or vaccinations, or other mechanisms through
18 which we know we can be safe, there is going to be a
19 time where we have to be very, very thoughtful about
20 the way we move, and these six indicators which I have
21 here are the ones that we've just been reminded about.
22      Again, I'm going to mention them to you, so
23 as we go through here, we can understand, really, how
24 these -- this has informed our work today.  So the six
25 indicators that we shared with you included the

following:  First is the ability to test, contact, and
trace, isolate and support those people who might have
been exposed.  A very, very important tool that we
have, in particular, as we're thinking about moving
from the first to the second, as we were just
described -- as was just described to us, stage, and
I'll give you more information on this, but, really, a
very important tool for all of our communities to be
able to keep ourselves safe, as we move around further.

The second is the ability to protect those
that are at high risk for COVID-19.  Those are our
individuals who are in congregate care settings, or
those who are 65 or older, or those with comorbidities
that we know for whom if they're exposed, their risk is
much greater.  And around everything that we've done,
we've made sure that that's been a very central part of
our dialogue and our activities.

It's also critical that we maintain surge
capacity for hospital and healthcare systems.  As I
mentioned, as we move to this next stage, it's not
about removing the risk entirely, it's about minimizing
risk.  Even as people move in an environment with
minimal risk, there is the possibility of in- --
increased cases, and we must make sure that our care
delivery system is there to support them in need.

1            Therapeutic development to meet the demand

2    is an area that we're working on as well, to make sure

3    that we help move the work forward.  And then finally,

4    we're going to talk today about the -- the -- the

5    indicator that focuses on businesses and schools and

6    care -- childcare facilities, making sure that we

7    support and make sure those environments are safe for

8    them, and that's what this next period is all about.

9            And, most importantly, and as I move on to

10    this next slide, is our ability to determine when we

11    may have -- that we're moving in a way that's safe and

12    best for Californians, also recognizing that there is

13    some risk involved.

14            So Dr. Ghaly presented to you this slide

15    that helps share with you a little bit about what, at

16    this moment, has given us the sense that it is the

17    right moment to start talking about preparedness for a

18    potential modification, and that is a recognition of

19    the way in which -- and this is a surrogate marker for

20    the amount of COVID-19, and how COVID-19 might be

21    moving in our communities.

22            We are doing that at this time because of

23    the absence of broad-scale surveillance.  We are doing

24    that at this time with something that is an excellent

25    indicator for us at this moment, which is an

understanding of trends and hospitalizations over time.
And this slide has shown us, from the very beginning,
first of all when we introduced our stay-at-home
orders, and over this period of time, it appears -- and
we're watching this cautiously -- but appears that
we've reached, really, a period of stabilization over
the past couple of weeks or so, in that the total
number of hospitalizations from COVID-19 and the total
number of admissions into ICUs from COVID-19 have
remained stable.

          Again, as the governor mentioned, we're
watching this carefully, and should that change, that
will certainly change the way that we talk about our
opportunities to move forward, but at this point, this
is the right moment for us to have this conversation
with you.

          So let me move on to what the different --
what the progress will look like.  But a couple of
quick reminders.  First of all, that COVID-19 is not
going away soon.  This is going to be a while, but
there are things -- as long as COVID-19 is here, there
are ways that we can modify the way we move around in
the environment that will make it more possible, and
that's what we're moving towards.

          So we're talking about modifications in the

1  stay-at-home order, but they will be guided by health
2  risk and our commitment to equity, as we think about
3  the kinds of interventions that are appropriate at this
4  time.
5            The final thing that's really important for
6  all of us to remember, though, is that ultimately, we
7  all have some responsibility in this.  Take -- the
8  responsibility exists at all levels, from the
9  individual, from the may -- way you make decisions
10 about the way you move in the environment, from
11 businesses, from the ways in which they change in the
12 environment to lower the risk, and ultimately also to
13 government, in the ways that we help support and lift
14 up appropriate policies.
15           So the four stages that we discussed, the
16 first stage is the stage that we're in.  This is the
17 stage where we are all either at home or engaged in the
18 essential workforce.  We know that there's work that
19 still needs to be done here before we move on to Stage
20 2, and that is about making the essential workforce
21 environment as safe as possible for all of those who
22 are workers and for any of those who may be staying at
23 home, but may be interacting with the essential
24 workforce, with essential businesses, as part of doing
25 those activities of daily living that we must do, like

1    going to the grocery store.

 2              That's where we are focused right now, and

 3    we will continue the work that we are doing across all

 4    of those indicators, to make sure that we are safe and

 5    secure as can be in the current stage, but we are also

 6    planning forward to Stage 2.

 7              So Stage 2 will be a focus on those that can

 8    be created -- those lower risk workplaces.  So the goal

 9    here will be creating opportunities for lower risk

10    sectors to adopt and reopen, and when I talk about

11    lower risk sectors, which I'll go into a little more

12    detail later, we're talking about things like

13    manufacturing that may not have been a part of the

14    essential sectors that are currently opening.

15              We also, at this first -- in Stage 2 will be

16    talking about modifying our school programs and

17    including childcare reopening.  The third stage is when

18    we get into those areas that may be higher risk, those

19    sectors that we think will take a lot more

20    modification, to adapt in a way that can make them

21    places where people can move with lower risk.

22              So those kinds of environments, we'll be

23    talking a little bit more as well, but we really want

24    to create an opportunity for those, but we know it will

25    be longer in coming, and so that is why those fall into

Stage 3.  Again, those are things like getting your
hair cut, getting your nails done, doing anything that
has very close inherent relationships with other
people, where the proximity is very close, and it will
be -- we need a very thoughtful process, to ensure that
people don't put themselves at great risk in doing
those activities.

And then finally, Stage 4 is the point at
which we know that we can begin to modify our
stay-at-home order and -- and have people moving much
more freely, because the risk is much lower, and that
will require therapeutics to be in place.

Okay.  So safety and preparedness.  Stage 1,
this is where we are right now.  The things that we're
going to be actively doing is continuing to build out
our testing, contact tracing.  We're going to be
building up our stores of PPE, to make sure they're
secured, not only for our current needs, but also in
anticipation of -- of what will be needed for Stage 2,
when we do begin to open other sectors that may also
rely upon PPE.

And we'll also be really focusing on
maintaining our hospital surge capacity for the time
being, but also anticipating that we may need more, as
we move forward.

1    We'll be continuing to make essential
2  workplaces as safe as possible, as I mentioned.  That
3  includes really thinking about the physical work
4  environment that we're in, changing workflows, to make
5  sure that people are safe.
6    We're going to make sure that we enhance our
7  essential -- our safety net for our essential workers,
8  continue to move forward, making PPE more available,
9  and then also continuing to remind all of you, in your
10  daily behaviors, that there is something for all of us
11  to do.  Maintaining our physical distance and doing all
12  of those things that we've reminded you can help to
13  keep you safer and at lower risk.
14    In Stage 2, we're going to really start
15  focusing on lower risk workplaces.  That means
16  gradually opening some of those workplaces with
17  adaptations.  These include things like retail,
18  allowing for curbside pickup, manufacturing, which can
19  include things like toys, clothing, other things,
20  furniture, that had -- was not a part of the essential
21  sector.
22    Talking about offices, this can include
23  things like PR firms and consulting and other places
24  where telework is not possible, but by modifying the
25  environment itself, they can make it lower risk for

1  individuals.

2          And then ultimately talking about opening

3  more public spaces, things like parks and trails that

4  may have historically been limited, because of our

5  concerns, trying to think about how we can modify that,

6  to make them safer for individuals to enjoy the outdoor

7  spaces, because we know physical activity is so

8  important to our health, and this is also about health,

9  clearly.

10          And then finally, another area that we need

11  to think about, besides the physical environment, is

12  really the environment, the safety net itself.  So what

13  are we providing for workers, so that if they get sick,

14  that they can be supported to stay at home, if they

15  need to, rather than feel like there is a need for them

16  to go to work?

17          Then there's the whole environment and -- of

18  childcare and schools.  And so for adults, maybe we

19  talk about, you know, work for adults, and for -- for

20  our -- our -- our younger adults, our children, school

21  is their place that's so important and critical for

22  them, and their learning, and we really, really feel

23  strongly that when it's safer for them, when we can

24  create environments that allow them to go back, we do

25  want them to go back.

| | |
|---|---|
| 1 | We realize, however, this is going to take |
| 2 | more planning, and that's why we are now -- we are |
| 3 | discussing this now, because we need to roll up our |
| 4 | sleeves now and be really thinking critically about how |
| 5 | to do this. |
| 6 | As has already started, we need to continue |
| 7 | that discussion and continue it more in earnest.  So |
| 8 | we're talking about summer programs and the next school |
| 9 | year potentially starting sooner, perhaps in July or |
| 10 | August. |
| 11 | We're talking about childcare facilities and |
| 12 | trying to find ways to help them provide more care, to |
| 13 | create more childcare availability to our workforce in |
| 14 | particular.  We think it's fundamental that we focus on |
| 15 | this, because we have to address learning gaps, which |
| 16 | have occurred as a result of this.  We've been |
| 17 | protecting all of us by limiting the amount of access |
| 18 | in this environment, but we have to make up for those |
| 19 | gaps that may have -- have occurred over this time. |
| 20 | We're -- we'd be focused importantly on |
| 21 | making sure that the environment is safe for kids, but |
| 22 | also safe for teachers, safe for others that are in the |
| 23 | school, safe for those who are providing essential |
| 24 | services and supporting those environments where our |
| 25 | kids will be. |

1            And ultimately, as we open up schools, as we

2    make sure that -- that childcare is more broadly

3    available, it also makes it more possible for parents

4    to go back to work.

5            So school will look very different, but we

6    really are focusing on enhancing that -- those

7    opportunities.

8            So what will we be doing?  What do we need

9    to do to get from Stage 1 to Stage 2, from the

10   essential sector environment that we're in, from the

11   stay-at-home with -- with quite limited engagement, to

12   one that will create more opportunities to -- for lower

13   risk workplaces?

14           So the things that need to happen and that

15   we'll be focusing now together will be, first of all,

16   focusing on government action.  So what are the kinds

17   of policies that we need to have in place that will

18   allow people to stay home when they're sick?

19           We need to provide guidance, and we'll

20   continue to do that and make it available for how

21   people can reduce risk, to continue to provide people

22   with the best scientific information that we have about

23   this virus, to help people prepare themselves, to move

24   into environment that is not parti- -- not -- not fully

25   safe, but certainly lower risk, so we can all make

decisions ourselves in a very informed way.

Businesses will need to think more about wage replacement, so that workers can stay home when sick. They'll need to be implementing adaptations to lower risk workplaces now, so that when we are ready in a few weeks, those changes will be in place and -- and when the data tells us the moment is right, those environments can start to open.

And then we, again, just sort of emphasize that in those places where workers can continue to work from home, we'll continue to encourage businesses to -- to support those opportunities, because, really, staying apart at this time still is the safest place for all of us.

And then what about as individuals? Well, we all need to continue to practice safety precautions, which is the physical distancing, using face coverings when appropriate. We need to avoid all non-essential travel. That will continue on. That's an important thing. That decreases our exposure, our potential exposure to others.

And we also need to, as individuals, continue to support and care for those people that we know are at higher risk, continue to make those phone calls to people that you know are in their home and

1   socially distancing themselves, continuing, make sure

2   that their needs are met, and thinking about how you

3   might be part of the solution for them.

4            So when are we going to be ready for Stage

5   2?  So again, we will refer back to those six

6   indicators.  As mentioned, all of those six indicators

7   are not exactly the same.  There are some that may be

8   more important to this first stage than to stages that

9   come in the future, but I want to share with you some

10  of our thinking now about which elements of the

11  indicators that we've discussed earlier will be key.

12           So, first of all, we'll be watching those

13  hospital and ICU trends carefully and thoughtfully, and

14  they need to remain stable for us to remain confident

15  that we are in a position where the stay-at-home orders

16  could be modified in a way that would continue to

17  maintain lower risk.

18           We need to maintain hospital surge capacity,

19  so that as we move through the -- to the next stage, we

20  can be confident that if there are any increased

21  infections from increased movement, that we do have the

22  facility to be able to respond and to support and care

23  for those patients.

24           We need to make sure that there is PPE

25  available to support the demands that will come, not

only from the existing environment, the existing
conditions that we're in, but also anticipating what
the needs will be for the future, and being sure that
we're confident we can secure those.

We need to make sure that there's sufficient
testing capacity to meet the -- the demand.  That's
been a key focus of much of our work, and you've heard
a lot about our plans.  We'll continue to work
diligently on that.

And, finally, we'll be looking at contact
tracing capacity statewide.  We'll be working with
local health authorities and governments, to make sure
that the capacity is there.

So I want to talk a little bit about the
opportunity for regional variations, which I know also
has been a -- a hot topic of discussion, as the
governor had mentioned and, as the State Public Health
Officer, I'm in constant communication with local
health authorities in understanding, really, where --
where they -- they -- where they are and -- and where
their needs and desires are.

During Stage 2, counties can choose to relax
stricter local orders at their own pace.  That's very
much about what we've been talking about in the Bay
Area.  The State order is -- stay-at-home order is the

basis for everyone, but there are some counties in which the local disease epidemiology was such that the local health officers felt that it was important to be stricter, and we appreciate, respect, and we think that's exactly the right thing, when local health officers understand the needs of the community, that they act appropriately, following the science.

Similarly here, as we lift some of the -- and make some modifications in our stay-at-home order, there may be counties that aren't ready to go as fast, and that will be supported, and that is a regional variation, which is absolutely fine.

Following Stage 2, once we have a statewide COVID-19 surveillance system in place, it will make it possible for us to understand what other types of regional variation might be possible.  That -- and -- and the reason that's so important is that we know that this virus doesn't respect boundaries of counties necessarily, and we know that as there are modifications in orders, people move differently across there.

We need to understand not only what's happening in specific counties, what's -- but what's also happening in surrounding counties, to really understand if the disease transmission has occurred,

and if we can modify in a way that's safe.  We'll be
working very closely with our local health authorities
and governments in consulting for that.

The final two stages that we discussed are
Stage 3 and Stage 4.  Stage 3 is the -- the space that
we get into when we're talking about higher risk
work -- workplaces, and that's one of the later phases,
because we know that will take much more modification.
We need to know much more about the movement of disease
to be able to make data-informed decisions about what's
safe for folks.  So these include places like personal
hair care places, entertainment venues where people are
sitting close -- closer together, and sporting events
without live audiences.

Other things that fall into this space are
in-person religious services, like churches and
weddings, and we'll need to think carefully about what
kinds of provisions can be put in place so that people
can join, but in a way that doesn't expose them to
increased risk for COVID-19.

And then ultimately, the space that we all
look forward to, some day, as we move forward and work
diligently together, is Stage 4, which would be the end
of the stay-at-home order, and that's when we'd be
opening all of our highest risk workplaces, without

1　modification necessary at that time, because at that

2　time, we will know that we have identified a way that

3　we can keep people safe from COVID-19, either from

4　population immunity, from the -- or from vaccinations.

5　　　　　　So with that, I just want to remind you that

6　this is the time and not of -- of staying in one place.

7　We are in Stage 1, but it's actually an important time

8　of work, and that's why we wanted to give you this

9　opportunity to understand our planning at this time.

10　　　　　　The first thing I want to tell you is that

11　if you want to be a part of the solution, you need to

12　stay home, if you're staying at home, and if you're

13　part of the essential workforce, we want you to stay

14　home when you're not working.  That is the best way to

15　protect yourself, but if you do need to go out to go to

16　the grocery store, make sure that you continue to

17　practice physical distancing and all the other things

18　that we tell you.  That's the first thing you can do to

19　be part of the solution.

20　　　　　　The second thing is that we're enlisting all

21　Californians to help inform the development of the

22　guidance for sectors across our economy.  If you're

23　somebody who has particular insight, if you -- if

24　you're a business person yourself, you're going to be

25　invited to provide information, and we'll put the

```
 1   website up in -- shortly for you, but we want to hear

 2   from you, because ideas that you have about how you can

 3   create work -- safe workplaces are ideas that we want

 4   to know about.

 5            We're going to be providing this guidance in

 6   a framework, ultimately, to help companies, businesses

 7   and -- and our schools reopen in the way that reduces

 8   risk, but it really will continue to rely upon all of

 9   us to keep us moving forward.

10            Thank you.

11            GOVERNOR NEWSOM:  Thank you, Dr. Angell.

12            And, of course, Dr. Angell will available,

13   as will I, for questions.

14            But the foundational point of emphasis we

15   want to advance today is Phase 2, as was presented by

16   Dr. Angell, is in weeks, not months.  Phase 3 and 4,

17   months, not weeks.

18            And I think that's what's important, so

19   people have a sense of where we are and where we

20   believe, based, again, on the data, we are going.  What

21   I just said can substantially change, if the data

22   changes, if the health prevalence and the spread of the

23   disease changes, if our behavior erratically changes,

24   and we put ourselves at higher risk, but risk is the

25   frame that we're advancing.
```

1          Lower risk, we will focus broadly across

2    sectors to begin reopening.  Higher risk, we'll be more

3    cautious, not weeks, but months, and highest risk,

4    along the lines of that Stage 4, where we are back at

5    concerts and convention halls, and with tens of

6    thousands of fans in large stadiums, will take some

7    time.

8          But nonetheless, we believe we do have a

9    framework that we can achieve, and we can achieve

10   together, with the kind of earnestness of effort that

11   Dr. Angell advanced, in terms of being able to break

12   these things down in very, very prescriptive terms and

13   begin a framework of, again, not just protecting those

14   sectors of our economy, but protecting the workforce

15   within those sectors and consumers that attach

16   themselves to those sectors as well.

17          Let me, as I do daily, attach you to the

18   latest data and numbers to reinforce and strengthen

19   what you saw on the screen a moment ago, as it relates

20   to the stabilization, but also caution you, as today's

21   numbers should, about where we are, as it relates to

22   the suppression of this disease.

23          Yesterday, we had 45 individuals that lost

24   their lives.  Today, we have 54 individuals that lost

25   their lives.  I mentioned that's roughly half of what

we saw last week, where we really saw a peak in the
terms of another (sic) of deaths. It's still too many,
too many lives torn apart. And, again, not stats, not
data. Real people, real families, real loved ones, and
so our hearts go out to each and every one of them.

We also mentioned yesterday that we're 1300
new positives in the State of California. Today, on --
I announce there were 1,576. 1300, now over 1576
individuals that have tested positive. Yesterday, I
mentioned that there were a increase -- there was an
increase in hospitalization rate of 1.4 percent.
Today, actually went up to 2.5 percent.

The only good news in that data is ICU
numbers today went down slightly and were stable
yesterday. Just gives you a sense. Again, we're not
out of the woods stable, though those numbers are
relative to so many other parts of the country. We
still need to see that downward movement, and we're
going to monitor that data on a daily, hourly basis
over the next few weeks, before we move forward with
these modifications.

If the data changes, we start to see some
spikes, some increase in our community surveillance, we
start seeing numbers that raise alarm bells, that's an
indicator that's no longer green or even a caution

light, turns red, and as a consequence, we adjust in
realtime.

So just want to remind folks of the dynamic
nature of this effort, and the very sober framework to
which we make decisions, again, on the basis of fact
and data, not ideology, not what we want, not what we
hope, but what actually is, and what we confidently can
predict in a short and median time.

So lot of work for a lot of sectors of our
economy to -- to do in the next few weeks.  We look
forward to doing that with them, and certainly for the
schools, I just want to -- once again, as a father of
four, that learning loss is very real.  And, from a
socioeconomic frame, from a racial justice frame, this
is even more compounding and more challenging, and so
it is incumbent upon us, I think, to -- to think anew,
in respect to the school year.

And, again, I am looking forward to those
robust conversations about the prospects of an earlier
school year that I do think is warranted, considering
the consequences of neglecting our next generation,
because of the inconvenience and the realities of this
virus and its spread.

That's, broad strokes, where we -- where we
are today.  I'll just end, as I always do, as a

```
 1  reminder, before we open up to questions, that you too
 2  can participate, not only in -- in a sector-by-sector
 3  conversation.  We have our digital roundtable in that
 4  respect, again, for retail today, but, moreover, to
 5  volunteer your time, your passion, your attention, your
 6  focus, your particular expertise to
 7  Californiansforall.ca.gov website.
 8  Californiansforall.ca.gov website.
 9            Happy now to answer any questions.
10            FEMALE SPEAKER:  Mariana Dale, KPCC.
11            MS. DALE:  Hi.  Thank you.  So today, you
12  talked about expanding childcare facilities and
13  availability in the coming weeks.
14            I've talked to a lot of providers who say
15  they still can't purchase supplies, and that the 50
16  million dollars that had been promised on April 10th
17  has still not been distributed to childcare centers and
18  agencies.  What's the status of that funding, and when
19  can childcare providers expect more support?
20            GOVERNOR NEWSOM:  Yeah, as I said, 2.87
21  million masks were distributed in the last 24 hours.
22  As soon as we get the supplies in, we get those
23  supplies out.  We're going to start seeing a cadence of
24  substantial increase in PPE, not just procedures --
25  procedural masks, but, soon, N95 masks, gowns, shields,
```

gloves, other personal protective gear.  As it comes
in, it comes right out.

And it's not just for childcare workers, but
across the panoply of support, in-home supportive
service workers, grocery workers, logistics workers,
manufacturers, farm workers.  We have a lot of
migrant -- seasonal migrant farm workers now coming
into the State of California, working on protocols and
procedures for PPE in that sector as well.

So across the panoply, but you're absolutely
right.  As it relates to childcare, I had a wonderful
meeting yesterday, a virtual meeting with the Women's
Caucus.  The entire subject matter was on childcare.
The number of pop-up childcare facilities, over 300.
Now we've opened recently the hundred million dollars
that we've put into the sector and emergency aid.
You're correct, 50 million of it was for PPE.  Getting
those out on the sites, to the sites is critical and
can't come soon enough, and so that was highlighted.

Kim Johnson, to answer your question, at the
Department of Social Services, on the line, she's
working to monitor the distribution of those funds and
make sure that the advocacy of those funds takes shape.

It's not just for PPE, it's for deep
sanitization and for physical modifications, just

1    temporary, to accommodate for new size cohorts, based

2    upon our guidance for childcare workers and for their

3    children.

4              This is a point of passion for me.  Last

5    year in January, I announced a substantial enhancement

6    in childcare funding to the State of California, and

7    just as late as January of this year, announced our

8    next phase of investment.

9              With the budget deficits looming, I caution

10   that that progress in that space may be impeded by the

11   new reality of our obligation to balance a budget.  No

12   printing press here in the State of California.

13             And so I can assure you this is an area of

14   deep concern and concentrated effort, because childcare

15   is economic development.  Childcare is foundational to

16   getting people back to work.  If they cannot get the

17   kind of quality -- quality childcare that they deserve,

18   they are less likely to get back to work and jump-start

19   this economy.  And so I deeply recognize there's a

20   reason it was incorporated into the business sector,

21   the childcare component, the inner relationship between

22   the two.

23             FEMALE SPEAKER:  Doug Sovern, KCBS Radio.

24             MR. SOVERN:  I have a question I want to ask

25   you about the State's model, but as the father of two

kids in kindergarten, I -- I would be remiss if I
didn't ask you to elaborate a little bit on reopening
the schools early, specifically, you know, why, what
the thinking is there.  Is it a matter of getting more
in-person education before next flu season?  Or I'll
let you explain why, and also when.  Parents will want
to know when that announcement or decision might be
made.

But then also, I'm curious.  California's
model has seemed to be an outlier, certainly overly
pessimistic at best, compared to the other models that
are out there, projecting a much later peak, a much
later surge.  And I'm wondering if now, have you guys
tweaked the State model?  Do you believe we are past
the peak?  Is the worst behind us?  Was there something
wrong with the way the data was being fed into that
model?  And what -- what have you learned that might
let you adjust that or -- or approach it differently
next time, God forbid there is a next time?

GOVERNOR NEWSOM:  Well, I'll let Dr. Ghaly
put that model together, and has been updated on a
weekly basis, that model, preemptively answering that
question in realtime, going back a few months.  By the
way, every state in our nation doing the same,
including some of the well-known chronicled modelers

that, even yesterday, came out with an adjustment to
their previous adjustment out of the State of
Washington, only highlighting and reinforcing frame of
your question.

　　　　　But as it relates to the data, in terms of
our decision making, the reason we're making the
announcement today is, regardless of our model, the
facts that are coming in, the facts that are presenting
themselves in ICUs, on hospitalizations and spread give
us confidence in the next few weeks we're able to make
these Stage 2 adjustments.

　　　　　Let me be specific, Doug.  We want to get
you back to work, or at least allow you more time to
work, sooner than later.  Our kids have lost a lot with
this disruption.  I am not naive.  We announced a week
or so ago, my wife and the Superintendent of Public
Education, some good work that's being done on new WiFi
hotspots, on distance learning, the application,
support of thousands, over 70,000 tablets and
Chromebooks, and other capacity to provide distance
learning.  Still inadequate, to the magnitude of six
million children, all throughout the State of
California in rural districts and -- and some urban
districts that just simply don't have the high quality
download speed and capacity or anything to download

1 into.
 2          And so there's been a learning loss, and you
 3 can either just roll -- you know, roll over and just
 4 accept that, or you can do something about it.  So
 5 that's our thinking, if we can maybe start up the
 6 school year a little earlier, that would help mind that
 7 gap a little bit, close that gap a little bit.
 8          It's a -- it's a -- it's a deep
 9 conversation.  The reason I'm having it with you is I
10 was having it privately over the last few days.  I want
11 to socialize those private conversations as quickly as
12 I can with you.  I mentioned over the next few weeks,
13 this is in the Stage 2 of our framework of decision
14 making.
15          So the next few weeks, we'll get some more
16 clarity to answer your question on -- on the
17 possibility of that, what the costs are, what that
18 actually looks like.  It's a conversation above and
19 beyond just summer school.
20          With that, I'll ask that Dr. Ghaly can come
21 up.
22          DR. GHALY:  Thank you, Governor, and thank
23 you for the question.
24          We continue to look at our model.  We have
25 been here for the last few weeks, talking about, not

just the model, but the actual cases that we're
tracking, both in the hospital and our ICUs. We have
conveyed a message of cautious optimism.

We knew, when we put together the models
many, many months ago now, weeks ago when we shared
them first with all Californians and started to talk to
colleagues around the nation about what their models
were and how they were using them, we knew that these
models were not going to be precise, that they would
point us in the right direction, and I think they have.

We continue to update them and look at them
closely, to make sure that we aren't being misguide --
guided in how we use them, and we believe in today's
announcement and the announcements over the last couple
of weeks that our models and the actuals are preparing
us for this area of stabilization with our data, with
our hospitalizations and ICU visits.

As we increase our testing capacity, that
bears out in what we're seeing as a percentage positive
among those increasing number of tests across the --
across the State, that we are preparing in weeks, not
months, to begin to modify those.

And that we're going to continue looking at
that model, making the adjustments, so that we can use
it as a planning tool, but that our actuals mean more,

1 and that we will continue to look at that to -- to
2 guide decisions that come from the State, to inform our
3 local partners with their individual county-level data,
4 so they too can make those plans, as they consider how
5 their local orders guide the decisions at that level.
6 We know that many folks are looking at the
7 models and deciding whether we were too pessimistic or
8 too optimistic, whether those led us to be too
9 conservative or too liberal with some of our decisions,
10 and we stand firm in our decision to do the things
11 we've done over the last many weeks, and as we move
12 forward, to use that same information to guide
13 decisions.
14 So we are always looking at these models.
15 We're always interested in updating them, so they're
16 more usable, but we continue to look at those actual
17 data points to guide the decisions, as we move forward.
18 GOVERNOR NEWSOM: Decisions, not conditions,
19 again, determine our fate in future, and that's why I
20 just want to remind everybody of their own individual
21 decisions, importance of physical distancing, continue
22 to advance the stay-at-home order. If we make bad
23 decisions, conditions can radically change, models can
24 change overnight.
25 Actuals, reality is radically impacted,

1   again, by those individual decisions.  Hundreds and

2   hundreds a day, millions, millions of people marching,

3   we hope, in the right and same direction.  We'll get

4   out of this sooner if we maintain that directive sense

5   of focus and continue to advance our commitment and

6   resolve.

