Charles S. LiMandri, SBN 110841
Paul M. Jonna, SBN 265389
Jeffrey M. Trissell, SBN 292480
Milan L. Brandon, SBN 326953
LIMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938
cslimandri@limandri.com
pjonna@limandri.com
jtrissell@limandri.com

Thomas Brejcha, *pro hac vice**
Peter Breen, *pro hac vice**
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmorsociety.org
*Application forthcoming

Attorneys for Plaintiffs

Harmeet K. Dhillon (SBN: 207873)
Mark P. Meuser (SBN: 231335)
Gregory R. Michael (SBN: 306814)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593
harmeet@dhillonlaw.com
mmeuser@dhillonlaw.com
gmichael@dhillonlaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTH BAY UNITED PENTECOSTAL CHURCH, a California nonprofit corporation, and BISHOP ARTHUR HODGES III, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, in his official capacity as the Governor of California; XAVIER BECERRA, in his official capacity as the Attorney General of California, SONIA ANGELL, in her official capacity as California Public Health Officer, WILMA J. | Case No.: 3:20-cv-865-BAS<br><br>**VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

1    WOOTEN, in her official capacity as Public
     Health Officer, County of San Diego,
2    HELEN ROBBINS-MEYER, in her official
3    capacity as Director of Emergency Services,
     and WILLIAM D. GORE, in his official
4    capacity as Sheriff of the County of San
5    Diego,

6                Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*The First Amendment does not allow our leaders to decide which rights to honor and which to ignore. In law, as in life, what's good for the goose is good for the gander. In these troubled times, nothing should unify the American people more than the principle that freedom for me, but not for thee, has no place under our Constitution.*

Spell v. Edwards, 962 F.3d 175 (5th Cir. 2020)
(Ho, J., concurring)

## INTRODUCTION

1.      For nearly 150 years, courts have recognized the old adage that "Even a dog distinguishes between being stumbled over and being kicked." HOLMES, THE COMMON LAW 3 (1881). More recently, this adage was constitutionalized when the Supreme Court held that "[j]ust as Holmes's dog could tell the difference between being kicked and being stumbled over, it will matter . . . whether [government action is] . . . motivated by sectarianism, or whether it lacks a history demonstrating that purpose." *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 n.14 (2005).

2.      Here, the American people are smarter than Holmes's dog, and have begun to see that they are being "kicked." They have seen how the onerous restrictions imposed on them by Governors to fight the coronavirus pandemic do not apply to certain, favored groups. When the public sentiment began to favor race-based political protest instead of compliance with the pandemic restrictions, public officials were all too eager to grant a *de facto* exception for those favored protestors. This favoritism has caused amazing harm in the form of a general loss of confidence by the American people in the merits of the pandemic restrictions at all. The too frequently repeated joke (which is not just a joke) is that the any otherwise unlawful gathering can proceed as long as it is termed a "George Floyd protest":



[1]

3.      At first, this blatant favoritism led simply to discontent and a loss of confidence by the American people. It also led to an order enjoining New York Governor Cuomo and New York Mayor de Blasio from enforcing coronavirus regulations against places of worship differently from other places. *Soos v. Cuomo*, No. 1:20-cv-651 (GLS/DJS), 2020 WL 3488742 (N.D.N.Y. June 26, 2020). It led as well to a concurring opinion noting that had Louisiana not withdrawn their restrictions on worship, a similar injunction would have been forthcoming. *Spell v. Edwards*, 962 F.3d 175, 180–83 (5th Cir. 2020) (Ho, J., concurring).

4.      But amazingly, although the protests led to a spike in coronavirus infection rates,[2] they did not lead to any spike in hospitalizations and deaths. Instead,

---

[1] *See* Bethany Mandel, *Time for New York's Jews to take their fight against Bill de Blasio to court*, WASHINGTON EXAMINER (Jun. 19, 2020), washex.am/38BE0Vh.

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

the rates of *actual harm* flowing from the pandemic have continued to spiral downwards to negligibility. Despite this downward spiral, California recently began closing back down. After banning worship outright for two months—between March 25 and May 27—California marginally opened up, and heavily regulated South Bay Pentecostal Church's worship for six Sundays, between May 27 and July 5. After that date, California reinstated its ban on worship by forbidding the activity at the heart of South Bay Pentecostal Church's services.

5.      It is time for California to recognize that disfavored religious minorities are not second-class citizens, and to explain how it can justify banning worship to prevent the spread of a generally non-lethal disease. As explained below, the death rates from the coronavirus are continuing to decline. In a society hostile to religion, banning worship might be justified to prevent deaths, but not common, flu-like symptoms.

6.      This Action presents facial and as-applied challenges to executive orders and guidance issued by the State of California (Governor Newsom, Attorney General Becerra, and Public Health Officer Sonia Angell, collectively, "California" or "the State"); and orders issued by the County of San Diego (Public Health Officer Wooten, Director of Emergency Services Robbins-Meyer, and Sheriff Gore, collectively "San Diego" or "the County").

## JURISDICTION AND VENUE

7.      This action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Plaintiffs' constitutional rights to freedom of religion, speech, and assembly, due process, and equal protection rights under the First and Fourteenth Amendments to the U.S. Constitution. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction over the claims asserting violations of the California Constitution through supplemental

---

[2] *See* Nick Givas, *LA Mayor Garcetti admits 'connection' between coronavirus outbreak and protests, after downplaying link*, FOX NEWS (July 2, 2020), fxn.ws/2Z4FCnc.

1  jurisdiction under 28 U.S.C. § 1367(a). This Court has authority to award the
2  requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief
3  and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42
4  U.S.C. § 1988.

5      8.      The Southern District of California is the appropriate venue for this
6  action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is the District in which
7  Defendants maintain offices, exercise their authority in their official capacities, and
8  will enforce the Orders; and it is the District in which substantially all of the events
9  giving rise to the claims occurred.

10                          **THE PARTIES**

11     9.      Founded in 1956, Plaintiff South Bay United Pentecostal Church is a
12 California non-profit corporation, located in Chula Vista, California. The Church
13 sues in its own capacity and on behalf of its congregants. It is a multi-national, multi-
14 cultural congregation. The majority of its members are Hispanic, with the balance
15 consisting of Filipino, Caucasian, African-American, and other ethnic groups. It is an
16 open and accepting community that believes all people are children of God.

17     10.     Plaintiff Bishop Arthur Hodges III is a resident of the County of San
18 Diego, California. He has served as the Chief Executive Officer and Senior Pastor of
19 the South Bay United Pentecostal Church for thirty-five years. He also serves as
20 Superintendent for the SoCal District of the United Pentecostal Church International.

21     11.     Defendant Gavin Newsom is sued in his official capacity as the
22 Governor of California. The California Constitution vests the "supreme executive
23 power of the State" in the Governor, who "shall see that the law is faithfully
24 executed." Cal. Const. Art. V, § 1. Governor Newsom signed the State Orders.

25     12.     Defendant Xavier Becerra is the Attorney General of California. As the
26 State's chief law enforcement officer, Becerra is responsible for executing the State's
27 police powers. He is sued in his official capacity.

28

13.     Defendant Sonia Angell is California's Public Health Officer. Under the authority of the State Order, Angell decided which employees in the State are to be "Essential Critical Infrastructure Workers." She is sued in her official capacity.

14.     Defendant Wilma J. Wooten is San Diego County's Public Health Officer. Wooten signed the County Order. She is sued in her official capacity.

15.     Defendant Helen Robbins-Meyer is made a party to this Action in her official capacity as the Director of Emergency Services, County of San Diego. She signed the County Orders.

16.     Defendant William D. Gore is made a party to this Action in his official capacity as Sheriff of the County of San Diego. He is responsible for enforcing the State Orders and the County Order.

17.     Each and every Defendant acted under color of state law with respect to all acts or omissions herein alleged.

## FACTUAL ALLEGATIONS

### Introduction

18.     On March 4 and 13, 2020, both President Donald J. Trump and Governor Gavin Newsom proclaimed a State of Emergency as a result of the threat of the emergence of a novel coronavirus, COVID-19.[3]

19.     Fear of the coronavirus epidemic gripped California, the nation, and the world. The coronavirus outbreak turned the world upside-down, causing profound damage to the lives of all Americans and to the national economy.

20.     In response to the virus, many states imposed "stay-at-home" orders to "flatten the curve" of the spread of the virus. In the vast majority of states, these stay-at-home orders protected the constitutional rights of churches and religious believers during the coronavirus pandemic. When those orders did not protect their

---

[3] President Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://bit.ly/2ZrAPwc; Governor Gavin Newsom, *Proclamation of a State of Emergency* (Mar. 4, 2020), https://bit.ly/3fsSkSo.

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

constitutional rights, many courts quickly corrected them. *See, e.g., Roberts v. Neace*, 958 F. 3d 409, 413 (6th Cir. 2020).

21.     Those states recognized that, during this pandemic, Americans need the Spirit of Almighty God even more to help them weather these dark times—and that this need is no less "essential" than any other need. Those states had it right.[4]

22.     "To be sure, individual rights secured by the Constitution do not disappear during a public health crisis." *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020). Fundamental and unalienable rights are, by their very nature, "essential"—they are the essential rights which led to the founding of this country and this state. For, "[h]istory reveals that the initial steps in the erosion of individual rights are usually excused on the basis of an 'emergency' or threat to the public. But the ultimate strength of our constitutional guarantees lies in the unhesitating application in times of crisis and tranquility alike." *United States v. Bell*, 464 F.2d 667, 676 (2d Cir. 1972) (Mansfield, J., concurring).

23.     For more than four hundred years, people have come to America in a quest for religious freedom. Like the Puritans, most of these pilgrims were fleeing religious persecution in Europe. They understood that "*[n]o* place, not even the unknown, is worse than *any* place whose state forbids the exercise of your sincerely held religious beliefs." *On Fire Christian Ctr., Inc. v. Fischer*, --- F.Supp.3d ---, 2020 WL 1820249, at *2 (W.D. Ky. 2020).

