Charles S. LiMandri, SBN 110841
Paul M. Jonna, SBN 265389
Jeffrey M. Trissell, SBN 292480
LIMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938
cslimandri@limandri.com
pjonna@limandri.com
jtrissell@limandri.com

Thomas Brejcha, *pro hac vice*\*
Peter Breen, *pro hac vice*\*
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmorsociety.org
\*Application forthcoming

Attorneys for Plaintiffs

Harmeet K. Dhillon (SBN: 207873)
Mark P. Meuser (SBN: 231335)
Gregory R. Michael (SBN: 306814)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593
harmeet@dhillonlaw.com
mmeuser@dhillonlaw.com
gmichael@dhillonlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTH BAY UNITED PENTECOSTAL CHURCH, a California nonprofit corporation, and BISHOP ARTHUR HODGES III, an individual,<br><br>    Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, in his official capacity as the Governor of California, *et al.*,<br><br>    Defendants. | Case No.: 3:20-cv-865-BAS<br><br>**Memorandum of Points & Authorities in Support of Renewed Motion for a Temporary Restraining Order / Preliminary Injunction**<br><br>Judge:  Cynthia Bashant<br>Dept:  Courtroom: 4B<br>Date:   TBD<br>Time:   No Oral Argument Unless Requested by the Court<br><br>ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

PROCEDURAL HISTORY ..............................................................................1

    A.    The Stabilization of the Pandemic in California ...................................1

    B.    The Present Ban on Pentecostal Worship .............................................3

    C.    Plaintiffs Bishop Hodges and South Bay Pentecostal Church..............5

LEGAL STANDARD ........................................................................................7

ARGUMENT......................................................................................................8

    1.    South Bay Pentecostal Church Will Likely Succeed on the Merits.......8

        1.1.    California's Worship Restrictions Violate Plaintiffs'
                Free Exercise Rights. .................................................................8

            1.1.1.  California's worship restrictions are not neutral..............8

            1.1.2.  California's worship and protest restrictions
                      are not generally applicable because they have
                      been enforced discriminatorily .......................................9

        1.2.    The Worship Restrictions Fail Strict Scrutiny and
                *Jacobson* Scrutiny Because They Are Not Narrowly
                Tailored. ..................................................................................10

            1.2.1.  The worship restrictions violate the California
                      Constitution................................................................10

            1.2.2.  The worship restrictions violate the U.S.
                      Constitution................................................................17

    2.    The Other Injunction Factors Favor South Bay. ...............................24

CONCLUSION.................................................................................................25

i

Memo. of P&As ISO Renewed Mtn. for TRO / Prelim. Inj.

# TABLE OF AUTHORITIES

*Cases:*

*A&M Records, Inc. v. Napster, Inc .* ............................................................... 7
    284 F.3d 1091 (9th Cir. 2002)

*Antietam Battlefield KOA v. Hogan* .............................................................. 14
    No. 1:20-cv-01130, 2020 WL 2556496 (D. Md. May 20, 2020)

*Ashcroft v. ACLU* ............................................................................................ 17
    542 U.S. 656 (2004)

*Berean Baptist Church v. Cooper*, ........................................................... 16, 24
    No. 4:20-CV-81-D, 2020 WL 2514313 (E.D.N.C. May 16, 2020)

*Blackhawk v. Pennsylvania,* ...................................................................... 9, 12
    381 F.3d 202 (3d Cir. 2004)

*Brown v. Smith* ............................................................................................... 10
    24 Cal. App. 5th 1135 (2018)

*Bruni v. City of Pittsburgh* ........................................................................... 16
    824 F.3d 353 (3d Cir. 2016)

*Calvary Chapel of Bangor v. Mills* ............................................................... 14
    No. 1:20-cv-00156, 2020 WL 2310913 (D. Me. May 9, 2020)

*Calvary Chapel Dayton Valley v. Sisolak* ............................. 12, 13, 15, 18, 20, 21
    --- S. Ct. ---, 2020 WL 4251360 (2020)

*Catholic Charities of Sacramento, Inc. v. Superior Court* ............................ 10
    32 Cal. 4th 527 (2004)

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* ...................... 8, 12
    508 U.S. 520 (1993)

*Coll. Republicans at San Francisco State Univ. v. Reed,* ............................. 26
    523 F. Supp. 2d 1005 (N.D. Cal. 2007)

# TABLE OF AUTHORITIES—Continued

*Cases:*

*Compassion in Dying v. State of Wash.* .................................................. 18
    79 F.3d 790 (9th Cir. 1996)

*Cross Culture Christian Ctr. v. Newsom* ............................................... 14
    No. 2:20-CV-00832-JAM-CKD, 2020 WL 2121111 (E.D. Cal. May 5, 2020)

*DiMartile v. Cuomo* ........................................................................... 19
    No. 1:20-CV-0859 (GTS/CFH), 2020 WL 4558711 (N.D.N.Y. Aug. 7, 2020)

*Doe v. Harris* ..................................................................................... 26
    772 F.3d 563 (9th Cir. 2014)

*Elrod v. Burns* ................................................................................... 25
    427 U.S. 347 (1976)

*Engle v. Vitale* ................................................................................... 24
    370 U.S. 421 (1962)

*Espinoza v. Montana Dep't of Revenue* ................................... 8, 9, 10, 12
    140 S. Ct. 2246 (2020)

*Everson v. Bd. of Ed. of Ewing Twp.* .................................................... 23
    330 U.S. 1 (1947)

*Ex parte Arata* ................................................................................... 10
    52 Cal. App. 380 (1921)

*Ex parte Martin* ................................................................................. 10
    83 Cal. App. 2d 164 (1948)

*Ex parte Milligan* ............................................................................... 18
    71 U.S. 2 (1866)

*First Baptist Church v. Kelly* ......................................................... 19, 20
    No. 20-1102-JWB, 2020 WL 1910021 (D. Kan. Apr. 18, 2020)

*Fisher v. Univ. of Texas at Austin* ......................................................... 8
    570 U.S. 297 (2013)

*Flores v. Huppenthal* ............................................................................ 7
    789 F.3d 994 (9th Cir. 2015)

MEMO. OF P&AS ISO RENEWED MTN. FOR TRO / PRELIM. INJ.

# TABLE OF AUTHORITIES—Continued

*Cases:*

*Gon v. First State Ins. Co.* ........................................................................ 7
    871 F.2d 863 (9th Cir. 1989)

*Hurley v. Irish American GLIB* .................................................................. 7
    515 U.S. 557 (1995)

*In re Wong Kim Ark* ................................................................................. 20
    71 F. 382 (N.D. Cal. 1896)

*Int'l Refugee Assistance Project v. Trump* ............................................... 24
    857 F.3d 554 (4th Cir. 2017)

*Jacobson v. Commonwealth of Massachusetts,* ............................... 1, 9, 17
    197 U.S. 11 (1905)

*Jew Ho v. Williamson* ........................................................................ 19, 20
    103 F. 10 (C.C. Cal. 1900)

*Joelner v. Vill. of Washington Park* ......................................................... 25
    378 F.3d 613 (7th Cir. 2004)

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer* .............. 12
    ---Fed. Appx. ---, 2020 WL 3468281 (6th Cir. 2020)

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania* ....... 24
    140 S. Ct. 2367 (2020)

*Maryville Baptist Church v. Beshear* ....................................................... 14
    No. 3:20-cv-278, 2020 WL 1909616 (W.D. Ky. Apr. 18, 2020)

*McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.* ............................ 22
    545 U.S. 844 (2005)

*McCullen v. Coakley* .......................................................................... 15, 16
    134 S. Ct. 2518 (2014)

1

## TABLE OF AUTHORITIES—Continued

2 *Cases:*

3 *Old Dominion Branch No. 496, National Ass'n of Letter Carriers v. Austin* .............. 7
4     418 U.S. 264 (1974)

