Charles S. LiMandri, SBN 110841
Paul M. Jonna, SBN 265389
Jeffrey M. Trissell, SBN 292480
LIMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938
cslimandri@limandri.com
pjonna@limandri.com
jtrissell@limandri.com

Thomas Brejcha, *pro hac vice*\*
Peter Breen, *pro hac vice*\*
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmorsociety.org
\*Application forthcoming

Attorneys for Plaintiffs

Harmeet K. Dhillon (SBN: 207873)
Mark P. Meuser (SBN: 231335)
Gregory R. Michael (SBN: 306814)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593
harmeet@dhillonlaw.com
mmeuser@dhillonlaw.com
gmichael@dhillonlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTH BAY UNITED PENTECOSTAL CHURCH, a California nonprofit corporation, and BISHOP ARTHUR HODGES III, an individual, | Case No.: 20-cv-865-BAS |
| Plaintiffs, | **Supplemental Declaration of Jeffrey M. Trissell, Esq. in Support of Plaintiffs' Renewed Motion for a Temporary Restraining Order / Preliminary Injunction** |
| v. | |
| GAVIN NEWSOM, in his official capacity as the Governor of California, *et al.*, | Judge:   Hon. Cynthia Bashant |
| Defendants. | |

I, Jeffrey M. Trissell, Esq. declare and state as follows:

1.    I am an attorney at law duly licensed to practice in the State of California and in the Southern District of California, and am counsel for Plaintiffs South Bay United Pentecostal Church and Bishop Arthur Hodges III. As such, I have personal knowledge of the matters set forth below and could and would competently testify thereto if called upon to do so.

2.    Attached hereto as **Exhibit Q** is a true and correct copy of California Public Health post series, *California COVID-19, By The Numbers*, published on Twitter, dated May 1, 2020, June 1, 2020, July 1, 2020, August 1, 2020 and available at: https://twitter.com/CAPublicHealth/status/1256358692695334912; https://twitter.com/CAPublicHealth/status/1267557726814498816; https://twitter.com/CAPublicHealth/status/1278489569420169216; https://twitter.com/CAPublicHealth/status/1289712952954597376.

3.    Attached hereto as **Exhibit R** is a true and correct copy of the California Department of Public Health, *Order of the State Public Health Officer*, dated May 7, 2020, and available at: https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%205-7-2020.pdf.

4.    Attached hereto as **Exhibit S** is a true and correct copy of the article *Some San Diego shopping malls get reopening date*, published by FOX5 San Diego, dated May 21, 2020, and available at: https://fox5sandiego.com/news/local-news/some-san-diego-shopping-malls-get-reopening-date.

5.    Attached hereto as **Exhibit T** is a true and correct copy of the article by Noah Higgins-Dunn, *California to allow hair salons and barbershops to reopen in majority of state's counties, Gov. Newsom says*, published by CNBC, dated May 26, 2020, and available at: https://www.cnbc.com/2020/05/26/california-to-allow-hair-salons-and-barbershops-to-reopen-in-majority-of-states-counties-gov-newsom-says.html.

6.     Attached hereto as **Exhibit U** is a true and correct copy of the article *Gyms, Bars, Museums, Hotels & More Can Reopen Friday, SD County Says*, published by NBC7 SAN DIEGO, dated June 8, 2020, and available at: https://www.nbcsandiego.com/news/local/gyms-bars-museums-hotels-more-can-reopen-friday-sd-county-says/2342823/.

7.     Attached hereto as **Exhibit V** is a true and correct copy of the article by Alex Swoyer, *Church sues California Gov. Gavin Newsom over ban against at-home Bible studies*, published by WASHINGTON TIMES, dated July 20, 2020, and available at: https://www.washingtontimes.com/news/2020/jul/20/gavin-newsom-sued-over-ban-against-home-bible-stud/.

8.     Attached hereto as **Exhibit W** is a true and correct copy of County of San Diego's *Safe Reopening Supplemental Guide, Faith-Based Organizations and Places of Worship*, published July 21, 2020, and available at: https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/covid19/Community_Sector_Support/CommunityBased-FaithBased-Organizations/FINAL_FBO%20COVID-19%20Companion%20Guide_7.22.20.pdf.

9.     Attached hereto as **Exhibit X** is a true and correct copy of a letter from United States Senators to President Trump regarding COVID-19 and religious freedom, dated July 23, 2020, and available at: https://www.lee.senate.gov/public/_cache/files/4b75b6ae-0fed-4f30-b14f-7cbe289b52fd/ltr-to-president-trump-on-covid.pdf.

10.     Attached hereto as **Exhibit Y** is a true and correct copy of the article by Joe Hong, *Gov. Newsom Outlines Strict Guidelines for Schools*, published by KPBS, dated July 17, 2020, and available at: https://www.kpbs.org/news/2020/jul/17/california-governor-outline-plans-reopening-school/.

11.     Attached hereto as **Exhibit Z** is a true and correct copy of County of San Diego, Health and Human Services Agency's *Order of the Health Officer and Emergency Regulations,* dated July 20, 2020, effective July 21, 2020.

12.     Attached hereto as **Exhibit AA** is a true and correct copy County of San Diego, Health and Human Services Agency's *Order of the Health Officer and Emergency Regulations,* dated August 7, 2020, effective August 8, 2020, and available at: https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/HealthOfficerOrderCOVID19.pdf.

13.     Attached hereto as **Exhibit BB** is a true and correct copy of the article by Vikram Thakur and Anu Jain, *COVID 2019-suicides: A global psychological pandemic*, published in BRAIN, BEHAVIOR, AND IMMUNITY, Volume 88 (August, 2020), pages 952-953, and available at: https://www.sciencedirect.com/science/article/pii/S0889159120306437?via%3Dihub

14.     Attached hereto as **Exhibit CC** is a true and correct copy the article by Leo Sher, *The impact of the COVID-19 pandemic on suicide rates*, published in QJM: AN INTERNATIONAL JOURNAL OF MEDICINE, (June 30, 2020), and available at: https://academic.oup.com/qjmed/advance-article/doi/10.1093/qjmed/hcaa202/5857612.

15.     Attached hereto as **Exhibit DD** is a true and correct copy of the article by Mark Reger, Ian Stanley, Thomas Joiner, *Suicide Mortality and Coronavirus Disease 2019–A Perfect Storm?*, published by JOURNAL OF AMERICAN MEDICAL ASSOCIATION (April 30, 2020), and available at: https://jamanetwork.com/journals/jamapsychiatry/fullarticle/2764584.

16.     Attached hereto as **Exhibit EE** is a true and correct copy the article by Sarah Moon and Jon Passantino, *Los Angeles apparel factory ordered closed after over 300 coronavirus cases and 4 deaths*, published by CNN, dated July 11, 2020, and available at: https://www.cnn.com/2020/07/11/health/coronavirus-los-angeles-apparel-factory-closed/index.html.

17.     Attached hereto as **Exhibit FF** is a true and correct copy of the Verified Complaint for Declaratory and Injunctive Relief in *Cross Culture Christian Center v.*

1  *Newsom,* Case No. 2:20-cv-00832-JAM-CKD (E.D. Cal. Apr. 22, 2020), along with
2  exhibits 4 and 9 thereto.

3      18.   Attached hereto as **Exhibit GG** is a true and correct copy the Order
4  Granting Temporary Restraining Order and Order to Show Cause Re Issuance of
5  Preliminary Injunction in *County of Ventura v. Godspeak Calvary Chapel*, Ventura
6  Cnty. Case No. 56-2020-00544086-CU-MC-VTA (Aug. 7, 2020).

7      19.   Attached hereto as **Exhibit HH** is a true and correct copy of the article
8  *'Great Concern': LA County Warns Churches Could Face Fines for Indoor Services*,
9  published by CBS LOS ANGELES, dated July 30, 2020, and available at:
10 https://losangeles.cbslocal.com/2020/07/30/covid-church-religious-indoor-
11 services-coronavirus-la-county/.

12     20.   Attached hereto as **Exhibit II** is a true and correct copy of Verified
13 Complaint for Temporary Restraining Order, Declaratory Relief, Injunctive Relief
14 and Damages in *Abiding Place Ministries v. Wooten,* Case No 20-CV-0683-BAS (S.D.
15 Cal. April 9, 2020), along with exhibits 3–8 thereto.

16     21.   Attached hereto as **Exhibit JJ** is a true and correct copy of the article by
17 Artie Ojeda, *Cease and Desist: County Cracks Down on Churches Holding Indoor*
18 *Services*, published by NBC SAN DIEGO, dated July 28, 2020, and available at:
19 https://www.nbcsandiego.com/news/coronavirus/cease-and-desist-county-cracks-
20 down-on-churches-holding-indoor-services/2373987/.

21     22.   Attached hereto as **Exhibit KK** is a true and correct of the article by
22 Eric Ting, *Gavin Newsom asked to reconcile support for protests with new warnings on*
23 *gatherings*, published by SF GATE, dated July 2, 2020, and available at:
24 https://www.sfgate.com/politics/article/Gavin-Newsom-protests-coronavirus-July-
25 Fourth-ask-15383112.php.

26     23.   Attached hereto as **Exhibit LL** is a true and correct copy of Exhibit "E"
27 to Verified Complaint for Declaratory and Injunctive Relief in *Calvary Chapel v.*
28 *Newsom*, Case No. Case 2:20-cv-01431-KJM-DMC (E.D. Cal. July 15, 2020), which

1   is a copy of Gavin Newsom's posts, published on TWITTER, dated May 30, 2020,

2   June 5, 2020, and June 19, 2020.

3          24.    Attached hereto as **Exhibit MM** is a true and correct copy of the article

4   by Cheri Mossburg, *Recent protests have contributed to California's coronavirus case*

5   *increase, state official says*, published by CNN, dated June 26, 2020, and available at:

6   https://www.cnn.com/world/live-news/coronavirus-pandemic-06-26-20-

7   intl/h_b3a9aa753b4c05ea71479065f58bf534.

8          I declare until penalty of perjury under the laws of the United States and the

9   State of California that the foregoing is true and correct. Executed on August 10,

10  2020.

11

12                                              _____

13                                              Jeffrey M. Trissell

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

**EXHIBIT Q**



Log in    Sign up    000

🔍 Search Twitter



**50,442**
**CASOS**

Edades de los casos confirmados
que han dado positivo:
• Edad 0-17: 1,449
• Edad 18-49: 24,613
• Edad 50-64: 13,044
• Edad 65+: 11,256
• Edad Desconocida: 80

Género de los casos confirmados
que han dado positivo:
• Mujeres: 24,973
• Hombres: 25,167
• Género Desconocido: 302

**Hospitalizaciones**

Casos confirmados de    Casos Sospechosos de    **2.073**
COVID-19              COVID-19

💬    🔁 6    ♡ 3    ↥

**Heather M** @hmbmkj · May 2                    ⌄
Replying to @CAPublicHealth @CAgovernor and 3 others
Why are you lumping 18-49 together? That's a pretty large group that makes
up a good number of your total so it would be nice to know more accurate
info based on age groups.

💬    🔁    ♡    ↥

**Anubis** @DeanHamby2 · May 2                    ⌄
Replying to @CAPublicHealth @CAgovernor and 3 others
Crazy

💬    🔁    ♡    ↥

8/7/2020 CA Public Health on Twitter: "California COVID-19, By The Numbers: ◆ Positive cases ◆ Confirmed hospitalizations 2,973 ◆ C...

Case 3:20-cv-00865-BAS-AHG Document 53-3 Filed 08/10/20 PageID.3011 Page 10 of 255









Q   Search Twitter

Log in   Sign up

Q Search Twitter

Log in    Sign up    ●●●







♡ 3        ⥮ 8        ♡ 3        ⬆

**CA Public Health** ✓ @CAPublicHealth · Aug 1                            ⌄
◆ Nota: Es posible que los números no representen los cambios verdaderos de un día a otro, ya que el informe de los resultados de las pruebas puede retrasarse.

♡ 3        ⥮ 3        ♡ 1        ⬆

**Chris Chamberlin** @whodamanthisguy · Aug 1                            ⌄
Replying to @CAPublicHealth and @GavinNewsom
How many of those cases are double, triple counted?
How many people actually showed up for their tests but got a "positive" anyway?

♡ 1        ⥮        ♡ 11        ⬆

**Erin** 🍂 @kraken_meister · Aug 1                            ⌄
None are double or triple counted. When you are suspected of having COVID-19 you are assigned a case worker, no matter how many tests you have.

♡ 2        ⥮        ♡ 19        ⬆

1 more reply

**Betty S.Fargo** @s_fargo · Aug 1                            ⌄
Replying to @CAPublicHealth and @GavinNewsom
God help you all. California people are too beautiful for this pain. God's speed to you in flattening the curve.

♡ 1        ⥮        ♡ 11        ⬆

**☀Momo_Ed|NAAARW Member☀** @Momo69HRM · Aug 1                            ⌄
Thank You. We definitely need the LORD

♡        ⥮        ♡ 3        ⬆

**Daily Dave (Parler: @realdailydave)** @RealDailyDave · Aug 1                            ⌄
Replying to @CAPublicHealth and @GavinNewsom
Now do active cases vs recovered rather than the total that we've HAD.

♡        ⥮        ♡ 2        ⬆

**R a n g j o i r** @Rangjoir · Aug 1                            ⌄
Replying to @CAPublicHealth and @GavinNewsom
Ah, the classic 18-49 age demographic. For those unaware, you combine these in reports when 18-24 or 40+ outweigh the rest of the segment. Guaranteed the 300k cases for 18-49 has over 70% cases in the 40+. It's absurd to report numbers like this.

♡        ⥮        ♡ 4        ⬆

**no one** @NoShortandshy14 · Aug 2                            ⌄
Replying to @CAPublicHealth
@GavinNewsom hasn't done a briefing in days. We need answers and need to know what the heck is going on. At least @NYGovCuomo did a briefing every day telling the people of NY what was going on and what he was planning on doing to flatten that curve.

♡ 1        ⥮        ♡ 4        ⬆

Q  Search Twitter

Log in    Sign up    •••



**EXHIBIT R**



ORDER OF THE STATE PUBLIC HEALTH
OFFICER
May 7, 2020

On March 19, 2020, I issued an order directing all individuals living in the State of California to stay at home except as needed to facilitate authorized, necessary activities or to maintain the continuity of operations of critical infrastructure sectors. (See https://covid19.ca.gov/stay-home-except-for-essential-needs/.) I then set out California's path forward from this "Stay-at-Home" Order in California's Pandemic Roadmap https://www.gov.ca.gov/wp-content/uploads/2020/05/5.4.20-Update-on-Californias-Pandemic-Roadmap.pdf.That Roadmap identifies four stages of the pandemic: safety and preparation (Stage 1), reopening of lower-risk workplaces and other spaces (Stage 2), reopening of higher-risk workplaces and other spaces (Stage 3), and finally an easing of final restrictions leading to the end of the stay at home order (Stage 4).

Today, COVID-19 continues to present a significant risk to the health of individuals throughout California. There are confirmed cases of the virus in 54 of the 58 counties across the State, and each day over the past two weeks over one thousand new cases have been confirmed in California and dozens of people have lost their lives due to the virus. However, owing to Californians' mitigation efforts, statewide data currently demonstrates stable rates of new infections and hospitalizations, the maintenance of surge capacity, and an improved ability to test, contact trace, isolate, and provide support to individuals exposed to COVID-19. As State Public Health Officer, I have determined that the statewide data now supports the gradual movement of the entire state from Stage 1 to Stage 2 of California's Pandemic Resilience Roadmap.

Gradual movement into Stage 2 is intended to reintroduce activities and sectors in a phased manner and with necessary modifications, in order to protect public health and result in a lower risk for COVID-19 transmission and outbreak in a community. Such deliberate phasing is critical to allowing the State to protect the public, and to mitigate and manage the impact of the re-openings, such that our health care delivery system has the capacity to respond to potential increased demands. Differences across the state in the prevalence of COVID-19, as well as testing rates, containment capability, and hospital capacity, have resulted in differences among local health jurisdictions' ability to safely progress through the various stages. The low and stable data reported by some local health officers in their local health jurisdictions, combined with sufficient COVID-19 preparedness, justifies allowance for some variation in the speed with which some local health jurisdictions will be able to move through the phases of Stage 2.

NOW, THEREFORE, I as State Public Health Officer and Director of the California Department of Public Health, order:

1. All local health jurisdictions in the state may begin gradual movement into Stage 2, as set forth in this Order, effective on May 8, 2020; however, a local health jurisdiction may implement or continue more restrictive public health measures if the jurisdiction's Local Health Officer believes conditions in that jurisdiction warrant it.

2. I will progressively designate sectors, businesses, establishments, or activities that may reopen with certain modifications, based on public health and safety needs, and I will add additional sectors, businesses, establishments, or activities at a pace designed to protect public health and safety. Those sectors, businesses, establishments, or activities that are permitted to open will be designated, along with necessary modifications, at https://covid19.ca.gov/roadmap/, as I announce them.

3. To the extent that such sectors are re-opened, Californians may leave their homes to work at, patronize, or otherwise engage with those businesses, establishments, or activities and must, when they do so, continue at all times to practice physical distancing, minimize their time outside of the home, and wash their hands frequently. To prevent further spread of COVID-19 to and within other jurisdictions within the State, Californians should not travel significant distances and should stay close to home. My March 19, 2020, Order otherwise remains in full effect.

4.  The California Department of Public Health has set forth criteria to help local health officers assess the capacity of their local health jurisdictions to move through Stage 2. Local health jurisdictions that meet the criteria and follow the process set forth https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/COVID-19-County-Variance-Attestation-Memo.aspx will be permitted to move through Stage 2 more quickly than the State as a whole and reopen additional low-risk businesses before the rest of the state, if they choose to do so. A list of the sectors, businesses, establishments, or activities, and any necessary modifications, that such a qualifying jurisdiction may choose to reopen will be available at https://covid19.ca.gov/roadmap-counties/, and may be expanded if I deem it to be in the interest of public health and safety.

Pursuant to the authority under EO N-60-20, and Health and Safety Code sections 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this Order is to go into effect immediately and shall stay in effect until further notice.

This Order is being issued to protect the public health of Californians as we move as expeditiously to minimize risk to the extent possible throughout the Stages of the Pandemic Resilience Roadmap.


Sonia Y Angell, MD, MPH
State Public Health Officer & Director
California Department of Public Health

**EXHIBIT S**



WATCH NOW / FOX 5 Morning News

LOCAL

# Some San Diego shopping malls get reopening date



 68°  

by **FOX 5 Digital Team**

Po ted **May 21, 2020 / 07 30 PM PDT** / Updated **May 21, 2020 / 10 16 PM PDT**

SAN DIEGO — Some of San Diego's most notable shopping malls plan to reopen next week with new health and safety protocols for customers.

Four shopping centers including Westfield UTC, Mission Valley, North County and Plaza Bonita will reopen to the community on May 29, a Westfield spokeswoman said in an email Thursday. The decision comes following approval by the state this week of a San Diego County plan which called for dine-in restaurants and in-store retail to reopen with modifications.

---

### RELATED CONTENT

**Faulconer: Restaurant, retail reopenings are 'major victory' for San Diego**

**Retail reopens in San Diego after state OKs county safety plan**

**CDC releases recommendations for schools to consider when reopening**

**Calif. official: School districts will 'make their own decisions' on reopening**

---

The centers reopen with adjusted hours, now open from 11 a.m. to 7 p.m. Monday through Saturday, and 12 p.m. to 6 p.m. on Sunday. They've also implemented a series of new measures including increasing the frequency of cleaning "high-touch areas" and monitoring the number of guests entering each center.

"We are excited to welcome back guests and come together as a community again," said Nino Rodriguez, vice president of shopping center management. "As we begin our initial recovery from the COVID-19 pandemic, our centers will be equipped to

68° 

**FOX 5**

☰

More information on the reopenings is available to customers through Westfield's Answers on the Spot program, which offers responses by text or online chat from 10 a.m. to 7 p.m. daily. Malls can be reached at 858-914-2752 (Westfield UTC), 619-324-3686 (Mission Valley), 760-232-6217 (North County) and 619-485-1770 (Plaza Bonita).

**Suggest a Correction**

### SHARE THIS STORY

## AROUND THE WEB





**Why is Everyone in Rancho Santa Fe Rushing to Get This $89 AC Unit?**

Blaux Portable AC



**3 Ways Your Cat Asks for Help**

Dr. Marty





68° 

FOX 5

☰



**California Doctor "I Beg Americans To Throw Out This Vegetable Now"**

Wellnessguide2020



**Top U.S. Vet Warns: The One Meat All Dogs Should Avoid**

Dr. Marty



**How Dogs Cry For Help: 3 Warning Signs Your Dogs Is Crying For Help**

Dr. Marty



**Removing Moles & Skin Tags Has Never Been This Easy**

Skincell Pro



 68°  



## Man found stabbed underneath Ocean Beach Pier

by City News Service / Aug 7, 2020

SAN DIEGO (CNS) - A man suffering from a stab wound was found underneath the Ocean Beach Pier early Friday morning, but he was expected to recover, police said.

The stabbing was reported around 4:15 a.m. near the pier off Niagara Avenue, San Diego police Officer Tony Martinez said.

**Read the Full Article** →



## Sweetwater district investigates inappropriate disruptions of online learning

**by Ka ia Gregorczyk / Aug 6, 2020**

CHULA VISTA, Calif. -- Just four days into the school year, Sweetwater Union High School District is investigating several instances of inappropriate interruptions during virtual learning.

District officials are looking into reports from four to five high schools.

**Read the Full Article →**






68°

by City News Service / Aug 6, 2020

VISTA (CNS) - A San Diego County Sheriff's Department employee accused of trying to break into a Vista business last month pleaded not guilty Thursday to attempted burglary and vandalism charges.

Estella Velez, a 54-year-old licensed vocational nurse at the Vista Detention Facility, was arrested last week, along with 44-year-old Raul Rios, on suspicion of crimes that include burglary and identity theft.

**Read the Full Article →**

---

## TOP STORIES



**Tourist snaps the toes off 19th-century statue while posing for photo**



**Virus testing in the US is dropping, even as deaths mount**



  

68°





**Homeless vets get free dental, eye care from Healing California**

**Watch: President Trump holds press conference**





**Brush fire halted near Sweetwater treatment facility**

**Herman Cain dies after COVID 19 battle**





**NASA launches Mars rover Perseverance**

**NASA's next Mars rover is brawniest and brainiest one yet**









68°

people in major dispensary bust

censorship

**Read more stories →**



—

## MORE STORIES



**Woman killed in apparent shark attack in Maine**



**County reports 523 new COVID-19 cases, no new deaths**



**Pres. Trump calls off Flo ida segment of GOP National Convention**



**President Trump holds another coronavirus press conference on Wednesday**

**Read more stories →**


68°  


Advertise with Us FOX 5


32,048

Shop now

### MOST POPULAR STORIES

(1) **Second stimulus checks: Where we stand as the week ends**

(2) **St. Augustine High School files lawsuit against Newsom to allow reopening**

(3) **US adds 1.8 million jobs in a sign that hiring has slowed**

(4) **Map: Where COVID-19 cases have been confirmed in San Diego County**

(5) **Coronavirus: County reports 263 new cases, 5 more deaths**

68° 

 68°  FOX 5 



## Tourist snaps the toes off 19th-century statue while posing for photo

Trending / 2 days ago

---

## Virus testing in the US is dropping, even as deaths mount

News / 2 days ago

---

## Pedestrian hurt in chain-reaction crash in La Jolla

News / 2 days ago

---

## Chasm grows between Trump and government coronavirus experts



Washington DC Bureau / 3 days ago

---

 68°  







**EXHIBIT T**



SEARCH QUOTES 🔍

☰    **MARKETS**    **BUSINESS**    **INVESTING**    **TECH**    **POLITICS**    **CNBC TV**

**HEALTH AND SCIENCE**

# California to allow hair salons and barbershops to reopen in majority of state's counties, Gov. Newsom says

**PUBLISHED TUE, MAY 26 2020·3:41 PM EDT | UPDATED TUE, MAY 26 2020·4:31 PM EDT**

**Noah Higgins-Dunn**
@HIGGINSDUNN

SHARE  f  🐦  in  ✉

☰    **MARKETS    BUSINESS    INVESTING    TECH    POLITICS    CNBC TV**

SEARCH QUOTES

home orders in mid-March, has been reopening its economy
statewide in phases.

The state is currently in phase two of its reopenign plan, which
has allowed for the resumption of retail businesses and
manufacturing jobs with modifications.



**Gavin Newsom, governor of California, speaks during a news conference in Sacramento, California, on Tuesday, April 14,
2020.**

*Rich Pedroncelli | AP | Bloomberg via Getty Images*

California Gov. Gavin Newsom announced on Tuesday that he
would ease the state's restrictions on barbershops and hair
salons for some counties in the state that meet certain health
criteria.

The state, which issued one of the earliest statewide stay-at-
home orders in mid-March, has been reopening its economy





MARKETS    BUSINESS    INVESTING    TECH    POLITICS    CNBC TV

businesses and manufacturing jobs with modifications.

Counties in the state that meet certain health criteria,
including less than 25 new cases per 100,000 residents in the
past 14 days or less than 8% testing positive in the last week,
are allowed to move further into the state's reopening plan.

Newsom said 47 of the state's 58 counties have "self-attested"
to meeting the state's criteria to move further into phase two,
and starting Tuesday they will be allowed to reopen
barbershops and hair salons with modifications, he said,
including enhanced cleaning protocols and face covering
requirements.

"Those counties will begin to allow for those kind of operations
with meaningful modifications, with the appropriate protective
gear, particularly face coverings that are so essential in that
environment, sanitation requirements and the like," Newsom
said.

So far, those 47 counties have been allowed to reopen dine-in
restaurant services with enhanced sanitation practices and
modifications. Newsom has yet to lift restrictions on nail
salons, bars and wineries, nightclubs and theme parks, among
other businesses.

"We are advancing conversations with the legislature in
particular supporting efforts to put out guidelines on nail salons
and personal care, personal services," Newsom said. "The
issues there require, I think, a little bit more specificity, a little
bit more nuance and details in terms of the guidance to satisfy





MARKETS     BUSINESS     INVESTING     TECH     POLITICS     CNBC TV

Some of California's largest counties, however, like San Francisco and Los Angeles County, have yet to move further into the state's reopening plan. Newsom has allowed cities to follow their own stay-at-home orders and ease restrictions when officials felt it's safe to do so.

Both the Bay Area and Los Angeles have issued their own stay-at-home orders. Barbara Ferrer, director of the Los Angeles County department of public health, has indicated that the county's stay-at-home restrictions will likely remain in place in the county through August, according to reports from NBC Los Angeles.

Newsom said that the hospitalization rate for Covid-19 cases in the state has remained stable and there's now more intensive-care unit beds available, although he said the number of people in the ICU remains "stubborn but stable."

"All of these numbers are part of those indicators that have to turn yellow to green so we can continue to march forward and indeed, they are turning yellow to green and we are marching forward as it relates to these modifications to the stay-at-home order," Newsom said.



≡    **MARKETS    BUSINESS    INVESTING    TECH    POLITICS    CNBC TV**

SEARCH QUOTES 🔍

## TRENDING NOW



**Coronavirus relief talks grind to a near halt, dimming chances of a stimulus deal**

**VIDEO** 07:26    1

## CalSTRS Ailman says there will be resurgence of virus in fall

**Sen. Sanders proposes one-time tax that would cost Bezos $42.8 billion, Musk $27.5 billion**

2



**Trump cutting off WeChat would be a devastating blow to some Chinese families in the U.S.**

3



**How much your next stimulus check could be**

4



**Will enhanced unemployment benefits be extended by Congress? Here's what to know**

5



SEARCH QUOTES 🔍

☰   **MARKETS**   **BUSINESS**   **INVESTING**   **TECH**   **POLITICS**   **CNBC TV**

**Subscribe to CNBC PRO**      **Licensing & Reprints**      **CNBC Councils**

**Supply Chain Values**        **CNBC on Peacock**          **Advertise With Us**

**Join the CNBC Panel**        **Digital Products**         **News Releases**

**Closed Captioning**          **Corrections**              **About CNBC**

**Internships**                **Site Map**                 **Podcasts**

**Ad Choices**                 **Careers**                  **Help**

**Contact**

## News Tips

Got a confidential news tip? We want to hear from you.

✉ **CNBC Newsletters**

Sign up for free newsletters and get more CNBC delivered to your inbox

**GET IN TOUCH**

**SIGN UP NOW**

Get this delivered to your inbox, and more info about our products and services.

**Privacy Policy  |  Do Not Sell My Personal Information  |  Terms of Service**

© 2020 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

**Market Data Terms of Use and Disclaimers**

Data also provided by

**EXHIBIT U**



☰  ☀ 68°

**SAN DIEGO**

TRENDING    Listen: Today in SD Podcast    Breakfast Buzz    Listen: Scene in SD Podcast    'Mo…    ⌄

**PUBLIC HEALTH ORDER**

# Gyms, Bars, Museums, Hotels & More Can Reopen Friday, SD County Says

Also included in the next wave of reopenings are wineries, card rooms, family entertainment centers, swimming pools, museums, galleries, zoos, aquariums, hotels and Airbnbs

Published June 8, 2020 • Updated on June 8, 2020 at 4:54 pm

  

NBC 5 News



Several more businesses including gyms, bars, museums, hotels and others will be allowed to reopen as soon as Friday, San Diego County public health leaders announced Monday, ending a nearly three-month shutdown for some.

San Diego s bar industry was one of the first shut down by the county s public health order, first issued on March 16 as the novel coronavirus began to spread through the region. Gyms followed several days later as health officials took more drastic steps to contain the spread

12 weeks later, public health officials have announced that they will loosen restrictions to allow those industries to reopen, along with wineries, card rooms, family entertainment centers, museums, galleries, zoos, aquariums, hotels and Airbnbs. Swimming pools, including those at apartment complexes, would be allowed to reopen.

**Local**



JUN 27
Latest Coronavirus Impacts: County Still Struggling With Case...



1 HOUR AGO

Drive-In Movies, Concerts Coming to Westfield Mission Valley and...

The county also announced that additional activities would be allowed to resume, effective immediately, with modifications, including day camps, campgrounds, RV parks and outdoor recreation like sports fishing and private charter boats.

The move from San Diego County leaders followed guidance from California Gov. Gavin Newsom, who is working to gradually pull back a statewide stay-at-home order.

Mark Ghaly, the state's top health official, said last week that the new wave of reopenings would only apply to counties that have met certain thresholds on the number of cases, testing and preparedness will be allowed to start reopening the other sectors.

Fletcher said businesses who wish to reopen this Friday were required to go to the county's Safe Reopening website and follow the steps outlined under their specific industry. Each industry will have its own requirements and standards to ensure the safety of their guests, Fletcher said.

Some Phase 3 businesses were notably not included in the wave of reopenings, including nail salons, places to get facials, tattoo parlors, therapeutic massage venues, movie theaters, conventions and concerts. Public Health Officer Wilma Wooten said she expected guidance from the state on more businesses in the coming weeks.

On Friday, San Diego County had a total of 8,619 cases and 296 deaths since the start of the outbreak.

This article tagged under:

**PUBLIC HEALTH ORDER · CORONAVIRUS · SOCIAL-DISTANCING · FACE MASKS · STAY AT HOME ORDER**

   

CCPA Notice

**Tab99la** Feed

### Before you renew Amazon Prime, read this

SPONSORED · WIKIBUY



### Wells Fargo Cash Wise Visa®

SPONSORED · WELLS FARGO



### $150 Cash Rewards Intro Bonus. Learn More!

SPONSORED · WELLS FARGO

### These New Assisted Living Apartments Near Oceanside Are A Dream Come True! Research Senior...

SPONSORED · SENIOR LIVING/ASSISTED LIVING

### Spending Too Much At Costco? Here are the Best and...

SPONSORED · BETTERBE







  

**SUBMIT TIPS FOR**
**INVESTIGATIONS**

**NEWSLETTERS**

**CONTACT US**

Send Feedback
KNSD EMPLOYMENT INFORMATION
TERMS OF SERVICE
Privacy policy
KNSD Public Inspection File
Do Not Sell My Personal Information
Ad Choices
Advertise with us
Careers at NBC 7
CA Notice

Copyright © 2020 NBC Universal Inc. All rights reserved



**Women Are Loving Chico's Just In Styles**

SPONSORED · CHICO'S



## Weather Forecast

SAN DIEGO, CA

68°

Scattered Clouds
10% Precip

TONIGHT
64°

TOMORROW
75°

## WHAT DO YOU THINK?

Loading survey...



**EXHIBIT V**

Case 3:20-cv-00865-BAS-AHG   Document 53-3   Filed 08/10/20   PageID.3055   Page 54 of 255

# Church sues California Gov. Gavin Newsom over ban against at-home Bible studies



*In this May 14, 2020, file photo, California Gov. Gavin Newsom discusses his revised 2020-2021 state budget during a news conference in Sacramento, Calif. Gov. Gavin Newsom announced Friday, July 17, 2020, that most counties will start the school year ... more >*

By Alex Swoyer - *The Washington Times* - Monday, July 20, 2020

Churchgoers sued California Gov. Gavin Newsom over his ban on indoor services in several counties, including in-home Bible studies.

Harvest Rock Church and its ministry argued the ban, which was aimed to stop the spread of the coronavirus, is unconstitutional and they're

Subscribe for just $1 a month.

**Fresh Content, Straight to your Inbox!**

"While the Governor has unilaterally and significantly restricted the number of individuals permitted to 'gather' in Plaintiffs' churches, he has imposed no similar restrictions on the untold thousands of protesters who have gathered all throughout California cities with no threat of criminal sanction, and no social distancing or restrictions whatsoever," the complaint filed Saturday read. "And, the Governor explicitly encouraged such large gatherings of protesters while condemning churches for [singing] hymns in their churches."

---

**TOP STORIES**

How judge in Michael Flynn case did an about-face on prosecutorial misconduct

Hydroxychloroquine is effective, 'helped save lives,' new peer-reviewed study finds

Conservative Catholics call on Biden to break 'deafening silence' on anti-Catholic vandalism, arson

---

Earlier this month the governor said worship could take place in the state with an indoor limit at 25 percent capacity but his order restricted singing to stop the spread of respiratory droplets.

Less than two weeks later, though, on July 13, he announced some counties must close indoor services.

---

**Fresh Content, Straight to your Inbox!**



**copyright case, judge assigned**

Harvest Rock Church, represented by the religious liberty legal group Liberty Counsel, argued the ban applies to at-home Bible studies too, which the church helps facilitate.

"Governor Gavin Newsom cannot disregard the First Amendment and ban all in-person worship in private homes and churches. Nor can the state micromanage the form of worship by banning singing or chanting. The governor is not the High Priest over all religions," said Mat Staver, founder of Liberty Counsel.

"There is not two First Amendments – one for protests and one for houses of worship. Gov. Newsom encourages thousands of protesters to gather in the streets but bans in-person worship and home Bible studies and fellowship. This discriminatory treatment is unconstitutional," Mr. Staver added.

**Fresh Content, Straight to your Inbox!**

Harvest International Ministry includes 162 churches in the state.

Mr. Newsom's office did not immediately respond to a request for comment.

## SIGN UP FOR DAILY NEWSLETTERS

Email Address       Submit   Manage Newsletters

Copyright © 2020 The Washington Times, LLC. Click here for reprint permission.

**Please read our comment policy before commenting.**

## Popular in the Community

**COMMISSION TURNS DOWN TRUMP...**

J.L
1d

#LetHerSpeakAll
candidates deserve a...

**OPRAH WINFREY SA
'SYSTEM OF WHITE...**

Guy Smith1
4d

There goes Oprah
using her Black...

**Fresh Content, Straight to your Inbox!**

# Conversation  18 Comments

When logging in with Disqus, please only use the "Email" option with the same details you already provided or use the "Forgot your password" option

**Your Username**                                                🔔  Log In

> Your Username
>
> _____
>
> What do you think?                                          📷

Sort by Best ⌄

**beanbag58**
20 July, 2020

So the democrat message is law abiding Americans cannot worship God, but thugs and rioters can carry out mayhem in very close quarters, even commit murder, and the democrats won't lift a finger to prevent it. The choice is clear in November: Trump if you love America, Biden if you want America to fail.  *(Edited)*

Reply   👍 10   👎

    **Spec Ops Lawyer** › beanbag58
    20 July, 2020

    Good Point! Under the left, two kinds of justice exist, i.e., one for Democratic-Socialists and one for us "little people."  *(Edited)*

    Reply   👍 4   👎

**Purple umbrella**
20 July, 2020

Newsom following in a long line of family politics and far left liberalism. His Aunt by marriage is Nancy Pelosi.  Both families tied closely to the Getty's and Pritzkers. They all lie when they say they are in it for public service. Just like Bush, Kennedy,  Clinton and now Obama,  they are sucked in for the greed and power. Be gone, all of them.

Reply   👍 5   👎

**Fresh Content, Straight to your Inbox!**

**beanbag58** › Purple umbrella
20 July, 2020

Correct, Newsom like Pelosi is simply part of the swamp that needs to be drained for America to ever get better.

Reply 👍 2 👎

**Show More Comments**

Powered by ⬤ OpenWeb

Terms | Privacy | Feedback

**Fresh Content, Straight to your Inbox!**

**EXHIBIT W**

# County of San Diego



## CORONAVIRUS DISEASE 2019 (COVID-19)

## SAFE REOPENING SUPPLEMENTAL GUIDE

JULY 21, 2020

# Faith-Based Organizations and Places of Worship



A DECADE OF HEALTHY, SAFE AND THRIVING COMMUNITIES

LIVEWELLSD.ORG

# TABLE OF CONTENTS

Disclaimer.................................................................................................2

Purpose of this Supplemental Guide.........................................................3

Safe Reopening Plan................................................................................4

    A. Signage...........................................................................................5

        ❖ *Communication*............................................................................5

    B. Measures to Protect Employee Health................................................7

    C. Measures to Protect Customer Safety................................................10

    D. Measures to Keep People Six Feet Apart...........................................12

    E. Other Measures...............................................................................14

Helpful Tip: Assign Roles and Responsibilities.........................................16

Resources...............................................................................................17

Definitions..............................................................................................18

Contact Us..............................................................................................19

Safe Reopening Plan Form......................................................................20

# DISCLAIMER

The information in this document was last revised on July 21, 2020.  To review the most updated information regarding current guidelines and Public Health Order, please visit the following websites:

- County of San Diego COVID-19 Website
- Faith-Based Organizations Sector
- Public Health Order
- California Department of Public Health Website

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased
2




# PURPOSE OF THIS SUPPLEMENTAL GUIDE

The Faith-Based Organization Sector is offering this supplemental guidance document as an additional resource to assist places of worship with implementation of the Safe Reopening Plan.

The purpose of this guide is to serve as a companion to:
- California Department of Public Health (CDPH) Industry Guidance for Places of Worship
- County of San Diego Public Order
- County of San Diego Safe Reopening Plan

**This guide does not obligate places of worship to resume in-person activity.** Further, it is strongly recommended that places of worship continue to facilitate remote services and other related activities for those who are vulnerable to Coronavirus Disease 2019 (COVID-19) including older adults and those with co-morbidities.

Places of worship will be able to use this guide in order to:
- Assess readiness by specific areas and actions.
- Initiate plans to resolve any issues.
- Create accountability.

