1  Charles S. LiMandri (SBN: 110841)
2  Paul M. Jonna (SBN: 265389)
   Jeffrey M. Trissell (SBN: 292480)
3  LIMANDRI & JONNA LLP
   P.O. Box 9120
4  Rancho Santa Fe, CA 92067
5  Telephone: (858) 759-9930
   Facsimile: (858) 759-9938
6  cslimandri@limandri.com
   pjonna@limandri.com
7  jtrissell@limandri.com

8
   Thomas Brejcha, *pro hac vice**
9  Peter Breen, *pro hac vice**
10 THOMAS MORE SOCIETY
   309 W. Washington St., Ste. 1250
11 Chicago, IL 60606
12 Telephone: (312) 782-1680
   tbrejcha@thomasmoresociety.org
13 pbreen@thomasmoresociety.org
   *Application forthcoming
14

15 Attorneys for Plaintiffs

Harmeet K. Dhillon (SBN:207873)
Mark P. Meuser (SBN: 231335)
Gregory R. Michael (SBN: 306814)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: 415-433-1700
Facsimile: 415-520-6593
harmeet@dhillonlaw.com
mmeuser@dhillonlaw.com
gmichael@dhillonlaw.com

Attorneys for Plaintiffs

16

17               UNITED STATES DISTRICT COURT

18             SOUTHERN DISTRICT OF CALIFORNIA

19 SOUTH BAY UNITED PENTECOSTAL          Case No. 3:20-cv-865-BAS
20 CHURCH, a California non-profit
   corporation; and BISHOP ARTHUR
21 HODGES III, an individual,            **Supplemental Declaration of**
                                         **George Delgado, M.D. in**
22          Plaintiffs,                  **Support of Plaintiffs' Renewed**
                                         **Motion for a Temporary**
23      v.                               **Restraining Order / Preliminary**
                                         **Injunction**
24 GAVIN NEWSOM, in his official capacity
25 as the Governor of California, *et al.*,
                                         Judge: Hon. Cynthia Bashant
26          Defendants.

27

28

_____
SUPP. GEORGE DELGADO, M.D. DECL.

I, George Delgado, M.D., declare and state as follows:

1.      I am a physician, licensed by the Medical Board of the State of California since 1989. I submit this declaration in support of Plaintiffs' Renewed Motion for a Temporary Restraining Order / Preliminary Injunction. I have personal knowledge of the matters set forth below, and could and would testify competently to them if called upon to do so.

## PROFESSIONAL BACKGROUND

2.      I graduated from St. Mary's College of California with a Bachelor of Science degree, summa cum laude and received my Doctor of Medicine degree from the University of California, Davis. I completed my family residency at Santa Monica Hospital/UCLA and I am board certified in family medicine and hospice and palliative medicine.

3.      Currently, I serve as a Medical Analyst for COVID Planning Tools, a multi-disciplinary group offering analysis of the COVID-19 pandemic as well as rational solutions and strategies for managing our public health response. Our group has developed a Monte Carlo COVID Decision Model that has proven to be more accurate than models more commonly being used to predict the pandemic.

4.      Since 2005, I have been the medical director of a family medical group. Additionally, I am the chief medical officer of a large hospice.

5.      Post-residency I have practiced medicine in the State of California for 29 years. During that time, I have treated many people with infectious diseases including viral illnesses such as influenza which tend to occur in epidemics. I have been intimately involved in planning for the current coronavirus disease 2019 (COVID-19) pandemic, caused by the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) for my family medical group and hospice.

6.      I have also provided expert advice in multiple litigations involving the COVID-19 pandemic. I provided an expert declaration in the action *Soos v. Cuomo*, No. 1:20-cv-651 (GLS/DJS) (N.D.N.Y. June 10, 2020) (injunction granted).

## The Flattening of the Curve and the Recent Upticks

7.     It is clear that due to early mitigation measures carried out throughout California, the trajectory of the COVID-19 pandemic was altered; the "curve was flattened." Mitigation measures, like any medical treatment, have untoward consequences, some foreseeable, some not. When they are imprecise they can lead to civil liberty infringements. Furthermore, the "treatment" that got us to where we are now, is not the "treatment" that is indicated for us now.

