Charles S. LiMandri (SBN: 110841)
Paul M. Jonna (SBN: 265389)
Jeffrey M. Trissell (SBN: 292480)
LIMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938
cslimandri@limandri.com
pjonna@limandri.com
jtrissell@limandri.com

Thomas Brejcha, *pro hac vice**
Peter Breen, *pro hac vice**
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Telephone: (312) 782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmoresociety.org
*Application forthcoming

Attorneys for Plaintiffs

Harmeet K. Dhillon (SBN:207873)
Mark P. Meuser (SBN: 231335)
Gregory R. Michael (SBN: 306814)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: 415-433-1700
Facsimile: 415-520-6593
harmeet@dhillonlaw.com
mmeuser@dhillonlaw.com
gmichael@dhillonlaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTH BAY UNITED PENTECOSTAL CHURCH, a California non-profit corporation; and BISHOP ARTHUR HODGES III, an individual,

Plaintiffs,

v.

GAVIN NEWSOM, in his official capacity as the Governor of California, *et al.*,

Defendants.

Case No. 3:20-cv-865-BAS

**Declaration of Sean G. Kaufmann in Support of Plaintiffs' Renewed Motion for a Temporary Restraining Order / Preliminary Injunction**

Judge: Hon. Cynthia Bashant

I, Sean G. Kaufman, declare and state as follows:

1.     I am a certified public health professional (CPH), behaviorist, health education and infectious disease specialist, with particular expertise in both behavioral-based training and infectious disease risk mitigation in clinical, laboratory and other public health settings. I make this declaration of personal, firsthand knowledge, and if called and sworn as a witness could and would testify competently thereto.

2.     I received my Bachelor of Arts and Sciences in Psychology in 1996 from San Diego State University in San Diego, California. In 1999, I received my Master in Public Health in Health and Human Behavior, also from San Diego State University in San Diego California.

3.     From 1997 to 1999, I was employed as a Project Manager and Health Education Specialist at San Diego State University in San Diego, California, serving in the Student Health Services Office of Health Promotion. In that role, I provided training programs, counseling and patient services for a variety of health issues.

4.     From 1999 through 2006, I worked for the Centers for Disease Control and Prevention ("CDC") in Atlanta, Georgia, serving during my tenure in CDC's National Center for HIV, AIDS and Tuberculosis, CDC's National Center for Infectious Diseases, CDC's Office of Terrorism and Emergency Response and the Office of the Director of the CDC. While with the CDC, I assisted with the CDC's response to HIV, the 9/11 and 2001 anthrax attacks, the West Nile Virus, SARS and monkeypox. I received a Distinguished Service Award from the United States Department of Health and Human Services in 2002 for outstanding contributions and public health activities in response to the 9/11 and subsequent anthrax attacks. I also received a Distinguished Service Award from the United States Department of Health and Human Services in 2003 for outstanding contributions and public health activities in response to the 2003 SARS outbreak.

5.　From 2004 through 2014, I served as Senior Associate and Director of the Science and Safety Training Program in the Rollins School of Public Health at Emory University in Atlanta, Georgia. During my association with Emory University, I developed and directed the Biosafety Laboratory 3 ("BSL3") and BSL4 Science and Safety Training Program along with the ONSITE program, all of which programs trained individuals both domestically and internationally to work safely in and support high-containment laboratories equipped to handle the most infectious and dangerous biological agents in the world. While associated with Emory University, I trained and managed those who clinically treated the first two Ebola patients in the United States working at the Emory University Isolation Unit during the 2014 Ebola outbreak.

6.　From 2011 through the present, I have served as the Founding Partner, President and Chief Executive Officer of Safer Behaviors (USA), where I serve as an expert consultant in behavioral-based training around infectious diseases in clinical and laboratory settings. In that role, I develop, manage, implement, and deliver a wide range of services for people working with and around infectious diseases, including those in laboratories, healthcare settings, and high-containment work environments, Applied Laboratory Emergency Response Training (ALERT) Programs for first responders, Personal Protective Equipment ("PPE") Training Programs, Emergency Communication Leadership Programs, and Biological Risk Mitigation Training for those serving on the frontline of emerging infectious diseases.

