XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
LISA J. PLANK
Deputy Attorney General
TODD GRABARSKY
Deputy Attorney General
State Bar No. 286999
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013
  Telephone:  (213) 269-6044
  Fax:  (916) 731-2124
  E-mail:  Todd.Grabarsky@doj.ca.gov
*Attorneys for Defendants Gavin Newsom,
California Governor; Xavier Becerra,
California Attorney General; and Sandra
Shewry,[1] Acting Director of the California
Department of Public Health*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SOUTH BAY UNITED PENTECOSTAL CHURCH, a California non-profit corporation; BISHOP ARTHUR HODGES III, an individual,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**GAVIN NEWSOM, in his official capacity as Governor of the State of California; XAVIER BECERRA, in his official capacity as Attorney General of California; SONIA ANGELL, in her official capacity as Director of the California Department of Public Health, et al.,**<br><br>Defendants. | 3:20-cv-00865-BAS-AHG<br><br>**STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date:        Not set<br>Time:        NO ORAL ARGUMENT<br>              UNLESS REQUESTED<br>              BY THE COURT<br>Dept:        4B<br>Judge:       The Honorable Cynthia<br>              Bashant<br>Action Filed: May 8, 2020 |

---

[1]  Defendant Sandra Shewry, the current Acting Director of the California Department of Public Health, is automatically substituted for Defendant Sonia Angell as a defendant.  Fed. R. Civ. P. 25(d).

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................1

Background....................................................................................................1

I.    The COVID-19 Pandemic...................................................................1

II.   California's Response to the Pandemic Emergency ............................2

     A.    The Initial Executive Order and Reopening Plan .......................2

     B.    The Reopening of In-Person Worship Services ........................3

     C.    The Surge in COVID-19 and Retightening of Indoor Activities...................................................................................4

     D.    Reopening of Indoor Worship Services in San Diego County ......................................................................................5

III.   Procedural History .............................................................................5

     A.    This Court's Denial of Plaintiff's Initial TRO Application........5

     B.    The Ninth Circuit's Denial of Plaintiffs' Application for Injunction Pending Appeal .......................................................7

     C.    The Supreme Court's Denial of Plaintiffs' Injunction Request ....................................................................................7

     D.    The Ninth Circuit's Limited Remand .......................................8

Legal Standard..............................................................................................9

Argument ......................................................................................................9

I.    COVID-19 Continues to Present a Public Health Emergency.............9

II.   Precedent Continues to Weigh Overwhelmingly Against Plaintiffs Claims........................................................................................12

III.   Plaintiffs Are Still Unlikely to Succeed on Their Claims...................14

     A.    The State's Directives Do Not Violate the Free Exercise Clause. ....................................................................................14

         1.    The State's Restrictions on Indoor Worship Services Do Not Discriminate Against Religious Activities. ...........................................................................15

            a.    The Restrictions on Indoor Worship Are the Same or Less Stringent Than Those on Comparably Risky Secular Activities. .................15

            b.    The Indoor Singing and Chanting Restriction Does Not Discriminate Against Religion.............22

         2.    The State's Directives Are Facially Neutral....................23

         3.    The State's Directives Survive Rational Basis Review..........................................................................24

     B.    Plaintiffs Have Not Shown Discriminatory Enforcement. .......25

i

# TABLE OF CONTENTS
(continued)

**Page**

C.    The Restrictions on Indoor, In-Person Worship Services Are a Constitutional Response to a Public Health Emergency. ...............................................................................29

D.    The State's Directives Would Survive Strict Scrutiny. ............31

E.    Plaintiffs' State Law Claim Fails.............................................34

IV.    The Remaining Factors Weigh Heavily Against an Injunction. .........35

Conclusion .....................................................................................................35

ii

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

# TABLE OF AUTHORITIES

**Page**

CASES

*Abiding Place Ministries v. Wooten*
   No. 3:20-cv-00683-BAS-AHG (S.D. Cal. Apr. 10, 2020) ................ 12, 27, 32, 34

*Alliance for the Wild Rockies v. Cottrell*
   632 F.3d 1127 (9th Cir. 2011) .................................................................... 9

*Antietam Battlefield KOA v. Hogan*
   No. 1:20-cv-01130-CCB, 2020 WL 2556496 (D. Md. May 20,
   2020) ...................................................................................................... 13, 29

*Ex parte Arata*
   52 Cal. App. 13 380, 385 (1921) ............................................................ 24

*Ass'n of Jewish Camp Operators v. Cuomo*
   No. 1:20-cv-0687-GTS-DJS, 2020 WL 3766496 (N.D.N.Y. July 6,
   2020) ...................................................................................................... 13, 29

*Berean Baptist Church v. Cooper*
   No. 4:20-CV-81-D, 2020 WL 2514313 (E.D.N.C. May 16, 2020) ............. 14, 24

*Binford v. Sununu*
   No. 217-2020-CV-00152 (N.H. Superior Ct. March 25, 2020) ........................ 14

*Bullock v. Carney*
   __ F.3d __, No. 20- 2096, 2020 WL 2819228 (3d Cir. May 30,
   2020) ............................................................................................................ 13

*Bullock v. Carney*
   No. 1-20-cv-674, 2020 WL 2813316 (D. Del. May 29, 2020) ........................... 13

*Calvary Chapel of Bangor v. Mills*
   No. 1:20-CV-00156-NT, 2020 WL 2310913 (D. Me. May 9, 2020) ................ 13

*Calvary Chapel of Bangor v. Mills*
   No. 20-1507 (1st Cir. June 2, 2020) .................................................... 13

*Calvary Chapel Dayton Valley v. Sisolak*
   No. 20-16169, 2020 WL 4274901 (9th Cir. July 2, 2020) ............... 13, 23, 24, 26

iii

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

## TABLE OF AUTHORITIES
### (continued)

Page

*Calvary Chapel Dayton Valley v. Sisolak*
No. 3:20-cv-00303-RFB-VCF, 2020 WL 4260438 (D. Nev. June 11, 2020) .................................................................................. 25, 26

*Calvary Chapel Lone Mountain v. Sisolak*
No. 2:20-cv-00907-RFB-VCF, 2020 WL 3108716 (D. Nev. June 11, 2020) .................................................................................. 13, 28

*Cassell v. Snyders*
No. 20-C-50153, 2020 WL 2112374 (N.D. Ill. May 3, 2020) ........................... 13

*Christian Cathedral v. Pan*
No. 20-CV-03554-CRB, 2020 WL 3078072 (N.D. Cal. June 10, 2020) ............................................................................................ 13

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah*
508 U.S. 520 (1993) ............................................................... 15, 24, 33

*County of Los Angeles v. Grace Cmty. Church*
No. B307056, 2020 WL 4876658 (Cal. Ct. App. Aug. 15, 2020) .............. *passim*

*Cross Culture Christian Ctr. v. Newsom*
No. 2:20-cv-00832-JAM-CKD, 2020 WL 2121111 (E.D. Cal. May 5, 2020) ...................................................................... 3, 12, 27, 30

*Crowl v. Inslee*
No. 3:20-cv-5352 (W.D. Wash. May 8, 2020) .................................... 13

*Davis v. Berke*
No. 1:20-CV-98, 2020 WL 1970712 (E.D. Tenn. Apr. 17, 2020) ...................... 14

*Diaz-Bonilla v. Northam*
No. 1:20-cv-377 (E.D. Va. June 5, 2020) .......................................... 13

*Dwelling Place Network v. Murphy*
No. 1:20-cv-06281 (D.N.J. June 15, 2020) ......................................... 13

*Elim Romanian Church v. Pritzker*
No. 19A1046, 2020 WL 2781671 (May 29, 2020) ............................... 13

iv

1
2

## TABLE OF AUTHORITIES
### (continued)

Page

*Elim Romanian Pentecostal Church v. Pritzker*
2020 WL 2517093 (7th Cir. May 16, 2020)...................................................13, 16

*Elim Romanian Pentecostal Church v. Pritzker*
962 F.3d 341 (7th Cir. 2020) ........................................................................*passim*

*Elim Romanian Pentecostal Church v. Pritzker*
No. 20-C-2782, 2020 WL 2468194 (N.D. Ill. May 13, 2020) ...........................13

*Elkhorn Baptist Church v. Brown*
366 Or. 506 (2020) ...............................................................................................14

*Elrod v. Burns*
427 U.S. 347 (1976) ..............................................................................................24

*Emp't Div. v. Smith*
494 U.S. 872 (1990) ..............................................................................................31

*Espinoza v. Mont. Dep't of Revenue*
140 S. Ct. 2246 (2020) ..........................................................................................31

*First Baptist Church v. Kelly*
No. 20-1102-JWB, 2020 WL 1910021 (D. Kan. Apr. 18, 2020)...................6, 14

*Garcia v. Google*
786 F.3d 733 (9th Cir. 2015) (en banc) .................................................................9

*Gish v. Newsom*
No. 20-55445 (9th Cir. May 7, 2020) ..................................................................12

*Gish v. Newsom*
No. EDCV20-755-JGB, 2020 WL 1979970 (C.D. Cal. Apr. 23,
2020)..............................................................................................................*passim*

*Givens v. Newsom*
No. 2:20-cv-00852-JAM-CKD, 2020 WL 2307224 (E.D. Cal. May
8, 2020)..........................................................................................................24, 26

*Grace United Methodist Church v. City of Cheyenne*
451 F.3d 643 (10th Cir. 2006) ..............................................................................33

v

1

2

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

3

*Harborview Fellowship v. Inslee*

4

No. 3:20-cv-05518-BHS (Docket Entry 42) (W.D. Wash. June 18,

5

2020).................................................................................................................13

6

*Harvest Rock Church v. Newsom*

No. 2:20-cv-6414-JGB-KK (C.D. Cal. Aug. 12, 2020) ..........................12, 25, 28

7

*Hawse v. Page*

8

No. 20-1960 (8th Cir. May 19, 2020)................................................................13

9

*High Plains Harvest Church v. Polis*

10

No. 1:20-CV-01480-RM-MEH, 2020 WL 4582720 (D. Colo. Aug.