7           FEMALE SPEAKER:  Final question, Sophia

8   Bollag, Sac Bee.

9           MS. BOLLAG:  Governor, I'm wondering if you

10   can give us a more specific update about the testing

11   status in nursing homes and elder care facilities.

12           How much testing are we doing in those

13   facilities, and is it enough?  And if not, how much

14   more testing do we need to be doing in those facilities

15   to reach a point where you're going to feel satisfied?

16           GOVERNOR NEWSOM:  Oh, a lot more.  It's not

17   enough.  That's -- that's the honest truth.  I've been

18   very clear with the testing task force, one of their

19   top priorities was focusing on all of our licensed

20   facilities, not just skilled nursing facilities.

21           As you know, we've made three or four

22   announcements in the skilled nursing facility and

23   licensed facility space, including increasing the

24   testing, as a priority in that space, increasing the

25   supply of PPP -- PPE in that space, and, as you know,

1   redirecting national guard to help support medical

2   guardsmen and women in that space, including folks from

3   the USNS Mercy.  We retrained over 600 nurses, we're

4   doing those daily check-in calls.  We have organized

5   ourselves in a much more thorough and deliberative way.

6           We're currently just -- Sophia, to -- just

7   to update you, we're monitoring 192 skilled nursing

8   facility sites that have a test of positive, either a

9   staff member or a patient.  Currently, 2,302

10   individuals that we're currently monitoring, just in

11   the SNF space.  Again, that's a universe of 1224

12   skilled nursing facilities, about 119,000 total

13   capacity.  It doesn't include the total number of

14   staff.

15           Forgive me for throwing those numbers out,

16   except I think they're important, but the answer to

17   your question is we need to do more, and this is part

18   of moving from Phase 1 to Phase 2.  It's one of the

19   principal indicators on testing that will allow us

20   to -- to continue to make some real progress.

21           FEMALE SPEAKER:  Final question,

22   Carla Marinucci, Politico.

23           MS. MARINUCCI:  On the call, you mentioned

24   reopening, and I think one of the questions is the

25   reopening of the legislature.  Several members of the

1  California Assembly have expressed concern about the
2  need for remote voting.  The Speaker has said that
3  there's a constitutional necessity for physical
4  presence.

5            But what do you think on this one?  I mean,
6  does the pandemic require a new assessment of this, of
7  legislative business and how to get it done in -- in
8  California?

9            And if I could, quickly, several people on
10 Twitter have asked me to ask you this today, including
11 Hank Plante, why is the California EDD website so
12 woefully unprepared and frozen on this big day when
13 freelancers and contractors are supposed to apply for
14 PUA unemployment?

15           We got that question on Twitter from many
16 people.

17           GOVERNOR NEWSOM:  Yeah, so let me -- as it
18 relates to independent branch of government,
19 legislature, they'll make their decisions, based upon
20 their best assessment and analysis.  I know that I'm
21 aware of those decisions, fact, had a brief
22 conversation with the speaker today.  I haven't been
23 tracking it as closely as I've been tracking all of
24 these other decisions, but I -- I respect whatever
25 determination they make, and have the confidence in

1   their leadership to make the right decision for their
2   members and those that they're trying to represent in
3   the State of California.
4          As it relates to the UI issues and the PUA
5   issues, we've been very aggressive on a daily basis, as
6   you know, to try to tackle the -- and as quickly as we
7   can to address the magnitude of the number of calls
8   that have come in.
9          Yesterday, I made some announcements, about
10  600 additional personnel, on top of the 1340 that we
11  had hired for the call centers, and we talked about the
12  new texting technology.  We talked about the new
13  chatbots that we put into place.  We talked about the
14  total number of connections that we actually have made
15  went from 417,000 minutes of individual talk time last
16  week to one million just yesterday from the previous
17  weeks.
18          So substantial increase in connection and
19  volume.  5.33 billion dollars, that's the new number.
20  5.33 billion dollars has been distributed through that
21  system, just since March 15th.  926 million, just on
22  Sunday alone.  I'll repeat that.  926 million dollars
23  was distributed just on Sunday.  So you're correct, we
24  have the PUAs up today, and, not surprising, the first
25  few hours, we've got to figure this out, but we said

we'd get it up today, and they're putting it together,
they're architecting it today.  Julie and her team at
EDD doing everything in their power to continue to get
these UIs out and start to get the PUAs up.

But here's the good news on the PUAs.  A lot
of states have put up PUA sites.  It's just an
application, takes weeks and weeks to get the checks.
Our expectation is not only when this site is more
stable today and tomorrow, next few days, they'll be
24- to 48-hour turnaround, in terms of those checks
being distributed.

So you're just dealing with unprecedented
amount of call volume.  And folks over at EDD, an
unprecedented amount of responsibility and work to
improve, to do better, to do more.  You deserve that,
Hank deserves that, the American people, 40 million
strong in the State of California, particularly the 3.5
million that have applied for unemployment insurance
since March 12th, and those that will be applying under
the PUA deserve it.

And so we'll continue to -- to do all we
can, everything in our power to improve upon that
experience in these historic and unprecedented times,
and, no, good enough never is.

And, yes, every day, this is one of our top

```
 1   points of conversation, concern, and effort, and -- and
 2   I can assure you that I -- I'm not only being held to
 3   account, but some of the brightest people that I know
 4   are as well in this space.
 5            Look, as it relates to being held to
 6   account, let us not be judged not to have been held in
 7   account of supporting others in need at this time of
 8   need for millions of Californians, not just applying
 9   for unemployment insurance or pandemic unemployment
10   assistance, PUA, but also those that need your
11   contribution of blood, maybe your willingness just to
12   call and check in, check in on a neighbor, a senior,
13   maybe deliver a meal in a safe way or provide some care
14   and support.
15            Please, if you're willing, you're able, go
16   to Californiansforall.ca.gov, Californiansforall.ca.gov
17   website, and share your passion, with real action.
18            Take care, everybody.  Stay safe.  Look
19   forward to seeing you tomorrow at noon.
20                         ***
21
22
23
24
25
```

1          I, RENAE E. LOPEZ, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3          That a record of the audio proceedings was

4    made by me using machine shorthand, which was

5    thereafter transcribed under my direction; that the

6    foregoing transcript is a true record of the audio

7    transcription.

8          I further certify that I am neither

9    financially interested in the action nor a relative or

10   employee of any attorney or any party to this action.

11          IN WITNESS WHEREOF, I have this date

12   subscribed my name.

13

14   Dated: May 5, 2020

15                        _____

16                        Renae E. Lopez
                          CSR No. 12142

17

18

19

20

21

22

23

24

25

**1**

**1**
27:13 31:9 37:7 51:18

**1,576**
40:8

**1.4**
40:11

**10th**
42:16

**119,000**
51:12

**12142**
56:16

**1224**
51:11

**12th**
54:19

**1300**
40:6,8

**1340**
53:10

**1576**
40:8

**15th**
53:21

**192**
51:7

**2**

**2**
27:19 28:14 31:9 33:5
34:22 35:13 38:15
46:11 47:13 51:18

**2,302**
51:9

**2.5**
40:12

**2.87**
42:20

**2020**
56:14

**24**
42:21

**24-**
54:10

**3**

**3**
27:1 36:5 38:16

**3.5**
54:17

**300**
43:14

**4**

**4**
27:8 36:5,23 38:16 39:4

**40**
54:16

**417,000**
53:15

**45**
39:23

**48-hour**
54:10

**5**

**5**
56:14

**5.33**
53:19,20

**50**
42:15 43:17

**54**
39:24

**6**

**600**
51:3 53:10

**7**

**70,000**
46:19

**9**

**926**
53:21,22

**A**

**absolutely**
35:12 43:10

**accept**
47:4

**access**
30:17

**accommodate**
44:1

**account**
55:3,6,7

**achieve**
39:9

**act**
35:7

**action**
31:16 55:17 56:9,10

**actively**
27:15

**activities**
27:7

**activity**
29:7

**actual**
48:1 49:16

**actuals**
48:15,25 49:25

**adaptations**
28:17 32:4

**additional**
53:10

**address**
30:15 53:7

**adjust**
41:1 45:18

**adjustment**
46:1,2

**adjustments**
46:11 48:24

**adults**
29:18,19,20

**advance**
38:15 49:22 50:5

**advanced**
39:11

**advancing**
38:25

**advocacy**
43:23

**agencies**
42:18

**aggressive**
53:5

**aid**
43:16

**alarm**
40:24

**allowing**
28:18

**American**
54:16

**amount**
30:17 54:13,14

**analysis**
52:20

**anew**
41:16

**Angell**
38:11,12,16 39:11

**announce**
40:8

**announced**
44:5,7 46:15

**announcement**
45:7 46:7 48:14

**announcements**
48:14 50:22 53:9

**answering**
45:22

**anticipating**
27:24 34:2

**anticipation**
27:19

application
46:18 54:7

applied
54:18

apply
52:13

applying
54:19 55:8

approach
45:18

appropriately
35:7

April
42:16

architecting
54:2

area
29:10 34:25 44:13
48:16

Assembly
52:1

assessment
52:6,20

assistance
55:10

assure
44:13 55:2

attach
39:15,17

attention
42:5

attorney
56:10

audiences
36:14

audio
56:3,6

August
30:10

authorities
34:12,19 36:2

availability
30:13 42:13

avoid

32:18

aware
52:21

**B**

back
29:24,25 31:4 33:5 39:4
44:16,18 45:23 46:13

bad
49:22

balance
44:11

based
38:20 44:1 52:19

basis
35:1 40:19 41:5 45:22
53:5

Bay
34:24

bears
48:19

Bee
50:8

begin
27:9,20 39:2,13 48:22

behavior
38:23

behaviors
28:10

bells
40:24

big
52:12

billion
53:19,20

bit
34:14 45:2 47:7

blood
55:11

Bollag
50:8,9

boundaries
35:18

branch

52:18

break
39:11

brightest
55:3

broad
41:24

broadly
31:2 39:1

budget
44:9,11

build
27:15

building
27:17

business
37:24 44:20 52:7

businesses
32:2,11 38:6

**C**

cadence
42:23

California
40:7 43:8 44:6,12 46:23
52:1,8,11 53:3 54:17
56:2

California's
45:9

Californians
37:21 48:6 55:8

Californiansforall.ca.
gov
42:7,8 55:16

call
51:23 53:11 54:13
55:12

calls
32:25 51:4 53:7

capacity
27:23 33:18 34:6,11,13
46:20,25 48:18 51:13

care
30:12 32:23 33:22
36:12 50:11 55:13,18

carefully
33:13 36:17

Carla
51:22

cases
48:1

Caucus
43:13

caution
39:20 40:25 44:9

cautious
39:3 48:3

centers
42:17 53:11

Certified
56:1

certify
56:2,8

challenging
41:15

change
38:21 49:23,24

changing
28:4

chatbots
53:13

check
55:12

check-in
51:4

checks
54:7,10

childcare
29:18 30:11,13 31:2
42:12,17,19 43:3,11,13,
14 44:2,6,14,15,17,21

children
29:20 44:3 46:22

choose
34:22

Chromebooks
46:20

chronicled
45:25

churches
36:16

clarity
47:16

clear
50:18

close
27:3,4 36:13 47:7

closely
36:2 48:12 52:23

closer
36:13

clothing
28:19

cohorts
44:1

colleagues
48:7

commitment
50:5

communication
34:18

community
35:6 40:23

companies
38:6

compared
45:11

component
44:21

compounding
41:15

concentrated
44:14

concern
44:14 52:1 55:1

concerns
29:5

concerts
39:5

conditions
34:2 49:18,23

confidence
46:10 52:25

confident
33:14,20 34:4

confidently
41:7

connection
53:18

connections
53:14

consequence
41:1

consequences
41:21

conservative
49:9

constant
34:18

constitutional
52:3

consulting
28:23 36:3

consumers
39:15

contact
27:16 34:10

continue
28:8 30:6,7 31:20,21
32:10,11,16,19,23,24
33:16 34:8 37:16 38:8
47:24 48:11,23 49:1,16,
21 50:5 51:20 54:3,21

continuing
27:15 28:1,9 33:1

contractors
52:13

contribution
55:11

convention
39:5

conversation
42:3 47:9,18 52:22 55:1

conversations
41:19 47:11

conveyed
48:3

correct
43:17 53:23

costs
47:17

counties
34:22 35:1,10,18,23,24

country
40:17

county-level
49:3

couple
48:14

coverings
32:17

COVID-19
35:14 36:20 37:3

create
29:24 30:13 31:12 38:3

critical
29:21 43:18

critically
30:4

CSR
56:16

curbside
28:18

curious
45:9

current
27:18

cut
27:2

D

daily
28:10 39:17 40:19 51:4
53:5

Dale
42:10,11

data
32:7 38:20,21 39:18
40:4,13,19,22 41:6
45:16 46:5 48:16 49:3,
17

data-informed
36:10

date
56:11

Dated
56:14

day
36:22 50:2 52:12 54:25

days
47:10 54:9

dealing
54:12

deaths
40:2

deciding
49:7

decision
45:7 46:6 47:13 49:10
53:1

decisions
32:1 36:10 41:5 49:2,5,
9,13,17,18,21,23 50:1
52:19,21,24

decreases
32:20

deep
43:24 44:14 47:8

deeply
44:19

deficits
44:9

deliberative
51:5

deliver
55:13

demand
34:6

demands
33:25

Department
43:21

deserve
44:17 54:15,20

deserves
54:16

**desires**
34:21

**determination**
52:25

**determine**
49:19

**development**
37:21 44:15

**differently**
35:20 45:18

**digital**
42:3

**diligently**
34:9 36:23

**direction**
48:10 50:3 56:5

**directive**
50:4

**discussed**
33:11 36:4

**discussing**
30:3

**discussion**
30:7 34:16

**disease**
35:2,25 36:9 38:23
39:22

**disruption**
46:15

**distance**
28:11 46:18,20

**distancing**
32:17 33:1 37:17 49:21

**distributed**
42:17,21 53:20,23
54:11

**distribution**
43:22

**districts**
46:23,24

**dollars**
42:16 43:15 53:19,20,
22

**Doug**
44:23 46:12

**download**
46:25

**downward**
40:18

**dynamic**
41:3

---

**E**

**earlier**
33:11 41:19 47:6

**early**
45:3

**earnest**
30:7

**earnestness**
39:10

**economic**
44:15

**economy**
37:22 39:14 41:10
44:19

**EDD**
52:11 54:3,13

**education**
45:5 46:17

**effort**
39:10 41:4 44:14 55:1

**elaborate**
45:2

**elder**
50:11

**elements**
33:10

**emergency**
43:16

**emphasis**
38:14

**emphasize**
32:9

**employee**
56:10

**encourage**
32:11

**end**

36:23 41:25

**engagement**
31:11

**enhance**
28:6

**enhancement**
44:5

**enhancing**
31:6

**enjoy**
29:6

**enlisting**
37:20

**ensure**
27:5

**entertainment**
36:12

**entire**
43:13

**environment**
28:4,25 29:11,12,17
30:18,21 31:10,24 34:1

**environments**
29:24 30:24 32:8

**epidemiology**
35:2

**erratically**
38:23

**essential**
28:1,7,20 30:23 31:10
37:13

**events**
36:13

**existing**
34:1

**expanding**
42:12

**expect**
42:19

**expectation**
54:8

**experience**
54:23

**expertise**

42:6

**explain**
45:6

**expose**
36:19

**exposure**
32:20,21

**expressed**
52:1

---

**F**

**face**
32:17

**facilities**
30:11 42:12 43:14
50:11,13,14,20 51:12

**facility**
33:22 50:22,23 51:8

**fact**
41:5 52:21

**facts**
46:8

**fall**
36:15

**families**
40:4

**fans**
39:6

**farm**
43:6,7

**fast**
35:10

**fate**
49:19

**father**
41:12 44:25

**fed**
45:16

**feel**
29:15,22 50:15

**felt**
35:3

**FEMALE**
42:10 44:23 50:7 51:21

**figure**
53:25

**final**
36:4 50:7 51:21

**finally**
27:8 29:10 34:10

**financially**
56:9

**find**
30:12

**fine**
35:12

**firm**
49:10

**firms**
28:23

**flu**
45:5

**focus**
30:14 34:7 39:1 42:6
50:5

**focused**
30:20

**focusing**
27:22 28:15 31:6,15,16
50:19

**folks**
36:11 41:3 49:6 51:2
54:13

**forbid**
45:19

**force**
50:18

**foregoing**
56:6

**Forgive**
51:15

**forward**
27:25 28:8 36:22 38:9
40:20 41:11,18 49:12,
17 55:19

**foundational**
38:14 44:15

**frame**
38:25 41:14 46:3

**framework**
38:6 39:9,13 41:4 47:13

**freelancers**
52:13

**freely**
27:11

**frozen**
52:12

**fully**
31:24

**fundamental**
30:14

**funding**
42:18 44:6

**funds**
43:22,23

**furniture**
28:20

**future**
33:9 34:3 49:19

**G**

**gap**
47:7

**gaps**
30:15,19

**gear**
43:1

**generation**
41:21

**Ghaly**
45:20 47:20,22

**give**
37:8 46:9 50:10

**gloves**
43:1

**God**
45:19

**good**
40:13 46:17 54:5,24

**government**
31:16 52:18

**governments**
34:12 36:3

**governor**
34:17 38:11 42:20
45:20 47:22 49:18 50:9,
16 52:17

**gowns**
42:25

**gradually**
28:16

**great**
27:6

**green**
40:25

**grocery**
37:16 43:5

**guard**
51:1

**guardsmen**
51:2

**guidance**
31:19 37:22 38:5 44:2

**guide**
49:2,5,12,17

**guided**
48:13

**guys**
45:13

**H**

**hair**
27:2 36:12

**half**
39:25

**halls**
39:5

**Hank**
52:11 54:16

**happen**
31:14

**happening**
35:23,24

**Happy**
42:9

**health**
29:8 34:12,17,19 35:3,5
36:2 38:22

**hear**
38:1

**heard**
34:7

**hearts**
40:5

**held**
55:2,5,6

**high**
46:24

**higher**
32:24 36:6 38:24 39:2

**highest**
36:25 39:3

**highlighted**
43:19

**highlighting**
46:3

**hired**
53:11

**historic**
54:23

**historically**
29:4

**home**
29:14 31:18 32:3,11,25
37:12,14

**homes**
50:11

**honest**
50:17

**hope**
41:7 50:3

**hospital**
27:23 33:13,18 48:2

**hospitalization**
40:11

**hospitalizations**
46:9 48:17

**hot**
34:16

**hotspots**
46:18

**hourly**

40:19

**hours**
42:21 53:25

**hundred**
43:15

**hundreds**
50:1,2

---

**I**

**ICU**
33:13 40:13 48:17

**ICUS**
46:9 48:2

**ideas**
38:2,3

**identified**
37:2

**ideology**
41:6

**immunity**
37:4

**impacted**
49:25

**impeded**
44:10

**implementing**
32:4

**importance**
49:21

**important**
29:8,21 32:19 33:8
35:3,17 37:7 38:18
51:16

**importantly**
30:20

**improve**
54:15,22

**in-home**
43:4

**in-person**
36:16 45:5

**inadequate**
46:21

**include**

28:17,19,22 36:11
51:13

**includes**
28:3

**including**
45:25 50:23 51:2 52:10

**inconvenience**
41:22

**incorporated**
44:20

**increase**
40:10,11,23 42:24
48:18 53:18

**increased**
33:20,21 36:20

**increasing**
48:20 50:23,24

**incumbent**
41:16

**independent**
52:18

**indicator**
40:25

**indicators**
33:6,11 51:19

**individual**
49:3,20 50:1 53:15

**individuals**
29:1,6 32:15,22 39:23,
24 40:9 51:10

**infections**
33:21

**inform**
37:21 49:2

**information**
31:22 37:25 49:12

**informed**
32:1

**inherent**
27:3

**insight**
37:23

**insurance**
54:18 55:9

**interested**
49:15 56:9

**investment**
44:8

**invited**
37:25

**issues**
53:4,5

---

**J**

**January**
44:5,7

**Johnson**
43:20

**join**
36:19

**judged**
55:6

**Julie**
54:2

**July**
30:9

**jump-start**
44:18

**justice**
41:14

---

**K**

**KCBS**
44:23

**key**
33:11 34:7

**kids**
30:21,25 45:1 46:14

**Kim**
43:20

**kind**
39:10 44:17

**kindergarten**
45:1

**kinds**
31:16 36:18

**knew**
48:4,8

**KPCC**
42:10

---

**L**

**large**
39:6

**late**
44:7

**latest**
39:18

**leadership**
53:1

**learned**
45:17

**learning**
29:22 30:15 41:13
46:18,21 47:2

**led**
49:8

**legislative**
52:7

**legislature**
51:25 52:19

**level**
49:5

**liberal**
49:9

**licensed**
50:19,23

**lift**
35:8

**light**
41:1

**limited**
29:4 31:11

**limiting**
30:17

**lines**
39:4

**live**
36:14

**lives**
39:24,25 40:3

**local**

34:12,18,23 35:2,3,5
36:2 49:3,5

**logistics**
43:5

**longer**
40:25

**looming**
44:9

**Lopez**
56:1,15

**loss**
41:13 47:2

**lost**
39:23,24 46:14

**lot**
34:8 41:9 42:14 43:6
46:14 50:16 54:5

**loved**
40:4

**lower**
27:11 28:13,15,25
31:12,25 32:5 33:17
39:1

**M**

**machine**
56:4

**made**
45:8 50:21 53:9,14 56:4

**magnitude**
46:21 53:7

**maintain**
33:17,18 50:4

**maintaining**
27:23 28:11

**make**
27:17 28:1,4,6,25 29:6
30:18 31:2,20,25 32:24
33:1,24 34:5,12 35:9,14
36:10 37:16 41:5 43:23
46:10 48:12 49:4,22
51:20 52:19,25 53:1