24.     Stretching back to the formation of colonies like Pennsylvania and Rhode Island, where citizens could practice religion in a way that would not be impeded by the government, this basic freedom that was sought by so many colonists was enshrined in the constitutions of the states and, most importantly, in the First

---

[4] *See, e.g.,* Attorney General William Barr, *Statement of Attorney General William P. Barr on Religious Practice and Social Distancing* (Apr. 14, 2020), https://bit.ly/3j7NhJl; Office of the Attorney General, *Memorandum for the Assistant Attorney General for Civil Rights and All United States Attorneys* (Apr. 27, 2020), https://bit.ly/3h2VqNh.

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

Amendment to the United States Constitution: "Congress shall make no law respecting the establishment of religion or prohibiting the free exercise thereof." U.S. Const. amend I. This religious heritage is evident even today in the names of California's cities, and specifically San Diego, whose founding 250 years ago by Fray St. Junípero Serra, the City celebrated just last year.

25. Yet between March 17 and May 25, the Golden State criminalized all religious assembly and communal religious worship. With the pandemic as justification, California and San Diego expanded their authority by extraordinary lengths, depriving all Californians of fundamental rights protected by the U.S. and California Constitutions, including freedom of religion, speech, and assembly, and due process and equal protection under the law. After May 25, California permitted religious individuals to worship according to California's guidelines, which on July 6 and July 13, it made increasingly more onerous.

26. Unfortunately, this is not a hypothetical situation from an Orwellian novel describing a bleak future—this is the current and very real nightmare endured by millions of religious citizens who maintain the conviction that the faithful practice of regularly gathering together is absolutely "essential." If the religious clauses of the U.S. and California constitutions mean anything, they prohibit the government from banning religious worship.

## THE HISTORY OF THE EXECUTIVE ORDERS

27. In response to emergency declarations issued by the federal and California governments, on March 17, 2020, the County of San Diego issued its "Order of the Health Officer and Emergency Regulations," which prohibited gatherings of more than 50 people. (Ex. 2-1.)

28. Two days later, on March 19, 2020, California Governor Newsom issued his Executive Order N-33-20 in which he ordered that "all residents are directed to immediately heed the current State public health directives." (Ex. 1-1.) The state public health directives require "all individuals living in the State of

7

California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors." (Ex. 1-1.)

29.     A few days later, on March 22, 2020, the California Public Health Officer designated a list of "Essential Critical Infrastructure Workers." (Ex. 1-2.) This list was supposed to include "essential" workers "needed to maintain continuity of operations of the federal critical infrastructure sectors." (Ex. 1-1.) However, also included on this list were industries California viewed as uniquely important, such as the Hollywood movie industry. (Ex. 1-2.) Included on the list of the "essential workforce" were "faith based services that are provided through streaming or other technology." Thus, at the very beginning, California began singling out the free exercise of religion by name, disfavoring groups whose religious beliefs required physical gathering.

30.     California's order and list of essential workers was adopted and re-promulgated by the County of San Diego in a series of orders dated between March 29 and May 1, 2020. (Ex. 2-2.) Those orders set further guidelines for "essential businesses" operating in San Diego County. Specifically, those orders promulgated the County of San Diego "Social Distancing and Sanitation Protocol" that all essential businesses were required to fill out and adhere to. (Ex. 2-3.) This was Stage 1 of Governor Newsom's 4-Stage "Resilience Roadmap" pandemic plan.

31.     After about six weeks of Stage 1, however, Californians began anticipating the day when they could reap the benefits of their hard work—their sacrifice. They began anticipating a lessening of the extreme measures imposed on them by their elected leaders, and began pushing for that lessening to come soon.

32.     In response to that pressure, on Tuesday, April 27, 2020, Governor Newsom held a press conference in which he outlined how we "have not only bent the curve in the state of California, but stabilized it."[5] As a result, "[t]he reality is, we

---

[5] California Governor, *Governor Gavin Newsom Provides an Update on the State's Response to the COVID-19 Pandemic*, FACEBOOK (Apr. 27, 2020),

are just a few weeks away, not months away, from making measurable and meaningful changes to our stay-at-home order."[6] This was supported by Governor Newsom's later recitation of the statistics:

> The number of hospitalizations, 1.4% increase. Again, we're seeing some stabilization, decrease, modest increase, decrease, modest increase in the total number of people hospitalized. The number of people in ICU's basically flat from yesterday, just one individual more than in the last 24 hours in the ICU—so again, stabilization.[7]

Towards the end of the press conference, Governor Newsom announced that during a press conference on the next day, he would outline the forthcoming "measurable and meaningful changes to our stay-at-home order."

33.    On Wednesday, Aril 28, 2020, Governor Newsom announced that those "meaningful modifications" would come in the form of moving to Stage 2 of the Resilience Roadmap.[8] During the press conference, Governor Newsom stressed that "the foundational point of emphasis we want to advance today is phase 2 . . . is in weeks not months, phase 3 and 4, months not weeks."[9]

---

https://bit.ly/3h19rLw, at 6:03.
[6] *Id.* at 6:40.
[7] *Id.* at 25:04.
[8] California Governor, *Governor Gavin Newsom Provides an Update on the State's Response to the COVID-19 Pandemic*, FACEBOOK (Apr. 28, 2020), https://bit.ly/2Wphz0v.
[9] *Id.* at 48:43.

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

34.     During the press conference, Dr. Sonia Angell—the Director of the California Department of Public Health—explained Stage 2 as follows, and showed the following graphic:



> In stage 2, we're going to really start focusing on lower risk workplaces, that means gradually opening some of those workplaces with adaptions. These include things like: Retail, allowing for curbside pickup; Manufacturing, which can include things like toys, clothing, other things, furniture, that was not a part of the essential sector; Talking about offices, this can include things like PR firms, and consulting, and other places where telework is not possible, but by modifying the environment itself, it can make it lower risk for individuals; and then ultimately talking about opening more public spaces, things like parks and trails, that may have historically been limited because of our concerns, trying to think about how we can modify that to make them safer for individuals to enjoy the outdoor spaces because we know physical activity is so important to our health, and this is also about health, clearly.[10]

35.     Dr. Angell then described Stage 3 and 4 as follows: "The third stage is when we get into those areas that may be higher risk, those sectors that we think will take a lot more modification to adapt in a way that can make them places where people

---

[10] *Id.* at 37:29.

Verified Second Amended Complaint for Declaratory & Injunctive Relief

can move with lower risk."[11] "Those are things like getting your hair cut, uh getting your nails done, doing anything that has very close inherent relationships with other people, where the proximity is very close."[12] "And then ultimately, the space that we all look forward to, someday as we move forward and work diligently together, is Stage 4, which would be the end of the stay-at-home order. And that's when we'd be opening all of our highest risk workplaces without modification necessary at that time, because at that time we will know that we have identified a way that we can keep people safe from COVID-19.[13]



36.    Then, on May 4, 2020, Governor Newsom issued a press release in which he stated that Stage 2 will begin, in part, on Friday, May 8, 2020. According to that press release, only some businesses will be allowed to reopen, like "bookstores, clothing stores, florists and sporting goods stores," but not yet "offices, seated dining at restaurants, shopping malls or schools."[14]

37.    On May 7, 2020, Governor Newsom held a press conference to announce the beginning of Stage 2. During that press conference, Governor Newsom

---

[11] *Id.* at 35:22.
[12] *Id.* at 35:52.
[13] *Id.* at 46:49.
[14] Office of Governor Gavin Newsom, *Governor Newsom Provides Update on California's Progress Toward Stage 2 Reopening* (May 4, 2020), https://bit.ly/2WnnOSx.

Verified Second Amended Complaint for Declaratory & Injunctive Relief

was asked by a journalist why schools were being prioritized over places of worship. The following exchange followed:

> Q: Thank you Governor. Can you clarify why churches and salons are in Stage 3 and not Stage 2. Um, what makes them more high risk than schools, for example? Uh, what factors are you weighing here when you decide what goes into what phase?
>
> A: Yeah, we're, we're looking at the science, epidemiology, looking again at frequency, duration, time, uh, and looking at low risk-high reward, low risk-low reward, looking at a series of conditions and criteria, as well as best practices uh from other states and nations.[15]

In other words, places of worship were being sidelined because they provide a "low reward" in the eyes of California.

38.   On May 7, 2020, Governor Newsom also published his Resilience Roadmap online. (Ex. 1-3.) That Roadmap identified the industries that may open immediately (retail for curbside pickup, manufacturing and logistics), those that would open in a few weeks (shopping malls, car washes, schools, restaurants), and those that cannot open for several months, until Stage 3 is announced (salons, tattoo parlors, gyms, bars, movie theaters, and places of worship). (Ex. 1-3, at 9). For each industry that would be allowed to open in Stage 2, the Roadmap also linked to industry-specific Pandemic Guidance that the industry had to comply with. The industry had to both comply with the guidance, and certify to the state that it was in compliance. At the same time, Governor Newsom published a press release announcing the Resilience Roadmap, and explaining the same. (Ex. 1-4.)

39.   Between May 8 and 21, 2020, the County of San Diego issued a series of Orders of the Health Office and Emergency Regulations. (Ex. 2-4.) Those orders

---

[15] California Governor, *Governor Gavin Newsom Provides an Update on the State's Response to the COVID-19 Pandemic*, FACEBOOK (May 7, 2020), https://bit.ly/2DNy9kj, at 50:36.

again incorporated Governor Newsom's Executive Orders, and set further guidelines for "reopening businesses" operating in San Diego County. Specifically, the orders promulgated the County of San Diego "Safe Reopening Plan" Protocol that all newly reopening businesses were required to fill out and adhere to. (Ex. 2-5.)

40.   Then the federal government weighed in.[16] On May 19, 2020, the Department of Justice sent a letter to Governor Newsom stating that his Resilience Roadmap violated the civil rights of religious Californians. In its letter, the DOJ specifically referenced this action and stated:

> *South Bay United Pentecostal Church v. Newsom*, No. 3:20-cv-865 (S.D. Cal. May 15, 2020) . . . do[es] not justify California's actions. . . . *South Bay United Pentecostal* does not describe why worship services can be distinguished from schools, restaurants, factories or other places Stage 2 permits people to come together. Other decisions around the country have followed *Lukumi* to make clear that reopening plans cannot unfairly burden religious services as California has done. . . .
>
> We believe, for the reasons outlined above, that the Constitution calls for California to do more to accommodate religious worship, including in Stage 2 of the Reopening Plan.