5 *Our Lady of Guadalupe Sch. v. Morrissey-Berru* ......................................... 23, 24
6     140 S. Ct. 2049 (2020)

7 *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church* ... 23, 24
8     393 U.S. 440 (1969)

9 *Reed v. Town of Gilbert, Ariz.* ............................................................ 12
10     576 U.S. 155, 172 (2015)

11
12 *Roberts v. Neace* ....................................................................... 9, 25
    958 F. 3d 409 (6th Cir. 2020)

13
14 *S. Bay United Pentecostal Church v. Newsom* ............................................ 13, 18
    140 S. Ct. 1613 (2020)

15
16 *S. Bay United Pentecostal Church v. Newsom,* .............................................. 18
    959 F.3d 938 (9th Cir. 2020)

17
18 *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich* ................... 24
19     426 U.S. 696 (1976)

20 *Soos v. Cuomo* ....................................................................... 12, 13, 20
21     No. 1:20-cv-651 (GLS/DJS), 2020 WL 3488742 (N.D.N.Y. June 26, 2020)

22 *Spell v. Edwards* ........................................................................ 21, 23
23     962 F.3d 175 (5th Cir. 2020)

24 *State v. Trump* ............................................................................. 7
25     871 F.3d 646 (9th Cir. 2017)

26 *Stormans, Inc. v. Wiesman* .................................................................. 9
27     794 F.3d 1064 (9th Cir. 2015)

28

v

# TABLE OF AUTHORITIES—Continued

***Cases:***

*Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear* .................................. 16
     --- F. Supp. 3d ---, 2020 WL 2305307 (E.D. Ky. 2020)

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly* .................................. 9
     309 F.3d 144 (3d Cir. 2002)

*Trump v. Hawaii* .................................. 20
     138 S. Ct. 2392 (2018)

*U. S. of Am. & Canada v. Milivojevich* .................................. 24
     426 U.S. 696 (1976)

*U.S. ex rel. F.T.C. v. Bus. Recovery Servs. LLC* .................................. 7
     488 F. App'x 188 (9th Cir. 2012)

*United States v. Playboy Entm't Grp., Inc.* .................................. 15
     529 U.S. 803 (2000)

***Other Authorities:***

Cal. Const. Art. 1, § 1 .................................. 10

District Attorney San Luis Obispo County, *SLO County DA Declared a
     Sanctuary County for Singing in Houses of Worship During COVID*,
     YOUTUBE (Jul. 31, 2020), https://youtu.be/KWjn233gMNM .................................. 5

Roxana Kopetman, *OC Board of Education to sue Newsom as it seeks the full
     reopening of schools*, THE ORANGE COUNTY REGISTER (Jul. 29, 2020),
     https://bit.ly/3fytGPr .................................. 8

# INTRODUCTION

The situation has changed dramatically since this Court ruled in early May on Plaintiffs South Bay United Pentecostal Church's and Bishop Arthur Hodges III's application for a temporary restraining order and OSC re: preliminary injunction. As Justice Kavanaugh recently made clear, defendants in cases such as these have had more than four months to get their act together, and to be able to convincingly meet their burden of establishing the constitutionality of their actions without recourse to *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). However, for the reasons discussed below, neither California nor San Diego can meet their burden under either regular Free Exercise jurisprudence, or *Jacobson* jurisprudence, and so this Court should grant Plaintiffs' request for an injunction.

# PROCEDURAL HISTORY

## A.    The Stabilization of the Pandemic in California

According to Centers for Disease Control and Prevention (CDC), between February 1 and July 15, 2020, there were 1,387,325 deaths in America, with 121,374 deaths occurring as a result of COVID-19—or 8.75%. (Dkt. 47, Verified Second Amended Complaint [VSAC], ¶ 105, Ex. 5-1.) The pandemic hit its peak in April, but since then has dropped off dramatically. (VASC, ¶ 105, Ex. 5-2.)

Looking to California specifically, it is doing quite well. In comparison to other states, as of July 15, 2020, California's death rate placed it as only the 30th highest rate among the 50 states. (VSAC, ¶ 107 & n.44.) Its statistics are only improving. (*See* Cicchetti Decl., ¶¶ 15–20.) California's death rate has largely stabilized, and its hospitalization rates are in free-fall. (VSAC ¶ 108, Ex. 5-3.)

As of July 14, 2020, California had only reported a total of 7,227 deaths from COVID-19. (VSAC, ¶ 106, Ex. 5-3.) With a population of 39,512,223 (Dkt. 13-1, RJN, at 4), this means that as of mid-July, the probability of dying of COVID-19 in California was 18.3 out of 100,000. This, of course, only includes data from the start of the pandemic in mid-March to mid-July. But even if extrapolated out, the data is

1

1  not overwhelming. Averaging the deaths for the past three months (May, June, and
2  July) shows an average of 2,384 monthly deaths. (Trissell Decl., Ex. Q.) If this rate
3  continues—which seems unlikely as the death rates are falling and a vaccine is
4  forthcoming—then over a twelve-month period, there would be 28,604 coronavirus
5  related deaths in California, which would be a death rate of 72.4 out of 100,000. In
6  comparison, the ten leading causes of death in California have the following rates out
7  of 100,000, according to the CDC: (1) Heart Disease: 139.7; (2) Cancer: 135;
8  (3) Alzheimer's: 37.1; (4) Stroke: 37; (5) Accidents: 33.7; (6) Chronic Lower
9  Respiratory Diseases: 30.9; (7) Diabetes: 21.4; (8) Influenza/ Pneumonia: 15.6;
10 (9) Drug Overdose: 12.8; (10) Hypertension: 12.3. (VSAC, ¶ 106 & n.43.)

11        Looking to San Diego County specifically, as of July 13, 2020, it had a total of
12 436 coronavirus related deaths. (VSAC, ¶ 109, Ex. 5-4.) With a population of
13 3,338,330 (Dkt. 21-1, RJN, at 16), this means that the probability of dying of COVID-
14 19 in San Diego County was 13 out of 100,000. Again, this only includes data from
15 the start of the pandemic in mid-March to mid-July. But if the data from San Diego's
16 reporting (VSAC, ¶ 110, Ex. 5-4) is extrapolated out—multiplied by three—then
17 there would be a total of 1,308 deaths, or a rate of only 39 out of 100,000. And of
18 course, this relies on the death rates not decreasing at all, an unlikely proposition. In
19 comparison, below are the leading causes of death in San Diego: (1) Malignant
20 Neoplasms: 158.3; (2) Diseases of the Heart: 140.6; (3) Alzheimer's Disease: 33.9;
21 (4) Chronic Lower Respiratory Diseases: 32.7; (5) Cerebrovascular Diseases: 30.3;
22 (6) Accidents: 30.5; (7) Diabetes: 20.4; (8) Suicide: 12.8; (9) Chronic Liver Disease:
23 11.0; (10) Hypertension: 9.8. (Dkt. 21-1, RJN, at 20.)

24        Finally, looking to South Bay Pentecostal Church itself, despite regularly
25 testing its staff and volunteers, South Bay has yet to receive a positive test for the
26 coronavirus. The Church has also encouraged its congregants to notify it if they test
27 positive for the coronavirus, and is unaware of any congregant testing positive as a
28 result of its worship services. (VSAC, ¶¶ 83, 179.) And as one of Plaintiffs' experts

makes clear, the Court should look to the Church itself. (Kaufmann Decl., ¶ 14.)

Thus, in both California generally, and San Diego specifically—if the official numbers can be trusted (*but see* Lyons-Weiler Decl., ¶¶ 8–20)—the coronavirus is approximately half as deadly as either heart disease or cancer. In San Diego specifically, even when extrapolated out for the whole year, the death rate stays in the 30s, along with Alzheimer's disease, respiratory disease, strokes and physical accidents. And at South Bay Pentecostal Church, the rate of coronavirus infections, hospitalizations, and deaths resulting from its worship services is an absolute 0.