**Worship Service Attendance/Capacity effective July 13, 2020 and until further notice:**
- ***Indoor Services***:  Indoor services may not be held at this time, in order to mitigate the spread of the virus.
- ***Outdoor Services***: Outdoor attendance should be limited naturally through implementation of strict physical distancing measures of a minimum of six feet between attendees from different households, in addition to other relevant protocols within this document.

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased

3




# SAFE REOPENING PLAN

The County of San Diego Public Health Order, effective June 3, 2020, requires all Faith-Based Organizations reopening to complete and implement a Safe Reopening Plan.

The purpose of the Safe Reopening Plan is to ensure that establishments that host patrons, including houses of worship, have a standardized process and guidelines to minimize risk of COVID-19.

The most recent public health order can be found by visiting San Diego County Public Health Order.

Provided in a checklist format (○), this guide covers the requirements that support a safe reopening plan to help prevent the spread of COVID-19.  Additionally, recommendations are provided throughout this guide (◈) to further support a safe reopening.

### *SAFE REOPENING PLAN*

 STEPS A THROUGH E: REQUIREMENTS & RECOMMENDATIONS

    A. Signage

    B. Measures to Protect Employee Health

    C. Measures to Protect Customer Safety

    D. Measures to Keep People Six Feet Apart

    E. Other Measures

A Safe Reopening Plan is required for indoor and outdoor operations. Each place of worship is unique, and as such, practical applications and guidance actions may need to be tailored to create an appropriate and complete plan.

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased

4




# A. Signage

**Signage** is an important part of the reopening plan. Signs reinforcing Physical Distancing, Personal Wellness, and Safe Health Practices are gentle reminders to staff and congregants to keep physically distant, wear facial coverings, and wash hands frequently.

 **REQUIRED**
Signage at each public entrance of the facility or outdoor area to inform all employees and customers that they should:
- avoid entering the facility if they have a cough or fever;
- wear facial coverings;
- maintain a minimum six-feet distance from one another; and
- not shake hands or engage in any unnecessary physical contact.

 **REQUIRED**
Post a copy of the Safe Reopening Plan at each public entrance to the facilities or outdoor areas.

 Sample signage
- County of San Diego Printable Resources and Materials
- Centers for Disease Control and Prevention (CDC) Print Resources

**Communication** is another important way to regularly inform your staff, congregants, and visitors of the steps taken to ensure a safe reopening. Examples include: bulletins, newsletters, websites, e-mails, phone calls, social media, texts, etc.

Suggested communication and messaging:

 Create initial announcement focusing on "Welcome/What to Expect" messages and attendance guidelines.

 Share the steps which have been taken to create a safe environment.

Share that many procedures and guidelines are in effect not only to protect ourselves, but to protect one another.

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased
5

 

 Emphasize that congregants who are at higher risk for severe illness from COVID-19 (65 years or older, have underlying medical conditions) and all who are experiencing symptoms of the virus, those who are quarantined or isolated are strongly encouraged to refrain from attending services.

- **Quarantine**: Persons are quarantined after being exposed to someone with COVID-19.

- **Isolation**: Persons are isolated after demonstrating symptoms consistent with COVID-19.

Have Faith Leaders create a short video message covering key messages and reopening plans.

Utilize "Live Stream" to share reopening plans.

Consider having a remote or virtual "Town Hall" to allow Faith Leaders to share reopening plans and answer questions.

Communication Resources:
- County of San Diego Printable Materials
- CDC Social Media Toolkit
- CDC Print Resources

Resources to create your own posters, handouts, and flyers:
- Adobe Spark: Create Your Own Physical Distancing Posters
- Canva: www.Canva.com

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased

6



# B. Measures to Protect Employee Health

**Measures to Protect Employee Health** can help prevent transmission of COVID-19 in your community. It is important to train and support staff in practicing Personal Wellness, Physical Distancing, and Safe Health Practices. Leading by example will convey to your team that you are prioritizing the health and well-being of your staff, congregants, and visitors.

 **REQUIRED**
Teleworking opportunities have been maximized.

 On days when there are no worship services, it is encouraged that staff work from home for tasks such as accounting or other administrative duties, when possible.

 Schedule staff to report to the office on rotating days, if possible.

 **REQUIRED**
All employees must have temperature taken upon reporting to work.

**Please note**: visitors/congregants do not need temperature checks, but it is highly recommended.

- If 100 degrees or more, they should not be allowed in the workplace.

- If a digital thermometer is not available, employees must be screened for COVID-19 symptoms, which include:
  - Fever or chills
  - Cough
  - Shortness of breath or difficulty breathing
  - Fatigue
  - Muscle or body aches
  - Headache
  - New loss of taste or smell
  - Sore throat
  - Congestion of runny nose
  - Nausea or vomiting
  - Diarrhea

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased
7



- To the maximum extent possible, make sure the temperature/symptom screener avoids close contact with those being screened.

- Both screener and staff should wear face coverings for the screening.

- Anyone who has a fever or other symptoms should contact their medical provider for medical advice. If they do not have a healthcare provider or are uninsured, call 2-1-1 for assistance.

- For additional control measures and screening information, see page 6 of CDPH Guidance.

- For testing information, please visit the County of San Diego Testing Site.

**REQUIRED**
All desks or individual workstations are separated by at least six feet.

If staff are coming in on rotating days and using the same desk space, computers, materials, etc., ensure availability of cleaning supplies and encourage staff to disinfect their space at the beginning and end of their shift.

For office work and worship services, ensure desk space, podiums, seats, musicians, etc. are separated by at least six feet.

**REQUIRED**
Break rooms, bathrooms, and other common areas are being disinfected frequently.

Disinfect microphones and stands, music stands, instruments and other items on pulpits and podiums between each use. Consult equipment manufacturers to determine appropriate disinfection steps, particularly for soft, porous surfaces such as foam mufflers, upholstery, etc.

Consider using disposable seat covers for congregants/visitors, particularly on porous surfaces or where a facility has multiple daily services.

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased
8



◆ Create a schedule of cleaning and disinfecting for each commonly used area and any shared items.

◆ Additional Resources:
Pages 7-8 of CDPH Guidance
County of San Diego Disinfection Guidance
CDC Cleaning and Disinfection Guidance
EPA Approved Disinfectants for Use Against SARS-CoV-2

**REQUIRED**
Disinfectant and related supplies are available to all employees.

**REQUIRED**
Hand sanitizer effective against COVID-19 is available to all employees.

**REQUIRED**
Soap and water are available to all employees.

**REQUIRED**
Copies of the Reopening Plan have been distributed to all employees.

◆ Ensure all employees understand the disinfection schedule and location of all supplies.

◆ Ensure that sanitary facilities stay operational and stocked at all times. Provide additional soap, paper towels, and hand sanitizer when needed. Consider more frequent cleaning and disinfecting of handwashing facilities that are used more often. Use signage to reinforce handwashing.

◆ Install hand sanitizer dispensers, touchless whenever possible, at entrances and contact areas such as meeting rooms, lobbies, and elevator landings.

◆ See pages 4-5 of CDPH Guidance for additional topics on employee and volunteer training.

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased

9



# C. Measures to Protect Customer Safety

**Measures to Protect Customer Safety** are intended to protect congregants and visitors. The implementation of these measures may help prevent transmission of COVID-19. Illustrating that your place of worship has an action plan and is practicing Personal Wellness, Physical Distancing, and Safe Health Practices will convey to congregants and visitors that you are prioritizing their health and well-being, as well as protecting the community at-large.

 **REQUIRED**
Reconfigure common areas and limit number of attendees and staff to ensure adherence to at least six foot physical distance requirement.

 **REQUIRED**

Curbside or outdoor service is made available where feasible.

**Please Note**: Outdoor worshop service attendance should be limited naturally through implementation of strict physical distancing measures of a minimum of six feet between attendees from different households, in addition to other relevant protocols within this document.

◈ Shorten services to limit the length of time congregants/visitors spend at facilities whenever possible. This could include limiting speeches, asking congregants/visitors to put on religious garments at home before arrival.

◈ Consider offering additional meeting times (per day or per week) so that fewer guests attend meetings and services at one time. Clean meeting areas between each use as described in this guidance.

◈ Persons from the same household may sit together and do not need to practice physical distancing.

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased
10

 

 Consider implementing a reservation system to limit the number of congregants/visitors attending facilities at a time. This can include the use of digital platforms or other types of tools.  Examples of online reservation websites are:

- Signupgenius.com
- Evite.com
- Eventbrite.com

If meetings or services are held in-person, continue to offer remote access to protect those 65 an older, those with co-morbidities and those who choose to remain at home.

 See pages 9-12 in CDPH Guidance for additional recommendations.

 **REQUIRED**
All patrons/visitors must wear facial coverings within six feet of another person.

**Please Note**: All persons two years of age or older who are present in the county shall have possession of a face covering when they leave their home or place of residence and shall wear the face covering as described in the CDPH Face Covering Guidance issued on June 18, 2020.

 Prior to services, remind congregants and visitors of the facial covering requirement and its importance in stopping the spread of COVID-19.

 Persons exempt from wearing a facial covering, as stated in the CDC Guidelines include:

- Children under age 2.
- Anyone who has trouble breathing, or is unconscious, incapacitated, or otherwise unable to remove the mask without assistance.

Place staff or volunteers at the entrance to buildings to remind people to wear facial coverings as they enter.

For more information on face coverings, visit Face Coverings: Protect Yourself and Others.

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased
11



# D. Measures to Keep People Six Feet Apart

**Measures to keep people six feet apart** will assist in establishing clear guidelines and expectations for staff, congregants, and visitors in your place of worship. Placing signage, using markings, training staff, and using a reservation system can help everyone adhere to physical distancing guidelines and help prevent the transmission of COVID-19.

○ **REQUIRED**
Placing signs outside the building or outdoor area reminding people to be at least six feet apart, including when in line. Encourage pedestrian traffic to follow one-way migration paths, if appropriate.

◇ Designate several staff members to walk around and give congregants friendly reminders about physical distancing and wearing a facial covering.

○ **REQUIRED**
Placing tape or other markings at least six feet apart in line areas inside and on sidewalks at public entrances.  Direct visitors to use the markings as guides for maintaining physical distancing.

◇ Determine how physical distancing will impact seating for services and the overall seating capacity for the house of worship.

◇ Prepare to accommodate for larger family groups from the same household as well as smaller household units.

◇ Map out areas where it is anticipated that congregants will be waiting in lines or are typically in close proximity.  These areas will need monitoring for adherence to the six foot physical distance requirement between household groups.

◇ Areas to consider placing markings include: outside prior to entering place of worship, seating areas, line spacing outside of restrooms.

◇ If applicable, place markings in sitting areas on the ground to ensure six feet physical distancing.

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased
12




 **REQUIRED**
All employees have been instructed to maintain at least six feet distance from visitors and from each other.  Exceptions may include: accepting payment, delivering goods or services, or as otherwise necessary.

◈  Establish a written, workplace-specific COVID-19 prevention plan at every location, perform a comprehensive risk assessment of all work areas, and designate a person at each workplace to implement the plan.

◈  Ensure all categories of staff including temporary, contract, and volunteer workers are also properly trained in COVID-19 prevention policies and have necessary Personal Protective Equipment (PPE) if job duties require it. Discuss these responsibilities ahead of time with organizations supplying temporary, contract, and/or volunteer staff.

◈  Regularly evaluate workplaces for compliance with the plan and document and correct deficiencies identified.

◈  Emphasize the importance of physical distancing, both at work AND off work time (see Physical Distancing section below).

◈  Limit the exchange of commonly used items.  This can include items such as cups, garments, ritual objects, etc.

◈  See page 9-12 of CDPH Guidance for additional recommendations on physical distancing.

 **REQUIRED**
Appointment system is utilized, when appropriate.

◈  Consider making appointments for counseling services or other in-person meetings to reduce lines or gathering in waiting areas.  Examples of online reservations include:
  • Signupgenius.com
  • Evite.com
  • Eventbrite.com

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased                    13



# E. Other Measures

**Other Measures and Recommendations** are other activities that are NOT mandatory, but you may want to consider to protect the health and safety of your staff, congregants, and visitors. In this section, you may add additional measures that may be specific to your house of worship, site or building.

Listed below are ideas that may be helpful in creating your Plan:

 **Flow of Foot Traffic**: Mark walking paths between spaces designated for congregants/visitors to sit/kneel so that people do not walk where someone may touch their head to the floor.

See page 8 of CDPH Guidance for additional recommendations.

 **Ventilation**: During meetings and services, introduce fresh outside air, for example, opening doors/windows (weather permitting) and operating ventilation systems.

 **Air Cleaners**: Consider installing portable high-efficiency air cleaners, upgrading the building's air filters to the highest efficiency possible, and making other modifications to increase the quantity of outside air and ventilation in worship areas, offices, and other spaces.

 **Food Self-Service/Food and Beverages**: Discontinue offering self-service food and beverages. Do not hold potlucks or similar family-style eating and drinking events that increase the risk of cross contamination. If food and beverages must be served, provide items in single-serve, disposable containers whenever possible. Employees or volunteers serving food should wash hands frequently and wear disposable gloves and face coverings.

See pages 11-12 of CDPH Guidance for additional recommendations.

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased

14



 **Singing:** As of July 13, indoor singing and recitation must be discontinued. as there is increased likelihood for transmission from contaminated exhaled droplets. This may be done outdoors with facial coverings and physical distancing.

 **Parking Lots**: Reconfigure parking lots to limit congregation points and ensure proper separation (e.g., closing every other space).

If performing drive-in services, ensure vehicle windows and doors are closed if six feet of distance is not possible between vehicles.

Consider volunteers to discourage gatherings among different households in the parking lot.

See pages 11-12 of CDPH Guidance for additional recommendations.

 **Virtual Services**: Continue to support remote services and other related activities to those who are vulnerable to COVID-19 including older adults and those with co-morbidities.

See page 12 of CDPH Guidance for additional recommendations.

 **Additional Safety Measures**: CDPH Guidance.

**Additional considerations for Places of Worship:** Stay updated on current State and Local guidance regarding ceremonies (weddings, funerals, etc) and other special events by visiting:
- www.coronavirus-sd.com
- www.sdcounty.ca.gov/covidfaithbased
- www.cdph.ca.gov/

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased

15



# HELPFUL TIP:
# ASSIGN ROLES AND RESPONSIBILITIES

The following are potential roles that staff and volunteers can support in order to ensure that all mandatory requirements and suggested guidelines are met:

**Senior Leaders**: Promote, model and encourage all health and safety measures.

**Reopening Lead**: Responsible for coordinating all implementation efforts.

**Communication Manger**: Responsible for monitoring wellness practices, and informing all leaders, staff and volunteers about overall plans, procedures, protocols and roles and responsibilities.

**Safe Entry Coordinator**: Responsible for ensuring all staff have their temperature taken and are not exhibiting symptoms of COVID-19.

**Welcome Staff**: Upon entry, reminding people to wear facial coverings, maintain physical distance, provide and encourage the use of hand sanitizer.

**Foot Traffic Staff**: Responsible for ensuring visitors/congregants follow the foot traffic guidance so that a six-foot distance is kept between all visitors, congregants, staff and volunteers.

**Parking Lot Attendants**: Responsible for ensuring there is no gathering in the parking lots and that cars and visitors/congregants are following appropriate physical distancing guidance. Responsible for posting signs, cones and taking other necessary measures to assist people in safely entering the building.

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased

16




# RESOURCES

If you need help finding social services or medical care, call the San Diego County Information line 2-1-1, which is available 24/7.

- What You Should Know (Infographic)
- FAQs, Fact Sheets and Materials (available in several languages)
- CDC Guidance for Community and Faith-Based Organizations
- Center for Faith and Opportunity Initiatives U.S. Dept of Health and Human Services
- How to Cope with Stress (available in several languages)
- Handwashing
- What If I'm Exposed
- Home quarantine guidance for close contacts to COVID-19
- Home care instructions for people with Respiratory Symptoms
- What to do if you have symptoms of Coronavirus Disease 2019
- Stay tuned on the *Live Well San Diego* for videos on how to use technology How-To YouTube Channel Playlist.

Other reliable sources of information include:
- California Department of Public Health (CDPH, State)
  https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/nCOV2019.aspx
- Centers for Disease Control and Prevention (CDC, National)
  http://www.cdc.gov/coronavirus/novel-coronavirus-2019.html
- World Health Organization (WHO, International)
  https://www.who.int/health-topics/coronavirus
- National Funeral Directors Association
  https://nfda.org/covid-19
- Behavioral Health Service
  https://www.sandiegocounty.gov/hhsa/programs/bhs/
- Access and Crisis Line
  (888) 724-7240 is available 24/7 for immediate help
  www.Up2sd.org
- Aging and Independence Services
  https://www.sandiegocounty.gov/content/sdc/hhsa/programs/ais.html
- Vital Family Assistance Center
  https://www.redcross.org/virtual-family-assistance-center.html

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased

17



# DEFINITIONS

**Physical Distancing**: Physical distancing is a practice recommended by public health officials to stop or slow down the spread of a contagious disease. A distance of 6 feet or 2 meters between individuals is recommended for COVID-19, to avoid the spread of respiratory droplets. While in the same location (ex: grocery store), wearing a facial covering and maintaining 6 feet of space between individuals is recommended. Direct and indirect touching of people or objects outside of the household should be avoided.

- *Direct Touching* – Physical contact with another person (handshake, hug, high fives)
- *Indirect Touching* - Sharing the same physical objects. (Examples include, sharing a glass of water, touching the same piece of paper, sharing a book, passing cell phones back and forth, etc...)

**Quarantine**: Used to separate and restrict the movement of people who are well, but who may have been exposed to someone with an infectious disease. People are placed in quarantine to wait and see if they will become ill during the incubation period of the disease. For COVID-19, the incubation period is 2-14 days.

**Isolation**: Used to separate people with symptoms of an infectious disease, even if the symptoms are mild, from people who do not have symptoms. Isolation can be done at home or in a separate facility. A person in isolation should stay away from others even while isolated at home, to avoid spreading the illness.

**Facial Covering**: Face coverings should cover the nose and mouth and be used when individuals may be around people outside of their household. Face covering should be used in addition to other protective measures (such as physical distancing and washing your hands). Cloth face coverings should:

- fit snugly but comfortably against the side of the face
- be secured with ties or ear loops
- include multiple layers of fabric
- allow for breathing without restriction
- be able to be laundered and machine dried without damage or change to shape

The cloth face coverings recommended are not surgical masks or N-95 respirators. Those are critical supplies that must continue to be reserved for healthcare workers and other medical first responders, as recommended by current CDC guidance.

For more information visit: County of San Diego Face Coverings Guidance | CDC Facial Coverings Guidance | CDC Cloth Face Coverings Q&A

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased
18




# CONTACT US

E-mail: covid-cbo-faith@sdcounty.ca.gov

Website: www.sdcounty.ca.gov/covidfaithbased

Telebriefings: Join us every second and fourth Wednesdays each month at 1 PM

Free presentations available on COVID-19 and other health related topics:
*Live Well San Diego* Speaker's Bureau

***We appreciate your commitment and dedication to keeping the County of San Diego healthy, safe and thriving!***

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased

19



## SAFE REOPENING PLAN

Business Name:

Facility Address:

*This plan does not need to be submitted at this time. This plan is to be used to prepare when businesses open per the Governor's Order. The County will not require approval for this plan.*

*Businesses must implement all mandatory measures listed in A and B below. Businesses shall select applicable measures listed in C and D below and be prepared to explain why any measure that is not implemented is inapplicable to the business. Businesses shall also provide specific details regarding their Safe Reopening Plan pertaining to their business in section E below.*

### A. Signage (Mandatory):

☐ Signage at each public entrance of the facility to inform all employees and customers that they should: avoid entering the facility if they have a cough or fever; wear facial coverings, maintain a minimum six-foot distance from one another; and not shake hands or engage in any unnecessary physical contact.

☐ Signage posting a copy of the Safe Reopening Plan at each public entrance to the facility.

### B. Measures To Protect Employee Health (Mandatory):

☐ Teleworking opportunities have been maximized.

☐ All employees have been told not to come to work if sick.

☐ All employees must have temperature taken upon reporting to work; if 100 degrees or more, should not be allowed in workplace.  Employees must be screened for symptoms (cough, shortness of breath or trouble breathing, headache, fever, chills, muscle or body aches, fatigue, sore throat, congestion or runny nose, new loss of taste or smell, nausea or vomiting, diarrhea, exposure to individuals who have tested positive for COVID-19)

☐ All employees must wear facial coverings in the workplace, if within six feet of others.

☐ All desks or individual work stations are separated by at least six feet.

☐ Break rooms, bathrooms, and other common areas are being disinfected frequently, on the following schedule:

☐ Personal Protective Equipment (PPE) has been provided at a level appropriate to employee job duties (describe below)

Page 1 of 3

REV 05/05/2020
County of San Diego

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased

20




## SAFE REOPENING PLAN

**B. Measures To Protect Employee Safety (Mandatory) Continued:**

☐ Soap and water are available to all employees at the following location(s):

☐ Copies of the Protocol have been distributed to all employees.

**C. Measures To Protect Customer Safety (Check all that apply to the facility):**

☐ Limit the number of customers in the store at any one time to _____ which allows for customers and employees to easily maintain at least six-foot distance from one another at all practicable times.

☐ All patrons/visitors must have facial coverings in their possession and wear them within 6 ft. of another person

☐ Curbside or outdoor service is made available where feasible.

☐ Optional – Describe other measures:

**D. Measures To Keep People At Least Six Feet Apart (Check all that apply to the facility):**

☐ Placing signs outside the store reminding people to be at least six feet apart, including when in line. Including encouragement for pedestrian traffic to follow one-way migration paths, if appropriate.

☐ Placing tape or other markings at least six feet apart in customer line areas inside the store and on sidewalks at public entrances with signs directing customers to use the markings to maintain distance.

☐ All employees have been instructed to maintain at least six feet distance from customers and from each other, except employees may momentarily come closer when necessary to accept payment, deliver goods or services, or as otherwise necessary.

☐ Appointment system is utilized, when appropriate.

☐ Optional – Describe other measures:

REV 05/05/2020
County of San Diego

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased

21



## SAFE REOPENING PLAN

**E. Additional Measures Specific to Business (Mandatory):**

*Any additional measures not included here should be listed on separate pages, which the business should attach to this document.

**You may contact the Health and Safety Coordinator with any questions or comments about this protocol:**

Name:                               Phone Number:

  **Signature, Appointing Authority or Designee**

**Date of Form Completed:**

REV 05/05/2020
County of San Diego

July 21, 2020
www.Coronavirus-SD.com
www.SDcounty.ca.gov/covidfaithbased



**EXHIBIT X**

# United States Senate

WASHINGTON, DC 20510

July 23, 2020

The Honorable Donald J. Trump
President of the United States
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500

Dear Mr. President,

At any point, but particularly during the COVID-19 pandemic, it is imperative that
we protect our First Amendment's guarantee of religious freedom. Regrettably,
this fundamental right—enjoyed by Americans throughout our history—has been
infringed by troubling policies implemented during this crisis by many state and
local government leaders.[i]

As you are aware, there continue to be reported cases of states and localities
prohibiting religious entities, including houses of worship, from reopening safely
despite compliance with safety precautions found in Centers for Disease Control
and Prevention (CDC) guidance such as social distancing, building and surface
sanitization, use of masks, etc. This discriminatory behavior violates our
Constitution's guarantee of religious freedom, specifically the free exercise
guarantee. On May 22, you appropriately identified "houses of worship . . . as
essential places that provide essential services" and called on all governors "to
allow our churches and places of worship to open right now." However, this call
for action appears to have fallen on deaf ears in many of our cities and states. Our
nation needs its houses of worship now more than ever.

While Attorney General Barr has appropriately indicated that the Department of
Justice would seek to protect religious freedom, these efforts may be too little, too
late, as it would require litigating the issues in the courts. As Attorney General
Barr recently stated, "even in times of emergency, when reasonable and temporary
restrictions are placed on rights, the First Amendment and federal statutory law
prohibit discrimination against religious institutions and religious believers. Thus,

government may not impose special restrictions on religious activity that do not apply also to similar nonreligious activity."[ii] Indeed, there is no "pandemic" exception to constitutionally protected rights.

We, therefore, respectfully request that you consider taking additional measures within your authority to ensure churches, houses of worship, and religious institutions are able to reopen with appropriate CDC implemented guidelines. Additionally, we ask you to support proposals in Congress to place restrictions on any forthcoming COVID-19 relief funding to states and localities that prevent churches, houses of worship, and religious schools and institutions from reopening.

Such executive action would send the nation and government leaders a clear and unequivocal message that religious liberty matters, and that no state or locality can unilaterally strip away protected constitutional rights. Your resolve and leadership on this issue would deliver a strong message in these most troubling times. We appreciate your commitment to protecting American citizens' right to exercise their faith, their right to pray for peace, and to healing a deeply divided nation.

Sincerely,


Mike Lee
United States Senator


Josh Hawley
United States Senator


Kelly Loeffler
United States Senator


Cindy Hyde-Smith
United States Senator


Mike Braun
United States Senator


Steve Daines
United States Senator


Thom Tillis
United States Senator


Roger Wicker
United States Senator

James Lankford
United States Senator

Tom Cotton
United States Senator

---

[1] Many, including yourself, have properly expressed concern over the recent appearance of a double-standard in allowing large gatherings for peaceful protesting but still prohibiting gatherings for religious worship or education.

[2] https://www.justice.gov/opa/pr/attorney-general-william-p-barr-issues-statement-religious-practice-and-social-distancing-0

**EXHIBIT Y**



Search Input Field [_____] 🔍

## Gov. Newsom Outlines Strict Guidelines For Schools

Friday, July 17, 2020

By Associated Press, Joe Hong



Photo by Megan Burks

Above: Castle Park Middle School in Chula Vista is shown, May 1, 2018.

## Listen to the Podcast Episode

California Gov. Gavin Newsom laid out strict criteria Friday for school reopenings that makes it unlikely the vast majority of districts will have classroom instruction in the fall as the coronavirus pandemic surges



▶ 0:00 / 8:18 ───────────── 🔊

Aired: July 17, 2020 | Transcript

+ Subscribe to this podcast

California Gov. Gavin Newsom laid out strict criteria Friday for school reopenings that makes it unlikely the vast majority of districts will have classroom instruction in the fall as the coronavirus pandemic surges.

The rules include a mandate that students above second grade and all staff wear masks in school.

Newsom's new guidance mandates that public schools in California counties that are on a watch list for rising coronavirus infections cannot hold in-person classes and will have to meet strict criteria for reopening. That's disappointing news for local school districts such as Poway Unified, which hoped to welcome some students back for in-person instruction in the fall.

"We have been planning for two options all along with a mindset that we need to be prepared to have the entire district be virtual if that was a situation that arose during the school year," said Carol Osborne, Poway Unified associate superintendent of learning support services. "I think it just now has arisen sooner than we anticipated."

The school district is considering multiple options, such as starting different grade levels on different dates or pushing back the start date to give the county more



time to get off the monitoring list, she said.

The state's guidance says all school staff and all students in grades three to 12 will be required to wear face coverings. Younger students will be encouraged but not required to wear masks. Osborne was relieved by this new rule.

## Your contact info

Thanks for submitting your question!

Name

Email address

Zip code

Phone

- ☑ Sign up for Today's Top News Newsletter
- ☑ Sign up for the Midday Edition Newsletter
- ☑ Sign up for KPBS' Most Popular Stories Newsletter
- ☑ Sign up for the KPBS/Arts Newsletter
- ☑ Sign up for the Catch-Up Newsletter
- ☐ I am over 16 years old
- ☐ I accept the Terms of Service

**Submit**

If you have questions about your own heal h or medical situation, please contact a medical professional.

Powered by Hearken | Terms of Service | Privacy Policy

Want more KPBS news?
Find us on Twitter and Facebook, or sign up for our newsletters. + Subscribe to our podcasts

To view PDF documents, Download Acrobat Reader.

"I think for especially for some of our older kids, that'll help put our minds at ease for a lot of our teachers," she said.



Watch Live: Californ...

The governor's strict new regulations mark a dramatic shift from his earlier position that it was up to local school districts and boards to decide when and how to reopen. His announcement came as many of the state's 1,000 school districts are set to resume instruction in mid-August, with many still finalizing reopening plans.

"Planning for the reopening of the 20-21 school year has really been a roller-coaster ride," said Robert Meszaros, a spokesman for the Kern County Superintendent of Schools' office. Kern County, north of Los Angeles, is not on the watch list but expects it could be soon and will be affected.

Meszaros said that while the governor's announcement wasn't unexpected, "it is very different from the directive that was given just a few short weeks ago when schools were encouraged to open for the 20-21 school year with in-person instruction to the greatest extent possible."

With many school districts struggling over the decision, teachers unions, parents and school officials have been urging Newsom to provide more direction on whether it is safe to return. This week, California reported its second-highest one-day totals in infection rates and deaths since the start of the pandemic. Nearly 7,500 people have died in California — more than 1,200 of them in the past two weeks.

Several large school districts have already said their schools will begin the new term virtually, including Los Angeles and San Diego, the state's two largest with a combined enrollment of 720,000 K-12 students. San Francisco, Oakland, Sacramento, Long Beach, Santa Ana and San Bernardino are among the other districts opting not to immediately return to classrooms.

Los Angeles County Department of Public Health Director Barbara Ferrer said it was "disheartening and unfortunate" that LA County students can't have a normal first day back at school but also necessary.

"This week, Los Angeles County has unfortunately reached grim milestones every day. We have reported the most cases in a single day, the most hospitalizations and tragically high death numbers," Ferrer said.

Los Angeles County is on the governor's watch list because of concerning coronavirus transmission and hospitalization rates. Being on the list had already put restrictions on the ability to reopen various segments of the economy. That means schools will have to open with distance learning.

Newsom's guidance lays out in detail when classrooms and schools would have to close if there is an outbreak. If a student or educator test positive for the virus, a classroom would have to close and the students and teacher would quarantine for 14 days. An entire school should revert to distance learning if it reports multiple cases, or 5 percent of students and staff test positive within a 14-day period.

Jeff Freitas, president of the California Federation of Teachers, said the union was thankful Newsom provided direction for schools Friday. But he said the rules for resuming in-person learning should be even stricter: Schools shouldn't be allowed to open until cases decline for 14 straight days within a county and statewide.

"Everybody involved wants in-person learning. We know that is the best way to provide education. But there is a safety issue here," he said.

The California Teachers Association, which represents 310,000 members, had pointedly urged Newsom last week not to reopen schools "until it is safe."

Republican Assemblyman Kevin Kiley accused the governor of listening to "special interests, not science" in laying out the rules.

"Rather than adopting a balanced approach that provides California families options for classroom-based and home-based learning, the governor is shutting down the vast majority of schools across the state," said Kiley, of Rocklin.

Schools across California closed in March as the state ramped up virus-related restrictions. The move to distance learning was rocky for teachers, parents and students, particularly those who lacked the right technology or internet access. Newsom noted the state budget includes more than $5 billion to help students suffering from learning losses.

Schools will now be required to introduce "robust distance learning programs," something teachers have said they are striving for but may be easier said than done.

The rules call for regular coronavirus testing of school staff and working with county contact tracers if an outbreak occurs, Newsom said.

Superintendents will be able to submit waiver requests to re-open elementary schools, for approval by the local health officers, but it was unclear how strict or lenient authorities would be when examining those requests.

**Sign up for Today's Top Stories newsletter**

Need help keeping up with the news that matters most? Get the day's top news — ranging from local to international — straight to your inbox each weekday morning.

Email address

SUBSCRIBE

*This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.*

**Get the answers to your questions at www.kpbs.org/coronavirus-questions**

What questions do you have about the coronavirus?

**EXHIBIT Z**



**HEALTH AND HUMAN SERVICES AGENCY**
PUBLIC HEALTH SERVICES

## ORDER OF THE HEALTH OFFICER
## AND EMERGENCY REGULATIONS
### (Effective July 21, 2020)

Pursuant to California Health and Safety Code sections 101040, 120175, and 120175.5 (b) the Health Officer of the County of San Diego (Health Officer) **ORDERS AS FOLLOWS**:

Effective 12:00 a.m. on Tuesday, July 21, 2020 and continuing until further notice, the following will be in effect for San Diego County (county):

1. All persons are to remain in their homes or at their place of residence, except for employees or customers traveling to and from essential businesses, reopened businesses, or essential activities as defined in section 22, below, or to participate in individual or family outdoor activity as allowed by this Order.

2. All public or private "gatherings," as defined in section 22 below, are prohibited.

3. All businesses not meeting the definition of essential business or reopened business in section 22 below are referred to in this Order as "non-essential businesses" and shall be and remain closed for the duration of this Order. All essential businesses and reopened businesses must comply with the requirements of this Order. Notwithstanding the foregoing, any business may remain open if its employees and owners can provide its services from home, including by telecommuting, without direct contact with the public.

4. All public, charter and private schools shall not  hold classes on the school campus, and shall conduct distance learning only as required by COVID-19 an Reopening In-Person Learning Framework for K-12 Schools in California, 2020-2021 School Year issued by the California Department of Health Services on July 17, 2020 availalble at {https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-

19/Schools%20Reopening%20Recommendations.pdf}.  Colleges and Universities shall not hold classes or other school activities where students gather on the school campus, except for research-related activities in colleges and universities and where necessary to train students who will serve as essential workers.

5.  Child daycare and child care providers shall operate in compliance with the measures set forth in State COVID-19 Updated Guidance: Child Care Programs and Providers and shall prepare and post a Safe Reopening Plan pursuant to section 11, below.

6.  "Non-essential personnel," as defined in section 22 below, are prohibited from entry into any hospital or long-term care facility.  All essential personnel who are COVID-19 positive or show any potential signs or symptoms of COVID-19 are strictly prohibited from entry into hospitals or long-term care facilities. Notwithstanding the foregoing, individuals requiring medical care for COVID-19 or related conditions may be admitted to hospitals or other medical facilities if the hospital or medical facility is appropriate for treating COVID-19 and has adequate precautions in place to protect its patients, medical personnel and staff.

7.  Hospitals and healthcare providers, including dentists shall:
    a.  Take measures to preserve and prioritize resources; and,
    b.  May authorize and perform non-emergent or elective surgeries or procedures based on their determination of clinical need and supply capacity, and where consistent with State guidance.
    c.  Nothing in this Order shall prevent physicians and other healthcare providers from conducting routine preventive care provided it conforms to any applicable State guidance.
    d.  Nothing in this Order shall prevent dentists or dental hygienists from conducting routine preventive care provided it conforms to any applicable State guidance.

8.  Hospitals, healthcare providers, pharmacies and commercial testing laboratories shall report all COVID-19 test results to the Public Health Officer immediately after such results are received.

9.  All persons two years of age or older who are present in the county shall have possession of a face covering when they leave their home or place of residence and shall wear the face covering as described and required in California Department of Public Health Face Covering Guidance issued on June 18, 2020, (available at:

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Guidance-for-Face-Coverings_06-18-2020.pdf).

10. All essential businesses that allow members of the public to enter a facility must prepare and post a "Social Distancing and Sanitation Protocol" on the form available at: https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/covid19/SOCIAL_DISTANCING_AND_SANITATION_PROTOCOL_04022020_V1.pdf ), or on a form required by another governmental entity requiring substantially similar information, for each of their facilities open to the public in the county. The Social Distancing and Sanitation Protocol must be posted at or near the entrance of the relevant facility, and shall be easily viewable by the public and employees.  A copy of the Social Distancing and Sanitation Protocol must also be provided to each employee performing work at the facility.  All essential businesses shall implement the Social Distancing and Sanitation Protocol and provide evidence of its implementation to any authority enforcing this Order upon demand.  The Social Distancing and Sanitation Protocol must ensure all required measures are implemented and must identify and require measures necessary to implement social distancing are implemented at each facility that will ensure social distancing and sanitation at that particular facility.  If the measures identified and implemented are not effective in maintaining proper social distancing and sanitation, the business shall promptly modify its Social Distancing and Sanitation Protocols to ensure proper social distancing and sanitation. Any business that fails to successfully implement social distancing and sanitation may be required to close.

11. All reopened businesses, with the exception of restaurants, bars, wineries, distilleries and breweries   which do not limit services to take-out or delivery, must prepare and post a "Safe Reopening Plan" on the form available at:https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/covid19/Community_Sector_Support/BusinessesandEmployers/SafeReopeningPlanTemplate.pdf for each of their facilities in the county.  Restaurants bars, wineries, distilleries and breweries which do not limit services to take-out or delivery, must prepare and post a "COVID-19 Restaurant Operating Protocol" on the form available at https://www.sandiegocounty.gov/content/dam/sdc/deh/fhd/food/pdf/covid19sdrestaurantoperatingprotocol_en.pdf  for each restaurant in the county. The Safe Reopening Plan or COVID-19 Restaurant Operating Protocol must be posted at or near the entrance of the relevant facility, and shall be easily viewable by the public and employees.  A copy of the Safe Reopening Plan or COVID-19 Restaurant Operating Protocol must also be provided to each employee performing work at the facility.  All reopened businesses shall implement the Safe Reopening

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

Plan or COVID-19 Restaurant Operating Protocol and provide evidence of its implementation to any authority enforcing this Order upon demand.  The Safe Reopening Plan or COVID-19 Restaurant Operating Protocol must ensure all required measures are implemented.  If the measures identified and implemented are not effective in maintaining proper social distancing and sanitation, the business shall promptly modify its Safe Reopening Plan or COVID-19 Restaurant Operating Protocol to ensure proper social distancing and sanitation. Any business that fails to comply with its Safe Reopening Plan or COVID-19 Restaurant Operating Protocol shall immediately close.

12. When the State of California has issued an industry guidance, or any subsequent amendments thereto, with mandatory and/or suggested measures to be implemented by a particular type of business or industry, a reopened business must include in its Safe Reopening Plan all of the industry guidance mandatory measures, including, but not limited to, all of the requirements and guidance set forth in the Statewide Public Health Officer Order, issued by the California Department of Health Services on July13, 2020, all portions of which are operative  in San Diego County effective immediately, and available at {https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%20Dimming%20Entire%20State%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.pdf}.  The reopened business shall include all suggested measures necessary to maintain proper sanitation, employee screening, social distancing and facial coverings.  Any mandatory measures required by this Order must also be included in the Safe Reopening Plan.

13. All brewpubs, breweries, bars and pubs shall close unless they comply with section 14c, below, in which case they shall comply with all other requirements in this section and section 14 below.  All other restaurants, bars, wineries, distilleries and breweries shall close indoor service in conformance with the requirements set forth in the Statewide Public Health Officer Order, issued by the California Department of Health Services on July13, 2020, all portions of which are operative  in San Diego County effective immediately, and available at {https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%20Dimming%20Entire%20State%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.pdf}, and shall be closed from 10:00 p.m. until 5:00 a.m. every day.  Guests already in the facility at 10:00 p.m. may remain in the facility until 11:00 p.m.  Only staff needed to close, open or clean shall be in the facility between the hours of 11:00 p.m. and 5:00 a.m.