8.     In the clinical practice of medicine, we acknowledge that people have spiritual, psychological and physical dimensions. We know that spiritual and psychological stress and trauma can lead to physical problems, including immune system dysfunction. Arbitrarily declaring religious services to be "non-essential," besides being unconstitutional, also carries with it certain profound spiritual and psychological risks that, ironically, could actually lead to an increase in mortality from COVID-19 by negatively impacting immune function and by destabilizing the support systems of vulnerable people.

9.     According to Robert Redfield, MD, the director of Centers for Disease Control and Prevention (CDC), at this point in the pandemic, both suicides and drug overdose deaths are outnumbering deaths due to the coronavirus, itself.[1] The social side effects of mitigation measures are rearing their ugly head.

10.     The Reproduction measure (R) gives an indication of how many additional persons an infected person can infect during an epidemic. When R drops below one, an outbreak loses steam and begins to subside. According to Rt Live, R is currently 0.88 in California, which is in agreement with the model of my COVID planning group.[2]

---

[1] *Transcript of COVID Webinar Series interview of Robert Redfield, MD*, BUCK INSTITUTE (Jul. 14, 2020), https://www.buckinstitute.org/covid-webinar-series-transcript-robert-redfield-md/ (accessed Aug. 5, 2020).

[2] *Rt COVID-19*, RT LIVE (as of Aug. 7, 2020), https://rt.live/.

SUPP. GEORGE DELGADO, M.D. DECL.

11.    In California, cases and hospitalizations have increased since about June 1, but the median age of those infected and hospitalized has decreased. Our conclusion, supported by the COVID-19 Decision Model is that the recent increases are related to two distinct but related phenomena. One was the tolerance and even encouragement of public protests whereby participants often did not wear masks and clearly did not respect social distancing. The other is what I have termed "mitigation fatigue." Members of the age 20–50 demographic have stopped heeding the calls of the governor and other government officials to decrease mobility and contacts. They have resumed socializing without social distancing and wear masks only when required. They intuitively recognize that imprecise, arbitrary COVID-19 mitigation measures are inappropriate and disproportionate.

12.    The figure below, obtained from CDC website, uses CDC data to explain how the early COVID-19 mitigation measures led to an approximate 40–50% decrease in mobility of California's residents in the transit, workplace, retail and recreation spheres. Over the ensuing weeks, mobility gradually increased to a level of about 60–80% of baseline (20–40% decrease from baseline). New restrictions were instituted by Governor Newsom on July 1 and July 13. The CDC data does not show any change in the mobility curves, nor was the cumulative death curve affected. This suggests that the measures were not followed by the populace, in my opinion due to mitigation fatigue.

13.    Not only are the current mitigation efforts futile, they are directed against the wrong activities and gatherings. The most likely drivers of the current increase in California cases are the 20–50 year old group that has resumed socializing—not worshippers attending church. Furthermore, most of the California and US church-related outbreaks occurred before June or in congregations that failed to follow commonsense recommendations, such as the ones I list below.

///

///

SUPP. GEORGE DELGADO, M.D. DECL.



https://www.cdc.gov/covid-data-tracker/#mobility

## Indoor Worship Services with Singing

14.    I am confident that a resumption of religious services can take place, with singing and indoors, in a manner that does not jeopardize public health. In fact, I feel that going to one's church, synagogue or mosque should be much safer than going to the grocery store, participating in a protest, or working at a manufacturing facility.