7.　Since 2014, I have provided Advanced Biological Risk Mitigation Training Programs with the American Society for Microbiology (ASM), National Institutes of Health (NIH), Fogarty International Center, CRDF Global throughout Pakistan, Egypt and Malaysia. I have consulted for the World Health Organization (WHO) and developed its Shipping of Infectious Substances Training and its Identification of Polio Samples for Eradication Efforts. In 2015, I received the John H. Richardson Special Recognition Award from the American Biological Safety

1  Association, recognizing outstanding contributions that have enhanced ABSA and
2  the profession of biological safety.

3      8.      My publications include the following: (a) *Anthrax in New Jersey: A*
4  *Health Education Experience in Bioterrorism Response and Preparedness*, HEALTH
5  PROMOT. PRACT. 6:430-36 (2005); (b) *Biosafety Behavioral Based Training for High*
6  *Biocontainment Laboratories: Bringing Theory into Practice for Biosafety Training*,
7  APPLIED BIOSAFETY J. 12:3 (2007); (c) *Review of the Emory University Applied*
8  *Laboratory Emergency Response Training (ALERT) Program*, APPLIED BIOSAFETY J.
9  14:1 (2009); (c) *Surviving Biosafety: Coping with Occupational Stressors of Serving the*
10  *Profession*, APPLIED BIOSAFETY J. 17:4 (2012); (d) *Chapter12: Strategies for*
11  *Communicating with the General Public About High-Containment Laboratories*, ANTH.
12  OF BIOSAFETY XIII, AM. BIOLOGICAL SAFETY ASSOCIATION (2012); (e) *Viral*
13  *Hemorrhagic Fevers: Chapter 9 – BSL4 Workforce Preparedness in Hemorrhagic Fever*
14  *Outbreaks*, TAYLOR & FRANCIS (2013); (f) *Bioerror and Safety Culture: The Leadership*
15  *Commitment to the Preparedness, Protection and Promotion of Scientists*, CULTURE: A
16  PUBLICATION OF THE AMERICAN SOCIETY FOR MICROBIOLOGY (2014); (g) *Biological*
17  *Safety Principles and Practices: Chapter 28 – A One-Safe Approach. Continuous Safety*
18  *Training Initiatives*, ASM PRESS (2017); and (h) *Prepare and Protect: Safer Behaviors in*
19  *Laboratories and Clinical Containment Settings*, ASM & WILEY PRESS (2020).

20      9.      I am an International Federation of Biosafety Professionals Certified
21  Professional in Biorisk Management, am certified as an MBTI Certified Provider by
22  GS Consultants, hold a Certification in Public Health provided by the National Board
23  of Public Health Examiners and have been accredited as a Certified Health Education
24  Specialist by the National Commission for Health Education Credentialing.

25      10.      In or about November 2019, while directing a Leadership Program in
26  Biological Risk Mitigation in Islamabad, Pakistan, I first became aware of an outbreak
27  of what was ultimately determined to be a novel coronavirus, SARS COV-2, in
28  Wuhan, China, that the world has since come to commonly refer to as COVID-19.

11.     Over the ensuing months, as part of my biosafety work and regular professional development, I have engaged in a thorough review of WHO and CDC data and the reams of international and domestic scientific data that have been published regarding COVID-19 in *The Lancet*, *Dispatch*, *The New England Journal of Medicine*, *JAMA*, *Clinical Infectious Diseases* and other publications, as well as the outcomes of prevailing international and domestic and international biosafety protocols associated with COVID-19. I have also facilitated multiple trainings, discussions, and assisted organizations with strategies minimizing risks to health and safety specific to COVID-19.