11

10, 2020)...........................................................................................................13

12

*Huey v. United Parcel Serv.*

165 F.3d 1084 (7th Cir. 1999)..........................................................................19

13

*Jacobson v. Massachusetts*

14

197 U.S. 11 (1905) ....................................................................................*passim*

15

*Jew Ho v. Williamson*

16

103 F. 10 (C.C.N.D. Cal. 1900) ........................................................................24

17

*Jones v. Parmley*

18

465 F.3d 46 (2d Cir. 2006)...............................................................................24

19

*Korematsu v. United States*

20

323 U.S. 214 (1944) ........................................................................................24

21

*Lacey v. Maricopa Cty.*

22

693 F.3d 896 (9th Cir. 2012)............................................................................28

23

*Legacy Church, Inc. v. Kunkel*

24

2020 WL 3963764 (D.N.M. July 13, 2020) ....................................14, 21, 25, 29

25

*Legacy Church v. Kunkel*

No. CIV-20-0327-JB\SCY, 2020 WL 1905586 (D.N.M. Apr. 17,

26

2020) ..................................................................................................14, 29, 33

27

*Lighthouse Fellowship Church v. Northam*

28

__ F. Supp. 3d __ (E.D. Va. May 21, 2020)......................................................13

vi

# TABLE OF AUTHORITIES
**(continued)**

**Page**

*Lighthouse Fellowship Church v. Northam*
No. 2:20-cv-204, 2020 WL 2110416 (E.D. Va. May 1, 2020) ..........................13

*MacEwen v. Inslee*
No. C20-5423 BHS, 2020 WL 4261323 (W.D. Wash. July 24,
2020)................................................................................................................13

*Ex parte Martin*
83 Cal. App. 2d 164 (1948)................................................................................24

*Maryville Baptist Church. v. Beshear*
957 F.3d 610 (6th Cir. 2020)..............................................................................14

*Murphy v. Lamont*
No. 3:20-CV-0694 (JCH), 2020 WL 4435167 (D. Conn. Aug. 3,
2020)................................................................................................................13

*Nigen v. New York*
No. 1:20-cv-01576-EK-PK, 2020 WL 1950775 (E.D.N.Y. Mar. 29,
2020)................................................................................................................14

*Our Lady of Sorrows Church v. Mohammad*
No. 3:20-cv-00674-AVC (D. Conn. May 18, 2020) ...........................................13

*PCG-SP Venture I LLC v. Newsom*
No. 20-cv-1138, 2020 WL 4344631 (C.D. Cal. June 23, 2020) ..................25, 26

*Pennhurst State Sch. & Hosp. v. Halderman*
465 U.S. 89 (1984) ............................................................................................34

*Phillips v. City of New York*
775 F.3d 538 (2d Cir. 2015) ..............................................................................29

*Prince v. Massachusetts*
321 U.S. 158 (1944) ..........................................................................................30

*Reed v. Town of Gilbert*
576 U.S. 155 (2015) ..........................................................................................33

*Roberts v. Neace*
958 F.3d 409 (6th Cir. 2020) (per curiam) ........................................................14

**<u>TABLE OF AUTHORITIES</u>**
**(continued)**

<u>Page</u>

*S. Bay United Pentecostal Church v. Newsom*
140 S. Ct. 1613 (2020) ................................................................*passim*

*S. Bay United Pentecostal Church v. Newsom*
959 F.3d 938 (9th Cir. 2020) .................................................7, 12, 33

*Shelby County v. Holder*
570 U.S. 529 (2013) .................................................................11

*Soos v. Cuomo*
2020 WL 3488742 (N.D.N.Y. June 26, 2020) ...........................28, 29

*Spell v. Edwards*
962 F3d 175 (5th Cir. 2020) ......................................................29

*Spell v. Edwards*
No. CV-20-00282-BAJ-EWD, 2020 WL 2509078 (M.D. La. May
15, 2020) .................................................................................13

*Stormans, Inc. v. Wiesman*
794 F.3d 1064 (9th Cir. 2015) .............................................*passim*

*Tabernacle Baptist Church v. Beshear*
No. 3:20-cv-00033-GFVT, 2020 WL 2305307 (E.D. Ky. May 8,
2020) .......................................................................................14

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*
309 F.3d 144 (3d Cir. 2002) .....................................................28

*Tigges v. Northam*
No. 3:20-CV-410, 2020 WL 4197610 (E.D. Va. July 21, 2020) .......13

*Tolle v. Northam*
No. 1:20-cv-00363-LMB-MSN, 2020 WL 1955281 (E.D. Va. Apr.
8, 2020) .....................................................................................14

*Tolle v. Northam*
No. 20-1419 (4th Cir. Apr. 28, 2020) ..........................................13

*Whitlow v. California*
203 F. Supp. 3d 1079 (S.D. Cal. 2016) ....................................29, 33

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3

4

*Whitsitt v. Newsom*
   No. 2:20-cv-00691-JAM-CKD (E.D. Cal. Aug. 19, 2020) ..................................14

5

6

*Winter v. Natural Resources Defense Council, Inc.*
   555 U.S. 7 (2008) ............................................................................................9

7

8

*Workman v. Mingo Cty. Bd. of Ed..*
   419 Fed. Appx. 348 (4th Cir. 2011) ...................................................29

9

**STATUTES**

10

Cal. Code Regs. § 340 .............................................................................22

11

12

Cal. Labor Code
   § 226(a) ............................................................................................22
   § 6409.1(b) ......................................................................................22

13

14

**CONSTITUTIONAL PROVISIONS**

15

16

United States Constitution
   First Amendment ...........................................................................*passim*
   Eleventh Amendment .....................................................................34
   Fourteenth Amendment .................................................................34

17

18

19

California Constitution
   Article I, § 4....................................................................................6, 34

20

21

22

23

24

25

26

27

28

# INTRODUCTION

Plaintiffs provide no reason for the Court to reverse its previous order denying their request for a temporary restraining order, especially as California's COVID-19-related restrictions on in-person religious worship services have *loosened* since the order was issued. When the Court rejected Plaintiffs' challenge to the restrictions in May, Plaintiffs were permitted to congregate only for drive-in or remote worship services, but now they may congregate outdoors in unlimited numbers for services that feature singing and chanting, or indoors up to 100 persons or 25% building capacity. Moreover, the State continues to impose similar or more severe restrictions on comparably risky secular activities. And, the relevant case law has grown even less hospitable to Plaintiffs' claims, with a plethora of decisions from the Supreme Court, the Ninth Circuit, California district courts, the California Court of Appeal, and a host of other courts across the country almost uniformly denying the extraordinary relief sought by Plaintiffs.

While Plaintiffs assert a new claim for discriminatory enforcement against houses of worship, they are unable to offer any persuasive evidence of the legal prerequisite for such a claim: a pattern of discrimination. Plaintiffs' assertion that rules have not been enforced against outdoor political protests is untrue because the State has in fact denied permits to political protests that could not comply with the public health directives and enforced the rules in other ways. And the few instances of enforcement against worship services that Plaintiffs have gathered do not show any pattern of discrimination, especially as they involve local actions taken against indoor, not outdoor, services.

Plaintiffs' Renewed Motion for TRO should be denied.

# BACKGROUND

## I.    THE COVID-19 PANDEMIC

As the Court is well aware, the COVID-19 pandemic has now infected over 5.6 million Americans, killing over 180,000, including over 12,000 deaths in

1

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

1 California.  Decl. of Todd Grabarsky ISO State Defs.' Opp'n Exs. 48-49.  The

2 novel coronavirus that causes this highly infectious and frequently fatal disease

3 spreads through respiratory droplets that remain in the air or on surfaces, and it may

4 be transmitted unwittingly by individuals who exhibit no symptoms.  Decl. of Dr.

5 James Watt ISO State De

6 no cure, no widely effective

7 treatment, and no vaccine d Decl.

8 ¶ 36.  As a consequence,

9 contact are th ide Watt

10 Decl. ¶ 47. rfor DCV20-

11 755-JGB (K ) W , (S.D. Cal. Apr. 23, 2020).

12 The cha track the daily COVID-19 infections and deaths in

13 California si h.[2]

14 May to mid- deaths continuing to

15 and only slig ring off since then.

16









² https://public.tableau.com/views/COVID-

Defs.' Opp'n to Renewed TRO (3: 65-BAS-AHG)

Disease Control and Prevention, the U.S. Health and Human Services Agency, and local health departments to monitor and plan for spread of COVID-19 to the United States.  Second Am. Compl. ("SAC") Ex. 1-1.  The California Department of Public Health also has been in regular communication with hospitals, clinics, and other health providers, providing guidance to them.  *Id.*

On March 4, 2020, the Governor proclaimed a State of Emergency in California, making additional resources available, formalizing emergency state actions already underway, and helping the State prepare for the broader spread of the disease.  *Id.*  Two weeks later, the Governor issued Executive Order N-33-20, the Stay-at-Home Order, which required "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors."  *Id.*  The Public Health Officer designated a list of "Essential Critical Infrastructure Workers."  *Id.* Ex. 1-2.  Included in that list were "[f]aith based services that are provided through streaming or other technology," a provisions since revised to include "[c]lergy for essential support and faith-based services that are provided through streaming or other technologies that support physical distancing and state public health guidelines."  SAC Ex. 1-2, at 16.  This provision permitted places of worship to conduct services over online streaming or teleconferencing and via drive-ins, but not in person.  *Cross Culture Christian Ctr. v. Newsom*, No. 2:20-cv-00832-JAM-CKD, 2020 WL 2121111, at *3 n.2 (E.D. Cal. May 5, 2020).

On April 28, 2020, the Governor announced a "Resilience Roadmap" for safe and gradual reopening.  The Roadmap had four stages: (1) safety and preparation; (2) reopening of lower-risk workplaces and other spaces; (3) reopening of higher-risk workplaces and other spaces; and (4) an end to the Stay-at-Home Order.  *Id.* Exs. 1-3, 1-6.  At first, in-person religious services were included in Stage 3.  *Id.*

**B.   The Reopening of In-Person Worship Services**

On May 25, 2020, California issued guidelines reopening places of worship

3

and providers of religious services.  SAC Ex. 1-5.  The guidelines contain instructions and recommendations for physical distancing during worship services as well as cleaning and disinfection protocols, training for employees and volunteers, and individual screening.  *Id.*  Additionally, in keeping with the CDC's recognition and recommendation that the size of worship services may be limited in accordance with guidance from state and local authorities, Grabarsky Decl. Ex. 47, the guidelines limited worship services to either 100 attendees or 25% of building capacity, whichever is less.  SAC Ex. 1-5.[3]  Under the May 25 guidelines, there was no statewide ban on in-person worship services, and such services could resume if permitted in the relevant county.  *Id.*

On June 12, the State released updated guidelines that removed any numerical attendance limit on outdoor worship services.  SAC Ex. 1-7, at 3 (recommending that outdoor attendance "be limited naturally through implementation of strict physical distancing measures").  The attendance limit was removed for outdoor political protests as well.  Grabarsky Decl. Ex. 14.

### C.   The Surge in COVID-19 and Retightening of Indoor Activities

Unfortunately, COVID-19 infections and deaths remounted, and on July 1, the State released new guidance (updated July 6) that requires places of worship to "discontinue indoor singing and chanting activities" because such activities "negate the risk reduction achieved through six feet of physical distancing."  SAC Exs. 1-9, 1-10.  The prohibition on indoor group singing and chanting also applies to political protests, schools, and restaurants.  Grabarsky Decl. Exs. 14-16.  But singing and chanting is permitted in outdoor worship services.  SAC Exs. 1-9, 1-10.

On July 13, 2020, in light of the "significant increase in the spread of COVID-19," the State issued an order re-imposing many previously relaxed restrictions on indoor activities.  SAC Ex. 1-13, at 1.  The July 13 order directed the statewide

---

[3] Similar numerical limits were placed on protests, but no other mass gatherings were permitted; and at the time of this reopening of worship services, schools, restaurants, bars were not permitted to reopen.