**makes**
31:3

**making**
28:8 30:21 46:6 47:14

48:24

**manufacturers**
43:6

**manufacturing**
28:18

**March**
53:21 54:19

**marching**
50:2

**Mariana**
42:10

**Marinucci**
51:22,23

**masks**
42:21,25

**matter**
43:13 45:4

**meal**
55:13

**means**
28:15

**median**
41:8

**medical**
51:1

**meet**
34:6

**meeting**
43:12

**member**
51:9

**members**
51:25 53:2

**mentioned**
28:2 33:6 34:17 39:25
40:6,10 47:12 51:23

**Mercy**
51:3

**message**
48:3

**met**
33:2

**migrant**
43:7

**million**
42:16,21 43:15,17
46:22 53:16,21,22
54:16,18

**millions**
50:2 55:8

**mind**
47:6

**minutes**
53:15

**misguide**
48:12

**model**
44:25 45:10,14,17,21,
22 46:7 47:24 48:1,24

**modelers**
45:25

**models**
45:11 48:4,7,9,15 49:7,
14,23

**modification**
36:8 37:1

**modifications**
35:9,20 40:21 43:25

**modified**
33:16

**modify**
27:9 29:5 36:1 48:22

**modifying**
28:24

**moment**
32:7 39:19

**monitor**
40:19 43:22

**monitoring**
51:7,10

**months**
38:16,17 39:3 45:23
48:5,22

**move**
27:25 28:8 31:23 33:19
35:20 36:22 40:20
49:11,17

**movement**
33:21 36:9 40:18

**moving**
27:10 38:9 51:18

**N**

**N95**
42:25

**nails**
27:2

**naive**
46:15

**nation**
45:24 48:7

**national**
51:1

**nature**
41:4

**necessarily**
35:19

**necessity**
52:3

**needed**
27:19

**neglecting**
41:21

**neighbor**
55:12

**net**
28:7 29:12

**news**
40:13 54:5

**NEWSOM**
38:11 42:20 45:20
49:18 50:16 52:17

**non-essential**
32:18

**nonetheless**
39:8

**noon**
55:19

**number**
43:14 48:20 51:13 53:7,
14,19

**numbers**
39:18,21 40:14,16,24
51:15

**nurses**
51:3

**nursing**
50:11,20,22 51:7,12

**O**

**obligation**
44:11

**occurred**
30:16,19 35:25

**Officer**
34:18

**officers**
35:3,6

**offices**
28:22

**open**
27:20 31:1 32:8 42:1

**opened**
43:15

**opening**
28:16 29:2 36:25

**opportunities**
31:7,12 32:12

**opportunity**
34:15 37:9

**optimism**
48:3

**optimistic**
49:8

**order**
27:10 34:25 35:9 36:24
49:22

**orders**
33:15 34:23 35:20 49:5

**organized**
51:4

**outdoor**
29:6

**outlier**
45:10

**overly**
45:10

**overnight**

49:24

**P**

**pace**
34:23

**pandemic**
52:6 55:9

**panoply**
43:4,10

**parents**
31:3 45:6

**parks**
29:3

**part**
28:20 33:3 37:11,13,19
51:17

**parti-**
31:24

**participate**
42:2

**partners**
49:3

**parts**
40:17

**party**
56:10

**passion**
42:5 44:4 55:17

**past**
45:14

**patient**
51:9

**patients**
33:23

**peak**
40:1 45:12,15

**people**
27:4,6,10 28:5 31:18,
21,23 32:23,25 35:20
36:12,18 37:3 38:19
40:4 44:16 50:2 52:9,16
54:16 55:3

**percent**
40:11,12

**percentage**
48:19

**person**
37:24

**personal**
36:11 43:1

**personnel**
53:10

**pessimistic**
45:11 49:7

**phase**
38:15,16 44:8 51:18

**phases**
36:7

**phone**
32:24

**physical**
28:3,11 29:7,11 32:17
37:17 43:25 49:21 52:3

**pickup**
28:18

**place**
27:12 29:21 31:17 32:6,
13 35:14 36:18 37:6
53:13

**places**
28:23 32:10 36:11,12

**planning**
30:2 37:9 48:25

**plans**
34:8 49:4

**Plante**
52:11

**point**
27:8 38:14 44:4 48:10
50:15

**points**
49:17 55:1

**policies**
31:17

**Politico**
51:22

**pop-up**
43:14

**population**
37:4

**position**
33:15

**positive**
40:9 48:19 51:8

**positives**
40:7

**possibility**
47:17

**potential**
32:20

**potentially**
30:9

**power**
54:3,22

**PPE**
27:17,21 28:8 33:24
42:24 43:9,17,24 50:25

**PPP**
50:25

**PR**
28:23

**practice**
32:16 37:17

**precautions**
32:16

**precise**
48:9

**predict**
41:8

**preemptively**
45:22

**prepare**
31:23

**preparedness**
27:13

**preparing**
48:15,21

**prescriptive**
39:12

**presence**
52:4

**presented**

38:15

**presenting**
46:8

**press**
44:12

**prevalence**
38:22

**previous**
46:2 53:16

**principal**
51:19

**printing**
44:12

**priorities**
50:19

**priority**
50:24

**private**
47:11

**privately**
47:10

**procedural**
42:25

**procedures**
42:24 43:9

**proceedings**
56:3

**process**
27:5

**programs**
30:8

**progress**
44:10 51:20

**projecting**
45:12

**promised**
42:16

**prospects**
41:19

**protect**
37:15

**protecting**
30:17 39:13,14

**protective**
43:1

**protocols**
43:8

**provide**
30:12 31:19,21 37:25
46:20 55:13

**providers**
42:14,19

**providing**
29:13 30:23 38:5

**provisions**
36:18

**proximity**
27:4

**PUA**
52:14 53:4 54:6,20
55:10

**PUAS**
53:24 54:4,5

**public**
29:3 34:17 46:16

**purchase**
42:15

**put**
27:6 36:18 37:25 38:24
43:16 45:21 48:4 53:13
54:6

**putting**
54:1

---

## Q

**quality**
44:17 46:24

**question**
43:20 44:24 45:23 46:4
47:16,23 50:7 51:17,21
52:15

**questions**
38:13 42:1,9 51:24

**quickly**
47:11 52:9 53:6

---

## R

**racial**
41:14

**radically**
49:23,25

**Radio**
44:23

**raise**
40:24

**rate**
40:11

**reach**
50:15

**ready**
32:5 33:4 35:10

**real**
40:4 41:13 51:20 55:17

**realities**
41:22

**reality**
44:11 49:25

**realize**
30:1

**realtime**
41:2 45:23

**reason**
35:17 44:20 46:6 47:9

**recently**
43:15

**recognize**
44:19

**record**
56:3,6

**red**
41:1

**redirecting**
51:1

**reduce**
31:21

**reduces**
38:7

**refer**
33:5

**regional**
34:15 35:11,16

**reinforce**
39:18

**reinforcing**
46:3

**relates**
39:19,21 43:11 46:5
52:18 53:4 55:5

**relationship**
44:21

**relationships**
27:3

**relative**
40:17 56:9

**relax**
34:22

**religious**
36:16

**rely**
27:21 38:8

**remain**
33:14

**remind**
28:9 37:5 41:3 49:20

**reminded**
28:12

**reminder**
42:1

**remiss**
45:1

**remote**
52:2

**Renae**
56:1,15

**reopen**
38:7

**reopening**
39:2 45:2 51:24,25

**repeat**
53:22

**replacement**
32:3

**Reporter**

56:2

**represent**
53:2

**require**
27:12 52:6

**resolve**
50:6

**respect**
35:4,18 41:17 42:4
52:24

**respond**
33:22

**responsibility**
54:14

**result**
30:16

**retail**
28:17 42:4

**retrained**
51:3

**risk**
27:6,11 28:13,15,25
31:13,21,25 32:5,24
33:17 36:6,20,25 38:8,
24 39:1,2,3

**robust**
41:19

**roll**
30:3 47:3

**roughly**
39:25

**roundtable**
42:3

**rural**
46:23

---

**S**

**Sac**
50:8

**safe**
28:2,5 30:21,22,23
31:25 36:1,11 37:3 38:3
55:13,18

**safer**
28:13 29:6,23

**safest**
32:13

**safety**
27:13 28:7 29:12 32:16

**sanitization**
43:25

**satisfied**
50:15

**school**
29:20 30:8,23 31:5
41:17,20 47:6,19

**schools**
29:18 31:1 38:7 41:12
45:3

**science**
35:7

**scientific**
31:22

**screen**
39:19

**season**
45:5

**seasonal**
43:7

**sector**
28:21 31:10 43:9,16
44:20

**sector-by-sector**
42:2

**sectors**
27:20 37:22 39:2,14,15,
16 41:9

**secure**
34:4

**secured**
27:18

**senior**
55:12

**sense**
38:19 40:15 50:4

**service**
43:5

**services**
30:24 36:16 43:21

**shape**
43:23

**share**
33:9 55:17

**shared**
48:5

**shields**
42:25

**short**
41:8

**shorthand**
56:1,4

**shortly**
38:1

**sic**
40:2

**sick**
29:13 31:18 32:4

**Similarly**
35:8

**simply**
46:24

**site**
54:8

**sites**
43:18 51:8 54:6

**sitting**
36:13

**size**
44:1

**skilled**
50:20,22 51:7,12

**sleeves**
30:4

**slightly**
40:14

**SNF**
51:11

**sober**
41:4

**Social**
43:21

**socialize**
47:11

**socially**
33:1

**socioeconomic**
41:14

**solution**
33:3 37:11,19

**sooner**
30:9 46:14 50:4

**Sophia**
50:7 51:6

**sort**
32:9

**Sovern**
44:23,24

**space**
36:5,15,21 44:10 50:23,
24,25 51:2,11 55:4

**spaces**
29:3,7

**speaker**
42:10 44:23 50:7 51:21
52:2,22

**specific**
35:23 46:12 50:10

**specifically**
45:3

**speed**
46:25

**spikes**
40:23

**sporting**
36:13

**spread**
38:22 41:23 46:9

**stabilization**
39:20 48:16

**stable**
33:14 40:14,16 54:9

**stadiums**
39:6

**staff**
51:9,14

**stage**
27:1,8,13,19 28:14 31:9
33:4,8,19 34:22 35:13

36:5,23 37:7 39:4 46:11
47:13

**stages**
33:8 36:4

**stand**
49:10

**start**
28:14 32:8 40:22,24
42:23 47:5 54:4

**started**
30:6 48:6

**starting**
30:9

**state**
34:17,25 40:7 43:8
44:6,12 45:14,24 46:2,
22 48:21 49:2 53:3
54:17 56:2

**State's**
44:25

**states**
54:6

**statewide**
34:11 35:13

**stats**
40:3

**status**
42:18 50:11

**stay**
29:14 31:18 32:3 37:12,
13 55:18

**stay-at-home**
27:10 31:11 33:15
34:25 35:9 36:24 49:22

**staying**
32:13 37:6,12

**store**
37:16

**stores**
27:17

**strengthen**
39:18

**stricter**
34:23 35:4

**strokes**

41:24

**strong**
54:17

**strongly**
29:23

**subject**
43:13

**subscribed**
56:12

**substantial**
42:24 44:5 53:18

**substantially**
38:21

**sufficient**
34:5

**summer**
30:8 47:19

**Sunday**
53:22,23

**Superintendent**
46:16

**supplies**
42:15,22,23

**supply**
50:25

**support**
32:12,23 33:22,25
42:19 43:4 46:19 51:1
55:14

**supported**
29:14 35:11

**supporting**
30:24 55:7

**supportive**
43:4

**supposed**
52:13

**suppression**
39:22

**surge**
27:23 33:18 45:13

**surprising**
53:24

**surrounding**

35:24

**surveillance**
35:14 40:23

**system**
35:14 53:21

———————

**T**

**tablets**
46:19

**tackle**
53:6

**takes**
43:23 54:7

**talk**
29:19 34:14 48:6 53:15

**talked**
42:12,14 53:11,12,13

**talking**
28:22 29:2 30:8,11
34:24 36:6 47:25

**task**
50:18

**teachers**
30:22

**team**
54:2

**technology**
53:12

**telework**
28:24

**tells**
32:7

**temporary**
44:1

**tens**
39:5

**terms**
39:11,12 40:2 46:5
54:10

**test**
51:8

**tested**
40:9

**testing**

27:16 34:6 48:18 50:10,
12,14,18,24 51:19

**tests**
48:20

**texting**
53:12

**therapeutics**
27:12

**thing**
32:20 35:5 37:10,18,20

**things**
27:1,14 28:12,17,19,23
29:3 31:14 36:15 37:17
39:12 49:10

**thinking**
28:3 30:4 33:2,10 45:4
47:5

**thoughtful**
27:5

**thoughtfully**
33:13

**thousands**
39:6 46:19

**throwing**
51:15

**time**
27:23 30:19 32:13 37:1,
2,6,7,9 39:7 41:8 42:5
45:19 46:13 53:15 55:7

**times**
54:23

**today**
38:15 39:24 40:7,12,14
41:25 42:4,11 46:7
52:10,22 53:24 54:1,2,9

**today's**
39:20 48:13

**tomorrow**
54:9 55:19

**tool**
48:25

**top**
50:19 53:10 54:25

**topic**
34:16

**torn**
40:3

**total**
51:12,13 53:14

**toys**
28:19

**tracing**
27:16 34:11

**tracking**
48:2 52:23

**trails**
29:3

**transcribed**
56:5

**transcript**
56:6

**transcription**
56:7

**transmission**
35:25

**travel**
32:19

**trends**
33:13

**true**
56:6

**truth**
50:17

**turnaround**
54:10

**turns**
41:1

**tweaked**
45:14

**Twitter**
52:10,15

**types**
35:15

**U**

**UI**
53:4

**UIS**
54:4

**ultimately**
29:2 31:1 36:21 38:6

**understand**
35:6,15,22,25 37:9

**understanding**
34:19

**unemployment**
52:14 54:18 55:9

**universe**
51:11

**unprecedented**
54:12,14,23

**unprepared**
52:12

**update**
48:11 50:10 51:7

**updated**
45:21

**updating**
49:15

**urban**
46:23

**usable**
49:16

**USNS**
51:3

**V**

**vaccinations**
37:4

**variation**
35:12,16

**variations**
34:15

**venues**
36:12

**virtual**
43:12

**virus**
31:23 35:18 41:23

**visits**
48:17

**volume**
53:19 54:13

**volunteer**
42:5

**voting**
52:2

**W**

**wage**
32:3

**wanted**
37:8

**warranted**
41:20

**Washington**
46:3

**watching**
33:12

**ways**
30:12

**website**
38:1 42:7,8 52:11 55:17

**weddings**
36:17

**week**
40:1 46:15 53:16

**weekly**
45:22

**weeks**
32:6 38:16,17 39:3
40:20 41:10 42:13
46:10 47:12,15,25 48:5,
15,21 49:11 53:17 54:7

**well-known**
45:25

**WHEREOF**
56:11

**wife**
46:16

**Wifi**
46:17

**willingness**
55:11

**woefully**
52:12

**women**
51:2

**Women's**
43:12

**wonderful**
43:11

**wondering**
45:13 50:9

**woods**
40:16

**work**
28:3 29:16,19 31:4
32:10 34:7,8 36:7,22
37:8 38:3 41:9 44:16,18
46:13,14,17 54:14

**workers**
28:7 29:13 32:3,10
43:3,5,6,7 44:2

**workflows**
28:4

**workforce**
30:13 37:13 39:14

**working**
34:11 36:2 37:14 43:8,
22

**workplaces**
28:2,15,16 31:13 32:5
36:7,25 38:3

**worst**
45:15

**wrong**
45:16

**Y**

**year**
30:9 41:17,20 44:5,7
47:6

**yesterday**
39:23 40:6,9,15 43:12
46:1 53:9,16

**younger**
29:20

**EXHIBIT F**

# Governor Newsom Provides Update on California's Progress Toward Stage 2 Reopening

Published: May 04, 2020

---

*Governor issues Report Card on state's progress in fighting COVID-19*

*Governor's Report Card indicates California will be prepared to move into the early phase of Stage 2 of reopening this Friday, May 8*

*Stage 2 allows gradual reopening of lower-risk workplaces with adaptations including bookstores, clothing stores, florists and sporting goods stores, with modifications*

*Governor also announces new framework to allow counties to move more quickly through Stage 2 if they attest that they meet the state's readiness criteria*

*State announces accelerated action to secure contact tracing capacity*

SACRAMENTO – As the state continues implementation of the four-stage framework to allow Californians to gradually reopen some lower-risk businesses and public spaces while continuing to preserve public health, Governor Gavin Newsom today announced that based on the state's progress in meeting metrics tied to indicators, the state can begin to move into Stage 2 of modifying the stay at home order this Friday, May 8, with guidelines released Thursday, May 7. The Governor released a Report Card showing how the state has made progress in fighting COVID-19 in a number of categories such as stabilized hospitalization and ICU numbers and acquiring PPE.

"Millions of Californians answered the call to stay home and thanks to them, we are in a position to begin moving into our next stage of modifying our stay at home order," said Governor Newsom. "But make no mistake – this virus isn't gone. It's still dangerous and poses a significant public health risk. As we move into the next stage of reopening, we will do so with updated guidance to help qualifying businesses make modifications needed to lower the risk of COVID-19 exposure to customers and workers. Californians should prepare now for that second stage of reopening."

**State Report Card**

The Governor also issued a state "Report Card" for how the state is doing in meeting key measures for moving into Stage 2. California is on track on the following statewide metrics:

- Stability of Hospitalizations
- Personal Protective Equipment Inventory
- Health Care Surge Capacity
- Testing Capacity
- Contact Tracing Capability
- Public Health Guidance in Place



California Department of Public Health Director and state Public Health Officer Dr. Sonia Angell presented on the state's Report Card today to underscore the data driving the move into the next stage.

**What's in Early Stage 2**

Later this week the state will release public health guidance for certain Stage 2 sectors including some retail, manufacturing, and logistics businesses, which will outline modifications that lower the risk of transmission. Businesses and employers in those sectors will be able to reopen as soon as Friday – if they can meet the guidelines provided by the state. Not all Stage 2 businesses will be able to open Friday with modifications. Some examples of businesses that can open with modifications include bookstores, clothing stores, florists and sporting goods stores.

Other Stage 2 sectors, such as offices and dine-in restaurants, will be part of a later Stage 2 opening. The announcement for Friday does not include offices, seated dining at restaurants, shopping malls or schools. As the Governor noted last week, the state is working with school districts and the California education community to determine how best and safely to reopen. That continues to be the case – this May 8 announcement does not

move up this timeline.

While the state will be moving from Stage 1 to Stage 2, counties can choose to continue more restrictive measures in place based on their local conditions, and the state expects some counties to keep their more robust stay at home orders in place beyond May 8.

**Regional Variation**

The Governor also announced today that while the state is moving into Stage 2 together, counties can move more quickly through Stage 2, if they attest that they meet the state's readiness criteria. Counties must create and submit a readiness plan which the state will make publicly available.

The Governor signed an executive order today directing the State Public Health Officer to establish criteria to determine whether and how, in light of local conditions, local health officers may implement public health measures less restrictive than the statewide public health directives. Counties must meet criteria including demonstrating they have a low prevalence of COVID-19, that they meet testing and contact tracing criteria, that their health care system is prepared in case they see a sudden rise in cases, and that they have plans in place to protect vulnerable populations. The state will outline these criteria in the coming days. The text of the Governor's executive order can be found here and a copy can be found here.

**Contact Tracing**

Contact tracing enables the state to suppress the spread of the virus to avoid outbreaks and allows us to maintain our health care capacity and confidently modify the stay at home order. To work toward these goals, the Governor announced a partnership with the University of California, San Francisco and University of California, Los Angeles to immediately begin training workers for a landmark contact tracing program that will help contain the ongoing COVID-19 pandemic while the state looks to modify the stay at home order. The partnership will include a virtual training academy for contact tracers. The first 20-hour training will begin Wednesday, May 6 with the goal of training 20,000 individuals in two months.

###

**EXHIBIT G**

2020 WL 2111316
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

MARYVILLE BAPTIST CHURCH, INC.;
Dr. Jack Roberts, Plaintiffs-Appellants,

v.

Andy BESHEAR, in his official capacity
as Governor of the Commonwealth
of Kentucky, Defendant-Appellee.

No. 20-5427
|
Decided and Filed: May 2, 2020 *

---

\*     This decision was originally filed as an
unpublished order on May 2, 2020. The court
has now designated the order for publication.

Appeal from the United States District Court for the Western
District of Kentucky at Louisville. No. 3:20-cv-00278—
David J. Hale, District Judge.

**Attorneys and Law Firms**

ON BRIEFS: Matthew D. Staver, Horatio G. Mihet,
Roger K. Gannam, LIBERTY COUNSEL, Orlando, Florida,
for Appellants; Carmine G. Iaccarino, OFFICE OF
THE KENTUCKY ATTORNEY GENERAL, Frankfort,
Kentucky, for Amicus Curiae in support of Appellants. S.
Travis Mayo, OFFICE OF THE GOVERNOR, Frankfort,
Kentucky, for Appellee; Richard B. Katskee, Alex J.
Luchenitser, AMERCIANS UNITED FOR SEPARATION
OF CHURCH AND STATE, Washington, D.C., for Amicus
Curiae in support of Appellee.

Before: SUTTON, McKEAGUE, and NALBANDIAN,
Circuit Judges.

## ORDER

PER CURIAM.

**\*1** Maryville Baptist Church and its pastor, Dr. Jack Roberts,
appeal the district court's order denying their emergency
motion for a temporary restraining order. The Church claims
that the district court's order effectively denied their motion
for a preliminary injunction to stop Governor Andy Beshear
and other Commonwealth officials from enforcing and
applying two COVID-19 orders. The orders, according to
the Church, prohibit its members from gathering for drive-
in and in-person worship services regardless of whether they
meet or exceed the social distancing and hygiene guidelines
in place for permitted commercial and other non-religious
activities. The Church moves for an injunction pending
appeal, which the Attorney General supports as amicus
curiae. The Governor opposes the motion.

Governor Beshear issued two pertinent COVID-19 orders.
The first order, issued on March 19, prohibits "[a]ll mass
gatherings," "including, but not limited to, community, civic,
public, leisure, faith-based, or sporting events." R. 1-5 at
1. It excepts "normal operations at airports, bus and train
stations, ... shopping malls and centers," and "typical office
environments, factories, or retail or grocery stores where large
numbers of people are present, but maintain appropriate social
distancing." *Id.*

The second order, issued on March 25, requires organizations
that are not "life-sustaining" to close. R. 1-7 at 2. According
to the order, religious organizations are not "life-sustaining"
organizations, except when they function as charities by
providing "food, shelter, and social services." *Id.* at 3.
Laundromats, accounting services, law firms, hardware
stores, and many other entities count as life-sustaining.

On April 12, Maryville Baptist Church held a drive-in
Easter service. Congregants parked their cars in the church's
parking lot and listened to a sermon over a loudspeaker.
Kentucky State Police arrived in the parking lot and issued
notices to the congregants that their attendance at the drive-
in service amounted to a criminal act. The officers recorded
congregants' license plate numbers and sent letters to vehicle
owners requiring them to self-quarantine for 14 days or be
subject to further sanction.

The Church says these orders and enforcement actions violate
its congregants' rights under Kentucky's Religious Freedom
Restoration Act and the free-exercise guarantee of the First
and Fourteenth Amendments to the U.S. Constitution.

We have jurisdiction over the appeal. "Interlocutory orders
of the district courts of the United States ... granting,
continuing, modifying, refusing or dissolving injunctions"
are immediately appealable. 28 U.S.C. § 1292(a)(1). As a
general rule, we do not entertain appeals from a district
court's decision to grant or deny a temporary restraining order.

That's because temporary restraining orders are usually "of short duration and usually terminate with a prompt ruling on a preliminary injunction, from which the losing party has an immediate right of appeal." *Ne. Ohio Coal. for the Homeless & Serv. Emps. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1005 (6th Cir. 2006). But usually is not always, and the label a district court attaches to an order does not control. When an order "has the practical effect of an injunction," *id.*, and an appeal "further[s] the statutory purpose of permit[ting] litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence," *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981), we will review it. We also tend to wait until the claimant seeks a stay from the district court, and the court rules on it. Claimants sought a stay on April 30. The district court has not yet ruled. But one explanation for the stay motion is tomorrow's Sunday service. Under these circumstances, no one can fairly doubt that time is of the essence. The case will become moot just over three Sundays from now, May 20, when the Governor has agreed to permit places of worship to reopen. And the district court's order has the practical effect of denying the Church's motion for a preliminary injunction, especially if no service, whether drive-in or in-person, is allowed in the interim.

**\*2** We review four factors when evaluating whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quotation omitted).

*Likelihood of success.* The Church is likely to succeed on its state and federal claims, especially with respect to the ban's application to drive-in services. Start with the claim under Commonwealth law—Kentucky's Religious Freedom Restoration Act. "Government shall not substantially burden" a person's "right to act ... in a manner motivated by a sincerely held religious belief," it guarantees, "unless the government proves by clear and convincing evidence" that it "has used the least restrictive means" to further "a compelling governmental interest in infringing the specific act." Ky. Rev. Stat. § 446.350. The point of the law is to exercise an authority every State has: to provide more protection for religious liberties at the state level than the U.S. Constitution provides at the national level. In this instance, the purpose of the

Kentucky RFRA is to provide more protection than the free-exercise guarantee of the First Amendment, as interpreted by *Employment Division v. Smith*, 494 U.S. 872 (1990). The Kentucky requirements parallel in large measure the RFRAs enacted by other States and one enacted by Congress, all of which share the goal of imposing strict scrutiny on laws that burden sincerely motivated religious practices. *See, e.g.*, Tex. Civ. Prac. & Rem. § 110.003; *see* 42 U.S.C. § 2000bb-1.

Application of this test requires little elaboration in most respects. The Governor's actions substantially burden the congregants' sincerely held religious practices—and plainly so. Religion motivates the worship services. And no one disputes the Church's sincerity. Orders prohibiting religious gatherings, enforced by police officers telling congregants they violated a criminal law and by officers taking down license plate numbers, amount to a significant burden on worship gatherings. *See Gonzales v. O Centro Espirita Beneficiente Uniao*, 546 U.S. 418, 428–32 (2006); *Barr v. City of Sinton*, 295 S.W.3d 287, 301 (Tex. 2009). At the same time, the Governor has a compelling interest in preventing the spread of a novel, highly contagious, sometimes fatal virus. All accept these conclusions.

The likelihood-of-success inquiry instead turns on whether Governor Beshear's orders were "the least restrictive means" of achieving these public health interests. Ky. Rev. Stat. § 446.350. That's a difficult hill to climb, and it was never meant to be anything less. *See Barr*, 295 S.W.3d at 289; *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). The way the orders treat comparable religious and non-religious activities suggests that they do not amount to the least restrictive way of regulating the churches. The orders permit uninterrupted functioning of "typical office environments," R. 1-5 at 1, which presumably includes business meetings. How are in-person meetings with social distancing any different from drive-in church services with social distancing? Kentucky permits the meetings and bans the services, even though the open-air services would seem to present a lower health risk. The orders likewise permit parking in parking lots with no limit on the number of cars or the length of time they are there so long as they are not listening to a church service. On the same Easter Sunday that police officers informed congregants they were violating criminal laws by sitting in their cars in a parking lot, hundreds of cars were parked in grocery store parking lots less than a mile from the church. The orders permit big-lot parking for secular purposes, just

not for religious purposes. All in all, the Governor did not narrowly tailor the order's impact on religious exercise.

**\*3** In responding to the state and federal claims, the Governor denies that the ban applies to drive-in worship services, and the district court seemed to think so as well. But that is not what the Governor's orders say. By their terms, they apply to "[a]ll mass gatherings," "including, but not limited to, ... faith-based ... events." R. 1-5 at 1. In deciding to open up faith-based events on May 20, and to permit other events before then such as car washes and dog grooming, *see Healthy at Work: Phase 1 Reopening*, https://govstatus.egov.com/ky-healthy-at-work (last visited May 2, 2020), the Governor did not say that drive-in services are exempt. And that is not what the Governor has done anyway. Consistent with the Governor's threats on Good Friday, state troopers came to the Church's Easter service, told congregants that they were in violation of a criminal law, and took down the license plate numbers of everyone there, whether they had participated in a drive-in or in-person service.

It bears noting that neither the Governor nor the Attorney General has raised sovereign immunity as a defense to this claim. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). That is within their rights, *see Wis. Dep't. of Corr. v. Schacht*, 524 U.S. 381, 389 (1998), and perhaps springs from a commendable recognition that, with or without a pandemic, no one wants to ignore state law in creating or enforcing these orders.

The Governor's orders also likely "prohibit[ ] the free exercise" of "religion" in violation of the First and Fourteenth Amendments, especially with respect to drive-in services. U.S. Const amends. I, XIV; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). On the one hand, a generally applicable law that incidentally burdens religious practices usually will be upheld. *See Smith*, 494 U.S. at 878–79; *New Doe Child #1 v. Congress of the United States*, 891 F.3d 578, 591–93 (6th Cir. 2018). On the other hand, a law that discriminates against religious practices usually will be invalidated unless the law "is justified by a compelling interest and is narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 553 (1993).

Discriminatory laws come in many forms. Outright bans on religious activity alone obviously count. So do general bans that cover religious activity when there are exceptions for comparable secular activities. *See Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012); *see also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365–67 (3d Cir. 1999). As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law.

*Ward*, 667 F.3d at 738. "At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Id.* at 740. As just shown, the Governor's orders do not seem to survive strict scrutiny, particularly with respect to the ban on outdoor services. The question, then, is one of general applicability.

The Governor's orders have several potential hallmarks of discrimination. One is that they prohibit "faith-based" mass gatherings by name. R. 1-5 at 1. But this does not suffice by itself to show that the Governor singled out faith groups for disparate treatment. The order lists many other group activities, and we accept the Governor's submission that he needed to mention faith groups by name because there are many of them, they meet regularly, and their ubiquity poses material risks of contagion.

The real question goes to exceptions. The Governor insists at the outset that there are "no exceptions at all." Appellee Br. at 21. But that is word play. The orders allow "life-sustaining" operations and don't include worship services in that definition. And many of the serial exemptions for secular activities pose comparable public health risks to worship services. For example: The exception for "life-sustaining" businesses allows law firms, laundromats, liquor stores, and gun shops to continue to operate so long as they follow social-distancing and other health-related precautions. R. 1-7 at 2–6. But the orders do not permit soul-sustaining group services of faith organizations, even if the groups adhere to all the public health guidelines required of essential services and even when they meet outdoors.

**\*4** We don't doubt the Governor's sincerity in trying to do his level best to lessen the spread of the virus or his authority to protect the Commonwealth's citizens. *See Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905). And we agree that no one, whether a person of faith or not, has a right "to expose the community ... to communicable disease." *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944). But restrictions

inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom. Assuming all of the same precautions are taken, why is it safe to wait in a car for a liquor store to open but dangerous to wait in a car to hear morning prayers? Why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister? The Commonwealth has no good answers. While the law may take periodic naps during a pandemic, we will not let it sleep through one.

Sure, the Church might use Zoom services or the like, as so many places of worship have decided to do over the last two months. But who is to say that every member of the congregation has access to the necessary technology to make that work? Or to say that every member of the congregation must see it as an adequate substitute for what it means when "two or three gather in my Name." Matthew 18:20; *see also* *On Fire Christian Ctr., Inc. v. Fischer*, No. 3:20-CV-264-JRW, 2020 WL 1820249, at *7–8 (W.D. Ky. Apr. 11, 2020). As individuals, we have some sympathy for Governor DeWine's approach—to allow places of worship in Ohio to hold services but then to admonish them all (we assume) that it's "not Christian" to hold in-person services during a pandemic. Doral Chenoweth III, *Video: Dewine says it's "not Christian" to hold church during coronavirus*, Columbus Dispatch, April 1, 2020. But this is not about sympathy. And it's exactly what the federal courts are not to judge—how individuals comply with their own faith as they see it. *Smith*, 494 U.S. at 886–87.

Keep in mind that the Church and Dr. Roberts do not seek to insulate themselves from the Commonwealth's general public health guidelines. They simply wish to incorporate them into their worship services. They are willing to practice social distancing. They are willing to follow any hygiene requirements. They are not asking to share a chalice. The Governor has offered no good reason so far for refusing to trust the congregants who promise to use care in worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same. Are they not often the same people, going to work on one day and attending worship on another? If any group fails, as assuredly some groups have failed in the past, the Governor is free to enforce the social-distancing rules against them for that reason.

The Governor claims, and the district court seemed to think so too, that the explanation for these groups of people to be in the same area—intentional worship—distinguishes them from groups of people in a parking lot or a retail store or an airport or some other place where the orders allow many people to be. We doubt that the reason a group of people go to one place has anything to do with it. Risks of contagion turn on social interaction in close quarters; the virus does not care why they are there. So long as that is the case, why do the orders permit people who practice social distancing and good hygiene in one place but not another? If the problem is numbers, and risks that grow with greater numbers, then there is a straightforward remedy: limit the number of people who can attend a service at one time.