41.   The DOJ's letter was sent by Eric S. Dreiband, Assistant Attorney General for the Civil Rights Division, and California's four U.S. Attorneys: McGregor W. Scott, Nicola T. Hanna, David L. Anderson, and Robert S. Brewer.

42.   On May 20, California let restaurants reopen in San Diego for in-person dining (Stage 2b),[17] and on that same day, houses of worship across California and the country began declaring that they would reopen for Pentecost Sunday—to celebrate the end of the Easter season—regardless of any executive orders. In California, 3,000

---

[16] Letter from Eric S. Dreiband, Ass. Attorney General, to the Hon. Gavin Newsom, Governor of California (May 19, 2020), https://politi.co/2ZztR8r.

[17] Candice Woo, *San Diego Dining Rooms Can Officially Reopen*, EATER SAN DIEGO (May 21, 2020), https://bit.ly/3eClH3m.

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

Christian churches announced in a letter to Governor Newsom that they would reopen. (Ex. 3-1.) In Minnesota, its Catholic bishops announced in a letter to their Governor that they would also reopen. (Ex. 3-2; Ex. 3-3.)[18]

43.     Further, on May 22, 2020, President Donald Trump held a press briefing.[19] During that press briefing, President Trump stated:

> Today I am identifying houses of worship: churches, synagogues, and mosques, as essential places that provide essential services. . . . These are places that hold our society together and keep our people united, the people are demanding to go to church, synagogue, go to their mosque, many millions of Americans embrace worship as an essential part of life. The ministers, pastors, rabbis, imams, and other faith leaders will make sure that their congregations are safe, as they gather and pray. I know them well, they love their congregations, they love their people, they don't want anything bad to happen to them or anybody else. The governors need to do the right thing and allow these very important essential places of faith to open right now, for this weekend. If they don't do it, I will override the governors.

44.     On Monday, May 25, 2020, Governor Newsom announced changes to his Resilience Roadmap with respect to constitutionally protected protesting and worship activities. With respect to both, Governor Newsom permitted individual counties to apply for 21-day licenses during which worship and protest would be permitted so long as the gathering did not exceed 25% of "building capacity" or "the relevant area's maximum occupancy," and with a maximum cap of no more than 100 persons. However, California remained in "Stage 2." Alongside this change, Governor Newsom published industry guidance for "Places of Worship" (Ex. 1-5),

---

[18] Letter from Eric Rassbach, The Becket Fund for Religious Liberty, to Tim Walz, Governor of Minnesota (May 20, 2020), https://bit.ly/30dv7gP; MPR News Staff, *Minnesota's Catholic bishops say they'll defy Walz's limits on church attendance*, MPR (May 20, 2020), https://bit.ly/3erpMHK.
[19] *Press Briefing by Press Secretary Keyleigh McEnany*, WHITE HOUSE (May 22, 2020), https://bit.ly/2WrcmoQ.

and updated the Q&A page on coronavirus website concerning political protests. (Ex. 1-6.)

45.     Before each 21-day license would be issued, the county would have to certify that it satisfied certain statistical benchmarks. The next day, May 26, 2020, Governor Newsom also announced that hair salons and barbershops could reopen (moving them from "Stage 3" to "Stage 2").[20] On May 27, 2020, San Diego received its first 21-day license, and issued a series of orders granting permission to worship. (Ex. 2-6.)

46.     During the same period, on June 3, 2020, San Diego sent a letter to Governor Newsom requesting permission to further reopen.[21] That letter stated the following:

> On behalf of the County of San Diego Board of Supervisors, I write this letter to request your consideration of allowing several Stage 3 businesses to reopen. . . .
>
> Several weeks have passed since accelerating openings within Stage 2 and we're pleased to report that all of the data shows that these openings have occurred without any negative impact on our healthcare system. In fact, every indicator has been stable or in some cases, improved. . . .
>
> Because of our positive data results, we believe there are several Stage 3 sectors that could be locally opened and managed. These include youth sports, fitness facilities, pools, charter fishing and boating, indoor museums, hotels, wineries/breweries, and theme parks. We also believe that religious facilities could be opened more broadly—beyond the 25% or 100 person cap provided we have another week of positive data.

---

[20] Noah Higgins-Dunn, *California to allow hair salons and barbershops to reopen in majority of state's counties, Gov. Newsom says*, CNBC (May 26, 2020, 3:41 PM), https://cnb.cx/2XvgSUd.
[21] Letter from Greg Cox, Chairman, San Diego County Board of Supervisors (Jun. 3, 2020), bit.ly/376cChq.

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

47. On June 12, 2020, California let gyms, bars, museums, hotels, and schools reopen in San Diego—generally most Stage 3 industries, excepting nail salons, tattoo parlors, and venues such as movie theaters and concert halls.[22]

48. That same day, Governor Newsom quietly changed the industry guidance for "Places of Worship" and the Q&A page concerning political protesting. On that date, Governor Newsom lifted all restrictions on either when they occurred outdoors—but continued the 100-person cap or 25% occupancy limit for indoor worship or protesting. (Ex. 1-7; Ex. 1-8.) Beginning on June 16, San Diego issued orders adopting this change. (Ex. 2-7.)

49. On July 6, 2020, Governor Newsom changed the industry guidance for "Places of Worship" and the Q&A page concerning political protesting. On that date, Governor Newsom banned "indoor singing and chanting activities." (Ex. 1-9; Ex. 1-10.) Then, on July 13, 2020, Governor Newsom banned 30 counties from conducting several indoor activities, including worship and protest. (Ex. 1-11; Ex. 1-12; Ex. 1-13.)[23] San Diego was one of those counties (Ex. 1-11), but San Diego's orders around these dates did not meaningfully change. They simply continued to assert that worship and protest must comply with the Governor's mandates. (Ex. 2-8.)

### BISHOP ARTHUR HODGES AND THE SOUTH BAY UNITED PENTECOSTAL CHURCH

50. South Bay Pentecostal Church is a reflection of the Chula Vista community. It is a multi-national, multi-cultural congregation. The majority of its members are Hispanic, with the balance consisting of Filipino, Caucasian, African-

---

[22] *Gyms, Bars, Museums, Hotels & More Can Reopen Friday, SD County Says*, NBC7 SAN DIEGO (Jun. 8, 2020), https://bit.ly/2CJO1n7.

[23] Also closed were indoor and outdoor activities at bars and breweries, and indoor activities at restaurants, wineries and tasting rooms, movie theaters, family entertainment (e.g., bowling alleys, miniature golf, batting cages, arcades), zoos and museums, cardrooms, fitness centers, protests, non-essential offices, personal care services (e.g., nail salons, body waxing, tattoo parlors), hair salons and barbershops, and malls. (Ex. 1-11.)

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

American, and other ethnic groups. The congregation represents a cross-section of society, from rich to poor and encompassing people of all ages. The Church is an open and accepting community that believes all people are children of God.

51.     Bishop Hodges has served as senior Pastor and Bishop of the South Bay Pentecostal Church for thirty-five years. He also serves as a District Superintendent of the United Pentecostal Church International. He oversees more than two-hundred pastors and ministers, representing more than one-hundred churches across Southern California.

52.     Bishop Hodges' vocation was settled from an early age. He is the son of a Pentecostal Pastor. His father repeatedly built churches from scratch, establishing the community and moving on to repeat the same process in another town.

53.     At the age of ten, he felt God calling him to the same ministry. However, sensing the labors of his Father, who was tasked with raising a family, maintaining his electrician business, and serving as a Pastor all at the same time, he understood the tremendous sacrifice that pastors are expected to make. At that age, he was frightened by the burden. As such, he was reluctant to accept God's call.

54.     When he was twelve, he attended a youth class. The teacher of that particular class was very passionate about the power of prayer. Frequently, he would end those classes in prayer meetings. At one prayer meeting, Bishop Hodges heard God asking him, "Are you willing to be my preacher? Will you be my minister?" In that moment, he said yes, and the fear of his father's burden finally left him. However, it would be a number of years before he would make good on that promise.

55.     Upon graduating from high school, Bishop Hodges believed he would become an airline pilot. However, his father requested that he honor his sacrifices in raising him and asked him to give Bible College a chance. Out of a sense of filial duty, Bishop Hodges enrolled at the Apostolic Bible Institute in St. Paul, Minnesota. While at the Institute, God's call became too loud to ignore. With a missionary's zeal, he threw himself into full-time ministry. He began preaching at youth camps,

conferences, and other venues, traveling from city to city and state to state, sharing God's Word with all who would open their hearts to listen.

56.     Two years later, Bishop Hodges' father invited him to serve as Assistant Pastor at South Bay Pentecostal Church. Sensing that life on the road was no place to grow a family, and with his wife pregnant with their first child, he agreed to accept the position. The passage of time brought change, and his father once more felt the call to move on to a new church. In his stead, Bishop Hodges was unanimously voted to take his place at South Bay, where he has served ever since.

57.     Bishop Hodges is a sincere, strong believer that the Bible is the infallible and immutable word of God. This belief is one that he shares with South Bay Pentecostal Church. They believe that there is one God—the creator of all. They practice as best they know how and can according to their abilities and understanding of Scripture. "Not forsaking the assembling of ourselves together, as the manner of some is; but exhorting one another: and so much the more, as ye see the day approaching." (Hebrews 10:25.)

58.     The South Bay Pentecostal Church's model is the New Testament church founded and described in the book of the Acts of the Apostles: "And when the day of Pentecost was fully come, they were *all with one accord in one place*." (Acts 2:1 [emphasis added].) They believe that "all" being gathered in "one place" is fundamental in order to fulfill Christ's final charge that "you will be my witnesses." (Acts 1:8.) Thus, at the Church's very beginning, they believe that the foundational function of the church, all gathering together with one accord, was established.

59.     The Book of Acts, which chronicles the founding of the Church, uses the word "together" thirty-one times, thus providing thirty-one reasons for the church to come together with one accord. Being "together" spiritually and physically is key in their preaching, teaching, and worship practice. This experience of worshipping together occurs *both* in the home *and* in the communal setting,

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

"continuing daily with one accord *in the temple*, and breaking bread *from house to house*." (Acts 2:46–47 [emphasis added].)