**B.     The Present Ban on Pentecostal Worship**

On March 4 and 13, 2020, both President Donald J. Trump and Governor Gavin Newsom proclaimed a State of Emergency as a result of the threat of the emergence of a novel coronavirus, COVID-19. (VSAC, ¶ 18.) Then, in response to these emergency declarations, on March 17, 2020, the County of San Diego issued its "Order of the Health Officer and Emergency Regulations," which prohibited gatherings of more than 50 people. (VSAC, ¶ 27, Ex. 2-1.)[1] Two days later, on March 19, 2020, California Governor Newsom issued his executive orders banning all worship (VSAC, ¶¶ 28–29, Exs. 1-1, 1-2), which were re-promulgated by San Diego. (VSAC, ¶¶ 30, Exs. 2-2, 2-3.) This was Stage 1 of Governor Newsom's 4-Stage "Resilience Roadmap" pandemic plan.

After seven weeks of Stage 1, however, Californians had enough—and on May 8, 2020, Governor Newsom moved California to Stage 2a of his Resilience Roadmap—opening retail for curbside pickup and manufacturing/warehousing. (VSAC, ¶¶ 31–39, Exs. 1-3, 1-4, 2-4, 2-5; Trissell Decl., Ex. R.) On Wednesday, May 20 (ahead of Memorial Day weekend), California let San Diego move ahead to Stage 2b, including permitting restaurants and malls to reopen. (VSAC, ¶ 42; Trissell Decl., Ex. S.)

On Memorial Day—Monday, May 25, 2020—Governor Newsom announced

---

[1] Unless noted, all quotations are "cleaned up" by having ellipses, brackets, citations, emphasis, and quotation marks omitted, and all emphasis is added.

3

Memo. of P&As ISO Renewed Mtn. for TRO / Prelim. Inj.

1  changes to his Resilience Roadmap with respect to constitutionally protected

2  protesting and worship activities. With respect to both, Governor Newsom permitted

3  individual counties to apply for 21-day licenses during which worship and protest

4  would be permitted so long as the gathering did not exceed 25% of "building

5  capacity" or "the relevant area's maximum occupancy," and with a maximum cap of

6  no more than 100 persons. (VSAC, ¶ 44.) However, California remained in "Stage

7  2." Alongside this change, Governor Newsom published industry guidance for

8  "Places of Worship" (VSAC, Ex. 1-5), and updated the Q&A page on the

9  coronavirus website concerning political protests. (VSAC, Ex. 1-6.)

10      The next day, May 26, 2020, Governor Newsom also announced that hair

11  salons and barbershops could reopen (moving them from "Stage 3" to "Stage 2").

12  (VSAC, ¶ 45; Trissell Decl., Ex. T.) On May 27, 2020, San Diego received its first

13  21-day worship/protest license, and issued a series of orders granting permission to

14  worship. (VSAC, ¶ 45, Ex. 2-6.) On June 5, 2020, California announced that the

15  remaining Stage 2 industries would be allowed to open within a week, such as

16  "schools and day camps." Some Stage 3 industries were also allowed to open, such

17  as "bars [and] gyms." (Dkt. 45-3, LiMandri Decl., Ex. 49.) Ultimately, on June 12,

18  2020, California let gyms, bars, museums, and schools reopen in San Diego—

19  essentially all Stage 3 industries except nail salons, tattoo parlors, and movie theaters.

20  (VSAC, ¶ 47; LiMandri Decl., Ex. 50; Trissell Decl., Ex. U.)

21      That same day, June 12, Governor Newsom changed, without public

22  announcement, the industry guidance for "Places of Worship" and the Q&A page

23  concerning protesting. On that date, Governor Newsom lifted restrictions on them

24  when they occurred outdoors—but continued the 100-person cap or 25% occupancy

25  limit for indoor worship or protesting. (VSAC, ¶ 48, Exs. 1-7, 1-8.) Beginning on June

26  16, San Diego issued orders adopting this change. (VSAC, ¶ 48, Ex. 2-7.)

27      On July 6, 2020, Governor Newsom changed the industry guidance for "Places

28  of Worship" and the Q&A page concerning political protesting. On that date,

4

Memo. of P&As ISO Renewed Mtn. for TRO / Prelim. Inj.

Governor Newsom banned "indoor singing and chanting activities." (VSAC, ¶ 49, Exs. 1-9, 1-10.) This led law enforcement in some counties to announce they would not enforce that order.[2] Then, on July 13, 2020, Governor Newsom banned 30 counties from conducting many indoor activities, including worship and protest. (VSAC, ¶ 49, Exs. 1-11, 1-12, 1-13.) This included small gatherings of worshippers in homes. (Trissell Decl., Ex. V.) San Diego was one of those counties (VSAC, Ex. 1-11), and it modified its orders to make clear that the ban on indoor activities applied in the County. (VSAC, Ex. 2-8; Trissell Decl., Ex. W.)[3] This led to a group of senators to call for President Trump to get involved again, and speak out against this newest worship ban. (Trissell Decl., Ex. X.) Finally, on July 17, 2020, California ordered that the same 30 counties may not reopen their schools. (Trissell Decl., Ex. Y; *see also* Exs. Z, AA.)

## C.      Plaintiffs Bishop Hodges and South Bay Pentecostal Church

During the week following Monday, May 25, 2020, California and San Diego lifted the first ban on all worship services. As a result, the following Sunday, May 31 (Pentecost Sunday), South Bay Pentecostal Church held worship services with no more than 100 persons in attendance. (VSAC, ¶ 71.) To attend a Sunday worship service, the Church required its congregants to reserve their place online. Every Sunday, the Church had to turn numerous people away because it met the 100-person cap for each of its services. This is despite the fact that the sanctuary could safely (with social distancing) accommodate well over 100 persons. (VSAC, ¶ 72.)

Each worship service required the participation of at least 30 volunteers/staff to be held. Such individuals served as parking lot attendants, members of the COVID-safe intake team, security, cleaners between services, ushers, greeters,

---

[2] District Attorney San Luis Obispo County, *SLO County DA Declared a Sanctuary County for Singing in Houses of Worship During COVID*, YOUTUBE (Jul. 31, 2020), https://youtu.be/KWjn233gMNM.

[3] Also closed were indoor and outdoor activities at bars and breweries, and indoor activities at restaurants, wineries and tasting rooms, movie theaters, family entertainment (e.g., bowling alleys, miniature golf, batting cages, arcades), zoos and museums, cardrooms, fitness centers, protests, non-essential offices, personal care services (e.g., nail salons, body waxing, tattoo parlors), hair salons and barbershops, and malls. (VSAC, Ex. 2-8.) Not closed were indoor activities at other places, such as essential offices, manufacturing, and either essential or nonessential retail.

musicians, singers, and video/audio projection operators. Many of the Church's volunteers and staff are elderly or high-risk, and so the Church asked them to not participate. This, however, limited its ability to hold multiple services. The Church had been holding, and could not feasibly hold more than, three worship services each Sunday. (VSAC, ¶ 73.)

The Church has a complex theology, based on Sacred Scripture, relating to the requirement that "all" of its congregants gather together. California's regulations continued to burden those religious beliefs, by preventing "all" from gathering. (VSAC, ¶¶ 57–62, citing Hebrews 10:25; Acts 1:8, 2:1, 2:42, 2:46–27.) These religious requirements disfavor multiple worship services, by preferring that the entire congregation meet at once. For example, it would be like holding a family reunion in three sessions, with one-third of the family gathering at each session, but not being allowed to meet the rest of the family gathering in the other sessions. (VSAC, ¶ 80.) The Church's theology also encourages congregants to attend multiple worship services—which many normally do. Nevertheless, because the interplay of California's regulations and the nature of its worship services limited the Church to serving a maximum of 300 people each Sunday (at three worship services), it had to limit congregants' ability to attend more than one service per Sunday. (VSAC, ¶ 81.)