14. All restaurants, bars, wineries and breweries shall also be required to ensure their customers comply with all of the following measures and shall immediately close if they are not able to

do so:

    a. No food or beverages shall be served to or consumed by a customer who is not seated at a table designated by the restaurant for dining.

    b. The bar area of a restaurant may be used only for table service of meals.

    c. Alcoholic drinks shall only be served as part of a meal and must be sold and served in the same transaction as the meal.  All meals shall be served by a food operator permitted by the San Diego County Department of Environmental Health.  This restriction shall not be applicable to outdoor service of wine at a winery or spirits at a distillery.

    d. Customers shall not stand in the restaurant, bar, winery, distillery or brewery except in the reception area while waiting for a table or to pick up take-out food.  If customers cannot be socially distanced in the reception area they shall wait in their cars or outside of the restaurant in a line with six feet between each customer.

    e. Discontinue open seating.  All members of the party must be present before seating and the host must bring the entire party to the table at one time. The customers allowed at a table are limited to members of a single household or customers who have asked to be seated together at the time a table is requested.

    f. Discontinue seating customers and/or groups at bar counters, sushi preparation bars, etc. where they cannot maintain at least six feet of distance from employee work areas/stations.  Install physical barriers or partitions in areas where maintaining a physical distance of six feet is difficult.

    g. Customers are not required to wear face coverings while at a table with members of the same household.  Customers at a table with non-household members are not required to wear face coverings when eating and drinking. Customers are required to wear face coverings at all other times in conformance with paragraph 9, above.

    h. Tables designated for dining shall be six feet apart, or separated by barriers or partitions that extend above the heads of customers while seated.  Customer shall not be allowed to bring additional chairs to the table that interfere with the six foot separation.

    i. Self-serve food or drink options, such as buffets, salad bars, and drink stations are not allowed.

    j. Shared entertainment items such as board games, arcade games and vending machines are prohibited and customers shall not have access to game and entertainment areas such as pool tables or darts.

    k. Dance floors shall be closed and live performances such as musical or dance acts shall be discontinued.

    l. Any customer that refuses to comply with this section shall be subject to enforcement per Health and Safety Code section 120295.

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

15. Places of Worship – Religious services and cultural ceremonial activities (including wedding ceremonies but not receptions) may be conducted in conformance with the State Guidance pursuant to sections 11 and 12, above.  Given the high risk of this activity, vulnerable members of the population (over 65 years old, compromised immune system or underlying condition) are strongly encouraged to participate through streaming or some other form of remote technology.  Outdoor services and cultural ceremonial activities may be conducted provided all persons practice social distancing as defined in section 22e, below.

16. Each essential business and reopened business shall:
    a. Require all employees/on-site contractors (hereinafter referred to as employees) to have possession of face coverings and wear them as described in section 9 above when in the business facility; and,
    b. Shall conduct temperature screening of all employees and prohibit entry to the workplace of employees with a temperature of 100 degrees or more, employees exhibiting COVID-19 symptoms as described by the Centers for Disease Control and Prevention, or employees who have recently been exposed to a person who has tested positive for COVID-19 (either directly or through a breach of Personal Protective Equipment in the case of healthcare workers/first responders).

17. Outdoor Recreation
    a. Each public park and recreation area or facility, shall operate in compliance with the measures set forth in the State COVID-19 Industry Guidance: Campgrounds, RV Parks and Outdoor Recreation.  The operator of the park shall prepare a Safe Reopening Plan pursuant to section 11, above, indicating how the park or recreation facility will implement the required measures. Any park or recreation area/facility at which the Protocol requirements cannot be effectively implemented may be required to close.
    b.  Outdoor recreation instruction and day camps that comply with the State COVID-19 Industry Guidance: Day Camps, may be conducted in park and recreation areas/facilities.
    c. Swimming pools owned or operated by a Homeowners' Association, Condominium or Apartment complex may be open provided the owner or operator completes and posts a Safe Reopening Plan that shows conformance with the requirements of this Order and with the swimming pool/aquatic venues requirements of the State COVID-19 Industry Guidance on Fitness Facilities.

18. All essential businesses and reopened businesses that remain in operation in accordance with

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

the Order shall make every effort to use telecommuting for their workforces.

19. A strong recommendation is made that all persons who are 65 years old or older, have a chronic underlying condition, or have a compromised immune system self-quarantine themselves at home or other suitable location.

20. All persons arriving in the county from international locations identified on the Centers for Disease Control and Prevention (CDC) Warning Level 2 or 3 Travel Advisory (available at: https://wwwnc.cdc.gov/travel/notices) shall be subject to 14-day home or other suitable location quarantine and self-monitoring.

21. Persons who have been diagnosed with COVID-19, or who are likely to have COVID-19, shall comply with the Order of the Health Officer titled: "Isolation of All Persons with or Likely to have COVID-19", or as subsequently amended.  Persons who have a close contact with a person who either has COVID-19, or is likely to have COVID-19, shall comply with the Order of the Health Officer titled: "Quarantine of Persons Exposed to COVID-19," or as subsequently amended.        Both        orders        are        available        at: https://www.sandiegocounty.gov/content/sdc/hhsa/programs/phs/community_epidemiology/dc/2019-nCoV/health-order.html.  If a more specific isolation or quarantine order is issued to a person, that order shall be followed.

22. For purposes of this Order:
    a. "Essential business" is any business or activity (or a business/activity that employs/utilizes workers) designated by the State Public Health Officer as "Essential Critical Infrastructure Workers" set forth in: https://covid19.ca.gov/img/Essential CriticalInfrastructureWorkers.pdf) as that list may be updated from time-to-time, and referenced in Executive Order N-33-20 issued by the Governor of the State of California.  For the purposes of this Order, the following businesses in the Food and Agriculture Sector are considered "groceries" or "other retail that sells food and beverages": grocery stores, corner stores and convenience stores, liquor stores that sell food, farmer's markets, food banks, farm and produce stands, supermarkets, big box stores that sell groceries and essentials, or similar business that sell food so long as the store has a current permit related to the sale of food and/or beverages from the San Diego County Department of Environmental Health.
    b. "Gathering" is any event or convening that brings together more than one person in a single room or single indoor or outdoor space at the same time.  A gathering does not include:

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

     i.  A gathering consisting only of members of a single family or household.

    ii.  Operations at airports, public transportation or other spaces where persons in transit are able to practice social distancing.

   iii.  Operations at essential businesses as defined in section 22a above and reopened businesses as defined in 22f below and where the other requirements set forth in this Order are followed.

c.  "Long term care facility" is a facility serving adults that require assistance with activities of daily living, including a skilled nursing facility, and that is licensed by the California Department of Community Care and Licensing, or the California Department of Public Health.

d.  "Non-essential personnel" are employees, contractors, or members of the public who do not perform treatment, maintenance, support, or administrative tasks deemed essential to the healthcare mission of the long-term care facility or hospital.  Non-essential personnel do not include first responders, nor State, federal, or local officials, investigators, or medical personnel carrying out lawful duties.  Non-essential personnel do not include visitors to hospitals and long-term care facilities who are granted entry by the facility's director, or designee, because they are family or friends who are visiting a resident in an end of life or similar situation, are parents or guardians visiting a child who is a patient, or because of any other circumstances deemed appropriate by the facility director, or designee, and where appropriate precautions by the facility that follow federal, State, and local public health guidance regarding COVID-19 are followed.

e.  "Social distancing" is maintaining a six-foot separation from all persons except for household members, first responders and medical providers or employees conducting temperature screenings.

f.  "Reopened business" is a business that is not an essential business as stated in section 22a above, and has reopened in conformance with the State of California's Resilience Roadmap (available at: https://covid19.ca.gov/roadmap-counties/) and the Statewide Public Health Officer Order, issued by the California Department of Health Services on July13, 2020, all portions of which are operative  in San Diego County effective immediately, and available at {https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%20Dimming%20Entire%20State%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.pdf}.  A reopened business may open when the State has posted the applicable COVID-19 INDUSTRY GUIDANCE, the Public Health Officer has posted an acknowledgement of the reopened status on the County of San Diego Coronavirus website and the business has

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

complied with the requirements of this Order.

23. Hotels and lodging establishments may be open for all guests, including tourists and leisure guests, provided they comply with the State COVID-19 Industry Guidance: Hotels, Lodging and Short Term Rentals and complete and post a Safe Reopening Plan pursuant to section 11, above.

24. This Order is issued as a result of the World Health Organization's declaration of a worldwide pandemic of COVID-19 disease, also known as "novel coronavirus."

25. This Order is issued based on scientific evidence regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect vulnerable members of the public from avoidable risk of serious illness or death resulting from exposure to COVID-19. The age, condition, and health of a significant portion of the population of the county places it at risk for serious health complications, including death, from COVID-19. Although most individuals who contract COVID-19 do not become seriously ill, persons with mild symptoms and asymptomatic persons with COVID-19 may place other vulnerable members of the public—such as older adults, and those with underlying health conditions—at significant risk.

26. The actions required by this Order are necessary to reduce the number of individuals who will be exposed to COVID-19, and will thereby slow the spread of COVID-19 in the county. By reducing the spread of COVID-19, this Order will help preserve critical and limited healthcare capacity in the county and will save lives.

27. This Order is issued in accordance with, and incorporates by reference: a) the Declaration of Local Health Emergency issued by the Health Officer on February 14, 2020; b) the Proclamation of Local Emergency issued by the County Director of Emergency Services  on February 14, 2020; c) the action of the County Board of Supervisors to ratify and continue both the local health emergency and local emergency on February 19, 2020; d) the Proclamation of a State of Emergency issued by the Governor of the State of California on March 4, 2020; e) Executive Order N-25-20 issued by the Governor of the State of California on March 12, 2020 which orders that "All residents are to heed any orders and guidance of state and local health officials, including but not limited to the imposition of social distancing measures, to control COVID-19"; f) Proclamation 9984 regarding COVID-19 issued by the President of the United States on March 11, 2020; g) Executive Order N-33-20 issued by the Governor of the State of California on March 19, 2020; h) the "Interim Additional Guidance

Page 9 of 11

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

for Infection Prevention and Control for Patients with Suspected or Confirmed COVID-19 in Nursing Homes" issued by the CDC; i) COVID-19 guidance issued by the California Department of Public Health on including, but not limited to the Face Coverings Guidance issued on April 1, 2020; and j) the State of California's "Resilience Roadmap."

28. This Order is issued to prevent circumstances often present in gatherings that may exacerbate the spread of COVID-19, such as: 1) the increased likelihood that gatherings will attract people from a broad geographic area; 2) the prolonged time period in which large numbers of people are in close proximity; 3) the difficulty in tracing exposure when large numbers of people attend a single event or are at a single location; and 4) the inability to ensure that such persons follow adequate hygienic practices.

29. This Order is issued to provide additional opportunities for recreational activities while also requiring additional protections from the spread of COVID-19 to the public who are taking advantage of these opportunities for recreational activities.   And providing additional protections for employees of essential businesses or reopened business and their customers/clients by increasing facial covering requirements and health checks and temperature screening.

30. This Order is issued to protect the public health as businesses are allowed to reopen by requiring businesses to implement procedures necessary to ensure their employees and customers comply with social distancing, sanitation and screening practices.

31. This Order comes after the release of substantial guidance from the Health Officer, the California Department of Public Health, the CDC, and other public health officials throughout the United States and around the world.

32. The statement of facts and circumstances set forth as justification for each Guidance issued by the California Department of Health Services that is referenced in this Order are hereby accepted and incorporated by reference into this Order.

33. Pursuant to Health and Safety Code section 120175.5 (b) all governmental entities in the county shall take necessary measures within the governmental entity's control to ensure compliance with this Order and to disseminate this Order to venues or locations within the entity's jurisdiction where gatherings may occur.

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

34. Violation of this Order is subject to fine, imprisonment, or both. (California Health and Safety Code section 120295.)

35. To the extent necessary, this Order may be enforced by the Sheriff or chiefs of police pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029.

36. Once this Order takes effect it shall supersede the Order of the Health Officer and Emergency Regulations dated July 14, 2020.

**IT IS SO ORDERED:**

Date: July 20 2020

Wilma J. Wooten, M.D., M.P.H.
Public Health Officer
County of San Diego

---

EMERGENCY REGULATIONS

As Director of Emergency Services for the County of San Diego, I am authorized to promulgate regulations for the protection of life and property pursuant to Government Code Section 8634 and San Diego County Code section 31.103. The following shall be in effect for the duration of the Health Officer Order issued above which is incorporated in its entirety by reference:

The Health Officer Order shall be promulgated as a regulation for the protection of life and property.

Any person who violates or who refuses or willfully neglects to obey this regulation is subject to fine, imprisonment, or both. (Government Code section 8665.)

Date: July 20, 2020

Helen Robbins-Meyer
Chief Administrative Officer
Director of Emergency Services
County of San Diego

**EXHIBIT AA**



**HEALTH AND HUMAN SERVICES AGENCY**
PUBLIC HEALTH SERVICES

## ORDER OF THE HEALTH OFFICER
## AND EMERGENCY REGULATIONS
(Effective August 8, 2020)

Pursuant to California Health and Safety Code sections 101040, 120175, and 120175.5 (b) the Health Officer of the County of San Diego (Health Officer) **ORDERS AS FOLLOWS**:

Effective 12:00 a.m. on Saturday, August 8, 2020 and continuing until further notice, the following will be in effect for San Diego County (county):

1. All persons are to remain in their homes or at their place of residence, except for employees or customers traveling to and from essential businesses, reopened businesses, or essential activities as defined in section 22, below, or to participate in individual or family outdoor activity as allowed by this Order.

2. All public or private "gatherings," as defined in section 22 below, are prohibited.

3. All businesses not meeting the definition of essential business or reopened business in section 22 below are referred to in this Order as "non-essential businesses" and shall be and remain closed for the duration of this Order. All essential businesses and reopened businesses must comply with the requirements of this Order. Notwithstanding the foregoing, any business may remain open if its employees and owners can provide its services from home, including by telecommuting, without direct contact with the public.

4. All public, charter and private schools shall not  hold classes on the school campus, and shall conduct distance learning only as required by COVID-19 and Reopening In-Person Learning Framework for K-12 Schools in California, 2020-2021 School Year issued by the California Department of Public Health on July 17, 2020 available at {https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Schools%20Reopening%20Recommendations.pdf}.   Colleges and Universities shall not

hold classes or other school activities where students gather on the school campus, except for research-related activities in colleges and universities and where necessary to train students who will serve as essential workers.

5. Child daycare and child care providers shall operate in compliance with the measures set forth in State COVID-19 Updated Guidance: Child Care Programs and Providers and shall prepare and post a Safe Reopening Plan pursuant to section 11, below.

6. "Non-essential personnel," as defined in section 22 below, are prohibited from entry into any hospital or long-term care facility.  All essential personnel who are COVID-19 positive or show any potential signs or symptoms of COVID-19 are strictly prohibited from entry into hospitals or long-term care facilities. Notwithstanding the foregoing, individuals requiring medical care for COVID-19 or related conditions may be admitted to hospitals or other medical facilities if the hospital or medical facility is appropriate for treating COVID-19 and has adequate precautions in place to protect its patients, medical personnel and staff.

7. Hospitals and healthcare providers, including dentists shall:
   a. Take measures to preserve and prioritize resources; and,
   b. May authorize and perform non-emergent or elective surgeries or procedures based on their determination of clinical need and supply capacity, and where consistent with State guidance.
   c. Nothing in this Order shall prevent physicians and other healthcare providers from conducting routine preventive care provided it conforms to any applicable State guidance.
   d. Nothing in this Order shall prevent dentists or dental hygienists from conducting routine preventive care provided it conforms to any applicable State guidance.

8. Hospitals, healthcare providers, pharmacies and commercial testing laboratories shall report all COVID-19 test results to the Public Health Officer immediately after such results are received.

9. All persons two years of age or older who are present in the county shall have possession of a face covering when they leave their home or place of residence and shall wear the face covering as described and required in California Department of Public Health Face Covering Guidance issued on June 18, 2020, (available at: https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

19/Guidance-for-Face-Coverings_06-18-2020.pdf).

10. All essential businesses that allow members of the public to enter a facility must prepare and post a "Social Distancing and Sanitation Protocol" on the form available at: https://www.sandiegocounty .gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/covid19/SOCIAL_DISTANCING_ AND_SANITATION_PROTOCOL_04022020_V1.pdf ), or on a form required by another governmental entity requiring substantially similar information, for each of their facilities open to the public in the county. The Social Distancing and Sanitation Protocol must be posted at or near the entrance of the relevant facility, and shall be easily viewable by the public and employees.  A copy of the Social Distancing and Sanitation Protocol must also be provided to each employee performing work at the facility.  All essential businesses shall implement the Social Distancing and Sanitation Protocol and provide evidence of its implementation to any authority enforcing this Order upon demand.  The Social Distancing and Sanitation Protocol must ensure all required measures are implemented and must identify and require measures necessary to implement social distancing are implemented at each facility that will ensure social distancing and sanitation at that particular facility.  If the measures identified and implemented are not effective in maintaining proper social distancing and sanitation, the business shall promptly modify its Social Distancing and Sanitation Protocols to ensure proper social distancing and sanitation. Any business that fails to successfully implement social distancing and sanitation may be required to close.

11. All reopened businesses, with the exception of restaurants, bars, wineries, distilleries and breweries   which do not limit services to take-out or delivery, must prepare and post a "Safe Reopening Plan" on the form available at:https://www.sandiegocounty.gov/content/dam/sdc/hhsa/programs/phs/Epidemiology/covid 19/Community_Sector_Support/BusinessesandEmployers/SafeReopeningPlanTemplate.pdf for each of their facilities in the county.  Restaurants bars, wineries, distilleries and breweries which do not limit services to take-out or delivery, must prepare and post a "COVID-19 Restaurant Operating Protocol" on the form available at https://www.sandiegocounty.gov/content/dam/sdc/deh/fhd/food/pdf/covid19sdrestaurantoper atingprotocol_en.pdf  for each restaurant in the county. The Safe Reopening Plan or COVID-19 Restaurant Operating Protocol must be posted at or near the entrance of the relevant facility, and shall be easily viewable by the public and employees.  A copy of the Safe Reopening Plan or COVID-19 Restaurant Operating Protocol must also be provided to each employee performing work at the facility.  All reopened businesses shall implement the Safe Reopening Plan or COVID-19 Restaurant Operating Protocol and provide evidence of its implementation

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

to any authority enforcing this Order upon demand.  The Safe Reopening Plan or COVID-19 Restaurant Operating Protocol must ensure all required measures are implemented.  If the measures identified and implemented are not effective in maintaining proper social distancing and sanitation, the business shall promptly modify its Safe Reopening Plan or COVID-19 Restaurant Operating Protocol to ensure proper social distancing and sanitation. Any business that fails to comply with its Safe Reopening Plan or COVID-19 Restaurant Operating Protocol shall immediately close.

12. When the State of California has issued an industry guidance, or any subsequent amendments thereto, with mandatory and/or suggested measures to be implemented by a particular type of business or industry, a reopened business must include in its Safe Reopening Plan all of the industry guidance mandatory measures, including, but not limited to, all of the requirements and guidance set forth in the Statewide Public Health Officer Order, issued by the California Department of Health Services on July 13, 2020, all portions of which are operative  in San Diego County effective immediately, and available at {https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%20Dimming%20Entire%20State%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.pdf}.  The reopened business shall include all suggested measures necessary to maintain proper sanitation, employee screening, social distancing and facial coverings.  Any mandatory measures required by this Order must also be included in the Safe Reopening Plan.

13. All brewpubs, breweries, bars and pubs shall close unless they comply with section 14c, below, in which case they shall comply with all other requirements in this section and section 14 below.  All other restaurants, bars, wineries, distilleries and breweries shall close indoor service in conformance with the requirements set forth in the Statewide Public Health Officer Order, issued by the California Department of Health Services on July13, 2020, all portions of which are operative  in San Diego County effective immediately, and available at {https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%20Dimming%20Entire%20State%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.pdf}, and shall be closed from 10:00 p.m. until 5:00 a.m. every day.  Guests already in the facility at 10:00 p.m. may remain in the facility until 11:00 p.m.  Only staff needed to close, open or clean shall be in the facility between the hours of 11:00 p.m. and 5:00 a.m.

14. All restaurants, bars, wineries and breweries shall also be required to ensure their customers comply with all of the following measures and shall immediately close if they are not able to do so:

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

a. No food or beverages shall be served to or consumed by a customer who is not seated at a table designated by the restaurant for dining.

b. The bar area of a restaurant may be used only for table service of meals.

c. Alcoholic drinks shall only be served as part of a meal and must be sold and served in the same transaction as the meal.  All meals shall be served by a food operator permitted by the San Diego County Department of Environmental Health.  This restriction shall not be applicable to outdoor service of wine at a winery or spirits at a distillery.

d. Customers shall not stand in the restaurant, bar, winery, distillery or brewery except in the reception area while waiting for a table or to pick up take-out food.  If customers cannot be socially distanced in the reception area they shall wait in their cars or outside of the restaurant in a line with six feet between each customer.

e. Discontinue open seating.  All members of the party must be present before seating and the host must bring the entire party to the table at one time. The customers allowed at a table are limited to members of a single household or customers who have asked to be seated together at the time a table is requested.

f. Discontinue seating customers and/or groups at bar counters, sushi preparation bars, etc. where they cannot maintain at least six feet of distance from employee work areas/stations.  Install physical barriers or partitions in areas where maintaining a physical distance of six feet is difficult.

g. Customers are not required to wear face coverings while at a table with members of the same household.  Customers at a table with non-household members are not required to wear face coverings when eating and drinking. Customers are required to wear face coverings at all other times in conformance with paragraph 9, above.

h. Tables designated for dining shall be six feet apart, or separated by barriers or partitions that extend above the heads of customers while seated.  Customer shall not be allowed to bring additional chairs to the table that interfere with the six foot separation.

i. Self-serve food or drink options, such as buffets, salad bars, and drink stations are not allowed.

j. Shared entertainment items such as board games, arcade games and vending machines are prohibited and customers shall not have access to game and entertainment areas such as pool tables or darts.

k. Dance floors shall be closed and live performances such as musical or dance acts shall be discontinued.

l. Any customer that refuses to comply with this section shall be subject to enforcement per Health and Safety Code section 120295.

15. Places of Worship – Religious services and cultural ceremonial activities (including wedding

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

ceremonies but not receptions) may be conducted in conformance with the State Guidance pursuant to sections 11 and 12, above.  Given the high risk of this activity, vulnerable members of the population (over 65 years old, compromised immune system or underlying condition) are strongly encouraged to participate through streaming or some other form of remote technology.  Outdoor services and cultural ceremonial activities may be conducted provided all persons practice social distancing as defined in section 22e, below.

16. Each essential business and reopened business shall:

    a. Require all employees/on-site contractors (hereinafter referred to as employees) to have possession of face coverings and wear them as described in section 9 above when in the business facility; and,

    b. Shall conduct temperature screening of all employees and prohibit entry to the workplace of employees with a temperature of 100 degrees or more, employees exhibiting COVID-19 symptoms as described by the Centers for Disease Control and Prevention, or employees who have recently been exposed to a person who has tested positive for COVID-19 (either directly or through a breach of Personal Protective Equipment in the case of healthcare workers/first responders); and

    c. Take all of the following actions if an employer becomes aware that an employee is diagnosed with COVID-19:

        i. Promptly notify the County Department of Public Health that there is an employee diagnosed with COVID-19, together with the name, date of birth, and contact information of the employee.

        ii. Cooperate with the County Department of Public Health's COVID-19 response team to identify and provide contact information for any persons exposed by the employee at the workplace.

        iii. Provide notice of the exposure to any employees, and contractors (who regularly work at the workplace), who may have been exposed to COVID-19, as stated in the State's COVID-19 Employer Playbook for a Safe Reopening, available at {https://files.covid19.ca.gov/pdf/employer-playbook-for-safe-reopening--en.pdf}.

17. Outdoor Recreation

    a. Each public park and recreation area or facility, shall operate in compliance with the measures set forth in the State COVID-19 Industry Guidance: Campgrounds, RV Parks and Outdoor Recreation.  The operator of the park shall prepare a Safe Reopening Plan pursuant to section 11, above, indicating how the park or recreation facility will

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

implement the required measures. Any park or recreation area/facility at which the Protocol requirements cannot be effectively implemented may be required to close.

    b.  Outdoor recreation instruction and day camps that comply with the State COVID-19 Industry Guidance: Day Camps, may be conducted in park and recreation areas/facilities.

    c.  Swimming pools owned or operated by a Homeowners' Association, Condominium or Apartment complex may be open provided the owner or operator completes and posts a Safe Reopening Plan that shows conformance with the requirements of this Order and with the swimming pool/aquatic venues requirements of the State COVID-19 Industry Guidance on Fitness Facilities.

18. All essential businesses and reopened businesses that remain in operation in accordance with the Order shall make every effort to use telecommuting for their workforces.

19. A strong recommendation is made that all persons who are 65 years old or older, have a chronic underlying condition, or have a compromised immune system self-quarantine themselves at home or other suitable location.

20. All persons arriving in the county from international locations identified on the Centers for Disease Control and Prevention (CDC) Warning Level 2 or 3 Travel Advisory (available at: https://wwwnc.cdc.gov/travel/notices) shall be subject to 14-day home or other suitable location quarantine and self-monitoring.

21. Persons who have been diagnosed with COVID-19, or who are likely to have COVID-19, shall comply with the Order of the Health Officer titled: "Isolation of All Persons with or Likely to have COVID-19", or as subsequently amended.  Persons who have a close contact with a person who either has COVID-19, or is likely to have COVID-19, shall comply with the Order of the Health Officer titled: "Quarantine of Persons Exposed to COVID-19," or as subsequently amended.          Both          orders          are          available          at: https://www.sandiegocounty.gov/content/sdc/hhsa/programs/phs/community_epidemiology/d c/2019-nCoV/health-order.html.  If a more specific isolation or quarantine order is issued to a person, that order shall be followed.

22. For purposes of this Order:

    a.  "Essential business" is any business or activity (or a business/activity that employs/utilizes workers) designated by the State Public Health Officer as "Essential Critical Infrastructure Workers" set forth in: https://covid19.ca.gov/img/Essential

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

CriticalInfrastructureWorkers.pdf) as that list may be updated from time-to-time, and referenced in Executive Order N-33-20 issued by the Governor of the State of California.  For the purposes of this Order, the following businesses in the Food and Agriculture Sector are considered "groceries" or "other retail that sells food and beverages": grocery stores, corner stores and convenience stores, liquor stores that sell food, farmer's markets, food banks, farm and produce stands, supermarkets, big box stores that sell groceries and essentials, or similar business that sell food so long as the store has a current permit related to the sale of food and/or beverages from the San Diego County Department of Environmental Health.

b. "Gathering" is any event or convening that brings together more than one person in a single room or single indoor or outdoor space at the same time.  A gathering does not include:

    i. A gathering consisting only of members of a single family or household.

    ii. Operations at airports, public transportation or other spaces where persons in transit are able to practice social distancing.

    iii. Operations at essential businesses as defined in section 22a above and reopened businesses as defined in 22f below and where the other requirements set forth in this Order are followed.

c. "Long term care facility" is a facility serving adults that require assistance with activities of daily living, including a skilled nursing facility, and that is licensed by the California Department of Community Care and Licensing, or the California Department of Public Health.

d. "Non-essential personnel" are employees, contractors, or members of the public who do not perform treatment, maintenance, support, or administrative tasks deemed essential to the healthcare mission of the long-term care facility or hospital.  Non-essential personnel do not include first responders, nor State, federal, or local officials, investigators, or medical personnel carrying out lawful duties.  Non-essential personnel do not include visitors to hospitals and long-term care facilities who are granted entry by the facility's director, or designee, because they are family or friends who are visiting a resident in an end of life or similar situation, are parents or guardians visiting a child who is a patient, or because of any other circumstances deemed appropriate by the facility director, or designee, and where appropriate precautions by the facility that follow federal, State, and local public health guidance regarding COVID-19 are followed.

e. "Social distancing" is maintaining a six-foot separation from all persons except for household members, first responders and medical providers or employees conducting

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

temperature screenings.

   f. "Reopened business" is a business that is not an essential business as stated in section 22a above, and has reopened in conformance with the State of California's Resilience Roadmap (available at: https://covid19.ca.gov/roadmap-counties/) and the Statewide Public Health Officer Order, issued by the California Department of Health Services on July13, 2020, all portions of which are operative  in San Diego County effective immediately, and available at {https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/SHO%20Order%20Dimming%20Entire%20State%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.pdf}.   A reopened business may open when the State has posted the applicable COVID-19 INDUSTRY GUIDANCE, the Public Health Officer has posted an acknowledgement of the reopened status on the County of San Diego Coronavirus website and the business has complied with the requirements of this Order.

23. Hotels and lodging establishments may be open for all guests, including tourists and leisure guests, provided they comply with the State COVID-19 Industry Guidance: Hotels, Lodging and Short Term Rentals and complete and post a Safe Reopening Plan pursuant to section 11, above.

24. This Order is issued as a result of the World Health Organization's declaration of a worldwide pandemic of COVID-19 disease, also known as "novel coronavirus."

25. This Order is issued based on scientific evidence regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, as well as best practices as currently known and available to protect vulnerable members of the public from avoidable risk of serious illness or death resulting from exposure to COVID-19. The age, condition, and health of a significant portion of the population of the county places it at risk for serious health complications, including death, from COVID-19. Although most individuals who contract COVID-19 do not become seriously ill, persons with mild symptoms and asymptomatic persons with COVID-19 may place other vulnerable members of the public— such as older adults, and those with underlying health conditions—at significant risk.

26. The actions required by this Order are necessary to reduce the number of individuals who will be exposed to COVID-19, and will thereby slow the spread of COVID-19 in the county. By reducing the spread of COVID-19, this Order will help preserve critical and limited healthcare capacity in the county and will save lives.

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

27. This Order is issued in accordance with, and incorporates by reference: a) the Declaration of Local Health Emergency issued by the Health Officer on February 14, 2020; b) the Proclamation of Local Emergency issued by the County Director of Emergency Services on February 14, 2020; c) the action of the County Board of Supervisors to ratify and continue both the local health emergency and local emergency on February 19, 2020; d) the Proclamation of a State of Emergency issued by the Governor of the State of California on March 4, 2020; e) Executive Order N-25-20 issued by the Governor of the State of California on March 12, 2020 which orders that "All residents are to heed any orders and guidance of state and local health officials, including but not limited to the imposition of social distancing measures, to control COVID-19"; f) Proclamation 9984 regarding COVID-19 issued by the President of the United States on March 11, 2020; g) Executive Order N-33-20 issued by the Governor of the State of California on March 19, 2020; h) the "Interim Additional Guidance for Infection Prevention and Control for Patients with Suspected or Confirmed COVID-19 in Nursing Homes" issued by the CDC; i) COVID-19 guidance issued by the California Department of Public Health on including, but not limited to the Face Coverings Guidance issued on April 1, 2020; and j) the State of California's "Resilience Roadmap."

28. This Order is issued to prevent circumstances often present in gatherings that may exacerbate the spread of COVID-19, such as: 1) the increased likelihood that gatherings will attract people from a broad geographic area; 2) the prolonged time period in which large numbers of people are in close proximity; 3) the difficulty in tracing exposure when large numbers of people attend a single event or are at a single location; and 4) the inability to ensure that such persons follow adequate hygienic practices.

29. This Order is issued to provide additional opportunities for recreational activities while also requiring additional protections from the spread of COVID-19 to the public who are taking advantage of these opportunities for recreational activities.  And providing additional protections for employees of essential businesses or reopened business and their customers/clients by increasing facial covering requirements and health checks and temperature screening.

30. This Order is issued to protect the public health as businesses are allowed to reopen by requiring businesses to implement procedures necessary to ensure their employees and customers comply with social distancing, sanitation and screening practices.

31. This Order comes after the release of substantial guidance from the Health Officer, the

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

California Department of Public Health, the CDC, and other public health officials throughout the United States and around the world.

32. The statement of facts and circumstances set forth as justification for each Guidance issued by the California Department of Health Services that is referenced in this Order are hereby accepted and incorporated by reference into this Order.

33. Pursuant to Health and Safety Code section 120175.5 (b) all governmental entities in the county shall take necessary measures within the governmental entity's control to ensure compliance with this Order and to disseminate this Order to venues or locations within the entity's jurisdiction where gatherings may occur.

34. Violation of this Order is subject to fine, imprisonment, or both. (California Health and Safety Code section 120295.)

35. To the extent necessary, this Order may be enforced by the Sheriff or chiefs of police pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029.

ORDER OF THE HEALTH OFFICER AND EMERGENCY REGULATIONS

36. Once this Order takes effect it shall supersede the Order of the Health Officer and Emergency Regulations dated July 29, 2020.

**IT IS SO ORDERED:**

Date: August 7, 2020

Wilma J. Wooten, M.D., M.P.H.
Public Health Officer
County of San Diego

---

EMERGENCY REGULATIONS

As Director of Emergency Services for the County of San Diego, I am authorized to promulgate regulations for the protection of life and property pursuant to Government Code Section 8634 and San Diego County Code section 31.103.  The following shall be in effect for the duration of the Health Officer Order issued above which is incorporated in its entirety by reference:

The Health Officer Order shall be promulgated as a regulation for the protection of life and property.

Any person who violates or who refuses or willfully neglects to obey this regulation is subject to fine, imprisonment, or both.  (Government Code section 8665.)

Date: August 7, 2020

Helen Robbins-Meyer
Chief Administrative Officer
Director of Emergency Services
County of San Diego

**EXHIBIT BB**



Since January 2020 Elsevier has created a COVID-19 resource centre with free information in English and Mandarin on the novel coronavirus COVID-19. The COVID-19 resource centre is hosted on Elsevier Connect, the company's public news and information website.

Elsevier hereby grants permission to make all its COVID-19-related research that is available on the COVID-19 resource centre - including this research content - immediately available in PubMed Central and other publicly funded repositories, such as the WHO COVID database with rights for unrestricted research re-use and analyses in any form or by any means with acknowledgement of the original source. These permissions are granted for free by Elsevier for as long as the COVID-19 resource centre remains active.

Brain, Behavior, and Immunity 88 (2020) 952–953

Contents lists available at ScienceDirect

# Brain, Behavior, and Immunity

journal homepage: www.elsevier.com/locate/ybrbi



## COVID 2019-suicides: A global psychological pandemic



An inspiring editorial by Montemurro (2020) entitled "*The emotional impact of COVID-19: From medical staff to common people*" recently published in the '*Brain, Behavior, and Immunity*' motivated us to pen down a concise yet, informative viewpoint entitled "COVID-2019-suicides: A global psychological pandemic".

24,81,026 is the fearsome and huge number of COVID-19 cases with 1,70,423 deaths being reported from around the world (https://www.worldometers.info/coronavirus/) is complicating the situation and difficult to control. The realization of the non-availability of vaccine and/or effective antiviral drug against SARS-CoV-2 virus, and understanding that social distancing and quarantine/self-isolation is the only available remedy to us, forced the governments of most of the countries to declare the nationwide lock down.

So far the only advice or the option against the disastrous COVID-19 is screening of suspected person for SARS-CoV-2, if comes positive, then quarantine/self-isolation in addition to supportive treatment. However, few cases have been reported around the world where people out of fear of getting COVID-19 infection, social stigma, isolation, depression, anxiety, emotional imbalance, economic shutdown, lack and/or improper knowledge, financial and future insecurities took their lives. With recent suicide reports we can anticipate the rippling effect of this virus on worldwide suicide events. However, the basic psychology and inability of the person and the mass society to deal with the situation are the major factors behind these COVID-19 suicides pandemic.

### 1. Possible factors and predictors

**Social Isolation/distancing** induce a lot of anxiety in many citizens of different country. However, the most vulnerable are those with existing mental health issues like depression and older adults living in loneliness and isolation. Such people are self-judgemental, have extreme suicidal thoughts. Imposed isolation and quarantine disrupts normal social lives and created psychological fear and feeling like trapped, for an indefinite period of time. The first suicidal case was reported from south India on 12th Feb 2020, where Balakrishna, a 50-year-old man wrongly co-related his normal viral infection to COVID-19 (Goyal et al., 2019). Although out of fear and love for his family, he quarantined himself, but later committed suicide, as he was psychologically disturbed after reading COVID-19 related deaths in the newspaper. In Delhi, India, one COVID-19 suspected man admitted in the isolation ward of the Safdarjung Hospital allegedly committed suicide by jumping off the seventh floor of the hospital building (https://economictimes.indiatimes.com/news/politics-and-nation/man-suspected-of-covid-19-commits-suicide/articleshow/74700431.cmsfrom=mdr).    Not    only India, psychosocial distress linked to COVID-19 crises has swept the globe. COVID-19 worries apparently prompted a murder-suicide (https://abc-news.go.com/US/wireStory/authorities-mans-covid-19-worries-prompt-murder-suicide-69997314) in Chicago where Patrick Jesernik shot Cheryl Schriefer before shooting himself. Patrick was in an illusion that two of them had SARS-CoV-2 infection.

**Worldwide lockdown creating economic recession:** The looming economic crisis may create panic, mass unemployment, poverty and homelessness will possibly surge the suicide risk or drive an increase in the attempt to suicide rates in such patients. US already claimed a vast increase in unemployment (4.6 million) during coronavirus emergency and speculated that lockdown will cause more deaths than COVID-19 itself amid the recession (Reger et al., 2020). This uncertainty of time for isolation, not only demoralize but also make people feel worthless, hopeless about present and future as exemplified by the suicide of German Hesse state Finance Minister Thomas Schaefer (https://www.todayonline.com/world/covid-19-german-minister-commits-suicide-after-virus-crisis-worries).

**Stress, anxiety and pressure in medical healthcare professionals** are at immense and at the peak. 50% of the medical staff in the British hospitals are sick, and at home, leaving high pressure on the remaining staff to deal with the situation. In King's College Hospital, London, a young nurse took her own life while treating COVID-19 patients (https://www.wzzm13.com/article/news/local/morning-features/suicide-risks-grow-during-pandemic/69-056e57859-d404-44ad-bf87-c70dad3c6671). Even the forefront warriors, i.e. medical professionals are constantly in close contact with COVID-19 positive and/or quarantined patients while treating them are under psychological trauma. The predictors are constant fear of getting infection, unbearable stress, helplessness and distress watching infected patients die alone.

**Social boycott and discrimination** also added few cases to the list of COVID-19 suicides. Mamun MA et al., 2020 reported the first COVID-19 suicide case in Bangladesh, where Zahidul Islam, a 36-year-old man committed suicide due to social avoidance by the neighbours and his moral conscience to ensure not to pass on the virus to his community (Mamun and Griffths, 2020). Other important cases from around the world have been described in Table 1.

### 2. Dealing with COVID-19 stress

Scientists across the world are trying hard to develop vaccine against SARS-CoV-2, and antivirals like Favipiravir and Ramdesivir are now under phase III clinical trials to treat clinical manifestation of COVID-19 disease. However, a total of 6,46,675 COVID-19 infected patients had already been recovered (https://www.worldometers.info/coronavirus/) and now different approaches need to be implemented to deal with COVID-19 related psychological stress. COVID-19 is a global crisis, so collective efforts are required to deal with this global pandemic. Emotional distress people need to first set the limit of COVID-19 related news consumption from local, national, international, social and digital platform and the sources must be authentic like CDC and WHO. One needs to maintain connectedness and solidarity despite the physical distance.. Individuals with the previous history of suicidal thoughts, panic and stress disorder, low self-esteem and low self-worth, are easily susceptible to catastrophic thinking like suicide in such viral pandemic. Indirect

https://doi.org/10.1016/j.bbi.2020.04.062
Received 21 April 2020; Accepted 22 April 2020
Available online 23 April 2020
0889-1591/© 2020 Elsevier Inc. All rights reserved.