15.    The CDC released interim guidelines in May advising faith communities on how to best hold services while minimizing the risk of spreading COVID-19. It is important to note that the statement includes the following: "CDC offers these suggestions for faith communities to consider and accept, reject, or modify, consistent with their own faith traditions, in the course of preparing to reconvene for in-person gatherings while still working to prevent the spread of COVID-19." Thus, in no way are the guidelines to be taken as requiring an infringement on First

Amendment-protected rights.[3]

16.  Many have expressed concern that worship services could become hotbeds of COVID-19 contagion, mostly because of the well-publicized case in Washington State last March where, out of 61 attendees, up to 53 people became ill after a two and a half hour choir practice where they were exposed to a person who was ill but did not realize he had COVID-19. Thirty three of those who were ill had tests confirming they were infected with SARS-CoV-2.[4] The participants were in a relatively small room with poor ventilation. Much of the time, they were only seated 6–10 inches apart. They practiced for two and a half hours and shared food, afterwards. Patient zero knew he was sick.

17.  Fortunately, since that fateful day in March, we have learned much about the virus and how it spreads. The lessons learned will allow Californians to safely worship indoors while singing. Certainly, things would have turned out very differently in Washington and in other locales if our current recommendations (listed below) were implemented.

18.  Singing does present some challenges, but none of them are insurmountable. A comprehensive report produced by a collaboration between a university and three music institutes in Germany, titled "Risk Assessment of a Coronavirus Infection in the Field of Music" was updated in July.[5] Citing research conducted by them and others, the medical, engineering and vocal experts concluded

---

[3] *Considerations for Communities of Faith*, CDC (May 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/faith-based.html (accessed Aug. 7, 2020).

[4] Lea Hamner, MPH, et al., *High SARS-CoV-2 Attack Rate Following Exposure at a Choir Practice — Skagit County, Washington, March 2020*, CDC (May 15, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e6.htm (accessed Aug. 6, 2020).

[5] Claudia Spahn, Ph.D., M.D. & Bernhard Richter, M.D., *Risk Assessment of a Coronavirus Infection in the Field of Music*, UNIVERSITY OF FREIBURG (Jul. 17, 2020 update), https://www.mh-freiburg.de/fileadmin/Downloads/Allgemeines/RisikoabschaetzungCoronaMusikSpahnRichter17.7.2020Englisch.pdf (translated by Kirk D. Moss, Ph.D. & Scott S. Swope, D.M.A) (accessed Aug. 6, 2020).

that singing only slightly increases the dispersion of respiratory droplets. It can, however, increase the production of aerosol particles, which are smaller (<5 microns). The group concludes that singing can safely take place in houses of worship, provided that singers are spaced about two meters apart (close to our standard of six feet), that masks are worn, and that ventilation is adequate.

19. Both the German group and an article by Naunheim, et al. in the Journal of Voice emphasize that as spacing increases and the amount of time spent singing decreases, the risk of spread of the virus diminishes.[6] Worship services generally have songs interspersed with sermons and prayers. The breaks in the singing action allow droplets to fall to the ground and aerosols to be dispersed and diluted.

20. A May webinar sponsored by the National Association of Teachers of Singing and other groups left viewers with the unequivocal message that singing with others could not safely resume until a SARS-CoV-2 vaccine or effective therapeutics were available.[7] As Naunheim, et al. make clear, this fear-based conclusion is not based on any scientific evidence.[8]

21. Ventilation is an important component in any plan to decrease the risk of viral transmission in an indoor venue with singing. Modern heating, ventilation and air conditioning (HVAC) can be very helpful. Another fear-based rumor is that HVAC systems can actually spread viral transmission, not diminish it. This is not the case with modern HVAC systems. There was a case in China of viral spread through a ventilation system, but it had more to do with the poor design of the system than

---

[6] Matthew R. Naunheim, et al., *Safer Singing During the SARS-CoV-2 Pandemic: What We Know and What We Don't*, J. OF VOICE (Jul. 1, 2020), https://www.jvoice.org/action/showPdf?pii=S0892-1997%2820%2930245-9 (accessed Aug. 6, 2020).

[7] *A Conversation: What Do Science and Data Say About the Near Term Future of Singing May 5, 2020 Webinar*, NAT'L ASS. OF TEACHERS OF SINGING, INC. (May 5, 2020), https://www.nats.org/cgi/page.cgi/_article.html/Featured_Stories_/NATS_COVID_Resources_Page (accessed Aug. 6, 2020).