12.     Through that process, I have become readily familiar with COVID-19's droplet (micro and macro) and surface transmission, the risks and likelihood of symptomatic and pre-symptomatic transmission, reproduction rates, signs, symptoms, mortality, risks and other infectious disease characteristics of COVID-19 across the population – including in both children and adults, as well as those with co-morbidities. I have put that ongoing review, as well as my education and twenty-five years of public health experience, to use in implementing and evaluating COVID-19 public health and safety protocols, including with respect to public health expertise I am currently providing to, among others, large-scale venues and film and television productions on safe operating procedures and protocols.

13.     I understand that the State of California currently claims that there is no way, consistent with science and public health, for houses of worship located within any county that is either on or any less than 14 days removed from the State of California's COVID-19 "monitoring list" – the precise criteria for which "monitoring list" are opaque but appear to require some combination of what the state deems to be a COVID-19 "surge" in infections or hospitalizations, what the state deems to be "stretched" ICU bed or ventilator capacity, or what the state deems to be "insufficient" COVID-19 testing – to open their doors to in-person worship and to do so safely. As such, I understand that the default position of the

State of California is that the science of public health dictates that no church, mosque, synagogue, or other house of worship located in California counties on the "monitoring list" can open for in-person instruction at all.

14.     Despite the state's claim, there is no rational and legitimate scientific or public health basis supporting the sweeping breadth and scope of the State of California's above-described closure mandate. Rather, given the real and significant public health and other harms—including especially psychological harms—known to be associated with restricting religious freedom, such unprecedented restriction should only ever be properly wielded as a disease control mechanism when the risks are far greater; when such closures are far more targeted – often at the individual church level; and far more limited in time. None of these criteria are met by the State of California's closure mandate.

15.     With respect to risks, everything that we know as public health and infectious disease professionals about the likelihood of symptomatic and presymptomatic transmission, reproduction rates, signs, symptoms, mortality, risks and other infectious disease characteristics of COVID-19 both domestically and internationally does not rationally comport with what I understand the state is claiming to be true in attempting to justify its mandate. Indeed, commonly utilized Susceptible, Infectious, and Recovered – or "SIR" – disease transmission modeling associated with COVID-19, together with WHO and CDC public health metrics, suggest that California's mandate is likely to make the overall public health situation worse and not better by, *inter alia*, enlarging the population of susceptible individuals.

16.     With respect to targeting, the sweeping nature of the State of California's closure mandate shows that it is not rationally targeted as an infectious disease control mechanism. There is no public health reason that a house of worship in an unaffected portion of a California county must be prohibited from operating because of an outbreak in an affected portion of a California county. Moreover, it is simply not true for the State of California to claim that there is no way to safely

operate as a house of worship in a county that meets the state's criteria for placement on its "monitoring list." While nothing is ever free from any risk, the data shows that any house of worship in any California county that (1) removes from the in-person church environment for between 5-7 days any individual that (i) reports having been in contact with a person who is COVID-19 positive; or (ii) has exhibited COVID-19 symptoms; (2) engages in temperature screening of all attendees, staff and visitors at points of entry, denying such entry to anyone who has a fever; (3) quickly and aggressively tests, isolates and contact traces any child or staff member presenting with COVID-19 symptoms; and (4) teaches, enforces and engages in frequent handwashing, sanitization and decontamination of high travel points within the church environment, may be said to meet commonly accepted public health definitions of safe operating that minimize risks. From a public health and infectious disease control perspective, all of these features are both feasible and sustainable at minimum cost.

17.    And with respect to being limited in time, the State of California's church closure mandate is not properly time-limited as a matter of public health and infectious disease control. To the extent the State of California may expect a vaccine at some point in the future, it should be noted that a vaccine has never been developed for a coronavirus like COVID-19. And even if developed and sufficiently adopted, any COVID-19 vaccine is likely to be similar to influenza vaccines that have been shown to quickly lose effectiveness. The latest COVID-19 data shows that the disease is not likely to ever be eradicated.

///

///

///

///

///

///

18.     In short, the State of California's overbroad and insufficiently targeted closure mandate is flatly inconsistent with the science of public health, biosafety protocols and with our understanding as infectious disease professionals of the characteristics of the COVID-19 virus.

I declare until penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed on August 10, 2020.

Sean G. Kaufman