4

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

closure of the indoor operations of restaurants, wineries and tasting rooms, family
entertainment centers, movie theaters, zoos, museums, and cardrooms, as well as
closure of all operations—indoor and outdoor—of bars, pubs, brewpubs, and
breweries. *Id.* at 3-4. In addition, for many counties, the order directed the closure
of indoor operations of places of worship as well as offices for non-critical
infrastructure sectors, personal care services, hair salons and barbershops, gyms and
fitness centers, and malls. *Id.* Outdoor worship services remained permitted
without an attendance limit throughout the State. *Id.*

### D.  Reopening of Indoor Worship Services in San Diego County

On August 28, in light of "increased knowledge of disease transmission
vulnerabilities and risk factors," the State issued an Order and related guidance
setting forth a four-tier system for reopening, taking effect August 31 and
superseding the July 13 Order. Grabarsky Decl. Exs. 50-53. Lower-risk activities
are permitted sooner than higher-risk activities, based on several criteria such as
"number of people per square feet," "duration of exposure," "physical interactions,"
"mixing of people from differing households and communities," "indoor vs.
outdoor," and "activities that are known to cause increased spread" like singing. *Id.*
Ex. 51. As San Diego County has been placed in Tier 2, indoor worship may now
take place there, up to 25% capacity or 100 persons, whichever is fewer. *Id.* Ex.
52-53. Indoor restaurants and movie theaters in San Diego are subject to the same
attendance restrictions as worship services, but bars, concerts, sporting events, and
theatrical performances remain closed entirely. *Id.*

### III.  PROCEDURAL HISTORY

### A.  This Court's Denial of Plaintiff's Initial TRO Application

On May 8, 2020, Plaintiffs, which include South Bay United Pentecostal
Church and its Senior Pastor, Bishop Arthur Hodges III, sued the State Defendants,
and numerous county officials to enjoin the Stay-at-Home Order, Resilience
Roadmap, and related county orders. *See* ECF No. 1. On May 11, Plaintiffs filed

5

the First Amended Complaint, in which they challenged California's then-current restrictions on in-person worship under the First Amendment's Free Exercise, Establishment, Free Speech, and Assembly Clauses; the Fourteenth Amendment's Due Process and Equal Protection Clauses; and rights enumerated in Article 1, sections 1 through 4, of the California Constitution.  ECF No. 11.

After their initial application for a TRO was rejected for non-compliance with the Court's meet-and-confer rules, ECF No. 8, Plaintiffs filed an amended TRO application, which the Court denied on May 15.  ECF No. 32.

In its denial, the Court concluded that Plaintiffs were unlikely to prevail on the merits of their claims for three reasons.  *First*, applying the Supreme Court's decision in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the Court held that, given the public health emergency, the State imposed permissible restrictions on the rights of individuals to freely exercise their religion.  Grabarsky Decl. Ex. 1 at 25-26 (herein "*South Bay I*").

*Second*, the Court held the State's then-controlling directives constitutional under ordinary Free Exercise Clause analysis because the restrictions on in-person worship services "are not because of a religious motivation," but rather because such gatherings "pose a greater risk of exposure to the virus."  *Id.* at 26.  The Court further found that many other comparable activities "that involve people sitting together in a closed environment for long periods of time" are "treated similar" to religious services.  *Id.* at 26-27, 29.  Thus, the Court found, the categorization of activities was based on the "risk of contracting the virus while participating in that activity."  *Id.* at 28-29.  The Court concluded that the restrictions imposed were rationally based on "protecting safety and stopping the virus spread."  *Id.* at 26-27.

*Third,* the Court held that, even if strict scrutiny applied, the directives were constitutional because they are narrowly tailored to further the State's compelling interest in protecting public health, as congregants may exercise their religion in many other ways.  *Id.* at 27-28.

6

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

In addition, the Court held that Plaintiffs failed to show a likelihood of success on their equal protection and due process claims because they presented "no evidence" that "similarly situated persons or businesses are treated differently" or that the State is "treating differently businesses that are alike," and the directives did not "shock[] the conscience." *Id.* at 28-30. The Court also held that neither the public interest nor the balance of equities supported a TRO because "[t]he only way currently known to curb the disease is to limit personal exposure." *Id.* at 30. The Court also found that State officials need to monitor how each stage of reopening affects infection rates and public health, and adapt its directives accordingly. *Id.*

### B. The Ninth Circuit's Denial of Plaintiffs' Application for Injunction Pending Appeal

Plaintiffs noticed an appeal and filed a *pro forma* application for injunction pending appeal, which the Court denied. ECF No. 39. Plaintiffs then filed with the Ninth Circuit an emergency motion for injunction pending appeal, which the appellate court denied on May 22, ruling that Plaintiffs "have not demonstrated a sufficient likelihood of success on appeal." *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939 (9th Cir. 2020) (*South Bay II*)); *see also id.* ("We're dealing here with a highly contagious and often fatal disease for which there presently is no known cure."). The Court also ruled that the remaining factors "do not counsel in favor of injunctive relief." *Id.* at 940. Judge Collins dissented. *Id.*

### C. The Supreme Court's Denial of Plaintiffs' Injunction Request

On May 23, Plaintiffs filed with the Supreme Court an emergency application for writ of injunction pending appeal, which they later amended to seek an injunction against the May 25 guidelines along with the Resilience Roadmap. Grabarsky Decl. Exs. 6-7. But, on May 29, the Supreme Court denied that application. *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (*South Bay III*). Chief Justice Roberts concurred in an opinion concluding that the California restrictions appear consistent with the Free Exercise Clause because they

7

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

do not discriminate against religion:

> Similar or more severe restrictions apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time. And the Order exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods.

*Id.* at 1613; *see also id.* at 1614 ("The notion that it is 'indisputably clear' that the Government's limitations are unconstitutional seems quite improbable.").

Chief Justice Roberts further explained that the "Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials in the States 'to guard and protect,'" that the latitude of those officials "'must be especially broad'" in the face of "'medical and scientific uncertainties,'" and that their judgments "should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.* at 1613-14 (quoting *Jacobson*, 197 U.S. at 38; *Marshall v. United States*, 414 U. S. 417, 427 (1974); *Garcia v. San Antonio Met. Transit Auth.*, 469 U.S. 528, 545 (1985)).

Justice Kavanaugh filed a dissenting opinion. *Id.* at 1614.

**D.    The Ninth Circuit's Limited Remand**

While the appeal was pending, on July 10, Plaintiffs' moved this Court for an indicative ruling to revisit the TRO denial, which the Court granted ruling that the motion raised a "substantial issue." ECF No. 46. On July 17, Plaintiffs filed the operative Second Amended Complaint. ECF No. 47. On July 29, the Ninth Circuit remanded the appeal "for the limited purpose of permitting the district court to consider Plaintiffs' request in light of the events and case law that have developed since May 15, 2020." ECF No. 49.

8

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

**LEGAL STANDARD**

Like a preliminary injunction, a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  Parties seeking such extraordinary relief must demonstrate (1) a strong likelihood of success on the merits, (2) irreparable injury if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest.  *Id.* at 20; *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132-35 (9th Cir. 2011).  Because they seek a mandatory injunction to disrupt already-implemented COVID-19-related directives, Plaintiffs must meet the "doubly demanding" burden of "establish[ing] that the law and facts *clearly favor* [their] position."  *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

**ARGUMENT**

**I.    COVID-19 CONTINUES TO PRESENT A PUBLIC HEALTH EMERGENCY.**

Citing statistics from the first half of July, Plaintiffs make the remarkable assertion that California is now "doing quite well" and that "the worst of the pandemic is absolutely over."  Renewed Mot. at 1, 11.  That is just wishful thinking.  To date, in California 679,099 individuals have been infected with COVID-19 and 12,407 have died.  Grabarsky Decl. Ex. 46.  While Plaintiffs are apparently unfazed by these deaths, *see* Renewed Mot. at 1 (noting that California had reported "*only* . . . 7,227 deaths" as of mid-July) (emphasis added), these numbers are enormous, far greater than the number of people killed in the 9/11 terrorist attacks and those who lost their lives in Hurricane Katrina.  Indeed, under Plaintiffs' own annualized calculations, *id.* at 1-3, COVID-19 is now the *third highest overall* cause of death in both California and San Diego County, behind only cancer and heart disease.  *Id.* at 1-3.  More troublingly, even though COVID-19 was completely unknown to scientists less than a year ago and resources have been mobilized worldwide to slow its spread, it is now the deadliest *infectious*

9

disease, and one still with no vaccine, no cure, and no widely effective treatment. Watt Decl. ¶ 24; Rutherford Decl. ¶¶ 36-37, 40.  In addition, Plaintiffs completely ignore the serious, long-term effects the disease may have in those who survive it. Watt Decl. ¶ 23; Rutherford Decl. ¶ 41.  California public health officials have more than adequate reason to be concerned about the pandemic, which is the greatest faced in over a century.  Rutherford Decl. ¶ 26.

Moreover, Plaintiffs are plainly wrong in suggesting that COVID-19 no longer poses a significant threat.  As shown by the charts on page 2, far from stabilizing, daily infections and deaths in California rose sharply from May to mid-July, several weeks after the State began requiring masks and reimposed numerous restrictions on gatherings.  Deaths continued to rise through the beginning of August and have only slightly tapered off since then.  *See* Watt Decl. ¶¶ 93-103.  In fact, the daily deaths in August are higher than they were in July.  *Id.* ¶¶ 93-96.

In erroneously asserting that COVID-19 has been curbed, Plaintiffs also ignore the reason why the State has been able to slow the spread of the disease: the imposition of the very types of public health restrictions that Plaintiffs ask the Court to enjoin.  California and other governments around the world have been able to "flatten the curve" and reduce case numbers, due largely to restrictions on personal interactions in which COVID-19 may be transmitting—including restrictions on large, in-person gatherings—the *only* measures proven to be effective in containing the disease's spread in the absence of a vaccine or cure.   Watt Decl. ¶ 24, 47-48; Rutherford Decl. ¶ 73; *see also* Decl. of Peter Imrey ISO State Defs.' Opp'n ¶ 29.  The resurgence of the virus in California after the State began easing restrictions, as well as the even more alarming events in Texas, Florida and other states that chose to reopen faster, underscores the importance and, indeed, indispensability of such restrictions.  *See* Rutherford Decl. ¶ 75.  Enjoining restrictions because they have proven effective in curbing COVID-19 would be "like throwing away your umbrella in a rainstorm because you are not getting wet."

1    *Shelby County v. Holder*, 570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting).

2       Plaintiffs have submitted four new declarations as well as a supplemental

3 declaration from their original declarant, Dr. George Delgado.  While Plaintiffs cite

4 one of their new declarants in asserting that "the worst of the pandemic is

5 absolutely over," Renewed Mot. at 11, neither the declaration cited nor the

6 replacement declaration later submitted by Plaintiffs says anything of the sort:

7 instead, the declarant argues that the present mortality rate from COVID-19 is

8 lower because the infection rate may actually be *higher* than reported.  First

9 Bhattacharya Decl. (ECF No. 53-8) ¶¶ 31-43; Second Bhattacharya Decl. (ECF No.

10 54) ¶¶ 19-30.[4]  Another declarant relies not on actual data-driven research, but

11 rather on press descriptions of studies, many of which have not yet been published

12 or peer-reviewed.  *See generally* Lyons-Weiler Decl.  And although Dr. Delgado

13 attributes the increase in cases since June to public political protests and "mitigation

14 fatigue," Supp. Delgado Decl. ¶ 11, he offers no explanation for this opinion

15 beyond a conclusory reference to a model that already has proven grossly

16 inaccurate and that he lacks any apparent qualification to use.  Imrey Decl. ¶¶ 16-

17 22; *see also id*. ¶¶ 23-29 (noting errors in Delgado's analysis).  Moreover, these

18 conclusions are contradicted by the opinions from Dr. James Watt, the chief of the

19 Division of Infectious Diseases at CDPH, and Dr. George Rutherford, the head of

20 the Division of Infectious Disease and Global Epidemiology at the UCSF School of

21 Medicine and one of the most prominent infectious disease epidemiologists in the

22 world.  *See generally* Watt Decl.; Rutherford Decl.