*Other factors.* Preliminary injunctions in constitutional cases often turn on likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam). That's true here with respect to the ban on drive-in worship services. As for harm to the claimants, the prohibition on attending any worship service this Sunday and the Sundays through May 20 assuredly inflicts irreparable harm. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). As for harm to others, an injunction appropriately permits religious services with the same risk-minimizing precautions as similar secular activities, and permits the Governor to enforce social-distancing rules in both settings. As for the public interest, treatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees. *See* *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012).

**\*5** The balance is more difficult when it comes to in-person services. Allowance for drive-in services this Sunday mitigates some harm to the congregants and the Church. In view of the fast-moving pace of this litigation and in view of the lack of additional input from the district court, whether of a fact-finding dimension or not, we are inclined not to extend the injunction to in-person services at this point. We realize that this falls short of everything the Church has asked for and much of what it wants. But that is all we are comfortable doing after the 24 hours the plaintiffs have given us with this case. In the near term, we urge the district court to prioritize resolution of the claims in view of the looming May 20 date and for the Governor and plaintiffs to consider acceptable alternatives. The breadth of the ban on religious services, together with

a haven for numerous secular exceptions, should give pause to anyone who prizes religious freedom. But it's not always easy to decide what is Caesar's and what is God's—and that's assuredly true in the context of a pandemic.

Accordingly, the plaintiffs' motion for an injunction pending appeal, and their motion to expedite briefing, oral argument and submission on the briefs, is **GRANTED IN PART**. The Governor and all other Commonwealth officials are hereby enjoined, during the pendency of this appeal, from enforcing orders prohibiting drive-in services at the Maryville Baptist Church if the Church, its ministers, and its congregants adhere to the public health requirements mandated for "life-sustaining" entities.

**All Citations**

--- F.3d ----, 2020 WL 2111316

---

End of Document    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT H

**2020 WL 1820249**
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky.

ON FIRE CHRISTIAN CENTER, INC., Plaintiff

v.

Greg FISCHER, et al., Defendants

CIVIL ACTION NO. 3:20-CV-264-JRW
|
Signed 04/11/2020

**Synopsis**
**Background:** After city, citing the need for social distancing during the COVID-19 pandemic, ordered persons not to attend religious services, even if congregants remained in their cars to worship, Christian church filed lawsuit and sought temporary restraining order (TRO) to prevent city from enforcing the prohibition against drive-in Easter services.

**Holdings:** The District Court, Justin R. Walker, J., held that:

under the circumstances, the court could issue the TRO without notice to city;

church was not required to post a security; and

given the strong likelihood of success on the merits of church's federal and state Free Exercise claims, as well as its Kentucky statutory claims, the requirements for a TRO were satisfied.

Motion granted.

**Procedural Posture(s):** Motion for Temporary Restraining Order (TRO).

**Attorneys and Law Firms**

Andrew Miller, Hyun-Soo Lim, Kevin Gallagher, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, Hiram A. Sasser, III, Roger Byron, First Liberty Institute, Plano, TX, J. Brooken Smith, Michael G. Swansburg, Jr., Swansburg & Smith PLLC, Louisville, KY, Matthew T. Martens, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, for Plaintiff.

## TEMPORARY RESTRAINING ORDER

Justin R. Walker, District Judge

**\*1** 1. The Court **GRANTS** the motion for a temporary restraining order filed by On Fire Christian Center, Inc. ("On Fire") against Mayor Greg Fischer and the City of Louisville (together, "Louisville").

2. The Court **ENTERS** this Temporary Restraining Order on Saturday, April 11, 2020 at 2:00 P.M. [1]

[1]    Fed. R. Civ. P. 65(b)(2).

3. The Court **ENJOINS** Louisville from enforcing; attempting to enforce; threatening to enforce; or otherwise requiring compliance with any prohibition on drive-in church services at On Fire. [2]

[2]
>    As a general rule, a court's injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."
>
>    *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). But Louisville ought not to view the limits of this injunction as a green light to violate the religious liberty of non-
>
>    parties. *Cf.*    42 U.S.C. § 1983.

4. Unless the Court enters this Temporary Restraining Order, the members of On Fire will suffer irreparable harm. [3] The government plans to substantially burden their religious practice on one of the most important holidays of the Christian calendar, Easter Sunday. [4]

[3]
>    *Id.*

[4]    DN 1 ¶ 13.

5. Notice to Louisville before entering this Temporary Restraining Order isn't necessary. [5] The facts in On Fire's affidavit "clearly show that immediate and irreparable injury, loss, or damage will result to [On Fire] before [Louisville] may be heard in opposition." [6] J. Brooken Smith, On Fire's lawyer, certified that he sent Louisville a letter yesterday detailing their potential claims but didn't hear anything back. [7]

5    Fed. R. Civ. P. 65(b)(1).

6    Fed. R. Civ. P. 65(b)(1)(A).

7    Fed. R. Civ. P. 65(b)(1)(B); DN 3-1 #43.

6. The Court issued this Temporary Restraining Order without notice because Easter Sunday is less than one day away. [8] Providing notice to Louisville before entering this Temporary Restraining Order would be impractical in such a short period of time.

8    Fed. R. Civ. P. 65(b)(2).

7. On Fire does not need to post a security because enjoining Louisville from prohibiting drive-in church services at On Fire doesn't interfere with Louisville's rights. [9]

9    Fed. R. Civ. P. 65(c)

8. The Court **GRANTS** On Fire's request for Oral Argument. The Court will hold a telephonic hearing on the preliminary injunction motion on **April 14, 2020 at 11:00 A.M.** Counsel shall email Ms. Megan Jackson at Megan_Jackson@kywd.uscourts.gov for the hearing's call-in number and access code. Members of the public interested in listening to the hearing may also email Ms. Jackson.

9. The Court **ORDERS** On Fire's lawyers to serve a copy of this Temporary Restraining Order and Opinion on Mike O'Connell, Jefferson County Attorney.

## MEMORANDUM OPINION

On Holy Thursday, an American mayor criminalized the communal celebration of Easter.

That sentence is one that this Court never expected to see outside the pages of a dystopian novel, or perhaps the pages of *The Onion.* But two days ago, citing the need for social distancing during the current pandemic, Louisville's Mayor Greg Fischer ordered Christians not to attend Sunday services, even if they remained *in their cars* to worship – and even though it's *Easter*.

**\*2** The Mayor's decision is stunning.

And it is, "beyond all reason," unconstitutional. [10]

10

    *Cf. Jacobson v. Massachusetts,* 197 U.S. 11, 31, 25 S.Ct. 358, 49 L.Ed. 643 (1905).

\* \* \*

According to St. Paul, the first pilgrim was Abel. With Enoch, Noah, Abraham, Isaac, Jacob, and Sara, they "died in faith, not having received the promises" of God's promised kingdom. [11] But they saw "them afar off, and were persuaded of them, and embraced them, and confessed that they were strangers and pilgrims on the earth." [12]

11    Hebrews 11:13.

12    *Id.*

The Plymouth Colony's second Governor, William Bradford, alluded to St. Paul's pilgrims when he recalled, years later, his fellow colonists' departure from England. The land they were leaving was comfortable and familiar. The ocean before them was, for them, unknown and dangerous. So too was the New World, where half would not survive the first winter. [13] There were "mutual embraces and many tears," as they said farewell to sons, daughters, mothers, and fathers, too young or old or fearful or frail to leave the Old World. [14]

13    Patricia Deetz and James Deetz, *Mayflower Passenger Deaths, 1620-1621,* THE PLYMOUTH COLONY ARCHIVE PROJECT (Dec. 14, 2007), http://www.histarch.illinois.edu/plymouth/Maydeaths.html.

14    WILLIAM BRADFORD, HISTORY OF PLYMOUTH COLONY 60 (Charles Deane, 1948) https://www.google.com/books/edition/History_of_Plymouth_Plantation/tYecOANlcwwC?hl=en&gbpv=1&dq=inauthor:%22WILLIAM+BRADFORD%22&printsec=frontcover.

But they sailed west because west was where they would find what they wanted most, what they needed most: the liberty to worship God according to their conscience. "They knew they were pilgrims," wrote Bradford, "and looked not much on those things" left behind, "but lifted their eyes to heaven, their dearest country and quieted their spirits." [15]

15    *Id.* at 59 (modernized).

The Pilgrims were heirs to a long line of persecuted Christians, including some punished with prison or worse for the crime of celebrating Easter[16] — and an even longer line of persecuted peoples of more ancient faiths.[17] And although their notions of tolerance left more than a little to be desired,[18] the Pilgrims understood at least this much: *No* place, not even the unknown, is worse than *any* place whose state forbids the exercise of your sincerely held religious beliefs.

16    Tacitus' *Annals* 15:44, *available at* http://www.perseus.tufts.edu/hopper/text?doc=Tac.+Ann.+15.44&redirect=true.

17    *See, e.g., Exodus* 1:11-18.

18    Nathaniel Philbrick, *Mayflower* 177 (2006) ("It was the Puritans who led the way in persecuting the Quakers, but the Pilgrims were more than willing to follow along. As a Quaker sympathizer acidly wrote, the 'Plymouth-saddle is on the Bay horse,' and in 1660 Isaac Robinson, son of the late pastor John Robinson, was dis-enfranchised for advocating a policy of moderation to the Quakers.").

The Pilgrims' history of fleeing religious persecution was just one of the many "historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause" of our Constitution's First Amendment.[19] It provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...."[20]

19    *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (quoting *Bowen v. Roy*, 476 U.S. 693, 703, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986)).

20    U.S. Const. amend. I; *see also*, U.S. Const. amend. XIV ("No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.").

*3    At the time of that Amendment's ratification, religious liberty was among the American experiment's most audacious guarantees. For millennia, soldiers had fought and killed to impose their religious doctrine on their neighbors. A century before America's founding, in Germany alone, religious conflict took the lives of one out of every five men, women, and children.[21] But not so in America. "Among the reasons the United States is so open, so tolerant, and so free is that no person may be restricted or demeaned by government in exercising his or her religion."[22]

21    Jason Daley, *Researchers Catalogue the Grisly Deaths of Soldiers in the Thirty Years' War*, SMITHSONIANMAG.COM (Jun. 6, 2017), https://www.smithsonianmag.com/smart-news/researchers-catalogue-grisly-deaths-soldiers-thirty-years-war-180963531/.

22    *Burwell v. Hobby Lobby*, 573 U.S. 682, 739, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014) (Kennedy, J., concurring).

Of course, pockets of society have not always lived up to our nation's ideals. Slave owners flogged slaves for attending prayer meetings.[23] Murderous mobs drove the Latter Day Saints into Utah.[24] Bigotry toward Roman Catholics motivated a majority of states to enact Blaine Amendments.[25] Harvard University created a quota system to admit fewer Jewish students.[26] Five decades ago, a former member of the racist, anti-Semitic, and anti-Catholic Ku Klux Klan sat on the Supreme Court.[27] And just over three decades ago, another ex-Klansman was the Majority Leader of the United States Senate.[28]

23    Albert J. Raboteau, *The Secret Religion of the Slaves: They often risked floggings to worship God*, CHRISTIANITY TODAY https://www.christianitytoday.com/history/issues/issue-33/secret-religion-of-slaves.html (last accessed Apr. 11, 2020).

24    *See Mormon Pioneers*, PIONEERS, https://www.bbc.co.uk/religion/religions/mormon/history/pioneers_1.shtml. (last accessed Apr. 11, 2020).

25    *See* Jane G. Rainey, *Blaine Amendments*, THE FIRST AMENDMENT ENCYCLOPEDIA, https://www.mtsu.edu/first-amendment/article/1036/blaine-amendments (last accessed Apr. 11, 2020).

26    *Anti-Semitism in the U.S.: Harvard's Jewish Problem*, JEWISH VIRTUAL LIBRARY, https://www.jewishvirtuallibrary.org/harvard-s-jewish-problem (last accessed Apr. 11, 2020).

27    Kat Eschner, *This Supreme Court Justice Was a KKK Member*, SMITHSONIAN MAG., Feb. 27, 2017 https://www.smithsonianmag.com/smart-news/supreme-court-justice-was-kkk-member-180962254/ (last accessed Apr. 11, 2020).

28    *Robert C. Byrd, United States Senator*, https://www.britannica.com/biography/Robert-C-Byrd (last accessed Apr. 11, 2020).

Some of that bigotry was not state-sponsored. But in recent years, an expanding government has made the Free Exercise Clause more important than ever. It was not long ago, for example, that the government told the Supreme Court it can prohibit a church from choosing its own minister;[29] force religious business owners to buy pharmaceuticals they consider abortion-inducing;[30] and conscript nuns to provide birth control.[31] Even after the Supreme Court vacated lower court decisions – by 9-0, 5-4, and 8-0 margins – the Free Exercise Clause remains a too-often-tested bulwark against discrimination toward people of faith, from religious cakemakers to religious preschoolers.[32]

29    *See Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 185, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012).

30    *See Hobby Lobby*, 573 U.S. at 691, 134 S.Ct. 2751.

31    *See Zubik v. Burwell*, --- U.S. ----, 136 S.Ct. 1557, 194 L.Ed.2d 696 (2016).

32    *See Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Comm'n*, --- U.S. ----, 138 S.Ct. 1719, 201 L.Ed.2d 35 (2018); *Trinity Lutheran*

*Church v. Comer*, --- U.S. ----, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017).

**\*4** This state of affairs has severe implications for religious Americans, because "freedom means that all persons have the right to believe or strive to believe in a divine creator and a divine law."[33] But its importance extends beyond the liberty to worship. It threatens liberty of all kinds. That's because, as de Tocqueville wrote, "religion, which among the Americans never directly takes part in the government of society, must be considered as the first of their political institutions; for if it does not give them the taste for liberty, it singularly facilitates use of it."[34]

33    573 U.S. at 736, 134 S.Ct. 2751 (Kennedy, J., concurring).

34    Alexis De Tocqueville, *Democracy in America I* at 475, Eduardo Nolla (ed.) & James T. Schleifer (tr.) (2012); *cf.*, NORTHWEST ORDINANCE 1787 (those elected by our country's founding generation believed "religion" to be "necessary to ... the happiness of mankind") available at https://www.visitthecapitol.gov/exhibitions/artifact/northwest-ordinance-1787 (last accessed Apr. 11, 2020).

\* \* \*

That brings us to this case. "As we are all painfully aware, our nation faces a public health emergency caused by the exponential spread of COVID-19, the respiratory disease caused by the novel coronavirus SARS-CoV-2."[35] Four days ago, defendant Mayor of Louisville Greg Fischer said it was "with a heavy heart" that he was banning religious services, even if congregants remain in their cars during the service.[36] He asserted, "It's not really practical or safe to accommodate drive-up services taking place in our community."[37] Drive-through restaurants and liquor stores are still open.[38]

35    *In re Abbott*, 954 F.3d 728, ----, 2020 WL 1685929 *2 (5th Cir. 2020).

36    DN 3-4 (Savannah Fadens & Ben Tobin, *Church vs. State: Can Kentucky Governments Block Religious Gatherings Amid COVID-19?*, LOUISVILLE COURIER J. (Apr.

9, 2020) https://www.courier-journal.com/story/news/2020/04/09/coronavirus-kentucky-can-beshear-block-religious-gatherings/2972356001/ (last accessed April 9, 2020)).

37    *Id.*

38    Kentucky Attorney General Daniel Cameron has said, "As long as Kentuckians are permitted to drive through liquor stores, restaurants, and other businesses during the COVID-19 pandemic, the law requires that they must also be allowed to participate in drive-in church services, consistent with existing policies to stop the spread of COVID-19." Otts, Chris. FISCHER: POLICE WILL COLLECT LICENSE PLATES OF EASTER CHURCHGOERS, WDRB.com, https://www.wdrb.com/in-depth/fischer-police-will-collect-license-plates-of-easter-churchgoers/article_795c708a-7b6d-11ea-8e48-d7138b31add7.html (last accessed Apr. 10, 2020).

Two days ago, on Holy Thursday, the Mayor threatened church members and pastors if they hold a drive-in Easter service:

- "We are not allowing churches to gather either in person or in any kind of drive-through capacity."[39]

- "Ok so, if you are a church or you are a churchgoing member and you do that, you're in violation of the mandate from the governor, you're in violation of the request from my office and city government to not do that."[40]

- "We're saying no church worshiping, no drive-throughs."[41]

39    DN 1 ¶ 27 (quoting Greg Fischer, *Daily COVID-19 Briefing By Louisville Mayor Greg Fischer* (Apr. 9, 2020), https://www.wave3.com/2020/04/09/fischer-confirms-new-cases-more-deaths/ (embedded video)).

40    *Id.*

41    *Id.*

The same day, the Mayor's spokesperson said he would use the police to deter and disburse drive-in religious gatherings:

"Louisville Metro Police have been proactive about reaching out to those we've heard about, and discouraging organizers from proceeding."[42] She added, perhaps in an effort to be less threatening, "This is not a law enforcement matter, it's a community matter."[43] But the Louisville Metro Police are not Peace Corps volunteers or community organizers; their job *is* law enforcement. And the Mayor's spokesperson backed up the Mayor's threat to use the police with a request for "anyone who sees violations from our social distancing guidance to reach out to 311" to inform on their family, friends, and neighbors.[44]

42    DN 3-4 (Savannah Fadens & Ben Tobin, *Church vs. State: Can Kentucky Governments Block Religious Gatherings Amid COVID-19?*, LOUISVILLE COURIER J. (Apr. 9, 2020) https://www.courier-journal.com/story/news/2020/04/09/coronavirus-kentucky-can-beshear-block-religious-gatherings/2972356001/ (last accessed April 9, 2020)).

43    *Id.*

44    *Id.*; *cf.* George Orwell, 1984.

**\*5**  Yesterday, on Good Friday, the Mayor's threats continued:

- "In order to save lives, we must not gather in churches, drive-through services, family gatherings, social gatherings this weekend."[45]

- "If there are gatherings on Sunday, Louisville Metro Police Department will be there on Sunday handing out information detailing the health risks involved, and I have asked LMPD to record license plates of all vehicles in attendance."[46]

- "We will share that information with our public health department, so they can follow up with the individuals that are out in church and gathering in groups, which is clearly a very, very unsafe practice."[47]

45    COVID-19 Daily Briefing, 04-10-2020, https://www.facebook.com/MayorGregFischer/videos/514408469234775/.

46    Otts, Chris. FISCHER: POLICE WILL COLLECT LICENSE PLATES OF

EASTER CHURCHGOERS, WDRB.com, https://www.wdrb.com/in-depth/fischer-police-will-collect-license-plates-of-easter-churchgoers/article_795c708a-7b6d-11ea-8e48-d7138b31add7.html (last accessed Apr. 10, 2020).

47     Otts, Chris. FISCHER: POLICE WILL COLLECT LICENSE PLATES OF EASTER CHURCHGOERS, WDRB.com, https://www.wdrb.com/in-depth/fischer-police-will-collect-license-plates-of-easter-churchgoers/article_795c708a-7b6d-11ea-8e48-d7138b31add7.html (last accessed Apr. 10, 2020); *cf.* Wheatley, Kevin. PARTICIPANTS IN WEEKEND GATHERINGS MUST SELF-QUARANTINE FOR 2 WEEKS, GOV. BESHEAR SAYS, WDRB.COM, https://www.wdrb.com/news/participants-in-weekend-gatherings-must-self-quarantine-for-2-weeks-gov-beshear-says/article_01fa77c6-7b72-11ea-90c7-7747ea013459.html (last accessed Apr. 10, 2020) ("License plate information will be collected from cars in parking lots by Kentucky State Police and forwarded to local health departments, who will then present an order to self-quarantine for 14 days at the owners' homes.").

Today is Holy Saturday. Tomorrow is Easter Sunday. This is for Christians, as Mayor Fischer has said, "the holiest week of the year." [48]

48     COVID-19 Daily Briefing, 04-10-2020, https://www.facebook.com/MayorGregFischer/videos/514408469234775/

On Sunday, tomorrow, Plaintiff On Fire Christian Center wishes to hold an Easter service, as Christians have done for two thousand years. On Fire has planned a drive-in church service in accordance with the Center for Disease Control's social distancing guidelines. [49] Yesterday, near the close of business, On Fire filed this suit, including a request for a Temporary Restraining Order. It has asked the Court to stop defendants Mayor Greg Fischer and Metro Louisville from carrying out their plan to enforce their interpretation of the Governor's social distancing order. [50]

49     Centers for Disease Control & Prevention, SOCIAL DISTANCING, QUARANTINE,

& ISOLATION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last accessed Apr. 11, 2020).

50     There is doubt about the meaning of the Governor's social distancing order. Kentucky Attorney General Daniel Cameron has said, "As long as Kentuckians are permitted to drive through liquor stores, restaurants, and other businesses during the COVID-19 pandemic, the law requires that they must also be allowed to participate in drive-in church services, consistent with existing policies to stop the spread of COVID-19." Otts, Chris. FISCHER: POLICE WILL COLLECT LICENSE PLATES OF EASTER CHURCHGOERS, WDRB.com, https://www.wdrb.com/in-depth/fischer-police-will-collect-license-plates-of-easter-churchgoers/article_795c708a-7b6d-11ea-8e48-d7138b31add7.html (last accessed Apr. 10, 2020). But what matters for this case is not what the Governor has purported to authorize the Mayor and the Louisville Metro Police Department to do; what matters is what the Mayor and the Police *are doing*

and what state action is imminent. *See Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 401, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013).

\* \* \*

**\*6** In reviewing a TRO motion, the Court considers whether:

1) On Fire has a strong likelihood of success on the merits;

2) On Fire would suffer irreparable injury without a TRO;

3) The "balance of the equities" tips in On Fire's favor; and

4) "[A]n injunction is in the public interest." [51]

On Fire can satisfy all four parts, and it is entitled to a Temporary Restraining Order. The threats against On Fire by the Mayor and Louisville Metro violate the First Amendment and Kentucky law.

51     *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d

249 (2008); *see also, Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (the Court considers the same factors in considering whether to grant a TRO or a preliminary injunction).

**I. On Fire has demonstrated a strong likelihood of success on the merits on its two Free Exercise claims and its Kentucky statutory claims.**

**A. On Fire has demonstrated a strong likelihood of success on its federal and state Free Exercise claims.**

There is no doubt that society has the strongest of interests in curbing the growth of a deadly disease, which is the interest Mayor Fischer and Metro Louisville (together, "Louisville") has asserted when ordering churches and churchgoers to stay home on Easter. "When faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.' "[52]

52
    *In re Abbott*, 954 F.3d 728, ----, 2020 WL 1685929, at *7 (5th Cir. 2020) (quoting *Jacobson*, 197 U.S. at 31, 25 S.Ct. 358).

In this case, Louisville is violating the Free Exercise Clause "beyond all question."[53]

53
    *Id.; see also, In re Abbott*, No. 20-50296, ---- Fed.Appx. ----, ---- – ----, slip op. at 2-3, 2020 WL 1844644 (5th Cir. Apr. 10, 2020).

To begin, Louisville is substantially burdening On Fire's sincerely held religious beliefs in a manner that is not "neutral" between religious and non-religious conduct, with orders and threats that are not "generally applicable" to both religious and non-religious conduct.[54] "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause."[55] In *Lukumi Babalu*, the City of Hialeah's ban on animal sacrifice was not "neutral" or "generally applicable" because it banned the Church of Lukumi Babalu's ritualistic animal sacrifices while

at the same time it did not ban most other kinds of animal killing, including kosher slaughtering and killing animals for non-religious reasons.[56]

54
    *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

55
    *Id.* at 543, 113 S.Ct. 2217.

56
    *Id.* at 536, 113 S.Ct. 2217.

Here, Louisville has targeted religious worship by prohibiting drive-in church services, while not prohibiting a multitude of other non-religious drive-ins and drive-throughs – including, for example, drive-through liquor stores. Moreover, Louisville has not prohibited parking in parking lots more broadly – including, again, the parking lots of liquor stores. When Louisville prohibits religious activity while permitting non-religious activities, its choice "must undergo the most rigorous of scrutiny."[57] That scrutiny requires Louisville to prove its interest is "compelling" and its regulation is "narrowly tailored to advance that interest."[58]

57
    *Id.; see also, id.* ("A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases.").

58
    *Id.* at 531-32, 113 S.Ct. 2217.

**\*7** Louisville will be (highly) unlikely to make the second of those two showings. To be sure, Louisville is pursuing a compelling interest of the highest order through its efforts to contain the current pandemic. But its actions violate the Free Exercise Clause "beyond all question"[59] because they are not even close to being "narrowly tailored to advance that interest."[60] As in *Lukumi Babalu*, the government's "proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree."[61]

59
    *In re Abbott*, 954 F.3d at ----, 2020 WL 1685929, at *7 (quoting *Jacobson v.*

*Massachusetts*, 197 U.S. 11, 31, 25 S.Ct. 358, 49 L.Ed. 643 (1905)); *see also In re Abbott*, No. 20-50296, --- Fed.Appx. ---, --- – ---, slip op. at 2-3, 2020 WL 1844644 (Apr. 10, 2020 5th Cir.).

60
    508 U.S. at 531-32, 113 S.Ct. 2217

61
    *Id.* at 546, 113 S.Ct. 2217.

In other words, Louisville's actions are "underinclusive" *and* "overbroad." [62] They're underinclusive because they don't prohibit a host of equally dangerous (or equally harmless) activities that Louisville has permitted on the basis that they are "essential." Those "essential" activities include driving through a liquor store's pick-up window, parking in a liquor store's parking lot, or walking into a liquor store where other customers are shopping. The Court does not mean to impugn the perfectly legal business of selling alcohol, nor the legal and widely enjoyed activity of drinking it. But if beer is "essential," so is Easter.

62
    *Id.*

Louisville's actions are also overbroad because, at least in this early stage of the litigation, it appears likely that Louisville's interest in preventing churchgoers from spreading COVID-19 would be achieved by allowing churchgoers to congregate in their cars as On Fire proposes. On Fire has committed to practicing social distancing in accordance with CDC guidelines. "Cars will park six feet apart and all congregants will remain in their cars with windows no more than half open for the entirety of the service." [63] Its pastor and a videographer will be the only people outside cars, and they will be at a distance from the cars. [64]

63
    DN 3-2 ¶ 6.

64
    *Id.*

Louisville might suggest that On Fire members could participate in an online service and thus satisfy their longing for communal celebration. But some members may not have access to online resources. And even if they all did, the Free Exercise Clause protects their right to worship as their conscience commands them. It is not the role of a court to tell religious believers what is and isn't important to their religion, so long as their belief in the religious importance is sincere. The Free Exercise clause protects sincerely held religious beliefs that are at times not "acceptable, logical, consistent, or comprehensible to others." [65]

65
    508 U.S. at 531, 113 S.Ct. 2217 (quoting *Thomas v. Review Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)).

The Court does not doubt that Mayor Fischer can satisfy his sincerely held religious beliefs by watching a service on the Internet. Millions of Americans will do that this Easter, and the Court does not doubt that they will be true to their own faiths. Nothing in this Opinion should be read to impugn the Mayor's motives or his faith. Indeed, it is obvious he is trying to save lives. But when considering the rights guaranteed by the Free Exercise Clause, it doesn't matter that the government burdening the religious practices of others "consists entirely of the pure-hearted, if the law it enacts in fact singles out a religious practice for special burdens." [66]

66
    508 U.S. at 559, 113 S.Ct. 2217 (Scalia, J., concurring).