60.     In observance of this sacred charge and sincerely held religious belief, South Bay Pentecostal Church holds between three and five services each Sunday. The average attendance at some of these services lies between two-hundred and three-hundred congregants. The Church's sanctuary can hold up to six-hundred people.

61.     The services focus on the scriptural charge to be "together"—both spiritually and physically. Services begin with Bible classes spread across different ages and groups. Each class may have between ten and one-hundred participants. When these classes conclude, congregants gather together with one accord for praise and worship. Those with special needs or sickness come forward and stand around the altar, where hands are laid upon them and they are then anointed. This sacrament observes the Scriptural charge to "let them pray over him, anointing him with oil in the name of the LORD." (James 5:14.)

62.     The Church believes that the act of laying on hands also assists in conferring, in a real sense, the gift of the Holy Ghost: "And when Paul had laid his hands on them, the Holy Ghost came on them." (Acts 19:6.) The service concludes with preaching followed by a challenge to physical action, where the congregation is challenged to approach the altar to "come believing, come praying." As mandated by Scripture, the service concludes with fellowship both inside and outside the sanctuary: "And they continued steadfastly in the apostles' doctrine and fellowship, and in the breaking of bread, and in prayers." (Acts 2:42.)

63.     South Bay Pentecostal Church also perform baptisms, funerals, weddings, and other religious ceremonies.

64.     They believe Scripture exhorts them to "[r]epent, and be baptized every one of you in the name of Jesus Christ for the remission of sins, and ye shall receive the gift of the Holy Ghost." (Acts 2:38.) They believe this sacrament of "new birth" cannot be performed on one's own, or by staying at home. One may repent on their

own, but they *cannot baptize themselves*. They believe there is no justifiable reason for postponing the sacrament of baptism, as it is a necessary part of salvation.

65.    As the below photos demonstrate, South Bay Pentecostal Church possesses a large sanctuary that provides ample room to accommodate the six feet of social distancing promoted by national, state, and local regulations.





VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF



66.   California's outright ban on worship from March 25 to May 27, 2020, and ban on indoor worship beginning on July 13, 2020, dramatically curtails the Church's ability to carry out its ministry.

67.   Those bans forbid the assembly required to come together with one accord. These orders forbid baptism, gathering around the altar, and any form of "being together" that is *both* physical and spiritual.

68.   "Zoom Meetings" and other tele-conferencing applications are inadequate substitutes as they curtail a minister's ability to lay hands upon a congregant or perform a baptism. They also curtail the congregation's ability to approach the altar, which is central to their experience of faith.

69.   "Outdoor worship" is also an inadequate substitute. South Bay Pentecostal Church does not have an adequate place where they can meet outdoors. More problematically, its theology requires approaching the altar at the end of each service and performing baptisms (both with social distancing). The altar and baptistery is in the sanctuary auditorium, which is indoors.

70.   Further, California's ban on singing as part of worship, beginning on July 6, 2020, is particularly concerning because singing is at the very heart of Pentecostal worship services. This requirement is essentially a ban on Pentecostal worship services. The ban on singing also makes little sense when applied to South Bay United Pentecostal Church, since all of its congregants wear masks.

71.   Between May 27 and July 12, 2020, California permitted South Bay Pentecostal Church to hold its (necessarily indoor) worship services, but limited to

the lesser of 100 people or 25% capacity of the Church's sanctuary. South Bay Pentecostal Church held such services, limited to 100 people. Below are photos of the worship services celebrating Pentecost Sunday on May 31, 2020:





72.    To attend one of those services held between May 27 and July 12, Sunday worship service, South Bay Pentecostal Church required its congregants to reserve their place online. But every Sunday, South Bay Pentecostal Church has had to turn numerous people away because it met the 100 person cap for each of its services. This is despite the fact that the sanctuary could safely (with social distancing) accommodate more than 100 persons.

73.    Each worship service requires the participation of least 30 volunteers/ staff to be held. Such individuals serve as parking lot attendants, members of the

22

COVID-safe intake team, security, cleaners between services, ushers, greeters, musicians, singers, and video/audio projection operators. Many of the volunteers and staff are elderly or high-risk, and so South Bay Pentecostal Church has asked them to not participate. This, however, has limited its ability to hold multiple services. Presently, South Bay Pentecostal Church has been holding, and cannot feasibly hold more than, three worship services each Sunday. If it had the resources and staffing to hold more services, it would, but it presently does not have the ability to do so.

74.     Thus, as a result of the Orders, South Bay Pentecostal Church is prohibited from holding the services mandated by Scripture. These include the important milestone services that mark life events and even the end of a life.

75.     South Bay Pentecostal Church desires to continue to hold services in a manner that properly protects its congregants so that they may observe the inviolable precepts of Scripture and encourage and comfort one another during these troubling times of the COVID-19 outbreak. The Church's congregation needs to connect with one another in order to receive the hope and encouragement they need to heal and grow in their faith and in order to observe the Scriptural requirement of gathering together with one accord.

76.     The Orders' sometimes outright ban on religious services are overbroad and unnecessary because Sunday services, baptisms, and funerals have been held in a manner consistent with the social distancing guidelines. In addition, the Church has integrated masks, gloves, screens, veils, and other screening mechanisms in order to protect congregants and inhibit the spread of COVID-19 during all services, including Sunday worship, baptisms, and funerals. Furthermore, the Church has encouraged anyone uncomfortable with gathering during the pandemic to stay at home. The Church has also required that anyone who is sick or has symptoms to stay at home.

77.     In other words, the Church has fully abided by the County's Social Distancing and Sanitation Protocol and Safe Reopening Plan, and any other necessary guidelines, just like any other responsible organization.

78.    These services are essential for the spiritual health of the congregation so that the congregants can exhort one another and the will of God during these difficult times.

79.    With respect to the Orders' regulation on how South Bay Pentecostal Church may worship, as stated above, it has a complex theology, based on Sacred Scripture, relating to the requirement that "all" of its congregants gather together. California's regulation of worship burdens those religious beliefs, by preventing "all" from gathering.

80.    South Bay Pentecostal Church's religious requirements disfavor multiple worship services, by preferring that the entire congregation meet at once. For example, it would be like holding a family reunion in three sessions, with one-third of the family gathering at each session, but not being allowed to meet the rest of the family gathering in the other sessions.

81.    South Bay Pentecostal Church's religious requirements also permit of, and encourage, congregants to attend multiple worship services—which many normally do. Nevertheless, because the interplay of California's regulations and the nature of its worship services limits it to serving a maximum of 300 people each Sunday (at three worship services), it has had to limit congregants' ability to attend more than one service per Sunday.

82.    Importantly, the Church has previously demonstrated its ability to adopt and enforce suitable guidelines for social distancing practices through its work as what may be the largest food distributor to needy people in the South Bay region of San Diego County. Since the closure orders were put in place, the Church has worked with the Chula Vista Police Department to develop a drive-through food distribution system so that hundreds of cars may drive into and around the Church parking lot. Volunteers are provided masks and gloves and deliver groceries, contact-free, directly into each driver's trunk or cargo area. During any given week, the

Church distributes between three and twelve tons of food. The Church has also been publicly fêted for its efforts by the Mayor of Chula Vista.



83.     Due to that experience, when California allowed limited worship to occur (under strict regulations) South Bay Pentecostal Church was confident that it could resume worship services safely and without incident. So far, its confidence has proven correct. Despite regularly testing its staff and volunteers, it has yet to receive a positive test for the coronavirus. The Church also encourages its congregants to notify it if they test positive for the coronavirus, and it is unaware of any congregant testing positive as a result of the Church's worship services.

### Restaurants, Factories, & Schools

84.     As stated above, California has effectively banned worship at South Bay Pentecostal Church to prevent the spread of the coronavirus, but has allowed many other activities and industries to proceed.

85.     California contends that because it has a neutral purpose, and has grouped like categories alike, it can specifically discriminate on the basis of religion, and provide unique burdens on people of faith. In other words, California claims it can ban worship, the SATs, and the bar exam, and later explain that all involve

people sitting together indoors for long periods of time. This is incorrect. To be neutral, California's ban must simply state that it applies to all people sitting together indoors for long periods of time.

86.     Stated differently, ordering that "worshippers may not gather" is no different than—and equally repugnant as—ordering that "African-Americans may not gather" or "Chinese may not gather." Or, providing distinct, industry-specific (mandatory) guidance for "places of worship" is no different than providing specific (mandatory) guidance for heterosexuals, homosexuals, and other sexual minorities.

87.     Even if the government later attempts to identify a purportedly neutral explanation, classifying people based on a protected characteristic is always repugnant, and indeed, trying to come up with an explanation, is equally repugnant as invidious stereotyping. *See Espinoza v. Montana Dep't of Revenue*, --- S. Ct. ---, 2020 WL 3518364, at *7 (2020) ("Status-based discrimination remains status based even if one of its goals or effects is" a valid, neutral goal.); *see also id.* at *9 (explaining that this is an "unremarkable" proposition, and citing *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017)).

88.     However, even engaging with California's discriminatory stereotyping, California contends that it is categorizing like businesses alike, and not treating houses of worship any different than similarly situated entities. This argument, however, is factually false.

89.     California has so far identified five factors, allegedly unique to places of worship, justifying its stereotyping: (1) a long period of time (i.e., distinct from early essential shopping, where Californians were advised to obtain their necessities and quickly depart); (2) a large number of distinct households (i.e., distinct from workplaces that generally have a smaller number of distinct households); (3) a shared experience (i.e., distinct from later permitted non-essential shopping, where individuals are present to browse for themselves only); (4) loud and frequent vocalizations spreading aerosol particles (i.e., distinct from manufacturing and

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

shopping that have large numbers of distinct households, but generally not singing); and (5) lack of identified attendees (i.e., distinct from workplaces who track their employees' attendance).

90. But these comparisons do not hold up under scrutiny. *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 940–47 (9th Cir. 2020) (Collins, J., dissenting), 140 S.Ct. 1613, 1614–15 (2020) (Kavanaugh, J., dissenting).