On June 12, 2020, after South Bay Pentecostal Church noted in briefing that political protests and worship services were treated the same under California's regulations—but in practice certain political protests were entirely exempt from those regulations—California modified them. Under the June 12 regulations, there are no restrictions on protest or worship, so long as they occur outdoors, not indoors. But regardless of whether this regulation was motivated by good or bad intent, it does not help South Bay Pentecostal Church. The Church does not have an adequate place where it can meet outdoors. More problematically, the Church's theology requires approaching the altar at the end of each service and performing baptisms (both with social distancing). The Church's altar and baptistery is in its sanctuary auditorium,

6

Memo. of P&As ISO Renewed Mtn. for TRO / Prelim. Inj.

which is indoors. (VSAC, ¶ 69.)

On July 6, 2020, in addition to the above restrictions, California published regulations stating that "Places of worship must therefore discontinue indoor singing and chanting activities." (VSAC, Ex. 1-9.) This restriction is particularly concerning because singing is at the very heart of Pentecostal worship services, and essentially acts as a ban on them. (VSAC, ¶ 70; 2d Supp. Bishop Hodges Decl., ¶¶ 3–23.) Finally, on July 13, 2020, California banned all indoor worship services. (VSAC, ¶ 49.) For the reasons stated above, it has thus again banned Plaintiffs from exercising their faith.

## LEGAL STANDARD

"A district court has inherent authority to modify [an order concerning] a preliminary injunction in consideration of new facts." *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002). "A party seeking modification of an injunction bears the burden of establishing that a significant change in facts or law warrants revision of the injunction [order]." *State v. Trump*, 871 F.3d 646, 654 (9th Cir. 2017). Typically, a motion to modify a preliminary injunction order is limited to new facts or law. *U.S. ex rel. F.T.C. v. Bus. Recovery Servs. LLC*, 488 F. App'x 188, 189-90 (9th Cir. 2012). "On the other hand, a modification may be so fundamental to the original injunction, or may otherwise present issues so inextricable from the validity of the original injunction, that review must include the whole package." *Gon v. First State Ins. Co.*, 871 F.2d 863, 866-67 (9th Cir. 1989). "A court abuses its discretion when it refuses to modify an injunction [order] in light of a significant change either in factual conditions or in law." *Flores v. Huppenthal*, 789 F.3d 994, 1001 (9th Cir. 2015). When the preliminary injunction order involves constitutional rights, a review of the whole package is also compelled by the constitution. *See Old Dominion Branch No. 496, National Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 282 (1974); *Hurley v. Irish American GLIB*, 515 U.S. 557, 567-68 (1995).

///

///

7

Memo. of P&As ISO Renewed Mtn. for TRO / Prelim. Inj.

# ARGUMENT

## 1. South Bay Pentecostal Church Will Likely Succeed on the Merits.

### 1.1. California's Worship Restrictions Violate Plaintiffs' Free Exercise Rights.

With respect to the State of California, its ban on religious worship triggers the application of strict scrutiny for the reasons discussed in this section.[4] With respect to the County of San Diego, any substantial burden on Plaintiffs' free exercise of religion automatically triggers strict scrutiny. This is because Plaintiffs are asserting against San Diego a claim under the California Constitution's Free Exercise clause, which automatically applies strict scrutiny. Therefore, with respect to San Diego, the Court may proceed directly to Section 1.2.[5]

#### 1.1.1. California's worship restrictions are not neutral.

If a law classifies on the basis of protected characteristic such as race or religion, it is subject to strict scrutiny. *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 309 (2013) (race); *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2255 (2020) (religion). With respect to the latter, a law classifies on the basis of religion and "lacks facial neutrality if it refers to a religious practice" unless it is clear that the words used were intended to have "a secular meaning." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 533, 546 (1993).

Previously, California instituted a generic ban on all people leaving their homes (VSAC, ¶ 28, Ex. 1-1), and then granted a long series of exemptions which did not include leaving one's home for the purpose of worship. (VSAC, ¶ 29, Ex. 1-2.) Thus, the parties were required to argue over whether those long series of exemptions made

---

[4] In line with its motion for an indicative ruling, South Bay Pentecostal Church tailors its argument to its Free Exercise claims under the U.S. and California Constitutions. However, the Church is not abandoning its Equal Protection or Due Process claims. Indeed, under modern jurisprudence, a Federal Free Exercise claim is akin to an Equal Protection claim, and so the analysis largely overlaps. And the Church still believes that a ban on *its* worship, and an instruction that it worship like some other groups (via video streaming, outdoor services, or without singing), "shocks the conscience."

[5] *Cf., e.g.*, VSAC, ¶ 46 (quoting letter from San Diego to California requesting leave to open more fully because local situation does not justify shutdown); Roxana Kopetman, *OC Board of Education to sue Newsom as it seeks the full reopening of schools*, THE ORANGE COUNTY REGISTER (Jul. 29, 2020), https://bit.ly/3fytGPr.

an otherwise neutral (not facially discriminatory) law not generally applicable. This is no longer the case. Now California is explicitly regulating worship itself. Stated differently, ordering that "worshippers may not gather" is no different than—and equally repugnant as—if in response to the very beginning of the pandemic, California ordered that "Chinese may not gather," or following the BLM Protest spikes, California ordered that "African-Americans may not gather." In either case, strict scrutiny is mandated.

Even if the government later attempts to identify a purportedly neutral explanation, classifying people based on a protected characteristic is always repugnant, and indeed, trying to come up with an explanation, is equally repugnant as invidious stereotyping. *Espinoza*, 140 S. Ct. at 2256 ("Status-based discrimination remains status based even if one of its goals or effects is" a valid, neutral goal).

### 1.1.2. California's worship and protest restrictions are not generally applicable because they have been enforced discriminatorily

Even if California's regulation of worship and protest were neutral, that regulation would not be generally applicable because they have been "enforced in a discriminatory manner." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004). "Faith-based discrimination can come in many forms." *Roberts v. Neace*, 958 F. 3d 409, 413 (6th Cir. 2020). To not be "enforced in a discriminatory manner," California must show that it "had enforced it[s regulations] uniformly." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 167–68 (3d Cir. 2002); *see also Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1083–84 (9th Cir. 2015) (no discriminatory enforcement because no evidence that Washington's "complaint-driven enforcement of the rules" was not uniform).

Previously, although Plaintiffs had evidence that California and San Diego were enforcing their regulations against places of worship, they had little evidence of a conscious refusal to enforce them against other groups. This has now changed, as explained below in section 1.2.2, mandating strict scrutiny.

9

**1.2.  The Worship Restrictions Fail Strict Scrutiny and *Jacobson* Scrutiny Because They Are Not Narrowly Tailored.**

*Jacobson* dealt with a statute, passed by a duly elected legislature, that infringed on federal constitutional rights. *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 38 (1905). It has no applicability to Plaintiffs' religious claims under the California Constitution. *Id.* Rather, under the California Constitution, the Right of Liberty limits the government's ability to mandate even secular pandemic restrictions. *See* Cal. Const. Art. 1, § 1 ("All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty"). Relying on this clause, California courts have held that its residents may only be quarantined if "reasonable ground exists to support the belief that the person so held is infected." *Ex parte Martin*, 83 Cal. App. 2d 164, 167 (1948); *see also Ex parte Arata*, 52 Cal. App. 380, 385 (1921). In light of the above, Plaintiffs proceed first to an analysis of regular Free Exercise jurisprudence, which applies to their California Constitution Free Exercise claim against San Diego, and then to a *Jacobson* analysis, which potentially applies to their U.S. Constitution Free Exercise claim against California.

### 1.2.1. The worship restrictions violate the California Constitution

Since San Diego's restrictions on Plaintiffs' worship burdens Plaintiffs' religious rights, they must satisfy "strict scrutiny." *Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527, 562 (2004).[6] "That stringent standard is not watered down but really means what it says. To satisfy it, government action must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Espinoza*, 140 S. Ct. at 2260.