*Brain, Behavior, and Immunity 88 (2020) 952–953*

**Table 1**
Representative cases showing psycological conditions and underlying predictors leading to COVID-19 suicides.

**Factors and predictors for COVID-19 suicides**
**Social Isolation/distancing**

| SN | Case History | Predictors | Reference |
|---|---|---|---|
| 1. | Santosh Kaur, a 65- year-old woman, committed suicide over the fear of the COVID-19. (**India**) | Person was depressed, had anxiety over COVID-19 and was alone. Her fear was just an illusion and there was no one to counsel or to console her. | https://www.tribuneindia.com/news/punjab/anxiety-over-covid-19-leads-to-phagwara womans-suicide-66466 *(Accessed on 7 April 2020)* |
| 2. | Chinese student living in the kingdom of Saudi Arabia had committed suicide by jumping from the 3rd floor of a hospital. (**Saudi Arabia**) | Quarantined on suspicion of being infected with the coronavirus. | https://www.middleeastmonitor.com/20200217-chinese-student-commits-suicide-in-saudi-after-being-quarantined-for-coronavirus/ *(Accessed on 15 April 2020)* |
| 3. | 19-year-old Emily Owen, youngest suicide victim(**Britain**) | Fear of isolation was created just by the announcement of the country lockdown | https://blogs.scientificamerican.com/observations/covid-19-is-likely-to-lead-to-an-increase-in-suicides/ *(Accessed on 8 April 2020)* |
| **Worldwide lockdown creating economic recession** | | | |
| 4. | Finance Minister Thomas Schaefer, 54-year-old economist. (**Germany**) | Could not able to bear and cope with the stress about the economic fallout of COVID-19. Turned him hopeless that he could not able to manage citizen's expectations for financial aid. | https://www.todayonline.com/world/covid-19-german-minister-commits-suicide-after-virus-crisis-worries *(Accessed on 8 April 2020)* |
| **Stress, anxiety and pressure in medical healthcare professionals** | | | |
| 5. | 49-year-old nurse (S.L.) of Jesolo hospital committed suicide by jumping into Piave river (**Italy**) | Lived alone and distressed | https://www.wsws.org/en/articles/2020/03/31/trez-m31.html *(Accessed on 9 April 2020)* |
| 6. | Daniela Trezzi, a 34-year-old nurse of the San Gerardo hospital (**Italy**) | Deeply traumatized, compassion fatigue, emotional burnout, hopelessness, and fear of contracting and spreading the disease to others. | https://www.wsws.org/en/articles/2020/03/31/trez-m31.html *(Accessed on 9 April 2020)* |
| **Social boycott and discrimination** | | | |
| 7. | Mustaffa, a 35-year-old male and Mohammad Dilshad, a 37-year-old male committed suicide. (**India**) | Both were facing social boycott and religious discrimination from their neighbours in the suspicion of positive COVID-19 report. Resulted in isolation, stigma and finally depression. | https://timesofindia.indiatimes.com/city/madurai/stigma-over-covid-testing-blamed-for-mans-suicide/articleshow/74939681.cms *(Accessed on 8 April 2020)* https://www.livemint.com/news/india/facing-social-boycott-covid-19-negative-man-commits-suicide-in-himachal-s-una-11586090515081.html *(Accessed on 9 April 2020)* |

clues need to be noticed with great care, where people often say 'I'm tired of life', 'no one loves me', 'leave me alone' and so on. On suspecting such behaviour in person, we can pull together the people struggling with suicidal ideation to make them feel loved and protective.

Socio-psychology needs and interventions for mental rehabilitation should be designed. Tele-counselling along with, 24x7 crisis response service for emotional, mental and behavioural support need to be implemented. However, majority of the countries are already practicing and implementing these measures. Health care policies and the perception for the COVI-19 health care professionals need to be strengthening as reported from Chinese studies (Li et al., 2020; Kang et al., 2020). Government recommendations to work from home, and travel less advisories restricted our social life, but, we can spend time indoor with our families, connect to friends on social media, and engage in mindfulness activities, till we all win this battle.

**Financial disclosure**

None.

**Declaration of Competing Interest**

The authors declare that they have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper.

**Acknowledgements**

None.

**References**

Montemurro, N., 2020. The emotional impact of COVID-19: From medical staff to common people. Brai, Behav. Immunity. https://doi.org/10.1016/j.bbi.2020.03.032.
https://www.worldometers.info/coronavirus/ (Accessed on 21 April 2020)
Goyal, K., Chauhan, P., Chhikara, K., Gupta, P., Singh, M.P., 2020. Fear of COVID 2019: first suicidal case in India!. Asian J. Psychiatry 49, 101989. https://doi.org/10.1016/j.ajp.2020.101989.
https://economictimes.indiatimes.com/news/politics-and-nation/man-suspected-of-covid-19-commits-suicide/articleshow/74700431.cms?from=mdr (Accessed on 9 April 2020).
https://abcnews.go.com/US/wireStory/authorities-mans-covid-19-worries-prompt-murder-suicide-69997314 (Accessed on 9 April 2020).
Reger, M.A., Stanley, I.H., Joiner, T.E., 2020. Suicide mortality and coronavirus disease 2019- A perfect storm? JAMA. Psychiatry. https://doi.org/10.1001/jamapsychiatry.2020.1060.
https://www.todayonline.com/world/covid-19-german-minister-commits-suicide-after-virus-crisis-worries (Accessed on 8 April 2020).
https://www.wzzm13.com/article/news/local/morning-features/suicide-risks-grow-during-pandemic/69-05657859-d404-44ad-bf87-c70dad3c6671 (Accessed on 9 April 2020).
Mamun, M.A., Griffths, M.D., 2020. First COVID-19 case in Bangladesh due to fear of COVID-19 and xenophobia: possible suicide prevention strategies. Asian J. Psychiatry 51, 102073.
Li, Z., Ge, J., Yang, M., Feng, J., Qiao, M., Jiang, R., et al., 2020. Vicarious traumatization in the general public, member, and non-members of medical teams aiding in COVID-19 control. Brain Behav. Immunity. https://doi.org/10.1016/j.bbi.2020.03.007.
Kang, L., Ma, S., Chen, M., Yang, J., Wang, Y., Li, R., et al., 2020. Impact on mental health and perceptions of psychological care among medical and nursing staff in Wuhan during the 2019 novel coronavirus disease outbreak: a cross-sectional study. Brain Behav. Immunity. https://doi.org/10.1016/j.bbi.2020.03.028.

Vikram Thakur[a,*], Anu Jain[b]
[a] *Department of Virology, Postgraduate Institute of Medical Education and Research, PGIMER, Chandigarh 160012, India*
[b] *Department of Biochemistry, Postgraduate Institute of Medical Education and Research, PGIMER, Chandigarh 160012, India*
*E-mail address:* vik5atif@gmail.com (V. Thakur).

* Corresponding author at: Department of Virology, Postgraduate Institute of Medical Education and Research, PGIMER, Chandigarh, Sector-12, Pin-160012, India.

**EXHIBIT CC**



QJM: An International Journal of Medicine, 2020, 1–6

doi: 10.1093/qjmed/hcaa202
Review

Downloaded from https://academic.oup.com/qjmed/advance-article/doi/10.1093/qjmed/hcaa202/5857612 by guest on 07 August 2020

REVIEW

# The impact of the COVID-19 pandemic on suicide rates

Leo Sher ⓘ [1,2,3]

[1]From the James J. Peters Veterans' Administration Medical Center, 130 West Kingsbridge Road, Bronx, NY 10468, USA, [2]Department of Psychiatry, Icahn School of Medicine at Mount Sinai, 1 Gustave L. Levy Pl, New York, NY 10029, USA and [3]Department of Psychiatry, Columbia University College of Physicians and Surgeons, 1051 Riverside Drive, New York, NY 10032, USA

Address correspondence to Prof. L. Sher, James J. Peters VA Medical Center, 130 West Kingsbridge Road, Bronx, NY 10468, USA. email: leo.sher@mssm.edu

## Summary

Multiple lines of evidence indicate that the coronavirus disease 2019 (COVID-19) pandemic has profound psychological and social effects. The psychological sequelae of the pandemic will probably persist for months and years to come. Studies indicate that the COVID-19 pandemic is associated with distress, anxiety, fear of contagion, depression and insomnia in the general population and among healthcare professionals. Social isolation, anxiety, fear of contagion, uncertainty, chronic stress and economic difficulties may lead to the development or exacerbation of depressive, anxiety, substance use and other psychiatric disorders in vulnerable populations including individuals with pre-existing psychiatric disorders and people who reside in high COVID-19 prevalence areas. Stress-related psychiatric conditions including mood and substance use disorders are associated with suicidal behavior. COVID-19 survivors may also be at elevated suicide risk. The COVID-19 crisis may increase suicide rates during and after the pandemic. Mental health consequences of the COVID-19 crisis including suicidal behavior are likely to be present for a long time and peak later than the actual pandemic. To reduce suicides during the COVID-19 crisis, it is imperative to decrease stress, anxiety, fears and loneliness in the general population. There should be traditional and social media campaigns to promote mental health and reduce distress. Active outreach is necessary, especially for people with a history of psychiatric disorders, COVID-19 survivors and older adults. Research studies are needed of how mental health consequences can be mitigated during and after the COVID-19 pandemic.

## Coronavirus disease pandemic

The coronavirus disease 2019 (COVID-19) pandemic began at the end of 2019 in China and has quickly spread globally.[1] Millions of people around the world are infected and hundreds of thousands have died.[1] The clinical manifestations of COVID-19 vary from asymptomatic forms to severe clinical conditions characterized by respiratory failure, sepsis, septic shock and multiple organ dysfunction syndromes.[1] Understandably, medical professionals and public health specialists are focused on taking care of individuals who are very sick, while containing the coronavirus's spread in the general population. Less attention is given to the psychiatric consequences of the COVID-19 crisis.

Multiple lines of evidence indicate that the COVID-19 pandemic has profound psychological and social effects.[1,2] There is a pervasive awareness of uncertainty over the future and an understanding that the pandemic is far from over. It is possible that there will be economic privation and political upheaval. The psychological sequelae of the pandemic will probably persist for months and years to come. In this article, I suggest that the COVID-19 pandemic may increase the

**Received:** 26 May 2020

© The Author(s) 2020. Published by Oxford University Press on behalf of the Association of Physicians. All rights reserved.
For permissions, please email: journals.permissions@oup.com

Downloaded from https://academic.oup.com/qjmed/advance-article/doi/10.1093/qjmed/hcaa202/5857612 by guest on 07 August 2020

prevalence of psychiatric disorders and suicide rates during and after the pandemic.

## Previous epidemics and suicide

Nothing in our lifetimes can be compared with the magnitude of the COVID 19 disaster. The last comparable crisis was the pandemic of Spanish Flu in 1918 19 caused by H1N1 viruses with genes of avian origin.[3] About 500 million people or one third of the world's population were infected with the Spanish Flu viruses and at least 50 million people perished around the world including about 675 000 in the USA.[3] The Spanish Flu epi demic was associated with an increase in death by suicide.[4] It has been proposed that a decrease in social integration and interaction during the epidemic and the fears caused by the epi demic likely increased suicide.[4] It is important to note that so cial isolation and fears are common during the current COVID 19 epidemic.[2]

There was a significant increase in suicide deaths among people aged 65 and over during the 2003 severe acute respira tory syndrome (SARS) outbreak in Hong Kong.[5] Research indi cates that this increase in suicides can be attributed to fears of contracting the illness, fears of being a burden to the family, general anxiety, social isolation and psychological distress.

## The psychological impact of COVID-19

A number of studies have been performed to examine the effect of the COVID 19 crisis on the mental health of the general popu lation, health care professionals and individuals with psychi atric disorders.[6–16] Wang et al.[6] examined psychological responses during the initial stage of the COVID 19 epidemic in the general population in China. The authors found that 53.8% of 1210 respondents rated the psychological impact of the out break as moderate or severe, 16.5% reported moderate to severe depressive symptoms and 28.8% reported moderate to severe anxiety symptoms. Qiu et al.[7] performed a countrywide survey that included 52 730 people in China during the COVID 19 epi demic and found that about 35% of the participants had psycho logical distress. This is consistent with the results of a recent Kaiser Family Foundation survey indicating that 45% of adults in the USA report that their mental health has been negatively impacted due to worry and stress over the coronavirus.[8]

Li et al.[9] analyzed online posts made by 17 865 Chinese social media customers before and after the declaration of COVID 19 in China on 20 January 2020. The authors observed that negative emotions including anxiety, depression and anger rose, where as the positive emotions and life satisfaction diminished. Xiao et al.[10] studied a relationship between social capital as meas ured by the Personal Social Capital Scale 16 and sleep character istics in person who was isolated during the COVID 19 epidemic. Researchers observed that anxiety was associated with stress and reduced sleep quality, and the combination of anxiety and stress reduced the positive effects of social capital on sleep quality. Xiao et al.[10] wrote that 'anxiety and stress of isolated individuals were at high levels, whereas the sleep qual ity was low.'

Ahmed et al.[11] did an online survey of 1074 Chinese people and found elevated rates of anxiety, depression, harmful alco hol use and decrease in mental wellbeing.[11] Rates of anxiety and depression were higher among young people aged 21 40 years in comparison to other age groups. Huang and Zhao[12] conducted a web based survey of 7236 individuals in China. The overall prevalence of generalized anxiety disorder, depressive symptoms and sleep abnormalities were 35.1%, 20.1% and 18.2%, respectively. This study also showed that health care professionals were more likely to have poor sleep quality in comparison to other occupational groups.

Lai et al.[13] examined a state of mental health of 1257 health care professionals in China. 50.4% of study participants reported depression, 44.6% anxiety, 34.0% insomnia and 71.5% distress. Frontline health care professionals who were taking care of patients with COVID had a higher risk of having symptoms of depression, anxiety, insomnia and distress in comparison to other medical professionals. In March 2020, Ahmed et al.[14] did an online study to examine anxiety and fear of getting infected among dentists. The authors received responses from 669 den tists from 30 countries. An overwhelming majority of study par ticipants reported anxiety and fear of contagion. Some dentists closed their practices for an indefinite period of time.

Hao et al.[15] compared the psychological impact of the COVID 19 epidemic on individuals with or without mood and anxiety disorders. Worries about their physical health, anger, impulsivity and suicidal ideation were significantly higher in psychiatric patients than in healthy controls.

Probably, alcohol consumption increases during the COVID 19 crisis.[2,16] According to a market research firm Nielsen, US sales of alcoholic beverages rose 55% in the week ending 21 March 2020 compared with the same period last year.[16] Online alcohol sales jumped 243%.

Multiple cases of COVID 19 related suicides in the USA, UK, Italy, Germany, Bangladesh, India and other countries have been reported in mass media and psychiatric literature.[17–22] For example, a 19 year old waitress in England died in a hospital after a suicide attempt because of fears of the 'mental health impacts' of isolation.[17] A 66 year old man with throat cancer hanged himself in a New York City hospital after testing posi tive for the coronavirus.[18] A man in Illinois who feared that he and his girlfriend contracted the coronavirus fatally shot his girlfriend and then killed himself.[19] They tested negative for the coronavirus. A 36 year old Bangladeshi man killed himself be cause he grew up in his village thought that he was infected with COVID 19 because he had fever and cold symptoms.[20] A postmortem examination showed that he did not have COVID 19. The 49 year old head of the Emergency Department in a New York City hospital died by suicide after telling her family about the tremendous suffering and death she witnessed while taking care of coronavirus patients.[21] Also, there is a huge in crease of calls to suicide prevention hotlines in the USA during the current COVID 19 epidemic.[22]

In summary, studies indicate that the COVID 19 pandemic is associated with distress, anxiety, fear of contagion, depression and insomnia in the general population. Health care professio nals are especially distressed.

## Suicidal behavior in the COVID-19 era

Social isolation, anxiety, fear of contagion, uncertainty, chronic stress and economic difficulties may lead to the development or exacerbation of stress related disorders and suicidality in vul nerable populations including individuals with pre existing psychiatric disorders, low resilient persons, individuals who reside in high COVID 19 prevalence areas and people who have a family member or a friend who has died of COVID 19 (Figure 1).[23,24] Individuals with pre existing psychiatric disor ders include not only patients who are treated by mental health professionals but also a very large number of people with psy chiatric conditions who do not receive psychiatric

treatment.[25,26] For example, an international study that included the data from countries in Europe, North and South America, Asia and Australia showed that the median untreated rates for schizophrenia, major depression and alcohol use dis order were 32.2%, 56.3% and 78.1%, respectively.[25] Community epidemiological research in the USA shows that a majority of individuals with mood disorders are either untreated or undertreated.[26]

Social isolation contributes to the pathophysiology of psy chiatric disorders and suicidal behavior.[5,27–30] In his famous book on suicide, Durkheim[27] emphasized that social connected ness is a critical factor in emotional health and social stability. The Irish Longitudinal Study on Ageing as well as other research investigations demonstrated that social isolation and loneliness are associated with major depression and generalized anxiety disorder.[28,29] Studies have shown that both objective social iso lation (e.g. living alone) and subjective sense of being alone are associated with suicidal ideation and behavior.[29] These obser vations are consistent across diverse cultures and populations. For example, the Quebec Health Survey showed that living alone and having no friends were associated with both suicidal ideation and suicide attempts.[30] Social disengagement played a role in the increased suicide rate during the 2003 SARS epidemic in Hong Kong.[5] One third of SARS related suicide victims expe rienced social isolation during the SARS outbreak. From a sui cide prevention perspective, it is troubling that the most important public health approach for the COVID 19 epidemic is social distancing.

Anxiety and fear of contagion during the COVID 19 crisis may be related to uncertainty, fear of unknown and panic inducing stories in traditional and social media.[2,23] Repeated ex posure to reports about the COVID crisis can intensify anxiety. Worries and fears cause various mental and physical symptoms and may lead to the development of anxiety disorders, depres sion and sleep disorders.[24] Studies suggest that the relation ships between insomnia and depression and insomnia and anxiety are bidirectional.[31] Sleeplessness contributes to symp toms of depression and anxiety and contrariwise, symptoms of depression and anxiety disturb sleep. Sleep disturbances are a stand alone risk factor for suicidal behavior.[32]

Uncertainty, especially economic uncertainty is associated with stress related disorders and suicide.[2,23,33,34] It has been shown that uncertainty is a more stressful state to be in than really knowing something bad will happen.[35] Uncertainty is associated with depression and anxiety.[33] In one research in vestigation, daily suicide data from England and Wales were matched to a daily economic policy uncertainty index over the period 2001 15.[34] The authors found that a spike in daily eco nomic uncertainty lead to an immediate impact on suicides which suggest that economic uncertainty may lead to an in crease in the risk of suicide.

The impact of economic problems related to the COVID 19 crisis on mental health may be severe. Millions of people around the world lost their jobs.[1,2,23] Measures required to con tain the virus, including self isolation by workers and consum ers, shutting of plants and stores and prohibitions on sports and entertainment events are detrimental for economy. Historically, economic downturns were associated with mental health disor ders and suicides.[36–39] Studies observed that increases in the unemployment rate were associated with higher prevalence of



Figure 1. Suicidal behavior in vulnerable populations in the COVID-19 era.

Downloaded from https://academic.oup.com/qjmed/advance-article/doi/10.1093/qjmed/hcaa202/5857612 by guest on 07 August 2020

depression, alcohol and other substance use disorders and suicide deaths.[36] Both perceived job insecurity and unemployment constitute significant risks of increased depressive symptoms in prospective observational studies.[37] In the USA, suicides increased during the Great Depression.[38] Suicide mortality peaked with unemployment, in the most recessionary years, 1921, 1932 and 1938.[38] Suicide rates also increased in other countries during the Great Depression. For example, Varnik[39] reported a rise in suicide death in Estonia in the early 1930s. Reeves *et al.*[40] observed that almost all European countries have experienced rising suicide rates during the 2008 10 recession. The authors estimated that, in total, there were at least 10 000 more economic suicides during the recession in the European Union, Canada and the USA than would have been expected. Economic decline during and after the COVID 19 pandemic will probably have a powerful and harmful effect on mental health and result in an increase in the prevalence of psychiatric disorders and suicidal behavior. It is important to note that financial problems may reduce access to psychiatric treatment.

There is a high probability that the COVID 19 survivors especially survivors who had severe COVID 19 are at elevated suicide risk.[41] Stressful experiences such as learning about the diagnosis of COVID 19, fear of infecting others, symptoms of the illness, hospitalization, especially admission to an intensive care unit, and loss of income may lead to the development of anxiety, depressive and post traumatic stress disorder.[41,42] A recent study in China indicated that 96.2% of recovering COVID 19 patients had significant posttraumatic stress symptoms.[43] Around 50% of recovered patients remained anxious after the 2003 SARS epidemic in Hong Kong.[44] COVID 19 infection is associated with neurological conditions including acute ischemic stroke, headache, dizziness, ataxia and seizures.[45] A recent review of the impact of the COVID on the brain show that neurological conditions are present in about 25% of the COVID 19 patients.[45] Many recovering COVID patients have physical symptoms including pain for a long time.[46] Neurological disorders such as ischemic stroke, headache and seizures are associated with suicidal behavior.[47] Physical symptoms, especially pain also increase suicide risk.[24,48]

Psychiatric conditions including mood, anxiety, sleep and substance use disorders are associated with suicidal behavior.[24] Studies in the USA suggest that >90% of suicide victims have a psychiatric disorder.[24,49] For example, depression is a major risk factor for suicide, accounting for up to 60% of suicide deaths.[49] Mental health consequences of the COVID 19 crisis including suicidal behavior are likely to be present for a long time and peak later than the actual pandemic.

There is a high probability that suicide rates will increase in many countries of the world. This problem may be especially difficult in the US. Suicide rates have been steadily growing in the USA over the last two decades.[50] From 1999 through 2017, the age adjusted suicide rate in the USA grew 33% from 10.5 to 14.0 per 100 000.[50] For women, the rate grew 53% from 4.0 in 1999 to 6.1 in 2017. For men, the rate grew 26% from 17.8 in 1999 to 22.4 in 2017. If suicide rates increase in the USA, it will add to the trend of rising national rates of suicide. An increase in suicide rates may become a significant public health issue in other countries.

## Suicide prevention in the COVID-19 era

In 1994, the Institute of Medicine (now the National Academy of Medicine) Committee on Prevention of Mental Disorders suggested that prevention of psychiatric conditions should be divided into three categories: universal preventive interventions, selective preventive interventions and indicated preventive interventions.[51,52] Suicide prevention efforts during the COVID 19 crisis can also classified as either universal, selective or indicated.

A universal approach is designed for everyone in the general population regardless of their risk for suicide.[52] To reduce suicides during the COVID 19 crisis it is imperative to decrease stress, anxiety, fears and loneliness in the general population. There should be traditional and social media campaigns to promote mental health and reduce distress. People need to be encouraged to stay connected and maintain relationships by telephone or video, get enough sleep, eat healthy food and exercise. It is vital to deliver community support for those living alone and to encourage families and friends to check in. Screenings for anxiety, depression and suicidal feelings ought to be employed. Transparent, timely and responsible media reporting is absolutely necessary. Community or organizational gatekeepers including clergy, first responders, pharmacists, geriatric caregivers and school employees may have an opportunity to identify individuals at risk for suicide and direct them to proper evaluation and treatment. Suicide prevention help lines should be available and may be very useful in preventing suicides. Integration of basic mental health services into outpatient primary care may help to minimize the harmful psychological effects of the COVID 19 crisis. Whenever possible, governments and non governmental organizations should provide financial support for people in needs. This may include direct cash payments, postponement of loan repayments, tax credits etc.

A selective approach is for subgroups at increased risk for suicide, for example, for individuals with a history of psychiatric disorders, persons with symptoms of significant emotional distress, COVID 19 survivors, frontline health care professionals and elderly people.[52] Active outreach is necessary, especially for people with a history of psychiatric disorders, COVID 19 survivors and older adults. People with psychiatric disorders should be advised to continue their treatment regimens and to stay in touch with their mental health professionals. Some psychiatric patients may need adjustments in their treatment and increased frequency of contact with their mental health clinicians. Telemedicine can improve accessibility of mental health care. Also, vulnerable individuals should be advised to limit watching, reading or listening to traditional and social media news stories.

An indicated approach is designed for individuals who have a risk factor or condition that puts them at very high risk for suicide, e.g. a recent suicide attempt.[52] Individuals in suicidal crises need special attention. Some suicidal persons might not seek help because of fear that attending face to face appointments with a health care professional might put them at risk of contracting COVID 19 or because of other reasons. Therefore, individuals with a recent suicide attempt history need a follow up. Clinicians should have well defined guidelines on how to deal with suicidal individuals.

Suicide prevention in the COVID 19 era is an important and difficult issue. Research studies are needed of how mental health consequences can be mitigated during and after the COVID 19 pandemic. It is to be hoped that the efforts of clinicians, researchers and policy makers will reduce COVID 19 related suicides.

*Conflict of interest.* None declared.

## References

1. Cascella M, Rajnik M, Cuomo A, Dulebohn SC, DiNapoli R. Features, evaluation and treatment coronavirus (COVID 19)

Downloaded from https://academic.oup.com/qjmed/advance-article/doi/10.1093/qjmed/hcaa202/5857612 by guest on 07 August 2020

Downloaded from https://academic.oup.com/qjmed/advance-article/doi/10.1093/qjmed/hcaa202/5857612 by guest on 07 August 2020

[Updated 2020 Apr 6]. In: *StatPearls [Internet]*. Treasure Island, FL: StatPearls Publishing, 2020. https://www.ncbi.nlm.nih.gov/books/NBK554776/.

2. Ornell F, Schuch JB, Sordi AO, Kessler F. "Pandemic fear" and COVID 19: mental health burden and strategies. *Braz J Psychiatry* 2020; **42**:232 35. [Epub ahead of print].

3. Centers for Disease Control and Prevention. *1918 Pandemic (H1N1 Virus)*. https://www.cdc.gov/flu/pandemic resources/1918 pandemic h1n1.html (10 May 2020, date last accessed).

4. Wasserman IM. The impact of epidemic, war, prohibition and media on suicide: United States, 1910 1920. *Suicide Life Threat Behav* 1992; **22**:240 54.

5. Yip PS, Cheung YT, Chau PH, Law YW. The impact of epidem ic outbreak: the case of severe acute respiratory syndrome (SARS) and suicide among older adults in Hong Kong. *Crisis* 2010; **31**:86 92.

6. Wang C, Pan R, Wan X, Tan Y, Xu L, Ho CS, *et al.* Immediate psychological responses and associated factors during the initial stage of the 2019 Coronavirus Disease (COVID 19) epi demic among the general population in China. *Int J Environ Res Public Health* 2020; **17**:1729.

7. Qiu J, Shen B, Zhao M, Wang Z, Xie B, Xu Y. A nationwide sur vey of psychological distress among Chinese people in the COVID 19 epidemic: implications and policy recommenda tions. *Gen Psychiatr* 2020; **33**:e100213.

8. Panchal N, Kamal R, Orgera K, Cox C, Garfield R, Hamel L, *et al. The Implications of COVID 19 for Mental Health and Substance Use*. Kaiser Family Foundation. 21 April 2020. https://www.kff.org/coronavirus covid 19/issue brief/the implications of covid 19 for mental health and substance use/ (14 May 2020, date last accessed).

9. Li S, Wang Y, Xue J, Zhao N, Zhu T. The impact of COVID 19 epidemic declaration on psychological consequences: a study on active Weibo users. *Int J Environ Res Public Health* 2020; **17**:2032.

10. Xiao H, Zhang Y, Kong D, Li S, Yang N. Social capital and sleep quality in individuals who self Isolated for 14 days during the Coronavirus Disease 2019 (COVID 19) outbreak in January 2020 in China. *Med Sci Monit* 2020; **26**:e923921.

11. Ahmed MZ, Ahmed O, Aibao Z, Hanbin S, Siyu L, Ahmad A. Epidemic of COVID 19 in China and associated psychological problems. *Asian J Psychiatr* 2020; **51**:102092.[Epub ahead of print].

12. Huang Y, Zhao N. Generalized anxiety disorder, depressive symptoms and sleep quality during COVID 19 outbreak in China: a web based cross sectional survey. *Psychiatry Res* 2020; **288**:112954. [Epub 12 April 2020].

13. Lai J, Ma S, Wang Y, Cai Z, Hu J, Wei N, *et al.* Factors associated with mental health outcomes among health care workers exposed to Coronavirus Disease 2019. *JAMA Netw Open* 2020; **3**:e203976.

14. Ahmed MA, Jouhar R, Ahmed N, Adnan S, Aftab M, Zafar MS, *et al.* Fear and practice modifications among dentists to com bat novel Coronavirus Disease (COVID 19) outbreak. *Int J Environ Res Public Health* 2020; **17**:2821.

15. Hao F, Tan W, Jiang L, Zhang L, Zhao X, Zou Y, *et al.* Do psychi atric patients experience more psychiatric symptoms during COVID 19 pandemic and lockdown? A case control study with service and research implications for immunopsychia try. *Brain Behav Immun* 2020;**S0889 1591**:30626 7. [Epub ahead of print].

16. Associated Press. *Booze Buying Surges; Senators Push Airlines for Cash Refunds*. 31 March 2020. https://apnews.com/c407ecb931 c6c528b4cceb0ecc216f0c (7 May 2020, date last accessed).

17. Miller JR. British teen dies after suicide attempt due to cor onavirus fears. *New York Post*, 25 March 2020. https://nypost.com/2020/03/25/british teen dies after suicide attempt due to coronavirus fears/.

18. Moore T, Bensimon O. Man with cancer commits suicide at NYC hospital after getting coronavirus. *New York Post*, 27 March 2020. https://nypost.com/2020/03/27/man with can cer commits suicide at nyc hospital after getting corona virus/.

19. Garger K. Illinois couple dead in murder suicide after man feared they had coronavirus. *New York Post*, 7 April 2020. https://nypost.com/2020/04/07/illinois couple dead after man feared they had covid 19/.

20. Mamun MA, Griffiths MD. First COVID 19 suicide case in Bangladesh due to fear of COVID 19 and xenophobia: possible suicide prevention strategies [published online ahead of print, 2020 Apr 7]. *Asian J Psychiatr* 2020; **51**:102073.

21. Rosner E, Sheehy K. Top Manhattan ER doc commits suicide, shaken by coronavirus onslaught. *New York Post*, 27 April 2020. https://nypost.com/2020/04/27/manhattan er doc lorna breen commits suicide shaken by coronavirus/.

22. Dunmore R. Coronavirus related suicides surface amid increased anxiety. *Newsone*, April 2020. https://www.google.com/amp/s/newsone.com/3921332/coronavirus related sui cides amid anxiety/amp/.

23. Lieberman JA, Olfson M. Meeting the Mental Health Challenge of the COVID 19 Pandemic. *Psychiatric Times*, 24 April 2020. https://www.psychiatrictimes.com/coronavirus/meeting mental health challenge covid 19 pandemic.

24. Sher L. Resilience as a focus of suicide research and preven tion. *Acta Psychiatr Scand* 2019; **140**:169 80. [Epub 20 June 2019].

25. Kohn R, Saxena S, Levav I, Saraceno B. The treatment gap in mental health care. *Bull World Health Organ* 2004; **82**:858 66. [Epub 14 December 2004].

26. Kessler RC, Merikangas KR, Wang PS. Prevalence, comorbid ity, and service utilization for mood disorders in the United States at the beginning of the twenty first century. *Annu Rev Clin Psychol* 2007; **3**:137 58.

27. Durkheim E. *Suicide. A study in Sociology*. California: Snowball Publ., 2012, pp. 297 325.

28. Domènech Abella J, Mundó J, Haro JM, Rubio Valera M. Anxiety, depression, loneliness and social network in the eld erly: longitudinal associations from The Irish Longitudinal Study on Ageing (TILDA). *J Affect Disord* 2019; **246**:82 8. [Epub 17 December 2018].

29. Calati R, Ferrari C, Brittner M, Oasi O, Olié E, Carvalho AF, *et al.* Suicidal thoughts and behaviors and social isolation: a narra tive review of the literature. *J Affect Disord* 2019; **245**:653 67. [Epub 7 November 2018].

30. Stravynski A, Boyer R. Loneliness in relation to suicide idea tion and parasuicide: a population wide study. *Suicide Life Threat Behav* 2001; **31**:32 40.

31. Mason EC, Harvey AG. Insomnia before and after treatment for anxiety and depression. *J Affect Disord* 2014; **168**:415 21.

32. Bernert RA, Nadorff MR. Sleep disturbances and suicide risk. *Sleep Med Clin* 2015; **10**:35 9.

33. Ahn S, Lee J, Chu SH, Sohn YH. Uncertainty and depression in people with Parkinson's disease: a cross sectional study. *Nurs Health Sci* 2017; **19**:220 7. [Epub 29 March 2017].

34. Vandoros S, Avendano M, Kawachi I. The association be tween economic uncertainty and suicide in the short run. *Soc Sci Med* 2019; **220**:403 10.

**6** | *QJM: An International Journal of Medicine*, 2020, Vol. 0, No. 0

35. de Berker AO, Rutledge RB, Mathys C, Marshall L, Cross GF, Dolan RJ, *et al*. Computations of uncertainty mediate acute stress responses in humans. *Nat Commun* 2016; 7:10996.

36. Martin Carrasco M, Evans Lacko S, Dom G, Christodoulou NG, Samochowiec J, González Fraile E, *et al*. EPA guidance on mental health and economic crises in Europe. *Eur Arch Psychiatry Clin Neurosci* 2016; 266:89 124.

37. Kim TJ, von dem Knesebeck O. Perceived job insecurity, un employment and depressive symptoms: a systematic review and meta analysis of prospective observational studies. *Int Arch Occup Environ Health* 2016; 89:561 73.

38. Tapia Granados JA, Diez Roux AV. Life and death during the Great Depression. *Proc Natl Acad Sci USA* 2009; 106:17290 5.

39. Värnik A. Suicide in Estonia. *Acta Psychiatr Scand* 1991; 84: 229 32.

40. Reeves A, McKee M, Stuckler D. Economic suicides in the Great Recession in Europe and North America. *Br J Psychiatry* 2014; 205:246 7.

41. Sher L. Are COVID 19 survivors at increased risk for suicide? *Acta Neuropsychiatr* 2020; 1. doi: 10.1017/neu.2020.21. [Online ahead of print].

42. McGiffin JN, Galatzer Levy IR, Bonanno GI. the intensive care unit traumatic? What we know and don't know about the in tensive care unit and posttraumatic stress responses. *Rehabil Psychol* 2016; 61:120 31.

43. Bo HX, Li W, Yang Y, Wang Y, Zhang Q, Cheung T, *et al*. Posttraumatic stress symptoms and attitude toward crisis mental health services among clinically stable patients with COVID 19 in China. *Psychol Med* 2020. doi: 10.1017/S0033291720000999. [Epub ahead of print]

44. Tsang HW, Scudds RJ, Chan EY. Psychosocial impact of SARS. *Emerg Infect Dis* 2004; 10:1326 27.

45. Asadi Pooya AA, Simani L. Central nervous system manifes tations of COVID 19: a systematic review. *J Neurol Sci* 2020; 413:116832. [Epub ahead of print].

46. D'Ambrosio A. COVID 19 sequelae can linger for weeks. *MedPage Today*, 13 May 2020. https://www.medpagetoday.com/infectiousdisease/covid19/86482.

47. Hudzik TJ, Marek GJ. (2014) Neurological disease and suicidal behavior. In: Cannon KE, Hudzik TJ, eds. *Suicide: Phenomenology and Neurobiology*. Springer International Publishing, Cham, Switzerland.

48. Ahmedani BK, Peterson EL, Hu Y, Rossom RC, Lynch F, Lu CY, *et al*. Major physical health conditions and risk of suicide. *Am J Prev Med* 2017; 53:308 15. [Epub 12 June 2017].

49. Mann JJ, Apter A, Bertolote J, Beautrais A, Currier D, Haas A, *et al*. Suicide prevention strategies: a systematic review. *JAMA* 2005; 294:2064 74.

50. Hedegaard H, Curtin SC, Warner M. Suicide mortality in the United States, 1999 2017. *NCHS Data Brief* 2018; 330:1 8.

51. Muñoz RF, Mrazek PJ, Haggerty RJ. Institute of Medicine Report on Prevention of Mental Disorders. Summary and Commentary. *Am Psychologist* 1996; 51:1116 22.

52. Sher L. Preventing suicide. *QJM* 2004; 97:677 80.

Downloaded from https://academic.oup.com/qjmed/advance-article/doi/10.1093/qjmed/hcaa202/5857612 by guest on 07 August 2020

**EXHIBIT DD**



## Viewpoint

ONLINE FIRST   FREE

April 10, 2020

# Suicide Mortality and Coronavirus Disease 2019—A Perfect Storm?

Mark A. Reger, PhD[1,2]; Ian H. Stanley, MS[1,3]; Thomas E. Joiner, PhD[3]

> Author Affiliations | Article Information

*JAMA Psychiatry.* Published online April 10, 2020. doi:10.1001/jamapsychiatry.2020.1060

S uicide rates have been rising in the US over the last 2 decades  The latest data available (2018) show the highest age-adjusted suicide rate in the US since 1941.[1] It is within this context that coronavirus disease 2019 (COVID-19) struck the US. Concerning disease models have led to historic and unprecedented public health actions to curb the spread of the virus. Remarkable social distancing interventions have been implemented to fundamentally reduce human contact  While these steps are expected to reduce the rate of new infections, the potential for adverse outcomes on suicide risk is high. Actions could be taken to mitigate potential unintended consequences on suicide prevention efforts, which also represent a national public health priority.

Advertisement



## COVID-19 Public Health Interventions and Suicide Risk

Secondary consequences of social distancing may increase the risk of suicide. It is important to consider changes in a variety of economic, psychosocial, and health-associated risk factors.

### Economic Stress

There are fears that the combination of canceled public events, closed businesses, and shelter in place strategies will lead to a recession. Economic downturns are usually associated with higher suicide rates compared with periods of relative prosperity.[2] Since the COVID-19 crisis, businesses have faced adversity

and laying off employees Schools have been closed for indeterminable periods, forcing some parents and guardians to take time off work. The stock market has experienced historic drops, resulting in significant changes in retirement funds. Existing research suggests that sustained economic stress could be associated with higher US suicide rates in the future.

## Social Isolation

Leading theories of suicide emphasize the key role that social connections play in suicide prevention. Individuals experiencing suicidal ideation may lack connections to other people and often disconnect from others as suicide risk rises.[3] Suicidal thoughts and behaviors are associated with social isolation and loneliness [3] Therefore, from a suicide prevention perspective, it is concerning that the most critical public health strategy for the COVID-19 crisis is social distancing. Furthermore, family and friends remain isolated from individuals who are hospitalized, even when their deaths are imminent. To the extent that these strategies increase social isolation and loneliness, they may increase suicide risk.

## Decreased Access to Community and Religious Support

Many Americans attend various community or religious activities. Weekly attendance at religious services has been associated with a 5-fold lower suicide rate compared with those who do not attend.[4] The effects of closing churches and community centers may further contribute to social isolation and hence suicide.