[8] Naunheim, et al., *supra* n. 6.

with HVAC systems in general, according to HVAC experts[9] and a second scientific article that corrected some of the misinterpretation of data in the original article reporting on the transmission.[10]

22.     Having as many windows and doors open as possible, as well as running the ventilation will effectively dilute aerosols containing viral particles. CDC suggests running the HVAC at the highest level (with air intake from outside) for two hours before and two hours after occupied times.[11] Industry experts recommend that, if possible, HVAC filters be minimum efficiency reporting values (MERV) 13 or better, which would remove most of the aerosol particles that could carry the coronavirus.[12]

## Comparison with Grocery Store

23.     One could easily compare an average grocery store, which serves 1,000 customers per day, to a house of worship, in terms of risk of contagion. Even with planned flow of foot traffic, the movement of people in the grocery store is relatively uncontrolled. The aisles are not designed to allow six-foot social distancing. People touch merchandise that they never buy. By the time a person puts an item in his or her cart, it may have been touched by several, if not hundreds of people in the three previous days (the coronavirus may survive up to three days on smooth surfaces). The cart, may have had its handle sanitized but the carriage itself likely was not. Next, the items are placed on the conveyer belt which has contacted hundreds of

[9] Joanna R. Turpin, *Can HVAC Systems Spread COVID-19?*, ACHR NEWS (May 31, 2020), https://www.achrnews.com/articles/143255-can-hvac-systems-spread-the-covid-19-virus (accessed Aug. 6, 2020).

[10] Yuguo Li, Ph.D., et al., *Aerosol transmission of SARS-CoV-2: Evidence for probable aerosol transmission of SARS-CoV-2 in a poorly ventilated restaurant* , MEDRXIV (Apr. 22, 2020), https://www.medrxiv.org/content/10.1101/2020.04.16.20067728v1.full.pdf (accessed Aug. 6, 2020).

[11] *COVID-19 Employer Information for Office Buildings*, CDC (Jul. 9, 2020 update), https://www.cdc.gov/coronavirus/2019-ncov/community/office-buildings.html (accessed Aug. 6, 2020).

[12] Turpin, *supra* n. 9.

items that others have touched. The clerk wears gloves but does not change gloves between customers. He touches nearly every item as well as money.

24.    The house of worship, on the other hand will likely have far fewer than 1,000 attendees and windows and doors can be open. The participants will be stationary for all or most of their services and their movements can be very controlled, planned and prescribed, as opposed to the uncontrolled movements in the grocery stores. Worshipers will not be touching multiple items. There will be time after each service to thoroughly clean the chairs or pews that they do touch.

25.    We can calculate the risk of contagion at the house of worship, if the guidelines listed below are followed, compared to a grocery store. A relative value greater than 1 makes the house of worship riskier, while a relative risk less than 1 makes the house of worship safer.

- o  Being in the same building with others at any one time: relative risk is 2 (100 in the house of worship; 50 in grocery store).

- o  People touching multiple objects: relative risk is 0.25. People touch far fewer objects in the house of worship; 1,000 people per day touch many things in the grocery store. Chairs and pews can be sanitized after each service. It is impracticable, if not impossible, to sanitize all items in a store.

- o  Close contact with others: relative risk is 0.25. Worshipers are stationary and socially distanced. They enter and exit in a controlled, spaced manner. Shoppers move about as they wish, even if flow is one way.

26.    The calculation is: **Risk in House of Worship =** Risk in Grocery Store x 2 x 0.25 x 0.25 = **0.125**, which is less than 1.

27.    **Therefore, the calculated risk of contracting COVID-19 at the house of worship is 0.125 or 12.5% the risk at the grocery store**.

///

///

## COMPARISON WITH PUBLIC PROTESTS

28.   Public protests have abounded in California since George Floyd was killed by a Minneapolis police officer. The protests have been allowed and/or tolerated by public officials. We can compare the risk of spreading the coronavirus in a house of worship and at a public protest. Social distancing has not been maintained at public protests. Many of the protestors may be wearing masks, however, they likely are not observing directives that all should be wearing masks in public. Many photos of protestors show them to be of different ages, however the main demographic represented is the age group of 20–50.