23    It is not necessary, however, for the Court to determine what amount of deaths

24 or death rate from COVID-19 is acceptable.  As Chief Justice Roberts held in this

---

26     [4] There is "very substantial scientific controversy" over Dr. Bhattacharya's
study because of potential selection bias in it and the treatment of false positives.
27 Imrey Decl. ¶¶ 41-50.  As a consequence, his assertion that the risks attending a
worship service are "commensurate or less than many other risks that many people
28 are willing to take in pursuit of their lives and faith," Second Bhattacharya Decl.
¶ 28, are unpersuasive, especially as he fails to identify any analogous risk.

case, an "unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people" should not be "second-guessing" decisions made by public health officials to combat an emergency pandemic "in areas fraught with medical and scientific uncertainties." *South Bay III*, 140 S. Ct. at 1613-14 (2020) (quotation marks omitted).  Instead, the Court must defer to the judgment of politically accountable public health officials. *Id.*  As the Ninth Circuit observed, the Bill of Rights is not "a suicide pact," and in a public health crisis a court must temper its "doctrinaire logic with a little practical wisdom."  *South Bay II*, 959 F.3d at 939 (quotation marks omitted).

## II.   PRECEDENT CONTINUES TO WEIGH OVERWHELMINGLY AGAINST PLAINTIFFS CLAIMS.

Since the Court denied the original TRO in May, the precedent supporting that ruling has only become more overwhelming.  In fact, *every* court to consider California's restrictions on in-person worship services, including this Court, other California district courts, the Ninth Circuit, and the Supreme Court, has denied injunctive relief.  In addition to this Court, district courts in four other cases have denied requests for preliminary injunctive relief against California's restrictions on worship services.[5]  As noted above, both the Ninth Circuit and the Supreme Court have denied injunctions in this case, *South Bay II*, 959 F.3d 938; *South Bay III*, 140 S. Ct. 1613, and the Ninth Circuit also denied an injunction in another case, *Gish v. Newsom*, No. 20-55445 (9th Cir. May 7, 2020) (Grabarsky Decl. Ex. 3).  And, noting "the weight of precedent favoring enforcement of COVID-19 related restrictions," the California Court of Appeal stayed a ruling partially denying an application by Los Angeles County to enforce restrictions on indoor worship services.  *County of Los Angeles v. Grace Cmty. Church*, No. B307056, 2020 WL 4876658, at *1-*2 (Cal. Ct. App. Aug. 15, 2020).

---

[5] *Harvest Rock Church v. Newsom*, No. 2:20-cv-6414-JGB-KK (C.D. Cal. Aug. 12, 2020) (Grabarsky Decl. Ex. 12-13); *Gish*, 2020 WL 1979970; *Abiding Place Ministries v. Wooten*, No. 3:20-cv-00683-BAS-AHG (S.D. Cal. Apr. 10, 2020); *id*, 2020 WL 2991467 (June 4, 2020); *Cross Culture*, 2020 WL 2121111.

12

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

Courts have similarly denied injunctive relief in the vast majority of cases challenging COVID-19 related restrictions on worship services imposed by other states.  For example, both the Ninth Circuit and the Supreme Court refused to enjoin restrictions imposed by Nevada, *Calvary Chapel Dayton Valley v. Sisolak*, No. 20-16169, 2020 WL 4274901 (9th Cir. July 2, 2020); *id.*, __ S. Ct. __, 2020 WL 4251360 (July 24, 2020), even though those restrictions raised more difficult constitutional issues than California's, *see id.* at *5 (Alito, J., dissenting).[6]  Five other circuits also have denied injunctions pending appeal,[7] and dozens of state and federal district courts have denied injunctive relief as well.[8]  One federal court has

---

[6] The Supreme Court also refused to enjoin Illinois's restrictions on religious services due to the issuance of superseding guidance.  *Elim Romanian Church v. Pritzker*, No. 19A1046, 2020 WL 2781671 (May 29, 2020) (*Elim Romanian III*).

[7] *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341 (7th Cir. 2020) (*Elim Romanian IV*), petition for rehearing en banc denied, July 27, 2020; *Elim Romanian Pentecostal Church v. Pritzker*, 2020 WL 2517093, at *1 (7th Cir. May 16, 2020) (*Elim Romanian II*); *Calvary Chapel of Bangor v. Mills*, No. 20-1507 (1st Cir. June 2, 2020) (Doc. No. 117596871); *Bullock v. Carney*, __ F.3d __, No. 20- 2096, 2020 WL 2819228 (3d Cir. May 30, 2020); *Hawse v. Page*, No. 20-1960 (8th Cir. May 19, 2020); *Tolle v. Northam*, No. 20-1419 (4th Cir. Apr. 28, 2020).

[8] *Murphy v. Lamont*, No. 3:20-CV-0694 (JCH), 2020 WL 4435167 (D. Conn. Aug. 3, 2020); *Tigges v. Northam*, No. 3:20-CV-410, 2020 WL 4197610 (E.D. Va. July 21, 2020); *High Plains Harvest Church v. Polis*, No. 1:20-CV-01480-RM-MEH, 2020 WL 4582720 (D. Colo. Aug. 10, 2020); *id.*, 2020 WL 3263902 (D. Colo. June 16, 2020); *MacEwen v. Inslee*, No. C20-5423 BHS, 2020 WL 4261323 (W.D. Wash. July 24, 2020); *Ass'n of Jewish Camp Operators v. Cuomo*, No. 1:20-cv-0687-GTS-DJS, 2020 WL 3766496 (N.D.N.Y. July 6, 2020); *Harborview Fellowship v. Inslee*, No. 3:20-cv-05518-BHS (Docket Entry 42) (W.D. Wash. June 18, 2020); *Dwelling Place Network v. Murphy*, No. 1:20-cv-06281 (D.N.J. June 15, 2020) (ECF No. 35); *Calvary Chapel Lone Mountain v. Sisolak*, No. 2:20-cv-00907-RFB-VCF, 2020 WL 3108716 (D. Nev. June 11, 2020), *appeal docketed*, No. 20-16169 (9th Cir.); *Christian Cathedral v. Pan*, No. 20-CV-03554-CRB, 2020 WL 3078072, at *2 (N.D. Cal. June 10, 2020); *Diaz-Bonilla v. Northam*, No. 1:20-cv-377 (E.D. Va. June 5, 2020) (ECF No. 25); *Bullock v. Carney*, No. 1-20-cv-674, 2020 WL 2813316 (D. Del. May 29, 2020); *Lighthouse Fellowship Church v. Northam*, __ F. Supp. 3d __ 2020 WL 2614626 (E.D. Va. May 21, 2020); *Antietam Battlefield KOA v. Hogan*, No. 1:20-cv-01130-CCB, 2020 WL 2556496 (D. Md. May 20, 2020); *Our Lady of Sorrows Church v. Mohammad*, No. 3:20-cv-00674-AVC (D. Conn. May 18, 2020); *Spell v. Edwards*, No. CV-20-00282-BAJ-EWD, 2020 WL 2509078 (M.D. La. May 15, 2020); *Elim Romanian Pentecostal Church v. Pritzker*, No. 20-C-2782, 2020 WL 2468194 (N.D. Ill. May 13, 2020) (*Elim Romanian I*); *Calvary Chapel of Bangor v. Mills*, No. 1:20-CV-00156-NT, 2020 WL 2310913 (D. Me. May 9, 2020); *Crowl v. Inslee*, No. 3:20-cv-5352 (W.D. Wash. May 8, 2020); *Cassell v. Snyders*, No. 20-C-50153, 2020 WL 2112374 (N.D. Ill. May 3, 2020); *Lighthouse Fellowship Church v. Northam*, No. 2:20-cv-204,

(continued…)

13

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

1  even dismissed without leave to amend a lawsuit challenging similar worship

2  restrictions for failure to state a claim.[9]

3        Instead of addressing the overwhelming weight of precedent, Plaintiffs

4  continue to focus on the few scattered decisions enjoining restrictions on worship

5  services.  These restrictions, however, differ substantially from California's.  For

6  example, the restrictions imposed by Kentucky drew distinctions so dubious that

7  even Kentucky's Attorney General challenged their constitutionality, *see Roberts v.*

8  *Neace*, 958 F.3d 409, 411 (6th Cir. 2020) (per curiam), and the Sixth Circuit

9  imposed an injunction pending appeal against Kentucky's restrictions on in-person

10  worship services only after Kentucky's governor failed to explain the distinctions,

11  *id.* at 414, in spite of a previous order enjoining restrictions on drive-in services for

12  lack of explanation, *Maryville Baptist Church. v. Beshear*, 957 F.3d 610, 615-16

13  (6th Cir. 2020).  *See also Tabernacle Baptist Church v. Beshear*, No. 3:20-cv-

14  00033-GFVT, 2020 WL 2305307 (E.D. Ky. May 8, 2020).  The Kansas and North

15  Carolina orders enjoined restrictions that, unlike California's, banned all in-person

16  religious services.  *See First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL

17  1910021, at *6 (D. Kan. Apr. 18, 2020); *Berean Baptist Church v. Cooper*, No.

18  4:20-CV-81-D, 2020 WL 2514313, at *7 (E.D.N.C. May 16, 2020).

19  **III.  PLAINTIFFS ARE STILL UNLIKELY TO SUCCEED ON THEIR CLAIMS.**

20        **A.  The State's Directives Do Not Violate the Free Exercise Clause.**

21        The Free Exercise Clause is violated "if the law at issue discriminates against

22

23  2020 WL 2110416 (E.D. Va. May 1, 2020); *Legacy Church v. Kunkel*, No. CIV-20-0327-JB\SCY, 2020 WL 1905586 (D.N.M. Apr. 17, 2020) (*Legacy Church I*);

24  *Davis v. Berke*, No. 1:20-CV-98, 2020 WL 1970712 (E.D. Tenn. Apr. 17, 2020); *Tolle v. Northam*, No. 1:20-cv-00363-LMB-MSN, 2020 WL 1955281 (E.D. Va.

25  Apr. 8, 2020), *motion for injunction pending appeal denied*, No. 20-1419 (4th Cir. Apr. 28, 2020); *Nigen v. New York*, No. 1:20-cv-01576-EK-PK, 2020 WL 1950775

26  (E.D.N.Y. Mar. 29, 2020); *Elkhorn Baptist Church v. Brown*, 366 Or. 506 (2020); *Binford v. Sununu*, No. 217-2020-CV-00152 (N.H. Superior Ct. March 25, 2020).