**\*8** At the same time, the Court does not for a moment doubt that for some believers Easter means gathering together, if not hand in hand or shoulder to shoulder, then at least car fender to car fender. Religion is not "some purely personal avocation that can be indulged entirely in secret, like pornography, in the privacy of one's room. For most believers, it is *not* that, and has never been." [67] Instead, just as many religions reinforce their faith and their bonds with the faithful through religious assemblies, many Christians take comfort and draw strength from Christ's promise that "where two or three are gathered together in My name, there am I in the midst of them." [68] Indeed, as On Fire points out, "the Greek word translated 'church' in our English versions of the Christian scriptures is the word 'ekklesia,' which literally means 'assembly.' " [69]

67
    *Lee v. Weisman*, 505 U.S. 577, 645, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Scalia, J., dissenting).

68
    Matthew 18:20.

69
    DN 1 ¶ 14 (quoting A.T. Robertson, A GRAMMAR OF THE GREEK NEW

TESTAMENT IN LIGHT OF HISTORICAL RESEARCH (3d ed. 1919)).

It is true that On Fire's church members could *believe* in everything Easter teaches them from their homes on Sunday. Soo too could the Pilgrims before they left Europe. But the Pilgrims demanded more than that. And so too does the Free Exercise Clause. It "guarantees the free *exercise* of religion, not just the right to inward belief." [70] That promise is as important for the minister as for those ministered to, as vital to the shepherd as to the sheep. And it is as necessary now as when the *Mayflower* met Plymouth Rock.

[70]

  *Trinity Lutheran*, 137 S.Ct. at 2026 (Gorsuch, J., concurring).

Finally, nothing in this legal analysis should be read to imply that the rules of the road in constitutional law remain rigidly fixed in the time of a national emergency. We know that from *Jacobson v. Massachusetts*. [71] The COVID-19 pandemic has upended every aspect of our lives: how we work, how we live, how we celebrate, and how we mourn. We worry about our loved ones and our nation. We have made tremendous sacrifices. And the Constitution is not "a suicide pact." [72]

[71]

  197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905); *see also In re Abbott*, 954 F.3d at ——, 2020 WL 1685929 at *7 (" *Jacobson* remains good law.").

[72]

  *Terminiello v. City of Chicago*, 337 U.S. 1, 37, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (Jackson, J., dissenting).

But even under *Jacobson*, constitutional rights still exist. [73] Among them is the freedom to worship as we choose. The brief history at the outset of this opinion does not even scratch the surface of religious liberty's importance to our nation's story, identity, and Constitution. But mindful of that importance, the Court believes there is a strong likelihood On Fire will prevail on the merits of its claim that Louisville may not ban its citizens from worshiping – or, in the relative safety of their cars, from worshiping together. [74]

[73]

  *Id.* at 31, 25 S.Ct. 358 (emergency does not permit "beyond all question, a plain, palpable invasion of rights secured by the fundamental law"); *cf.* at 27, 25 S.Ct. 358 (... "an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised in particular circumstances and in reference to particular persons in such an *arbitrary, unreasonable manner*, or might go so far beyond what was reasonably required for the safety of the public, *as to authorize or compel the courts to interfere for the protection of such persons*.") (emphasis added); *id.* at 38, 25 S.Ct. 358 ("...the police power of a state, whether exercised directly by the legislature, or by a local body acting under its authority, may be exerted in such circumstances, or *by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression*.") (emphasis added).

[74]

  Since the Kentucky Supreme Court has held that the right to worship in its state Constitution is "in line with United States Supreme Court precedent" on the federal Free Exercise Clause, Louisville's ban is unconstitutional under state law, too. *Gingerich v. Commonwealth*, 382 S.W.3d 835, 844 (Ky. 2012).

## B. On Fire has also demonstrated a strong likelihood of success on its Kentucky statutory claim.

**\*9** Kentucky's Religious Freedom Restoration Act prohibits Louisville from "substantially burden[ing] a person's freedom of religion." [75] Louisville must prove "by clear and convincing evidence that [they have] a compelling interest in infringing the specific act [and have] used the least restrictive means to further that interest." [76] As was true for non-neutral laws targeting religion, "judges in RFRA cases may question only the sincerity of a plaintiff's religious belief, not the correctness or reasonableness of that religious belief." [77] And as with the strict scrutiny analysis in the constitutional context, to survive under RFRA the government must "show[ ] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases." [78] And as above, banning drive-in church services isn't the least restrictive means to advance Louisville's interest in preventing the spread of coronavirus. Moreover, if sitting in cars did pose a significant danger of spreading the virus,

Louisville would close all drive-throughs and parking lots that are not related to maintaining public health, which they haven't done.[79]

75  Ky. Rev. Stat. § 446.350.

76  *Id.*

77  *Priests for Life v. HHS*, 808 F.3d 1, 17 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from denial of reh'g *en banc*) (citing *Hobby Lobby*, 134 S.Ct. at 2774 n.28, 2777-79; *Thomas*, 450 U.S. at 714-16, 101 S.Ct. 1425), vac'd by *Zubik v. Burwell*, ––– U.S. ––––, 136 S.Ct. 1557, 194 L.Ed.2d 696 (2016); *see also* *Hobby Lobby*, 573 U.S. at 725, 134 S.Ct. 2751 ("it is not for us to say that their religious beliefs are mistaken or insubstantial. Instead, our 'narrow function ... in this context is to determine' whether the line drawn reflects 'an honest conviction' ....") (quoting *Thomas*, 450 U.S. at 716, 101 S.Ct. 1425).

78  *Hobby Lobby*, 573 U.S. at 727, 134 S.Ct. 2751.

79  In the interest of moving on from the Court's example of liquor stores that are open, the Court takes judicial notice that ice cream shops (and their parking lots) are still open – to the relief of every sweet tooth in the city.

Given the strong likelihood On Fire will succeed on its religious liberty claims, there is no need to address whether it will also succeed on its freedom-of-assembly claim.

## II. On Fire would suffer irreparable injury without a TRO.

"Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."[80] Here, that is not difficult. Protecting religious freedom was a vital part of our nation's founding, and it remains crucial today. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[81]

80  *Winter*, 555 U.S. at 11, 129 S.Ct. 365.

81  *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also* *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.").

For Christians, there is nothing minimal about celebrating Easter, the holiest day in the Christian calendar. And for the reasons explained above, the Court does not doubt that for them, an online substitute for an in-person, in-the-car celebration is no substitute at all. On Fire "and its members have a sincerely held religious belief that physical corporate gathering of believers each Sunday, especially on Easter Sunday, is a central element of religious worship commanded by the Lord."[82] Having to skip Easter Sunday would substantially burden On Fire's members' religious practice.[83]

82  DN 3-2 ¶ 7.

83  DN 3-2 ¶ 11.

## III. The balance of the equities tips in On Fire's favor.

If the Court did not immediately intervene and stop Louisville's enforcement plan, churchgoers at On Fire would face an impossible choice: skip Easter Sunday service, in violation of their sincere religious beliefs, or risk arrest, mandatory quarantine, or some other enforcement action for practicing those sincere religious beliefs. Unless a government action is far more narrowly tailored to a compelling government interest than is Louisville's, that is a choice no one in our nation should ever have to face. Conversely, because Louisville allows other, non-religious and no-more-essential parking and drive-throughs, there is not yet any evidence in the record that stopping Louisville from enforcing its unconstitutional order will do it any harm.

## IV. A TRO is in the public interest.

**\*10** In considering whether a TRO is in the public interest, "a court must at the very least weigh the potential injury to the public health when it considers enjoining state officers from enforcing emergency public health laws."[84] The Court has considered that question above. With the limited record before the Court, it is unclear how a gathering of cars in a parking lot is a danger to public health. Admittedly, the record as it stands is sparse and one-sided. But in that limited record, there

isn't any evidence that On Fire's parking lot will prove more dangerous than the countless other parking lots that remain open. Nor is there any evidence that churches are less essential than every other business that is currently allowed to be open – liquor stores among them.

84

> *In re Abbott*, 954 F.3d 728 , ——, 2020 WL 1685929 *12 (5th Cir. 2020).

Moreover, whereas the public may have no interest in Louisville's overbroad ban on drive-in church services, the public has a profound interest in men and women of faith worshiping together this Easter in a manner consistent with their conscience. You do not have to share On Fire's faith to believe that celebrating that faith – while gathered together in praise of the One they believe healed the sick and conquered death – will bring hope to many in need of hope this Holy Week.

\* \* \*

There is no instruction book for a pandemic. The threat evolves. Experts reevaluate. And government officials make the best calls they can, based on the best information they have.

Sometimes those government officials will disagree. The Mayor of Louisville, in this case, wants to save lives. The state Attorney General, to pick one example of an official who disagrees with the Mayor, surely shares the Mayor's concern for the public's health. Neither has faced this situation before. We all hope that we will never have to face anything like this again. And neither leader, the Court feels confident, is acting with malice toward the physical or spiritual health of On Fire's congregation.

Some who read this Court's opinion will disagree with the Mayor. Others will disagree with the Court. And each camp will include some readers who share On Fire's faith, others whose conscience calls them to a different faith, and still others who profess no faith at all. Each of them, believers and non-believers, deserves at least this from the Court: To know why I decided as I did. You may not agree with my reasons, but my role as a judge is to explain, to teach, and perhaps, at least on occasion, to persuade.

The Christians of On Fire, however, owe no one an explanation for why they will gather together this Easter Sunday to celebrate what they believe to be a miracle and a mystery. True, they can attempt to explain it. True, they can try to teach. But to the nonbeliever, the Passion of Jesus – the betrayals, the torture, the state-sponsored murder of God's only Son, and the empty tomb on the third day – makes no sense at all. And even to the believer, or at least to some of them, it can be incomprehensible as well.

But for the men and women of On Fire, Christ's sacrifice isn't about the logic of this world. Nor is their Easter Sunday celebration. The reason they will be there for each other and their Lord is the reason they believe He was and is there for us. For them, for all believers, "it isn't a matter of reason; finally, it's a matter of love." [85] , [86]

85

> Robert Bolt, *A Man for All Seasons* 141.

86

> JRW, SDR, & PBB.

**All Citations**

--- F.Supp.3d ----, 2020 WL 1820249

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT I

2020 WL 1910021
Only the Westlaw citation is currently available.
United States District Court, D. Kansas.

FIRST BAPTIST CHURCH; Pastor
Stephen Ormond; Calvary Baptist Church;
and Pastor Aaron Harris, Plaintiffs,

v.

Governor Laura KELLY, in her
official capacity, Defendant.

No. 20-1102-JWB
|
Filed 04/18/2020

**Synopsis**
**Background:** Churches and pastors brought action alleging
that governor's executive orders prohibiting mass gatherings
in light of COVID-19 pandemic violated their First
Amendment free exercise rights. Governor moved to dismiss,
and plaintiffs moved for temporary restraining order (TRO).

**Holdings:** The District Court, John W. Broomes, J., held that:

it had subject matter jurisdiction over action;

action was not rendered moot by governor's issuance of new
executive order;

orders were subject to strict scrutiny;

plaintiffs were likely to succeed on merits;

plaintiffs demonstrated irreparable harm;

balance of equities weighed in favor of granting TRO; and

public interest in preventing violation of constitutional rights
favored granting TRO.

Governor's motion denied; plaintiffs' motion granted.

**Procedural Posture(s):** Motion for Temporary Restraining
Order (TRO).

**Attorneys and Law Firms**

Joshua A. Ney, Topeka, KS, Ryan A. Kriegshauser,
Kriegshauser Law, LLC, Olathe, KS, Tyson C. Langhofer,
Ashburn, VA, for Plaintiffs.

Jason Andrew Zavadil, John B. Turney, Jr., Pedro L.
Irigonegaray, Irigonegaray & Associates, Topeka, KS, Lumen
Mulligan, Lawrence, KS, for Defendant.

**MEMORANDUM AND ORDER**

JOHN W. BROOMES, UNITED STATES DISTRICT
JUDGE

**\*1** This matter is before the court on Plaintiffs' "Motion
for Expedited Hearing and Motion for Temporary Restraining
Order." (Doc. 7.) The motion was filed in conjunction with
Plaintiffs' verified complaint (Doc. 1), which alleges that
enforcement of restrictions on religious activity in Defendant
Governor Laura Kelly's Executive Order ("EO") 20-18 would
violate Plaintiffs' rights, including their First Amendment
right to the free exercise of religion. The complaint seeks
declaratory and injunctive relief pursuant to 42 U.S.C.
§ 1983, as well as relief under state law. The court held a
telephonic hearing on the motion for temporary restraining
order ("TRO") on April 17, 2020, at 4:00 p.m.

Prior to the hearing, Defendant filed a motion to dismiss,
arguing the claims are moot because Governor Kelly signed
EO 20-25 on April 17, 2020. (Doc. 9.) EO 20-25 alters some
of the state-imposed restrictions on public activities, and it
states in part that EO 20-18 "is rescinded and replaced by
this order" as of the effective date of April 18, 2020, at 12:01
p.m." (Doc. 9-2 at 5.)

For the reasons stated herein, Defendant's motion to dismiss
(Doc. 9) is DENIED and Plaintiffs' motion for a temporary
restraining order (Doc. 7) is GRANTED.

The Governor has issued a series of executive orders
imposing restrictions on numerous public and private
activities in light of the COVID-19 pandemic. For example,
on March 17, 2020, the Governor signed EO 20-04, which
among other things prohibited "mass gatherings" in the State
of Kansas. The term was defined to include any public or
private convening that brings together 50 or more people in
a confined or enclosed space. The prohibition was expressly

applied to mass gatherings at auditoriums, theaters, stadiums, and a number of other venues. The order contained a substantial list of activities or facilities that were exempt from the prohibition, including "Religious gatherings, as long as attendees can engage in appropriate social distancing." Another order issued the same day (EO 20-07) closed public and private schools in Kansas. On March 24, 2020, the Governor issued EO 20-14, which prohibited mass gatherings of more than 10 people. The exemption for religious gatherings was maintained intact "as long as attendees can engage in appropriate social distancing." Also, on March 24, 2020, the Governor issued EO 20-15 establishing the Kansas Essential Functions Framework ("KEFF"), which identified essential functions that must be exempted from any "stay-at-home" order issued by local authorities. The essential functions identified in the order included a wide array of things, including "Preserve Constitutional Rights."

On March 27, 2020, the Governor signed EO 20-16, which adopted a statewide "stay-at-home" order directing all Kansas citizens to stay at home unless they were performing "an essential activity." (Doc. 1-3 at 3.) The order exempted individuals performing listed essential functions from the prohibitions in the order, although it still required them, to the extent possible without significant disruption to essential functions, to use tele-working or, if meeting in person, to follow appropriate safety protocols, including maintaining a 6-foot distance between individuals. (*Id.* at 5.) The order restated and refined the KEFF essential functions. The essential function of preserving constitutional rights was expanded to include several items, including "Perform or attend religious or faith-based services or activities." (*Id.* at 7.)

**\*2** On April 7, 2020, five days before Easter, the Governor issued EO 20-18. It found enhanced measures were needed to slow the spread of COVID-19, and it made certain changes to existing prohibitions. In the provision listing venues to which the prohibition on "mass gatherings" applies, the order included for the first time "churches or other religious facilities" among the previously listed auditoriums, theaters, stadiums, and other venues. The order then adopted the following specific restriction on religious activities:

> With regard to churches or other religious services or activities, this order prohibits gatherings of more than ten congregants or parishioner in the same building or confined

or enclosed space. However, the number of individuals – such as preachers, lay readers, choir or musical performer, or liturgists – conducting or performing a religious service may exceed ten as long as those individuals follow appropriate safety protocols, including maintaining a six-foot distance between individuals and following other directive regarding social distancing, hygiene, and other efforts to slow the spread of COVID-19.

(Doc. 1-1 at 3.) The order restricted a number of other activities as well, but it also maintained a long list of activities and facilities that were exempt from the prohibitions in the order. The exempted activities and facilities included most governmental operations. The list of exemptions also included, among others: airports; childcare locations; hotels; food pantries and shelters; detoxification centers; shopping malls "and other retails establishments where large numbers of people are present but are generally not within arm's length of one another for more than 10 minutes"; libraries; restaurants, bars, and retail food establishments (including grocery stores), provided social distancing of 6 feet was maintained; office spaces; "manufacturing, processing, distribution, and production facilities"; public transportation; and job centers.

Plaintiffs filed this action on April 16, 2020, after sending a letter to the Governor asking that allowance be made for churches to hold in-person worship services provided the congregants follow rigorous social-distancing and safety protocols applicable to similar secular facilities. (Doc. 1 at 5.) The Governor's counsel responded that the matter was under review and that an order would be issued soon. (*Id.*) On April 17, 2020, the Governor signed EO 20-25, which did not alter the restriction on religious activities, but which removed certain items (such as libraries) from the exempted functions or facilities, and it placed additional restrictions on some of the exempted activities. Among other things, it limited the exemption for retail establishments where large numbers of people were present to customers and employees that are "performing essential activities or essential functions under Executive Order 20-16." Restaurants and bars were limited to no more than ten customers in the building, who must maintain a six-foot distance, but it allowed the number of

persons operating the facility to exceed ten if they maintained safety protocols. Office spaces were still exempt but were limited to those "performing essential activities or functions as described and limited by Executive Order 20-16." (Doc. 9-2.)

## I. Jurisdiction

This court has subject matter jurisdiction over Plaintiffs' claims arising under federal law pursuant to 28 U.S.C. § 1331. The court further finds the exercise of this court's jurisdiction over such claims is proper under the rule of *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (plaintiff alleging violation of federal law may seek prospective injunctive relief against responsible state official). [1] As for Defendant's mootness argument, the court finds Plaintiffs' claims are not moot. Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010) (citation omitted.) "Article III's requirement that federal courts adjudicate only cases and controversies necessitates that courts decline to exercise jurisdiction where the award of any requested relief would be moot—i.e. where the controversy is no longer live and ongoing." *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir. 1994), *superseded by statute on other grounds*. In this instance, the controversy between the parties is ongoing, as the restrictions on religious activities in newly executed EO 20-25 (Doc. 9-2) are identical to the restrictions on religious activities found in EO 20-18, which formed the basis of the complaint. Plaintiffs have made a sufficient showing that a live controversy exists as to whether the Governor's current restrictions on religious activity – found in both EO 20-18 and EO 20-25 – violate Plaintiffs' First Amendment right to freely exercise their religion. The court thus concludes that it has jurisdiction over the dispute, and that Defendant's motion to dismiss on mootness grounds (Doc. 9) should be denied.

[1]     This order is premised solely on Plaintiffs' federal law claims and does not consider Plaintiffs' claim that enforcement of Executive Order 20-18 violates Kansas law. (Doc. 1 at 14-15.)

## II. Standards for issuance of a TRO

**\*3** When addressing a motion for temporary restraining order, the court applies the same standard as it applies to a motion for preliminary injunction. Four factors must be

shown by the movant to obtain injunctive relief: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction is in the public interest. Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal. *Tickets for Less, LLC v. Cypress Media, LLC*, No. 20-2047-JAR-GEB, 2020 WL 528449, at \*2 (D. Kan. Feb. 3, 2020). *See also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "Additionally, some preliminary injunctions are disfavored and require a stronger showing by the movant —viz., movants must satisfy a heightened standard. They are '(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.' " *Fish v. Kobach*, 840 F.3d 710, 723–24 (10th Cir. 2016) (citation omitted.) "In seeking such an injunction, the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* (citation and internal quotation marks omitted.)

## III. Analysis

A. Status quo. Defendant argued at the hearing that Plaintiffs' requested TRO should be denied because it would alter the status quo. The "status quo" in this context refers to "the last peaceable uncontested status existing between the parties before the dispute developed." *Hobby Lobby Stores, Inc. v. Sebelius*, No. 12-6294, 2012 WL 6930302, at \*1 (10th Cir. Dec. 20, 2012) (citing *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009)). The last peaceable uncontested status between the parties was just prior to the enactment of EO 20-18, the first order which subjected Plaintiffs to the current restrictions on religious activities. Because the requested TRO would return the parties to that uncontested status, it would not alter the status quo and is not a disfavored injunction. *See Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 798 (10th Cir. 2019) (the status quo was the parties' status before the challenged ordinance was adopted.)

B. Likelihood of success on the merits.

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show the deprivation of a federal right by a person acting under color of state law. The First Amendment provides in part that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. amend. I. The First Amendment applies to the States by virtue of the Fourteenth Amendment. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000). Plaintiffs claim, among other things, that the restrictions on religious activity imposed by EO 20-18 (and now 20-25) violate Plaintiffs' First Amendment right to freely exercise their religion, including their right to attend worship services in their respective church facilities. For reasons that follow, the court concludes, based on the matters presented so far, that Plaintiffs are likely to prevail on this claim.

i. *Standard of review.* The parties dispute the standard that applies to the court's review of the Governor's executive orders. At the hearing on the TRO, Defendant asserted that these executive orders are not subject to heightened scrutiny because they do not target religious activity, but instead apply broadly to a large swath of both secular and non-secular behavior. The court assumes Defendant is suggesting that this case is controlled by the less rigorous standards for review set forth in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). However, *Smith* was an unemployment case in which the plaintiff was denied unemployment benefits because he was fired for violating a generally applicable statute criminalizing the use of peyote, a hallucinogenic drug. Smith claimed that the government's decision violated his rights under the Free Exercise Clause of the First Amendment. *Id.* at 874, 110 S.Ct. 1595.

**\*4** The statute at issue in *Smith* was a facially neutral law that criminalized the use of certain drugs that was "not specifically directed at [Smith's] religious practice, and that is concededly constitutional as applied to those who use the drug for other reasons." *Id.* at 878, 110 S.Ct. 1595. The Supreme Court stated that it has never excused an individual "from compliance with an otherwise valid law *prohibiting conduct that the State is free to regulate.*" *Id.* at 879, 110 S.Ct. 1595 (emphasis added). But the executive orders at issue in this case expressly restrict religious activity. Indeed, a fair reading of EO 20-18 and EO 20-25 shows that they operate as a wholesale prohibition against assembling for religious

services anywhere in the state by more than ten congregants. While it is unclear at this stage of the proceedings exactly how many churches may be impacted by that proscription, it is fair to say that these executive orders will likely impact the majority of churches and religious groups in Kansas. Thus, EO 20-18 and EO 20-25 sweep far beyond the "incidental effect" on religious activity excused in *Smith*. *Id.*; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (noting *Smith's* application to incidental burdening of particular religious practices).

At the TRO hearing, Defendant also relied heavily on *In re Abbott*, 954 F.3d 772 (5th Cir. 2020), a case recently decided by the Fifth Circuit. In *Abbott*, the Fifth Circuit upheld an executive order issued by the governor of Texas that required healthcare providers to postpone non-essential surgeries and procedures during the COVID-19 pandemic in order to conserve critical medical resources and otherwise curb the spread of coronavirus infection. Plaintiffs in that case claimed that the executive order infringed the constitutional right to abortion. However, unlike the present case, the executive order at issue in *Abbott* made no mention of abortion or other constitutionally protected activity. *Id.* at ——, at \*3.

*Abbott* relied heavily on *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905), a case challenging a Massachusetts law that mandated smallpox vaccinations when the state was battling the disease. *Abbott* quoted *Jacobson* for propositions such as " '[U]nder the pressure of great dangers,' constitutional rights may be reasonably restricted 'as the safety of the general public may demand' " *Abbott* at ——, at \*1 (quoting *Jacobson,* 197 U.S. at 29, 25 S.Ct. 358); "[b]ut '[i]t is no part of the function of a court' to decide which measures are 'likely to be the most effective for the protection of the public against disease' " *Id.* (quoting *Jacobson*, 197 U.S. at 30, 25 S.Ct. 358); and

> [I]n every well-ordered society charged with the duty of conserving the safety of its members the rights of

the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.

*Id.* at ——, at *6 (quoting *Jacobson*, 197 U.S. at 29, 25 S.Ct. 358). *Abbott* concluded its analysis, as relevant here, as follows:

The bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." [ *Jacobson*, 197 U.S.] at 31, 25 S. Ct. 358. Courts may ask whether the state's emergency measures lack basic exceptions for "extreme cases," and whether the measures are pretextual—that is, arbitrary or oppressive. *Id.* at 38, 25 S. Ct. 358. At the same time, however, courts may not second-guess the wisdom or efficacy of the measures. *Id.* at 28, 30, 25 S. Ct. 358.

*Id.* at ——, at *7.

*Abbott's* reliance on *Jacobson* counsels further analysis of that case. *Jacobson*, like *Abbott*, involved a facially neutral law, which required vaccination for smallpox. The issue in that case did not involve the free exercise of religion, but rather a claim that the law invaded an individual's liberty "to care for his own body and health in such way as to him seems best," as protected by the Fourteenth Amendment. *Jacobson*, 197 U.S. at 26, 25 S.Ct. 358. And although it did not deal with a question of religious liberty, *Jacobson* appears more in line with *Smith* in the sense that law at issue in *Jacobson* did not expressly purport to interfere with rights secured by the Constitution. In concluding that no constitutional violation occurred under the Massachusetts law, *Jacobson* said,

**\*5** Smallpox being prevalent and increasing at Cambridge, the court would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case. We say necessities of the case, because it might be that an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons.

*Id.* at 28, 25 S.Ct. 358. Importantly, the second sentence of the foregoing quote points out that, even in such extreme cases as a public health crisis, the police power of the state is not without limits, and is subject to appropriate judicial scrutiny. And,

if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id.* at 28, 25 S.Ct. 358.

At the TRO hearing, both sides argued most extensively about the application of the Supreme Court's decision in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). In that case, the City of Hialeah passed several facially neutral ordinances aimed at curbing the practice of animal sacrifice that was central to the religious practice of the Santeria religion. The Church of the Lukumi Babalu Aye, Inc., and its congregants practiced the Santeria religion and had recently announced plans to establish a church facility in Hialeah, Florida. Shortly thereafter, Hialeah's city council called an emergency meeting and began enacting a series of ordinances that prohibited animal sacrifices and animal cruelty, and threatened those who violated the ordinances with criminal prosecution. The ordinances purported to extend these prohibitions to the killing of animals for food, but then carved out exemptions for slaughterhouses and other licensed establishments that killed animals for food purposes. *Lukumi*, 508 U.S. at 528, 113 S.Ct. 2217. The Supreme Court ultimately concluded that the object of these ordinances was to target the Santeria church members. *Id.* at 535, 113 S.Ct. 2217.

The Court began its analysis of the claims in *Lukumi* with the proposition from *Smith* that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531, 113 S.Ct. 2217. However, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, ... and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Id.* at 533, 113 S.Ct. 2217. The neutrality analysis begins with the text of the law, itself, and the law "lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.*

In this case, EO 20-18 and EO 20-25 expressly purport to restrict in-person religious assembly by more than ten congregants. In that sense, they are not facially neutral. Defendant asserts that despite the express restrictions imposed on religious assembly, the laws are facially neutral because they apply as well to a much broader swath of secular activity in addition to the overt limitations placed on church gatherings. Nevertheless, while these executive orders begin with a broad prohibition against mass gatherings,

they proceed to carve out broad exemptions for a host of secular activities, many of which bear similarities to the sort of personal contact that will occur during in-person religious services. *Lukumi* indicates that a court should evaluate these exemptions in assessing a law's neutrality. *See Lukumi*, 508 U.S. at 535-37, 113 S.Ct. 2217.

\*6 The court pauses its analysis at this point to circle back to the initial question of what standard is to be applied in evaluating Plaintiffs' claims under the Free Exercise Clause. Unsurprisingly, the parties have failed to identify any controlling authority for evaluating a wholesale prohibition on in-person religious services like that at issue in this case. Under ordinary circumstances, it goes without saying that the government could not lawfully expressly prohibit individuals from meeting together for religious services. Accordingly, the leading cases tend to address facially neutral laws that burden religious beliefs, or restrictions that explicitly or implicitly target particular religious groups or practices. Based on the relatively unique circumstances herein presented, the court concludes that *Smith*, *Abbott*, *Jacobson*, and similar cases do not provide the best framework in which to evaluate the Governor's executive orders because all those cases deal with laws that are facially neutral and generally applicable.