91. It is plain that grocery stores and non-essential retail shopping primarily involve strangers, and do not involve pre-registered attendees. Further, the average grocery shopper takes 43 minutes to complete his shopping.[24] The average trip to the mall, for those aged 18–34, is 158.4 minutes. [25] The average person makes 1.6 trips to the grocery store every week.[26] And the average woman spends 399 hours shopping a year.[27] This all adds up, with Americans spending a collective 37 billion hours per year waiting in lines. [28] Under California's current rules, one can take as long as one likes to complete their shopping. This results, as numerous Twitter videos and photos demonstrate, in large gatherings.[29]

92. Further, Plaintiff's expert Dr. Delgado opined on the *relative* risk of shopping versus worship services. Dr. Delgado ultimately concluded that "the calculated risk of contracting COVID-19 at the house of worship is 0.25 or 25% the risk at the grocery store." Delgado Decl., ¶¶ 14–22. That conclusion flowed from the following analysis:

---

[24] *7 Facts about Grocery Shopping that Might Shock You*, FIVE STAR HOME FOODS (Jul. 25, 2017), bit.ly/2zYpSZc.

[25] *Average Time Spent at Regional and Super-Regional Malls by Consumers in the United States from April to June in 2016, by Age*, STATISTA (Jun. 2016), bit.ly/375fdYU.

[26] Staff, *Consumers' Weekly Grocery Shopping Trips in the United States from 2006 to 2019*, STATISTA (Jun. 2019), bit.ly/2Y1m8hk.

[27] Kathryn Kattalia, *On Average, Women Spend 399 Hours Shopping A Year, Survey Finds*, N.Y. DAILY NEWS (Mar. 4, 2011), bit.ly/3ctsknx.

[28] Alex Stone, *Why Waiting Is Torture*, N.Y. TIMES (Aug. 18, 2012), nyti.ms/2AwVo0h.

[29] Teresa Sardina (@TeresaNews8), TWITTER (Mar. 31, 2020), t.co/GQY8uaJM8b; RuggerPro (@RuggerPro), TWITTER (Mar. 12, 2020), t.co/PvrWJPnPRj; *see also* Allie Wagner, *Costco Lines Reach Unexpected Lengths as Shoppers Rush to Stores to Calm their Coronavirus Fears*, KUSI NEWS (Mar. 13, 2020), bit.ly/3eOMLx2.

> One could easily compare an average grocery store, which serves 1,000 customers per day, to a house of worship in terms of risk of contagion. Even with planned flow of foot traffic, the movement of people in the grocery store remains relatively uncontrolled. The aisles are not designed to allow six-foot social distancing. People touch merchandise that they will never buy. By the time a person puts an item in his or her cart, it may have been touched by several, if not hundreds of people in the three previous days (the coronavirus can survive up to three days on smooth surfaces). The cart may have had its handle sanitized but the carriage itself likely was not. Next, the items are placed on a conveyer belt which has contacted hundreds of items that others have touched. The clerk wears gloves but does not change gloves between customers. He touches nearly every item as well as money.
>
> The house of worship, on the other hand will likely have far fewer than 1,000 attendees and services may even be held outdoors. The participants will be stationary for all or most of their services and their movements can be very controlled, planned, and prescribed, as opposed to the uncontrolled movements in grocery stores. Worshipers will not be touching multiple items. There will be time after each service to thoroughly clean the chairs or pews that they do touch.

Delgado Decl., ¶¶ 15–16. This conclusion is not unique to Dr. Delgado. Rather, the general unsanitariness of grocery stores is widely known.[30]

93.     Further, under California's Stage 2a, which began on May 8, there was no limit on the number of people, or length of time spent, in factories. For example, Defendant Angell specifically identified that what could open was "manufacturing, which can include things like toys, *clothing*, other things." California is famous for its clothing manufacturing, and pictures of them show that they result in a gathering

---

[30] Brent Schrotenboer, *Are Grocery Stores and Pharmacies Vectors for the Coronavirus?*, USA TODAY (Mar. 27, 2020), bit.ly/2XwFqfu; Michael Bartiromo, *How Gross Is Your Shopping Cart?*, FOX NEWS (Jul. 20, 2013), fxn.ws/2XvJaOE.

involving (1) a long period of time (presumably an eight hour shift); (2) a large number of distinct households; and (3) a shared experience.

94.    Below is an image of a clothing factory that was operated by American Apparel in Garden Grove, California.[31]



95.    Amazingly, this exact type of factory resulted in one of California's largest outbreaks, and required the shuttering of a Los Angeles Apparel factory in early July.[32] Los Angeles Apparel and American Apparel are both companies founded by Dov Charney.

96.    Similarly, in California's later Stage 2b, which began in on May 20, restaurants could open with *no* capacity limit. On average, Americans expect to spend 60.2 minutes dining at a restaurant—essentially the same amount of time as the typical worship service.[33] But of course, diners can take as long as they want to eat their meal. Further, in a busy restaurant, most diners could also be expected to be strangers to those around them, and to speak loudly so as to be heard by their own party without wearing masks. The only difference between restaurants and worship

---

[31] *L.A. and Bay Area Hit Hard: Report*, L.A. TIMES (Jan. 30, 2020), bit.ly/3dv98al.
[32] Sarah Moon & Jon Passantino, *Los Angeles Apparel factory ordered closed after over 300 coronavirus cases and 4 deaths*, CNN (Jul. 11, 2020), https://cnn.it/2WqXcAd.
[33] Sheryl E. Kimes et al., *How Long Should Dinner Take? Measuring Expected Meal Duration for Restaurant Revenue Management*, J. REVENUE & PRICING MGMT. (2002), bit.ly/309rWIr.

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

would appear to be the size of the gathering, as some restaurants may be small—but plenty of restaurants can seat 100 guests or more.[34] As a result, restaurants are coronavirus epicenters,[35] and lower courts are in broad agreement that gatherings at restaurants are comparable to those at places of worship.[36] Finally, on June 12, California let fitness facilities reopen, even though they too can serve as coronavirus spreaders.[37]

97.   Despite the above, between May 27 and July 5, places of worship were limited by numerical caps that simply did not apply to shopping, restaurants, manufacturing, or fitness studios. As of July 13, places of worship, non-essential shopping, restaurants, and fitness studios, have again been shuttered—but so called "essential" shopping and manufacturing can continue, despite the potential for outbreaks.[38]

---

[34] *San Diego Private Dining*, OPEN TABLE (Jun. 4, 2020), bit.ly/3cBpzka (listing restaurants per seating capacity).

[35] Will Stone, *Bars Are Reopening In Some Places And Closing In Others. If You Go, Know The Risks*, NPR (Jul. 3, 2020), https://n.pr/32peHVd; Andy Meek, *Please avoid this activity right now above all others*, BGR (Jul. 1, 2020), https://bit.ly/32kK1V8.

[36] *E.g., Soos v. Cuomo*, No. 1:20-cv-651, 2020 WL 3488742, at *11 (N.D.N.Y. June 26, 2020); *Antietam Battlefield KOA v. Hogan*, No. 1:20-cv-01130, 2020 WL 2556496, at *9 (D. Md. May 20, 2020); *Calvary Chapel of Bangor v. Mills*, No. 1:20-cv-00156, 2020 WL 2310913, at *8 (D. Me. May 9, 2020); *Cross Culture Christian Ctr. v. Newsom*, No. 2:20-cv-00832, 2020 WL 2121111, at *6 (E.D. Cal. May 5, 2020); *Maryville Baptist Church v. Beshear*, No. 3:20-cv-278, 2020 WL 1909616, at *2 (W.D. Ky. Apr. 18, 2020).

[37] *Research Letter: Cluster of Coronavirus Disease Associated with Fitness Dance Classes, South Korea*, CENTERS FOR DISEASE CONTROL & PREVENTION (Aug. 2020), https://bit.ly/3eCqEJu; *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, ---Fed. Appx. ---, 2020 WL 3468281, at *3 (6th Cir. June 2020)

[38] *See, e.g.*, Jessica Lussenhop, *Coronavirus at Smithfield Pork Plant: The Untold Story of America's Biggest Outbreak*, BBC NEWS (Apr. 17, 2020), bbc.in/36WYaIp; Mark Reilly, *Dozens of Workers Infected by Coronavirus at Owatonna Glass Factory*, MINNEAPOLIS/ST. PAUL BUS. J. (May 20, 2020), bit.ly/2XuF7C3; Michelle Gallardo, *COVID-19 Outbreaks at IL Meat Processing Plants Prompt Some to Call for Shutdown*, ABC7 CHICAGO (May 19, 2020), abc7.ws/2AxTlZU; *Coronavirus Outbreak at Maruchan Ramen Noodle Factory in Virginia Sickens at Least 7 Workers*, FOX5 WASH. D.C. (May 13, 2020), bit.ly/2Xz8rrj.

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

### The "George Floyd" Protestors

98.    On Monday, May 25, 2020—the same day that California announced that worship and protesting could resume under strict regulations—a police officer in Minneapolis, Minnesota killed an African-American man in his custody named George Floyd. The next day, a video-recording of the interaction went viral on social media, leading to protests in Minneapolis. The day after that, Wednesday, May 27, protests erupted in cities across the country, including a protest with hundreds of participants in Los Angeles. (Ex. 4-1.)[39] These protests plainly violated Governor Newsom's ban on political protests exceeding 100 persons.

99.    That Saturday, May 30, 2020, the George Floyd protests reached San Diego County. That day, a group of 1,000 protestors blocked the I-8 highway. This protest also violated Governor Newsom's 100-person cap on political protest. Illegal protests in San Diego occurred daily for at least ten days, until June 8. (Ex. 4-2.)[40]

100.    In response to the killing of George Floyd, on May 30 Governor Newsom issued a press release "thank[ing] . . . community members who exercised their right to protest peacefully and encouraged others to do the same." (Ex. 4-3.) The next day, Governor Newsom held a press briefing in which he again thanked and encouraged the protestors and the protest organizers, stating: "To those who want to express themselves . . . God bless you. Keep doing it. Your rage is real." (Ex. 4-4.)