---

[6] This Court has previously noted that the California Supreme Court has always simply applied strict scrutiny without explicitly stating whether it is required or not. But in light of this, all lower courts are bound to continue applying strict scrutiny as well, so long as there is a burden to religious rights. *See, e.g., Brown v. Smith*, 24 Cal. App. 5th 1135, 1145 (2018) ("[A]ssum[ing] that laws requiring vaccination substantially burden the free exercise of religion and therefore merit strict scrutiny"). Here, as explained in the declarations of Bishop Hodges and the Verified Second Amended Complaint, California's restrictions criminalize activity necessary to Plaintiffs' faith, and so burden their free exercise of religion.

10

Memo. of P&As ISO Renewed Mtn. for TRO / Prelim. Inj.

Here, San Diego's supposed interest of "the highest order" is "in curbing the virus" at the expense of all other interests. (Dkt. 38, TRO Hearing Transcript, at 5:10–11.) However, Plaintiffs no longer agree that this is a compelling interest. In light of the flattening of the death and hospitalization rates, regardless of the infection rate, numerous experts have concluded that the worst of the pandemic is absolutely over. (VSAC, Exs. 5-5, 5-6; Bhattacharya Decl., ¶¶ 31–43.) These opinions are particularly important when it is recognized—as it is widely recognized—that the pandemic lockdowns have led to a spike in suicides, and that restricting religious practice is detrimental to psychological health.

Due to the heavy-handed quarantine, suicide rates have spiked. (VSAC, Ex. 5-7.) Indeed, "[a]ccording to Robert Redfield, MD, the director of Centers for Disease Control and Prevention (CDC), at this point in the pandemic, both suicides and drug overdose deaths are outnumbering deaths due to the coronavirus, itself." (Supp. Delgado Decl., ¶ 9.) Indeed, the scientific literature is now speaking about two pandemics, a coronavirus pandemic, and a "COVID-19 suicides pandemic." (Trissell Decl., Exs. BB, CC, DD.) This is unsurprising since scientific studies have found that "[p]atients highly religious by multiple indicators, particularly those involved in community religious activities, remit faster from depression." (VSAC, Ex. 5-13.) And contrarily, the stress of being unable to practice one's faith can lead to negative outcomes throughout the whole body. (VSAC, Ex. 5-10.)

Outside the pandemic context, "an increasing number of studies [] have persuasively documented positive relationships between religious involvement and physical and mental health outcomes." (VSAC, Ex. 5-8.) Studies have shown that "[r]eligious service attendance . . . predicted both objective and subjective physical health and well-being." (VSAC, Ex. 5-9.) And within the pandemic context, a new "review of the literature published from 1978 to 2019" makes clear that religion is especially needed during the present pandemic. (VSAC, Ex. 5-12.) This has spurred forthcoming additional articles, for example, on "how religious involvement may

11

enhance immune function and resilience against the coronavirus." (VSAC, Ex. 5-11.) Plaintiffs contest that San Diego has a compelling interest in harming the physical and mental health of all of its residents solely to curb the coronavirus, when the disease death rate is half that of death rates for heart disease and cancer.

However, even if San Diego had a compelling interest in harming public health to keep its coronavirus numbers lower than they already are, in the Free Exercise context, "[a] law does not advance 'an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.'" *Espinoza*, 140 S. Ct. at 2261 (quoting *Lukumi*, 508 U.S. at 547.) In other words, the fact that *any* industry is allowed to open and spread the coronavirus—even if it does so to a lesser degree than Plaintiffs supposedly would—means that "appreciable damage" to the "vital interest" is occurring, and so the order fails for "underinclusiveness." *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 172 (2015); *Espinoza*, 140 S. Ct. at 2261 (same); *see also Soos v. Cuomo*, No. 1:20-cv-651 (GLS/DJS), 2020 WL 3488742, at *11 (N.D.N.Y. June 26, 2020) (New York's regulations, which had very similar 25% capacity limits for worship, 50% for select businesses, and no limit for other businesses, were underinclusive).

Only if the spread of the coronavirus by all other sectors was "inconsequential" could San Diego refuse Plaintiffs the special protection they merit under the Free Exercise Clause of the California Constitution. *Blackhawk*, 381 F.3d at 208 (quoting *Lukumi*, 508 U.S. at 543.) This San Diego undeniably cannot do. There have been numerous coronavirus outbreaks tied to factories. (VSAC, ¶¶ 93–95, 97; LiMandri Decl., Exs. 44, 52–55; Trissell Decl., Ex. EE.) Further, restaurants are coronavirus epicenters (LiMandri Decl., Exs. 47–48), as well as gyms. (LiMandri Decl., Ex. 51; *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, --- Fed.Appx. ---, 2020 WL 3468281, at *3 (6th Cir. 2020).) The outbreaks at these places are not "inconsequential." *Calvary Chapel Dayton Valley v. Sisolak*, --- S. Ct. ---, 2020 WL 4251360, at *4 (2020) (Alito, J., dissenting) ("Having allowed thousands to gather,"

12

Memo. of P&As ISO Renewed Mtn. for TRO / Prelim. Inj.

"the State cannot claim to have a compelling interest in limiting religious gatherings").

Notably, in a subtle departure from this orthodox analysis, all five Justices have recently applied far more of an equal protection style analysis. All five agree that worship cannot be treated less favorably than other similarly situated activities. *See S. Bay United Pentecostal Church v Newsom*, 140 S. Ct. 1613 (2020); *Calvary Chapel Dayton Valley v. Sisolak*, --- S. Ct. ---, 2020 WL 4251360 (2020). The issue, then, is what activities are similar.

Four of the justices are clear that restaurants/breweries may not have less stringent restrictions than houses of worship. *S. Bay*, 140 S. Ct. at 1613; *Calvary Chapel*, 2020 WL 4251360, *2, 3, 6. Justice Roberts was silent on this point, but restaurants are not akin to the industries he found dissimilar, namely retail, banks, and laundromats. *S. Bay*, 140 S. Ct. at 1613 (contrasting "lectures, concerts, movie showings, spectator sports, and theatrical performances," with "grocery stores, banks, and laundromats"). Thus, on the merits (as opposed to in an emergency application for an injunction),[7] Justice Roberts would likely side with the other four justices who find restaurants too similar to houses of worship to be granted preferential treatment.

This makes sense. On average, Americans expect to spend 60.2 minutes dining at a restaurant—essentially the same amount of time as the typical worship service. (LiMandri Decl., Ex. 45.) But of course, diners can take as long as they want to eat their meal. Further, in a busy restaurant, most diners could also be expected to be strangers to those around them, and to speak loudly so as to be heard by their own party without wearing masks. The only difference between restaurants and worship would appear to be the size of the gathering, as some restaurants may be small—but plenty of restaurants can seat 100 guests or more. (LiMandri Decl., Ex. 46.) And

---

[7] *S. Bay United Pentecostal Church v Newsom*, 140 S. Ct. 1613 (2020) (Roberts, J., concurring) ("Applicants seek to enjoin enforcement of the Order. Such a request demands a significantly higher justification than a request for a stay because, unlike a stay, an injunction does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts. This power is used where the legal rights at issue are indisputably clear and, even then, sparingly and only in the most critical and exigent circumstances.").

lower courts are in broad agreement that gatherings at restaurants are comparable to those at places of worship. *E.g., DiMartile v. Cuomo*, No. 1:20-CV-0859 (GTS/CFH), 2020 WL 4558711, at *10 (N.D.N.Y. Aug. 7, 2020); *Soos v. Cuomo*, No. 1:20-cv-651, 2020 WL 3488742, at *11 (N.D.N.Y. June 26, 2020); *Antietam Battlefield KOA v. Hogan*, No. 1:20-cv-01130, 2020 WL 2556496, at *9 (D. Md. May 20, 2020); *Calvary Chapel of Bangor v. Mills*, No. 1:20-cv-00156, 2020 WL 2310913, at *8 (D. Me. May 9, 2020); *Cross Culture Christian Ctr. v. Newsom*, No. 2:20-cv-00832, 2020 WL 2121111, at *6 (E.D. Cal. May 5, 2020); *Maryville Baptist Church v. Beshear*, No. 3:20-cv-278, 2020 WL 1909616, at *2 (W.D. Ky. Apr. 18, 2020). Here, between May 20 and July 13, restaurants were allowed to open without the capacity limits imposed on places of worship. This Court should not allow that to happen again.