## Barriers to Mental Health Treatment

Health care facilities are adding COVID-19 screening questions at entry points. At some facilities, children and other family members (without an appointment) are not permitted entry. Such actions may create barriers to mental health treatment (eg, canceled appointments associated with child restrictions while school is canceled). Information in the media may also imply that mental health services are not prioritized at this time (eg, portrayals of overwhelmed health care settings, canceled elective surgeries). More overcrowded emergency departments may negatively affect services for survivors of suicide attempt Reduced access to mental health care could negatively affect patients with suicidal ideation

## Illness and Medical Problems

Exacerbated physical health problems could increase risk for some patients, especially among older adults, in whom health problems are associated with suicide. One patient illustrated the psychological toll of COVID 19 symptoms when he told his clinician, "'I feel like (you) sent me home to die "[5]

## Outcomes of National Anxiety

8/7/2020 Suicide Mortality and Coronavirus Disease 2019—A Perfect Storm? | Depressive Disorders | JAMA Psychiatry | JAMA Network

Case 3:20-cv-00865-BAS-AHG Document 53-3 Filed 08/10/20 PageID.8132 Page 131 of 255

It is possible that the 24/7 news coverage of these unprecedented events could serve as an additional stressor, especially for individuals with preexisting mental health problems. The outcomes of national anxiety on an individual's depression, anxiety, and substance use deserve additional study.

## Health Care Professional Suicide Rates

Many studies document elevated suicide rates among medical professionals [6] This at risk group is now serving in the front lines of the battle against COVID-19. A national discussion is emerging about health care workers' concerns about infection, exposure of family members, sick colleagues, shortages of necessary personal protective equipment, overwhelmed facilities, and work stress. This special population deserves support and prevention services

## Firearm Sales

Many news outlets have reported a surge in US gun sales as COVID-19 advances. Firearms are the most common method of suicide in the US, and firearm ownership or access and unsafe storage are associated with elevated suicide risk [7] In this context, issues of firearm safety for suicide prevention are increasingly relevant.

## Seasonal Variation in Rates

In the northern hemisphere, suicide rates tend to peak in the late spring and early summer  The fact that this will probably coincide with peak COVID-19 prevention efforts is concerning and deserves additional study.

# Suicide Prevention Opportunities

Despite challenges, there are opportunities to improve suicide prevention efforts in this unique time Maintenance of some existing efforts is also possible.

## Physical Distance, Not Social Distance

Despite its name, social distancing requires physical space between people, not social distance  Efforts can be made to stay connected and maintain meaningful relationships by telephone or video, especially among individuals with substantial risk factors for suicide. Social media solutions can be explored to facilitate these goals.

## Tele-Mental Health



There is national momentum to increase the use of telehealth in response to COVID 19 Unfortunately, tele–mental health treatments for individuals with suicidal ideation have lagged far behind the telehealth field. Opportunities to increase the use of evidence-based treatments for individuals with suicidal thoughts have been noted for years, especially in rural settings, but fear of adverse events and lawsuits have paralyzed the field Disparities in computer and high speed internet access must also be addressed Research, culture change, and potentially even legislative protections are needed to facilitate delivery of suicide prevention treatments to individuals who will otherwise receive nothing.

## Increase Access to Mental Health Care

As COVID 19 precautions develop in health care settings, it is essential to consider the management of individuals with mental health crises. Screening and prevention procedures for COVID-19 that might reduce access to care (eg, canceled appointments, sending patients home) could include screening for mental health crises; clinical staff would be needed to some degree in settings that may currently relegate COVID 19 symptom screening to administrative staff Also, rather than sending a patient with a child home, alternative treatment settings could be considered (eg, a private space outside).

## Distance-Based Suicide Prevention

There are evidence-based suicide prevention interventions that were designed to be delivered remotely. For example, some brief contact interventions (telephone based outreach)[8] and the Caring Letters intervention (in which letters are sent through the mail)[9] have reduced suicide rates in randomized clinical trials. Follow-up contact may be especially important for individuals who are positive for COVID-19 and have suicide risk factors.

## Media Reporting

Because of suicide contagion, media reports on this topic should follow reporting guidelines and inthe National Suicide Prevention Lifeline (1-800-273-TALK). The hotline remains open.

# Optimistic Considerations

There may be a silver lining to the current situation. Suicide rates have declined in the period after past national disasters (eg, the September 11, 2001, terrorist attacks). One hypothesis is the so-called pulling-together effect, whereby individuals undergoing a shared experience might support one another, thus strengthening social connectedness Recent advancements in technology (eg, video conferencing) might facilitate pulling together. Epidemics and pandemics may also alter one's views on health and mortality, making life more precious, death more fearsome, and suicide less likely.

8/7/2020 Suicide Mortality and Coronavirus Disease 2019—A Perfect Storm? | Depressive Disorders | JAMA Psychiatry | JAMA Network

Case 3:20-cv-00865-BAS-AHG Document 53-3 Filed 08/10/20 PageID.8134 Page 133 of 255

## Conclusions

Concerns about negative secondary outcomes of COVID-19 prevention efforts should not be taken to imply that these public health actions should not be taken  However, implementation should include a comprehensive approach that considers multiple US public health priorities, including suicide prevention. There are opportunities to enhance suicide prevention services during this crisis.

## Article Information

Back to top

**Corresponding Author:** Mark A  Reger, PhD, VA Puget Sound Health Care System, 1660 S Columbian Way (S-116), Seattle, WA 98108 (mark.reger@va.gov).

**Published Online:** April 10, 2020. doi:10.1001/jamapsychiatry.2020.1060

**Conflict of Interest Disclosures:** None reported

**Disclaimer:** The views expressed in this article are those of the authors and do not necessarily reflect the position or policy of the Department of Veterans Affairs or University of Washington.

## References

1. Drapeau  CW, McIntosh  JL. U.S.A. suicide: 2018 official final data. Published 2020. Accessed April 1, 2020. https://suicidology.org/wp-content/uploads/2020/02/2018datapgsv2_Final.pdf

2. Oyesanya  M, Lopez-Morinigo  J, Dutta  R.  Systematic review of suicide in economic recession.  *World J Psychiatry*. 2015;5(2):243-254. doi:10.5498/wjp.v5.i2.243
   PubMed  |  Google Scholar  |  Crossref

3. Van Orden  KA, Witte  TK, Cukrowicz  KC, Braithwaite  SR, Selby  EA, Joiner  TE  Jr.  The interpersonal theory of suicide.  *Psychol Rev*. 2010;117(2):575-600. doi:10.1037/a0018697
   PubMed  |  Google Scholar  |  Crossref

4. VanderWeele TJ, Li  S, Tsai  AC, Kawachi  I   Association between religious service attendance and lower suicide rates among US women   *JAMA Psychiatry*  2016;73(8)  845  851  doi 10 1001/jamapsychiatry 2016 1243
   Article  |  PubMed  |  Google Scholar  |  Crossref

5. CBS News. Coronavirus patients describe symptoms. Published 2020. Accessed March 19, 2020. https://www.cbsnews.com/news/coronavirus-symptoms-fever-dry-cough-shortness-of-breath/



8/7/2020　Suicide Mortality and Coronavirus Disease 2019—A Perfect Storm? | Depressive Disorders | JAMA Psychiatry | JAMA Network

Case 3:20-cv-00865-BAS-AHG　Document 53-3　Filed 08/10/20　PageID.8135　Page 134 of 255

6. Dutheil  F, Aubert  C, Pereira  B,  et al.  Suicide among physicians and health-care workers.  *PLoS One*. 2019;14(12):e0226361. doi:10.1371/journal.pone.0226361
   PubMed  |  Google Scholar

7. Mann  JJ, Michel  CA.  Prevention of firearm suicide in the United States.  *Am J Psychiatry*. 2016;173(10):969-979. doi:10.1176/appi.ajp.2016.16010069
   PubMed  |  Google Scholar  |  Crossref

8. Fleischmann  A, Bertolote  JM, Wasserman  D,  et al.  Effectiveness of brief intervention and contact for suicide attempters.  *Bull World Health Organ*. 2008;86(9):703-709. doi:10.2471/BLT.07.046995
   PubMed  |  Google Scholar  |  Crossref

9. Motto  JA, Bostrom  AG   A randomized controlled trial of postcrisis suicide prevention   *Psychiatr Serv*  2001;52(6) 828 833  doi 10 1176/appi ps 52 6 828
   PubMed  |  Google Scholar  |  Crossref

**Comment**

**2 Comments for this article**　　　　　　　　　　　　　　　　　　　　**EXPAND ALL**

April 14, 2020

**Suicide Mortality and Coronavirus Disease 2019–Addressing Heavy Drinking is a Prevention Opportunity Not to be Ignored**

**Shannon Lange, PhD** | Institute for Mental Health Policy Research, Centre for Addiction and Mental Health, Toronto ON, Canada

Shannon Lange PhD1*, Michael Roerecke PhD1, & Jürgen Rehm PhD1

1Institute for Mental Health Policy Research, Centre for Addiction and Mental Health, Toronto ON, Canada

As Reger and colleagues [1] accurately point out, an epidemic, and in the case of the coronavirus disease 2019 a pandemic, does not directly lead to suicide mortality, but rather, it creates a situation in which the potential for suicide is high. There are a number of risk factors for suicide that can become more prevalent during a pandemic, one of particular importance being heavy drinking. Heavy drinking may increase during such times. ...

READ MORE

PDF

Help

June 17, 2020

**Losing the Will to Live....**

**Melinda Huffman, BSN,MSN,CCNS,CHC** | National Society of Health Coaches

Thank you for this article!

Long Term Care facilities, especially assisted living where residents are often moderately independent and live in apartment-style units decorated like their homes, have residents in some cases having "lost their will to live". This includes residents who were active and enjoyed life prior. The concern of executive management about their facility's liability for a Covid "outbreak"has caused severe lockdowns that confine these residents to their rooms for days and days without regular fresh air, sunshine, exercise, or socialization. Food is brought to them.

The management teams of these facilities (how many we don't know) are ...

**READ MORE**

## See More About

( Coronavirus (COVID19) )  ( Infectious Diseases )  ( Psychiatry )  ( Public Health )

( Pulmonary Medicine )  ( Suicide )

 **Coronavirus Resource Center**

### SCHEDULED MAINTENANCE

Our websites may be periodically unavailable between 12:00 AM CT and 12:00 PM CT on August 8, 2020 regularly scheduled maintenance.

PDF

Help

## Trending

**Opinion**

Religious Service Attendance and Despair Among Health Professionals—A Catalyst for New Avenues of Inquiry

*July 1, 2020*

### Research 

Religious Service Attendance and Deaths Related to Drugs, Alcohol, and Suicide in US Health Care Professionals

*July 1, 2020*

### Research

Trends in the Incidence and Lethality of Suicidal Acts in the United States

*July 1, 2020*

**Select Your Interests**

Advertisement



**Coronavirus (COVID-19) Resource Center**

PDF

Help

---

## JOB LISTINGS ON JAMA CAREER CENTER®

**Primary Care Opportunities Near Boston, MA**
Lynn, Massachusetts

**System Chief, Division of Neonatology**
New York City, New York

**Improvement & Implementation Science Faculty Position**
Cincinnati, Ohio

Tenure-Track Clinical Associate Professor/Clinical Assistant

Professor (several posts)

Hong Kong (HK)

Academic Pediatric Otolaryngologist Opportunity in Southern

California

Loma Linda, California

See more at JAMA Career Center

## Others Also Liked

**The COVID 19 Pandemic: ASCO Addresses Ethical Considerations for the Allocation of Scarce Resources to Patients With Cancer** ⬀

Susan Moench, Hematology Advisor, 2020

**COVID-19: Underserved Populations Disproportionately Affected by Delay of Nonessential Procedures** ⬀

Jessica Nye, Gastroenterology Advisor, 2020

**ACR Issues Clinical Guidance for Pediatric Patients With Rheumatic Disease During the COVID 19 Pandemic** ⬀

Rheumatology Advisor, 2020





## Trending

**Association of Childhood Maltreatment With Suicide Behaviors Among Young People**

JAMA Network Open | *Research* | *August 5, 2020*

**Religious Service Attendance and Despair Among Health Professionals—A Catalyst for New Avenues of Inquiry**

JAMA Psychiatry | *Opinion* | *July 1, 2020*

**Religious Service Attendance and Deaths Related to Drugs, Alcohol, and Suicide in US Health Care Professionals**

JAMA Psychiatry | *Re earch* | *July 1, 2020*

8/7/2020 Severe Coronavirus Infections in Pregnancy: Intersecting Complexities of SARS-CoV-2 and Psychiatry | Infectious Diseases | JAMA Psychiatry | JAMA Network

Case 3:20-cv-00865-BAS-AHG Document 50-3 Filed 08/10/20 PageID.8130 Page 138 of 255



**EXHIBIT EE**

 **Los Angeles Apparel factory ordered closed after over 300 coronavirus cases and 4 deaths**

By Sarah Moon and Jon Passantino, CNN

Updated 8 07 AM ET, Sat July 11, 2020

(CNN) — A garment manufacturer in downtown Los Angeles with over 300 confirmed coronavirus cases among

 • LIVE TV  

The Los Angeles Apparel had three deaths in June and one in July, prompting an investigation, the Los Angeles County Department of Public Health announced in a tatement

The death of four dedicated garment worker i heartbreaking and tragic," aid Dr Barbara Ferrer of the Lo Angeles County Department of Public Health. "Business owners and operators have a corporate, moral and social esponsibility to their employees and their families to provide a safe work environment."

Los Angeles Apparel was founded in 2016 by Dov Charney, who previously founded American Apparel. It was first shut down on June 27 after violating the county's mandatory health orders. The company failed to cooperate with the health department' inve tigation of a reported coronaviru outbreak, health official aid

On June 19, a concerned healthcare provider notified county health officials of a possible outbreak at the garment factory, it said. The health department said despite its multiple requests for a list of all employees, Los Angeles Apparel failed to provide it and reported 151 ca e that week

The li t wa a "crucial tool" needed by the health department to compare it to testing results and determine the extent of the outbreak. "It allows DPH to track employees against DPH's list of confirmed positive or negative Covid-19 individuals received from te ting lab ," the health department aid

**Related Article:** Expert warns the US is approaching 'one of the most unstable times in the history of our country'

When in pector vi ited the factory on June 26, they observed multiple violations of physical distancing requirements and infection control protocols, including the use of cardboard as a barrier between the workers, the health department aid

o Angele Apparel wa given detailed in truction on tep that had to be taken for reopening

On July 4, the health department received an incomplete li t of all employee at the company with 198 po itive esults reported. The health department then used that list to compare with results from laboratories and determined that as of July 10, there were more than 300 positive cases at the site.

While the county's department of public health sent a letter to the company saying only employees who tested positive on or before June 26 could return to work if they had no symptoms, Los Angeles Apparel reopened with ew employee and violated the health officer' order

At thi time, Lo Angele Apparel i under order to remain clo ed until they can how that the facility i in full compliance with Public Health mandates," the health department said.

n a phone interview with CNN on Friday night, Charney fiercely disputed the allegations from the health department, saying officials are operating in "bad faith" and "looking for scapegoats," and suggested the decision to shut down the factory was "political."

Charney said the clothing maker had erected cardboard barrier between worker to reduce pread of the viru , but insisted that the company was not told the material did not comply with health orders. Instead, he blamed health officials for what he described as a lack of clear instruction for employer to keep worker afe, calling it "poor practice on their part."

And while the health department had ordered Los Angeles Apparel to only allow workers back into the factory who had

 

● LIVE TV

**Related Article:** These California doctors flew to New York to fight Covid-19. Here's what they learned.

"Ab olutely, we brought in new employee ," Charney aid "What company can't hire new employees? No one said do not hire new employees."

Charney read aloud a letter to CNN that he received from the county health department that stated only employees who had previously tested positive and been free of symptom could return to work at the factory

Charney al o di puted the a ertion that the company had attempted to prevent health official from entering the factory for inspection, saying they were only asked to wait until the firm's legal counsel could arrive on site.

"We never said they couldn't come in," Charney said. "We never, ever didn't let them in."

Charney said he was aware that a number of the company's employees had been infected with the virus and died, though he ugge ted employee could have been e po ed to the virus elsewhere.

"A gentleman who worked with me for 15, 20 years," recently died from complications of Covid-19, he said. "We're all in tears. But I don't know how he got it. His wife also got it. And if he got it here, of cour e it' horrifying But I can't think that everyone just got it here."

**Related Article:** New WHO report says airborne coronavirus transmission cannot be ruled out' in outbreaks in some indoor settings

And while Charney blamed the county for a lack of testing and contact tracing, he said the company would be working with officials to reopen the factory again.

"Could I have done things differently? Of course, with 2020 hind ight I have ome new idea ," he aid "I would have arranged testing from the start, every week. I would have fought for more testing earlier."

Los Angeles is part of the recent resurgence of coronavirus cases. California has recorded more than 300,000 coronavirus cases -- 40% of which are in Los Angeles County. The state has also reached record highs in hospitalizations and ICU rates with well over 6,000 patients being treated.

Search CNN...

US

**EXHIBIT FF**

Dean R. Broyles, Esq., CA Bar No. 179535
dbroyles@nclplaw.org
NATIONAL CENTER FOR LAW & POLICY
539 West Grand Avenue
Escondido, California 92025
Tel:  (760) 747-4529
Fax: (760) 747-4505


Robert H. Tyler, Esq., CA Bar No. 179572
rtyler@tylerbursch.com
Nada N. Higuera, Esq. CA Bar No. 299819
nhiguera@tylerbursch.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Tel:   (951) 600-2733
Fax:  (951) 600-4996

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

# SACREAMENTO DIVISION

| | |
|---|---|
| **CROSS CULTURE CHRISTIAN CENTER**, a California Non-Profit Corporation; **PASTOR JONATHAN DUNCAN**, an individual<br><br>        Plaintiffs,<br><br>    vs.<br><br>**GAVIN NEWSOM**, in his official capacity as Governor of California; **XAVIER BECERRA**, in his official capacity as the Attorney General of California; **SONIA ANGELL**, in her official capacity as | Case No.:<br><br>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**1**

**VERIFIED COMPLAINT**

California Public Health Officer; **MAGGIE PARK**, in her official capacity as Public Health Officer, San Joaquin County; **MARCIA CUNNINGHAM**, in her official capacity as Director of Emergency Services, San Joaquin County; **CITY OF LODI**; **TOD PATTERSON**, in his official capacity as Chief of Police of Lodi, California,

                    Defendants.

## PRELIMINARY STATEMENT

1.     Civil rights are not suspended by a virus. Fundamental and unalienable rights are, by their very nature, "essential."  Yet the State of California has, in a sweeping abuse of its power, criminalized all religious assembly and communal religious worship while allowing citizens to gather at a liquor store, pot-dispensary, Planned Parenthood, Walmart, CVS, Costco, Home Depot, and many other locations which are deemed "essential."  This is not a hypothetical situation from an Orwellian novel describing a bleak future—this is the current and very real nightmare endured by millions of religious citizens who maintain the conviction that the faithful practice of regularly gathering together is absolutely "essential."  The state's flagrant abuse of authority violates Plaintiffs' and other citizens' fundamental and unalienable civil rights, including the free exercise of religion, right to assemble, freedom of speech, and equal protection of the law, in violation of the U.S. and California constitutions. The mass criminalization of religious gatherings was dismissively and causally accomplished by the state and local government's abuse of its discretion in issuing orders relating to COVID-19. The state fails to articulate or support the implicit assertion that the complete prohibition of religious gatherings due to their "non-essential' status is the least restrictive means to accomplish its compelling interests.  In contrast, many other establishments are permitted to continue operations if they carefully follow Centers for Disease Control and Prevention ("CDC") social distancing

guidelines.  Simultaneously, the state maintains a near endless list of commercial establishments as "essential" wherein people have been freely gathering and where social distancing is impracticable or impossible.  At the least, churches, similar to Cross Culture Christian Center, should be permitted to gather so long as they abide by the CDC's social distancing guidelines.

2.     The state does not have the authority to disregard well-established religious tenets relating to gatherings and method of worship.  Despite the absence of authority, California has limited all religious institutions to one mode of worship only: live streaming services on the internet. Plaintiff Cross Culture Christian Center's (the "Church") protected First Amendment activity-the gathering together of a religious congregation- has been criminalized in spite of the Church carefully following the social distancing guidelines promulgated by the CDC.  "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Church of the Lukumi Balalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1990).  The state's ban is openly targeted at religious gatherings while permitting similar gatherings for "essential" entities.

3.     On or about April 3, 2020, San Joaquin County issued a specific stay-at-home order targeting the Church.  The order completely prohibited "non-essential" uses of the Church building as well as the entire parking lot. At the same time, a purportedly "essential" day care center on the same Church property is able to continue to operate on-site.  The Church is therefore banned even from making video recordings for church services streamed over the internet.  If the Church wanted to have a "drive-in service," which is also permissible under Governor Gavin Newsom's stay-at-home Executive Order N-33-20 dated March 19, 2020 ("State Order), it is prohibited from doing so by the April 3, 2020 County Order.  This absolute government ban on any and all of the Church's religious worship activity is "'beyond all reason' unconstitutional." *On Fire*

*Christian Center, Inc. v. Fischer*, No. 3:20-cv-264-JRW at *3 (W.D. Ky. Apr. 11, 2020), quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905).

4. The seeds of this litigation were sewn by the emergence and spread of COVID-19, otherwise commonly referred to a coronavirus. This lawsuit germinated because of Governor Gavin Newsom's sweeping stay at home State Order with no end date, and the four subsequent "stay at home" orders of the Public Health Officer and Director of Emergency Services of San Joaquin County ("County Orders") dated March 21, 2020 and March 26, 2020, April 3, 2020, and April 14, 2020. These State and County Orders have declared that all religious assemblies are "non-essential," even churches that are carefully following CDC "social distancing" guidelines. Simultaneously the State and County Orders declare similarly situated commercial business assemblies as "essential," permitting virtually unlimited parking and human assembly. This lawsuit became full grown as of the April 3, 2020 San Joaquin County Order which specifically targeted the Church and resulted in the Church being completely locked out of their leased building and parking lot. The City of Lodi Police Department aggressively enforced the religiously intolerant and discriminatory State Order and County Orders (collectively, the "Orders"), further necessitating this lawsuit.

5. On Wednesday, March 25, 2020, the City of Lodi, acting on the tip of an informant, sent two uniformed police officers to disrupt the Church's lightly attended midweek service. The police officers told Plaintiff JONATHAN DUNCAN ("Pastor Duncan") the meeting was in violation of the Orders and warned that further enforcement actions would likely follow. A few days later, on April 1, 2020, the City of Lodi sent three police officers to post a notice on the Church building, warning that the Church's "non-essential" use of the building was a "public nuisance" in violation of the State and County Orders and that the Church would be criminally prosecuted if they continued to meet. On April 3, 2020, San Joaquin County issued an Order specifically targeting the Church, declaring the Church "non-essential" and completely barring it from using the Church building or parking lot. On Palm Sunday morning, April 5,

2020, more than five Lodi uniformed police officers told Pastor Duncan that a county order barred him from using the Church building and parking lot, and that the landlord had changed the locks on the Church. The landlord did not have a judicial order to change the locks, nor had any unlawful detainer proceedings been initiated. The officers warned Pastor Duncan that they would cite him if he tried to access the Church property, despite the valid lease that was still in effect.

6.     For more than four hundred years, people have come to America in a quest for religious freedom. Our shores were populated with many, like the Puritans, who were fleeing religious persecution in Europe.  They understood that "[n]o place, not even the unknown, is worse than *any* place whose state forbids the exercise of your sincerely held religious beliefs." *On Fire Christian Center, Inc., supra*, at *4. Stretching back to the formation of colonies like Pennsylvania and Rhode Island, where citizens could practice religion in a way that would not be impeded by the government, this basic freedom that was sought by so many colonists was subsequently enshrined in the constitutions of the states and, most importantly, in the First Amendment to the United States Constitution. "Congress shall make no law respecting the establishment of religion or prohibiting the free exercise thereof." U.S. Const. amend i.

7.     The First Amendment's guarantee of religious liberty was perhaps its boldest and most audacious promise.  Indeed, history is dominated by a long list of tyrants and tyrannies.  Until America, freedom was not the historical norm.  For centuries European kings and rulers had spent considerable treasure and blood attempting to coercively impose differing religious beliefs and practices on others. America would be different, precisely because of our firm commitment to religious freedom and tolerance. As de Tocqueville wrote, "religion…must be considered as the first of their political institutions; for if it does not give them the taste for liberty, it singularly facilitates use of it."  Justice Anthony Kennedy recently echoed de Tocqueville's sentiments, "Among the reasons the United States is so open, so tolerant, and so free is that no person may be restricted or demeaned by government in

exercising his or her religion."  *Burwell v. Hobby Lobby*, 573 U.S. 682, 739 (2014) (Kennedy, J., concurring).

8.     Yet in the days leading up to one of the holiest days on the Christian calendar, Easter, Defendants Gavin Newsom, the San Joaquin County Officials, and officers of the Lodi Police Department (collectively, "Defendants"), announced and enforced what would previously have been unthinkable in a nation like the United States—that they were prohibiting all church worship gatherings in the state of California, limiting all religious assembly and worship only to video streamed over the internet. On April 3, 2020, San Joaquin County doubled down the threat to the Church, targeting the Church with an order prohibiting its use of the Church's leased buildings and parking lot.  This ban is backed by Orwellian threats of potential criminal penalties, including citations, fines, and arrest.

9.     Due to the unprecedented nature of COVID-19 and the indisputable tragedy the disease has wrought on our great Republic, there are those who may find it tempting to hold that First Amendment rights should acquiesce to claims of public health and safety in this instance.  However, state regulations, even during a public health crisis do not supersede constitutional rights: "[N]o rule proscribed by a state, nor any regulation adopted by a local government agency acting under the sanction of state legislation, shall contravene the Constitution of the United States, nor infringe on any right granted or secured by that instrument**…. Local…regulation…*must always yield in case of conflict with…the Constitution***, or any right which that instrument gives or secures."  *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 25 (1905) (emphasis added).

10.    The justification for this astounding government overreach is the COVID-19 pandemic, truly a national and international tragedy.  The coronavirus outbreak has turned our world upside-down, causing profound damage to our lives and to our economy.  And it is understood that the rules of constitutional interpretation are not as rigidly fixed in a time of national emergency. *Jacobson v. Massachusetts*, 197 U.S. 11

1  (1905).  "But even under *Jacobson*, constitutional rights still exist.  Among them is the
2  freedom to worship as we choose."  *On Fire Christian Center, Inc., supra*, at *4 (citing
3  *Jacobson* at 31).

4        11.    In full understanding of the public and private danger posed by COVID-19,
5  the Church has conducted itself and intends to continue to conduct its religious
6  assemblies and worship services in a manner that adheres to CDC and California
7  guidelines on social distancing and safe gatherings. The Church merely contends that, at
8  least for its congregants, its assemblies *are* an "essential service" and should therefore,
9  because of fundamental First Amendment Protections, be treated at least as equally as
10 businesses which have which been declared "essential," including the commercial retail
11 stores or the daycare center that meets at the Church site.  Defendants' targeting of
12 religious adherents and total ban from religious assembly, even in a manner consistent
13 with governmental social distancing guidelines, while permitting similar (and at times
14 even more intimate) social interaction to continue unabated in retail and commercial
15 establishments, flies in the face of the First Amendment of the U.S. Constitution,
16 Article I, Sections 2, 3 and 4 of the California Constitution, and the Religious Land Use
17 and Institutionalized Persons Act.

18       12.    Recognizing that times of crisis would arise, that such times might lead
19 governments to seek to repress unalienable fundamental freedoms, and that the
20 Republic's survival depended upon defeating such repressive instincts, the genius of our
21 founding document is that it placed explicit protections into the text of the Bill of
22 Rights. And, importantly, "[o]ur Bill of Rights placed our survival on firmer ground—
23 that of freedom, not repression." *Konigsberg v. State Bar of California*, 366 U.S. 36, 79
24 (1961) (Black, J., dissenting).

25       13.    During times of national crisis attended by widespread fear and panic, such
26 as the current uncertainty arising from COVID-19, "the fog of public excitement
27 obscures the ancient landmarks set up in our Bill of Rights." *American Communist
28 Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 453 (1950) (Black, J., dissenting). But, where the

fog of public excitement is at its apex, "the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937).

14.     Our commitment to our founding principles is most tested and best calculated during times of crisis and uncertainty. Our willingness to reaffirm our staunch commitment to our fundamental freedoms is imperative to the very survival of the American experiment. For, "[h]istory reveals that the initial steps in the erosion of individual rights are usually excused on the basis of an 'emergency' or threat to the public. **But the ultimate strength of our constitutional guarantees lies in the unhesitating application in times of crisis and tranquility alike**." *United States v. Bell*, 464 F.2d 667, 676 (2d Cir. 1972) (Mansfield, J., concurring) (emphasis added).

15.     In the instant matter, Plaintiff brings this case to highlight the troubling erosion of fundamental and cherished liberties wrought by the imposition of the State Order and the County Orders and their unconstitutional enforcement by the Lodi Police Department. Plaintiffs seek not to discredit or discard the government's unquestionable interest in doing that task for which it was instituted – protecting the citizenry. But, as is often true in times of crisis and fear, Plaintiffs respectfully submit that in an effort to uphold their sworn duties, Defendants have – perhaps unwittingly – stepped over a line the Constitution does not permit. Therefore, Plaintiffs bring this action to ensure that this Court safeguard the cherished liberties for which millions have fought, bled, and died. For, "[i]**f the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be discarded**." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 483 (1934) (Sutherland, J., dissenting) (emphasis added). As John Adams opined in 1765, "Liberty must at all hazards be supported. We have a right to it, derived from our Maker. But if we had not, our fathers have earned and bought it for us, at the expense of their ease, their estates, their pleasure, and their blood."

///

16.    Plaintiffs pray unto the Court that it not permit their unalienable and fundamental liberties enshrined in the Constitution to be another tragic casualty of COVID-19.

## PARTIES – PLAINTIFFS

17.    Plaintiff CROSS CULTURE CHRISTIAN CHURCH (the "Church") is a domestic non-profit corporation Christian church organized exclusively for religious purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.  The Church is located in the City of Lodi, San Joaquin County, California.

18.    Plaintiff JONATHAN DUNCAN ("Pastor Duncan") serves as the lead pastor of the Church.  He is 43 years old.

## PARTIES – DEFENDANTS

19.    Defendant GAVIN NEWSOM is the Governor of the State of California, and is sued in his official capacity.  The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const. Art. V, §1. Governor Newsom signed the State Order.

20.    Defendant XAVIER BECERRA is the Attorney General of California, and is sued in his official capacity. Under California law, the Attorney General is the chief law enforcement officer with supervision over all sheriffs in the state. Cal. Const. Art. V, §13.

21.    Defendant SONIA ANGELL is the California Public Health Officer. She is sued in her official capacity only. Under the authority of the State Order, the State Public Health Officer created California's "Essential Critical Infrastructure Workers," discussed below.

22.    Defendant MAGGIE PARK is the Public Health Officer, San Joaquin County, California. She is sued in his official capacity only.  She signed the San Joaquin County "Stay at Home" Orders dated March 21, 2020 and March 26, 2020, April 3, 2020, and April 14, 2020.

///

23.    Defendant MARCIA CUNNINGHAM is the Director of Emergency Services, San Joaquin County, California.   She is sued in her official capacity only. She signed the San Joaquin County "Stay at Home" Orders dated March 21, 2020, March 26, 2020, and April 14, 2020.

24.    Defendant CITY OF LODI is a municipality organized under the laws of the State of California.  The City of Lodi is subject to suit under 42 U.S.C. 1983 and common law.  Defendant TOD PATTERSON is the Chief of Police of the City of Lodi. He is sued in his official capacity only.  He is responsible for enforcing and has directed the enforcement of the State Orders and the County Orders against religious institutions including the Church.

## JURISDICTION AND VENUE

25.    This civil rights action raises federal questions under the United States Constitution, specifically the First and Fourteenth Amendments, and under federal law, particularly 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq.*

26.    This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

27.    This action also arises under Article I, §§ 2, 3 and 4 of the California Constitution (freedom of speech, right of assembly, and religious free exercise).

28.    This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.

29.    This Court has authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, implemented through Rule 57 of the Federal Rules of Civil Procedure. This Court is also authorized to grant injunctive relief and damages under 28 U.S.C. § 1343, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and reasonable attorney's fees and costs under 42 U.S.C. § 1988.

///

///

30.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1)–(2) because Defendants are situated in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

**FACTUAL BACKGROUND**

**A.     Executive and Administrative Response to COVID-19.**

31.     On March 4, 2020, California Governor Gavin Newsom declared a state of emergency for the entire State of California in response to COVID-19.  On March 11, 2020, the World Health Organization (WHO) declared COVID-19 a pandemic. On March 13, 2020, President Donald J. Trump declared COVID-19 a national emergency. On March 16, 2020, President Trump and the CDC issued "15 Days to Slow the Spread" guidance advising individuals, in part, to avoid **social** gatherings in groups of more than 10 people.  On March 19, 2020, Governor Newsom issued the State Order, Executive Order N-33-20, a statewide stay at home order with exceptions for "critical infrastructure." On March 21, 2020, San Joaquin County issued its own stay at home order.  On March 26, 2020, San Joaquin County issued a revised "stay at home" order. On April 3, 2020 San Joaquin County issued a targeted Order, specifically naming the Church and declaring its ongoing use of the leased property in violation of the State and County Orders.  This April 3 targeted Order declared the Church a "non-essential" entity and ordered it to cease all occupation and use of the leased buildings and the parking lot, while at the same time permitting a preschool to continue to meet on the property.  On April 14, 2020, San Juaquin County issued another amended order allowing "non-essential businesses" to conduct "minimum basic operations."

**B.     Governor Newsom's Executive Order**

32.     On March 4, 2020, Governor Gavin Newsom proclaimed a State Emergency as a result of the threat of COVID-19.[1] Governor Newsom's "stay at home" State Order included a multitude of exceptions for "critical infrastructure." A true and

---

1 As of the date of this filing, the Proclamation of a State of Emergency can be found online at: https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf

correct copy of this State Order is attached hereto as Exhibit 1.  The State Order provides, in pertinent part:

> "**[A]ll residents are directed to immediately heed** the current State public health directives, which I ordered the Department of Public Health to develop for the current statewide status of COVID-19."

> "To protect public health, **I** as State Public Health Officer and Director of the California Department of Public Health **order all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors**, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. In addition, and in consultation with the Director of the Governor's Office of Emergency Services, **I may designate additional sectors as critical** in order to protect the health and well-being of all Californians....this order is to go into effect immediately and **shall stay in effect until further notice**."

Exhibit 1 at Paragraph 1 (emphasis added).

33.     Although the State Order references the "federal critical infrastructure sectors," on or about March 22, 2020, the California Public Health Officer published its own list of "Essential Critical Infrastructure Workers" ("ECIW")[2], discussed in detail below. A true and correct copy of the ECIW is attached as Exhibit 6.  When compared to the federal list, the ECIW is significantly more restrictive of the religious clergy, only allowing them to participate in "faith-based services that are provided through streaming or other technology."  Exhibit 6.  Accordingly, California prohibits all religious leaders from conducting in-person and out-of-home religious services, regardless of the "social distancing" measures taken to reduce or eliminate the risk of spreading the virus.

34.     Meanwhile, the ECIW list deems the continuity of services provided by coffee baristas, burger flippers, laundromat technicians, pot dispensary operators, and liquor store employees to be so "essential" for society that these activities are permitted

---

2 As of the date of this filing, the list of Essential Critical Infrastructure Workers ("ECIW") can be found online at https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf

to continue under the State Order, despite the existence of the very same risk Defendants rely on to stymie the Plaintiffs' exercise of fundamental rights.

35.   Furthermore, the State Order delegates to the State Public Health Officer and Director of the California Department of Public Health the authority to "**designate additional sectors as critical...**"   Exhibit 1 at paragraph 1 (emphasis added).   Finally, the State Order has no expiration date, as it "shall stay in effect until further notice." Exhibit 1 at paragraph 1.

**C.    First San Joaquin County Order Prohibiting All Non-Essential Gatherings**

36.   On March 21, 2020, San Joaquin County issued its own stay at home order, a true and correct copy of which is attached hereto as Exhibit 2.   This county order provides, in pertinent part, mandated that:

> "**ALL INDIVIDUALS LIVING IN THE COUNTY TO STAY AT HOME** OR AT THEIR PLACE OF RESIDENCE **EXCEPT THAT THEY MAY LEAVE TO PROVIDE OR RECEIVE CERTAIN ESSENTIAL SERVICES OR ENGAGE IN CERTAIN ESSENTIAL ACTIVITIES AND WORK FOR** ESSENTIAL BUSINESSES AND GOVERNMENTAL SERVICES; EXEMPTING INDIVIDUALS EXPERIENCING HOMELESSNESS FROM THIS ORDER BUT URGING THEM TO FIND SHELTER AND GOVERNMENT AGENCIES TO PROVIDE IT; **DIRECTING ALL BUSINESSES AND GOVERNMENTAL AGENCIES TO CEASE NON-ESSENTIAL OPERATIONS AT PHYSICAL LOCATIONS IN THE COUNTY**; **PROHIBITING ALL NON-ESSENTIAL GATHERINGS OF ANY NUMBER OF INDIVIDUALS**; AND ORDERING CESSATION OF ALL NON-ESSENTIAL TRAVEL."

Exhibit 2 at p. 1 (emphasis added).

37.   The county's stay at home order prohibited all non-essential gatherings of any number of individuals."   Exhibit 2 at paragraph 6.   However, there was an exemption for those providing or receiving "essential services" or those engaging in "essential activities" or working for "essential businesses and governmental services."

Exhibit 2 at paragraph 11.  The order allowed individuals the unlimited ability to leave their residence to "engage in activities or perform tasks essential to their health and safety," and perform "essential activities" including the following: "obtaining medical supplies and medication, visiting a health care professional, obtaining supplies they need to work from home…to obtain necessary services or supplies [including food or consumer products]….to engage in outdoor activities….to perform work as an Essential Critical Infrastructure worker….to care for a family member in or pet in another household…to attend private gatherings of not more than six relatives." Exhibit 2 at paragraph 11.  Individuals or businesses were warned of criminal penalties for not obeying the order. The order warned that "Violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both. (California Health and Safety Code § 120295, et *seq.)*" Exhibit 2 at p. 1.

### D.     Second San Joaquin County Order Prohibiting All Non-Essential Gatherings

38.     On March 26, 2020, San Joaquin County issued a revised "stay at home" order, a true and correct copy of which is attached hereto as Exhibit 3.  Similar to the prior county order, it exempted those providing or receiving "essential services" or those engaging in "essential activities" or working for "essential businesses and governmental services" and "**prohibiting all non-essential gatherings of any number of individuals.**"  Exhibit 3 at p. 1 (emphasis added).

39.     The order, in pertinent part, directed:

"**ALL INDIVIDUALS LIVING IN THE COUNTY TO STAY AT HOME** OR AT THEIR PLACE OF RESIDENCE **EXCEPT THAT THEY MAY LEAVE TO PROVIDE OR RECEIVE CERTAIN ESSENTIAL SERVICES OR ENGAGE IN CERTAIN ESSENTIAL ACTIVITIES AND WORK FOR ESSENTIAL BUSINESSES** AND GOVERNMENTAL SERVICES; EXEMPTING INDIVIDUALS EXPERIENCING HOMELESSNESS FROM THIS ORDER BUT URGING THEM TO FIND SHELTER AND GOVERNMENT AGENCIES TO PROVIDE IT; DIRECTING ALL BUSINESSES AND GOVERNMENTAL AGENCIES TO CEASE NON-ESSENTIAL

---

**14**
**VERIFIED COMPLAINT**

OPERATIONS AT PHYSICAL LOCATIONS IN THE COUNTY; PROHIBITING ALL NON-ESSENTIAL GATHERINGS OF ANY NUMBER OF INDIVIDUALS; AND ORDERING CESSATION OF ALL NON-ESSENTIAL TRAVEL."