29.   On the other hand, indoor religious services can (and have been conducted in California and other states) with great care and control. Social distancing can be maintained, all participants wear masks and movement of people can be directed carefully.

30.   Religious service congregants will generally all be facing in the same direction, while public protestors may be looking around and sometimes facing or walking in different directions. A droplet released by an unknowingly infected worshipper is most likely to hit the back of the person seated in front of him or her, and will be unlikely to infect that person. Alternatively, in a protest situation, a droplet released by an unknowingly infected person is more likely to be inhaled by another facing the infected protestor.

31.   We can calculate the risk of contagion at the house of worship, if the guidelines listed below are followed, compared to a public protest. A relative value greater than 1 makes the house of worship riskier, while a relative risk less than 1 makes the house of worship safer.

- o   Being in the same area with others at any one time: relative risk is 0.01 (100 in the house of worship; 10,000 at a public protest).
- o   Being in a well-ventilated house of worship compared to outside: relative risk is 4.

SUPP. GEORGE DELGADO, M.D. DECL.

- People touching multiple objects: relative risk is 1. People touch pews and chairs in the house of worship compared to people at the protest touching railings, poles, signs, etc. The pews and chairs can be sanitized.
- Close contact with others: relative risk is 0.5. Worshipers are stationary and socially distanced. They enter and exit in a controlled, spaced manner. Protesters are close to one another and even rubbing against each other. They move at different rates which exposes them to more people.
- Yelling: relative risk is 0.5. Protestors and leaders yell full-throated slogans. Worship leaders use electronic amplification and evidence-based strategies that decrease the risks of singing.

32.   The calculation is: **Risk in House of Worship =** Risk in public protest x 1 x 0.01 x 4 x 1 x 0.5 x 0.5 = **0.01**, which is far less than 1.

33.   **Therefore, the calculated risk of contracting COVID-19 at the house of worship is 0.01 or 1% the risk at public protests** that have been allowed and or tolerated by public officials.

## Comparison with Manufacturing Facilities

34.   Some manufacturing facilities were deemed "essential" and remained open in California; others have opened as mitigation measures were relaxed. One could easily compare an average manufacturing plant to a house of worship, in terms of risk of contagion. Even with planned flow of foot traffic, the movement of people in the manufacturing plant is dependent on immediate needs and therefore sub-optimally controlled. The walkways are not designed to allow six-foot social distancing. Workers have to touch equipment and products as part of the normal workflow. By the time an item reaches the end of a production line, it may have been touched by several, if not hundreds of people.

35.   In a production facility, employees must sometimes work in close proximity to one another, often at a distance of less than six feet and often facing each

other. Although wearing masks decreases risks of contagion, it does not change the fact that members of different households are clustered together for long periods of time. Furthermore, the job may require that employees move about, potentially contacting other employees.

36.     Manufacturing facilities may have large and very expensive equipment. Modifying or moving such equipment in order to create social distancing opportunities may be prohibitively expensive, impractical or impossible.

37.     Workers spend 8-12 hours per day at manufacturing plants. Obviously, they need to move about to use the restrooms, eat and rest. The movement and visits to places away from their work stations create opportunities for spread of the virus.

38.     Suppliers and contractors must visit manufacturing facilities in order to keep those facilities running efficiently and effectively. Visitors may not be familiar with a particular facility's procedures and protocols for minimizing exposure to the coronavirus. Unfamiliar visitors may increase the risk of transmission.

39.     Religious services can be held in well ventilated buildings, while factories may not have that luxury. The participants at the house of worship will be stationary for all or most of their services and their movements can be very controlled, planned and prescribed, as opposed to the less controlled movements in manufacturing facilities.

40.     Religious service congregants will generally all be facing in the same direction, while manufacturing workers may be face-to-face by necessity of the work. Worshipers will not be touching multiple items as they might in manufacturing plants. There will be ample time after each service to thoroughly clean the chairs or pews that they do touch.