27      [9] *Legacy Church, Inc. v. Kunkel*, 2020 WL 3963764 (D.N.M. July 13, 2020) (*Legacy Church II*); *see also Whitsitt v. Newsom*, No. 2:20-cv-00691-JAM-CKD

28  (E.D. Cal. Aug. 19, 2020) (Grabarsky Decl. Ex. 4) (recommending dismissal without leave to amend a challenge to California's in-person worship restrictions).

14

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533, 543 (1993).  It is not violated when a law does not "'infringe upon or restrict practices because of their religious motivation'" and does not "impose[] burdens only on conduct motivated by religious belief.'" *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076, 1079 (9th Cir. 2015) (quoting *Lukumi*, 508 U.S. at 533, 543).  Importantly, in determining whether there is discrimination against religion, courts compare the treatment of religious conduct and "*analogous* non-religious conduct." *Lukumi*, 508 U.S. at 546 (emphasis added); *see also Stormans,* 794 F.3d at 1079 (examining "*comparable* secular conduct") (emphasis added).  Moreover, a law that is "neutral and of general applicability" need only survive rational basis review. *Lukumi*, 508 U.S. at 531-32.  California's restrictions on indoor worship services satisfy these requirements.

1. **The State's Restrictions on Indoor Worship Services Do Not Discriminate Against Religious Activities.**

    a. **The Restrictions on Indoor Worship Are the Same or Less Stringent Than Those on Comparably Risky Secular Activities.**

As noted, Chief Justice Roberts found no apparent discrimination against religion because California's restrictions on worship services are no more stringent than the restrictions imposed on comparable secular activities:

> Similar or more severe restrictions apply to *comparable* secular gatherings . . .  where large groups of people gather in close proximity for extended periods of time. And the Order exempts or treats more leniently only *dissimilar* activities . . . in which people neither congregate in large groups nor remain in close proximity for extended periods.

*South Bay III*, 140 S. Ct. at 1613 (emphasis added).  The Seventh Circuit similarly held that, in terms of risk of spreading COVID-19, in-person worship services are comparable to other "congregate functions" such as "concerts, lectures, theatrical performances, or choir practices" in which many people gather at the same time, in the same place, for the same purpose, and for an extended time, often singing and

15

speaking loudly.  *Elim Romanian IV*, 962 F.3d at 344-46; *see also Elim Romanian II*, 2020 WL 2517093, at *1 (distinguishing activities such as "shopping, in which people do not congregate or remain for extended periods").  This Court found the same.  *South Bay I* at 26-29; *see also Gish*, 2020 WL 1979970, at *6 (comparing worship services to "activities where people sit together in an enclosed space to share a communal experience," like concerts).

It is now even clearer that there is no discrimination against religious services because worship services are treated *even more favorably*.  Plaintiffs may now congregate indoors with up to 100 persons or 25% capacity, or for outdoor, drive-in, and internet worship services without attendance restrictions.  Grabarsky Decl. Ex. 52-53.  Indoor protests are subject to the same attendance restrictions as indoor worship services, and other secular gatherings such as concerts, sporting events, or theatrical performances remain prohibited altogether.  Even under the July 13 Order, numerous secular indoor secular gatherings—e.g., restaurants, movie theaters, family entertainment centers, wineries, bars, museums, and cardrooms— were closed statewide, whereas indoor religious services were permitted in many counties, and outdoor services with no attendance limits were allowed statewide.

It is also clearer now that, as the Court found, *South Bay I* at 26-29, the restrictions on indoor worship services and other gatherings have been and are based on the risks of spreading COVID-19.  As Dr. Watt explains, gatherings increase the risk of transmission:

> Gatherings where individuals are in close proximity to others are especially risky because . . . the COVID-19 virus can be spread by people who are not showing symptoms, and therefore individuals who are present will not know from mere observation whether others in close proximity are more or less likely to be carrying the virus.

Watt Decl. ¶ 39; *see also id.* ¶¶ 37-44, 55-56, 72-76.  That risk increases with the length of time the gathering lasts and the proximity of people to each other at the gathering, and is especially high for indoor gatherings such as worship services that

16

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

feature singing and chanting.  *Id.* ¶ 43-46, 72-73 88-92.  Accordingly, the recently issued guidelines on gatherings are expressly based on comparative risk factors such as "number of people per square feet," "duration of exposure," "amount of mixing of people from differing households and communities," "indoor vs. outdoor," and "activities that are known to cause increased spread" like singing. Grabarsky Decl. Ex. 51.

Dr. Rutherford confirms that the State's restrictions rest upon sound scientific analysis.  Public gatherings pose a great threat of spreading COVID-19 because, unlike many other illnesses, this disease can be spread unknowingly by individuals without symptoms, even when requirements for social distancing and face coverings are observed.  Rutherford Decl. ¶¶ 22-24, 27, 38-41, 47-52.  Of particular importance here, indoor worship services present an "exceptionally high risk of COVID 19 transmission."  *Id.* ¶¶ 53, 57-64.  This is in part because, to become infected an individual must receive a sufficient viral load to overcome their immune system, which is more likely where, as in a worship service, individuals are in close proximity to one another for an extended duration.  *Id.*  The threat is even greater in worship services than in many similar public gatherings because COVID-19 is primarily transmitted through respiratory droplets or aerosolized particles, and houses of worship tend to have limited or insufficient ventilation.  *Id.* ¶¶ 49, 53, 57-64.  Singing, chanting, or group recitation further increases the risk of infection by increasing the distance that droplets or aerosolized particles travel.  *Id.* ¶¶ 53-56; *see also* Watt Decl. ¶¶ 45-46, 88-92.  Finally, worship services frequently involve people who know each other and will talk with each other, even though they do not see each other during the week, which creates vectors for transmitting COVID-19 from one otherwise isolated group to another.  *See* Rutherford Decl. ¶¶ 57-64.

It should come as no surprise then that worship services frequently become "super-spreader" events resulting in dozens, hundreds and even thousands of new infections.  *See id.* ¶¶ 31-35; Watt Decl. ¶ 44; *see also* Grabarsky Decl. Exs. 20-38

17

(detailing such "super-spreader" events).  Moreover, recent evidence suggests that a large proportion of the spread of COVID-19 is due to super-spreader events.  Rutherford Decl. ¶¶ 31-35.  Thus, worship services pose at least as high a risk of spreading COVID-19 as other secular activities subject to similar restrictions.

Although Plaintiffs submit declarations from four new declarants, they continue to rely almost entirely on Dr. Delgado's in disputing the State's comparative risk assessments.  This is surprising given that Dr. Delgado's credibility is severely undermined by his lack of training as an epidemiologist and his tragically wrong prediction that the total number of deaths in Los Angeles County would be "approximately 1,900, for this year," Delgado Decl. (ECF No. 12-3) ¶ 12—in actuality, more than 5,600 people have *already* died there, Grabarsky Decl. Ex. 48; Imrey Decl. ¶¶ 20-23.  Far from explaining why he erred so massively, Dr. Delgado ignores the error and touts (without support) the same "Monte Carlo model" that led him so far astray.  Supp. Delgado Decl. ¶ 3.[10]

Dr. Delgado's opinions on the comparative risk posed by indoor worship services are baseless.  In his initial declaration, Dr. Delgado compared the risk of infection in a worship service to a grocery store based on three factors: (1) "Being in the same building with others at the same time"; (2) "People touching multiple objects"; (3) "Close contact with others."  Delgado Decl. ¶¶ 14-22.  Assigning these factors values of 4, 0.25, and 0.25, and then multiplying them together, he calculated that risk of infection from grocery shopping was four times greater than from attending a worship service.  *Id*. ¶¶ 18-22.  Dr. Delgado did not explain the

---

[10] Dr. Delgado's credibility is further undermined by his apparent misrepresentations concerning his affiliation with the UCSD School of Medicine.  Although Dr. Delgado's biography on the website of his family medical group states that he is a "voluntary associate professor" at the UCSD School of Medicine, Grabarsky Decl. Ex. 43-44, in fact he has not been affiliated with the school since 2012 and has been admonished by UCSD to stop representing any affiliation.  Decl. of Kim James ISO State Defs.' Opp'n Exs. A-C.  In addition, the American College of Obstetrics and Gynecologists has questioned the medical ethics of Dr. Delgado for promoting an "unproven and unethical" procedure and engaging in an "unmonitored research experiment."  Grabarsky Decl. Ex. 42.

18

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

basis of this methodology, how he selected the three factors that he used, or how he assigned values to those factors, *see id.* ¶¶ 17-21, though he does discuss how often items are likely to be touched in churches and grocery stores, *id.* ¶¶ 15-16.  Dr. Delgado's supplemental declaration repeats this opinion largely if not entirely verbatim, Supp. Delgado Decl. ¶¶ 23-27, and he offers similar opinions concerning the relative risks of public protests and manufacturing facilities, using five factors for public protests and three for manufacturing facilities.  *Id.* ¶¶ 28-42.  Once again, he fails to explain how he chose the factors or assigned values to them.

These opinions are not admissible.  First, Dr. Delgado lacks qualification to offer a comparative risk analysis.  Although he has a medical degree, his experience is in the diagnosis and treatment of individual patients, not the transmission and prevent of disease in population grounds, and he does not claim the specialized training in epidemiology or statistics needed to perform disease risk modeling.  Imrey Decl. ¶¶ 12-14.  Second, Dr. Delgado does not apply a generally accepted or otherwise reliable methodology and, indeed, ignores multiple critical contributors to epidemic spread in populations.  *Id.* ¶ 35.  Furthermore, his methodology is so arbitrary that it easily can be used to reach exactly the opposite conclusions.  *Id.* ¶¶ 36-38.  Third, Dr. Delgado's application of his flawed methodology is unscientific: he assigns values for the factors he has selected without offering any data to support them.  *Id.* ¶¶ 37-38 ("No practical scientific basis is available for assessing the reliability of [his] numbers."); *see also* Rutherford Decl. ¶¶ 87-91.

If Dr. Delgado's opinions are not excluded entirely, they should be given no weight.  As explained above, because Dr. Delgado fails to explain what methodology he employed, how he chose the factors that he used or how he assigned values to them, his opinions are unsupported by any useful explanation and therefore lack any probative value.[11]  In addition, his calculations are based on

---

[11] *See, e.g.*, *Huey v. United Parcel Serv.*, 165 F.3d 1084, 1087 (7th Cir. 1999) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

multiple faulty or unsupported assumptions. For example, he calculates the relative risks of grocery shopping, manufacturing plants, and worship services based on the likelihood of transmission through touching objects with the COVID-19 virus. Supp. Delgado Decl. ¶¶ 23-24, 31, 34, 40. It is, however, now established that "fomite" transmission (transmission by contract with an object) is "exceptionally rare" for the COVID-19 virus. Rutherford Decl. ¶¶ 30, 91; Watt Decl. ¶ 29. In calculating the relative risk of public protests, Dr. Delgado ignores the fact that most protests take place outdoors, where it is now generally accepted that transmission is less likely. Rutherford Decl. ¶ 72. He also ignores the risks created by singing in comparing worship services to shopping and manufacturing, as well as the use of engineering controls such as plexiglass barriers and other protections in factories, *id*. ¶ 69, he assumes dubiously and without explanation that religious services will be held in well ventilated buildings, Supp. Delgado Decl. ¶ 39; Rutherford Decl. ¶¶ 49, 88, and he assumes that worshippers will comply with all applicable laws and directives but shoppers, factory workers, and protestors will not, Supp. Delgado Decl. ¶¶ 23-24, 28 34, 38-40; Rutherford Decl. ¶¶ 88-89. In short, Dr. Delgado's comparative risk analysis has no persuasive value.