The court concludes that *Lukumi*, though not identical, provides the most appropriate framework to evaluate this case. The ordinances at issue in *Lukumi*, though facially neutral in some respects, contained elements that were clearly targeted at religious practices, such as the prohibitions on ritual sacrifices. And although *Lukumi* dealt with laws that the Court concluded were ultimately aimed at a particular religious group, the court does not think that the Supreme Court would have excused the First Amendment violations in that case if the offending provisions had been part of a broader set of laws that did nothing to diminish the religious animus that was both explicit and implicit in the provisions targeting the church. Based on the foregoing reasoning, the court will evaluate Plaintiffs' claims under the Free Exercise Clause according to the principles set forth in *Lukumi*.

"At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532, 113 S.Ct. 2217. "A law lacks facial neutrality if it refers

to a religious practice without a secular meaning discernable from the language or context."  *Id.* at 533, 113 S.Ct. 2217.

In evaluating neutrality, courts are admonished to "survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders," [2]  *Lukumi*, 508 U.S. at 534, 113 S.Ct. 2217, and, in particular, to consider in that context exceptions or exemptions granted to secular activity that are not extended to religious activity. *See*  *id.* at 535-37, 113 S.Ct. 2217. When "individualized exemptions from a general requirement are available, the government 'may not refuse to extend that system to cases of 'religious hardship' without compelling reason.' "  *Id.* at 537, 113 S.Ct. 2217 (quotation omitted).

[2]     At the TRO hearing, the court indicated it did not perceive that this was necessarily a religious gerrymandering case. However, upon further analysis, the principles explained in  *Lukumi* indicate that the court should consider the effect of the exemptions in these executive orders when evaluating neutrality.

In addition to neutrality, the Free Exercise Clause requires that "laws burdening religious practice must be of general applicability."  *Lukumi*, 508 U.S. at 542, 113 S.Ct. 2217. "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause."  *Id.* at 543, 113 S.Ct. 2217. A law is underinclusive, and thus not generally applicable, when it fails to prohibit secular activity that endangers the same interests to a similar or greater degree than the prohibited religious conduct.  *Id.*

A law that fails to satisfy the requirements of neutrality and general applicability is subjected to strict scrutiny.  *Id.* at 546, 113 S.Ct. 2217. "To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests."  *Id.* (internal quotations omitted). When "[t]he proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that

burdened religion to a far lesser degree," a lack of narrow tailoring invalidates the law.  *Id.*

ii. *Application to this Case.*

*7 EO 20-18 and EO 20-25 both state that their prohibitions against mass gatherings apply to "churches or other religious facilities." (EO 20-18 ¶1.b; EO 20-25 ¶1.b). Both orders expressly state in their respective paragraphs 1.c that "[w]ith regard to churches or other religious services or activities, this order prohibits gatherings of more than ten congregants or parishioners in the same building or confined or enclosed space [with exceptions for additional individuals conducting the service]." These provisions show that these executive orders expressly target religious gatherings on a broad scale and are, therefore, not facially neutral.

Given the circumstances, Plaintiffs have made a substantial showing that development of the current restriction on religious activities shows religious activities were specifically targeted for more onerous restrictions than comparable secular activities. The Governor previously designated the attendance of religious services as an "essential function" that was exempt from the general prohibition on mass gatherings. That designation has not been rescinded or modified, yet in EO 20-18 and EO 20-25 churches and religious activities appear to have been singled out among essential functions for stricter treatment. It appears to be the only essential function whose core purpose – association for the purpose of worship – had been basically eliminated. [3] For example, the secular facilities that are still exempt from the mass gathering prohibition or that are given more lenient treatment, despite the apparent likelihood they will involve mass gatherings, include airports, childcare locations, hotels, food pantries and shelters, detoxification centers, retail establishments (subject to the distancing and "essential function" purpose noted above), retail food establishments, public transportation, job centers, office spaces used for essential functions, and the apparently broad category of "manufacturing, processing, distribution, and production facilities." As Plaintiffs point out, the exemption for office spaces is broad enough to include such activities as providing real estate services.

[3]     As Defendant points out, restaurants and bars were subjected to increased restrictions in EO 20-25, including the prohibition on mass gatherings. The order adopted an exemption that allowed the number of employees operating such facilities

to exceed ten, provided they maintained safety protocols. (Doc. 9-2 at 4.) This restriction is arguably comparable to the restriction imposed on religious activity, but it appears to be the only essential function other than religious activities on which such a restriction was imposed. The order allows restaurant and bar facilities to continue takeout and delivery services.

The legitimate health and safety concerns arising from people attending religious services inside a church would logically be present with respect to most if not all these other essential activities. Defendant has not argued that mass gatherings at churches pose unique health risks that do not arise in mass gatherings at airports, offices, and production facilities. Yet the exemption for religious activities has been eliminated while it remains for a multitude of activities that appear comparable in terms of health risks. Based on the record now before the court, the most reasonable inference from this disparate treatment is that the essential function of religious activity was targeted for stricter treatment due to the nature of the activity involved, rather than because such gatherings pose unique health risks that mass gatherings at commercial and other facilities do not, or because the risks at religious gatherings uniquely cannot be adequately mitigated with safety protocols.[4] It is also an arbitrary distinction, in the sense that the disparity has been imposed without any apparent explanation for the differing treatment of religious gatherings. These facts undermine Defendant's contentions and lead the court to conclude that EO 20-18 and EO 20-25 are not neutral laws of general applicability. Instead, they restrict religious practice while failing to "prohibit secular activity that endangers the same interests to a similar or greater degree." As such, the restriction is likely subject to strict scrutiny, and can be sustained only if it is narrowly tailored to further the compelling state interest in slowing or halting the spread of COVID-19.

[4]     At the TRO hearing, it was represented that a total of 35 COVID-19 clusters have been identified in Kansas, with 5 of those being attributable to churches. It was also represented that 13 of the clusters resulted at private companies, including a recent increase of 9 such clusters. No information was presented as to whether the clusters involving churches arose with or without the use any safety protocols such as social distancing.

**\*8** On the current record, Plaintiffs are likely to prevail on their assertion that the restriction on religious mass gatherings

is not narrowly tailored. Specifically, Plaintiffs point to a number of other secular mass gathering activities or locations that merely require certain safety protocols, including social distancing. Given the similarities of physical proximity between these "essential" secular gathering and Plaintiffs' religious gatherings (which are also deemed essential under EO 20-16), the court finds that Plaintiffs can likely show that the broad prohibition against in-person religious services of more than ten congregants is not narrowly tailored to achieve the stated public health goals where the comparable secular gatherings are subjected to much less restrictive conditions. For that reason, and for the reasons previously stated, Plaintiffs have shown they are likely to succeed on the merits of their claim alleging a violation of their First Amendment right to the free exercise of religion.

C. Irreparable harm. To obtain a TRO, Plaintiffs must show they will suffer irreparable harm in the absence of the order. *Winter*, 555 U.S. at 20, 129 S.Ct. 365. The Supreme Court has recognized that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Plaintiffs have alleged that without a TRO, they will be prevented from gathering for worship at their churches this Sunday, April 19, 2020 and thereafter. The court concludes Plaintiffs have made a sufficient showing of irreparable harm.

D. Balance of the equities. Plaintiffs must also show that the balance of equities tips in their favor. *Winter*, 555 U.S. at 20, 129 S.Ct. 365. Plaintiffs have shown that they will be harmed by a deprivation of the constitutional right to freely exercise their religion, and that they face a threat of criminal penalties if they violate the current restrictions in EO 20-25. The court recognizes that the current pandemic presents an unprecedented health crisis in Kansas, and in this country. The Governor has an immense and sobering responsibility to act quickly to protect the lives of Kansans from a deadly epidemic. The court would not issue any restraint, temporary or otherwise, if the evidence showed such action would substantially interfere with that responsibility. Plaintiffs have shown, however, that they are willing to abide by protocols that have been determined by the Governor to be adequate to protect the lives of Kansans in the context of other mass gatherings. In view of that, and in view of the fact that a preliminary injunction hearing has been promptly scheduled for April 23, 2020, the court concludes that the balance of equities weighs in favor of granting a TRO, pending the

preliminary injunction hearing, to permit Plaintiffs to engage in worship services under the conditions stated in this order.

E. Public interest. Lastly, to obtain a TRO, Plaintiffs must show that the granting of a TRO is in the public interest. *Winter,* 555 U.S. at 20, 129 S.Ct. 365. The public interest is furthered by preventing the violation of a party's constitutional rights. *Free the Nipple,* 916 F.3d at 807. Additionally, for the reasons previously mentioned, the record shows that allowing Plaintiffs to gather for worship with the safety protocols similar to those applicable to other essential function mass gatherings is consistent with the interest in protecting public health.

F. Security. After considering the nature of the constitutional claim presented, and the absence of harm to Defendant from a temporary return to the status quo, the court determines that no security should be required for the issuance of the TRO. *Cf.* Fed. R. Civ. P. 65(c).

G. Scope of the TRO. Given the limited record before the court at this stage of the proceedings, and the gravity of the issues involved, the court is somewhat hesitant to simply say that Plaintiffs are free to conduct their religious services using the same social distancing and protective measures specified in the executive orders for similar exempt activities. In particular, Defendant has not had the opportunity to put on evidence that might support stricter safety measures for religious services. At the TRO hearing, Plaintiffs set forth specific plans for social distancing and safety precautions that appear to exceed the general requirements for similar exempt activities under EO 20-25. Until the court has an opportunity to hear evidence on these matters, the terms of the TRO will require Plaintiffs to comply with their proposed measures. Specifically, First Baptist Church of Dodge City will adhere to the following:

> **\*9** • Prior to and following the in-person service, the facility will be deep-cleaned;

> • Invitations will be directed to regular church attendees for this in-person service;

> • Individuals will be advised to continue to engage in "stay at home" protocols as directed by EO 20-16 in order to attend the service;

> • No church members are known to have had any contact with known COVID-19 confirmed cases;

• Attendees will be advised to perform temperature checks at home on all attendees prior to attending the service. Individuals that are ill or have fevers will not attend;

• High-risk individuals will be advised not to attend the in-person service;

• Attendees will be advised to bring their own PPE, including masks and gloves;

• Attendees will be advised not to engage in hand shaking or other physical contact;

• Hand sanitizer will be available for use throughout the facility;

• The in-person service will be limited to 50 individuals in a space that has a capacity for 300 individuals (a cross-shaped auditorium 50 feet by 74 feet at the center; 2,950 square feet total, allowing almost 57 square feet available to each attendee at maximum social distancing);

• Co-habitating family units may sit closer together but otherwise the maximum social distancing possible will be used, however, at a minimum, the CDC recommended protocol will be observed with a minimum distance of at least 6 feet;

• A single point of entry and single point of exit on opposite sides of the building will be used, establishing a one-way traffic pattern to ensure social distancing;

• Ventilation will be increased as much as possible, opening windows and doors, as weather permits;

• These procedures will be communicated to church members in advance of the service;

• Church bulletin and offering plates will not be used during the service;

• Attendees will be advised to wash their clothes following the service;

• If Church leadership becomes aware of a clear, immediate, and imminent threat to the safety of the attendees or cannot follow the protocols listed above, the gathering will be immediately disbanded.

Calvary Baptist Church of Junction City will adhere to the following:

- Splitting out pews and marking designated sitting areas to keep non-cohabitating congregants at least six feet apart before, during, and after the worship service;

- Marking multiple entrances to encourage socially distanced foot traffic;

- Propping doors open to prevent the need for congregants to touch doors while entering and exiting the church or sanctuary;

- Suspending passing offering plates and bulletins;

- Actively discouraging handshaking or other social touching;

- Offering hand sanitizer throughout the building;

- Providing face masks to offer to any interested persons.

(*See* Doc. 1 at 8-11.)

### IV. Conclusion

Defendant's motion to dismiss the complaint (Doc. 9) is DENIED. Plaintiffs' motion for a temporary restraining order (Doc. 7) is GRANTED. The court will file a separate order containing the terms of the TRO.

**\*10** A hearing on Plaintiffs' request for a preliminary injunction is scheduled for April 23, 2020, at 9:00 a.m.

### All Citations

--- F.Supp.3d ----, 2020 WL 1910021

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT J

2020 WL 2305307
Only the Westlaw citation is currently available.
United States District Court, E.D. Kentucky.

TABERNACLE BAPTIST CHURCH, INC. OF
NICHOLASVILLE, KENTUCKY, Plaintiff,

v.

ANDREW BESHEAR, in his official capacity
as Governor of Kentucky, et al., Defendants.

Civil No. 3:20-cv-00033-GFVT
|
Filed: 05/08/2020

**OPINION & ORDER**

Gregory F. Van Tatenhove United States District Judge

**\*1** We are a relatively young nation. But our Constitution is the oldest in the world.[1] We describe it as enduring— a value that must be protected not only when it is easy but when it is hard.

| 1 | "Written in 1787, ratified in 1788, and in operation since 1789, the United States Constitution is the world's longest surviving written charter of government." UNITED STATES SENATE, CONSTITUTION DAY, https://www.senate.gov/artandhistory/history/common/generic/ConstitutionDay.htm. |

And this is a hard and difficult time. A new virus sweeps the world, ravages our economy and threatens our health. Public officials, including the defendants in this case, make minute by minute decisions with the best of intentions and the goal of saving the health and lives of our citizens.

But what of that enduring Constitution in times like these? Does it mean something different because society is desperate for a cure or prescription?

Simply put, that is the question presented here. Tabernacle Baptist Church wants to gather for corporate worship. They want to freely exercise their deeply held religious belief about what it means to be a faithful Christian. For them, it is "essential" that they do so. And they want to invoke the Constitution's protection on this point.

But the governor, by executive order, has put a stop to that. He can do that, but he must have a compelling reason for using his authority to limit a citizen's right to freely exercise something we value greatly— the right of every American to follow their conscience on matters related to religion. As explained below, despite an honest motive, it does not appear at this preliminary stage that reason exists. Consequently, as explained below, the motions for a temporary restraining order are GRANTED.

**I**

To curb the spread of the coronavirus in the Commonwealth of Kentucky, Governor Andrew Beshear has issued a series of executive orders limiting social interaction between Kentuckians. Non-essential businesses are temporarily closed, restaurants are relegated to take-out only, and citizens have been asked to practice social distancing. The plaintiffs take exception to two of these protective measures. On March 19, 2020, as part of broader efforts to "flatten the curve,"[2] acting Secretary of the Cabinet for Health and Family Services Eric Friedlander issued an order prohibiting "mass gatherings." [R. 3-7.]. Per Secretary Friedlander's Order, mass gatherings include "any event or convening that brings together groups of individuals, including, but not limited to, community, civic, public, leisure, **faith-based**, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities." *Id.* (emphasis added). Some activities which necessarily involve large groups of individuals were excluded. "[A]irports, bus and train stations, medical facilities, libraries, shopping malls and centers, or other spaces where persons may be in transit" were not included within the definition of "mass gathering," nor were "typical office environments, factories, or retail or grocery stores[.]" *Id.*

| 2 | The term "flatten the curve" refers to slowing the spread of the coronavirus through the population. The goal is to "reduce[ ] the number of cases that are active at any given time, which in turn gives doctors, hospitals, police, schools, and vaccine-manufacturers time to respond, without becoming overwhelmed." Siobhan Roberts, *Flattening the Coronavirus Curve*, The New York Times, https://www.nytimes.com/article/flatten-curve-coronavirus.html. The result is that, when plotted on a line graph, the rate of infection |

appears as a flattened curve rather than a steep peak.

**\*2** Later, on March 25, 2020, Governor Beshear issued an executive order mandating all businesses which are not "life-sustaining" close. [R. 3-5.]. Religious organizations were excluded from the category of "life-sustaining," except to the extent they provide "food, shelter and social services." *Id.* Entities allowed to remain open included hardware stores, laundromats and dry cleaners, law offices, and liquor stores, provided they adhere to social distancing and hygiene guidelines. *See id.*

Plaintiff Tabernacle Baptist Church describes itself as "an independent, fundamental, Baptist church, independent of the world but dependent on the Word of God." *Id.* at ¶ 13. Since issuance of the above orders, Tabernacle has ceased holding in-person religious services. [R. 3-1 at 5.] Instead, Tabernacle has resorted to broadcasting services online via Facebook or holding drive-in services wherein congregants may listen to the service over their FM radio. *Id.* For Plaintiff, these substitutes offer cold comfort. "Tabernacle has a sincerely-held religious belief that online services and drive-in services do not meet the Lord's requirement that the church meet together in person for corporate worship." *Id.* For this reason, Tabernacle argues the foregoing Orders violate its First Amendment rights to free exercise of religion and freedom of assembly.[3] [R. 1.] Tabernacle argues it is likely to succeed on the merits of its claims because the orders are not narrowly tailored to serve the public health interest.

[3]
The executive order has yet to be enforced against Plaintiff Tabernacle. However, the Court notes that there is no issue at this preliminary stage concerning Tabernacle's ability to establish standing in its apparent pre-enforcement challenge. *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016); *see also Michigan Gas Co. v. F.E.R.C.*, 115 F.3d 1266, 1269 (6th Cir. 1997) ("Standing 'is a qualifying hurdle that plaintiffs must satisfy even if raised sua sponte by the court.' "). To bring such a challenge, a plaintiff must sufficiently allege (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that is "proscribed by a [law]," and (3) "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)

(citation omitted). It is beyond dispute that the first two elements are easily met. As to the third element, the Court notes first that violation of the recently promulgated executive orders is a Class A misdemeanor under Kentucky law. *See* KRS § 39A.990; *see also* KRS § 532.020(2); KRS § 534.040 (setting forth the penalties for a Class A misdemeanor). And second, there is an established record of enforcement against churches that have violated the executive order in the same way Tabernacle proposes. *See Maryville Baptist*, 2020 U.S. App. LEXIS 14213, at \*1 (6th Cir. May 2, 2020); *Roberts*, 2020 U.S. Dist. LEXIS 77987, at \*2 (E.D. Ky. May 4, 2020). Thus, it appears that Tabernacle also meets this third and final element. In sum, on the limited record before the Court, it appears that Tabernacle meets each element of the pre-enforcement standing analysis and, notably, the Governor has advanced no argument to the contrary. Indeed, the Governor, to this point in the litigation, evinces an intent to continue enforcing the orders at issue.

Defendants dispute this characterization. Although not required in the context of ruling on a TRO, the Court held a telephone hearing this afternoon, shortly after the Defendants filed an appeal in a similar case. Counsel for Tabernacle, the Attorney General, Secretary Friedlander, and Governor Beshear participated in the call. Defendants argued the prohibition on mass gatherings is constitutional, because it is applicable to all mass gatherings generally. Further, the Defendants pointed out factual distinctions between the social interaction that takes place in a transactional setting, such as a grocery store, and the communal nature of religious services. The arguments made were substantive, not jurisdictional.

**\*3** Notably, Tabernacle's is not the first challenge that has sought to enjoin the actions of Kentucky officials that curtailed residents' ability to participate in corporate worship. To date, three other district courts in Kentucky have considered whether to grant a temporary restraining order to enjoin government proscriptions on religious gatherings. In one case, the plaintiff church requested a TRO against the City of Louisville's prohibition on drive-in church services on Easter. *On Fire Christian Ctr., Inc. v. Fischer*, No. 3:20-CV-264-JRW, 2020 U.S. Dist. LEXIS 65924 (W.D. Ky. Apr. 11, 2020). The other two cases centered on the constitutionality of Governor Beshear's executive orders. *See Roberts v. Neace*, No. 2:20-CV-054-WOB, 2020 U.S. Dist.

LEXIS 77987 (E.D. Ky. May 4, 2020); *Maryville Baptist Church, Inc. v. Beshear*, No. 3:20-CV-278-DJH, 2020 U.S. Dist. LEXIS 70072 (W.D. Ky. Apr. 18, 2020). Appeals are pending before the Sixth Circuit in each of these latter cases. In *Roberts*, plaintiffs have moved for an injunction pending appeal that would permit them to attend in-person church services this Sunday. [*Roberts, et al. v. Neace, et al.*, 2:20-54-WOB-CJS, R. 56.] The Plaintiffs in *Maryville Baptist* are awaiting a district court ruling on their motion to enjoin the Governor's prohibition on mass gatherings as it applies to in-person religious services while their appeal remains pending. *Id.*

While instructive, this Court is not bound by the decisions of the district courts in those cases. *See Camreta v. Greene*, 563 U.S. 692, 709 n. 7 (2011); *Ohio A. Philip Randolph Inst. v. Larose*, 761 F. App'x 506, 514 n. 4 (6th Cir. 2019) ("[T]ypically district court judges are not bound by previous decisions of other judges within the same district."). Ultimately, the constitutionality of these governmental actions will be resolved at the appellate level, at which point the Sixth Circuit will have the benefit of the careful analysis of the various district courts, even if we disagree.

## II

Rule 65 allows the Court to issue a TRO without notice to the other party only if "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). As noted, the Governor and Secretary Friedlander filed an appearance, and participated in a hearing held earlier today. Additionally, although the Governor has not yet prepared a response to the instant motion, the Court considered briefing filed by the defendants in other, similar challenges to the prohibition on mass gatherings as it pertains to religious services, and provided at the Court's request. In determining whether to issue a TRO, the Court examines: 1) whether the movant has shown a strong likelihood of success on the merits; 2) whether the movant will suffer irreparable harm if the injunction is not issued; 3) whether the issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing the

injunction. *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (citations omitted).

"[A] temporary restraining order is an extraordinary remedy designed for the limited purpose of preserving the status quo pending further proceedings on the merits[.]" *Stein v. Thomas*, 672 Fed. App'x 565, 572 (6th Cir. 2016). This is because "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Reed v. Cleveland Bd. of Educ.*, 581 F.2d 570, 573 (6th Cir. 1978) (quoting *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 439 (1974)). Thus, Tabernacle must show that the foregoing preliminary injunction factors are met, and that immediate, irreparable harm will result if the TRO is not issued.

### A

**\*4** The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or exercising the free exercise thereof," with few exceptions. U.S. Const. amend. 1. "When constitutional rights are threatened or impaired, irreparable injury is presumed." *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 649 (6th Cir. 2015) (internal citations omitted). The Supreme Court has held "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). This is precisely what Tabernacle alleges: violation of its First Amendment rights, specifically its right to exercise its religion and the right to freely assemble. [R. 1; R. 3-1.] Sixth Circuit precedent establishes that, "when a party seeks a preliminary injunction on the basis of a ... violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009).

Of course, "[t]he possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order and morals of the community." *Crowley v. Christensen*, 137 U.S. 86, 89 (1890). The question becomes, then, whether the mass gathering prohibition issued by Governor Beshear amounts to "reasonable conditions" on Kentuckians' constitutional right to free exercise of their sincerely-held religious beliefs.

Context is important. The orders at issue do not simply restrict religious expression; they restrict religious expression in an attempt to protect the public health during a global pandemic. As a result, the Court is tasked with identifying precedent in unprecedented times.

Defendant Governor Beshear and other courts have looked to *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). *See In re Abbott*, 954 F.3d 772 (5th Cir. 2020); *Adams & Boyle, P.C. v. Slatery*, 2020 U.S. App. LEXIS 13357 (6th Cir. Apr. 24, 2020); *On Fire Christian Ctr. v. Fischer*, 2020 U.S. Dist. LEXIS 65924, *16–17 (W.D. Ky. Apr. 11, 2020). There, the Supreme Court considered whether, when faced with an outbreak of smallpox, the city of Cambridge could constitutionally require its adult residents to receive vaccinations against the disease. *See Jacobsen*, 197 U.S. at 25–26. Those who refused to vaccinate were subjected to a fine. *Id.* at 26. Although the defendant argued the law was an invasion of his liberty and violative of due process, the Supreme Court upheld the vaccination requirement based on public health concerns. *Id.* at 39.

Though over a century old, *Jacobson* is arguably the case that most directly speaks to "the expanded scope of a state's police power during times of public health crises[.]" *Adams & Boyle, P.C.*, 2020 U.S. Dist. LEXIS 13357 at *17. The Fifth Circuit has distilled *Jacobson*'s analysis into a clearer, multi-factor test:

> The bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." Courts may ask whether the state's emergency measures lack basic exceptions for "extreme cases," and whether the measures are pretextual—that is, arbitrary or oppressive." At the same time, however, courts may not second-guess the wisdom or efficacy of the measures.

*In re Abbott*, 954 F.3d 772, 784–85 (5th Cir. 2020) (internal citations omitted); *see also Adams & Boyle, P.C. v. Slatery*, 2020 U.S. App. LEXIS 13357 (6th Cir. Apr. 24, 2020) (applying the foregoing factors to the Governor of Tennessee's directive to "postpone surgical and invasive procedures that are elective and non-urgent" including abortions). The *Jacobson* test gives states considerable leeway in enacting measures during public health emergencies. However, "even under *Jacobson*, constitutional rights still exist." *On Fire Christian Ctr.*, 2020 U.S. Dist. LEXIS 65924 at * 15. And while courts should refrain from second-guessing the efficacy of a state's chosen protective measures, "an acknowledged power of a local community to protect itself against an epidemic ... might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere[.]"

*Jacobson*, 197 U.S at 28.

**\*5** Here, not only has Tabernacle alleged an irreparable injury, but Tabernacle is likely to succeed on the merits of its federal constitutional claim. Defendant does not dispute that the challenged orders place a burden on the free exercise of religion in Kentucky. A law that incidentally burdens religion, but "that is neutral and of general applicability need not be justified by a compelling government interest[.]" *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993). If a law is not neutral or generally applicable, then it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* 531–32. Even viewed through the state-friendly lens of *Jacobson*, the prohibition on religious services presently operating in the Commonwealth is "beyond what was reasonably required for the safety of the public."

*Jacobson*, 197 U.S. at 28.

The Sixth Circuit recently addressed a similar challenge to Kentucky's prohibition on religious services. *See Maryville Baptist Church, Inc. v. Beshear*, 2020 U.S. App. LEXIS 14213 (6th Cir. May 2, 2020). Maryville Baptist Church held a drive-in service on Easter Sunday. But, pursuant to the prohibition on mass gatherings and executive order closing non-essential businesses—the same orders challenged in this case—"Kentucky State Police arrived in the parking lot and issued notices to the congregants that their attendance at the drive-in service amounted to a criminal act." *Id.* at *3. On appeal, the Sixth Circuit considered whether to stay the district court's order denying Maryville Baptist Church's motion to enjoin enforcement of these restrictions. *Id.* In its analysis, the Court observed that Maryville Baptist was likely to succeed on the merits of its claim because "[t]he way the orders treat comparable religious and non-religious activities suggests that they do not amount to the least restrictive way of regulating the churches." *Id.* at *7.

Ultimately, the Sixth Circuit opted to enjoin enforcement of the orders only as they pertained to drive-in services. *Id.* at * 15. *Maryville Baptist* does not decide this case, but it is indicative of what might come. It follows that the prohibition on in-person services should be enjoined as well. The restrictions which the Sixth Circuit criticized as "inexplicably applied to one group and exempted from another" are the same restrictions Tabernacle challenges today. *Id.* at *11. And, as the Sixth Circuit recognized, "many of the serial exemptions for secular activities pose comparable public health risks to worship services." *Id.* at *10. The prohibition on mass gatherings is not narrowly tailored as required by *Lukumi.* There is ample scientific evidence that COVID-19 is exceptionally contagious. But evidence that the risk of contagion is heightened in a religious setting any more than a secular one is lacking. If social distancing is good enough for Home Depot and Kroger, it is good enough for in-person religious services which, unlike the foregoing, benefit from constitutional protection.