101.    He further stated: "I just again want to express my deep gratitude and my deep humility, to those leaders of every stripe, that all across this state and all across our nation, are doing justice in this moment, those demonstrators who are reaching out." (Ex. 4-5.) "So I just want to thank all the leaders, not only again assembled here, but throughout the state, once again, for your courage, because now is a time for courage, now is a time for your voice to be brought to the forefront."

---

[39] Derrick Bryson Taylor, *George Floyd Protests: A Timeline*, N.Y. Times (Jun. 22, 2020, 12:07 PM), nyti.ms/2XvFfBg.

[40] *Live Blog: Protesters Gather in Downtown San Diego Saturday Night After San Diego Police Officers Shoot Man*, KPBS (Jun. 27, 2020), bit.ly/2z3N6g4.

Verified Second Amended Complaint for Declaratory & Injunctive Relief

(Ex. 4-5.) Further, when asked whether he was worried that the protests would lead to a COVID-19 spike, Governor Newsom ducked the question and focused on the need for people to get tested if they are worried about exposure. (Ex. 4-5.)

102.   Similarly, San Diego has refused to enforce its orders against the George Floyd protests. When Supervisor Nathan Fletcher was asked about them, he simply stated that when San Diegans "choose to express their First Amendment right, which is their right, then we hope that they do it as safely and responsibly as they can." (Ex. 4-6.) And San Diego law enforcement published a tweet about a protest exceeding the 100+ cap, stating "[w]e are facilitating this protest to ensure everyone remains safe." (Ex. 4-7.) This facilitation, has led to thousands of people protesting, as shown in several videos and photos obtained from Twitter. (Ex. 4-8; Ex. 4-9; Ex. 4-10.)

103.   Thus, if concerned about the plight of African-Americans in our nation, or about the death of George Floyd, or about police brutality generally, between May 25 and June 12, Californians were de facto allowed to join a 1,000-person outdoor protest, but were not allowed to join with 101 people to pray indoors or outdoors. This discriminatory enforcement led millions of Americans to no longer respect the rule of law, and begin flouting it.

104.   It also led to the Department of Justice to write a letter to New York officials, informing them that their discriminatory enforcement was unconstitutional. (Ex. 4-11.) When that discriminatory enforcement led to an injunction, the Department of Justice issued another press release applauding the decision. (Ex. 4-12.)

### THE CURRENT STATE OF THE PANDEMIC

105.   Due to the unified efforts of the American people, efforts to curb the coronavirus have proven successful. According to the Centers for Disease Control and Prevention, between February 1 and July 15, 2020, there have been 1,387,325 deaths in America, with 121,374 deaths occurring as a result of COVID-19—or 8.75%. (Ex. 5-1.) The pandemic hit its peak in April, but has since dropped off dramatically.

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

At its peak, 15,255 people died in the week of April 19–25, 2020. But in the week of July 5–11, there were only 272 deaths. This is shown impressively by the below graphic published by the CDC. (Ex. 5-2.)





**NOTE:** Provisional death counts are based on death certificate data received and coded by the National Center for Health Statistics as of the date of analysis and do not represent all deaths that occurred in that period.
**SOURCE:** NCHS, National Vital Statistics System. Estimates are based on provisional data.

[41]

106.    Looking to California specifically, as of July 14, 2020, it has only reported a total of 7,227 deaths from COVID-19. (Ex. 5-3.). The most recent information from the U.S. Census Bureau estimates the population of California at 39,512,223 persons.[42] Thus, the probability of dying of COVID-19 in California is 18.3 out of 100,000. In comparison, the ten leading causes of death in California have the following rates out of 100,000, according to the CDC:[43]

---

[41] National Center for Health Statistics, *Weekly Updates by Select Demographic and Geographic Characteristics*, CENTERS FOR DISEASE CONTROL & PREVENTION (as of Jul. 15, 2020), https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm
[42] *QuickFacts California*, U.S. CENSUS BUREAU (as of Jul. 15, 2020), https://bit.ly/2Cfenh5.
[43] National Center for Health Statistics, *California*, CENTERS FOR DISEASE CONTROL & PREVENTION (as of Jul. 15, 2020), https://bit.ly/30hBP59.

a. Heart Disease: 139.7

b. Cancer: 135

c. Alzheimer's: 37.1

d. Stroke: 37

e. Accidents: 33.7

f. Chronic Lower Respiratory Diseases: 30.9

g. Diabetes: 21.4

h. Influenza/Pneumonia: 15.6

i. Drug Overdose: 12.8

j. Hypertension: 12.3

107.   In comparison to other states, as of July 15, 2020, California's death rate places it as the 30th highest rate among the 50 states.[44]

108.   To examine the death rates over time, California has prepared the graphic below and to the left, accurate as of July 15, 2020. (Ex. 5-3.) The faded line shows the actual number of deaths, with the dark black line showing the average based on the last 14 days. The chart shows that the death rate has largely stabilized, staying on average around 80 deaths per day. California has also prepared a graphics concerning hospitalization rates, and ICU rates—which show not only stabilization, but free-fall.

---

[44] *Death rates from coronavirus (COVID-19) in the United States as of July 15, 2020, by state (per 100,000 people)*, STATISTA (as of Jul. 15, 2020), https://bit.ly/2Zv8Mfi.

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF



109.    Looking to San Diego County specifically, as of July 13, 2020, it has a total 436 deaths. (Ex. 5-4.) The most recent data from the U.S. Census Bureau places its population at 3,338,330.[45] Thus, the probability of dying of COVID-19 in San Diego County is 13 out of 100,000. In comparison, below are the leading causes of death in San Diego, as prepared by the County Health Department:[46]

a.  Malignant Neoplasms: 155.2

b.  Diseases of the Heart: 146.8

c.  Alzheimer's Disease: 36.5

d.  Chronic Lower respiratory Diseases: 33.7

e.  Cerebrovascular Diseases: 32.2

f.  Accidents: 31.4

g.  Diabetes: 18.8

h.  Suicide: 11.9

i.  Chronic Liver Disease: 10.3

j.  Influenza/Pneumonia: 9.6

---

[45] *QuickFacts San Diego County, California,* U.S. CENSUS BUREAU (as of Jul. 15, 2020), https://bit.ly/2ZuKx0X.
[46] Health & Human Services Agency, *Leading Causes of Death Among San Diego County Residents*, COUNTY OF SAN DIEGO (2011), https://bit.ly/2B1kGUP.

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

110.    The County has also published a graphic to examine its death rates over time. (Ex. 5-4.) That chart shows that there has never been more than 10 deaths in a single day, and that the coronavirus never actually led to a spike—with the rates always being relatively low.



**COVID-19 Deaths in San Diego County by Date of Death**   LIVE WELL SAN DIEGO

COVID-19-Associated Deaths by Date of Death
San Diego County Residents, N=436

Deaths that occurred during this time may not yet be registered.

Data are preliminary and subject to change. Data through 7/13/2020, current as of 7/14/2020 8:00 AM.
Prepared by County of San Diego, Health & Human Services Agency, Public Health Services, Epidemiology and Immunization Services Branch, 7/14/2020

111.    Finally, looking to South Bay Pentecostal Church itself, as stated above, neither Bishop Hodges nor any of its staff have tested positive for the coronavirus. Further, the Church is not aware of any member of its congregations testing positive after coming to a worship service.

112.    In light of the above flattening of the death rates, regardless of the infection rate, numerous experts have concluded that the worst of the pandemic is absolutely over. (Ex. 5-5; Ex. 5-6.)[47] These opinions are particularly important when

---

[47] Ex. 5-5, William M. Briggs, *Why You Shouldn't Panic About 'Spikes' and 'Surges' in New Coronavirus Cases*, THE STREAM (Jun. 30, 2020), https://bit.ly/3j6aEmA; Ex. 5-6, JB Handley, *Second Wave? Not even close.*, OFFGUARDIAN (Jul. 7, 2020), https://bit.ly/2Zy7j8k.

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

it is recognized—as it is widely recognized—that the pandemic lockdowns have led to a spike in suicides, and that restricting religious practice is detrimental to psychological health. (Ex. 5-7–Ex. 5-13.)

## Conclusion

113.    In full understanding of the public and private danger posed by the coronavirus, churches and people of faith have conducted themselves, and intend to continue conducting themselves, in a manner that adheres to neutral CDC and California guidelines on social distancing and safe gatherings. But they cannot abide by restrictions imposed solely on them, either by explicitly discriminatory orders, unequal enforcement of neutral orders, or gerrymandered orders intended to protect favored groups.

114.    To be blunt, California's present regime is demeaning and denigrating to all persons of faith. Plaintiffs contend that, at least for their congregants, their assemblies *are* an "essential service" and should therefore, because of fundamental First Amendment Protections, be treated equal to all other industries and activities.

115.    California's targeting of religious adherents and total ban from religious assembly, even in a manner consistent with governmental social distancing guidelines, while permitting similar (and at times even more intimate) social interaction to continue unabated in retail and commercial establishments, flouts the protections of the U.S. and California Constitutions.

116.    Thus, Plaintiffs bring this case to highlight the troubling erosion of fundamental and cherished liberties wrought by the imposition of the Orders and the Four Stage Reopening Plan, and their unconstitutional enforcement by the California Attorney General and San Diego police. Plaintiffs request (1) an injunction preventing California and San Diego from ordering compliance with industry-specific standards for Places of Worship that does not apply to other industries; (2) an injunction preventing California and San Diego from treating Places of Worship dissimilarly from shopping (whether deemed by California to be essential or non-

essential shopping), restaurants, and factories; and (3) an injunction preventing California from banning singing or chanting during worship services when face masks are worn—or issuing another, allegedly neutral ban, that clearly targets worship.

117.    Plaintiffs do not seek to discredit or discard the government's unquestionable interest in doing that task for which it was instituted—protecting the citizenry. But, as is often true in times of crisis and fear, Plaintiffs respectfully submit that to uphold its sworn duties, California has stepped over a line the U.S. and California Constitutions do not permit. Plaintiffs thus bring this action to ensure that this Court safeguard the cherished liberties for which millions have fought, bled, and died. For, "[i]f the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be discarded." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 483 (1934) (Sutherland, J., dissenting).