But most importantly, the above Justices' views on the likelihood of spreading the coronavirus at stores[8] (either the "essential" grocery stores, or the nonessential retail), and in manufacturing and warehousing facilities, were not legal views—but factual views. A better developed record establishes that the coronavirus does spread more easily at stores and manufacturing facilities than in places of worship.

It is plain that shopping at supermarkets and retail stores primarily involves strangers, who cannot be told where to go, and who have not pre-registered to attend. Further, the average grocery shopper takes 43 minutes to complete his shopping. (LiMandri Decl., Ex. 34.) The average trip to the mall, for those aged 18–34, is 158.4 minutes. (LiMandri Decl., Ex. 35.) The average person makes 1.6 trips to the grocery store every week. (Ex. 36.) And the average woman spends 399 hours shopping a year. (LiMandri Decl., Ex. 37.) This all adds up, with Americans spending a collective 37 billion hours per year waiting in lines. (LiMandri Decl., Ex. 38.) Under California's current rules, one can take as long as one likes to complete their

---

[8] Justice Roberts found that houses of worship were dissimilar from stores, but was silent as to their similarity to factories. Justices Thomas, Alito, Gorsuch, and Kavanaugh held that houses of worship were similar to both stores and factories. *S. Bay*, 140 S. Ct. at 1613–16.

14

Memo. of P&As ISO Renewed Mtn. for TRO / Prelim. Inj.

1 shopping. This results, as numerous Twitter videos demonstrate, in large gatherings.

2 (LiMandri Decl., Ex. 39–41.)

3       The only true distinction is that in shopping centers people are milling about,

4 and so may not spend a significant amount of time next to a single person (except

5 when waiting in line). But that is a distinction without a difference. As stated by Dr.

6 Delgado, due to the inability to control where shoppers walk and what they touch, the

7 coronavirus spreads more easily in stores than in houses of worship. (Supp. Delgado

8 Decl., ¶¶ 23–27.) This conclusion is not unique to Dr. Delgado. Rather, the general

9 unsanitariness of stores is widely known. (LiMandri Decl., Exs. 42–43.)

10      Further, under California's current rules, there is no limit on the number of

11 people, or length of time spent, in factories. For example, Defendant Angell

12 specifically identified that what could open was "manufacturing, which can include

13 things like toys, *clothing*, other things." (Dkt. 12-4, at 111.) California is famous for its

14 clothing manufacturing, and pictures of them show that they result in a gathering

15 involving (1) a long period of time (presumably an eight-hour shift); (2) a large

16 number of distinct households; and (3) a shared experience. (LiMandri Decl., Ex.

17 44.) And as further explained by Dr. Delgado, the reason why there have been so

18 many outbreaks related to factories is because they do spread the coronavirus more

19 readily than places of worship. (Supp. Delgado Decl., ¶¶ 34–43.)

20      The First Amendment jurisprudence set forth above requires places of worship

21 to at least be treated equally. And as Justice Kavanaugh made clear, the burden is on

22 the state to justify unequal treatment. *Calvary Chapel*, 2020 WL 4251360, at *9

23 ("[T]he First Amendment requires that religious organizations be treated equally to

24 the favored or exempt secular organizations, unless the State can sufficiently justify

25 the differentiation."); *see also United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803,

26 816, 818 (2000) (under strict scrutiny, the government "bears the burden of proving

27 the constitutionality of its actions" and does not get "the benefit of the doubt.").

28      Under this burden, California must demonstrate that it seriously undertook to

15

Memo. of P&As ISO Renewed Mtn. for TRO / Prelim. Inj.

consider other, less-restrictive alternatives and ruled them out for good reason, meaning that it "considered different methods that other jurisdictions have found effective." *McCullen v. Coakley*, 134 S. Ct. 2518, 2539 (2014). Under its burden, California "would have to show either that substantially less-restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out for good reason." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016).

Here, there is no evidence that California engaged in these actions. Notably, the only *evidence* actually submitted so far by California is one expert declaration. (Dkt. 23-2, Watt Decl., ¶¶ 1–18.) But that declaration merely establishes the undisputed fact that gatherings can lead to COVID-19 outbreaks, and then provides examples of outbreaks connected to "religious services, choir practices, funerals, and parties." (Watt Decl., ¶ 15.)

But that declaration does not answer the real question. There have been plenty of outbreaks related to factories. (LiMandri Decl., Exs. 52–55.) What is California's compelling interest in restricting churches, *but not* factories or other industries? "There is ample scientific evidence that COVID-19 is exceptionally contagious. But evidence that the risk of contagion is heightened in a religious setting any more than a secular one is lacking." *Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear*, --- F. Supp. 3d ---, 2020 WL 2305307, at *5 (E.D. Ky. 2020). Further, examples abound of less restrictive approaches that California has neither tried nor considered:

> Notably, 15 other Governors trusted the people of their states and exempted religious gatherings from *any attendance limitations* during this pandemic. The Governor has failed to cite any peer-reviewed study showing that religious interactions in those 15 states have accelerated the spread of COVID-19 in any manner distinguishable from non-religious interactions.

*Berean Baptist Church v. Cooper*, No. 4:20-CV-81-D, 2020 WL 2514313, at *9 (E.D.N.C. May 16, 2020) (footnote omitted). Indeed, Illinois' orders simply adopt California's guidance and make the standards permissive, not mandatory. (LiMandri

16

Decl., Ex. 56.) California has no evidence that a permissive approach will not be sufficient. And in June, San Diego itself sent a letter to Governor Newsom stating that due to its "positive data results" it "believe[s] that religious facilities could be opened more broadly—beyond the 25% or 100 person cap provided we have another week of positive data." (LiMandri Decl., Ex. 7.) Further, many states have never had any state-wide shutdown whatsoever. (LiMandri Decl., Ex. 57.) The COVID-19 rates in those states have been largely similar to California's. (LiMandri Decl., Ex. 58.) Other states have set their caps at 250 persons. (LiMandri Decl., Ex. 61.) Why 100 and not 250? It is not clear, but it appears that California has simply arbitrarily picked a number.

South Bay Pentecostal Church's food distribution and Pentecost worship services met or exceeded the distancing and hygiene requirements California and San Diego deem sufficient for other industries, including currently open factories. As such, there is no justification for restricting Plaintiffs in a manner disparate from those other industries. California's failure to tailor its Reopening Plan to closely fit the safety ends it espouses, and its failure to try other, less restrictive alternatives that it cannot demonstrate are not working in other jurisdictions across the country, defeats California's satisfaction of its burden to prove narrow tailoring. "As the Government bears the burden of proof on the ultimate question of . . . constitutionality, [Plaintiffs] must be deemed likely to prevail unless the Government has shown that [its] proposed less restrictive alternatives are less effective than [unduly limiting Plaintiffs' worship]." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). It has not shown as much.

### 1.2.2. The worship restrictions violate the U.S. Constitution

In *Jacobson*, the Supreme Court explained that legislatures can validly enact restrictions on substantive due process rights to stop the spread of diseases, but they violate the federal constitution if they do so in "an arbitrary, unreasonable manner," or in a way that "go[es] so far beyond what was reasonably required for the safety of the public." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 28 (1905).

17

As stated previously, Plaintiffs do not believe *Jacobson* ever could have been applied to a Free Exercise claim.[9] It also dealt with a legislature deliberating and passing a statute—not an executive acting unilaterally during an emergency. But perhaps more poignantly, there is little reason why it should *continue* to apply. As Justice Kavanaugh recently noted,

> As more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights. Governor Sisolak issued the directive in question on May 28, more than two months after declaring a state of emergency on March 12. Now four months have passed since the original declaration. The problem is no longer one of exigency, but one of considered yet discriminatory treatment of places of worship.