Exhibit 3 at p. 1 (emphasis added).

40.   This new order emphasized the need for "social distancing" when, for any reason, people left their homes.  Social distancing was defined in the new order as "maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high touch surfaces, and not shaking hands." Exhibit 3 at paragraph 11(f).

41.   Just as before, the new county order allowed individuals the unlimited ability to leave their residence to "engage in activities or perform tasks essential to their health and safety," including to "perform "essential activities" including, "obtaining medical supplies and medication, visiting a health care professional, obtaining supplies they need to work from home…to obtain necessary services or supplies [including food or consumer products]….to engage in outdoor activities….to perform work as an Essential Critical Infrastructure worker….to care for a family member in or pet in another household."  Exhibit 3 at paragraph 11(a).   Under the terms of County Order, any [grocery, convenience, warehouse, or "big box"] store may operate without any limit on the number of employees or customers present, as long as it insures social distancing (6 feet) and other health practices for its employees, and otherwise promotes social distancing (about 6 feet) and other best practices for non-employees.

42.   However, the option "to attend private gatherings of not more than six nonrelatives in a home or place of residence" was removed from the list of permitted activities. Also, similar to the prior order, individuals and businesses were warned of criminal penalties for not obeying the order. "Violation of or failure to comply with this

Order is a misdemeanor punishable by fine, imprisonment, or both. (California Health and Safety Code § 120295, *et seq.*)"  Exhibit 3 at p. 1.

**D. The April 3 Targeted County "Order Prohibiting Public Assembly" at Cross Culture Christian Center**

43.     On April 3, 2020, San Joaquin County Public Health Officer, Maggie Park, M.D. issued an "Order Prohibiting Public Assembly," a true and correct copy of which is attached hereto as Exhibit 4.   This order specifically referenced Plaintiff Cross Culture Christian Center's lease and ongoing use of the facility owned by their landlord, Bethel Open Bible Church located at 760 S Ham Ln, in Lodi, California.   The order states, in pertinent part:

"You are hereby **ordered to close your facility located at 760 South Ham Lane, Lodi, California, and prevent future use of the facility, including the parking lot, for public assembly** due to the outbreak of COVID-19 in the state of California and County of San Joaquin.

On March 19, 2020, the Governor of California issued an executive **order N-33-20** (the "Order") **mandating all individuals living in the state of California to stay home** or at their place of residence **except as needed to maintain continuity of operations of the 16 federal critical infrastructure sectors**. On **March 26, 2020, the San Joaquin County Public Health Officer issued an order prohibiting public assemblies of any size that are not essential for life and safety.**

On March 29, 2020, the **City of Lodi reported to the County Public Health Officer that your tenant, Cross Culture Community Church was continuing to use your facility for public assembly, and that Cross Culture Community Church was aware of the County Order and intended to continue to meet in violation of the Order**. As a facility for public assembly **neither the building or the parking lot is part of the essential critical infrastructure as defined by State and Federal agencies**. Continued operation, in violation of the Order, will hamper the County's ability to slow transmission of the disease and increase the risk to the public from COVID-19.

Any person who refuses or willfully neglects to comply with this emergency order is guilty of a misdemeanor, punishable by fine and/or

imprisonment. (Government Code section 8665; Health and Safety Code section 120275.) In addition, there are civil and administrative penalties that can be imposed upon you as a result of continued operation."

The ability of Bethel Open Bible Church to operate a child-care facility consistent with the order of the State Public Health Officer issued March 22, 2020 is unaffected by this Order."

Exhibit 4 (emphasis added).

44.     The order targeted at the Church's lawful use of Bethel Open Bible Church's facilities and threatening criminal and civil penalties against was signed by Maggie Park, M.D., San Joaquin County Public Health Officer.

**E. Most Recent San Joaquin County Order Prohibiting All Non-Essential Gatherings**

45.     On April 14, 2020, San Joaquin County issued a revised "stay at home" order, a true and correct copy of which is attached hereto as Exhibit 5.  Similar to the prior county orders, it exempted those providing or receiving "essential services" or those engaging in "essential activities" or working for "essential businesses and governmental services" and "**prohibiting all non-essential gatherings of any number of individuals**".  Exhibit 5 at paragraph 5 (emphasis added).

46.     This April 14, 2020 County Order allows "non-essential businesses" to conduct "minimum basic operations," but not be open to the public. Exhibit 5 at paragraph 11(b) (emphasis added).

**F. California's Definition of "Essential Critical Infrastructure" Workers**

47.     On March 22, 2020, the State Public Health Officer created a list designating those persons who were "Essential Critical Infrastructure Workers," a true and correct copy of which is attached hereto as Exhibit 6 ("State ECIW List").  The purpose of the State ECIW List was to "help state, local, tribal, and industry partners as they work to protect communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security" Exhibit 5  at p. 2.

48.   The fourteen-page State ECIW List is largely modeled on the Federal ECIW List of recommended sector and jobs, which the government has deemed are important for the continuity of operations during times of crisis and which may remain open.   The State CIW exempts thirteen sectors of workers from the State and County "stay at home" orders:   Healthcare/Public Health; Emergency Services Sector; Food and Agriculture;   Energy;   Water   and   Wastewater;   Transportation   and   Logistics; Communications and Information Technology;   Critical Manufacturing;   Hazardous Materials;   Financial   Services;   Chemical;   Defense   Industrial   Base   and   Other Community-Based Government Operations.   Exhibit 6 at pp. 1-14.   This State ECIW list is incorporated into the State and County Orders discussed above.   See Exhibits 1-5.

49.   The "Other Community-Based Government Operations" sector allowed to remain open and whose workers are exempt from the "stay at home" orders includes a wide variety of commercial retail stores: "Commercial Retail Stores, that supply essential sectors, including convenience stores, pet supply stores, auto supplies and repair, hardware and home improvement, and home appliance retailers."   Exhibit 6 at p. 11 (emphasis added).

50.   The   U.S.   Department   of   Homeland   Security   Cybersecurity   and Infrastructure Agency updated guidance document, *Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience In COVID-19 Response*, Ver. 3.0 (April 17, 2020) ("CISA Guidance 3.0") is incorporated by reference into the State and County Orders (Exhibits 1-5). A true and correct copy of this CISA Guidance 3.0 is attached hereto as Exhibit 7. It specifies "Clergy for essential support" as "essential critical infrastructure workers" who are "needed to maintain the services and functions Americans depend on daily and that need to be able to operate resiliently during the COVID-19 pandemic response," and whose ability "to continue to work during periods of   community   restriction,   access   management,   social   distancing,   or   closure orders/directives   is   crucial   to   community   resilience   and   continuity   of   essential functions." Exhibit 7.   The State ECIW also references faith-based organizations, but

the State of California strictly limits their activities only to online worship services: "Faith based services that are provided through streaming or other technology" Exhibit 6 at p. 11.

51.     The introduction to the State ECIW List acknowledges that Governor Newsom's State Order (Exhibit 1) has delegated to the "State Public Health Officer" the discretion to designate "additional sectors…as critical to protect [sic] health and well-being of aall [sic] Californians."  Exhibit 6 at p. 1.   More than eleven states have declared houses of worship as "essential services" or have otherwise exempted religious services from the stay at home orders.[3]

52.     Governor Gavin Newsom was asked to include houses of worship in California as part of the State ECIW or as exempted from the "stay at home" orders, but he has ignored this request and has thus far declined to do so. A true and correct copy of the letter written to Governor Newsom from Plaintiffs' counsel is attached hereto as Exhibit 8.

53.     Therefore, both the state of California and San Joaquin County have, through their sweeping stay at home orders incorporating the State ECIW List have, on their face and as applied, permitted virtually unrestricted public assembly with social distancing at a multitude of commercial retail stores by deeming it as "essential." At the same time, the orders forbid any and all public assembly at houses or worship with social distancing, simply by discretionarily deeming religious assembly as "non-essential" and not including it on the State ECIW List.   In California, a broad array of commercial assembly is currently deemed lawful while, at the same time, any and all religious assembly, even if social distancing is employed, is classified as a criminal activity.   It is this discretionary determination by State Officials which Plaintiffs contend violates multiple provisions of the U.S. Constitution and similar provisions of the Constitution of the State of California, as is discussed further below.

---

[3] https://abcnews.go.com/Health/states-crack-gatherings-due-coronavirus-exemptions-religious-groups/story?id=69847021

### G. The Religious Beliefs and Practices of the Church

54.     The Church is led by Pastor Duncan and a church board of directors.  The Church started as a home Bible study meeting in Pastor Duncan's home approximately twelve years ago.

55.     In 2009, the growing group incorporated as a California non-profit religious corporation.  From 2015 to 2019, the Church rented its own facility in an industrial area of Lodi, California.  In March of 2019, the Church entered into a three-year lease and started renting space from Bethel Open Bible Church in Lodi, California.

56.     Currently, the Church has approximately 27 adult attendees during its Sunday service, and even less attendees during its midweek Wednesday night service. The leased sanctuary where the Church meets can hold up to 400 people.

57.     The Church describes itself as "a Community of the Rescued. Our heart is to truly be The Cross Culture, making the Love of God our priority. We as a Community are working through our struggles so we will better reflect Christ in our lives, home and world. Our desire is to love as Jesus loved, teach as Jesus taught, and give as Jesus gave."

58.     The Church has a sincerely and deeply held religious belief that it is essential for them as Christians to assemble and regularly gather together in person for the teaching of God's Word, prayer, worship, baptism, communion and fellowship. This is based on scriptures from the Bible, including Hebrews 10:25, Acts 2:40-47, and Acts 5:40-42.  These activities are primarily fulfilled in the gathering together of the Church body for Sunday worship services and Wednesday night worship services.

59.     The Church believes that based on the Bible, they are eternal beings in this temporary world, and God's Word (the Bible) is even more essential than food based on the following scripture in Matthew 4:4: "[Jesus] answered, 'It is written, "Man shall not live by bread alone, but by every word that comes from the mouth of God."'"  Indeed, the joyful duty to assemble together, in person, for worship services is a central tenet of the Christian faith, both believed and practiced by the Church according to the Bible, a

tenet that is especially important to maintain during times of turmoil and trouble in the world: "And let us consider how to stir up one another to love and good works, not neglecting to meet together, as is the habit of some, but encouraging one another, and all the more as you see the Day drawing near." Hebrews 10:24–25.

60.    The joyful duty to love their neighbors is likewise a central tenet of the Christian faith believed and practiced by the Church. They believe this is done first through sharing the Gospel of Jesus Christ—that Jesus died for the forgiveness of our sins, that He rose again to secure for us eternal life with God the Father, and that whoever believes in Jesus Christ will share in that eternal life—and second through good works, such as caring for the sick and hungry. And the Church believes, still according to the Bible, that it is the very practice of regularly assembling together to worship God through the preaching and teaching of God's Word that inspires and equips Christians to love their neighbors and perform such good works, as shown in the passage quoted above ("let us consider how to stir up one another to love and good works"), and also: "All Scripture is breathed out by God and profitable for teaching, for reproof, for correction, and for training in righteousness, that the man of God may be complete, equipped for every good work." 2 Tim. 3:16–17.

61.    Pastor Duncan was a police officer with the Stockton Police Department before he was medically discharged due to a physical injury.  As a public servant, Pastor Duncan took the following oath:

> "I, Jonathan Duncan, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of California against all enemies, foreign and domestic; that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of California; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties upon which I am about to enter."

62.     The Church's congregation is multi-racial and represents a cross-section of society, from rich to poor and of all ages. The Church's congregation also includes members and visitors running the gamut of essential workers. These essential workers and service providers receive spiritual support, comfort, guidance, and shelter from the ministry of the Church's personnel, including Pastor Duncan.

**H. The Church's Worship Services Following State and County Executive Orders and Enforcement Against the Church by the Lodi Police Department**

63.     Even before the State and County "stay at home orders" went into effect, the Church was already following CDC and state recommended "social distancing" guidelines.  Among other actions, Pastor Duncan counselled individuals to follow their doctor's instructions, adhere to the CDC guidelines, and act in the best interest of community health and safety.

64.     After the State and County Orders were issued, in accordance with its sincerely held religious beliefs and its practices consistent to those beliefs, the Church elected to continue to conduct worship services on March 22, March 25, and March 29, 2020, while at the same time continuing to follow CDC and state recommended "social distancing" guidelines.  In addition to the CDC guidelines, the Church is willing to limit the number of congregants in the sanctuary at the same time to 50 persons or less and have multiple personnel present to ensure proper spacing between persons and orderly compliance with all CDC guidelines.

65.     On Wednesday March 25, 2020, two Lodi Police Officers disrupted The Church's midweek service.  On information and belief, their visit was triggered by someone acting on behalf of Bethel Church (the landlord/lessor) who had informed Lodi Police Department that the Church would be meeting that night, purportedly in violation of the County Orders.  Lodi Police Corporal Bradley and Officer Silva entered the foyer of the building where the Church meets at approximately 7:30 p.m.  Due to their presence, Pastor Duncan was forced to communicate with them for an extended

period of time and was therefore prohibited from performing his regular pastoral duties of leading the Church worship service that evening.

66.   During the conversation, Corporal Bradley advised Pastor Duncan that he was there to "educate" the Church about the San Joaquin County Order.   However, Corporal Bradley proceeded to warn Pastor Duncan about the steps the Police Department was prepared to take against the Church following this initial "education" procedure, including posting a written cease and desist notice on the building for non-compliance.   Bradley continued, that, if this were not heeded, the Lodi Police would likely follow up with an enforcement action, purportedly for "disturbing the peace." Based on the totality of this conversation, it was Pastor Duncan's understanding, who is a retired law enforcement officer, that these Lodi Police officers had been dispatched with orders to shut down the Church's assembly and order them to vacate the building.

67.   On March 27, 2020, counsel for Plaintiffs submitted a cease and desist letter to the Lodi Police department and other city officials.   The letter demanded that government officials cease all enforcement actions and agree to honor and respect the Church's First Amendment rights to peaceably assemble, freedom of speech, and free exercise of religion.   The City of Lodi did not immediately respond to Plaintiffs' counsel, but waited more than a week to reply.

68.   On March 29, 2020, the Church met for its regular Sunday services. Before the services started, the building was prepared to accommodate social distancing.

69.   Signs were posted on the Church doors and in the entry area advising Church members of the following:

> "COVID-19 Precautions:  Please abide by the following, just as you would at the grocery store- 1. Wash hands upon entry.  2. Social distancing 6 feet or more. 3. Sit together as a household, with your children. 4. If you are sick or at risk, please know that you are loved, but we request that you resort to isolation for your safety and the safety of others.  We will be live on the church's Facebook and hope you tune in."



70.     Hand sanitizer and sanitizing wipes were placed in the foyer near the signs (See photo above).

71.     The drinking fountain was blocked off and covered.

///

///

///

///

///

///



72.    The rows of chairs in the sanctuary were separated from each other by more than six (6) feet (See pictures below).

///

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17
18
19
20
21
22
23
24
25
26
27
28

73.     On April 1, 2020, Lodi Police officers posted a "public nuisance" notice on the building leased by the Church.  A true and correct copy of this notice is attached as Exhibit 9.  Printed on the City of Lodi's letterhead, the notice stated that "the business activities conducted on these premises are illegal."  Exhibit 9. Referencing California Health and Safety Codes §§ 120130 and 12025, California Penal Code §373a, the State Order, and the County Order, the notice declared that "This posting constitutes written legal notice to discontinue **non-essential business activities** and **maintenance of a public nuisance** upon these premises."  Exhibit 9 (emphasis added).  The notice listed the business name targeted as, "Cross Culture Church" [sic].  Exhibit 9.  The notice threatened that "failure to discontinue **non-essential** business activities is a **misdemeanor**… that each violation was a "separate and distinct offence" the may be "**prosecuted** until the nuisance is abated."  Exhibit 9 (emphasis added).  It was signed

by Sgt. Fritz, Sgt. Ambriz and Officer Stillman, of the Lodi Police Department, badge numbers 56, 32, and 34.

74.     Less than two days later, on April 3, 2020, San Joaquin County issued its "Order Prohibiting Public Assembly" Exhibit 4 (discussed in detail above), which specifically targeted the Church and forbade any use of the buildings or parking lot for any reason, except for daycare.

75.     On Sunday, April 5, 2020 when Pastor Duncan arrived at the Church to open up for Palm Sunday services, he was greeted by a half dozen law enforcement officers who informed him that the locks had been changed on the church building by the landlord. They also advised him that if he were to access the parking lot and/or church building that they would cite him for violating the public health orders, but would not arrest him. The Church's lease for the subject property is still in effect, it has not expired, and no unlawful detainer proceedings have been filed to prevent the Church's legal occupancy and possession pursuant to the terms of the lease agreement. The landlord changed the locks without a judicial order to do so.

## CONSTITUTIONAL CLAIMS

### COUNT I

### THE ORDERS VIOLATE PLAINTIFFS' RIGHT TO FREE EXERCISE OF RELIGION UNDER THE FIRST AMENDMENT

76.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

77.     The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' right to free exercise of religion.

78.     Plaintiffs have sincerely held religious beliefs that the Bible is the infallible, inerrant word of the Lord Jesus Christ, and that they are to follow its teachings.

**VERIFIED COMPLAINT**

79. Plaintiffs have sincerely held religious beliefs, rooted in the Bible, that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis.

80. The State Order and the County Orders, on their face and as applied, prohibit all faith-based assemblies and gatherings in Plaintiffs' leased Church, including the use of the leased parking lot, even if Plaintiffs follow CDC and state "social distancing guidelines, which is a violation of Plaintiffs' right to the free exercise of religion.

81. The State Order and the County Orders, on their face and as applied, target Plaintiffs' sincerely held religious beliefs and practices by prohibiting all faith-based gatherings.

82. The State Order and the County Orders, on their face and as applied, impermissibly burden Plaintiffs' sincerely held religious beliefs, compel Plaintiffs to either change those beliefs or to act in contradiction to them, and force Plaintiffs to choose between the teachings and requirements of its sincerely held religious beliefs or Defendants' imposed value system.

83. The State Order and the County Orders, on their face and as applied, place Plaintiffs in an irresolvable conflict between compliance with the orders and compliance with their sincerely held religious beliefs.

84. The State Order and the County Orders, on their face and as applied, put substantial pressure on Plaintiffs to violate their sincerely held religious beliefs by ignoring the fundamental teachings and tenets of the Bible concerning the assembling together of the Church.

85. The State Order and the County Orders, on their face and as applied, are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious beliefs, speech, assembly, and viewpoint of Plaintiffs.

86. The State Order and the County Orders, on their face and as applied, constitute a substantial burden on Plaintiffs' sincerely held religious beliefs.

87.     Defendants lack a compelling, legitimate, or rational interest in the State Order and County Orders' application of differential standards for churches and faith-based gatherings than those applicable to other so-called "essential" businesses or services, such as the preschool which continues to meet at the Church location and other commercial establishments where people assemble and congregate.

88.     Even if the State Order and the County Orders' restriction on faith-based gatherings were supported by a compelling interest, which they are not, they do not employ the least restrictive means to accomplish the government's purported interest.

89.     The State Order and the County Orders fail to accommodate Plaintiffs' sincerely held religious beliefs.

90.     The State Order and the County Orders, specifically target Plaintiffs' sincerely held religious beliefs, and the Orders set up a system of individualized exemptions that permit certain other similarly situated businesses or services to continue operations under certain guidelines while prohibiting faith-based gatherings, such as Plaintiffs', from operating under similar guidelines.

91.     The State Order and the County Orders, on their face and as applied, constitute a religious gerrymander.

92.     The State Order and the County Orders, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs' immediate and irreparable harm, and actual and undue hardship.

93.     Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their constitutional rights.

94.     WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in the prayer for relief.

///

///

///

///

# COUNT II

## THE ORDERS VIOLATE PLAINTIFFS' RIGHT TO FREEDOM OF ASSEMBLY UNDER THE FIRST AMENDMENT

95.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

96.     The First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging the right of the people peaceably to assemble.

97.     The State Order and the County Orders, on their face and as applied, prohibit all faith-based assemblies and gatherings in the Church, including Plaintiffs' use of the leased parking lot, even if Plaintiffs follow CDC and state "social distancing guidelines, which is a violation of Plaintiffs' right to peaceably assemble.

98.     The State Order and the County Orders, on their face and as applied, are an unconstitutional prior restraint on Plaintiffs' right to assemble.

99.     The State Order and the County Orders, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

100.    The State Order and the County Orders, on their face and as applied unconstitutionally discriminate on the basis of content.

101.    Defendants lack a compelling, legitimate, or rational interest in the State Order and County Orders' application of differential standards for churches and faith-based gatherings than those applicable to other so-called "essential" businesses or services, such as the preschool with continues to meet at the Church location and other commercial establishments where people assemble and congregate.

102.    The State Order and the County Orders, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the Orders.

103.    The State Order and the County Orders, on their face and as applied, are not narrowly tailored to serve the government's purported interest.

104.   The State Order and the County Orders, on their face and as applied, do not leave open ample alternative channels of communication for Plaintiffs.

105.   The State Order and the County Orders, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on Plaintiffs' constitutionally protected right to assembly.

106.   The State Order and the County Orders, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Defendants, to apply or not apply the orders in a manner to restrict free assembly.

107.   The State Order and the County Orders, on their face and as applied, are under-inclusive by limiting their prohibitions to only certain entities, organizations, or businesses deemed non-essential.

108.   The State Order and the County Orders, on their face and as applied, are unconstitutionally vague and overbroad as they chill and abridge the free assembly rights of Plaintiffs.

109.   On their face and as applied, the State Order and the County Orders are a violation of Plaintiffs' right to free assembly and have caused, are causing, and will continue to cause Plaintiff to suffer immediate and irreparable injury and undue and actual hardship.

110.   Plaintiffs have no other adequate remedy at law to correct the continuing deprivation of its constitutional rights.

111.   WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT III

## THE ORDERS VIOLATE

## PLAINTIFFS' RIGHT TO FREEDOM OF SPEECH UNDER

## THE FIRST AMENDMENT

112.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

113.   The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' freedom of speech.

114.   The State Order and the County Orders, on their face and as applied, prohibit all faith-based assemblies, gatherings, and religious speech in Plaintiffs' leased Church, including Plaintiffs' use of the leased parking lot for expressive activities, even if Plaintiffs follow CDC and state social distancing guidelines, which is a violation of Plaintiffs' right to the freedom of speech.

115.   The State Order and the County Orders, on their face and as applied, are an unconstitutional prior restraint on Plaintiffs' speech.

116.   The State Order and the County Orders, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

117.   The State Order and the County Orders, on their face and as applied, unconstitutionally discriminate on the basis of content.

118.   Defendants lack a compelling, legitimate, or rational interest in the State Order and County Orders' application of differential standards for churches and faith-based gatherings than those applicable to other so-called "essential" businesses or services, such as the preschool with continues to meet at the Church location, and other commercial establishments where people assemble and congregate.

119.   The State Order and the County Orders, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the Orders.

120.   The State Order and the County Orders, on their face and as applied, are not narrowly tailored to serve the government's purported interest.

121.   The State Order and the County Orders, on their face and as applied, do not leave open ample alternative channels of communication for Plaintiffs.

122.   The State Order and the County Orders, on their face and as applied, are irrational and unreasonable and imposes unjustifiable and unreasonable restrictions on

Plaintiffs' constitutionally protected speech.

123.   The State Order and the County Orders, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Defendants, to apply or not apply the Orders in a manner to restrict free speech.

124.   The State Order and the County Orders, on their face and as applied, are under-inclusive by limiting their prohibitions to only certain entities, organizations, or businesses deemed "non-essential."

125.   The State Order and the County Orders, on their face and as applied, are unconstitutionally overbroad as they chill and abridge the free speech rights of Plaintiffs.

126.   On their face and as applied, the State Order and County Orders violation of Plaintiffs' right to free speech has caused, is causing, and will continue to cause Plaintiffs to suffer immediate and irreparable injury and undue and actual hardship.

127.   Plaintiffs have no other adequate remedy at law to correct the continuing deprivation of their constitutional rights.

128.   WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT IV

## THE ORDERS VIOLATE

## THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT

129.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

130.   The Establishment Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the government from establishing a religion.

131.   The Establishment Clause also prohibits excessive government entanglement with religion.

132. The Establishment Clause also prohibits the government from showing hostility toward religion and prohibits showing favoritism towards one religious sect over another or towards non-religion and religion.

133. The State Order and the County Orders, on their face and as applied, permit Defendants to display impermissible hostility towards religious or faith-based gatherings.

134. The State Order and the County Orders, on their face and as applied, impermissibly show favoritism toward certain non-religious gatherings over religious or faith-based gatherings.

135. The State Order and the County Orders, on their face and as applied, violate the Establishment Clause because they excessively entangle the government with religion.

136. The State Order and the County Orders, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

137. Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their cherished constitutional liberties.

138. WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT V

### THE ORDERS VIOLATEPLAINTIFFS' RIGHT TO EQUAL PROTECTION UNER THE FOURTEENTH AMENDMENT

139. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

140. The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the right to equal protection under the law.

141. The State Order and County Orders, on their face and as applied, are an unconstitutional abridgement of Plaintiffs' right to equal protection under the law, are

not neutral, and specifically target Plaintiffs and other faith-based gatherings for unequal treatment.

142.   The State Order and County Orders, on their face and as applied, are an unconstitutional abridgment of Plaintiffs' right to equal protection because they permit Defendants to treat Plaintiffs differently from other similarly situated businesses and organizations on the basis of content and viewpoint of Plaintiffs' gatherings.

143.   The State Order and County Orders, on their face and as applied, impermissibly discriminate between certain non-religious gatherings and religious or faith-based gatherings.

144.   Defendants lack a compelling, legitimate, or rational interest in the State Order and County Orders' application of differential standards for churches and faith-based gatherings than those applicable to other so-called "essential" businesses or services, including the preschool that continues to meet at the Church site and other commercial business where people assemble and congregate.

145.   The State Order and County Orders, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served.

146.   The State Order and County Orders, on their face and as applied, do not have a rational basis.

147.   The State Order and County Orders, on their face and as applied, are irrational and unjustifiable and impose irrational and unjustifiable restrictions on Plaintiffs' religious and faith-based gatherings.

148.   The State Order and County Orders, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

149.   Plaintiffs have no other adequate remedy at law to correct the continuing deprivation of their constitutional rights.

150.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in the prayer for relief.

<div align="center">

**COUNT VI**

**THE ORDERS VIOLATE**

**PLAINTIFFS' RIGHT TO ASSEMBLE UNDER ARTICLE I, §3 OF THE CALIFORNIA CONSTITUTION**

</div>

151.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

152.    Article I, Section 3 of the Constitution of the State of California states that "[t]he people have the right…to assemble freely to consult for the common good."

153.    The State Order and County Orders, on their face and as applied, completely bar Plaintiffs' religious gatherings even if Plaintiffs fully comply with the CDC and state social distancing guidelines.

154.    The State Order and County Orders, on their face and as applied, are an unconstitutional prior restraint on Plaintiffs' right to assemble.

155.    The State Order and County Orders, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

156.    The State Order and County Orders, on their face and as applied, unconstitutionally discriminate on the basis of content.

157.    Defendants lack a compelling, legitimate, or rational interest in the State Order and the County Orders' application of differential standards for churches and faith-based gatherings than those applicable to other so-called "essential" businesses or services.

158.    The State Order and County Orders, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the Orders.

159.    The State Order and County Orders, on their face and as applied, are not narrowly tailored to serve the government's purported interest.

<div align="center">

**VERIFIED COMPLAINT**

</div>

160.   The State Order and County Orders, on their face and as applied, do not leave open ample alternative channels of communication for Plaintiffs.

161.   The State Order and County Orders, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on Plaintiffs' constitutionally protected right to assembly.

162.   The State Order and County Orders, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Defendants, to apply or not apply the Orders in a manner to restrict free assembly.

163.   The State Order and County Orders, on their face and as applied, are under-inclusive by limiting their prohibitions to only certain entities, organizations, or businesses deemed "non-essential."

164.   The State Order and County Orders, on their face and as applied, are unconstitutionally vague and overbroad as they chill and abridge the free assembly rights of Plaintiffs.

165.   The State Order and County Orders' violation of Plaintiffs' right to free assembly have caused, are causing, and will continue to cause Plaintiffs to suffer immediate and irreparable injury and undue and actual hardship.

166.   Plaintiffs have no other adequate remedy at law to correct the continuing deprivation of their constitutional rights.

167.   WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT VII

## THE ORDERS VIOLATE PLAINTIFFS' RIGHT TO LIBERTY UNDER ARTICLE 1, § 1 OF THE CALIFORNIA CONSTITUTION

168.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

169.   In California, "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring,

possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy. Cal. Const. Art. 1, §1.

170.   California courts have held that Public Health Officials' authority over the rights of personal liberty is limited. Before exercising their full powers to quarantine, there must be "reasonable grounds [] to support the belief that the person so held is infected." *Ex parte Martin*, 83 Cal. App. 2d 164 (1948). Public Health Officials must be able to show "probable cause to believe the person so held has an infectious disease ..." *Id*.

171.   California courts found that Public Health Officials could not quarantine twelve (12) blocks of San Francisco Chinatown because of nine (9) deaths due to bubonic plague. See *Jew Ho v. Williamson*, 103 F. 10 (C.C. Cal. 1900), and *Wong Wai v. Williamson*, 103 F. 1 (C.C. Cal. 1900). The court found it "purely arbitrary, unreasonable, unwarranted, wrongful, and oppressive interference with the personal liberty of complainant" who had "never had or contracted said bubonic plague; that he has never been at any time exposed to the danger of contracting it, and has never been in any locality where said bubonic plague, or any germs of bacteria thereof, has or have existed". *Jew Ho*, 103 F. 10 (C.C. Cal. 1900).

172.   California courts have found that "a mere suspicion [of a contagious disease], unsupported by facts giving rise to reasonable or probable cause, will afford no justification at all for depriving persons of their liberty and subjecting them to virtual imprisonment under a purported order of quarantine." *Ex parte Arata*, 52 Cal. App. 380, 383 (1921) (emphasis added).

173.   In *Jew Ho v. Williamson*,103 F. 10 (C.C. Cal. 1900), and *Wong Wai v. Williamson*, 103 F. 1 (CC Cal. 1900), the California courts found that there were more than 15,000 people living in the twelve blocks of San Francisco Chinatown who were to be quarantined. The courts found it unreasonable to shut down the ability of over 15,000 people to make a living because of nine deaths. This was one death for every 1,666 inhabitants of Chinatown.

174.   Plaintiffs have never had or contracted said coronavirus; they have never been at any time exposed to the danger of contracting it, and have never been in any locality where said coronavirus or any germs of bacteria thereof, has or have existed.

175.   Requiring Plaintiffs to abstain from all religious gatherings, despite substantial modifications to satisfy the public health interests at stake, violates their California Constitutional liberty rights.

176.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Orders.

177.   Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorney fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

## COUNT VIII

## THE GATHERING ORDER VIOLATES PLAINTIFFS' RIGHT TO FREEDOM OF SPEECH UNDER ARTICLE 1, § 2 OF THE CALIFORNIA CONSTITUTION

178.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

179.   Article I, Section 2 of the Constitution of the State of California states, "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

180.   The State Order and County Orders, on their face and as applied, completely bar religious speech at religious gatherings, even if Plaintiffs fully comply with the CDC and state social distancing guidelines. This violates Plaintiffs' right to the freedom of speech.

181.   The State Order and County Orders, on their face and as applied, are an unconstitutional prior restraint on Plaintiffs' speech.

182. The State Order and County Orders, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

183. The State Order and County Orders, on their face and as applied, unconstitutionally discriminate on the basis of content.

184. Defendants lack a compelling, legitimate, or rational interest in the State Order and County Orders' application of differential standards for churches and faith-based gatherings than those applicable to other so-called "essential" businesses or services, including the preschool that continues to meet at the Church site and other commercial business where people assemble and congregate.

185. The State Order and County Orders, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the Orders.

186. The State Order and County Orders, on their face and as applied, are not narrowly tailored to serve the government's purported interest.

187. The State Order and County Orders, on their face and as applied, do not leave open ample alternative channels of communication for Plaintiffs.

188. The State Order and County Orders, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on Plaintiffs' constitutionally protected speech.

189. The State Order and County Orders, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Defendants, to apply or not apply the Orders in a manner to restrict free speech.

190. The State Order and County Orders, on their face and as applied, are under-inclusive by limiting their prohibitions to only certain entities, organizations, or businesses deemed non-essential.

191. The State Order and County Orders, on their face and as applied, are unconstitutionally overbroad as they chill and abridge the free speech rights of Plaintiffs.

192.   On their face and as applied, the State Order and County Orders have caused, are causing, and will continue to cause Plaintiffs to suffer immediate and irreparable injury and undue and actual hardship.

193.   Plaintiffs have no other adequate remedy at law to correct the continuing deprivation of its constitutional rights.

194.       WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT IX

## THE ORDERS VIOLATE PLAINTIFFS' RIGHT TO FREE EXERCISE AND ENJOYMENT OF RELIGION UNDER ARTICLE I, §4 OF THE CALIFORNIA CONSTITUTION

195.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

196.   Article I, § 4 of the Constitution of the State of California states, "Free exercise and enjoyment of religion without discrimination or preference are guaranteed."

197.   "[T]he religion clauses of the California Constitution are read more broadly than their counterparts in the federal Constitution."   Carpenter v. City and County of San Francisco, 93 F.3d 627, 629 (1996).

198.   Plaintiffs have sincerely held religious beliefs that the Bible is the infallible, inerrant word of the Lord Jesus Christ, and that they are to follow its teachings.

199.   Plaintiffs have sincerely held religious beliefs, rooted in the Bible's commands, that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis.

200.   The State Order and County Orders, on their face and as applied, completely bar Plaintiffs' faith-based religious gatherings and use of their parking lot,

even if Plaintiffs fully comply with the CDC and state social distancing guidelines, in violation of Plaintiffs' right to the free exercise of religion.

201.   The State Order and County Orders, on their face and as applied, target Plaintiffs' sincerely held religious beliefs by prohibiting faith-based assemblies of any number of people and the even the use of the Church parking lot, whether or not Plaintiffs follows CDC social distancing guidelines.

202.   The State Order and County Orders, on their face and as applied, impermissibly burden Plaintiffs' sincerely held religious beliefs, compel Plaintiffs to either change those beliefs or to act in contradiction to them, and force Plaintiffs to choose between the requirements of their sincerely held religious beliefs or Defendants' imposed value system, which deems religious assembly as non-essential.

203.   The State Order and County Orders, on their face and as applied, place Plaintiffs in an irresolvable conflict between compliance with the Orders and their sincerely held religious beliefs.

204.   The State Order and County Orders, on their face and as applied, put substantial pressure on Plaintiffs to violate their sincerely held religious beliefs by ignoring the fundamental teachings of Christianity concerning the assembling of church members.

205.   The State Order and County Orders, on their face and as applied, are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious beliefs, speech, assembly, and viewpoint of Plaintiffs.

206.   The State Order and County Orders, on their face and as applied, constitute a substantial burden on Plaintiffs' sincerely held religious beliefs.

207.   Defendants lack a compelling, legitimate, or rational interest in the State Order and County Orders' application of differential standards for churches and faith-based gatherings than those applicable to other so-called "essential" businesses or services, including the preschool that continues to meet at the Church site and other commercial business where people assemble and congregate.

208.   Even if the State Order and County Orders' restriction on faith-based gatherings were supported by a compelling interest, which they are not, they are not the least restrictive means to accomplish the government's purported interest.

209.   The State Order and County Orders, on their face and as applied, fail to accommodate Plaintiffs' sincerely held religious beliefs.

210.   The State Order and County Orders, on their face and as applied, specifically target Plaintiffs' sincerely held religious beliefs and set up a system of individualized exemptions that permit certain other similarly situated businesses or services to continue operations under certain guidelines while prohibiting faith-based gatherings from operating with similar guidelines.

211.   The State Order and County Orders, on their face and as applied, constitute a religious gerrymander.

212.   The State Order and County Orders, on their face and as applied, have caused, are causing, and will continue to cause Plaintiffs immediate and irreparable harm, and actual and undue hardship.

213.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their Constitutional and statutory rights unless Defendants are enjoined from implementing and enforcing the State Order and County Orders.

214.   WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

## STATUTORY CLAIMS

## COUNT X

## THE GATHERING ORDER VIOLATES THE CHURCH'S RIGHTS UNDER THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT, 42 U.S.C. § 2000 et. Seq.

215.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs, as if fully set forth herein.

216. The Religious Land Use and Institutionalized Persons Act ("RLUIPA") states that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution." 42 U.S.C. § 2000cc(a)(1). If the government does impose such a restriction, it must then demonstrate that such a burden on the religious assembly is supported by a compelling interest and is the least restrictive means to further that alleged interest.

217. RLUIPA further mandates that no government "impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. §2000cc(b)(1).

218. RLUIPA further states that "[n]o government shall impose or implement a land use regulation that (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. §2000cc(b)(3).

219. The State Order and County Orders, on their face and as applied, bar Plaintiff Church from assembling for worship in its leased facility and even from using the parking lot, thereby imposing a land use regulation in a manner that imposes a substantial burden on the religious exercise of the Church, a religious assembly or institution, in violation of 42 U.S.C. § 2000cc(a)(1).

220. The State Order and County Orders, on their face and as applied, impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution, in violation of 42 U.S.C. §2000cc(b)(1).

221. The State Order and County Orders, on their face and as applied, impose or implement a land use regulation that totally excludes religious assemblies from a jurisdiction or unreasonably limits religious assemblies, institutions, or structures within a jurisdiction, in violation of 42 U.S.C. §2000cc(b)(3).

222.   The Church has sincerely held religious beliefs that the Bible is the infallible, inerrant word of the Lord Jesus Christ, and that Church members are to follow its teachings.

223.   Plaintiff Church has sincerely held religious beliefs, rooted in the Bible, that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis.

224.   The State Order and County Orders, on their face and as applied, target the Church's sincerely held religious beliefs by prohibiting faith-based gatherings of any size, even if they follow CDC "social distancing" guidelines.

225.   The State Order and County Orders, on their face and as applied, impermissibly and substantially burdens the Church's sincerely held religious beliefs.

226.   The State Order and County Orders, on their face and as applied, constitute a substantial burden on the Church's sincerely held religious beliefs and religious practice of regular assembly.

227.   Defendants lack a compelling, legitimate, or rational interest in the State Order and County Orders' application of differential standards for churches and faith-based gatherings than those applicable to other so-called "essential" businesses or services, including the preschool that continues to meet at the Church site and other commercial business where people assemble and congregate.

228.   Even if the State Order and County Orders' restriction on faith-based gatherings were supported by a compelling interest, which they are not, the State Order and County Orders do not employ the least restrictive means to accomplish the government's purported interest.

229.   The State Order and County Orders, on their face and as applied, have caused, are causing, and will continue to cause the Church immediate and irreparable harm, and actual and undue hardship, as they completely bar the Church's religious assembly and worship.

230.   The Church has no adequate remedy at law to correct the continuing deprivation of its Constitutional and statutory rights, unless Defendants are enjoined from implementing and enforcing the State Order and County Orders.

231.   As the Church has found it necessary to engage the services of counsel to vindicate its rights under the law, the Church is therefore entitled to an award of attorney fees and costs pursuant to California Code of Civil Procedure Section 1021.5.