41.     We can calculate the risk of contagion at the house of worship, if the guidelines listed below are followed, compared to a manufacturing facility. A relative value greater than 1 makes the house of worship riskier, while a relative risk less than 1 makes the house of worship safer.

1      o Being in the same building or part of a building with others at any one
2       time: relative risk is 1 (100 in the house of worship; 100 in facility).

3      o People touching multiple objects: relative risk is 0.5. People touch fewer
4       things in the house of worship.

5      o Close contact with others: relative risk is 0.5. Worshipers are stationary
6       and socially distanced. They enter and exit in a controlled, spaced
7       manner. Manufacturing workers move about as their jobs demand. Some
8       jobs require workers to be closer than six feet, some workers must face
9       each other, and some work stations cannot be modified to allow social
10       distancing.

11  42.  The calculation is: **Risk in House of Worship** = Risk in manufacturing
12 facility x 1 x 0.5 x 0.5 = **0.25**, which is less than 1.

13  43.  **Therefore, the calculated risk of contracting COVID-19 at the house**
14 **of worship is 0.25 or 25% the risk at the manufacturing facility** and manufacturing
15 facilities are open in California.

16              **R**ECOMMENDATIONS

17  44.  The following commonsense recommendations will allow a safe return
18 to meaningful, spiritually rich religious services, with singing, for the millions of
19 Californians who cherish their religion and do not deem it unessential.

20    a. Have a questionnaire that the attendees self-administer before entering.
21     Any who have symptoms of COVID-19 or contact with someone
22     infected should be told to not enter.

23    b. Check temperatures of all who enter. A temperature of 100 degrees
24     Fahrenheit (37.8 Celsius) should preclude admission.

25    c. All who enter the house of worship should sanitize their hands.

26    d. More services should be offered to allow limiting congregation sizes.
27     There should be no arbitrary limit on congregation size, however, as
28     long as six-foot social distancing can be maintained.

e. Shorter sermons and shorter services will allow clergy to offer more services while maintaining their spiritual and physical stamina.

f. Houses of worship should be well ventilated, with many doors and windows open. HVAC systems should be run as high as comfortably possible during services, and as high as possible two hours before and after services to "flush" and dilute the air. There is less chance of contagion in well ventilated areas.

g. If possible, filters should be upgraded to MERV 13 or higher. An HVAC professional should be consulted since higher rated filters may increase the load for fan motors.

h. During services, people should sit together as families, with six feet between families. Only allow seating in every other pew or row, leading to six-foot spacing.

i. Choir members, cantors and clergy should use amplification, if possible, in order to allow the use of less than full-throated singing.

j. Choir members should be as far as possible from the general congregation.

k. Face coverings or face masks should be worn by attendees and choir members. The clergy person, being at greater than six-feet away, need not wear a face covering, unless he or she is talking in a loud voice without amplification, or is singing.

l. No hugging, kiss of peace, hand holding or hand shaking should be allowed.

m. Where communion is offered, lines can be spaced with families at six-foot intervals.

n. The minister who distributes communion should sanitize his or her hands, and take great care not to touch any recipient's mouth or hand. If an inadvertent contact occurs, the minister should re-sanitize his or her

1    hands, immediately.

2       o. Worship aids and prayers should be projected, if possible. Reusable
3         prayer books should be removed from the building.

4       p. Foot traffic entering and exiting the worship area should be designed as a
5         one-way flow loop.

6       q. Egress after the service should be row by row, commencing with row
7         closest to the door.

8       r. After each service, chairs, benches and pews should be sanitized.

9       45.   Like the CDC guidelines, these guidelines should be followed to the
10   extent which the demands of any particular faith allow. They should not be
11   deemed—like California's requirements—as a prerequisite to the exercise of one's
12   constitutional right to engage in worship.

13      I declare until penalty of perjury under the laws of the United States and the
14   State of California that the foregoing is true and correct. Executed on August 8,
15   2020.

16

17                  George Delgado, M.D.