Plaintiffs' other arguments concerning comparative risk are also unpersuasive. Plaintiffs continue to assert that COVID-19 spreads more easily at grocery stores than at places of worship based on outdated reports from before the pandemic about the frequency of shopping trips and the amount of time spent in stores, *see* Renewed Mot. at 14-15 (citing LiMandri Decl. Exs. 34-43). But they do not explain how any of the figures that they cite translate into risk of spreading COVID, much less why that risk is greater than the risk of worship services. Even more important, their assertion that the amount of time that individuals spend in the same place as others is irrelevant, *id.*, is unsupported by any expert opinion and directly contradicted by scientific studies and the generally accepted views of epidemiologists. Rutherford Decl. ¶¶ 64-66, 87-91. And as Plaintiffs acknowledge,

20

however, when shopping people do "not spend a significant amount of time next to a single person," Renewed Mot. at 15, nor do they engage in the sort of group singing, chanting, and recitation that is typical of activities like worship services, sporting events, and concerts. *See Elim Romanian IV*, 2020 WL 3249062, at *5; Rutherford Decl. ¶ 65-66.

Plaintiffs also continue to argue that restaurants are riskier than worship services, Renewed Mot. at 14-15 (citing LiMandri Decl. Exs. 45-46), but this issue is moot. As Plaintiffs acknowledge, *id.* at 14, religious worship was treated more favorably under the July 13 Order, SAC Ex. 1-13, at 3-4, and, at present, the two are treated the same, Grabarsky Decl. Ex. 53. Moreover, worship services are not comparable to restaurants because, among other things, diners generally do not enter restaurants at the same time, do not know or talk with others not at their table, do not eat for the same duration, and do not exit at the same time, all of which reduces the likelihood of interaction and infection. Rutherford Decl. ¶¶ 67-68; Grabarsky Decl. Ex. 16; *see also Legacy Church II*, 2020 WL 3963764, at *26, *83 n.35 ("[M]ost experts agree that restaurants . . . may not be as dangerous as indoor mass gatherings that involve prolonged proximity, like concerts, lectures, and religious services.").[12] Notably, none of Plaintiffs' declarants offer any opinion about the comparative risk posed by restaurants.

Finally, Plaintiffs argue that factories are riskier than worship services. Renewed Mot. at 15. But besides Dr. Delgado, the only evidence that they offer is a photograph taken before the pandemic, *see* LiMandri Decl. Ex. 44; Grabarsky Decl. Exs. 40-41, in which the workplace does not appear to have been reconfigured to provide physical distancing or engineering controls like plexiglass shields as current guidelines require, *see id.* Exs. 17-18. And because employers

---

[12] Contrary to Plaintiffs' assertion, Renewed Mot. at 13, Chief Justice Roberts is unlikely to find otherwise as he refused to enjoin Nevada's differential treatment of restaurants (50% capacity cap) and houses of worship (50-person cap), *Calvary Chapel of Dayton Valley*, 2020 WL 4251360, and he rejected Plaintiffs' own comparison with restaurants in *South Bay III*, Grabarsky Decl. Ex. 6-7.

21

must maintain records of the employees present and immediately notify authorities of any on-site COVID-19 contraction, Cal. Labor Code § 6409.1(b); 8 Cal. Code Regs. § 340, Cal. Labor Code § 226(a), contact tracing is much easier in factories. When these restrictions and regulations are observed, the risk of COVID-19 transmission at factories is less than the risk at worship services.[13]  *See* Rutherford Decl. ¶¶ 69-71; Watt Decl. ¶¶ 104-05.

In short, Plaintiffs fail to rebut the State's evaluation of the relative risk of worship services and thus to show that State imposes greater restrictions on in-person worship services than on comparably risky secular activities.

### b.   The Indoor Singing and Chanting Restriction Does Not Discriminate Against Religion.

Plaintiffs' challenge to the prohibition against singing and chanting in indoor worship services fails because this prohibition does not discriminate against religion.  Singing and chanting greatly increases the risk of transmission, especially in indoor gatherings such as worship services, because such activities increase the distance traveled by COVID-19 droplets and aerosolized particles, even while wearing face coverings.  Rutherford Decl. ¶¶ 48, 53-56, 66, 78-79, 83; Watt Decl. ¶¶ 45-46, 88-92; *see also Grace Cmty. Church*, 2020 WL 4876658, at *2 ("[S]inging, shouting and chanting [are] risks that physical distanc[ing] and wearing a mask do not eliminate.") (quotation marks omitted); *Elim Romanian IV*, 962 F.3d at 346 ("[S]peaking and singing . . . increase the chance that persons with COVID-19 may transmit the virus through the droplets that speech or song inevitably produce.").

In addition, California has not prohibited singing and chanting solely in indoor worship services.  To the contrary, indoor singing and chanting are prohibited in secular activities such as political protests and at schools.  Grabarsky Decl. Ex. 14,

---

[13] Plaintiffs assertion that Chief Justice Roberts was "silent as to [houses of worship's] similarity to factories," Renewed Mot. at 14 n.8, is belied by his rejection of Plaintiffs' argument as to their similarity in their briefings before the Court, *see, e.g.*, Grabarsky Decl. Ex. 6 at 24, 29.

22

at 6; *id.* Ex. 15, at 12.  Restaurants are also not allowed to provide live musical or other performances, *id.*, Ex. 16, at 3, and other secular gatherings likely to feature group singing and chanting such as concerts, sporting events, and theatrical performances continue to be banned entirely.

Although Dr. Delgado opines that singing can occur safely in indoor worship services, Supp. Delgado Decl. ¶ 14, he does not offer any opinion concerning the comparative threat posed by singing and chanting in such services and thus offers no reason to believe that the restrictions are discriminatory.  In addition, there is nothing in his background suggesting that he is qualified to render such an opinion, and his opinion on this point must be met with skepticism because in his initial declaration he recommended that "[n]o singing by the assembly should be allowed, as singing can aerosolize the virus," Delgado Decl. ¶ 23(H), and he continues to make this recommendation on his website, Grabarsky Decl. Ex. 45.  Finally, Sean Kaufmann, Plaintiffs' biosafety declarant, is noticeably silent on this subject.

### 2.    The State's Directives Are Facially Neutral.

In arguing that the State's restrictions on indoor gatherings are not neutral towards religion, Plaintiffs falsely assert that the State's directives order that "'worshippers may not gather.'"  Renewed Mot. at 9; *see also id.* ("California is explicitly regulating worship itself.").  To be clear, that quote appears nowhere in any of the State's directives, and it is untrue: congregants are expressly permitted under the directives to gather for indoor worship in San Diego and for outdoor worship statewide.  Grabarsky Decl. Exs. 52-53.

Plaintiffs offer no reason why the Court should reverse its prior finding that no facial discrimination exists, *South Bay I* at 26, or depart from the plethora of similar rulings on this issue.  *See* Section II, *supra*.  Even the dissenting Supreme Court Justices stopped short of finding facial non-neutrality; rather, they engaged in comparisons of restrictions on worship services with those in areas they believed analogous.  *South Bay III*, 150 S. Ct. at 1614 (Kavanaugh, J., dissenting); *Calvary*

23

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

*Chapel Dayton Valley*, 2020 WL 4251360, at *2 (Alito, J., dissenting); *id.* at *6 (Gorsuch, J., dissenting).  And Justice Kavanaugh explicitly found that Nevada's worship restrictions are *not* ones that "expressly discriminate against religious organizations because of religion."  *Id.* at *7-*8.

Yet, Plaintiffs double down on this notion with the remarkable contention that *any* burden on religious worship constitutes "*per se* a 'palpable invasion' of their rights."  Renewed Mot. at 19 (quoting *Jew Ho v. Williamson*, 103 F. 10, 18 (C.C.N.D. Cal. 1900)).  But First Amendment protections are not absolute.  *Elrod v. Burns*, 427 U.S. 347, 360 (1976); *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006); *Berean Baptist Church*, 2020 WL 2514313, at *6.  Indeed, interests under the Free Exercise Clause may be curtailed under the appropriate constitutional framework.  *See e.g.*, *Lukumi*, 508 U.S. 520; *Stormans*, 794 F.3d 1064; *Jacobson*, 197 U.S. 11.

Plaintiffs' reliance on *Jew Ho* for this notion is "clearly inapposite" because that case involved not a global pandemic in which hundreds of thousands have perished and tens of millions have gotten sick, but rather a "racially-motivated and scientifically-unfounded quarantine of San Francisco's Chinatown," *Givens v. Newsom*, No. 2:20-cv-00852-JAM-CKD, 2020 WL 2307224, at *9 (E.D. Cal. May 8, 2020), that would likely "increase [the disease's] danger and its destructive force," 103 F. at 22-23, 26.  Plaintiffs, however, neither accuse the State of bigotry nor suggest that the directives at issue here are irrational or would worsen the spread of COVID-19.  Plaintiffs' invocation of *Korematsu v. United States*, 323 U.S. 214 (1944) (Renewed Mot. at 20), which also involved blatant racial discrimination and not a pandemic, is similarly inapposite, as are *Ex parte Martin*, 83 Cal. App. 2d 164, 167 (1948), and *Ex parte Arata*, 52 Cal. App. 13 380, 385 (1921) (Renewed Mot. at 10), cases that only involved "the quarantine of two individuals in jail," *Givens*, 2020 WL 2307224, at *9.

### 3.   The State's Directives Survive Rational Basis Review.

Because the challenged restrictions on worship services do not discriminate

24

against religion, they need only have a rational basis to satisfy the Free Exercise Clause.  *Stormans*, 794 F.3d at 1076.  They easily meet this requirement because, as shown above, they further the government's interest in protecting worshippers, the communities in which they live, and the public in general.

Plaintiffs do not even begin to show otherwise.  One of their declarants, Mr. Kaufman, asserts that "there is no rational and legitimate scientific or public health basis supporting" the State's directives, and "everything that we know as public health and infectious that disease professionals . . . does not rationally comport with what I understand the state is claiming to be true in attempting to justify its mandate."  Kaufmann Decl. ¶¶ 14-15.  But he offers no support or even explanation for these grandiose assertions; his expertise is in the area of biosafety, not epidemiology; and his assertion is directly contradicted by accomplished experts in the field of epidemiology.  *See generally* Watt Decl.; Rutherford Decl.  Nor do Plaintiffs' other declarants support this conclusion: while they criticize some of the data available, Second Bhattacharya Decl. ¶¶ 19-28; Lyons-Weiler Decl. ¶¶ 8-22, and suggest alternatives strategies, Second Bhattacharya Decl. ¶¶ 29-33; Lyons-Weiler Decl. ¶¶ 24-29, they do not suggest that the restrictions imposed by the State lack a scientific basis or are otherwise irrational.