Finally, the Court is cognizant that absent a temporary restraining order today, congregants Tabernacle Baptist will be forced to forego in-person service this Sunday. Tabernacle states it "is committed to physically gathering its congregants in person in its sanctuary in a manner consistent with social distancing precautions in order to ensure the safety and well-being of its congregants." [R. 3-1 at 4.] And, should they be permitted to gather, Tabernacle has said it will follow the Center for Disease Control's guidelines on mass gatherings. *Id.* On this condition, the Court will GRANT Plaintiff's Motion for Temporary Restraining Order.

**B**

Plaintiffs have established a likelihood of success on the merits with respect to their free exercise claim, and the Court grants their motion for a TRO on that basis. The likelihood of success on the merits is largely determinative in constitutional challenges like this one, however, the remaining factors also mitigate in favor of Plaintiffs. As already explained, Tabernacle's injury is irreparable. *See Elrod*, 427 U.S. at 373. To stay the prohibition on mass gatherings with respect to religious services which observe the social distancing guidelines promulgated by the Center for Disease Control, as Tabernacle has promised to do, does not harm the Defendants. Finally, the public interest favors the enjoinment

of a constitutional violation. *See Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).

*\*6 While the Court has granted Plaintiff's and the Attorney General's Motions for a TRO based on the free exercise clause of the First Amendment, that is not the only issue before it. Tabernacle also brings claims grounded in the First Amendment guarantee of freedom to assemble, the Kentucky Constitution, and Kentucky's Religious Freedom Restoration Act. [R. 1] These issues are reserved for another day, and will benefit from briefing from the Defendants.

**C**

As a final matter, the Court considers the scope of the TRO. The Attorney General urges the Court to apply its injunction statewide rather than limiting its application to Tabernacle Baptist Church. In *Califano v. Yamasake*, the Supreme Court pointed out that one of the "principles of equity jurisprudence" is that "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Rodgers v. Bryant*, 942 F.3d 451 (quoting *Califano v. Yamasake*, 442 U.S. 682 (1979)); *see also Trump v. Int'l Refugee Assist. Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."); *De Beers Consol. Mines Ltd. v. United States*, 325 U.S. 212, 220, 65 S. Ct. 1130, 89 L. Ed. 1566 (1945) ("A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally."). In the present case, the Executive Order at issue does not just affect Tabernacle Baptist Church. The Executive Order applies to all churches. Therefore, as the Eighth Circuit has recently upheld, injunctive relief may extend statewide because the violation established impacts the entire state of Kentucky.

**III**

The Constitution will endure. It would be easy to put it on the shelf in times like this, to be pulled down and dusted off when more convenient. But that is not our tradition. Its enduring quality requires that it be respected even when it is hard.

In light of the foregoing, the Court will grant Plaintiff's Motion for a TRO. But the Court's review at this stage is preliminary. In depth consideration of the constitutional issues at play will require additional briefing from the parties, and particularly a response from Defendants. Expedited consideration is appropriate. Accordingly, and the Court being otherwise sufficiently advised, it is **ORDERED** as follows:

1. The Motions for Temporary Restraining Order **[R. 3; R. 13]** are **GRANTED;**

2. Defendants are **ENJOINED** from enforcing the prohibition on mass gatherings with respect to any in-person religious service which adheres to applicable social distancing and hygiene guidelines;

3. Intervening Plaintiff Attorney General Daniel Cameron's Motion for Emergency Hearing **[R. 13]** is **DENIED AS MOOT;**

4. A telephonic scheduling conference shall be held **Monday, May 11, 2020** at **11:00 a.m.**, with Judge Van Tatenhove sitting in **Frankfort**, Kentucky; and

5. To join the teleconference, the parties are **DIRECTED** to call AT&T Teleconferencing at 1-877-336-1280 and enter Access Code 2086161 (followed by #), and, when requested, enter the Security Code 09170 (followed by #).

This the 8th day of May, 2020.

**All Citations**

Slip Copy, 2020 WL 2305307

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT K**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

TEMPLE BAPTIST CHURCH; *et al.*,          )
                                          )
      Plaintiffs,          )
                                          )
      v.          )
                                          )    Case No. 4:20-cv-64-DMB-JMV
CITY OF GREENVILLE, *et al.*,          )
                                          )
      Defendants.          )
_____)

**THE UNITED STATES' STATEMENT OF INTEREST IN SUPPORT OF PLAINTIFFS**

      The United States of America respectfully files this Statement of Interest pursuant to

28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United

States in a suit pending in a court of the United States." The United States also enforces

34 U.S.C. § 12601, which allows the United States to bring suit when law enforcement officers

engage in a pattern or practice that deprives individuals of their federal constitutional or statutory

rights.

      The United States has a substantial interest in the preservation of its citizens'

fundamental right to the free exercise of religion, expressly protected by the First Amendment.

To that end, the United States regularly files statements of interest and amicus briefs on

important issues of religious liberty in courts at every level, from trial courts to the Supreme

Court of the United States. In addition, the Attorney General has issued comprehensive guidance

interpreting religious-liberty protections available under the United States Constitution and

federal law. *Federal Law Protections for Religious Liberty*, 82 Fed. Reg. 49668 (Oct. 6, 2017)

(hereinafter "Attorney General Guidelines"). As relevant here, the Attorney General Guidelines

explain that "although government generally may subject religious persons and organizations to

1

neutral generally applicable laws," government cannot "apply such laws in a discriminatory way" or otherwise "target persons or individuals because of their religion." *Id.* at 49669.

Especially in the midst of the COVID-19 pandemic, the United States has a strong interest in ensuring the development and maintenance of the best possible public health strategies to combat the virus and protect the people of the United States from harm. This case raises issues of national public importance regarding the interplay between the government's compelling interest in protecting public health and safety from COVID-19 and citizens' fundamental right to free exercise of religion.

### INTRODUCTION[1]

This suit is brought by Temple Baptist Church, a church in Greenville, and its Pastor, Arthur Scott (collectively, the "church") against the City of Greenville and its mayor (collectively, the "city") alleging that the city has taken improper action to stop it from holding drive-in church services in response to the COVID-19 virus. The church broadcasts its service over a low-power FM station for its parishioners who gather in their cars in the church's parking lot. ECF 1, ¶ 24. Attendees are required to remain in their cars at all times with their windows rolled up. *Id.* ¶¶ 1, 27. The church does not have a website or the ability to stream services online, and "many church members do not have social media accounts, the ability to participate in a Zoom call, or watch services online." *Id.* ¶ 23.

The Mississippi governor has designated churches and other religious entities as an "essential business or operation" that can operate so long as they adhere to Centers for Disease Control and Prevention (CDC) and Mississippi Department of Health guidelines. *Id.* ¶¶ 35-42. On April 7, 2020, however, the city issued an order titled "Executive Order Regarding Church

---

[1] The United States submits this brief on the basis of the facts alleged in the complaint.

2

Services" that barred churches from holding in-person or drive-in services until the Governor's shelter in place order is lifted. *Id.* ¶ 44. On April 8, the city dispatched eight uniformed police officers to the church. *Id.* ¶ 52-53. "[N]o one was outside his or her car at any point during the service, including when the City police arrived" and those "attending the service were sitting peacefully inside their cars listening to Pastor Scott's sermon, with their windows rolled up." *Id.* ¶54-55. The police then "began knocking on car windows, demanding driver's licenses, and writing citations with $500 fines." *Id.* ¶ 56.

The church filed this suit in response, raising claims under, *inter alia*, the Free Exercise Clause, and under the Mississippi Religious Freedom Restoration Act (MRFRA), MISS. CODE ANN. § 11-61-1(5) (2020).

## ARGUMENT

### I. Constitutional Rights Are Preserved During a Public Health Crisis

The federal government, the District of Columbia and all 50 states have declared a state of emergency and have taken unprecedented, but essential, steps to contain the spread of the novel coronavirus, and consequences of the life-threatening COVID-19 pandemic. *See, e.g.*, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020).[2] The President has issued "Coronavirus Guidelines for America" which, among other measures, urge the public to "follow the directions of [their] state and local authorities," to "avoid social gatherings in groups of more than 10 people" and to "use drive-thru, pickup, or delivery options" instead

---

[2] Presidential Proclamation, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/

of "eating or drinking at bars, restaurants, and food courts."[3] The CDC has recommended that individuals "[s]tay home as much as possible" and when in public keep "about 6 feet" away from others.[4] States and localities have imposed a variety of measures, including mandatory limitations on gatherings. Observing these guidelines is the best path to swiftly ending COVID-19's profound disruptions to our national life and resuming the normal economic life of our country. Citizens who seek to do otherwise are not merely assuming risk with respect to themselves, but are exposing others to the same danger. It is for that reason that state and local governments have acted to protect public health by restricting in-person assemblies, including religious assemblies.

There is no pandemic exception, however, to the fundamental liberties the Constitution safeguards. Indeed, "individual rights secured by the Constitution do not disappear during a public health crisis." *In re Abbott*, --- F.3d ---, 2020 WL 1685929, at *6 (5th Cir. Apr. 7, 2020). These individual rights, including the protections in the Bill of Rights made applicable to the states through the Fourteenth Amendment, are always in force and restrain government action.

At the same time, the Constitution does not hobble government from taking necessary, temporary measures to meet a genuine emergency. According to the Supreme Court, "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905).

---

[3] Coronavirus Guidelines for America (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf
[4] Centers for Disease Control, How to Protect Yourself and Others (April 8, 2020) https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

4

The "settled rule [from *Jacobson*]," the Fifth Circuit recently explained, "allows the state to restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and even to leave one's home." *In re Abbott*, 2020 WL 1685929, at *6. And, critically, "[t]he right to practice religion freely does not include the liberty to expose the community . . . to communicable disease." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). Emergency public health measures such as gathering limitations and social distancing requirements in response to COVID-19 are evaluated under the Supreme Court's decision in *Jacobson*. Courts owe substantial deference to government actions, particularly when exercised by states and localities under their police powers during a bona fide emergency.

Nevertheless, the Supreme Court has instructed courts to intervene:

[I]f a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, *beyond all question, a plain, palpable invasion of rights secured by the fundamental law*.

*Jacobson*, 197 U.S. at 31 (emphasis added). As a result, government can take extraordinary, temporary measures to protect the public. In *Jacobson*, the Court explained, by way of example, that "[a]n American citizen arriving at an American port" who had traveled to a region with yellow fever "may yet, in some circumstances, be held in quarantine against his will." *Id.* at 29.

If, however, the record establishes "beyond all question, a plain, palpable" violation of the foregoing principles, then a court must grant relief. *See In re Abbott*, 2020 WL 1685929, at *7. Courts reviewing a challenge to a measure responding to the "society-threatening epidemic" of COVID-19 should be vigilant to protect against clear invasions of constitutional rights while ensuring they do "not second-guess the wisdom or efficacy of the measures" enacted by the democratic branches of government, on the advice of public health experts. *Id.*

5

II.     **The Free Exercise Clause Prohibits Unequal Treatment of Religious Individuals and Organizations**

A. The Free Exercise Clause guarantees to all Americans the "right to believe and profess whatever religious doctrine [they] desire[]." *Empl't Div. v. Smith*, 494 U.S. 872, 877 (1990). It also protects their right to act on these beliefs, through gathering for public worship as in this case, or through other acts of religious exercise in their daily lives. While the protections for actions based on one's religion are not absolute, *id.* at 878-79, among the most basic requirements of the Free Exercise Clause are that government may not restrict "acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display," *id.* at 877, nor "target the religious for special disabilities based on their religious status." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (internal quotation marks omitted); *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672.

To determine whether a law impermissibly targets religious believers or their practices, the Supreme Court has directed courts to "survey meticulously" the text and operation of a challenged law to ensure that it is neutral and of general applicability. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (1993). The Court explained: "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 543; *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672.

6

Under the Free Exercise Clause, a law or rule, or the application of a law or rule, that is not both neutral and generally applicable is subject to heightened scrutiny. *Church of the Lukumi Babalu Aye*, 508 U.S. at 531.

A law or rule is not neutral if it singles out particular religious conduct for adverse treatment; treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons; visits "gratuitous restrictions on religious conduct"; or "accomplishes . . . a 'religious gerrymander,' an impermissible attempt to target [certain individuals] and their religious practices." *Id.* at 533-35, 538 (internal quotation marks omitted); *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672. In short, "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting *Church of the Lukumi Babalu Aye*, 508 U.S. at 534).

A law is not generally applicable if "in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief,' including by "fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than . . . does the prohibited conduct." *Church of the Lukumi Babalu Aye*, 508 U.S. at 534; *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672.

Accordingly, the Supreme Court's free exercise decisions instruct this Court to "survey meticulously," *id.* at 534, the risks and character of the various essential services that the city continues to permit. The Court must determine whether the city's distinctions between nonreligious essential services and religious essential services are truly neutral and generally applicable. In other words, the Court must ensure that like things are treated as like, and that religious organizations are not singled out for unequal treatment. *See id.* at 533-34.

7

If the Court determines that the city's prohibition on drive-in church services is in fact not the result of the application of a generally applicable and neutral law or rule, then it must review the city's justifications and determine if the city has demonstrated a compelling governmental interest, pursued through the least restrictive means. *See id.* at 546.

The Court must be appropriately deferential to the expertise of public health officials in evaluating potential distinctions between a drive-in church and other permitted essential activities where people gather in cars, parking lots, or interact in some way in significant numbers. *See Jacobson,* 197 U.S. at 31; *In re Abbott,* 2020 WL 1685929, at *7. But such deference will not justify action that is "beyond all question, a plain, palpable" violation of free exercise principles. *Jacobson,* 197 U.S. at 31; *see also In re Abbott,* 2020 WL 1685929, at *7. Thus, if the Court determines that the city's prohibition is not in fact the result of a neutral and generally applicable law or rule, then the Court may sustain it only if the city establishes that its action is the least restrictive means of achieving a compelling governmental interest. *Church of the Lukumi Babalu Aye,* 508 U.S. at 546.

**B.** The allegations in the complaint strongly suggest that the city's prohibition of drive-in church services, despite the inclusion of measures to reduce risk such as requiring people to remain in their cars, are neither neutral nor generally applicable.

Take neutrality first. According to the city, "ALL businesses and industries deemed essential by state and federal orders" may continue operations, ECF 1, ¶ 45, and the state has designated churches such as the one here as essential. Nevertheless, the city barred the church from holding services even if the church adheres to CDC and Mississippi COVID-19 guidelines for essential operations. *See id.* ¶¶ 33, 35. These allegations suggest that the city singled out

8

churches for distinctive treatment not imposed on other entities the state has designated as essential services.

In addition to appearing non-neutral, the church's allegations also tend to show that the city's emergency actions are not applied in a generally applicable manner. The church alleges facts tending to show that conduct is being permitted for various secular reasons when equivalent conduct is being forbidden to churches holding drive-in services. Notably, the city appears to permit citizens to sit in a "car at a drive-in restaurant with [their] windows rolled *down*," but not "at a drive-in church service with [their] windows rolled *up*." *Id.* ¶ 51. The church thus alleges that the city has "fail[ed] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree," *Church of the Lukumi Babalu Aye*, 508 U.S. at 543, than drive-in services like the church's here.

## III.     The Compelling Interest/Least Restrictive Means Test Is a Searching Inquiry

The Court should apply heightened scrutiny under the Free Exercise Clause if it determines, after applying appropriate deference to local officials, that the church has been treated by the city in a non-neutral and non-generally applicable manner. The same analysis would apply if the Court found that the church's religious exercise has been burdened under the Mississippi Religious Freedom Restoration Act, MISS. CODE ANN. § 11-61-1(5)(b) ("Mississippi RFRA"). The federal Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, which applies to federal action (but not state and local government action) "prohibits the Government from substantially burdening a person's exercise of religion . . . unless the Government demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 695 (2014)

9

(citations and internal marks omitted). This is true "even if the burden results from a rule of general applicability," *O Centro Espirita Beneficente Uniao do Vegetal v. Gonzales*, 546 U.S. 418, 424 (2006). Mississippi's RFRA similarly states that the government "may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person: (i) is in furtherance of a compelling governmental interest; and (ii) is the least restrictive means of furthering that compelling governmental interest." MISS. CODE ANN. § 11-61-1(5)(b). This is a difficult standard to meet.

As a general matter, prohibiting large gatherings to prevent the spread of COVID-19 undeniably advances a compelling government interest. The Fifth Circuit recently recognized "the escalating spread of COVID-19, and the state's critical interest in protecting the public health." *In re Abbott*, 2020 WL 1685929, at *1. However, that is not the end of the inquiry. In *O Centro*, the Supreme Court considered under the federal RFRA whether banning a religious group from using a particular controlled substance in its worship service was supported by the compelling interest of enforcing the drug laws. *See* 546 U.S. at 428-39. The Court recognized that while enforcing the drug laws constitutes a compelling interest as a general matter, the government had to show more—a compelling interest in applying those laws to the small religious group that sought to use a drug in religious ceremonies that was not a sought-after recreational drug and thus not prone to diversion. Drawing on its Free Exercise Clause precedents, the Supreme Court held that courts must look "beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431.

The Supreme Court has noted that "'context matters' in applying the compelling interest test, and has emphasized that strict scrutiny's fundamental purpose is to take 'relevant

10

differences' into account." *Id.* (citations omitted). For example, in *Cutter v. Wilkinson*, the

Supreme Court applied the compelling interest standard in a manner that directed that prison

administrators be afforded deference on what constitutes safety and good order. 544 U.S. 709,

723 (2005). Similarly, here, a court must apply this standard in the context of a pandemic that

officials have predicted—if unchecked—could claim a significant number of American lives.

On the other hand, the requirement set forth in *O Centro* that a compelling interest must be

evaluated in context rather than by reference to a broad general principle such as health or safety,

and the related requirement that the government must use the least restrictive means to achieve

its interest, *see Hobby Lobby*, 573 U.S. at 728 (the "least-restrictive-means standard is

exceptionally demanding"), emphasize that a court must engage in a searching inquiry.

The question for this Court, then, is whether the city's alleged actions here—namely,

"reclassif[ying] churches as '*non*-essential'" businesses and operations so as to prevent this

church from engaging in its "'drive-in' services [that] involve no in-person contact," ECF 1,

¶¶ 24, 45—furthers a compelling interest, and whether there is no less restrictive measure the

city could use to achieve that interest while allowing the church to hold its services. If in this

fact-intensive and context-laden analysis, the court determines that there are no "relevant

differences," *O Centro*, 546 U.S. at 420, with regard to the efficacy in containing COVID-19

between what the church proposed and what the city would require, then the city's measure must

yield to the church's sincerely held religious exercise.

The facts alleged in the church's complaint strongly suggest that there are no such

differences and that the city should allow the church to hold its drive-in services. Under strict

scrutiny, the city has the burden to demonstrate that prohibiting the small church here from

holding the drive-in services at issue here—services where attendees are required to remain in

11

their cars in the church parking lot at all times with their windows rolled up and spaced consistent with CDC guidelines—is the least restrictive means of furthering a compelling interest. As of now, it seems unlikely that the city will be able to carry that burden. Again, according to the complaint, the church "does not allow those attending its 'drive-in' services' to leave their cars for any reason," ECF 1, ¶ 5, and requires them to space their cars "beyond CDC guidelines," with their "windows up," *id.* ¶¶ 1, 24. Based on those allegations, it is unclear why prohibiting these services is the least restrictive means of protecting public health, especially if, as alleged in the complaint, the city allows other conduct that would appear to pose an equal—if not greater—risks, *see id.* ¶ 51.

## CONCLUSION

The United States respectfully requests the Court to consider the arguments set forth above in evaluating this case. The facts alleged in the complaint strongly suggest that the city's actions target religious conduct. If proven, these facts establish a free exercise violation unless the city demonstrates that its actions are neutral and apply generally to nonreligious and religious institutions or satisfies the demanding strict scrutiny standard.


Dated: April 14, 2020

12

Respectfully submitted,

ERIC S. DREIBAND
Assistant Attorney General

/s/ William C. Lamar
WILLIAM C. LAMAR (MSB #8479)                    ALEXANDER V. MAUGERI
United States Attorney                           Deputy Assistant Attorney General
Northern District of Mississippi
900 Jefferson Ave.,                              /s/ Eric W. Treene
Oxford, MS 38655                                 ERIC W. TREENE
Phone: (662)234-3351                             Special Counsel
Email: Chad.Lamar@usdoj.gov                      Civil Rights Division
                                                 U.S. Department of Justice
                                                 950 Pennsylvania Avenue NW
D. MICHAEL HURST, JR.                            Washington, DC 20530
United States Attorney                           Phone: (202) 514-2228
Southern District of Mississippi                 Email: Eric.Treene@usdoj.gov
501 E. Court St.
Suite 4.430
Jackson, MS 39201

13

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that this 14th day of April 2020, the foregoing United States' Statement of Interest was electronically filed with the Clerk of Court using the CM-ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ William C. Lamar
WILLIAM C. LAMAR

**EXHIBIT L**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| LIGHTHOUSE FELLOWSHIP CHURCH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 2:20-cv-00204-AWA-RJK |
| RALPH NORTHAM, in his official capacity | ) |
| as Governor of the Commonwealth of Virginia, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**THE UNITED STATES' STATEMENT OF INTEREST IN SUPPORT OF PLAINTIFF'S
MOTION FOR AN INJUNCTION PENDING APPEAL**

The United States respectfully submits this Statement of Interest supporting Plaintiff

Lighthouse Fellowship Church's ("Lighthouse"), motion for an injunction pending appeal filed

on May 2, 2020. ECF 18. The United States respectfully suggests that the Court erred in its

Memorandum Opinion and Order of May 1, 2020, ECF 16, denying Lighthouse's Emergency

Motion for a Temporary Restraining Order and Preliminary Injunction, for the reasons below.[1]

The Court denied that motion without a hearing, without any briefing from the Commonwealth

and without Lighthouse having the opportunity to reply to any justifications offered.

This case, as set forth in detail below, involves important questions of how to balance the

deference owed to public officials in addressing a pandemic threatening the health and safety of

the public with fundamental constitutional rights. For purposes of this filing, the United States

does not take a position on the ultimate question of whether the Commonwealth may have a

---

[1] *See* Fed. R. Civ. P. 62(d); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 558 (E.D. Va. 2016)
(following preliminary injunction standards when ruling on a motion for a stay pending appeal).

legally sufficient justification for treating Plaintiff differently from non-retail businesses or other

permitted assemblies that may be comparable.  The Commonwealth has not yet responded to

Plaintiff's allegations that it permits non-retail businesses, such as law or accounting offices, to

gather in numbers greater than ten so long as they use social distancing.  Likewise, the

Commonwealth has not yet responded to Plaintiff's allegations that various comparable secular

gatherings are permitted.  Based on the materials before the Court, Plaintiff has demonstrated a

likelihood of success on the merits of its claim under the Free Exercise Clause of the U.S.

Constitution that the Commonwealth's executive orders have prohibited religious gatherings at

places of worship, even with social distancing and personal hygiene protocols, while allowing

comparable secular gatherings to proceed with social distancing.  It thus becomes the

Commonwealth's burden to demonstrate that it has compelling reasons to treat Plaintiff

differently than similar non-religious businesses, and that it has pursued its objectives through

the least restrictive means.  Because the Commonwealth has not yet filed any response, it has not

satisfied its burden.

On May 2, 2020, the United States Court of Appeals for the Sixth Circuit granted an

Injunction Pending Appeal in a case raising issues similar to those in this case, *Maryville Baptist

Church, Inc. v. Beshear*, No. 20-5427, slip op. (6th Cir. May 2, 2020) (per curiam).  The Sixth

Circuit there concluded: "[t]he Governor has offered no good reason so far for refusing to trust

the congregants who promise to use care in worship in just the same way it trusts accountants,

lawyers, and laundromat workers to do the same." *Id.* at 8.

Similarly, here, the Commonwealth has not explained why it differentiates and "refus[es]

to trust" this small congregation's worship activities that, as alleged, follow social distancing and

personal hygiene protocols, while allowing and trusting non-retail businesses to gather more than

ten people in such a fashion.  As Plaintiff has made an initial showing that the Commonwealth's

executive orders treat religious organizations less favorably than similar secular organizations,

and the Commonwealth has not yet carried its strict-scrutiny burden of justifying its differential

treatment of religion, the Court should grant Plaintiff's motion and grant an injunction pending

appeal.

## INTEREST OF THE UNITED STATES

The United States of America respectfully files this Statement of Interest pursuant to

28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United

States in a suit pending in a court of the United States."  The United States also enforces

34 U.S.C. § 12601, which allows the United States to bring suit when law enforcement officers

engage in a pattern or practice that deprives individuals of their federal constitutional or statutory

rights.

The United States has a substantial interest in the preservation of its citizens'

fundamental right to the free exercise of religion, expressly protected by the First Amendment.

To that end, the United States regularly files statements of interest and amicus briefs on

important issues of religious liberty in courts at every level, from trial courts to the Supreme

Court of the United States.  In addition, the Attorney General has issued comprehensive guidance

interpreting religious-liberty protections available under the United States Constitution and

federal law. *Federal Law Protections for Religious Liberty*, 82 Fed. Reg. 49668 (Oct. 26, 2017)

("Attorney General Guidelines").  As relevant here, the Attorney General Guidelines explain that

"[a]lthough government generally may subject religious persons and organizations to neutral,

generally applicable laws," government cannot "apply such laws in a discriminatory way" or

otherwise "target persons or individuals because of their religion." *Id.* at 49669.

3

The United States also has a strong interest, especially in the midst of the COVID-19 pandemic, in ensuring the development and maintenance of the best possible public health strategies to combat the virus and protect the people of the United States from harm. But that interest must be balanced with constitutional liberties. This case raises issues of national public importance regarding the interplay between the government's compelling interest in protecting public health and safety from COVID-19 and citizens' fundamental right to the free exercise of religion.

## BACKGROUND[2]

This suit was brought by the Lighthouse Fellowship Church in Chincoteague Island, Virginia against Governor Ralph Northam (the "governor" or the "Commonwealth") alleging that the governor has ordered restrictions on gatherings in response to the COVID-19 virus that improperly restrict religious gatherings at places of worship while allowing comparable secular gatherings, including the continued operation of any "business operations offering professional rather than retail services." ECF 1-3, ¶ 8.

Lighthouse "is a small congregation without the resources or equipment to . . . conduct parking lot or drive-in services." ECF 1, ¶ 9. This church has a specialized ministry catering to the socioeconomically disadvantaged. "[M]any of the members it serves are recovering drug addicts, former prostitutes" and others "trying to put their lives together, who do not have the resources to watch worship services over the Internet." *Id.* For "those members, Lighthouse is their only family and assembling with their church family is everything." *Id.*

---

[2] The United States assumes the truth of the facts alleged in the complaint and reflected in the accompanying exhibits for purposes of this brief.

According to the complaint, the Town of Chincoteague Police Department has understood the governor's orders to prohibit Lighthouse from hosting religious services with more than ten people and has enforced these orders against the church. Specifically, the Town of Chincoteague Police Department "imposed criminal sanctions against [its] religious gatherings that included 16 people . . . even though these 16 people were separated by more than six feet in the 225-seat sanctuary." ECF 1, ¶ 2 (emphasis omitted). Indeed, on April 5, 2020, Lighthouse's pastor, Kevin Wilson, was issued a criminal citation and summons because of this sixteen-person worship service. ECF 1, ¶ 8; ECF 1-7. During that service, Lighthouse maintained "social distancing and personal hygiene protocols, including extensive and enhanced sanitizing of common surfaces in Lighthouse's building prior to the service," and "requir[ed] attendees to remain at least six feet apart and use hand sanitizer prior to entering and during movement inside Lighthouse's building." ECF 1, ¶ 54.