## FIRST CLAIM FOR RELIEF

### Free Exercise Clause of First Amendment to U.S. Constitution

*(By all Plaintiffs against All Defendants)*

118.    Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

119.    The Orders and Defendants' enforcement thereof violate the First Amendment, both facially and as-applied to Plaintiffs. The First Amendment of the Constitution protects the "free exercise" of religion. Fundamental to this protection is the right to gather and worship. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts . . . [such as the] freedom of worship and assembly."). The Free Exercise Clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

120.   As the Supreme Court has noted, "a law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993). A law is not neutral if it identifies religion or worship explicitly. *Espinoza v. Montana Dep't of Revenue*, --- S. Ct. ---, 2020 WL 3518364, at *7 (2020); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017). "A law is not generally applicable if its prohibitions substantially underinclude non-religiously motivated conduct that might endanger the same governmental interest that the law is designed to protect." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1079 (9th Cir. 2015) (citing *Lukumi*, 508 U.S. at 542–46). A law is also not generally applicable if it is "enforced in a discriminatory manner." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004). "Faith-based discrimination can come in many forms." *Roberts v. Neace*, 958 F. 3d 409, 413 (6th Cir. 2020).

121.   The Orders and Reopening Plan are neither neutral nor of general application. Defendants' restrictions have specifically and explicitly targeted religious and "faith-based" services and are thus not neutral on their face. Defendants have prohibited certain public and private gatherings deemed "non-essential," including out-of-home religious services, while exempting a laundry list of industries and services purportedly "essential" to the government's various interests, including medical cannabis dispensaries and other medical providers, courts, public utilities, daycare and childcare, "necessary" shopping—and favored political protesting. Defendants have also provided a de facto exemption for protests against the unjust death of George Floyd, without extending the same solicitude to Plaintiffs' religious gatherings.

122.   In addition to relegating all faith activities to a third-class status (at best), Defendants have threatened criminal penalties for holding in person services, and have thus substantially burdened Plaintiffs' religious exercise. Defendants have forced Plaintiffs to choose between their sincerely held religious beliefs and their

desire to follow secular rules, in many cases imposed by unelected government officials.

123.    Laws and government actions that burden religious practice and are either not neutral or not generally applicable must satisfy a compelling governmental interest and be narrowly tailored to achieve that end.

124.    Defendants' mandates are not "narrowly tailored" to further any compelling governmental interest. Defendants have granted numerous special exemptions to their bans on public gatherings and conduct, including for purportedly "essential" businesses and activities, provided that social distancing practices are observed. Since these gatherings may be permitted, there can be no doubt that Defendants must permit Plaintiffs to engage in religious activities and services provided that Plaintiffs also adhere to the social distancing guidelines currently in place.

125.    Requiring Plaintiffs to abstain from religious gatherings violates Plaintiffs' Constitutional right to free exercise of religion. The state does not have the power under our Constitutional scheme to decree that as to faith activities, "streaming" (for those congregations and parishioners with the wealth and technological acumen to partake of such truncated substitutes) is "good enough" when at the same time the state protects the entertainment industry and media organizations' First Amendment rights while denying the Plaintiffs their First Amendment rights.

126.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

127.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

128.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF

### Free Exercise of Religion of Article I, Section 4, of the Cal. Constitution

*(By all Plaintiffs against the County Defendants)*

129.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

130.   In California "[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed." Cal. Const. Art. 1, §4.

131.   "In general, the religion clauses of the California Constitution are read more broadly than their counterparts in the federal Constitution." *Carpenter v. City and County of San Francisco*, 93 F.3d 627, 629 (9th Cir. 1996). Courts "therefore review [a] challenge. . . under the free exercise clause of the California Constitution in the same way [they] might have reviewed a similar challenge under the federal Constitution after *Sherbert*, and before *Smith*. In other words, we apply strict scrutiny." *Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527, 562 (2004) (citations omitted).

132.   For the reasons stated in Plaintiffs' First Claim for Relief, requiring Plaintiffs to only engage in religious worship outdoors, or without singing, or without the full congregation in attendance, violates Plaintiffs' free exercise rights under the California Constitution as well. This burdening cannot satisfy strict scrutiny because California permits other industries and activities to proceed unhindered.

133.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders in a neutral manner that does not treat worship worse than manufacturing, restaurants, or shopping.

134.   Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorney fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

### THIRD CLAIM FOR RELIEF

### Establishment Clause of First Amendment to U.S. Constitution

*(By all Plaintiffs against All Defendants)*

135.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

136.   The Orders and Defendants' enforcement thereof violate the First Amendment, both facially and as-applied to Plaintiffs. The Establishment Clause of the "First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005) (*citing Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). The Establishment Clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *Everson v. Board of Ed. of Ewing*, 330 U.S. 1 (1947).

137.   The Orders, as stated, advance no secular purpose. Defendants have made numerous exceptions to their Orders, permitting the same conduct (counseling) if performed by secular practitioners but not religious ministers. Defendants have also distinguished between religions, permitting services that can be performed via livestream to proceed, but banning all services that require in-person participation. It is not for Defendants to determine which faiths may have their services proceed.

138.   The Orders and Defendants' *ad hoc* enforcement of them have the primary effect of inhibiting religious activity.

139.   Defendants have failed to avoid excessive government entanglement with religion. Defendants permit only some forms of religious observance, such as livestreamed, at-home religious activities.

140.   There is no historical precedent in the United States for inhibiting religious practices on terms more restrictive than those imposed on identical secular activities, as Defendants do now.

141.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

142.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

143.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## FOURTH CLAIM FOR RELIEF

### Free Speech Clause of First Amendment to U.S. Constitution

*(By all Plaintiffs against All Defendants)*

144.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully Set forth herein.

145.   The Orders and Defendants' enforcement thereof violate the First Amendment, both facially and as-applied to Plaintiffs.

146.   Under Defendants' Orders, public gatherings and church services are prohibited.

147.   Plaintiffs engage in protected speech through worship, religious discussions, singing hymns, and praying with their congregation.

148.   Defendants' imposition of the Orders is unreasonable and has a chilling effect on protected speech by outright banning in-person church services at the pain

43

of criminal penalty. Additionally, the State Orders were accompanied by statements that they would generally not be enforced by police, and that officers should exercise discretion before considering doing so. But the Orders fail to provide any guidance as to what violations would be prioritized, leaving it up to the officers' unfettered discretion to decide which violations to enforce. Such a lack of standards along with a grant of such discretion renders the Orders unconstitutional both facially and as they are applied.

149.    The Orders are unconstitutionally overbroad, and therefore void as a matter of law, both on their faces, and as it is applied.

150.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

151.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

152.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## FIFTH CLAIM FOR RELIEF

### Freedom of Speech of Article I, Section 2, of the Cal. Constitution

*(By all Plaintiffs against the County Defendants)*

153.    Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

154.    In California, "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Cal. Const. Art. 1, §2.

155.    "The California Supreme Court has recognized that the California Constitution is 'more protective, definitive and inclusive of rights to expression and

speech' than the First Amendment to the United States Constitution." *Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142, 1167 (9th Cir. 2007).

156. For the reasons stated in Plaintiffs' Fourth Claim for Relief, requiring Plaintiffs to abstain from their religious gatherings, despite substantial modifications to satisfy the public health interests at stake, violates Plaintiffs' liberty of speech rights under the California Constitution as well.

157. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

158. Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

## SIXTH CLAIM FOR RELIEF

### Violation of First Amendment Freedom of Assembly Clause

*(By all Plaintiffs against All Defendants)*

159. Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

160. The Orders and Defendants' enforcement thereof violate the First Amendment, both facially and as-applied to Plaintiffs. The First Amendment of the Constitution protects the "right of the people peaceably to assemble." The Freedom of Assembly Clause was incorporated against the states in *De Jonge v. Oregon*, 299 U.S. 353 (1937).

161. "The right of free speech, the right to teach, and the right of assembly are, of course, fundamental rights." *Whitney v. California*, 274 U.S. 357, 373 (1927). When a government practice restricts fundamental rights, it is subject to "strict scrutiny" and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available. *See, e.g.*, *San Antonio*

*Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973); *Dunn v. Blumstein*, 405 U.S. 330 (1972).

162.   By denying Plaintiffs the ability to conduct services, Defendants are in violation of the Freedom of Assembly Clause. Defendants cannot meet the no-less-restrictive-alternative test. The CDC's and the County's social distancing guidelines are appropriate to limit the spread of COVID-19. Imposing more restrictive requirements that target churches while at the same time allowing manufacturing, logistics, offices, retail, and restaurants to open, as well as political protests against the unjust death of George Floyd, is not the least restrictive means of achieving Defendants' public safety goals.

163.   Requiring Plaintiffs to abstain from religious gatherings in a manner not required of other activities violates Plaintiffs' Constitutional right to peaceably assemble.

164.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

165.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

166.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## SEVENTH CLAIM FOR RELIEF

### Freedom of Assembly of Article I, Section 3, of the California Constitution

*(By all Plaintiffs against the County Defendants)*

167.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

168.   In California "[t]he people have the right to . . . assemble freely to consult for the common good." Cal. Const. Art. 1, §3.

169.   For the reasons stated in Plaintiffs' Sixth Claim for Relief, requiring Plaintiffs to abstain from their religious gatherings in a manner not required of other activities violates Plaintiffs' right to assemble freely under the California Constitution as well.

170.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

171.   Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

## EIGHTH CLAIM FOR RELIEF

### Right to Liberty of Article I, Section 1, of the California Constitution

*(By all Plaintiffs against the County Defendants)*

172.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

173.   In California, "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. Art. 1, §1.

174.   California courts have found that Public Health Officials could not quarantine 12 blocks of San Francisco Chinatown because of nine deaths due to bubonic plague. *See Jew Ho v. Williamson*, 103 F. 10 (C.C. Cal. 1900); *Wong Wai v. Williamson,* 103 F. 1 (C.C. Cal. 1900).

175.   In *Jew Ho* and *Wong Wai*, the California courts found that there were more than 15,000 people living in the twelve blocks of San Francisco Chinatown who

1  were to be quarantined. The courts found it unreasonable to shut down the ability of
2  over 15,000 people to make a living because of nine deaths. This was one death for
3  every 1,666 inhabitants of Chinatown.