*Calvary Chapel*, 2020 WL 4251360, at *2 (Kavanaugh, J., dissenting). Every day, Plaintiffs' constitutional rights are being irreparably violated. At least, after four months California should be able to explain, very precisely and without recourse to *Jacobson*, why that irreparable harm is necessary.

If, however, the Court determines that a full-throated application of *Jacobson* is warranted, then there are two questions the Court must analyze. The first question is whether the law "has no real or *substantial* relation to those objects" of protecting public health. *Jacobson*, 197 U.S. at 28. The second question is whether the law is a "palpable invasion of rights secured by the fundamental law." *Id*. Here, as explained in section 1.2.1. *supra*, neither California nor San Diego has convincingly explained

---

[9] *See, e.g., Ex Parte Milligan*, 71 U.S. 2, 120 (1866) (express constitutional rights apply with more force, not less, during emergencies); *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939 (9th Cir. 2020) (not explicitly applying *Jacobson*, and dissent arguing against applying it); *Compassion in Dying v. State of Wash.*, 79 F.3d 790, 799 (9th Cir. 1996) (describing *Jacobson* as applying to "substantive due process cases"), *rev'd*, 521 U.S. 702 (1997); *S. Bay United Pentecostal Church v Newsom*, 140 S. Ct. 1613, 1614 (2020) (Kavanaugh, J., dissenting) (not applying *Jacobson*); *Calvary Chapel Dayton Valley v. Sisolak*, --- S. Ct. ---, 2020 WL 4251360, at *5 (2020) (Alito, J., dissenting) (expressing suspicion over applicability of *Jacobson*).

1   why letting large numbers of people sit together indoors for eight hours at a factory or

2   a school, but not for one-hour worshipping, provides a "real or substantial" benefit to

3   curbing the pandemic—let along curbing infection numbers justifies the spike in

4   suicides. California has only ever asserted that the novel coronavirus is serious, and

5   needs to be curbed. But that is not a sufficient answer—especially when California

6   lets potential hotbeds for coronavirus outbreaks operate without complying with the

7   restrictions placed on churches. *See DiMartile*, 2020 WL 4558711, at *10 (permitting

8   a large restaurant to host diners at 50% capacity, but banning a wedding with more

9   than 50 persons, violated Equal Protection clause, even considering *Jacobson*). But

10  perhaps more importantly, there are three reasons why California's regulation of

11  worship constitutes a "palpable invasion" of Plaintiffs' constitutional rights.

12          *First*, imposing burdens on Plaintiffs *because* of their religion is *per se* a

13  "palpable invasion" of their rights. *See Jew Ho v. Williamson*, 103 F. 10 (C.C. Cal.

14  1900); *First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, at *6 (D.

15  Kan. Apr. 18, 2020).

16          In *Jew Ho*, the San Francisco "board of health" purported to quarantine 12 city

17  blocks, consisting of some 15,000 people, due to fear of a bubonic plague epidemic. *Jew*

18  *Ho*, 103 F. at 11–13. But the evidence established that, in practice, only the 10,000

19  Chinese living in those blocks were subject to it. *Id.* at 23. The court there analyzed

20  whether the quarantine order was "a palpable invasion of rights secured by fundamental

21  law," *id.* at 18, and held that in no case could such discrimination be tolerated:

22              The evidence here is clear that this is made to operate
                against the Chinese population only, and the reason given
23              for it is that the Chinese may communicate the disease
                from one to the other. That explanation, in the judgment of
24              the court, is not sufficient. It is, in effect, a discrimination.
25

26  "Therefore the court must hold that this ordinance is invalid and cannot be

27  maintained." *Id.* at 23–24. Similarly, in *First Baptist Church*, the court reviewed

28  *Jacobson*, and rejected it when applied to the facts because the regulation at issue was

facially discriminatory: "*Jacobson*, and similar cases do not provide the best framework in which to evaluate the Governor's executive orders because all those cases deal with laws that are facially neutral." *First Baptist Church*, 2020 WL 1910021, at *6. The same conclusion should be reached here. When a law "is discriminating in its character" it is a palpable violation of fundamental rights. *Jew Ho*, 103 F. at 26.[10] Stated more concretely, if analogized to the situation in *Korematsu*, the courts should not look to factors such as the length of the Japanese internment, or the conditions of the internment. That is irrelevant. What is relevant is that the government discriminated based on a protected characteristic. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) ("*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—has no place in law under the Constitution."); *Calvary Chapel*, 2020 WL 4251360, at *11 (Kavanaugh, J., dissenting) ("There are certain constitutional red lines that a State may not cross even in a crisis. Those red lines include racial discrimination, religious discrimination, and content-based suppression of speech.").

   *Second*, courts have held that discriminatory enforcement of the pandemic restrictions results in a palpable violation of fundamental rights. *Soos*, 2020 WL 3488742. "[W]hatever *Jacobson*'s scope, . . . pandemic regulations must govern 'evenhandedly,'" for "the principle that freedom for me, but not for thee, has no

---

[10] *Jew Ho* was decided by the U.S. Circuit Court for the District of California. At the time it was decided, the federal courts were in a period of transition. Previously, the district courts essentially served as misdemeanor and admiralty courts, the circuit courts as the regular trial court, and the Supreme Court as the sole appellate court. However, in 1891, the circuit courts of appeals were created as intermediate appellate courts, and the district courts became the regular trial courts. 26 Stat. 826. This led to a period of about twenty years when the old circuit courts had attributes of both the district courts and the circuit courts of appeal. On the one hand, the old circuit courts tried in the first instance major federal crimes and diversity actions. On the other hand, appeals from their adjudications of constitutional issues did *not* go to the circuit courts of appeal—but rather to the Supreme Court. *Id.* Thus, should San Francisco have decided to appeal in *Jew Ho*, the appeal would not have gone to the Ninth Circuit, but to the Supreme Court. In 1911, the old circuit courts were abolished, and absorbed by both the district courts and the circuit courts of appeal. 36 Stat. 1087. Most important here, when the old circuit courts decided constitutional issues that were appealable not to the Ninth Circuit but to the Supreme Court, they created binding circuit law. *See In re Wong Kim Ark*, 71 F. 382, 385 (N.D. Cal. 1896) (citing an old circuit court opinion: "being the law of this circuit, is controlling upon this court"). Thus, *Jew Ho* should be binding on this Court.

1  place under our Constitution." *Spell v. Edwards*, 962 F.3d 175, 180–83 & n.1 (5th Cir.

2  2020) (Ho, J., concurring). "The State defends the Governor on the ground that the

3  protests expressed a viewpoint on important issues, and that is undoubtedly true, but

4  favoring one viewpoint over others is anathema to the First Amendment." *Calvary*

5  *Chapel*, 2020 WL 4251360, at \*4 (Alito, J., dissenting); *see also* VSAC, ¶ 104, Exs. 4-

6  11, 4-12 (press releases and letters from DOJ).

7      Here, starting on May 25, California decided to nominally treat political

8  protests and religious worship exactly the same—imposing a limit on gatherings at

9  25% of "building capacity" or "the relevant area's maximum occupancy," along with

10 a maximum cap of 100 persons. (VSAC, ¶ 44, Exs. 1-5, 1-6.) Nevertheless, despite

11 enforcing its restrictions against houses of worship,[11] California has steadfastly

12 refused to enforce its restrictions against political protests.

13     The same day that California created that regime—Monday, May 25, 2020—a

14 police officer in Minneapolis, Minnesota killed an African-American man in his

15 custody named George Floyd. The next day, a video-recording of the incident went

16 viral on social media, leading to protests in Minneapolis. The day after that,

17 Wednesday, May 27, protests erupted in cities across the country, including a protest

18 with hundreds of participants in Los Angeles. (VSAC, ¶ 98, Ex. 4-1.) These protests

19 plainly violated Governor Newsom's ban on political protests exceeding 100 persons.

20     The next day, Saturday, May 30, 2020, the George Floyd protests reached San

21 Diego County. That day, a group of 1,000 protestors blocked the I-8 highway. This

22 protest also violated Governor Newsom's 100-person cap on political protest. The

23 protests in San Diego continued daily for weeks. (VSAC, ¶ 99, Ex. 4-2.)

24     As stated above, the George Floyd protests in California have plainly violated

25 the Governors' orders against protest and worship—violating the 100-person cap

26 _____

[11] Despite well-publicized statements by Governor Newsom and San Diego officials that no police
27 enforcement would be forthcoming (Dkt. 12-4, Original Trissell Decl., ¶¶ 9–11), government
officials have enforced the restrictions against house of worship throughout the state (Trissell
28 Decl., Exs. FF, GG, HH), and in San Diego specifically. (Trissell Decl., Exs. II, JJ.)

1  through protests numbering in the thousands, but instead of trying to shut down
2  these unlawful gatherings, California encouraged them.

3      In response to the killing of George Floyd, Governor Newsom actively
4  promoted unlawful protests. He "thank[ed]" the protestors for violating his orders
5  (VSAC, ¶ 100, Ex. 4-3), instructed them to "[k]eep doing it" (VSAC, ¶ 100, Ex. 4-
6  4), "express[ed his] deep gratitude" to them (VSAC, ¶ 101, Ex. 4-5), and told them
7  they had a "right" to free speech. (Trissell Decl., Ex. KK.) Later, he even tweeted
8  his support. (Trissell Decl., Ex. LL.) Similarly, San Diego has refused to enforce its
9  orders against the George Floyd protests, telling them they had a "right" to illegally
10  protest (VSAC, ¶ 102, Ex. 4-6), and worked to "facilitate[e]" them. (VSAC, ¶ 102,
11  Ex. 4-7.) This facilitation led to thousands of people protesting, as shown in several
12  videos obtained from Twitter. (VSAC, ¶ 102, Exs. 4-8, 4-9, 4-10.)

13      It is true that on June 12, 2020, California lifted all restrictions on outdoor
14  protest activities—so that by definition anything the protestors did would not be in
15  violation of its orders. And then a month later, on July 13, California forced many
16  other businesses (and worship services) to take their operations outside. But that
17  does not defeat discriminatory enforcement. Courts must not "turn a blind eye to the
18  context in which [a] policy" arises. *McCreary Cty., Ky. v. Am. Civil Liberties Union of*
19  *Ky.*, 545 U.S. 844, 866 (2005). This is especially the case when the logic underlying
20  the state's rationale is suspect:

21          The Governor may respond that his order forbids only
            indoor worship but still allows people of faith to worship
22          outdoors. But whether health experts would endorse that
            dichotomy—and whether the First Amendment permits
23          it—is far from obvious. . . . Under his logic, the Governor
            would allow tens of thousands of LSU fans to assemble this
24          fall under the open sky at Tiger Stadium, while forbidding
            countless others from cheering on the Saints under the
25          Superdome.
26

27  *Spell v. Edwards*, 962 F.3d 175, 182 & n.6 (5th Cir. 2020) (Ho, J., concurring).
28  Indeed, why were the June 12 changes made without any public announcement?

Most importantly, the parties are in agreement that the cause of the recent spike in coronavirus infections (even though the spike has caused no spike in hospitalizations and deaths) is California's and San Diego's own refusal to enforce their regulations against the protestors. (*See* Trissell Decl., Ex. MM [Defendant Angell: "We don't have exact numbers, but we do know from speaking to our counties that it is a contributor."]; Supp. Delgado Decl., ¶ 11 ["Our conclusion, supported by the COVID-19 Decision Model is that the recent increases are related to . . . the tolerance and even encouragement of public protests"].) Making places of worship pay for the sins of protestors is discriminatory enforcement—a palpable violation of Plaintiffs' rights.

*Third*, under Plaintiffs' faith, physical, indoor, in-person worship services are required, with singing—not video-recorded or outdoor services. (VSAC, ¶¶ 58–61, 67–70, 79–81.) "[S]inging is at the very heart of Pentecostal worship services," and so a ban on singing "is essentially a ban on Pentecostal worship services." (VSAC, ¶ 70.) It should seem plain that a ban on Pentecostal worship services is a "palpable invasion" of the rights of Pentecostal Christians. *See Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 15–16 (1947) ("Neither a state nor the Federal Government can . . . force nor influence a person to go to or to remain away from church against his will").

In adjudicating whether it is or not, this Court must also answer that question in a manner that does not violate the religious clauses in other ways. The Supreme Court has made clear that "First Amendment values are plainly jeopardized when litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2063 n.10 (2020) (quoting *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969)). Because such values are jeopardized, courts are forbidden from issuing legal opinions that have the effect of "resolving underlying controversies over religious doctrine." *Id.* (quoting *Presbyterian Church*, 393 U.S. at 449). Indeed, "[w]hen the government chooses sides on religious issues, the 'inevitable result' is 'hatred, disrespect and even contempt'

23

Memo. of P&As ISO Renewed Mtn. for TRO / Prelim. Inj.

towards those who fall on the wrong side of the line." *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 604 (4th Cir. 2017), *vacated as moot*, 138 S. Ct. 353 (2017) (quoting *Engel v. Vitale*, 370 U.S. 421, 431 (1962)).

"In a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of" the requirements of various faiths. *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2066. "It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own." *Id.* at 2063 n.10 (quoting *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 715 n.8 (1976)). As a result, "[a] religious institution's explanation of . . . the life of the religion in question is important." *Id.* at 2066. And in regular First Amendment jurisprudence, neither the government nor the courts may "tell the plaintiffs that their beliefs are flawed," but "must accept the sincerely held []objections." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020).

In the pandemic context, courts have made clear that they cannot simply tell the religious objector that they are wrong, that they may worship in a manner not required (or even permitted) by their faith. *See Berean Baptist Church v. Cooper*, No. 4:20-CV-81-D, 2020 WL 2514313, at *7 (E.D.N.C. May 16, 2020) ("Again, the question becomes: who decides whether a religious organization or group of worshipers correctly determined that their religious beliefs dictated the need to have more than 10 people inside to worship? Under EO 138, the answer is [the government]. This court has grave concerns about how that answer comports with the Free Exercise Clause."). Thus, this Court should accept Plaintiffs' assertions that California's and San Diego's regulations act as a ban on their Free Exercise of Religion.

**2. The Other Injunction Factors Favor South Bay.**

The Supreme Court has made clear that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). As previously acknowledged by this Court, without an injunction preventing California from further enforcing its worship restrictions, the Church will suffer irreparable harm to its fundamental constitutional rights. (Dkt. 38, 6:3–6.)

The balance of hardships also tips overwhelming in favor Plaintiffs because the threatened injury to them is weighty—the loss of constitutional rights and the inability to practice their faith. *Coll. Republicans at San Francisco State Univ. v. Reed*, 523 F. Supp. 2d 1005, 1012 (N.D. Cal. 2007). By contrast, the cost of a temporary restraining order to the Government is negligible. "[T]here can be no harm to [the government] when it is prevented from enforcing an unconstitutional statute." *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004).

Finally, an injunction is in the public interest. The Ninth Circuit has "consistently recognized" that there is a "significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 683 (9th Cir. 2014). And there is an even greater interest here—treating Plaintiffs similarly to the favored protesters— which is necessary to maintain public confidence in the government and the courts. *See, e.g., Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) ("As for the public interest, treatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their renewed motion for a temporary restraining order / preliminary injunction.


LiMANDRI & JONNA LLP


Dated: August 10, 2020          By: _____

Charles S. LiMandri
Attorneys for Plaintiffs

25