232.          WHEREFORE, the Church respectfully prays for the relief against Defendants as hereinafter set forth in its prayer for relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A.   That this Court issue a Preliminary Injunction enjoining Defendants, Defendants' officers, agents, employees, attorneys, and all other persons acting in active concert or participation with them, from enforcing the State Order and County Orders so that:

i.   Defendants will not apply the State Order and County Orders in any manner as to infringe Plaintiffs' constitutional and statutory rights by discriminating against their right to assembly, speech, free exercise of religion, equal protection, and all other constitutional and statutory rights outlined herein;

ii.   Defendants will apply the State Order and County Orders in a manner that treats Plaintiffs' faith-based gathering on equal terms and in an equal manner with that afforded other non-faith-based gatherings;

iii.   Defendants will permit faith-based gatherings to continue to meet so long as they comply with the same social distancing and reasonable limitations Defendants have placed on similar non-faith-based assemblies in the State Order and County Orders; and

iv.   Defendants will permit Plaintiffs the opportunity to comport their behavior to any further limitations or restrictions that Defendants may impose in any future

modification, revision, or amendment of State Order and County Orders or similar directive, instruction, ordinance, or other legally operative mechanisms.

B.     That this Court issue a Permanent Injunction enjoining Defendants, Defendants' officers, agents, employees, attorneys, and all other persons acting in active concert or participation with them, from enforcing the State Order and County Orders so that:

i.     Defendants will not apply State Order and County Orders in any manner as to infringe Plaintiffs' constitutional and statutory rights by discriminating against their right to assembly, speech, free exercise of religion, equal protection, and all other constitutional and statutory rights outlined herein;

ii.     Defendants will apply the State Order and County Orders in a manner that treats Plaintiffs' faith-based gatherings on equal terms and in an equal manner with that afforded other non-faith-based gatherings;

iii.     Defendants will permit faith-based gatherings to continue to meet so long as they comply with the same social distancing, precautionary, and reasonably limitations Defendants have placed on similar non-faith-based assemblies; and

iv.     Defendants will permit Plaintiffs the opportunity to comport their behavior to any further limitations or restrictions that Defendants may impose in any future modification, revision, or amendment of the State Order and County Orders or similar directive, instruction, ordinance, or other legally operative mechanisms.

C.     That this Court render a Declaratory Judgment declaring that the State Order and County Orders both on their face and as applied by Defendants are unconstitutional under the United States Constitution and California Constitution, and declaring that:

i.     Defendants have violated Plaintiffs' right to free exercise of religion by impermissibly prohibiting faith-based gatherings, substantially burdening their sincerely held religious beliefs and applying criteria that are neither neutral nor generally applicable to religious and non-religious gatherings;

ii.     Defendants have violated Plaintiffs' right to freedom of assembly by impermissibly prohibiting faith-based gatherings;

iii.    Defendants have violated Plaintiffs' right to freedom of speech by impermissibly prohibiting faith-based gatherings of more than ten people;

iv.    Defendants have violated Plaintiffs' right to equal protection of the laws by impermissibly prohibiting faith-based gatherings and applying criteria that treats faith-based gatherings in a discriminatory and dissimilar manner than that applied to various non-religious gatherings;

v.     Defendants have violated the Establishment Clause by impermissibly demonstrating hostility towards faith- based gatherings and by impermissibly showing favoritism to certain non-religious gatherings;

vii.   Defendants have violated the Religious Land Use and Institutionalized Persons Act by substantially and impermissibly burdening the Church's sincerely held religious beliefs and treating it in an unequal manner to other non-religious assemblies or institutions, by imposing a substantial burden on the Church's sincerely held religious beliefs without a compelling government interest, and without deploying the least restrictive means to achieve any permissible government interest; and

D.     That this Court award Plaintiffs nominal damages for the violation of Plaintiffs' constitutional rights.

E.     That this Court adjudge, decree, and declare the rights and other legal relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment.

F.     That this Court retain jurisdiction over the matter for the purposes of enforcing this Court's order.

G.     That this Court declare Plaintiffs are a prevailing party and award Plaintiffs the reasonable costs and expenses of this action, including a reasonably attorney's fees in accordance with 42 U.S.C. §1988.

///

Case 3:20-cv-00865-BAS-AHG   Document 53-3   Filed 08/10/20   PageID.3192   Page 191 of
255
Case 2:20-cv-00832-JAM-CKD   Document 1   Filed 04/22/20   Page 49 of 51

H.     That this Court grant such other and further relief as this Court deems equitable and just under the circumstances.

Respectfully submitted,

NATIONAL CENTER FOR LAW & POLICY

Dated:  April 22, 2020

/s/ Dean R. Broyles, Esq.
Dean R. Broyles
Attorneys for Plaintiffs, **Cross Culture Christian Center and Pastor Jonathan Duncan**

ADVOCATES FOR FAITH & FREEDOM

Dated:  April 22, 2020

/s/ Robert H. Tyler, Esq.
Robert H. Tyler
Attorneys for Plaintiffs, **Cross Culture Christian Center and Pastor Jonathan Duncan**

Case 3:20-cv-00865-BAS-AHG   Document 53-3   Filed 08/10/20   PageID.3193   Page 192 of
255
Case 2:20-cv-00832-JAM-CKD   Document 1   Filed 04/22/20   Page 50 of 51

## **VERIFICATION**

I, Jonathan Duncan, have read the foregoing Verified Complaint and know its contents.

1.   I am a party to this action.

2.   I have read the foregoing complaint and know of the contents thereof.

3.   The same is true of my own knowledge, except as those matters which therein are stated on information as to information and belief. As to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___Apr. 22, 2020___, at ___Lodi___, California.

_____
Jonathan Duncan

1

2

3 **VERIFICATION**

4

5 I, Jonathan Duncan, Chief Executive Officer of Cross Culture Christian Center, declare as

6 follows:

7 1.    Cross Culture Christian Center, a California Domestic Nonprofit

8 Corporation, is a party to this action. I am the Chief Executive Officer and am duly

9 authorized to act on behalf of Cross Culture Christian Center.

10 2.    I have read the foregoing Verified Complaint and know of the contents

11 thereof.

12 3.    The same is true of my own knowledge, except as those matters which

13 therein are stated on information as to information and belief.  As to those matters, I

14 believe them to be true.

15 I declare under penalty of perjury under the laws of the United States of America

16 that the foregoing is true and correct.

17 Executed on _April 22, 2020_, at _Lodi_____, California.

18

19

20 _____

Cross Culture Christian Center

21 By: Jonathan Duncan

Its: Chief Executive Officer

22

23

24

25

26

27

28

**51**
**VERIFIED COMPLAINT**

Case 3:20-cv-00865-BAS-AHG  Document 53-3  Filed 08/10/20  PageID.3195  Page 194 of
255
Case 2:20-cv-00832-JAM-CKD  Document 1-4  Filed 04/22/20  Page 1 of 1

Order Prohibiting Public Assembly.
April 3, 2020

Pastor Michael Allison
Bethel Open Bible Church
760 South Ham Lane
Lodi, California

You are hereby ordered to close your facility located at 760 South Ham Lane, Lodi, California, and prevent future use of the facility, including the parking lot, for public assembly due to the outbreak of COVID-19 in the state of California and County of San Joaquin.

On March 19, 2020, the Governor of California issued an executive order N-33-20 (the "Order") mandating all individuals living in the state of California to stay home or at their place of residence except as needed to maintain continuity of operations of the 16 federal critical infrastructure sectors. On March 26, 2020, the San Joaquin County Public Health Officer issued an order prohibiting public assemblies of any size that are not essential for life and safety.

On March 29, 2020, the City of Lodi reported to the County Public Health Officer that your tenant, Cross Culture Community Church was continuing to use your facility for public assembly, and that Cross Culture Community Church was aware of the County Order and intended to continue to meet in violation of the Order. As a facility for public assembly neither the building or the parking lot is part of the essential critical infrastructure as defined by State and Federal agencies. Continued operation, in violation of the Order, will hamper the County's ability to slow transmission of the disease and increase the risk to the public from COVID-19.

Any person who refuses or willfully neglects to comply with this emergency order is guilty of a misdemeanor, punishable by fine and/or imprisonment. (Government Code section 8665; Health and Safety Code section 120275.) In addition, there are civil and administrative penalties that can be imposed upon you as a result of continued operation.

The ability of Bethel Open Bible Church to operate a child-care facility consistent with the order of the State Public Health Officer issued March 22, 2020 is unaffected by this Order.

*Maggie Park*

Maggie Park. M.D.
San Joaquin County
Public Health Officer

CITY COUNCIL
DOUG KUEHNE, Mayor
ALAN NAKANISHI,
Mayor Pro Tempore
MARK CHANDLER
JOANNE MOUNCE

## CITY OF LODI
**2015 "Wine Region of the Year"**
CITY HALL, 221 WEST PINE STREET
P.O. BOX 3006
LODI, CALIFORNIA 95241-1910
(209) 333-6702 / FAX (209) 333-6807
www.lodi.gov    cityclerk@lodi.gov

STEPHEN SCHWABAUER
City Manager
PAMELA M. FARRIS
Assistant City Clerk
JANICE D. MAGDICH
City Attorney

# NOTICE OF PUBLIC NUISANCE

## THE VIOLATIONS DESCRIBED IN THIS NOTICE CONSTITUTE VIOLATIONS OF THE CALIFORNIA HEALTH AND SAFETY CODE AND CALIFORNIA PENAL CODE

THE BUSINESS ACTIVITIES CONDUCTED UPON THESE PREMISES ARE ILLEGAL. THEY ARE BEING CONDUCTED IN VIOLATION OF CALIFORNIA HEALTH AND SAFETY CODE, INCLUDING SECTIONS 120130 AND 120295. (VIOLATION OF CALIFORNIA EXECUTIVE ORDER N-25-20 AND ORDER OF THE SAN JOAQUIN COUNTY PUBLIC HEALTH OFFICER, DIRECTING ALL BUSINESSES TO CEASE NON-ESSENTIAL OPERATIONS). FURTHER, THE BUSINESS ACTIVITIES CONDUCTED UPON THESE PREMISES VIOLATE PENAL CODE SECTION 373a (EVERY PERSON WHO MAINTAINS, PERMITS, OR ALLOWS A PUBLIC NUISANCE TO EXIST UPON HIS OR HER PROPERTY OR PREMISES, AND EVERY PERSON OCCUPYING OR LEASING THE PROPERTY OR PREMISES OF ANOTHER WHO MAINTAINS, PERMITS, OR ALLOWS A PUBLIC NUISANCE TO EXIST THEREON).

THIS POSTING CONSTITUTES WRITTEN LEGAL NOTICE TO DISCONTINUE NON-ESSENTIAL BUSINESS ACTIVITIES AND MAINTENANCE OF A PUBLIC NUISANCE UPON THESE PREMISES.

FAILURE TO DISCONTINUE NON-ESSENTIAL BUSINESS ACTIVITIES IS A MISDEMEANOR (H.S.C. § 120295 AND P.C. § 373a). FAILURE TO DISCONTINUE THE NUISANCE MAY BE PUNISHED AS A MISDEMEANOR AND THE EXISTENCE OF SUCH NUISANCE FOR EACH AND EVERY DAY AFTER THE POSTING OF THIS NOTICE SHALL BE DEEMED A SEPARATE AND DISTINCT OFFENSE. ALL PERSONS GUILTY OF VIOLATING THESE SECTIONS MAY BE PROSECUTED UNTIL THE NUISANCE IS ABATED. (P.C. § 373A).

BUSINESS NAME: CROSS CULTURE CHURCH

PROPERTY ADDRESS: 760 S Ham LN.          Lodi, CA

LODI POLICE OFFICER SGT. FRITZ / BINKLEY   BADGE NO. 54/32/34
                      Sgt. Sausez

DATED 4/1/20, 2020

**EXHIBIT GG**

1  LEROY SMITH, State Bar No. 107702
   County Counsel, County of Ventura
2  JACLYN SMITH, State Bar No. 274311
   Assistant County Counsel
3  800 South Victoria Avenue, L/C #1830
   Ventura, California 93009
4  Telephone: (805) 654-2773
   Facsimile: (805) 654-2185
5  E-mail: jaclyn.smith@ventura.org

6  Attorneys for Plaintiffs County of Ventura
   and Robert Levin, M.D., in His Capacity as
7  Health Officer for Ventura County

RECEIVED
VENTURA SUPERIOR COURT

*AG* AUG 06 2020

VENTURA
SUPERIOR COURT
FILED

AUG 07 2020

MICHAEL D. PLANET
Executive Officer and Clerk
BY:_____, Deputy
ADRIANA VELASCO

8  **(EXEMPT FROM FILING
   FEES [Gov. Code, § 6103].)**

9

10              SUPERIOR COURT OF CALIFORNIA, COUNTY OF VENTURA

11

12  COUNTY OF VENTURA and ROBERT )   Case No. 56-2020-00544086-CU-MC-VTA
    LEVIN. M.D.. in his capacity as Health )
13  Officer for Ventura County,          )   Reservation No. 2523184
                                         )
14              Plaintiffs,              )   [PROPOSED] ORDER GRANTING
                                         )   TEMPORARY RESTRAINING ORDER
15          vs.                          )   AND ORDER TO SHOW CAUSE RE
                                         )   ISSUANCE OF PRELIMINARY
16  GODSPEAK CALVARY CHAPEL,             )   INJUNCTION
    ROB MCCOY and DOES 1-1000,           )
17  inclusive,                           )   Verified complaint filed: August 5, 2020
                                         )
18              Defendants.              )
                                         )
19  _____ )

20          The application of plaintiffs County of Ventura ("County") and Robert Levin,

21  M.D., in his capacity as Health Officer for Ventura County ("County Health Officer"), for

22  a temporary restraining order and order to show cause re issuance of a preliminary

23  injunction against defendants Godspeak Calvary Chapel, Rob McCoy and Does 1-1,000

24  came on for ex parte hearing on August 7, 2020, at 8:30 a.m., ~~or as soon thereafter as the~~

25  ~~matter could be heard,~~ in Courtroom 20 of the above-entitled court, located at 800 South

26  Victoria Avenue, Ventura, California.  Appearances were as stated in the record.

27          Based upon the papers submitted and argument of counsel, the court finds that

28  there is an immediate threat to public health and safety due to the 2019 novel coronavirus

1

ORDER GRANTING TEMPORARY RESTRAINING ORDER AND OSC

1  (COVID-19) pandemic.  The court further finds that plaintiffs are likely to prevail on the

2  merits of their complaint and that the harm to the general public, including all residents of

3  Ventura County, from the nonissuance of a restraining order outweighs the harm to

4  defendants from the issuance of a restraining order.  Accordingly, the application is

5  GRANTED as follows:

<div align="center">

**TEMPORARY RESTRAINING ORDER**

</div>

7  **IT IS HEREBY ORDERED** that defendants Godspeak Calvary Chapel, Rob

8  McCoy and Does 1-1,000, and each of them, and their agents, employees, representatives,

9  members, and volunteers, and all persons acting under, in concert with or for them, are

10  hereby enjoined and prohibited from:

11  1.  Conducting, participating in, or attending any indoor worship services at 320

12  Via Las Brisas, Newbury Park, Ventura County, California (hereafter "Property") or any

13  other place within Ventura County; and

14  2.  Conducting, participating in, or attending any outdoor worship services at the

15  Property or any other place within Ventura County unless, at all times during the services,

16  they (a) fully comply with all applicable state and local health orders, including the State

17  Stay at Home Order (including the Statewide Public Health Officer Order issued July 13,

18  2020) and the Order of the Ventura County Health Officer Closing Specified Indoor

19  Industries and Activities effective July 14, 2020 (collectively, the "Health Orders"), (b)

20  comply with the mandate of the State Public Health Officer to wear face coverings and

21  practice physical distancing and (c) do not permit or allow any violations of these orders

22  or mandates.

23  **IT IS FURTHER HEREBY ORDERED** that the County and its personnel,

24  including employees of the Sheriff's Department, Code Compliance Division and

25  Department of Public Health, and other applicable governmental agencies are hereby

26  authorized to enter onto the Property to post notice of this Order in visible locations on

27  the Property, including, but limited to, on exterior fences, gates, structures, doors or any

28  / / /

<div align="center">

2

</div>

1  other structure thereupon, and to distribute this Order to defendants and/or any other

2  persons present on the Property.

3  **ORDER TO SHOW CAUSE**

4  **IT IS HEREBY ORDERED** that defendants are to appear on August **31**, 2020,

5  at **10:00** a.m., in Courtroom 20 of the above-entitled court, located at 800 South Victoria

6  Avenue, Ventura, California, to show cause why a preliminary injunction should not be

7  ordered, prohibiting, restraining and enjoining defendants, and each of them, and their

8  agents, employees, representatives, members, and volunteers, and all persons acting

9  under, in concert with or for them, from:

10  1.  Conducting, participating in, or attending any indoor worship services at the

11  Property or any other place within Ventura County; and

12  2.  Conducting, participating in, or attending any outdoor worship services at the

13  Property or any other place within Ventura County unless, at all times during the services,

14  they (a) fully comply with all applicable state and local health orders, including the Health

15  Orders, (b) comply with the mandate of the State Public Health Officer to wear face

16  coverings and practice physical distancing and (c) do not permit or allow any violations of

17  these orders or mandates.

18  This Order Granting Temporary Restraining Order and Order to Show Cause re

19  Issuance of Preliminary Injunction shall be served on defendants no later than August

20  **11**, 2020, by personal service, overnight courier, facsimile or electronic mail.  Proof of

21  service shall be filed no later than August **13**, 2020.

22  Any opposition papers to the Order to Show Cause shall be filed and served on

23  plaintiffs by ~~personal service, overnight courier, facsimile or~~ electronic mail no later than

24  August **21**, 2020 at **4:00 p.m.**

25  Any reply papers to the Order to Show Cause shall be filed and served on

26  defendants by ~~personal service, overnight courier, facsimile or~~ electronic mail no later

27  than August **28**, 2020 at **4:00 pm**.

28  The Temporary Restraining Order granted herein shall expire on **August 31, 2020 at conclusion of hearing**.

3

The Court finds good cause to extend TRO and continue
hearing on OSC to 8/31/20 beyond
15 days.

1   IT IS SO ORDERED.

2

3   Dated:         AUG 0 7 2020          JUDGE OF THE SUPERIOR COURT

4

5                                        MATTHEW P. GUASCO

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

**EXHIBIT HH**

  

☰ MENU    NEWS    SPORTS    BEST OF    VIDEO    WEATHER    CONTESTS/MORE

# 'Great Concern': LA County Warns Churches Could Face Fines For Indoor Services

By CBSLA Staff    July 30, 2020 at 6:42 pm    Filed Under: Church Services, COVID-19





Air Conditioning Pro - San Diego, CA Professionals

We Are Fully Licensed Heating & Air-Conditioning Replacement/New install professionals.

FOLLOW US

     

OUR | NEWSLETTER

 Sign up and get our latest headlines delivered right to your inbox!

Email address

Subscribe Now!



**LOS ANGELES (CBSLA)** – Investigators are looking into reports of religious institutions in Los Angeles County that continue to hold indoor services despite coronavirus restrictions barring such gatherings, officials revealed Thursday.

MOST **VIEWED**

 LA Angels Employee Arrested In Connection With Death Of Pitcher Tyler Skaggs




Los Angeles County's health officer Dr. Muntu Davis said notices will be issued to any offenders who are in violation of health orders banning large gatherings.

ADVERTISING


Swim Coach Arrested In Connection With Teen s Disappearance, Gir Found Safe


Riverside County Sheriff s Department Investigating Severa Disappearances In Idy wi d Area


LAPD Ca ed To Ho mby Hi s Wedding After Noise Comp aints Hours After Garcetti Warned Uti ities Cou d Be Shut Off To Party Houses


Gunshot Victim Dies After Being Found Wounded At Orange Crash Site


Hasbro Pu s Tro s Do Over Video A eging Hidden Button Promotes Pedophi ia


Hacienda Heights Rifle-Wie ding Robbery Suspect Wounded By Deputies After Wi d Pursuit, Mu tip e Shootouts


LAUSD Offers G impse Into What Schoo s Wi Look Like Once Students Return


One Rescued After Car Pinned Under Big-Rig In Santa C arita


WATCH: Sto en Car Suspects Arrested After Wi d Chase

Speaking to reporters online, Davis said there are exceptions allowing outdoor church services and political protests, but attendees are required to wear face coverings and practice social distancing.

"Unfortunately we've heard reports of some faith organizations operating outside of those health and safety requirements," Davis said. "From
a health and safety perspective this is of great concern given the large number of COVID-19 cases that continue to be diagnosed in Los Angeles County.

".. For those (violators) for which we are aware of and are able to confirm, we will send a notice of violation requesting their adherence," he
said. "... We're hoping that institutions that are in violation of the health officer order will follow the example of so many other faith institutions who hold their services outdoors with safety protocols in place."

There was no suggestion by Davis that any of the roughly 1,000 active virus
outbreaks being investigated by the county involve any religious institutions.

Davis referenced Davis referenced a Washington state choir practice in March that led to 87% of the attendees becoming infected with the virus, and ultimately two deaths doctors linked to COVID-19.


Air Conditioning Pro - San Diego, CA Professionals
We Are Fully Licensed Heating & Air-Conditioning Replacement/New install professionals.

Comments



CCPA Notice

Tab☻la Feed

**These New Assisted Living Apartments Near Oceanside Are A Dream Come True! Research Senior Assisted Living Oceanside**

Senior Living/Assisted Living | Sponsored

**The Dead Giveaway That Tells You When Amazon's Giving You A Better Price Than Other Retailers**

Wikibuy | Sponsored

**Here's Why This $70 Respirator is Better Than Your Face Mask**

O2 Canada | Sponsored

**New Black KN-95 Masks [Buy Here] - Ships From California**

Stratton Essential Supply | Sponsored

**Closing Time: Here's All The Restaurant Chains Closing in 2020**

Collider | Sponsored

**New Assisted Living Near Oceanside Coming in 2020**

Assisted Living  Search Ads | Sponsored

**California : Launches New Policy For Cars Used Less Than 59 Miles/Day**

Bill Cruncher | Sponsored

**Southern California Parents Sue Gov. Newsom Over Restrictions On In-Person Schooling**

**Swim Coach Arrested In Connection With Teen's Disappearance, Girl Found Safe**

## ◉CBS Los Angeles

Follow Us

| NEWS | SPORTS | WATCH + LISTEN | CORPORATE | STATION INFO |
|---|---|---|---|---|
| LA News | Lakers | Music | About Us | About CBS2 / KCAL9 |
| LA Weather | Clippers | Video | Advertise | |
| Business | Dodgers | Podcasts | Connect | |
| Consumer | Angels | Seen On TV | | |
| Entertainment | Rams | Only CBS | | |
| Investigative | Chargers | Best Of LA | | |
| | College Sports | Best Of Orange County | | |

◉CBSLOCAL ©2020 CBS Broadcasting Inc. All Rights Reserved.
Powered by WordPress.com VIP

By viewing our video content, you are accepting the terms of our Video Services Policy
Privacy Policy | Terms of Use | California Privacy/Info We Collect | California Do Not Sell My Info | Mobile User Agreement | Ad Choices | EEO Report | Public File for KCBS-TV | Public File for KCAL-TV | Public Inspection File Help

**EXHIBIT II**

# UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF CALIFORNIA

42B6  >?#   **'20 CV 0683 BAS AHG**

**VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, DECLARATORY RELIEF, INJUNCTIVE RELIEF AND DAMAGES**

## COMPLAINT

## INTRODUCTION

))))))))))))))))))))))))))))))))))))))))))))))))))))        )))))))))))))))))

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER, DECLARATORY RELIEF, INJUNCTIVE RELIEF AND DAMAGES**

'# CROMRKVVOXQONZOMSPSMKVVYKLS\OVSQSYQK^RO\SXQVKVVYaSXQ ObMOZ^SYX]WY\O^RKXYXO_XN\ON&%%\YKNMK^OQY\SOYX"\OVSQSY_][SXO]]OKXN KM^S`S^SO]RY_VNKXcVSWS^K^SYX]WV_N\OVYaSXQ^ROQ\XPaY\UO\]KXNM_]^YWO\YP ^RY]O_]SXO]]OKXNKM^S`S^SO]#

(# CRO?\NO\ S] XY^K XO_^\KVVKaYPQOXO\KVZZVSMKLSVS^cK_]SO^K\QO^K 4YX]^S^_^SYXKVVYOM^KM^S`SAc]]OWLVcaRSVO]SQXSPSMKX^Vc_\NOXSXQ^7\OO6bO\MS]O YPAOVSQSYXKX!Z\Y`SNSXQYKNObOWZ^SYP]\WKXcKM^S`S^SOKK\OXY^MYX]^S^_^SYXKVVc Z\Y^OM^ON#

**JURISDICTION AND VENUE**

)# CRO4Y_\^RK]Y\SQSXKV_\S]NSM^SYX@VKSX^SPP]O\4VKSW_XNODB4YX]^#! 2\^#:::! BOM KXN_XNO\ D#B#4#e &((&KXN&()( ÄK Ä(LOMK_]ORS]MVKSWS]OY_^YP^RO 7S\]^2WOXNWOX^Y^ROIDXS^OB^K^O4YX]^S^_^SYX#

*# CRO4Y_\^RK]]_ZZVOWOX^KV_\S]NSM^SYX@VKSX^SPP]^K^OVKaMVKSW_XNO\ D#B#4#e &(+, LOMK_]OROK^K^OVKaMVKSW]Y \OVK^OY^ROMVKSWO\aRSMR^RO4Y_\^RK] Y\SQSXKV_\S]NSM^SYXY^RK^S^PY\WZK\^YP^RO]KWOMK]OY\MYX^\Y`O\]c_XNO2\^SMVO::: YP^RO DXS^OB^K^O4YX]^S^_^SYX#

+# CRO4Y_\^WKcKaK\NNKWKQO]\]_KX^Y' D#B#4# &.-(#

,# EOX_OS]Z\YZO\SX^RS]T_NSMSKVNS]^\SM^_XNO\ D#B#4# &(.&ÄLKL]KVWNOPOXNKX^] \O]SNOSX^ROT_NSMSKVNS]^\SMKXNK\OO]SNOX^]Y^ROB^K^OYP4KVSPY\XSKKXN^ROO`OX^]RKQK`O \S]O^Y^RS]KM^SYXYMM_\\ON^RSXRS]NS]^\SM^#

-# CRO4Y_\^RK]ZO\]YXKV_\S]NSM^SYXKVVNKWOXNOPOXNKX^]LOMK_]OROcK\O KVV\O]SNOX^]YP^RO4Y_X^cYPBKXSOQYKXN^ROB^K^OYP4KVSPY\XSKKXN^RO?\NO\^RK^S]LOSXQ MRKVVOXQON_S]NSM^SYXKWSNO^RSVT_NSMSKVNS\#

**PARTIES**

.# @VKSX^SPP2BSNSX@VKM]OXS]\S]SO]]K *%&ÄM Ä(Y\ZY\K^SYXY\WONKXN_Vc YZO\K^SXQK4R_\MR_XNO\^ROKa] YP^ROB^K^OYP4KVSPY\XSKOSXKP^O\c\OPO\OXMON ^RO4R_\MRSXMV_NSXQS]WOWLO\]#

$$$

## FACTUAL BACKGROUND

### The Church

***The Order***

COMPLAINT FOR TEMPORARY RESTRAINING ORDER, DECLARATORY RELIEF,
INJUNCTIVE RELIEF AND DAMAGES

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER, DECLARATORY RELIEF, INJUNCTIVE RELIEF AND DAMAGES**

^RO¿OWKSSXᶜSX^ROSᶜORSMWKJ}^ROᶜNSNᶜVKJB_XNKcf:P^RO\OWLO\YPᶜY_\MYXQ\OQKNSᶜYX
XYᶜKLSNWᶜc?\NO\!^ROᶜBRO\SᶜBBV\YKUᶜQM^SYXQᶜMO]]K\YOXPY\MᶜRO^\NO\#h

(&#     CRO^\NO\KVVYᶜQK^RO\SᶜRQ]KW_V^S^_XPL_]SXO]]QK]XKM^S`S^QᶜKK\O
XY^MYX]^S^_^SYXᶜKV^OM^ONX^V¿O[_S\SXQOROW^YOXKMPᶜYMSKNᶜS]^KXMSᶜSXQᶜSXM^OK]ON
]KXS^K^S\YᶜKXNK\NJᶜaO^O\! S^NYO]KY^KVVYᶜ¿4R_\MRᶜaRSᶜS] Z\Y^OM^DᶜN^RO7S\]^
2WOXNWOXP^RGᶜYX]^S^_^SYᶜQK^ROO!OXSᶜS^OXKMᶜRᶜQ^\SM^Oᶜ2]Y]]SLVᶜOMSNS^^KXMSXQ
KXN\Oᶜ\OSQORO]ᶜZᶜYᶜJ]SLVᶜOXS^K^SᶜYKXK\K\\K\N\N]#

***The Church's Efforts***

('#     CROᶜ4R_\MRRK]]Y_QR^YaY\UaSᶜR4Y_X^cYPPSMSᶜXMVᶜN^SRᶜQ_LVSᶜMKV^R
?PPSMOᶜKXN\OᶜY_X^cᶜBRO\SPPᶜYᶜPSXKᶜKaKcᶜᶜ^YK]]OWLᶜVᶜᶜRSᶜVOKN`KXMSᶜRᶜOᶜBᶜY`O\XWOX^jᶜ]
SX^O\O]]ᶜXMV_NOᶜKM^SᶜXQᶜSᶜSᶜS]ᶜ^KXMEᶜKᶜOᶜSXM^OK]ᶜOKXS^K^S\YᶜKXNK\N]#

((#     CROᶜ4R_\MRRKJWKNOR\O¿ᶜZOMSEᶜSMZY]KᶜYᶜKa\S^^O¿ᶜRᶜYᶜWKXNKX_WLOYP
KXMSVᶜKᶜZYJKᶜSXMV_NOᶜXO¿ᶜ^YᶜM]SᶜXQᶜSᶜSᶜS]^KXMEᶜQᶜ]O\SMOᶜDᶜ_S\SXO¿ᶜYXQ^OᶜQKᶜXᶜ^]
aOK\Z\Y^OM^OᶜQᶜOKⱰSXMV_N¿SᶜRᶜXQᶜᶜVKᶜS^S^!K]]OWLVSᶜXᶜQᶜRSMVᶜNᶜ]OᶜOWLVVSᶜXᶜ_QKWKWSᶜᶜS^ᶜ]
]Z^OKN\Yᶜ_^Y^O^OᶜKVKᶜOᶜOᶜᶜKXKYZO^O^KM¿SᶜN^O^\RᶜZKWS^OᶜKMᶜOᶜ@RO^R\OO
]ZOMSEᶜSMZY]K}KK]OKᶜ^KMR¿OᶜbRSLS^('}_) KXNᶜ#

()#     <Oᶜ^OO}bMRKXQ\OᶜONᶜaOO\Rᶜ4R_\MRKXSᶜ5676>52>CB    \OVK^OᶜN\ROᶜ]OPPY\^ᶜ]
K\OᶜK^^KMROᶜ}bRSLS^¿}!, KXNᶜ#

(*#     CROᶜ4R_\MRRK]KV^ᶜYPPOᶜOᶜYNKᶜ]]OWLWSW^SWᶜOᶜSWS^^¿LXKXᶜᶜQ_SNKXXMᶜOᶜO]}^\SM^OᶜSYX]
SWZYᶜ]OᶜᶜN:_4Y_X^cYPPSMSᶜKV#

(+#     CROᶜ5676>52>CB     RK`OSXPY\WOᶜN\O\4R_\MRᶜ}RKSP^ROᶜKᶜ]]OWLVᶜXYYWK^^Oᶜ\O
aRK^Z\OMK_^SYᶜ}bOᶜS¿KU_OROᶜaSVᶜVOSXSᶜXᶜ]YWXKSᶜ^^Oᶜ NO\KXNᶜRᶜ\NO\\NO\aSVᶜVOOXPY\MO\MON
KQKSX^]ROWSXMV_N¿WᶜOᶜNOᶜWKᶜᶜK\K\K\JᶜSLVᶜKVᶜYᶜY]SᶜPSXXO\ᶜKᶜXSWSᶜXᶜSWZ\]}]YXWOX^¿#

(,#     ?X_2Z\S\-! '%'%! 4Y_X]OᶜY\Yᶜ\Rᶜ\4R_\MRᶜ]UONᶜSᶜPᶜRᶜO¿5676>52>C   B_aY_VᶜNᶜLO
aSVVSXᶜQ\WWOO¿^OᶜaSᶜR^Rᶜ\RᶜᶜR\4R_\MR^YNS]M_]ᶜ]K_ⱭᶜKV^ᶜ^KᶜZKᶜXᶜ^KVᶜᶜRᶜOᶜOᶜKᶜ\RᶜⱭᶜ¿RᶜS^^RᶜO¿5676>52>CB    \OP_]ONYWYOO^ᶜ
aSᶜRᶜRᶜ4R_\MR#

$$$

$$$

))))))))))))))))))))))))))))))))))))))))))))))))))))    ))))))))))))))))))

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER, DECLARATORY RELIEF,
INJUNCTIVE RELIEF AND DAMAGES**

# FIRST CLAIM

### (First and Fourteenth Amendment – Free Exercise)

(-# @VKSXR**SPD**L**K**VVO**QKX**NSXMY\ZY\KL*O*]OPO\OXM**KO**M**RX**N`O`\cKVVOQK^SYX MYX^KS**XKX**\KQ\K**ZR**R`\Y_Q**R**, YP^RS**J**YWZVKS**X**X**J**^RY_QR_VV**J**O^PY`\'RO\OSX#

(.#   CRO7S\]^2WOXNWOX**P**^RO**D**XS^O**B**^K^**G**J]YX]^S^_^S**Z**'X**`**SNO]RK&4YXQ\O]] ]RKVWKU**O**XYVKaf  Z\YRSLS^S**X**R**Q**O**P**\OOObO\MS]**O**Y**P**OVSQS**Y**X**XD**NO\'^RO7Y_\^OOX^R 2WOXNWOX^R**S**]Z\YRSLS**C**]`O`\c VO`O**Y**P**]^K^**G**KXNVYM**K**V**`**O`**W**OX**P**\YWWKUS**X**Q**\**VKa Z\YRSLS^S**X**R**Q**P`\OOObO\MS]**Y**P**OVSQSYX#

)%#   ?X S^]PKM**Y**O**.K**]KZZVSO**N**R**O**\NO`\SYVK^**Q**R**C**7S\]^2WOXNW**X**O**7\OO6bO\MS]**O 4VK_]**O**.OMK_**$**O**MYX]^S^_**K**O**Y`O\L\YK**N**]^SM^S**Y**X**X**R**O**7\OO6bO\MS]**O**PAOVSQS**XX**X**Y**X`**RO MY\YVV** S**K**s**]**\**J**^2WOXNWOX**S**Q**R^YK]]OWLVc#

)&#   ?X S^]PKM**Y**O**.K**]KZZVSO**N**R**O**\NO`\SYVK^**Q**R**C**7\OO6bO\MS]**O**4VK_]**O**.OMK_**$**O SWZO\WS]]SL**Z**V**C**KM**O**J**Y\Y]^\SXQOX**O**]^\SM^SY**N**]^SM^SY**N**]^SM^SY**N**]**K**^RO4R_\MR^RK**X**\OZVKM**O**Y**X**K**]OM_VK\ L_]SXO]]O]#

)'#   ?X S^]PKM**Y**O**.K**]KZZVSO**N**R**O**\NO`\SYVK^**Q**R**C**7\OO6bO\MS]**O**4VK_]**O**.OMK_**$**O KVVYK**K**]VK\Q**K**O**_WLOY**P**]OM_VK^**Q**S**VK^RO\O`**K**SVK^R**X**S**Z\YRSLS^S**X**R**Q**OQSQSY**Q**K^\O\SXQ]#

)(#   ?X S^]PKM**Y**O**.K**]KZZVSO**N**R**U**C**7\NO`\SYVK^**Q**R**C**C**7\OO6bO\MS]**O**4VK_]**O**.OMK_**$**O**S] XY^XK\\YaVc^KSVY`\**K**XX**NS^S\ XY^^ROVOK]**O**J^\SM^SY**N**^SM^SY**N**]^SM^S**O**X**X**YK]**K**^YKMMYWZ**K**VVS**K**S**Q**M**Y**RY**X**WZOVVSXQ QY`O\XWOXS**K**NO\O]^#

))#   ?X S^]PKM**Y**O**.K**]KZZVSO**N**R**O**\NO`\SYVK^**Q**R**C**7\OO6bO\MS]**O**4VK_]**O**.OMK_**$**O MYX]^S^_**K**]\Y**K**S**Y\^RO**O**bO\MS]**Y**P**R**G**R_\**M**R^**_\MRjS7^\OO6bO\MS]**SQ**R**OR^]#

)*#   ?X S^]PKM**Y**O**.K**]KZZVSO**N**R**O**\NO`\SYVK^**Q**R**C**7\OO6bO\MS]**O**4VK_]**O**.OMK_**$**O ObOWZ**U**J**VK\QO**K**O**_WLOYPL_]SXO]]SO**XX**X**O**J**K**J**XXKM^S^S^S^S^S**SRK**K**\KOXY7Z\Y^OM^RO**XX**R^YK]]^S^K YX! aRSV**O**K**XY7Z\Y^\SNS**O**NK**O**_PPSMSO**OX**O**]**Vs^KVOObOWZ^S**SN**R**K**Y^YOM^'O**N**S**]^2WOXNWOX**O**KXM^S^S**O**c#

)+#   ?X S^]PKM**Y**O**.K**]KZZVSO**N**R**O**\NO`\SYVK^**Q**R**C**7\OO6bO\MS]**O**4VK_]**O**.OMK_**$**O Z\YRSLS^S^S**R**O**7\OO6bO\MS]**O**7\PAOVSQSYX**K**K**XX**KL\SNQO**P**SRSVSQS**O**K**R^YK]]OWLVK**KX**K**NNOZ\S\O\\O`**K**^RO 4R_\MR**K**X**O**\]^]WOWLO\**K**SVK^R**Y**P**VSLO\S^\S\j**K**Y]**R**K^\RY_N_Z]**O**R**K**\Y_**K**]**O**]^RY_OM^\OZWOW]]**O**J**SPVK#

## SECOND CLAIM

**(First and Fourteenth Amendment; California Const., Article I, § 3(a) – Assembly)**

### THIRD CLAIM

### (Fifth Amendment – Due Process)

$$$

$$$

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER, DECLARATORY RELIEF,
INJUNCTIVE RELIEF AND DAMAGES**

## FOURTH CLAIM

### (Unlawful Order – Arbitrary, Unreasonable and Oppressive)

## FIFTH CLAIM

### (Unlawful Order – Exceeds Statutory Authority)

## SIXTH CLAIM

### (Deprivation of Rights – 42 U.S.C. § 1983)

$$$

$$$

$$$

$$$

$$$

$$$

))))))))))))))))))))))))))))))))))))))))))))))))))))))))                    )))))))))))))))))

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER, DECLARATORY RELIEF,
INJUNCTIVE RELIEF AND DAMAGES**

**PRAYER FOR RELIEF**

F96A67?A6!    @VKSX^SPPOM^P_VY_O]^}^RG4Y_\^^YOX^CT_NQWOK&QKX]^
5OPOXNKK]PYVVYa]/

&# 8\KX^SXQRQ@VKSX^SPPjXM_\\OXPSWOWY^SPYK^OWZK\c\O]^\KSXSXQ\O\0

'# 5OMVK\XXPY\MOWYPXRO\NO\KQKSXRJGR_\MRYLO_XKaP_VKXN$K\
`SYVK^SYPXRGR_\MRj]SQR^]0

(# 8\KX^SXQXY\NOZ\OVSWSXKKSVNSRO\OKPZO!WKXOXOXGYSXSXQ
5676>52>CB    KXN5676>52>CBj   YPPSMOKQOX}KPPSVSKOOKX]!
]_MMO]]YQWZVYcOKXXKXcY^ROZO\]YX}RYK\OSXKM^SMOYXMO^\
ZK\^SMSZKa^SYKXcYP^ROPY\OQYSZ}]YXP^YWOXPY\M}RQ^\NO\KQKSX]^
@VKSX^SPP0

)# 6X^\cYPT_NQWOPXY^@VKSXKSPPKRQKSXS]OPOXNKRY]NOZS`K^SYXPSQR^]!
SXMV_NKXQaK\NYPNKWKQOSKXKWY_X^YLONO^O\WSXORG4Y_\^0

*# 2aK\NSXQZ_XS^S`OKWKQOQKKSXXXc5OPOXNKPX_XKY^YLOKM^SXKXKX
YPPSMSNKXZKMH6XONOZ\S`SXQRQ@VKSXYSPP\SQR^]0

+# 2aK\NSXQ@VKSX^SPPj]KXK^^Y\XOJ}OKJK_^RY\SdONOXRRON\A#4S`#@#}) !)'
D#B#4# &.--!  KXN$KXcY^RQKZZZVSMKLKVK0

,# 2aK\NSXQ_MRP_\^RO\OOVS&P^RG4Y_\^NOOWT_]^KXX\YZG0

*Respectfully Submitted,*

jjjjjjjjjjjjjjjjjjjjjjjjjj

**Jeremiah Graham**
&&.*+3O\XK\NX@VK5K#! @WI%.+-
BKX}SSOQY42  .'&'-
C/Ä+&.+(("*&&%
TO\OWSKRNQ\KRKW1QWKSV#MYW

*Attorney for Plaintiff*
*ABIDING PLACE MINISTRIES*

)))))))))))))))))))))))))))))))))))))))))))))))           )))))))))))))))))

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER, DECLARATORY RELIEF,**
**INJUNCTIVE RELIEF AND DAMAGES**

## ABIDING PLACE MINISTRIES
### *Plan for Assembly*

**WHEREAS** on March 19, 2020, Gavin Newsom, the Governor of California, issued an executive order, styled Executive Order N-33-20, directing the citizens of California to heed the current State public health directives, and to "stay-at-home."

**WHEREAS** on March 27, 2020, Wilma J. Wooten, the Public Health Officer for the County of San Diego, issued an order prohibiting gatherings of more than ten (10) people.

**WHEREAS** the Abiding Place Ministries, and its Pastor, and all members, believe that they must comply with the command of God "not to forsake the assembling of yourselves together," and that the assembly must take place in "one place" on the "Lord's Day" as directed by the Holy Scriptures.

**WHEREAS** the Abiding Place Ministries, and its Pastor believe they must do everything possible to obey Law Enforcement Officers, as long as their orders do not conflict with the commandments of God.

**WHERAS** the Abiding Place Ministries is a small congregation, and ordinarily has less than one-hundred (100) members in attendance at its meetings, and no household of more than ten (10) people.

**ABIDING PLACE MINISTRIES PROPOSES**:

**(1)** We will assemble as a congregation on our 427 Acre Mission Base, located at 2155 N. Campo Truck Trl., Campo, CA 91906.

**(2)** We will assemble by household, each household comprised of only individuals who share a residential address, and each household comprising no more than ten (10) people (hereinafter "Family Unit").

**(3)** We will strictly enforce social distancing guidelines between each Family Unit, requiring each Family Unit to stay ten (10) feet apart from each other Family Unit during the service.

**(4)** We have a tent that is 5400 square feet, with less than four-hundred (400) square feet reserved for the platform. With each Family Unit placed at the center of a one-hundred square feet area, each family unit will be approximately ten (10) feet from each other Family Unit, which is a greater distance than required by current social distancing guidelines.

**(5)** If there are more than fifty (50) family units, any additional Family Unit will be required to participate in the assembly from outside of the tent, and to maintain the same social distancing as each Family Unit in the tent.

**(6)** Our members will be instructed by the Pastor to return to their home after the Assembly has ended, without stopping on the way, and to fully heed and follow the orders of the Governor and the County.

**ABIDING PLACE MINISTRIES**
*Proposed Plan for Assembly*

**WHEREAS** on March 19, 2020, Gavin Newsom, the Governor of California, issued an executive order, styled Executive Order N-33-20, directing the citizens of California to heed the current State public health directives, and to "stay-at-home."

**WHEREAS** on March 27, 2020, Wilma J. Wooten, the Public Health Officer for the County of San Diego, issued an order prohibiting gatherings of more than ten (10) people.

**WHEREAS** the Abiding Place Ministries, and its Pastor, and all members, believe that they must comply with the command of God "not to forsake the assembling of yourselves together," and that the assembly must take place in "one place" on the "Lord's Day" as directed by the Holy Scriptures.

**WHEREAS** the Abiding Place Ministries, and its Pastor believe they must do everything possible to obey Law Enforcement Officers, as long as their orders do not conflict with the commandments of God.

**WHEREAS** the Abiding Place Ministries, and its Pastor, have been working with the San Diego County Sheriff's Office to find the least restrictive means to achieve their objectives, while avoiding arrest or criminal charges for obeying the Holy Scriptures.

**ABIDING PLACE MINISTRIES PROPOSES**:

**(1)** We will assemble as a congregation on our 427 Acre Mission Base, located at 2155 N. Campo Truck Trl., Campo, CA 91906 (hereinafter "Mission Base").

**(2)** We will assemble by household, each household comprised of only individuals who share a residential address, and each household comprising no more than ten (10) people (hereinafter "Family Unit").

**(3)** We will strictly enforce social distancing guidelines between each Family Unit, requiring each Family Unit to stay ten (10) feet apart from each other Family Unit during the service.

**(4)** This social distancing will be accomplished by arranging chairs, or marking areas, in such a way that each Family Unit has an area that is at least ten (10) feet away from each other Family Unit.

**(5)** There are multiple large fields on the Mission Base, and we are proposing to use the field marked in Exhibit A.

**(6)** From that field, we are proposing to set up the service in the area marked in Exhibit B.

**(7)** Our members will be instructed by the Pastor to maintain social distancing, and return to their home after the Assembly has ended, without stopping on the way, and to fully heed and follow the orders of the Governor and the County.

# EXHIBIT A



# EXHIBIT B



**ABIDING PLACE MINISTRIES**
*Proposed Plan for Assembly in Vehicles*

**WHEREAS** on March 19, 2020, Gavin Newsom, the Governor of California, issued an executive order, styled Executive Order N-33-20, directing the citizens of California to heed the current State public health directives, and to "stay-at-home."

**WHEREAS** on March 27, 2020, Wilma J. Wooten, the Public Health Officer for the County of San Diego, issued an order prohibiting gatherings of more than ten (10) people.

**WHEREAS** the Abiding Place Ministries, and its Pastor, and all members, believe that they must comply with the command of God "not to forsake the assembling of yourselves together," and "to assemble all the more" in light of the coming day of the Lord, and that the assembly must take place in "one place" on the "Lord's Day" as directed by the Holy Scriptures.

**WHEREAS** the Abiding Place Ministries, and its Pastor believe they must do everything possible to obey Law Enforcement Officers, as long as their orders do not conflict with the commandments of God.

**WHEREAS** the Abiding Place Ministries, and its Pastor, have been working with the San Diego County Sheriff's Office to find the least restrictive means to achieve the Church's objectives, while complying with the Orders of the Health Office.

**ABIDING PLACE MINISTRIES PROPOSES**:

**(1)**  We expect approximately thirty (30) vehicles to attend our one service, which will be held at 11:00 a.m. on Sunday.

**(2)**  We will assemble as a congregation on our 427 Acre Mission Base, located at 2155 N. Campo Truck Trl., Campo, CA 91906 (hereinafter "Mission Base").

**(3)**  We will assemble by vehicle, each vehicle to be parked and arranged in such a way that resembles a drive-in movie theater, each member of the Church to attend the service from inside their vehicle.

**(4)**  We will maintain adequate spacing between cars to ensure the safety of the passengers, and otherwise maintain as much space as may be suggested by authorities when granting this proposal.

**(5)**  Our members will be instructed to remain in their cars during the service, and not to leave their cars after the service has ended.

**(6)**  The service will be broadcast to each vehicle by radio, or internet, and any amplified sound will be done at reduced levels that are significantly below any local sound ordinance, to avoid creating a nuisance for our neighbors.

**(7)**  Our members will be instructed by the Pastor to maintain social distancing, and return to their home after the Assembly has ended, without stopping on the way, and to fully heed and follow the orders of the Governor and the County.



# County of San Diego

**NICK MACCHIONE, FACHE**
AGENCY DIRECTOR

**HEALTH AND HUMAN SERVICES AGENCY**
PUBLIC HEALTH SERVICES
3851 ROSECRANS STREET, MAIL STOP P-578
SAN DIEGO, CA 92110-3134
(619) 531-5800 • FAX (619) 542-4186

**WILMA J. WOOTEN, M.D.**
PUBLIC HEALTH OFFICER

April 4, 2020

Pastor Mark Spitsbergen
Abiding Place Ministries
2155 N Campo Truck Trail
Campo, CA 91906

Dear Pastor Spitsbergen,

Thank you for reaching out to San Diego County officials regarding your church services. By way of background, Executive Order N-33-20 issued by the Governor of the State of California ordered all individuals living in the State of California to stay home or at their place of residence, except as otherwise allowed, including services needed to maintain continuity of operations of sectors designated in the document available at: https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf.

I appreciate that this is a very difficult situation for you and your congregation. The inability to physically gather in one place for religious services—particular during these uncertain times—has been a hard sacrifice for faith communities throughout San Diego, the nation, and the world. These orders are designed to prevent the unprecedented spread of a communicable disease—and are temporary in nature. This is hopefully a once in a lifetime event and with the shared sacrifice of all San Diego county residents we can avoid the widespread illness and death that other parts of the nation and the world are experiencing.

It is my understanding that you are making well intentioned efforts to limit interaction at your services; but from a public health perspective, and based on the orders in place, you must stay at home and not congregate. This is vital to protect the health of your congregation and the health of the entire community. Considering the gravity of the situation, and the risk to the public's health, I am hopeful that you will reconsider your decision to proceed with having a gathering. I ask that you continue your ministry by using technology to conduct services for the temporary period that these orders are in place.

Since gatherings are a violation of the State and local orders, when gatherings do occur, it results

Abiding Place Ministries
April 4, 2020
Page 2

in calls to, and requires responses from, law enforcement. Due to the impact that this pandemic has had on local resources, it is my hope that the Sheriff's Department will not be required to intervene. However, they are prepared to do so for the planned April 12, 2020 gathering. Due to the public health crisis in our region we cannot make an exception for your congregation that would be inconsistent with how this is interpreted and enforced countywide.

Sincerely,

Wilma J. Wooten, M.D., M.P.H.
Public Health Officer
County of San Diego

**ABIDING PLACE MINISTRIES**

Dr. Wilma J. Wooten, M.D., M.P.H.
**Public Health Officer**
Health and Human Services Agency
for the County of San Diego
3851 ROSECRANS STREET, MAIL STOP P-578
SAN DIEGO, CA 92110-3134
(619) 531-5800

**VIA REGULAR MAIL AND E-MAIL**

**Re: Our Requests for Permission to Assemble in Light of Covid-19**

Dear Dr. Wooten -

Thank you for your letter dated April 4, 2020, and for taking the time to respond to our inquiries about complying with all government directions, and still being able to assemble. I have forwarded it to Pastor Mark, who also wants to thank you for taking the time to reach out to him. First off, I want to assure you that we are taking the pandemic seriously, and do not want to do anything that will jeopardize the County.

Our congregation has been instructed by Pastor Mark to stay-at-home and fully heed and follow your Countywide Order, and the Governor's Order, both of which we have reviewed extensively. In fact, we understand the importance of doing everything we can to stop the spread of COVID-19, and have been taking precautionary measures to that effect since we first became aware of the disease in January. While those measures include all the things you would expect, including proper hygiene, social distancing, self-isolation, and all the best practices described on Covid19.ca.gov; above all of those things (which we began to teach and enforce in a heightened manner starting in January), our congregation depends on and values two things: (1) the Assembly, commonly referred to as "Church," and (2) Prayer. We have learned that those two things do more than all the other precautionary methods combined.

Our Pastor is actually a former full-time clinical scientist who worked at Eli Lilly and Company for fourteen years and has extensive experience studying infectious diseases. That is part of the reason why he became aware of this disease in January, and immediately began instructing the congregation in the best practices for avoiding it. We also knew about the severity of the disease, because God revealed it to us as a congregation, in the Assembly, in January, and we immediately began to take precautionary measures as a congregation under the direction of our Pastors. In fact, in January we were instructed to cease going to restaurants, limit trips outside our home and community and to entirely avoid spreading our germs even if we felt healthy.

As a congregation, we also practice divine healing and dependency on God for our health, and that is the most essential part of the maintenance of our health and well-being as a community. It is so important and essential because we have learned that the Assembly is the best preventative against disease. This is not just our opinion and experience, it is supported by the entirety of human history, including extensive coverage in the Holy Scriptures.

Not only is our Assembly the best cure and preventative for disease, it is an absolutely essential part of our interaction with God, and cannot be replaced by technology. I do not think it is necessary to lay out all the scriptural proofs of our faith for you, but suffice it to say that

every time the word "Church" is used in the New Testament, it is actually a translation of the Greek word for "Assembly" or "Gathering," and it is defined in "one place" and cannot be forsaken for any reason, and must be done all the more in the face of "pestilences."

Not only are we a Church, we are also an organization dedicated to serving endangered people groups throughout the world. My family and I are actually missionaries to Kashmir, and many of our members have participated in assemblies in conflict regions of the world, under threat of death. We are faced, then and now, with the same question that has faced those of like precious faith for millennia, "is it better to obey man, or to obey God?"

We believe it is our duty to obey and comply with your orders as much as we possibly can, but cannot, under any circumstance, forsake the assembling of ourselves together, even if it means fine, imprisonment or death. However, we think that there is a less-restrictive means, and that is conducting our Assemblies in a manner that complies with all the required social distancing guidance, and more. We are willing to meet in our vehicles (as we did this past Sunday), or in Hazmat Suits, if that is the only way we can be permitted to meet.

To that end, we have made three specific proposals to the County Sheriff's Office (all of which I have attached here, and the third being the one we followed this past Sunday), and we know that they have been in communication with your office to try to find a way in which we would be permitted to obey God without fine or imprisonment. We are willing to consider any precautionary methods your office recommends, or allows - only, we must be permitted to meet on the Lord's Day, especially this coming Sunday, which is the most important celebration of the year and a time we come together to rededicate our lives to God.

Both Pastor Mark Spitsbergen and I are willing to speak with you this week, and try to reach some kind of arrangement. We are not interested in setting a precedent for the rest of the County, even though we desire for all men to come to know the saving and healing work of Christ Jesus that has so blessed our lives. We are simply looking for a way to serve God freely.

Respectfully yours,

Jeremiah Graham

Abiding Place Ministries
2155 N. Campo Truck Trl.,
Campo, CA 91906

(619) 633-5110



**ABIDING PLACE MINISTRIES**
*Proposed Plan for Assembly in Vehicles*

**WHEREAS** on March 19, 2020, Gavin Newsom, the Governor of California, issued an executive order, styled Executive Order N-33-20, directing the citizens of California to heed the current State public health directives, and to "stay-at-home."

**WHEREAS** on March 27, 2020, Wilma J. Wooten, the Public Health Officer for the County of San Diego, issued an order prohibiting gatherings of more than ten (10) people.

**WHEREAS** the Abiding Place Ministries, and its Pastor, and all members, believe that they must comply with the command of God "not to forsake the assembling of yourselves together," and "to assemble all the more" in light of the coming day of the Lord, and that the assembly must take place in "one place" on the "Lord's Day" as directed by the Holy Scriptures.

**WHEREAS** the Abiding Place Ministries, and its Pastor believe they must do everything possible to obey Law Enforcement Officers, as long as their orders do not conflict with the commandments of God.

**WHEREAS** the Abiding Place Ministries, and its Pastor, have been working with the San Diego County Sheriff's Office to find the least restrictive means to achieve the Church's objectives, while complying with the Orders of the Health Office.

**ABIDING PLACE MINISTRIES PROPOSES**:

**(1)** We expect approximately thirty (30) vehicles to attend our one service, which will be held at 11:00 a.m. on Sunday.

**(2)** We will assemble as a congregation on our 427 Acre Mission Base, located at 2155 N. Campo Truck Trl., Campo, CA 91906 (hereinafter "Mission Base").

**(3)** We will assemble by vehicle, each vehicle to be parked and arranged in such a way that resembles a drive-in movie theater, each member of the Church to attend the service from inside their vehicle.

**(4)** We will maintain adequate spacing between cars to ensure the safety of the passengers, and otherwise maintain as much space as may be suggested by authorities when granting this proposal.

**(5)** Our members will be instructed to remain in their cars during the service, and not to leave their cars after the service has ended.

**(6)** The service will be broadcast to each vehicle by radio, or internet, and any amplified sound will be done at reduced levels that are significantly below any local sound ordinance, to avoid creating a nuisance for our neighbors.

**(7)** Our members will be instructed by the Pastor to maintain social distancing, and return to their home after the Assembly has ended, without stopping on the way, and to fully heed and follow the orders of the Governor and the County.



## ABIDING PLACE MINISTRIES
### *Proposed Plan for Assembly*

**WHEREAS** on March 19, 2020, Gavin Newsom, the Governor of California, issued an executive order, styled Executive Order N-33-20, directing the citizens of California to heed the current State public health directives, and to "stay-at-home."

**WHEREAS** on March 27, 2020, Wilma J. Wooten, the Public Health Officer for the County of San Diego, issued an order prohibiting gatherings of more than ten (10) people.

**WHEREAS** the Abiding Place Ministries, and its Pastor, and all members, believe that they must comply with the command of God "not to forsake the assembling of yourselves together," and that the assembly must take place in "one place" on the "Lord's Day" as directed by the Holy Scriptures.

**WHEREAS** the Abiding Place Ministries, and its Pastor believe they must do everything possible to obey Law Enforcement Officers, as long as their orders do not conflict with the commandments of God.

**WHEREAS** the Abiding Place Ministries, and its Pastor, have been working with the San Diego County Sheriff's Office to find the least restrictive means to achieve their objectives, while avoiding arrest or criminal charges for obeying the Holy Scriptures.

## ABIDING PLACE MINISTRIES PROPOSES:

**(1)** We will assemble as a congregation on our 427 Acre Mission Base, located at 2155 N. Campo Truck Trl., Campo, CA 91906 (hereinafter "Mission Base").

**(2)** We will assemble by household, each household comprised of only individuals who share a residential address, and each household comprising no more than ten (10) people (hereinafter "Family Unit").

**(3)** We will strictly enforce social distancing guidelines between each Family Unit, requiring each Family Unit to stay ten (10) feet apart from each other Family Unit during the service.

**(4)** This social distancing will be accomplished by arranging chairs, or marking areas, in such a way that each Family Unit has an area that is at least ten (10) feet away from each other Family Unit.

**(5)** There are multiple large fields on the Mission Base, and we are proposing to use the field marked in Exhibit A.

**(6)** From that field, we are proposing to set up the service in the area marked in Exhibit B.

**(7)** Our members will be instructed by the Pastor to maintain social distancing, and return to their home after the Assembly has ended, without stopping on the way, and to fully heed and follow the orders of the Governor and the County.



# ABIDING PLACE MINISTRIES
### *Plan for Assembly*

**WHEREAS** on March 19, 2020, Gavin Newsom, the Governor of California, issued an executive order, styled Executive Order N-33-20, directing the citizens of California to heed the current State public health directives, and to "stay-at-home."

**WHEREAS** on March 27, 2020, Wilma J. Wooten, the Public Health Officer for the County of San Diego, issued an order prohibiting gatherings of more than ten (10) people.

**WHEREAS** the Abiding Place Ministries, and its Pastor, and all members, believe that they must comply with the command of God "not to forsake the assembling of yourselves together," and that the assembly must take place in "one place" on the "Lord's Day" as directed by the Holy Scriptures.

**WHEREAS** the Abiding Place Ministries, and its Pastor believe they must do everything possible to obey Law Enforcement Officers, as long as their orders do not conflict with the commandments of God.

**WHERAS** the Abiding Place Ministries is a small congregation, and ordinarily has less than one-hundred (100) members in attendance at its meetings, and no household of more than ten (10) people.

## ABIDING PLACE MINISTRIES PROPOSES:

**(1)** We will assemble as a congregation on our 427 Acre Mission Base, located at 2155 N. Campo Truck Trl., Campo, CA 91906.

**(2)** We will assemble by household, each household comprised of only individuals who share a residential address, and each household comprising no more than ten (10) people (hereinafter "Family Unit").

**(3)** We will strictly enforce social distancing guidelines between each Family Unit, requiring each Family Unit to stay ten (10) feet apart from each other Family Unit during the service.

**(4)** We have a tent that is 5400 square feet, with less than four-hundred (400) square feet reserved for the platform. With each Family Unit placed at the center of a one-hundred square feet area, each family unit will be approximately ten (10) feet from each other Family Unit, which is a greater distance than required by current social distancing guidelines.

**(5)** If there are more than fifty (50) family units, any additional Family Unit will be required to participate in the assembly from outside of the tent, and to maintain the same social distancing as each Family Unit in the tent.

**(6)** Our members will be instructed by the Pastor to return to their home after the Assembly has ended, without stopping on the way, and to fully heed and follow the orders of the Governor and the County.



# County of San Diego

**NICK MACCHIONE, FACHE**
AGENCY DIRECTOR

**HEALTH AND HUMAN SERVICES AGENCY**
PUBLIC HEALTH SERVICES
3851 ROSECRANS STREET, MAIL STOP P-578
SAN DIEGO, CA 92110-3134
(619) 531-5800 • FAX (619) 542-4186

**WILMA J. WOOTEN, M.D.**
PUBLIC HEALTH OFFICER

Pastor Mark Spitsbergen
Abiding Place Ministries
2155 N Campo Truck Trail
Campo, CA 91906

Dear Pastor Spitsbergen,

On April 4, 2020, I sent you a letter outlining all of the reasons it is important for your church to comply with the Orders I have issued to protect the public from the spread of COVID-19. I am in receipt of a response today with proposals attached from Jeremiah Graham. The proposals, while well intentioned, are not within the parameters of the State and local orders.

I am sure you and your congregation share my concern for the health and well-being of the community. We are at the point where we need the entire community to come together to fight the spread of the virus by staying home whenever possible. This is needed to save lives. In my April 4, 2020 letter I expressed my expectation you would comply with the orders by April 12, 2020. I am writing to confirm this expectation in the strongest terms.

I have attached a copy of the latest version of the Order of the Health Officer and Emergency Regulations. You will see that I have prohibited all gatherings of any size and even where done in vehicles. Also, members of the public, including members of your congregation should be staying at home unless they are travelling to an essential business for work or conducting essential tasks such as shopping for food or receiving medical care. Faith based services are on the list of essential businesses created by the California Department of Public Health if the services "are provided through streaming or other technology." I understand you stream your services via the internet. Therefore, you and your employees who are essential for the operation of equipment necessary to support the streaming of your services may travel to your facility. However, members of your congregation need to participate in your services by viewing the services at home. Members of your congregation are not allowed to travel to your site. This would be an unlawful gathering, even if they remain in their vehicles as they did last Sunday.

While the ability to view the service via the internet helps to mitigate the impacts to your congregation, I understand prohibiting your congregation from gathering together is a significant sacrifice. Unfortunately, the spread of the coronavirus requires that we all make sacrifices and I am counting on you and your congregation to do their part and voluntarily abide by my Order.

If the members of your congregation do not abide my Order, the Sheriff will take actions necessary to enforce the Order.

Thank you for your anticipated cooperation in this matter.

Date: April 8, 2020

Wilma J. Wooten, M.D., M.P.H.
Public Health Officer
County of San Diego

cc: Jeremiah Graham

**EXHIBIT JJ**

  

**CHURCHES**





County public health officer sends notices to    **Read more**

The San Diego County Public Health Officer has sent strongly worded notices to at least three churches that have either violated or have voiced an intention to violate current public health orders restricting indoor services.

The notices, which are all posted below, were signed by Dr Wilma Wooten and are dated July 17, warning that the failure to comply could result in a misdemeanor citation and $1,000 fine for each violation.

Two churches, Lighthouse Baptist Church on Skyline Drive, and Skyline Church on Campo Road, received notices that are virtually identical.

**Local**



JUN 27
**Latest Coronavirus Impacts: 282 New COVID-19 Cases, 5 Additional...**



30 MINS AGO
**Forensic Investigation: City Failed To Conduct Basic Review Of 101...**

"It has been reported that your church intends to conduct indoor services at multiple locations in violation of the Order of the State Health Officer and the County Order of the Health Officer and Emergency Regulations," begins the notice.

The notice goes on to express regret and acknowledges the impact of the restrictions. But they also state that the activity puts many people at risk.

"I hope that your consideration and concern for the health and safety of your congregation and the general public will convince you to move in-person services outdoors in compliance with the orders'



Meanwhile, a cease-and-desist order was sent to the Awaken Church's Balboa Campus in Kearny Mesa.

In the order, Wooten said she has viewed video from a local news station showing the church conducting an indoor service in violation of health orders.

NBC 7 aired video of the indoor service on July 15.

The church, in further defiance, then held an outdoor event the following week in its parking lot. Dozens gathered for a concert without wearing masks or social distancing.

The county has not made public any further action taken against the church.

In a message posted to Awaken Church's Facebook page on July 17, Pastor Jurgen Matthesius bemoaned Gov. Gavin Newsom's order "dictating and regulating how worship can be conducted." The pastor noted the critical role of the church in aiding residents who are managing the physical, emotional and psychological toll brought on by the pandemic.

"The church is a place that provides healing, relief and hope from these situations," Jurgen wrote in the post.

Jurgen said the church will go above and beyond to make sure it is following regulations – to an extent.

"However, there's an expiration date on how long a church can function online and still meet all the aspects of the health, the physical and emotional and spiritual needs of our people," Jurgen added in the post

Jurgen also said that restrictions have become much worse than the virus itself, downplaying the ratio of deaths to population in San Diego County

"While every death is a tragedy, the impact of these shutdowns extends far beyond the disease itself," Jurgen wrote

  

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.



# County of San Diego

NICK MACCHIONE, FACHE
AGENCY DIRECTOR

**HEALTH AND HUMAN SERVICES AGENCY**
PUBLIC HEALTH SERVICES

WILMA J. WOOTEN, M.D.
PUBLIC HEALTH OFFICER

Pastor John Heinrichs
Pastor Becky Heinrichs
Awaken Church-Balboa Campus
7620 Balboa Avenue
San Diego, CA 92111

ORDER OF THE HEALTH OFFICER TO CEASE AND DESIST

I have viewed a video reported on a local news station showing your church conducting an indoor service operating in violation of the Order of the State Health Officer and the County Order of the Health Officer and Emergency Regulations. I appreciate and deeply regret the impact these restrictions have on your congregation. However, the State has found, and I concur, that indoor services create a significant risk of spreading COVID-19. Nationwide, there have been a number of outbreaks stemming from indoor church services resulting in hospitalizations and death. The activity shown on the video creates a very significant risk of viral spread, given the lack of face coverings, close contact, and singing. I am sure you share my concern for the health of your parishioners, your staff and members of the public who come in contact with them. This activity puts all of them at risk. It also puts the rest of the business and faith community at risk by increasing the likelihood of increasing COVID-19 cases and hospitalizations which will require further restrictions to control the spread. You may continue your services outdoors, with the appropriate social distancing and use of face coverings, which will minimize the risk to your parishioners and the public.

Therefore, I am ordering you to **cease and desist the indoor operations** of your church services and that your outdoor operations comply with social distancing, face covering and sanitation requirements. I hope that your concern for the health and safety of your congregation and the general public will result in your to compliance with the Orders' requirements. As the responsible party for your facility it is your duty to ensure that the Orders' are complied with at your facility. However, if you do not comply we will take actions necessary to enforce the Orders. Failure to comply may result in criminal misdemeanor citations with a $1,000 fine for *each* violation.

Date: July 17, 2020

Wilma J. Wooten, M.D., M.P.H
Public Health Officer
County of San Diego



# County of San Diego

NICK MACCHIONE, FACHE
AGENCY DIRECTOR

**HEALTH AND HUMAN SERVICES AGENCY**
PUBLIC HEALTH SERVICES

WILMA J. WOOTEN, M.D.
PUBLIC HEALTH OFFICER

Pastor Doug Fisher
Lighthouse Baptist Church
1345 Skyline Drive
Lemon Grove, CA 91945

## ORDER OF THE HEALTH OFFICER

It has been reported that your church intends to conduct indoor services in violation of the Order of the State Health Officer and the County Order of the Health Officer and Emergency Regulations. I appreciate and deeply regret the impact these restrictions have on your congregation. However, the State has found, and I concur, that indoor services create a significant risk of spreading COVID-19. Nationwide, there have been a number of outbreaks stemming from indoor church services resulting in hospitalizations and death. I am sure you share my concern for the health of your congregation, your staff and members of the public who come in contact with them. This activity puts many people at risk. It also puts the rest of the business and faith community at risk by increasing the likelihood of increasing COVID-19 cases and hospitalizations, which will require further restrictions to control the spread. You may continue your services outdoors, with the appropriate social distancing and use of face coverings, which will minimize the risk to your parishioners and the public. In the unincorporated area of the County, you may wish to use parks and recreation areas for such activities, if another suitable outdoor location is unavailable.

I hope that your consideration and concern for the health and safety of your congregation and the general public will convince you to move in-person services outdoors in compliance with the Orders' requirements. As the responsible party for your facility it is your duty to ensure that the Orders' are complied with. If you do not comply, we will take actions necessary to enforce the Orders. Failure to comply may result in criminal misdemeanor citations with a $1,000 fine for *each* violation.

Date: July 17, 2020

Wilma J. Wooten, M.D., M.P.H
Public Health Officer
County of San Diego



# County of San Diego

**NICK MACCHIONE, FACHE**
AGENCY DIRECTOR

**HEALTH AND HUMAN SERVICES AGENCY**
PUBLIC HEALTH SERVICES

**WILMA J. WOOTEN, M.D.**
PUBLIC HEALTH OFFICER

Dr. Jeremy McGarity
Lead Pastor
Skyline Church
1130 Campo Road
La Mesa, CA 91941

## ORDER OF THE HEALTH OFFICER

It has been reported that your church intends to conduct indoor services at multiple locations in violation of the Order of the State Health Officer and the County Order of the Health Officer and Emergency Regulations. I appreciate and deeply regret the impact these restrictions have on your congregation. However, the State has found, and I concur, that indoor services create a significant risk of spreading COVID-19. Nationwide, there have been a number of outbreaks stemming from indoor church services resulting in hospitalizations and death. I am sure you share my concern for the health of your congregation, your staff and members of the public who come in contact with them. This activity puts many people at risk. It also puts the rest of the business and faith community at risk by increasing the likelihood of increasing COVID-19 cases and hospitalizations, which will require further restrictions to control the spread. You may continue your services outdoors, with the appropriate social distancing and use of face coverings, which will minimize the risk to your parishioners and the public. In the unincorporated area of the County, you may wish to use parks and recreation areas for such activities, if another suitable outdoor location is unavailable.

I hope that your consideration and concern for the health and safety of your congregation and the general public will convince you to move in-person services outdoors in compliance with the Orders' requirements. As the responsible party, it is your duty to ensure that the Orders' are complied with at your facilities. If you do not comply, we will take actions necessary to enforce the Orders. Failure to comply may result in criminal misdemeanor citations with a $1,000 fine for *each* violation.

Date: July 17, 2020

Wilma J. Wooten, M.D., M.P.H
Public Health Officer
County of San Diego

**EXHIBIT KK**



**FULL CORONAVIRUS COVERAGE**

CA health official: Glitch fixed, but backlog of 300K records

**SFUSD, teachers union reach agreement for distance learning**

2:51 PM    **4 Big Sur roads closed due to 'overwhelming increase in visitors'**

**74-year-old Bay Area sports bar faces closure amid pandemic**

**Airlines tougher on masks with new zero tolerance policies**

**New York schools cleared to open statewide**

**SFGATE**

https://www.sfgate.com/politics/article/Gavin-Newsom-protests-coronavirus-July-Fourth-ask-15383112.php

# Gavin Newsom asked to reconcile support for protests with new warnings on gatherings

By **Eric Ting**, SFGATE  Updated 1:58 pm PDT, Thursday, July 2, 2020



In this photo taken Friday, June 26, 2020, Gov. Gavin Newsom speaks about the coronavirus pandemic as he gives an update on the state's response to it at a news conference in Rancho Cordova, Calif.

During his Thursday press conference, California Gov. **Gavin Newsom** was asked why Californians should heed his new warnings against gatherings for Fourth of July weekend when he was previously supportive of protests against police brutality, where officials did not enforce mask-wearing or social-distancing.

Over the past week, Newsom has told residents not to gather with individuals outside their households and to avoid large crowds for any Fourth of July parades or demonstrations, while adding the state will "mitigate" any large crowds.



1 Click 'Continue'

2 Get free extension

3 Learn amazing recipes

eatandfeelfresh.club

"As always, we've had a mandate for a consistent period of time as it relates to large crowd gatherings," he **said on Wednesday**. "Please, avoid those crowds. We're going to do our best to try to mitigate people congregating and doing what we can to encourage good behavior."



Support & Advice for Caregivers.

Ad    GET STARTED    AARP

On Thursday, KCBS Radio's Doug Sovern asked the governor, "I've heard from a number of people who don't understand why they're being told you can't go see grandpa this weekend, you can't see Uncle Joe, you can't have a barbecue with your neighbors but then they turn on the TV and see hundreds or thousands of people protesting. So can you explain the selective enforcement or preferential treatment given based on political persuasion? Can you explain to people why they should listen to these messages when they do see that happening and no one is getting tickets, no one is even being told to enforce the masks or social distancing?"

Newsom responded with, "If they care about their grandfather, their uncle, their aunt, that's why they should listen."

The governor then stated that no one will be cracking down on social gatherings in backyards before returning to commenting on the protests.

"I maybe was unique in my household but I don't think I was, I think it was universally taught: Just because someone else is doing it, doesn't mean you should," Newsom said. "People know what the right thing to do is. I encourage them to do the right thing. And people also understand that we have a Constitution, we have a right to free speech and we are all dealing with a moment in our nation's history that is profound and pronounced... but I recognize the dichotomy and to the extent the dialectic between those examples and all I can offer is this consideration: Do what you think is best not only for you but for the health of the people you love."



It is unclear to what extent the protests contributed to the spread of the virus. An **Associated Press investigation found little evidence** the demonstrations are primarily responsible for recent upticks, but Los Angeles County public health director Barbara Ferrer **has stated it is "highly likely"** the protests led to an increase in positive cases.

When the protests first started, Newsom **told the demonstrators**, "You've lost patience, so have I. You are right to feel wronged. You are right to feel the way you are feeling" and **retweeted images of** protests in praise. After police used rubber bullets and tear gas to disperse crowds, **he tweeted**, "Protesters have the right to protest peacefully — not be harassed."

**MORE CORONAVIRUS COVERAGE:**

Gavin Newsom asked to reconcile support for protests with new warnings on gatherings - ...   Page 5 of 5
Case 3:20-cv-00865-BAS-AHG    Document 53-3    Filed 08/10/20    PageID.3249    Page 248 of
255

*Sign up for 'The Daily' newsletter for the latest on coronavirus **here**.*

**— Newsom announces new restrictions in 19 California counties**

**— The virus didn't stop a socialite from throwing a backyard soiree. Then tests came back positive.**

**— These metrics suggest the coronavirus is indeed back on the upswing in the Bay Area**

**— Why coronavirus cases in California are suddenly surging**

**— Gavin Newsom: Californians should 'reconsider' July 4th plans, state will 'mitigate' big gatherings**

*Eric Ting is an SFGATE digital reporter. Email: **eric.ting@sfgate.com** | Twitter: **@_ericting***

© 2020 Hearst Communications, Inc.

**H E A R S T**

**EXHIBIT LL**







**EXHIBIT MM**

CNN | World   Africa  Americas  Asia  Australia  China  Europe  India  Middle East  United Kingdom   • LIVE TV   Edition ⌄

↑ 16 New Updates

All | Cases | Catch Up | Economy | Hotspots | Reopening | White Ho...

## What you need to know

- More than half of US states are **seeing an increase** in Covid-19 cases. In Texas, some bars have been ordered to close as officials fear "apocalyptic" surges if current trends continue. Meanwhile, Florida reported its highest single day of cases.

- Travelers from the United States are **"unlikely" to be allowed** into the European Union, several EU officials told CNN.

- Dr. Anthony Fauci says the White House coronavirus task force is "**seriously considering**" a new testing strategy.

- Number of Covid-19 cases in Latin America has tripled in the past month, surpassing 2 million infections, the Pan American Health Organization said.

*Our live coverage of the coronavirus pandemic has ended for the evening.*

94 Posts

SORT BY  Latest ⌄

4:48 p.m. ET, June 26, 2020

### Recent protests have contributed to California's coronavirus case increase, state official says

From CNN's Cheri Mossburg





Our live coverage of the coronavirus pandemic has ended for the evening.

Protesters congregate in Los Angeles, at the intersection of Hollywood and Highland, on June 7. David McNew/Getty Images

People commingling during recent racial justice protests are believed to be a contributing factor to the rise in coronavirus cases in California, according to Dr. Sonia Angell, the state's health director.

> "We don't have exact numbers, but we do know from speaking to our counties that it is a contributor. Of course it is difficult to tease out exactly because at the same time, the people were going out for these protests, we were also seeing increased movement for other reasons," Angell said in a news conference.

Angell stressed that with community spread, health officials may not be able to distinguish exactly where someone may have been exposed.

"It's highly likely given the increased numbers that we're seeing, that some of this is in fact people who may have been in a crowded situation at one of the protests where there was spread," Los Angeles Health Director Barbara Ferrer said earlier this week.



Advertisement

Protesters congregate in Los Angeles, at the intersection of Hollywood and Highland, on June 7. David McNew/Getty Images

People commingling during recent racial justice protests are believed to be a contributing factor to the rise in coronavirus cases in California, according to Dr. Sonia Angell, the state's health director.

> "We don't have exact numbers, but we do know from speaking to our counties that it is a contributor. Of course it is difficult to tease out exactly because at the same time, the people were going out for these protests, we were also seeing increased movement for other reasons," Angell said in a news conference.

Angell stressed that with community spread, health officials may not be able to distinguish exactly where someone may have been exposed.

"It's highly likely given the increased numbers that we're seeing, that some of this is in fact people who may have been in a crowded situation at one of the protests where there was spread," Los Angeles Health Director Barbara Ferrer said earlier this week.

Sacramento County reported at least three individual cases that are apparently linked to recent demonstrations, according to California Department of Public Health.