## B.    Plaintiffs Have Not Shown Discriminatory Enforcement.

The only entirely new argument advanced in support of Plaintiffs' renewed motion is that the State's failure to make mass arrests in response to the outdoor protests that erupted after an African-American man named George Floyd was killed in police custody demonstrate discriminatory enforcement of COVID-19 restrictions against religious worships.  Renewed Mot. at 20-23.  Other courts have rejected similar claims.  *See, e.g.*, *Harvest Rock* (Grabarsky Decl. Exs. 12-13); *Calvary Chapel Dayton Valley v. Sisolak*, No. 3:20-cv-00303-RFB-VCF, 2020 WL 4260438, at *2 (D. Nev. June 11, 2020); *Legacy Church II*, 2020 WL 3963764, at *86 n.38; *see also PCG-SP Venture I LLC v. Newsom*, No. 20-cv-1138, 2020 WL

25

4344631 at *7 (C.D. Cal. June 23, 2020).  And, though the plaintiffs in *Calvary Chapel Dayton Valley* made similar arguments to the Supreme Court, *e.g.*, Grabarsky Decl. Ex. 8 at 17-18, the Court was not persuaded.  2020 WL 4251360.  Plaintiffs offer no reason to reach a different conclusion here.

Indeed, Plaintiffs' discriminatory enforcement argument is based on a mistaken premise.  While Plaintiffs claim that the State refused to enforce the restrictions on gatherings against the George Floyd protests, the evidence they submit shows only that the Governor supported the protestors and their message, not that the Governor encouraged protestors to violate the restrictions on gatherings.  In fact, the Governor urged protestors to follow physical distancing and other COVID-19 restrictions.  Grabarsky Decl. Ex. 39.  Even more important, the State *has* enforced those restrictions against protestors: when the NAACP requested a permit for a rally "to protest the death of George Floyd," the California Highway Patrol denied the permit because organizers could not ensure that the event would comply with CDPH's directives on public protests.  Decl. of Cpt. Douglas Lyons ISO State Defs.' Opp'n ¶¶ 5-6; *see also Givens*, Hrg. Tr. 10-12 (Grabarsky Decl. Ex. 5).  Numerous other permits for gatherings in violation of the COVID-19-related restrictions have also been denied.  Lyons Decl. ¶ 7; *see also id.* ¶ 15.  And CHP has arrested participants in recent protests who violated the law.  *Id*. ¶ 13.

Where the State refrained from arresting protestors for violating then-imposed restrictions on outdoor gatherings, it did so for good—and non-discriminatory—reasons.  First, arresting protestors for violating gathering restrictions would be counterproductive from a public health perspective because such arrests "could entail significant person-to-person physical contact and the collective detention of large groups of individuals."  *PCG-SP Venture*, 2020 WL 4344631 at *11.  Second, arresting masses of protestors "presents serious public safety concerns that overcome otherwise valid considerations of public health."  *Id.* at *7; *see also Calvary Chapel Dayton Valley*, 2020 WL 4260438, at *4 ("Outdoor protests

26

1   involve dynamic large interactions where state officials must . . . consider the

2   public safety implications of enforcement of social distancing."); *cf. Stormans*, 794

3   F.3d at 1084 ("it is not [the Court's] role to second-guess how the executive branch

4   exercises its discretion" in its chosen method of enforcement).[14]  Thus, Plaintiffs

5   have failed to show any improper favoritism towards secular gatherings.

6        Plaintiffs likewise have not shown any pattern of enforcement against worship

7   services.  While California has nearly 40 million people and thousands upon

8   thousands of houses of worship, Plaintiffs offer only a few isolated incidents of

9   enforcement against worship services.  Renewed Mot. at 21 n.11.  In two of these

10  incidents, rather than citing any evidence, they point to unsubstantiated allegations,

11  one in a case the plaintiff has chosen to no longer pursue, Trissell Decl. Ex. II

12  (*Abiding Place Ministries*); Grabarsky Decl. Ex. 10, and the other in a case in

13  which the church allegedly subject to enforcement, Trissell Decl. Ex. FF (*Cross

14  Culture*), has averred that such legal issues have been "resolve[d]," Grabarsky Decl.

15  Ex. 11, ¶ 72, and another church in the same case alleges that it has been holding

16  indoor, in-person services without suggesting enforcement against it, *id*. ¶¶ 81, 208-

17  14.  A third incident involved flagrant violations of COVID-19 restrictions in which

18  a church not only held indoor services, but also openly encouraged congregants to

19  forgo face coverings, sing, and even hug each other.  Trissell Decl. Ex. GG (*County

20  of Ventura v. Godspeak Calvary Chapel*).

21       These isolated incidents hardly demonstrate a pattern of discrimination against

22  religious services.  Indeed, because all of the incidents of enforcement identified by

23  Plaintiffs involve local authorities, they do not show any enforcement attributable

24  to the State.  *See Stormans*, 794 F.3d at 1083-84 (rejecting discriminatory

25  enforcement claim based on complaint-driven enforcement process).  Even more

26  important, all of the incidents involved *indoor* services, unlike the George Floyd

27 _____

      [14] It also should be noted that most of the George Floyd-related protests
28  occurred on city streets, and CHP generally leaves enforcement action on city
    streets to local police.  Lyons Decl. ¶ 9-10.

27

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

protests, which occurred *outdoors* where risk of COVID-19 transmission is substantially lower.  Rutherford Decl. ¶ 72.  Thus, in pointing to enforcement of restrictions against *indoor* worship and *outdoor* protests, Plaintiffs are comparing apples and oranges.  *Harvest Rock*, Grabarsky Decl. Ex. 12, at 13-14 (holding that indoor worship services and outdoor protests are "categorically different under any kind of analysis").

Far from suggesting otherwise, Plaintiffs attempt to avoid the burden of proving a discriminatory pattern by wrongly asserting, based on an incorrect reading of a Third Circuit decision, that "California must show that it 'had enforced it[s regulations] uniformly.'"  Renewed Mot. at 9 (quoting *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 167-68 (3d Cir. 2002)).  That decision, however, neither shifted the burden to government defendants nor required proof of uniformity.  In the passage from which Plaintiffs pluck language, the Third Circuit merely noted that the ordinance at issue in that case would have qualified as neutral and generally applicable if enforced uniformly.  *Tenafly*, 309 F.3d at 167.  Even more important, the Third Circuit found that the plaintiff there had proved that the defendant enforced the ordinance against Orthodox Jewish groups while exempting other similarly situated secular and religious groups.  *Id.* at 151-54, 167.  In any event, binding Ninth Circuit authority places upon plaintiffs the burden to prove discriminatory enforcement.  *See Stormans*, 794 F.3d at 1083; *see also Calvary Chapel Lone Mountain*, 2020 WL 3108716, at *4; *cf. Lacey v. Maricopa Cty.*, 693 F.3d 896, 920 (9th Cir. 2012) ("The standard for proving discriminatory effect is a demanding one.").

Plaintiffs' reliance on the district court order in *Soos v. Cuomo*, 2020 WL 3488742 (N.D.N.Y. June 26, 2020), is also misplaced.  First, unlike California, New York imposed attendance limits on indoor worship services (25% of building capacity) while allowing twice as great attendance at permitted indoor secular activities (50% of capacity), and it imposed 25-person limits on outdoor worship

28

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

services, while allowing outdoor graduation services to have 150 persons.  *Soos*, 2020 WL 3488742, at *11-*12.  Second, there was more likely a pattern of discriminatory enforcement in *Soos*: while New York officials did not arrest political protestors for violating restrictions on public gatherings, they maintained "constant police presence and interference" with worship services, interrupting services and subjecting them to "repeated harassment and surveillance."  2020 WL 3488742, at *5-*7.  As there is no suggestion of any such harassment and surveillance here, but only a few isolated incidents of local enforcement, *Soos* is inapposite.  *See Ass'n of Jewish Camp Operators*, 2020 WL 3766496, at *15-16 (distinguishing *Soos*); *Legacy Church II*, 2020 WL 3963764, at *86 n.38 (same).[15]

In short, Plaintiffs' discriminatory enforcement arguments fail, both factually and legally.

### C.   The Restrictions on Indoor, In-Person Worship Services Are a Constitutional Response to a Public Health Emergency.

Plaintiffs do not rehash their previous argument that *Jacobson* does not apply to the Free Exercise Clause, Renewed Mot. at 18 & n.9, which was rejected by this Court, *South Bay I* at 25-26, and numerous other courts.[16]  Once again, however, they fail to offer any reason for the Court to rule differently.

Recognizing that States have broad authority to respond to public health

---

[15] Plaintiffs' reliance on the concurrence in  *Spell v. Edwards*, 962 F3d 175 (5th Cir. 2020) is misplaced as well.  Because the appeal in that case was dismissed as moot, the statements in the concurrence are mere dicta and, in any event, cannot justify departing from binding Ninth Circuit decisions requiring proof of a pattern of discriminatory enforcement.

[16] *E.g.*, *South Bay III*, 140 S. Ct. at 1613-14 (Roberts, C.J., concurring); *Grace Cmty. Church*, 2020 WL 4876658; *Elim Romanian IV*, 962 F.3d 341; *Antietam Battlefield*, 2020 WL 2556496; *Legacy Church I*, 2020 WL 1905586; *see also Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015); *Workman v. Mingo Cty. Bd. of Ed.*, 419 Fed. Appx. 348 (4th Cir. 2011); *Whitlow v. California*, 203 F. Supp. 3d 1079 (S.D. Cal. 2016).  To the extent Plaintiffs argue that *Jacobson* should not apply because there no longer is an emergency, Renewed Mot. at 18, they are wrong, *see* Section I, *supra*.  Plaintiffs' assertion that *Jacobson* is inapplicable because the COVID-19 is now several months old is plainly wrong: in *Jacobson* the Supreme Court treated the vaccination requirement as an exercise of emergency powers even though the requirement was not applied to the plaintiff until more than four months after it was adopted.  *See* 197 U.S. at 12-13.

29

emergencies, the Supreme Court held in *Jacobson* that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." 197 U.S. at 27 (quotation marks omitted). Moreover, it is not a court's role "to determine which one of two modes [is] likely to be the most effective for the protection of the public against disease." *Id*. at 30. And because States often must take swift and decisive action during a health emergency, constitutional rights may be reasonably restricted "as the safety of the general public may demand." *Id*. at 29; *see also Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944) ("The right to practice religion freely does not include liberty to expose the community . . . to communicable disease."). Thus, a measure taken to combat a public health emergency will be upheld against constitutional challenge unless it has no "real or substantial relation" to the emergency or "is, beyond all question, a plain, palpable invasion of rights" secured by the Constitution. *Jacobson*, 197 U.S. at 31.

Plaintiffs deny that California's restrictions on indoor, in-person worship services have a "real or substantial relation" to public health and safety. But they do not dispute this Court's finding that "[t]he only way currently known to curb the disease is to limit personal exposure." *South Bay I* at 30; *see also Gish*, 2020 WL 1979970, at *4; *Cross Culture*, 2020 WL 2121111, at *5. Instead, they focus on distinctions supposedly drawn between worships services and other public gatherings, asserting that there is no real or substantial benefit to permitting gatherings at schools and factories but not at houses of worship. California, however, does not permit unrestricted gatherings at schools and factories. To the contrary, both are subject to extensive and in many respects more stringent restrictions than worship services. Grabarsky Decl. Exs. 15, 17-18. Indeed, while indoor worship services are now allowed in San Diego, in-person classes are not yet permitted, and factories are subject to much more stringent spacing and protection requirements, none of which Plaintiffs have suggested should be applied to houses of worship. *Id.* Exs. 50-53.

30

Nor are the restrictions on indoor, in-person worship services "beyond all question" a "plain, palpable" invasion of the Free Exercise Clause.  In San Diego, Plaintiffs may worship indoors up to 100 persons or 25% capacity or outdoors without any attendance restrictions and with singing and chanting.  *Id.*  Even in other counties, "a wide swath of religious expression remains untouched," *Gish*, 2020 WL 1979970, at \*5, so that "[i]ndividuals can practice religion in whatever way they wish as long as they're not sitting with each other in large groups inside," *South Bay I* at 28.  *See also Elim Romanian IV*, 962 F.3d at 347; *Grace Cmty. Church*, 2020 WL 4876658, at \*2.  Moreover, while Plaintiffs note that courts cannot resolve "controversies over religious doctrine" or "choose[] sides on religious doctrines," Renewed Mot. at 23, the ban on singing and chanting does nothing of the sort.  It restricts conduct that greatly increases the risk of spreading COVID-19 during worship services.  Because this does not affect the "right to believe and profess whatever religious doctrine one desires," *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990), it does not impact the core right protected by the Free Exercise Clause and thus is not a plain and palpable invasion of the Clause.  As explained above, the restrictions—whether on their face, in application, or via enforcement—do not even amount to a constitutional violation under traditional analysis, let alone one that is, "beyond all question," "plain [and] palpable."

**D.   The State's Directives Would Survive Strict Scrutiny.**

Plaintiffs provide no reason for the Court to reconsider its ruling that even under strict scrutiny, which does not apply, the State's directives pass constitutional muster.  *South Bay I* at 27-28.  Plaintiffs now contend, for the first time, that California's restrictions on indoor worship services are not supported by a compelling interest.  Renewed Mot. at 11.  That is clearly wrong.  As this  Court has already found "of course, there's a compelling government interest in safety and health." *South Bay I* at 27.  Indeed, absent a vaccine or widely effective treatment, restricting personal interactions is the only effective way to slow the

31

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

spread of the highly contagious and frequently fatal COVID-19 virus.  *See, e.g.*, *South Bay I* at 30; *Grace Cmty. Church*, 2020 WL 4876658, at *2.  Moreover, as shown above, gatherings such as worship services where large numbers of people who interact only once a week in the same place for an extended period of time to engage in a shared communal experience that features singing and chanting, pose an especially great threat of transmission.  Indeed, worship services frequently have become "super-spreader" events, Rutherford Decl. ¶¶ 31-35, and since the Court denied the original TRO in early May, there has been a marked *increase* in such events originating in houses of worship, resulting in dozens, hundreds and even thousands of new infections, especially as in-person services have begun to reopen. Grabarsky Decl. 20-38 (recounting such "super-spreader" events in California, other parts of the United States, as well as Canada, Germany, and South Korea). Nor, contrary to Plaintiffs' suggestions, has Plaintiffs' own community been spared, as to date there have been at least 4,785 cases in Chula Vista, *id.* Ex. 49, as even members of their own congregation have been infected.[17]

Plaintiffs assert that suicides and overdoses outnumber deaths due to COVID-19, Renewed Mot. at 11, but they provide no evidence of the number of suicides and overdoses attributable to California's COVID-19 restrictions, much less the restrictions on worship services at issue here.   In fact, the only evidence that Plaintiffs cite concerns restrictions on high schools, not worship services, and even then, Plaintiffs fail to isolate teenage suicides solely attributable to those restrictions.[18]  Imrey Decl. ¶ 30.  In any event, Plaintiffs' arguments on this front again reveal that these issues are related to just the sort of policy decisions made by politically accountable public health officials that courts are ill-equipped to second-guess, especially in the face of medical and scientific uncertainty.  *South Bay III*, 140 S. Ct. at 1613-14 (Roberts, C.J., concurring); *Abiding Place Ministries* at 4;

---

[17] *See* https://www.youtube.com/watch?v=nilvIiWrmMw at 17:16-18:40.
[18] *See* Supp. Delgado Decl. ¶ 9 (referencing https://www.buckinstitute.org/covid-webinar-series-transcript-robert-redfield-md).

1    *Jacobson*, 197 U.S. at 30.

2    Plaintiffs also deny that there can be any compelling interest in restricting

3    worships services to slow the COVID-19 pandemic while "*any* industry is allowed

4    to open and spread the coronavirus."  Renewed Mot. at 24.  But the State has a

5    compelling interest not just in protecting the public as a whole, but also in

6    protecting the individuals who attend worship services as well as their family and

7    friends who are likely to come into contact with them.  And as this Court has

8    already found, *South Bay I* at 27, it is well-settled that the mere presence of some

9    secular exemptions does not automatically mandate exemptions for any and all

10   religious activity.  *Lukumi*, 508 U.S. at 543; *Stormans*, 794 F.3d at 1079; *Grace*

11   *United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 651 (10th Cir. 2006);

12   *Whitlow*, 203 F. Supp. 3d at 1086-87.  Even more fundamentally, "[t]he

13   government need not choose between doing nothing in the face of a pandemic and

14   closing all of society," for "[i]t may choose a middle ground."  *Legacy Church I*,

15   2020 WL 1905586, at *36 n.12.[19]  Moreover, this is especially true where, as here,

16   the State is dealing with an activity that poses an unusually high risk of spreading a

17   deadly virus and of becoming a "super-spreader" event.  As the Ninth Circuit has

18   recognized, the Bill of Rights is not "a suicide pact," and "doctrinaire logic" must

19   be tempered "with a little practical wisdom."  *South Bay II*, 959 F.3d at 939.

20   Plaintiffs also provide no reason to disrupt the Court's previous finding that

21   the State's directives are narrowly tailored to serve that interest, *South Bay I* at 27-

22   28, especially as the restrictions on worship services have *loosened* since May.

23   Plaintiffs assert that less restrictive alternatives have not been considered, but in

---

24   [19] Plaintiffs' reliance on *Espinoza v. Mont. Dep't of Revenue* for this
argument (Renewed Mot. at 12) is misplaced because that decision did not analyze
25   secular exemptions across various industries; rather, it considered a regulation that
expressly discriminated against religious schools and in favor of secular ones by
26   prohibiting state scholarships for private schools from being used for any school
"'owned or controlled in whole or in part by any church, religious sect, or
27   denomination.'"  140 S. Ct. 2246, 2252 (2020).  Likewise inapposite is Plaintiffs'
citation to *Reed v. Town of Gilbert*, 576 U.S. 155 (2015) (Renewed Mot. at 12), a
28   case that did not concern the Free Exercise Clause.

33

1  fact the State has tailored its restrictions to the current state of knowledge

2  concerning the virus, its spread, and the State's ability to treat persons infected with

3  the disease.  As detailed above, it has expanded and contracted its restrictions on

4  worship services, abandoning some restrictions (such as those on outdoor services)

5  and adding others (such as the ban on singing and chanting).  This adaptive

6  approach comports with the Court's finding that the State must "continue to

7  monitor how each stage of reopening with the increasing risk of each one affects

8  the overall number of infections."  *Id.* at 30.  And given the medical and scientific

9  uncertainty over the precise extent of the restrictions needed to combat COVID-19

10  in general, and to protect congregants, their families, and communities in particular,

11  the Court should not second guess the judgments made by the State's politically

12  accountable public health experts.  *South Bay III*, 140 S. Ct. at 1613-14 (Roberts,

13  C.J., concurring); *Abiding Place Ministries* at 4; *Jacobson*, 197 U.S. at 30.

14       Finally, Plaintiffs fault the State for not adopting the same restrictions on

15  indoor worship services as in other states.  Renewed Mot. at 17.  But California was

16  one of the first states hit by COVID-19, and Plaintiffs do not even suggest that the

17  states they invoke face circumstances similar to those in California where, even

18  under Plaintiffs' own statistics, numbers and rates of infections and deaths have

19  only increased in recent months.  *See* Section I, *supra*.  Although California has

20  managed to keep the fatality rate relatively low, this is no time to second-guess the

21  State's public health officials and force it to loosen restrictions based on actions

22  taken in other states facing less dire circumstances as well as different

23  characteristics such as population, demographics, geography, and urbanization.

24      **E.**   **Plaintiffs' State Law Claim Fails.**

25       Plaintiffs' do not reassert their state religious exercise claim, under California

26  Constitution Article I, section 4, against the State Defendants, Renewed Mot. at 8;

27  nor could they.  *See* U.S. Const. amend. XI; *Pennhurst State Sch. & Hosp. v.*

28  *Halderman*, 465 U.S. 89, 124-25 (1984); *see also South Bay I* at 27-28.  But, in any

34

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

event, that claim would fail for the reasons explained in the County Defendants' opposition brief.

## IV.   THE REMAINING FACTORS WEIGH HEAVILY AGAINST AN INJUNCTION.

Plaintiffs' provide no reason for the Court to reconsider its ruling that neither "the balance of equities [n]or public interest supports issuing a TRO," *South Bay I*, at 30, even in light of their new arguments about indoor singing restrictions or outdoor political protests, which, as shown above, do not demonstrate a constitutional violation.  It also remains unquestionable that the public also has the strongest of interests in protecting itself from infectious disease and in curbing COVID-19 so that, among numerous other reasons, the economy, schools, and other activities can reopen more quickly.  As shown above, indoor, in-person worship services continue to pose a great risk of transmission and outbreak, as shown by the numerous instances of "super-spreader" events, leading to hundreds or even thousands of new infections.  The threat is especially great here given the large services featuring singing Plaintiffs wish to hold, which, as shown above, pose an especially high risk of transmission.  And, that COVID-19 cases and deaths increased when the restrictions were loosened in late-May and early June shows the harm of enjoining them altogether, as Plaintiffs seek to do.  Consequently, any harm that Plaintiffs might suffer as a result of the restrictions is far outweighed by the potential harm to religious congregants themselves, their families and communities, and the public health in general.  *See South Bay I* at 30 ("I understand it's difficult for everyone involved, but it is in the public interest to continue to protect the population as a whole.").

## CONCLUSION

For the foregoing reasons, Plaintiffs' renewed TRO motion should be denied.

//

//

//

35

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)

Dated:  August 31, 2020

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
LISA J. PLANK
Deputy Attorney General


*/s/ Todd Grabarsky*
TODD GRABARSKY
Deputy Attorney General
*Attorneys for Defendants Gavin*
*Newsom, California Governor;*
*Xavier Becerra, California Attorney*
*General; and Sandra Shewry, Acting*
*Director of the California*
*Department of Public Health*

SA2020301026

State Defs.' Opp'n to Renewed TRO (3:20-cv-00865-BAS-AHG)