Over the last two months, the governor has issued a series of Executive Orders prohibiting religious gatherings of more than ten people, while permitting secular gatherings of more than ten people to occur under an array of circumstances (collectively, the "Orders"). Governor Northam's Executive Order Amended Number Fifty-Three issued on April 15, 2020, bans "all public and private in person gatherings of more than 10 individuals." ECF 1-3, ¶ 1. Executive Order Number Fifty-Five, which Governor Northam issued on March 30, 2020, further specified that prohibited activities "include[] parties, celebrations, *religious*, or other social events." ECF 1-4, ¶ 2 (emphasis added). Violations of the Orders are charged criminally and—according to the Virginia State Police—"can result in an individual[ ] or business being charged with a class one misdemeanor, which carries up to a year in jail and $2,500 fine." ECF 1-5, at 1.

5

The Orders, however, permit various secular activities resulting in gatherings of more than ten people, so long as "to the extent possible, [they] adhere to social distancing recommendations, enhanced sanitizing practices on common surfaces, and other appropriate workplace guidance from state and federal authorities while in operation." ECF 1-3, ¶ 6. First, the Orders permit any and all "business operations offering professional rather than retail services [to] remain open," with only an advisory that "they should utilize teleworking as much as possible." ECF 1-3, ¶ 8; *see also* ECF 1-4, ¶ 2.a (excluding from the ten-person gathering limit any business "not required to close to the public under Executive Order 53"). The Commonwealth publicly confirmed that "[n]othing in the Executive Order impacts business sectors that are not explicitly listed" such that the prohibitions "only cover[] (1) recreation and entertainment businesses, (2) brick and mortar non-essential retail businesses, and (3) restaurants, dining establishments, food courts, breweries, microbreweries, distilleries, wineries, tasting rooms, and farmers markets."[3] Accordingly, the Orders do not limit the ability of employees of any non-retail business, including but not limited to professional services businesses, to gather. The Orders impose no limit, for example, on the ability of the workforce to assemble in conference rooms or anywhere else at those worksites. *See id.*

Second, the Orders contain various exceptions authorizing gatherings of more than ten individuals across an array of "retail businesses," including "[b]eer, wine, and liquor stores," "[h]ome improvement, hardware, building material, and building supply retailers," "[l]aundromats and dry cleaners," and any "department store" that includes a food or pharmacy section. ECF 1-3, ¶ 5. Third, all other "brick and mortar retail business[es]" not specifically

---

[3] *See* Virginia's Statewide Stay at Home Order: Frequently Asked Questions, "I am not a business sector explicitly listed in the Executive Order, but I believe that I am an essential business. What should I do?," https://www.virginia.gov/coronavirus/faq/.

exempted from the ten-person limit "may continue to operate" if they "limit all in-person shopping to no more than 10 patrons per establishment" with social distancing. *Id.* ¶ 6. The Orders do not impose any numerical caps on the number of staff members who can be present in such retail businesses to service those ten patrons. *See id.*

Lighthouse has submitted photographs reflecting application of these exceptions in practice. For example, some photographs show that various big-box retail stores remain open and are drawing large crowds inside the stores, as evidenced by full parking lots of vehicles. *See* ECF 1, ¶¶ 59-60 (declaration averring that "there were 268 cars in the WalMart parking lot," "156 cars in the Target parking lot," and "162 cars in the parking lot" of Lowe's). A photograph of one of the governor's press conferences shows the use of social distancing in an enclosed space where more than ten people have gathered. *See* ECF 1, ¶ 58.

Lighthouse filed this suit on April 24, 2020, raising claims under, *inter alia*, the Free Exercise Clause of the First Amendment to the United States Constitution. This Court denied Lighthouse's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction on May 1, 2020. ECF 16.

For the reasons set forth below, the United States believes that the church has set forth a strong case that the Orders, by exempting other activities permitting similar opportunities for in-person gatherings of more than ten individuals, while at the same time prohibiting churches from gathering in groups of more than ten—even with social distancing measures and other precautions—has impermissibly interfered with the church's free exercise of religion. Unless the Commonwealth can prove that its disparate treatment of religious gatherings is justified by a compelling reason and is pursued through the least restrictive means, this disparate treatment violates the Free Exercise Clause, and the Orders may not be enforced against the church. This

7

proof simply has not occurred because the Commonwealth has not yet submitted any argument or evidence in this case.

This is not to say that the Commonwealth must necessarily permit live, indoor church gatherings. As discussed below, there are good reasons to discourage gatherings of more than ten people and to encourage people to stay home whenever possible. But the Free Exercise Clause generally mandates that restrictions on gatherings be applied equally. Thus, an order purportedly aimed at promoting social distancing cannot impose a greater restriction on religious gatherings than similar secular gatherings absent the most compelling, narrowly tailored reasons. It will be difficult for the Commonwealth to justify having one set of rules that allows for secular gatherings—such as in-person operations for any non-retail business and various other exemptions permitting large-scale retail gatherings—while denying to Lighthouse the ability to worship in modest numbers with appropriate social distancing and sanitizing precautions.

## ARGUMENT

### I.      Constitutional Rights Are Preserved During a Public Health Crisis

The federal government, the District of Columbia, and all fifty States have declared states of emergency, and have taken unprecedented and essential steps to contain the spread of the novel coronavirus and the consequences of the life-threatening COVID-19 pandemic.[4] The President issued "Coronavirus Guidelines for America," which, among other measures, urge the public to "follow the directions of [their] state and local authorities," to "avoid social gatherings in groups of more than 10 people" and to "use drive-thru, pickup, or

---

[4] *See, e.g.*, Presidential Proclamation, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

delivery options" instead of "eating or drinking at bars, restaurants, and food courts."[5] The Centers for Disease Control and Prevention recommended that individuals "[s]tay at home as much as possible" and when in public keep "about 6 feet" away from others.[6] States and localities, in turn, imposed a variety of measures, including mandatory limitations on gatherings. And more recently, President Trump also "unveiled Guidelines for Opening Up America Again, a three-phased approach based on the advice of public health experts" to "help state and local officials when reopening their economies, getting people back to work, and continuing to protect American lives."[7] Following these guidelines is the best path to swiftly ending COVID-19's profound disruptions to our national life and resuming the normal economic life of our country. Citizens who seek to do otherwise are not merely assuming risk with respect to themselves, but are exposing others to the same danger. Accordingly, state and local governments, seeking to protect the public health, are restricting in-person assemblies, including religious assemblies.

Moreover, the Constitution does not hobble government from taking necessary, temporary measures to meet a genuine emergency. According to the Supreme Court, "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S.

---

[5] The President's Coronavirus Guidelines for America (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.
[6] Centers for Disease Control and Prevention, How to Protect Yourself and Others (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention-H.pdf.
[7] Guidelines: Opening Up America Again (April 16, 2020), https://www.whitehouse.gov/openingamerica/.

11, 29 (1905).  In *Jacobson*, for example, the Court explained that "[a]n American citizen arriving at an American port" who had traveled to a region with yellow fever "may yet, in some circumstances, be held in quarantine against his will."  *Id.*  The "settled rule [from *Jacobson*]," a court of appeals recently noted, "allows the state to restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and even to leave one's home."  *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020).  And, critically, "[t]he right to practice religion freely does not include the liberty to expose the community . . . to communicable disease."  *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).  Emergency public health measures such as gathering limitations and social distancing requirements in response to COVID-19 are evaluated under the Supreme Court's decision in *Jacobson.*  Courts owe substantial deference to government actions, particularly when exercised by states and localities under their police powers during a bona fide emergency.

But there is no pandemic exception to the Constitution and its Bill of Rights.  Indeed, "individual rights secured by the Constitution do not disappear during a public health crisis."  *In re Abbott*, 954 F.3d at 784.  These individual rights, including the protections in the Bill of Rights made applicable to the states through the Fourteenth Amendment, are always operative and restrain government action.  Accordingly, the Supreme Court has instructed courts to intervene "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, *beyond all question, a plain, palpable invasion of rights secured by the fundamental law*."  *Jacobson*, 197 U.S. at 31 (emphasis added).  Thus, if the record establishes a "plain, palpable" violation of constitutional rights, then a court must grant relief.  *See In re Abbott*, 954 F.3d at 784.  Courts reviewing measures designed to address the "society-threatening epidemic" of COVID-19 should

10

be vigilant to protect against clear invasions of constitutional rights while ensuring they do "not second-guess the wisdom or efficacy of the measures" properly enacted by the democratic branches of government, on the advice of public health experts. *Id.* at 784-85.

## II. The Free Exercise Clause Prohibits Unequal Treatment of Religious Individuals and Organizations

A. The Free Exercise Clause guarantees to all Americans the "right to believe and profess whatever religious doctrine [they] desire[]." *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990). It also protects their right to act on these beliefs, through gathering for public worship as in this case, or through other acts of religious exercise in their daily lives. While the protections for actions based on one's religion are not absolute, *id.* at 878-79, among the most basic requirements of the Free Exercise Clause are that government may not restrict "acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display," *id.* at 877, nor "target the religious for special disabilities based on their religious status," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (citation and internal quotation marks omitted); *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672. To determine whether a law impermissibly targets religious believers or their practices, the Supreme Court has directed courts to "survey meticulously" the text and operation of a challenged law to ensure that it is neutral and of general applicability. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (1993). The Court explained: "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 543; *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672.

11

Under the Free Exercise Clause, a law or rule, or the application of a law or rule, that is not both neutral and generally applicable is subject to heightened scrutiny. *Church of the Lukumi Babalu Aye*, 508 U.S. at 531.

A law or rule is not neutral if it singles out particular religious conduct for adverse treatment; treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons; "visits gratuitous restrictions on religious conduct"; or "accomplishes . . . a religious gerrymander, an impermissible attempt to target [certain individuals] and their religious practices." *Id.* at 533-35, 538 (citations and internal quotation marks omitted); *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672.

A law is not generally applicable if "in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief," including by "fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than does" the prohibited conduct. *Church of the Lukumi Babalu Aye*, 508 U.S. at 534; *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672. In *Church of the Lukumi Babalu Aye*, the Court found that the challenged ordinances were "underinclusive with regard to the [government's] interest in public health" because they outlawed the religious conduct at issue but failed to prohibit various nonreligious conduct that had an equal or greater impact on public health. 508 U.S. at 543-45. The ordinances were thus not generally applicable. *Id.*

"A law is underinclusive, and thus not generally applicable, when it fails to prohibit secular activity that endangers the same interests to a similar or greater degree than the prohibited religious conduct." *First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, at *6 (D. Kan. Apr. 18, 2020); *accord Central Rabbinical Congress of U.S. & Canada v. New York Dep't of Health*, 763 F.3d 183, 197 (2d Cir. 2014) (A law is not generally applicable

12

if it "is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it."); *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012) ("If the law appears to be neutral and generally applicable on its face, but in practice is riddled with exemptions . . . the law satisfies the First Amendment only if it 'advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests.'" (citation omitted)); *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 534 & 538; Attorney General Guidelines, 82 Fed. Reg. at 49672.

A "prohibition that society is prepared to impose upon [religious] worshippers but not upon itself," the Supreme Court held, is not generally applicable and is subject to strict scrutiny. *Church of the Lukumi Babalu Aye*, 508 U.S. at 545 (citation omitted); *see also American Life League, Inc. v. Reno*, 47 F.3d 642, 654 (4th Cir. 1995) (recognizing that a law would not be generally applicable if the same conduct is not "outlawed for all," or if a violation under a law depended on "whether a violator acts on the basis of religious conviction or temporal views").

Accordingly, the Supreme Court's Free Exercise Clause decisions instruct this Court to "survey meticulously," *Church of the Lukumi Babalu Aye*, 508 U.S. at 534, the risks and character of the various activities the state chooses to permit. "All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice. The Free Exercise Clause protect[s] religious observers against unequal treatment." *See id.* at 542 (internal citation omitted).

Here, the Court must determine whether the Commonwealth's distinctions between religious and secular gatherings are truly neutral and generally applicable. In other words, the

Court must ensure that like things are treated as like, and that religious gatherings are not singled out for unequal treatment.

If the Court determines that the Orders fail to prohibit secular activities comparable to Lighthouse's gathering of more than ten individuals, then the Court must review the Commonwealth's purported justifications and determine if they meet strict scrutiny, *i.e.*, whether the Commonwealth has demonstrated a compelling governmental interest, pursued through the least restrictive means. *See id.* at 546 ("The compelling interest standard that we apply . . . is not 'water[ed] . . . down' but 'really means what it says.'" (internal citation omitted)); *see also Jesus Christ Is The Answer Ministries, Inc. v. Baltimore County, Md.*, 915 F.3d 256 (4th Cir. 2019) ("A government decision fails strict scrutiny if it is not narrowly tailored to advance a compelling state interest.").

The Court must be appropriately deferential to the expertise of public health officials in evaluating potential distinctions between secular gatherings listed in the Orders and religious gatherings. *See Jacobson*, 197 U.S. at 31; *In re Abbott*, 954 F.3d at 784-85. But such deference will not justify action that is "beyond all question, a plain, palpable" violation of free exercise principles. *Jacobson*, 197 U.S. at 31; *see also In re Abbott*, 954 F.3d at 784-85. Thus, if the Court determines that the Orders plainly are not neutral and generally applicable, then the Court may sustain their disparate treatment of religious gatherings only if it meets the demands of strict scrutiny.

**B.** In prohibiting church services or other religious gatherings that exceed ten people, despite permitting various other gatherings that may result from secular activities, the Commonwealth's Orders appear, at least, not to be generally applicable.

The Orders' exemption of all non-retail businesses, including professional services, from the mass-gathering limit, is not generally applicable. Under this exemption, a large law firm, real estate firm, or any other non-retail business, such as a production facility, is free to operate using its entire workforce, without any limits on the size of meetings or any prohibitions on gathering in conference rooms or any other part of these offices. As the Supreme Court made clear in *Church of the Lukumi Babalu Aye,* a "prohibition that society is prepared to impose upon [religious worshippers] but not upon itself," is not generally applicable. 508 U.S. at 545 (citation omitted). Or as then-Judge Alito explained, "[a] law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004). And this is what the Sixth Circuit held recently in *Maryville Baptist Church, Inc. v. Beshear*, No. 20-5427, slip op. (6th Cir. May 2, 2020) (per curiam). The Sixth Circuit determined that because "[t]he Governor has offered no good reason so far for refusing to trust the congregants who promise to use care in worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same," *id.* at 8, a rule was not generally applicable under *Church of the Lukumi Babalu Aye* and strict scrutiny applied. *Id.* at 6, 8.

The inconsistent treatment in the Orders of conduct that appears to endanger the Commonwealth's interest to a similar degree to permitted activities shows, on this record, that the Commonwealth has not acted in a generally applicable manner.[8]  It is thus incumbent on the

---

[8] Because the Orders are not generally applicable, strict scrutiny applies, and the Court need not reach the issue of whether the Orders are neutral toward religion. The United States notes, however, that "[n]eutrality and general applicability are interrelated, and . . . failure to satisfy one

Commonwealth to show how it is in fact not treating Lighthouse in a disparate manner. It is not possible for the Commonwealth to do so on this record because it has not yet responded to the motion for a TRO or preliminary injunction. Likewise, Lighthouse has made at least an initial showing of irreparable injury. *See Stuart Circle Parish v. Board of Zoning Appeals of City of Richmond*, 946 F. Supp. 1225, 1235 (E.D. Va. 1996) (recognizing that "plaintiffs will suffer irreparable injury [where] they will be prevented from practicing the free exercise of their religion"). And the Commonwealth has not come forward with any reasons why the equities and public interest would weigh against Plaintiff's proposed gatherings, which, as alleged, serve an essential function for its congregants while complying with all social distancing and sanitation guidelines. Thus, on this record, a preliminary injunction should have issued and an injunction pending appeal is warranted.

**C.** The United States does not take a position in this Statement on the advisability of in-person gatherings in Virginia or in any of its localities at this time, as the proper response to the COVID-19 pandemic will vary over time depending on facts on the ground. But the Commonwealth cannot treat religious gatherings less favorably than other similar, secular gatherings. To be clear, this principle does not prevent a government from seeking to establish "that mass gatherings at churches [of the sort Lighthouse proposes] pose unique health risks that

_____

requirement is a likely indication that the other has not been satisfied." *Church of the Lukumi Babalu Aye*, 508 U.S. at 531. The value judgment inherent in providing exemptions for secular activities that impact the Commonwealth's interests while not providing exemptions for Plaintiff's religious activities tends to indicate that the Commonwealth's actions may not be religion-neutral. *See Fraternal Order of Police v. Newark*, 170 F.3d 359, 365 (1999) (Alito, J.) ("[I]n *Smith* and *Lukumi,* it is clear . . . the Court's concern was the prospect of the government's deciding that secular motivations are more important than religious motivations"); *id.* at 366 (heightened scrutiny attaches when government "makes a value judgement in favor of secular motivations, but not religious motivations").

do not arise" in the context of the activities that the Orders permit. *First Baptist Church*, 2020 WL 1910021 at *7; *see infra* Part III. As discussed in Part III, however, the Commonwealth has not yet asserted any such carefully tailored approach, and Lighthouse would be entitled to relief unless the Commonwealth can carry its burden on strict scrutiny. *See, e.g., id.* at *3 & 7 (holding that "secular facilities that are still exempt from the mass gathering prohibition or that are given more lenient treatment," including "airports, childcare locations, hotels, food pantries and shelters, detoxification centers," "shopping malls," and "office spaces," demonstrated religious targeting that failed strict scrutiny and called for a temporary restraining order against the Kansas Governor's COVID-19 Order).

### III.     The Compelling Interest / Least Restrictive Means Test Is a Searching Inquiry

A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance "'interests of the highest order'" and must be narrowly tailored in pursuit of those interests. *Church of the Lukumi Babalu Aye*, 508 U.S. at 546. "The compelling interest standard that we apply . . . is not 'water[ed] . . . down' but 'really means what it says.'" *Id*; *see also Axson-Flynn*, 356 F.3d at 1294 (Where a law or rule is not neutral and generally applicable, defendants "face the daunting task of establishing that the requirement was narrowly tailored to advance a compelling governmental interest."). This is a difficult standard for the Commonwealth to meet.

As a general matter, prohibiting large gatherings to slow the spread of COVID-19 undeniably advances a compelling government interest. The Fifth Circuit has recently recognized "the escalating spread of COVID-19, and the state's critical interest in protecting the public health." *In re Abbott*, 954 F.3d at 778. Moreover, the Supreme Court has noted that

"'context matters' in applying the compelling interest test, and has emphasized that strict scrutiny's fundamental purpose is to take 'relevant differences' into account." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). For example, in *Cutter v. Wilkinson*, the Supreme Court applied the compelling interest standard in a manner that directed that prison administrators be afforded deference on what constitutes safety and good order. 544 U.S. 709, 723 (2005). Similarly, here, a court must apply this standard in the context of the pandemic.

However, that is not the end of the inquiry. In *O Centro*, the Supreme Court considered under the federal RFRA whether banning a religious group from using a particular controlled substance in its worship service was supported by the compelling interest of enforcing the drug laws. *See O Centro*, 546 U.S. at 428-39. The Court recognized that while enforcing the drug laws undoubtedly constitutes a compelling interest as a general matter, the government had to show more: a compelling interest in applying those laws to the small religious group that sought to use a drug in religious ceremonies that was not a sought-after recreational drug and thus not prone to diversion. Drawing on its Free Exercise Clause precedents, the Supreme Court held that courts must look "beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431. And given that "a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited," the existence of other exemptions for similar conduct will be relevant in determining whether denying the desired religious exemption survives strict scrutiny. *Id.* at 433.

Because a compelling interest must be evaluated in context rather than by reference to a broad general principle such as health or safety, and because the "least-restrictive-means standard is exceptionally demanding," *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014), a court must engage in a searching inquiry.

The ultimate question for this Court, then, is whether the Commonwealth's prohibition on in-person religious worship exceeding ten people to Lighthouse's sixteen-person gathering— while exempting all non-retail businesses and others from the ten-person limit—furthers a compelling interest, and whether there is no less restrictive measure the Commonwealth could use to achieve that interest while allowing the church to hold its services. If, in this fact-intensive and context-laden analysis, the Court determines that there are no "relevant differences," *O Centro*, 546 U.S. at 431-32, with regard to efficacy in slowing the spread of COVID-19, between allowing the church to meet as proposed and allowing these various preferred gatherings, then the Commonwealth's Orders must yield to the church's sincerely held religious exercise. At this stage of the case, where the Commonwealth has yet to respond, it is not possible to reach that conclusion.

## CONCLUSION

The United States respectfully requests that the Court consider these arguments in deciding the Plaintiff's Motion for an Injunction Pending Appeal. The facts on this record show that the Commonwealth has imposed limits on religious activity it has not imposed on comparable secular activities. If proven, the facts alleged in Lighthouse's complaint would thus establish a Free Exercise violation unless the Commonwealth demonstrates that its actions satisfy the demanding strict scrutiny standard. The Commonwealth has not yet filed its response and has introduced no evidence. It therefore has not satisfied its burden. Accordingly, based on this

Court's decision to deny the motion for a preliminary injunction at this stage, the United States

respectfully requests that the Court either grant the Injunction Pending Appeal, or in the

alternative, hold a hearing on Plaintiff's motion to ensure that Defendant's responses can be

evaluated.

Dated:  May 3, 2020

Respectfully submitted,

ERIC S. DREIBAND
Assistant Attorney General

G. ZACHARY TERWILLIGER
United States Attorney

ALEXANDER V. MAUGERI
Deputy Assistant Attorney General

ELLIOTT M. DAVIS
ERIC W. TREENE
Special Counsels

*/s/ Jennifer E. Flurry*
Jennifer E. Flurry, VSB No. 80149
Office of the United States Attorney
101 West Main Street, Suite 8000
Norfolk, Virginia  23510
Telephone: (757) 441-3160
Facsimile:  (757) 441-6689
Email: jennifer.flurry@usdoj.gov

*Counsel for the United States of America*

**EXHIBIT M**

 An official website of the United States government
Here's how you know ∨

**Department of Justice**

Office of Public Affairs

**FOR IMMEDIATE RELEASE**                                         Tuesday, April 14, 2020

## Attorney General William P. Barr Issues Statement on Religious Practice and Social Distancing; Department of Justice Files Statement of Interest in Mississippi Church Case

Attorney General William P. Barr issued the following statement:

"In light of the COVID-19 pandemic, the President has issued guidelines calling on all Americans to do their part to slow the spread of a dangerous and highly contagious virus. Those measures are important because the virus is transmitted so easily from person to person, and because it all too often has life-threatening consequences for its victims, it has the potential to overwhelm health care systems when it surges.

To contain the virus and protect the most vulnerable among us, Americans have been asked, for a limited period of time, to practice rigorous social distancing. The President has also asked Americans to listen to and follow directions issued by state and local authorities regarding social distancing. Social distancing, while difficult and unfamiliar for a nation that has long prided itself on the strength of its voluntary associations, has the potential to save hundreds of thousands of American lives from an imminent threat. Scrupulously observing these guidelines is the best path to swiftly ending COVID-19's profound disruptions to our national life and resuming the normal economic life of our country. Citizens who seek to do otherwise are not merely assuming risk with respect to themselves, but are exposing others to danger. In exigent circumstances, when the community as a whole faces an impending harm of this magnitude, and where the measures are tailored to meeting the imminent danger, the constitution does allow some temporary restriction on our liberties that would not be tolerated in normal circumstances.

But even in times of emergency, when reasonable and temporary restrictions are placed on rights, the First Amendment and federal statutory law prohibit discrimination against religious institutions and religious believers. Thus, government may not impose special restrictions on religious activity that do not also apply to similar nonreligious activity. For example, if a government allows movie theaters, restaurants, concert halls, and other comparable places of assembly to remain open and unrestricted, it may not order houses of worship to close, limit their congregation size, or otherwise impede religious gatherings. Religious institutions must not be singled out for special burdens.

Today, the Department filed a Statement of Interest in support of a church in Mississippi that allegedly sought to hold parking lot worship services, in which congregants listened to their pastor preach over their car radios, while sitting in their cars in the church parking lot with their windows rolled up. The City of Greenville fined congregants $500 per person for attending these parking lot services – while permitting citizens to attend nearby drive-in restaurants, even with their windows open.[1]  The City appears to have thereby singled churches out as the only essential service (as designated by the state of Mississippi) that may not operate despite following all CDC and state recommendations regarding social distancing.

As we explain in the Statement of Interest, where a state has not acted evenhandedly, it must have a compelling reason to impose restrictions on places of worship and must ensure that those restrictions are narrowly tailored to advance its compelling interest. While we believe that during this period there is a sufficient basis for the social distancing rules that

have been put in place, the scope and justification of restrictions beyond that will have to be assessed based on the circumstances as they evolve.

Religion and religious worship continue to be central to the lives of millions of Americans. This is true more so than ever during this difficult time. The pandemic has changed the ways Americans live their lives. Religious communities have rallied to the critical need to protect the community from the spread of this disease by making services available online and in ways that otherwise comply with social distancing guidelines.

The United States Department of Justice will continue to ensure that religious freedom remains protected if any state or local government, in their response to COVID-19, singles out, targets, or discriminates against any house of worship for special restrictions."

---

[1]⬚  The City has since stated it will drop the fines, but will continue to enforce the order.

---

**Attachment(s):**
Download Statement of Interest

**Topic(s):**
Coronavirus

**Component(s):**
Office of the Attorney General

**Press Release Number:**
20-380

*Updated April 21, 2020*

**EXHIBIT N**



# Office of the Attorney General
## Washington, D. C. 20530

April 27, 2020

MEMORANDUM FOR THE ASSISTANT ATTORNEY GENERAL FOR CIVIL RIGHTS AND
ALL UNITED STATES ATTORNEYS

FROM:         THE ATTORNEY GENERAL

SUBJECT:      Balancing Public Safety with the Preservation of Civil Rights

      The current national crisis related to COVID-19 has required the imposition of extraordinary restrictions on all of our daily lives. Millions of Americans across the nation have been ordered to stay in their homes, leaving only for essential and necessary reasons, while countless businesses and other gathering places have been ordered to close their doors indefinitely. These kinds of restrictions have been necessary in order to stop the spread of a deadly disease—but there is no denying that they have imposed tremendous burdens on the daily lives of all Americans.

      In prior Memoranda, I directed our prosecutors to prioritize cases against those seeking to illicitly profit from the pandemic, either by hoarding scarce medical resources to sell them for extortionate prices, or by defrauding people who are already in dire circumstances due to the severe problems the pandemic has caused. We have pursued those efforts vigorously and will continue to do so. Now, I am directing each of our United States Attorneys to also be on the lookout for state and local directives that could be violating the constitutional rights and civil liberties of individual citizens.

      As the Department of Justice explained recently in guidance to states and localities taking steps to battle the pandemic, even in times of emergency, when reasonable and temporary restrictions are placed on rights, the First Amendment and federal statutory law prohibit discrimination against religious institutions and religious believers. The legal restrictions on state and local authority are not limited to discrimination against religious institutions and religious believers. For example, the Constitution also forbids, in certain circumstances, discrimination against disfavored speech and undue interference with the national economy. If a state or local ordinance crosses the line from an appropriate exercise of authority to stop the spread of COVID-19 into an overbearing infringement of constitutional and statutory protections, the Department of Justice may have an obligation to address that overreach in federal court.

      I am therefore directing the Assistant Attorney General for Civil Rights, Eric Dreiband, and Matthew Schneider, the U.S. Attorney for the Eastern District of Michigan, to oversee and coordinate our efforts to monitor state and local policies and, if necessary, take action to correct them. They should work not only with all Department of Justice offices and other federal agencies, but with state and local officials as well.

Many policies that would be unthinkable in regular times have become commonplace in recent weeks, and we do not want to unduly interfere with the important efforts of state and local officials to protect the public. But the Constitution is not suspended in times of crisis. We must therefore be vigilant to ensure its protections are preserved, at the same time that the public is protected.

I thank you for your attention to this important initiative and for your service to our country.