4    176.   In *Jew Ho*, the court stated that it was "purely arbitrary, unreasonable,
5  unwarranted, wrongful, and oppressive interference with the personal liberty of
6  complainant" who had "never had or contracted said bubonic plague; that he has
7  never been at any time exposed to the danger of contracting it, and has never been in
8  any locality where said bubonic plague, or any germs of bacteria thereof, has or have
9  existed." *Jew Ho*, 103 F. 10.

10   177.   California courts have instead focused on the necessity of there being
11 "reasonable grounds [] to support the belief that the person so held [quarantined] is
12 infected." *Ex parte Martin*, 83 Cal. App. 2d 164 (1948). Public Health Officials must
13 be able to show "probable cause to believe the person so held has an infectious
14 disease. . . ." *Id.* "[A] mere suspicion [of a contagious disease], unsupported by facts
15 giving rise to reasonable or probable cause, will afford no justification at all *for*
16 *depriving persons of their liberty* and subjecting them to virtual imprisonment under a
17 purported order of quarantine." *Ex parte Arta*, 52 Cal. App. 380, 383 (1921)
18 (emphasis added).

19   178.   As stated above, as of July 15, 2020 the probability of dying of COVID-
20 19 is 18.3 out of 100,000 in California generally, and 13 out of 100,000 in San Diego
21 specifically.

22   179.   Plaintiffs have never had or contracted said coronavirus. Despite
23 regularly testing its staff and volunteers, it has yet to receive a positive test for the
24 coronavirus. The Church also encourages its congregants to notify it if they test
25 positive for the coronavirus, and it is unaware of any congregant testing positive as a
26 result of the Church's worship services. If there is reason to believe that a congregant
27 has come into contact with an individual who has tested positive for the coronavirus,
28 Plaintiffs require a negative test from that individual before they may return to

worship services. This goes beyond CDC requirements, and ensures that South Bay Pentecostal Church is one of the safest places to be.

180.   Requiring Plaintiffs to abstain from religious gatherings violates their California Constitutional liberty rights.

181.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

182.   Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

## NINTH CLAIM FOR RELIEF

### Violation of Substantive Rights in the Due Process Clause of

### Fourteenth Amendment to U.S. Constitution

*(By all Plaintiffs against All Defendants)*

183.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

184.   The Orders and Defendants' enforcement thereof violate Plaintiffs' substantive due process rights secured by the Fourteenth Amendment to the U.S. Constitution. Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law." The fundamental liberties protected by this Clause include most of the rights enumerated in the Bill of Rights. *See Duncan v. Louisiana*, 391 U.S. 145, 147–149 (1968). In addition, these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs. *See, e.g.*, *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972); *Griswold v. Connecticut*, 381 U.S. 479, 484–486 (1965).

185.   Plaintiffs' rights to freedom of religion, assembly, speech, and travel are fundamental rights protected by the U.S. Constitution. *See, e.g.*, *Aptheker v. Secretary of State*, 378 U.S. 500, 520 (1964); *Kent v. Dulles*, 357 U.S. 116, 127 (1958).

186.   When a government practice restricts fundamental rights such as the right to practice religion freely, assemble peacefully, speak, and travel, it is subject to "strict scrutiny" and can be justified only if it furthers a compelling government purpose, and, even then, only if no less restrictive alternative is available. *See, e.g. Memorial Hospital v. Maricopa County*, 415 U.S. 250, 257–58 (1974); *Dunn v. Blumstein*, 405 U.S. 330, 339-341 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 89 (1969), *Maher v. Roe*, 432 U.S. 464, 488 (1977).

187.   Strict scrutiny applies to Plaintiffs' claims because the Orders mandate that Plaintiffs stay at home, impinging on their fundamental rights to freedom of religion, assembly, speech, and travel. These Orders do not permit Plaintiffs to exercise these rights, even while conforming to the CDC and County guidelines for social distancing, unless Defendants deem them "essential" or as participating in "essential" activities.

188.   Defendants' mandates are not "narrowly tailored" to further any compelling governmental interest. Defendants have granted numerous special exemptions to their bans on public gatherings, including for purportedly "essential" businesses and activities, provided that social distancing practices are observed. Since these gatherings can be permitted, there can be no doubt that Defendants may, and therefore must, permit Plaintiffs to engage in equivalent constitutionally-protected activities provided that Plaintiffs also adhere to the social distancing guidelines.

189.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

190.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

191.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## TENTH CLAIM FOR RELIEF

### Equal Protection Clause of Fourteenth Amendment to U.S. Constitution

*(By all Plaintiffs against All Defendants)*

192.    Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

193.    The Orders and Defendants' enforcement thereof violate the Fourteenth Amendment, both facially and as-applied to Plaintiffs. The Fourteenth Amendment of the Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." Equal protection requires the state to govern impartially—not draw arbitrary distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objection.

194.    Defendants intentionally and arbitrarily categorize individuals and conduct as either "essential" or "non-essential." Those persons classified as "essential," or as participating in essential services, are permitted to go about their business and activities provided certain social distancing practices are employed. Those classified as "nonessential," or as engaging in non-essential activities, are required to stay in their residence, unless it becomes necessary for them to leave for one of the enumerated "essential" activities.

195.    Strict scrutiny under the Equal Protection Clause applies where, as here, the classification impinges on a fundamental right, including the right to practice

Verified Second Amended Complaint for Declaratory & Injunctive Relief

religion freely, the right to free speech and assembly, and the right to travel, among others.

196.   Defendants cannot satisfy strict scrutiny, because their arbitrary classifications are not narrowly tailored measures that further compelling government interests, for the reasons stated above.

197.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

198.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

199.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## ELEVENTH CLAIM FOR RELIEF

### Vagueness in Violation of the Due Process Clause of
### Fourteenth Amendment to U.S. Constitution

*(By all Plaintiffs against All Defendants)*

200.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

201.   The Orders and Defendants' enforcement thereof violate the Due Process Clause of the Fourteenth Amendment, both facially and as-applied to Plaintiffs.

202.   A regulation is constitutionally void on its face when, as matter of due process, it is so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application" *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926); *People ex rel. Gallo v. Acuna*, 14 Cal.4th 1090, 1115 (1997). The void for vagueness doctrine is designed to prevent arbitrary and discriminatory

enforcement. The problem with a vague regulation is that it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis. . . ." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

203.   Defendants' Orders are void for vagueness for the following reasons:

    a. The State Order provides that individuals are ordered to "heed" State public health directives. The word "heed" is defined by Webster's Dictionary to mean "to give consideration or attention to"—not specifically to adhere to those directives. Yet, the State Order is widely reported in the media and cited by local and state officials, including the County Orders, as compelling compliance with State public health directives to shelter in place unless conducting essential business. The State Order also includes the text of the public health directive, which includes language that ostensibly "order[s]" compliance, creating further ambiguity as to whether Plaintiffs must comply with, or merely heed, the public health directive. Accordingly, the State Order is vague as to what precisely is being ordered, and what actions may result in criminal penalties, fines, or imprisonment.

    b. All of the Orders, when issued, were surrounded by statements in press conferences or press releases stating that they can be enforced, but will not always be enforced. And that citizens should police themselves, and that officers should exercise good faith judgment. Thus, without guidance, no reasonable person would know whether his conduct is going to subject him to prosecution. In a March 19, 2020, press conference, Governor Newsom stressed that there will be *no* police enforcement of the State Orders.[48] And in March 18,

---

[48] https://www.facebook.com/CAgovernor/videos/494465634769746/, at 4:00 and 34:00.

Verified Second Amended Complaint for Declaratory & Injunctive Relief

2020, press conference, the County's Dr. Wilma Wooten stressed that she was only expecting 80%-90% compliance—which would be sufficient.[49]

204.   As a result of these ambiguities, no reasonable person could understand what conduct violates the Orders and might subject that person to criminal penalties.

205.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

206.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

207.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for judgment against Defendants and request the following relief:

A. An order and judgment declaring that the Orders, facially and as-applied to Plaintiffs, violate the First and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 1, 2, and 4 of the California Constitution;

B. An order temporarily, preliminarily, and permanently enjoining and prohibiting Defendants as follows

    i.   an injunction preventing California and San Diego from ordering compliance with industry-specific standards for Places of Worship that does not apply to other industries;

---

[49] https://youtu.be/sogjrotTCSw, at 1:10:15.

Verified Second Amended Complaint for Declaratory & Injunctive Relief

ii.  an injunction preventing California and San Diego treating Places of Worship dissimilarly from shopping (whether deemed by California to be essential or non-essential shopping), restaurants, and factories; and

iii.  an injunction preventing California from banning singing or chanting during worship services when masks are worn—or issuing another, allegedly neutral ban, that clearly targets worship.

C. For attorneys' fees and costs; and

D. Such other and further relief as the Court deems appropriate and just.

Respectfully submitted,

LiMANDRI & JONNA LLP

Dated: July 17, 2020          By: _____
Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
Attorneys for Plaintiffs

THOMAS MORE SOCIETY

Dated: July 17, 2020          By: _____
Thomas Brejcha
Peter Breen
Attorneys for Plaintiffs

DHILLON LAW GROUP INC.

Dated: July 17, 2020          By: _____
Harmeet K. Dhillon
Mark P. Meuser
Gregory R. Michael
Attorneys for Plaintiffs

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

# VERIFICATION

I, Bishop Arthur Hodges, am a plaintiff in this action. I am also the Senior Pastor of South Bay United Pentecostal Church, also a plaintiff in this action. I have read the above Verified Second Amended complaint for Declaratory & Injunctive Relief, and know its contents. I make this verification on behalf of myself and South Bay Pentecostal Church.

The information supplied in the foregoing is based on my own personal knowledge or has been supplied by my attorneys or other agents or compiled from available documents. The information in the foregoing document is true to the extent of my personal knowledge. As to the information provided by my attorneys or other agents or compiled from available documents, including all contentions and opinions, I do not have personal knowledge but made a reasonable and good faith effort to obtain the information by inquiry to other natural persons or organizations, and believe it is true.

Thus, I am informed and believe that the matters stated in the foregoing document are true and on that ground certify or declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 17th day of July 2020, at Chula Vista, California.

Bishop Arthur Hodges III

VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF