Charles S. LiMandri (SBN 110841)
cslimandri@limandri.com
Paul M. Jonna (SBN 265389)
pjonna@limandri.com
Jeffrey M. Trissell (SBN 292480)
jtrissell@limandri.com
Noel J. Meza (SBN 331169)
nmeza@limandri.com
LiMandri & Jonna LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Tel: (858) 759-9930

Thomas Brejcha, *pro hac vice*\*
tbrejcha@thomasmoresociety.org
Peter Breen, *pro hac vice*\*
pbreen@thomasmorsociety.org
Thomas More Society
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
(\**Pro hac vice* application forthcoming)

Attorneys for Plaintiffs

Harmeet K. Dhillon (SBN: 207873)
harmeet@dhillonlaw.com
Mark P. Meuser (SBN: 231335)
mmeuser@dhillonlaw.com
Gregory R. Michael (SBN: 306814)
gmichael@dhillonlaw.com
Dhillon Law Group Inc.
177 Post Street, Suite 700
San Francisco, CA 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SOUTH BAY UNITED PENTECOSTAL CHURCH, a California non-profit corporation, BISHOP ARTHUR HODGES III, an individual,

Plaintiffs,

v.

GAVIN NEWSOM, in his official capacity as the Governor of California, *et al.*,

Defendants.

CASE NO. 3:20-cv-00865-BAS

**NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF SOUTH BAY UNITED PENTECOSTAL CHURCH'S RENEWED MOTION FOR A TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION**

Judge:      Hon. Cynthia Bashant
Courtroom:  4B
Date:       TBD
Time:       TBD

**TO:   THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** of the following supplemental authority, which was issued after briefing was completed and submitted for Plaintiffs South Bay United Pentecostal Church and Bishop Arthur Hodges III's Renewed Motion for Temporary Restraining Order / Preliminary Injunction:

1.     On September 14, 2020, the United States District Court for the Western District of Pennsylvania held and declared, in relevant part:

> (1) that the congregate gathering limits imposed by Defendants' mitigation orders violate the right of assembly enshrined in the First Amendment; (2) that the stay-at-home and business closure components of Defendants' orders violate the Due Process Clause of the Fourteenth Amendment; and (3) that the business closure components of Defendants' orders violate the Equal Protection Clause of the Fourteenth Amendment.
>
> . . .
>
> The Court closes this Opinion as it began, by recognizing that Defendants' actions at issue were undertaken with the good intention of addressing a public health emergency.  But even in an emergency, the authority of the government is not unfettered.  The liberties protected by the Constitution are not fair-weather freedoms—in place when times are good but able to be cast aside in times of trouble.  There is no question that this Country has faced, and will face, emergencies of every sort.  But the solution to a national crisis can never be permitted to supersede the commitment to individual liberty that stands as the foundation of the American experiment.  The Constitution cannot accept the concept of a "new normal" where the basic liberties of the people can be subordinated to open-ended emergency mitigation measures.  Rather, the Constitution sets certain lines that may not be crossed, even in an emergency.  Actions taken by Defendants cross those lines.  It is the duty of the Court to declare those actions unconstitutional.  Thus, consistent with the reasons set forth above, the Court will enter judgment in favor of Plaintiffs.

-1-

NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF RENEWED MOTION FOR A TEMPORARY
RESTRAINING ORDER / PRELIMINARY INJUNCTION

*County of Butler v. Wolf*, No. 2:20-cv-677 (W.D. Pa. Sept. 14, 2020), ECF No. 79.  A copy of this opinion is attached hereto as Exhibit A.

Respectfully submitted,

LiMANDRI & JONNA LLP

Dated: September 14, 2020        By: _____
                                        Charles S. LiMandri
                                        Paul M. Jonna
                                        Jeffrey M. Trissell
                                        Noel J. Meza
                                        Attorneys for Plaintiffs

NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF RENEWED MOTION FOR A TEMPORARY
RESTRAINING ORDER / PRELIMINARY INJUNCTION

**Exhibit A**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

COUNTY OF BUTLER, *et al*,

               *Plaintiffs*,

    v.

THOMAS W. WOLF, *et al*,

               *Defendants*.

Civil Action No. 2:20-cv-677

Hon. William S. Stickman IV

## **OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

## I. **INTRODUCTION**

The COVID-19 pandemic has impacted every aspect of American life. Since the novel coronavirus emerged in late 2019, governments throughout the world have grappled with how they can intervene in a manner that is effective to protect their citizens from getting sick and, specifically, how they can protect their healthcare systems from being overwhelmed by an onslaught of cases, hindering their ability to treat patients suffering from COVID-19 or any other emergency condition. In this Country, founded on a tradition of liberty enshrined in our Constitution, governments, governors, and courts have grappled with how to balance the legitimate authority of public officials in a health emergency with the Constitutional rights of citizens. In this case, the Court is required to examine some of the measures taken by Defendants—Pennsylvania Governor Thomas W. Wolf and Pennsylvania Secretary of Health Rachel Levine—to combat the spread of the novel coronavirus. The measures at issue are: (1)

the restrictions on gatherings[1]; and, (2) the orders closing "non-life-sustaining" businesses and directing Pennsylvanians to stay-at-home.

After reviewing the record in this case, including numerous exhibits and witness testimony, the Court believes that Defendants undertook their actions in a well-intentioned effort to protect Pennsylvanians from the virus. However, good intentions toward a laudable end are not alone enough to uphold governmental action against a constitutional challenge. Indeed, the greatest threats to our system of constitutional liberties may arise when the ends *are* laudable, and the intent *is* good—especially in a time of emergency. In an emergency, even a vigilant public may let down its guard over its constitutional liberties only to find that liberties, once relinquished, are hard to recoup and that restrictions—while expedient in the face of an emergency situation—may persist long after immediate danger has passed. Thus, in reviewing emergency measures, the job of courts is made more difficult by the delicate balancing that they must undertake. The Court is guided in this balancing by principles of established constitutional jurisprudence.

This action seeks a declaration that Defendants' actions violated and continue to violate the First Amendment, as well as both the Due Process and Equal Protection clauses of the Fourteenth Amendment. Specifically, Plaintiffs argue that numeric limitations on the size of gatherings violates the First Amendment. They argue that the components of Defendants' orders closing "non-life-sustaining" businesses and requiring Pennsylvanians to stay-at-home violated both the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

---

[1] Pursuant to the July 15, 2020 Orders of Defendants, indoor events and gatherings of more than 25 people are prohibited, and outdoor events and gatherings of more than 250 people are prohibited. (ECF Nos. 48-5, 48-6).

To examine the issues presented by Plaintiffs, the Court first had to determine what type of scrutiny should be applied to the constitutional claims. As explained at length below, the Court believes that ordinary canons of scrutiny are appropriate, rather than a lesser emergency regimen. The Court next had to determine whether the question of the business closure and related stay-at-home provisions of Defendants' orders remain before it. The record shows that they do. The language of the orders themselves, as well as testimony adduced at trial, show that these provisions are merely suspended, not rescinded, and can be re-imposed at Defendants' will. This, in addition to the voluntary cessation doctrine, compelled the Court to examine issues relating to these components of Defendants' orders.

Having addressed the necessary threshold questions, the Court proceeded to the merits of Plaintiffs' claims and, after carefully considering the trial record and the parties extensive pre and post-trial briefing holds and declares: (1) that the congregate gathering limits imposed by Defendants' mitigation orders violate the right of assembly enshrined in the First Amendment; (2) that the stay-at-home and business closure[2] components of Defendants' orders violate the Due Process Clause of the Fourteenth Amendment; and (3) that the business closure components of Defendants' orders violate the Equal Protection Clause of the Fourteenth Amendment.

## II. <u>BACKGROUND</u>

Pennsylvania saw its first presumptive positive cases of COVID-19 in the early days of March 2020. (ECF No. 40, p. 1; ECF No. 37, ¶ 6). On March 6, 2020, Governor Wolf signed a Proclamation of Disaster Emergency noting that "the possible increased threat from COVID-19

---

[2] Plaintiffs challenge only the business closure provisions which had designated every business in the Commonwealth as "life-sustaining" or "non-life-sustaining" and closed the later. They do not challenge components of those orders which permit the businesses to open subject to certain restrictions, such as percentage occupancy limits. As such, the Court's opinion does not impact those components of Defendants' orders.

3

constitutes a threat of imminent disaster to the health of the citizens of the Commonwealth" such that it was necessary "to implement measures to mitigate the spread of COVID-19." (ECF No. 42-1).

The Governor's proclamation of a disaster emergency vested him with extraordinary authority to take expansive action by executive order. Within the Governor's office, a "group" "was formed to work on issues related to the pandemic" both on the "economic development side and pertaining to the business closures" and "on the health side, teams were formed to work to understand the progress of the pandemic." (ECF No. 75, p. 17).[3] It was an "interdisciplinary team" with "individuals from the [G]overnor's office and agencies being pulled together for specific tasks," including Secretary Levine. (ECF No. 75, pp. 17-18). The "group" never reduced its purpose to writing, although "its stated purpose was to develop mechanisms to respond to that emerging threat [i.e. a pandemic] in a very quick period of time." (ECF No. 75, p. 26). The names of its members remain unknown.

Part of the "group" consisted of a "reopening team" and a "policy team." (ECF No. 75, pp. 17-21). None of their "hundreds, if not thousands" of meetings were open to the public, no meeting minutes were kept, and "formality was not the first thing on [their] minds." (ECF No. 75, pp. 21, 26, 28, 30-31, 89-90, 134). The "reopening team" was "working to develop the various guidance that was necessary to respond to the pandemic," and it "published that on the Commonwealth's website and put out press releases." (ECF No. 75, pp. 27-28, 32). It also formulated the stay-at-home order. (ECF No. 75, pp. 33-34). The "policy team" was tasked with creating the distinctions between "life-sustaining" and "non-life-sustaining" businesses as well as preparing responses for the public on frequently asked questions. (ECF No. 75, pp. 21,

---

[3] Throughout this Opinion, page citations are to pages of the applicable trial transcripts and pleadings, and not the ECF document page number.

4

35).  Its members consisted solely of employees from the Governor's policy and planning office, none of whom possess a medical background or are experts in infection control.  (ECF No. 75, pp. 22-25, 100-01).

The Governor never attended meetings of the various teams, but he "participated in regular calls and updates with members of his administration" and he "was briefed and consulted on key matters."  (ECF No. 75, p. 29).  Ultimately, without ever conducting a formal vote, the teams, by consensus when "there [was] a favorite approach everyone agree[d] on," put together the scope of an order and submitted it to the Governor through his Chief of Staff for approval.[4] (ECF No. 75, pp. 45-47, 96-97).  All of the orders, according to the Governor, were geared "to protect the public from the novel and completely unprecedented pandemic" and "prevent the spread of the disease."  (ECF No. 75, pp. 136-37).  According to the Executive Deputy Secretary for the Pennsylvania Department of Health, from a public health perspective, the intent of the orders "was to reduce the amount of interaction between individuals."  (ECF No. 75, p. 209; ECF No. 37, ¶ 7).

The various orders issued by Defendants will be discussed with specificity in the analysis that follows as they relate to the particular legal issues in this case.  That said, by way of background, the Court would note the following relevant events.

---

[4] For example, in regard to the July 15, 2020 Order that contained a limit of twenty-five percent of the stated fire code maximum occupancy for indoor dining, policy team members reviewed models from other states - Florida, Colorado, Texas, and California - "and then made a decision based on collective input of the policy folks, the legal folks, the Department of Health and health professionals as to what would be the best approach to move forward."  (ECF No. 74, pp. 49-51). As to the provision in the Order that alcohol could only be served in the same transaction as a meal, "it was one of the features of the California order that we [i.e. the policy team] did look at and thought it made sense."  (ECF No. 74, p. 59).  At the end of this process, the proposal for the Order was submitted to the Governor for approval.  (ECF No. 74, p. 51).

On March 13, 2020, the Governor announced a temporary closure of all K-12 Pennsylvania schools. (ECF No. 42-2). On March 19, 2020, the Governor issued an Order regarding the closure of all Pennsylvania businesses that were "non-life-sustaining."[5] (ECF No. 42-2). Enforcement of the Order was to begin on March 21, 2020 at 12:01 a.m. (ECF No. 42-2). Secretary Levine issued a similar order on March 19, 2020. (ECF No. 42-14). Defendants then issued stay-at-home orders for Allegheny County, Bucks County, Chester County, Delaware County, Monroe County, Montgomery County, and Philadelphia County. (ECF Nos. 42-15 and 42-16). Enforcement of the Governor's Order was slated to commence on March 23, 2020 at 8:00 PM. (ECF No. 42-15). Amended stay-at-home orders were issued by Defendants from March 23, 2020 through March 31, 2020 to include other counties. (ECF Nos. 42-17 through 42-29). On April 1, 2020, Defendants ordered all citizens of Pennsylvania to stay-at-home effective immediately "except as needed to access, support, or provide life-sustaining businesses, emergency or government services." (ECF Nos. 42-30, 42-31, 47-2). Then, on April 9, 2020, the Governor extended the school closures for the remainder of the 2019-2020 academic year. (ECF No. 47-5).

The Governor issued a "Plan for Pennsylvania" on or about April 17, 2020, that included a three phased reopening plan – moving from the "red phase" to the "yellow phase" to the "green

---

[5] A waiver process, whereby businesses could challenge their designation as "non-life-sustaining," existed from March 19, 2020 until April 3, 2020. (ECF No. 75, p. 226). A team of economic development professionals within the Pennsylvania Department of Community and Economic Development was assembled to review the waiver requests. (ECF No. 75, p. 214). Originally, there were twelve team members and by the end of two weeks there were forty team members plus fifty members answering the telephones. (ECF No. 75, p. 214). By the time the waiver period closed, 42,380 waiver requests were received. 6,124 were granted, 12,812 were denied, and 11,636 were determined not to need a waiver. (ECF No. 38, ¶ 14).

phase" - with corresponding "work & congregate setting restrictions" and "social restrictions."[6] (ECF Nos. 47- and 42-81). The stay-at-home provisions of Defendants' orders were extended through June 4, 2020.[7] (ECF Nos. 42-48, 42-49, 42-50, and 42-51). On May 7, 2020, Defendants issued an order for limited opening of businesses, lifting the stay-at-home requirements in certain counties and moving them into the "yellow phase," but imposing gathering limits. (ECF Nos. 42-52 and ECF Nos. 42-53). Throughout May and June, various counties were moved by Defendants from the "yellow phase" to the "green phase." (ECF Nos. 42-54 through 42-61, and 42-63 through 42-75). The final county, Lebanon, was moved into the "green phase" effective July 3, 2020. (ECF No. 42-74). The "green phase" eased most restrictions with the continued suspension of the stay-at-home and business closure orders. (ECF No. 75, pp. 36-37, 144-45).

––––––––––––––––––––

[6] The phases were developed by members of senior staff in the Governor's Office who thought it would be "understandable" to the citizens of Pennsylvania. (ECF No. 75, p. 75). The Commonwealth partnered with Carnegie Mellon University to review demographic and health data for each county. When considering the movement of counties from the "yellow phase" to the "green phase," the Department of Health relied on four metrics:

> (1) whether the county had stable, decreasing, or low confirmed case counts for the immediately proceeding 14-day period compared to the previous 14-day period; (2) whether the contacts of cases within the county were being monitored; (3) whether the Polymerase Chain Reaction (PCR) testing positivity rate, meaning the number of positive cases per 100,000 population, had been less than 10% for the past 14 days; and (4) whether hospital bed use was 90% per district population in the county.

(ECF No. 37, ¶ 25). As to the business closures, the Governor's office based reopening decisions "upon whether a business created a high-risk for transmission of COVID-19." (ECF No. 39, ¶ 17).

[7] While the Governor's representative testified that "our approach throughout the pandemic has not been to take an aggressive enforcement approach," the fact remains that Pennsylvanians were cited for violating the stay-at-home and business closure orders. (ECF No. 74, pp. 61-69; ECF Nos. 42-102, 48-7, 54-3).

On June 3, 2020, the Governor renewed his proclamation of disaster emergency for ninety days. (ECF No. 42-62). On July 15, 2020, Defendants issued "targeted mitigation" orders imposing limitations on businesses in the food services industry, closing nightclubs, prohibiting indoor events and gatherings of more than 25 persons, and prohibiting outdoor gatherings of more than 250 persons. (ECF Nos. 48-5, 48-6, 54-1). Most recently, on August 31, 2020, Governor Wolf renewed his proclamation of disaster emergency for ninety days stating "the COVID-19 pandemic continues to be of such magnitude and severity that emergency action is necessary to protect the health, safety, and welfare of affected citizens of Pennsylvania." (ECF Nos. 73, 73-1). This disaster declaration allows "based on the course and development of the virus, that certain restrictions could be put back in place." (ECF No. 75, p. 37).

Plaintiffs filed their Complaint on May 7, 2020, seeking a declaratory judgment that Defendants violated certain constitutional rights through the issuance of orders designed to combat the COVID-19 pandemic. Plaintiffs are comprised of three groups. The "County Plaintiffs" consist of the Counties of Butler, Fayette, Greene, and Washington, Pennsylvania. The "Political Plaintiffs" consist of the following individuals: Mike Kelly, an individual residing in the County of Butler and a member of the United States House of Representatives; Daryl Metcalfe, an individual residing in the County of Butler and a member of the Commonwealth of Pennsylvania House of Representatives; Marci Mustello, an individual residing in the County of Butler and a member of the Commonwealth of Pennsylvania House of Representatives; and Tim Bonner, an individual doing business in the County of Butler and a member of the Commonwealth of Pennsylvania House of Representatives. The "Business Plaintiffs" consist of the following: Nancy Gifford and Mike Gifford, d/b/a Double Image; Prima Capelli, Inc.; Steven Schoeffel; Paul F. Crawford, t/d/b/a Marigold Farm; Cathy Hoskins, t/d/b/a Classy Cuts Hair

8

Salon; R.W. McDonald & Sons, Inc.; Starlight Drive-In, Inc.; and, Skyview Drive-In, LLC. The Complaint asserted five counts under 42 U.S.C. § 1983: Count I - Violation of The Takings Clause; Count II – Substantive Due Process; Count III – Procedural Due Process; Count IV – Violation of Equal Protection; and, Count V – Violation of the First Amendment. (ECF No. 1).

On May 20, 2020, Plaintiffs filed a Motion for Speedy Hearing of Declaratory Judgment Action Pursuant to Rule 57 and a supporting brief. (ECF Nos. 9 and 10). Defendants filed their Response on May 26, 2020. (ECF Nos. 12 and 13). Telephonic oral argument occurred on May 27, 2020. By May 28, 2020 Memorandum Opinion and Order, the Court held that expedited proceedings were warranted to examine the claims in the Complaint at Count II by the Business Plaintiffs, at Count IV by all Plaintiffs, and at Count V by all Plaintiffs. The Court denied the motion as to Counts I and III. (ECF No. 15).

A Case Management Order was issued on June 2, 2020. (ECF No. 18). Expedited discovery commenced on June 12, 2020. (ECF No. 18). The parties agreed that all direct testimony for the Declaratory Judgment Hearing would be given via written Declarations and/or Affidavits and the parties filed those documents along with a Joint Stipulation of Facts and Joint Exhibits. (ECF Nos. 16, 19-34, 37-40, 42, 47, 48). Pre-hearing briefs were also submitted. (ECF Nos. 36, 40). The declaratory judgment hearing occurred over two days, July 17, 2020 and July 22, 2020, with eighteen witnesses testifying. (ECF Nos. 74 and 75). Afterward, the parties submitted comprehensive post-hearing briefs and additional adjudicative facts. (ECF Nos. 56, 59, 61, 64, 66, 67, 68, 71, 73).

### III. __ANALYSIS__

#### A. THE COUNTY PLAINTIFFS CANNOT ASSERT CLAIMS UNDER SECTION 1983

Defendants argue that the County Plaintiffs—Butler, Fayette, Greene, and Washington Counties—are not proper plaintiffs. They contend that the County Plaintiffs lack standing to bring an action under 42 U.S.C. § 1983. The County Plaintiffs argue that they have standing on both an individual basis and as representatives of their citizens. The Court holds that County Plaintiffs are not proper parties.

The County Plaintiffs focus their argument on general concepts of Article III standing, pointing to areas where the Counties may be able to illustrate specific harm to them, as counties, resulting from Defendants' actions. The alleged harm includes "interference with the holding of public meetings that can be attended by all residents of the Counties, negative impacts on tax revenue, negative impacts on reputation, negative impacts on the citizens of the respective Counties, and loss of access to lawyers and law offices in those Counties." (ECF No. 56, p. 30). But even if these allegations of harm could establish general Article III standing, they are not enough to confer standing under Section 1983.

Section 1983 does not confer any substantive rights, but rather, merely provides a cause of action for the deprivation of constitutional rights under the color of state law. Counties are creatures of the state. They do not possess rights under the Constitution. They cannot assert a claim against the state—of which they are a creation—for violating rights that they do not possess. *See Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 40 (1933) ("A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator."); *see also Pennsylvania Professional Liability Joint Underwriting Ass'n v. Wolf*, 324 F.

10

Supp. 3d 519, 530 (M.D. Pa. 2018) ("Counties, municipalities, and other subdivisions owing their existence to the state generally cannot assert constitutional claims against their creator."); *Williams v. Corbett,* 916 F. Supp. 2d 593, 598 (M.D. Pa. 2012) (same); *Jackson v. Pocono Mountain School District*, 2010 WL 4867615, at *3 (M.D. Pa. Nov. 23, 2010) ("[A] number of Circuits, including the Second, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh, have all held that a political subdivision may not bring a federal suit against its parent state or its subdivisions on rights . . . .").

The County Plaintiffs have attempted to assert claims in their own right and as the representatives of their residents. While counties may undoubtedly litigate in many circumstances, as Defendants aptly note, well established law prohibits the County Plaintiffs from bringing claims of constitutional violations under Section 1983. As such, the County Plaintiffs are not proper parties and cannot obtain relief in this case. They are hereby dismissed as parties.

### B. CONSTITUTIONAL CHALLENGES TO DEFENDANTS' ORDERS

#### 1) "Ordinary" canons of constitutional review should be applied to Defendants' orders.

Before moving into the substance of Plaintiffs' constitutional claims, the Court will examine what "lens" it should use to review those claims. In other words, what is the appropriate standard, or regimen of standards, that the Court must use to weigh the constitutionality of the claims? Plaintiffs base their constitutional arguments on ordinary constitutional scrutiny, whereas Defendants argue that their actions should be afforded a more deferential standard as emergency measures relating to public health.

Over the last century, federal courts have developed a regimen of tiered scrutiny for examining most constitutional issues—rational basis scrutiny, intermediate scrutiny and strict

11

scrutiny. The appropriate standard depends on the nature of the claim and, specifically, the nature of the right allegedly infringed. In this case, Defendants point to the emergency nature of the challenged measures and correctly argue that they have broad authority under state police powers in reacting to emergency situations relating to public health and safety. They contend that the traditional standards of constitutional scrutiny should not apply, but rather, that a more deferential standard as articulated in *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905), should be used. Defendants contend that *Jacobson* sets forth a standard that grants almost extraordinary deference to their actions in responding to a health crisis and that, based on that deference, Plaintiffs' claims are doomed to fail. In other words, Defendants argue that no matter which traditional level of scrutiny that the underlying constitutional violation would normally require, a more deferential standard is appropriate.

In *Jacobson*, the Supreme Court upheld a Massachusetts statute empowering municipal boards of health to require that all residents be vaccinated for smallpox.[8] Jacobson was prosecuted for refusing to comply with the City of Cambridge's vaccination mandate. *Id.* at 13. He argued that the mandatory vaccine regimen "was in derogation of the rights secured to [him] by the preamble to the Constitution of the United States, and tended to subvert and defeat the purposes of the Constitution as declared in its preamble." *Id.* at 13-14. Jacobson also contended that the measure violated the Fourteenth Amendment and the "spirit of the Constitution." *Id.* at 14.

The Supreme Court rejected out-of-hand the arguments that the measure violated the Constitution's preamble or "spirit," explaining that only the specific, substantive provisions of the Constitution can give rise to an actionable claim of rights. The Supreme Court, likewise,

---

[8] The statute provided an exception for children who had a certificate signed by a physician representing that they were "unfit subjects for vaccination." *Id.* at 12-13.

rejected Jacobson's challenge under the Fourteenth Amendment. It explained that the States possess broad police powers which encompass public health measures:

> [a]lthough this court has refrained from any attempt to define the limits of that power, yet it has distinctly recognized the authority of a state to enact quarantine laws and 'health laws of every description;' indeed, all laws that relate to matters completely within its territory and which do not by their necessary operation affect the people of other states.

*Id.* at 25. The Supreme Court explained that "the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactments as will protect the public health and the public safety." *Id.*

Although the *Jacobson* Court unquestionably afforded a substantial level of deference to the discretion of state and local officials in matters of public health, it did not hold that deference is limitless. Rather—it closed its opinion with a *caveat* to the contrary:

> Before closing this opinion we deem it appropriate, in order to prevent misapprehension [of] our views, to observe—perhaps to repeat a thought already sufficiently expressed, namely—that the police power of a state, whether exercised directly by the legislature, or by a local body acting under its authority, may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression.

*Id.* at 38. There is no question, therefore, that even under the plain language of *Jacobson*, a public health measure may violate the Constitution.

*Jacobson* was decided over a century ago. Since that time, there has been substantial development of federal constitutional law in the area of civil liberties. As a general matter, this development has seen a jurisprudential shift whereby federal courts have given greater deference to considerations of individual liberties, as weighed against the exercise of state police powers. That century of development has seen the creation of tiered levels of scrutiny for constitutional claims. They did not exist when *Jacobson* was decided. While *Jacobson* has been cited by some modern courts as ongoing support for a broad, hands-off deference to state authorities in matters

13

of health and safety, other courts and commentators have questioned whether it remains instructive in light of the intervening jurisprudential developments.

In *Bayley's Campground, Inc. v. Mills*, __ F. Supp. 3d __, 2020 WL 2791797 (D. Me. May 29, 2020), a district court examined whether the governor of Maine's emergency order requiring, *inter alia*, visitors from out of state to self-quarantine, was constitutional. As here, before proceeding to its analysis of the substantive legal issues, the court examined how it should weigh the issues—according to a very deferential analysis purportedly consistent with *Jacobson*, as advocated by the governor, or under "regular" levels of scrutiny advocated by the plaintiffs. The district court examined *Jacobson* and, specifically, whether it warranted the application of a looser, more deferential, standard than the "regular" tiered scrutiny used on constitutional challenges. It observed: "[i]n the eleven decades since *Jacobson*, the Supreme Court refined its approach for the review of state action that burdens constitutional rights." *Id.* at *8 (citing *Planned Parenthood v. Casey,* 505 U.S. 833, 857 (1992)). *See also Planned Parenthood*, 505 U.S. at 857 (citing *Jacobson*, 197 U.S. 24-30) (affirming that "a State's interest in the protection of life falls short of justifying any plenary override of individual liberty claims."). The district court declined to apply a standard below those of the established tiered levels of scrutiny. It stated:

> [T]he permissive *Jacobson* rule floats about in the air as a rubber stamp for all but the most absurd and egregious restrictions on constitutional liberties, free from the inconvenience of meaningful judicial review. This may help explain why the Supreme Court established the traditional tiers of scrutiny in the course of the 100 years since *Jacobson* was decided.

*Bayley's Campground,* at *8.

Justice Alito's dissent (joined by Justices Thomas and Kavanaugh) to the Court's denial of emergency injunctive relief in *Calvary Chapel Dayton Valley v. Sisolak*, __ U.S. ___, 2020

WL 4251360 (Jul. 24, 2020) (Alito, J., dissenting), also casts doubt on whether *Jacobson* can, consistent with modern jurisprudence, be applied to establish a diminished, overly deferential, level of constitutional review of emergency health measures.[9]  In arguing that the Supreme Court should have granted the requested injunction, Justice Alito stated: "[w]e have a duty to defend the Constitution, and even a public health emergency does not absolve us of that responsibility."

*Id.* at \*1.  Justice Alito pointed out:

> For months now, States and their subdivisions have responded to the pandemic by imposing unprecedented restrictions on personal liberty, including the free exercise of religion.  This initial response was understandable.  In times of crisis, public officials must respond quickly and decisively to evolving and uncertain situations.  At the dawn of an emergency—and the opening days of the COVID-19 outbreak plainly qualify—public officials may not be able to craft precisely tailored rules.  Time, information, and expertise may be in short supply, and those responsible for enforcement may lack the resources needed to administer rules that draw fine distinctions.  Thus, at the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules.  In general, that is what has happened thus far during the COVID-19 pandemic.
>
> But a public health emergency does not give Governors and other public officials *carte blanche* to disregard the Constitution for as long as the medical problem persists.  As more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights.

*Id.* at \*2.  Justice Alito found unreasonable the argument that *Jacobson* could be used to create a deferential standard whereby public health measures will pass scrutiny unless they are "beyond all question a plain, palpable invasion of rights secured by the fundamental law."  *Id.* at \*5.  Rather, he reasoned, "it is a mistake to take language in *Jacobson* as the last word on what the Constitution allows public officials to do during the COVID-19 pandemic . . . . It is a considerable stretch to read the [*Jacobson*] decision as establishing the test to be applied when

---

[9] The Court is aware that neither the Supreme Court's denial of review, nor Justice Alito's dissent are precedential, however, in light of the facts and circumstances in this case, the Court finds Justice Alito's dissent instructive and persuasive regarding the issues presented.

statewide measures of indefinite duration are challenged under the First Amendment or other provisions not at issue in that case." *Id.* at *5.

The district court in *Bayley's Campground* cited to a recent scholarly article examining the type of constitutional scrutiny that should be applied to challenges to COVID-19 mitigation strategies—Lindsay F. Wiley & Stephen I. Vladeck, *Coronavirus, Civil Liberties, and the Courts: the Case Against "Suspending" Judicial Review*, 133 HARV. L. REV. F. 179 (2020).[10] The Court has reviewed the professors' paper and finds it both instructive and persuasive. There, the learned professors argue that *Jacobson* should not be interpreted as permitting the "suspension" of traditional levels of constitutional scrutiny in reviewing challenges to COVID-19 mitigation measures. *Id.* at 182 ("In this Essay, we argue that the suspension approach to judicial review is wrong—not just as applied to governmental actions taken in response to novel coronavirus, but in general."). The professors highlight three objections to an overly deferential "suspension" model standard of review:

> First, the suspension principle is inextricably linked with the idea that a crisis is of finite—and brief—duration. To that end, the principle is ill-suited for long-term and open-ended emergencies like the one in which we currently find ourselves.

> Second, and relatedly, the suspension model is based upon the oft-unsubstantiated assertion that "ordinary" judicial review will be too harsh on government actions in a crisis—and could therefore undermine the efficacy of the government's response. In contrast, as some of the coronavirus cases have already demonstrated, most of these measures would have met with the same fate under "ordinary" scrutiny, too. The principles of proportionality and balancing driving most modern constitutional standards permit greater incursions into civil liberties in times of greater communal need. That is the essence of the "liberty regulated by law" described by the Court in *Jacobson*.

> Finally, the most critical failure of the suspension model is that it does not account for the importance of an independent judiciary in a crisis—"as perhaps

---

[10] Lindsay F. Wiley is Professor of Law and Director, Health Law and Policy Program, American University Washington School of Law. Stephen I. Vladeck is the A. Dalton Cross Professor of Law, University of Texas School of Law. *Id.* at 179.

the only institution that is in any structural position to push back against potential overreaching by the local, state, or federal political branches . . . . Otherwise, we risk ending up with decisions like *Korematsu v. United States*—in which courts sustain gross violations of civil rights because they are either unwilling or unable to meaningfully look behind the government's purported claims of exigency.

*Id.* at 182-83 (internal footnotes and citations omitted). These objections, especially the problem of ongoing and indefinite emergency measures, largely mirror the concern expressed by Justice Alito in *Calvary Chapel*.

The Court shares the concerns expressed by Justice Alito, as well as Professors Wiley and Vladeck, and believes that an extraordinarily deferential standard based on *Jacobson* is not appropriate. The Court will apply "regular" constitutional scrutiny to the issues in this case. Two considerations inform this decision—the ongoing and open-ended nature of the restrictions and the need for an independent judiciary to serve as a check on the exercise of emergency government power.

First, the ongoing and indefinite nature of Defendants' actions weigh strongly against application of a more deferential level of review. The extraordinary emergency measures taken by Defendants in this case were promulgated beginning in March—six months ago. What were initially billed as temporary measures necessary to "flatten the curve" and protect hospital capacity have become open-ended and ongoing restrictions aimed at a very different end—stopping the spread of an infectious disease and preventing new cases from arising—which requires ongoing and open-ended efforts. Further, while the harshest measures have been "suspended," Defendants admit that they remain in-place and can be reinstated *sua sponte* as and when Defendants see fit. In other words, while not currently being enforced, Pennsylvania citizens remain subject to the re-imposition of the most severe provisions at any time. Further, testimony and evidence presented by Defendants does not establish any specified exit gate or end

17

date to the emergency interventions. Rather, the record shows that Defendants view the presence of disease mitigation restrictions upon the citizens of Pennsylvania as a "new normal" and they have no actual plan to return to a state where all restrictions are lifted. It bears repeating; after six months, there is no plan to return to a situation where there are no restrictions imposed upon the people of the Commonwealth. Sam Robinson, a Deputy Chief of Staff to the Governor, testified as much when asked if there was a phase of reopening beyond the "green phase" where there would be no restrictions:

> Q. You can't move from green to no restrictions whatsoever? There's no way to do that under this system, right?

> A. So there are a number of options for, you know, what post green potentially could look like, and that could just be entirely removal of all restrictions or replacement with other restrictions, maybe not a color-coordinated system. There are certainly other options on the July 15[th] order that we've referenced from last week, certainly an approach that was a change that was not strictly speaking within the red/yellow/green framework as originally contemplated.

> And we are doing our best to respond to the pandemic nimbly and not being locked into a specific approach but to target areas where we see spread and things that we can do to balance the need to reopen the economy and continue moving Pennsylvania back towards the new normal that the governors and others have talked about while at the same time taking targeted mitigation steps to prevent the spread of the virus, which is what's embodied in that July 15[th] order.

> Q. What is the new normal? What does the governor mean by the new normal? What's that mean?

> A. Well, we're still evolving into it, but obviously it's more consciousness about steps to prevent the spread of COVID and ways that Pennsylvanians are having to be more conscious of those mitigation efforts and take steps to be responsible individually to protect fellow Pennsylvanians.

(ECF No. 75, pp. 70-71). Even when the existing restrictions are replaced, it appears to be the intent of Defendants to impose and/or keep in place some ongoing restrictions. Mr. Robinson testified that "early on it was sort of just assumed that beyond green was no restrictions, and that

may be ultimately where we get." (ECF No. 75, p. 75).  However, the position is now less clear in that Mr. Robinson hedged on whether any future period of no restrictions can be foreseen. (ECF No. 75, p. 76) ("at the point that we are ready to remove all of the restrictions, we will have a discussion about how specifically to do that. *It may be that the whole—you know, that whole system is replaced with just very limited restrictions*.") (emphasis added).

Courts are generally willing to give temporary deference to temporary measures aimed at remedying a fleeting crisis.  Wiley & Vladeck, *supra* p. 16, at 183.  Examples include natural disasters, civil unrest, or other man-made emergencies.[11]  There is no question, as Justice Alito reasoned in *Calvary Chapel*, that courts may provide state and local officials greater deference when making time-sensitive decisions in the maelstrom of an emergency.  But that deference cannot go on forever.  It is no longer March.  It is now September and the record makes clear that Defendants have no anticipated end-date to their emergency interventions.  Courts surely may be willing to give in a fleeting crisis.  But here, the duration of the crisis—in which days have turned into weeks and weeks into months—already exceeds natural disasters or other episodic emergencies and its length remains uncertain.  Wiley & Vladeck, *supra* page 16, at 184.  Faced with ongoing interventions of indeterminate length,[12] "suspension" of normal constitutional levels of scrutiny may ultimately lead to the suspension of constitutional liberties themselves.

---

[11] *See generally Moorhead v. Farrelly*, 727 F. Supp. 193 (D. V.I. 1989) (discussing the destruction resulting from Hurricane Hugo); *United States v. Chalk*, 441 F.2d 1277 (4th Cir. 1971) (discussing widespread civil unrest resulting from racial incident); *In re Juan C.*, 28 Cal.App.4th 1093 (Ca. 1994) (discussing measures implemented to combat widespread looting and violence resulting from Los Angeles rioting).

[12] It is true that under 35 Pa.C.S.A § 7301(c), the Governor's declaration of emergency, and related measures, will expire after ninety days.  However, the Governor is able to *sua sponte* issue a continued emergency declaration. In *Wolf v. Scarnati*, __A.3d__, 2020 WL 3567269 (Pa. Jul. 1, 2020), the Pennsylvania Supreme Court held that a vote of the legislature was powerless to vitiate the declaration, unless the governor signed off (as in normal legislation). *See id.* at *11

Second, ordinary constitutional scrutiny is necessary to maintain the independent judiciary's role as a guarantor of constitutional liberties—even in an emergency. While principles of balancing may require courts to give lesser weight to certain liberties for a time, the judiciary cannot abrogate its own critical constitutional role by applying an overly deferential standard.

While respecting the immediate role of the political branches to address emergent situations, the judiciary cannot be overly deferential to their decisions. To do so risks subordinating the guarantees of the Constitution, guarantees which are the patrimony of every citizen, to the immediate need for an expedient solution. This is especially the case where, as here, measures directly impacting citizens are taken outside the normal legislative or administrative process by Defendants alone. There is no question that our founders abhorred the concept of one-person rule. They decried government by fiat. Absent a robust system of checks and balances, the guarantees of liberty set forth in the Constitution are just ink on parchment. There is no question that a global pandemic poses serious challenges for governments and for all Americans. But the response to a pandemic (or any emergency) cannot be permitted to

---

("because H.R. 836 was not presented to the Governor, and, in fact, affirmatively denied the Governor the opportunity to approve or veto that resolution, H.R. 836 did not conform with the General Assembly's statutory mandate in section 7301(c) or with the Pennsylvania Constitution."). Thus, in practical effect, absent a veto-override, the Governor's orders can be reissued without limit. Professors Wiley & Vladeck recognized that this situation could lead to the situation of the permanent emergency: "[a]t least under federal law, emergencies, once declared, tend not to end; the President can unilaterally extend national emergency declarations on an annual basis in perpetuity, and can be stopped only by veto-proof supermajorities of both houses of Congress. And unless courts are going to rigorously review whether the factual justification for the emergency measure is still present[,] . . . the government can adopt measures that wouldn't be possible during "normal" times long after the true exigency passed." Wiley & Vladeck, *supra* page 16, at 187. On August 31, 2020, the Governor renewed the emergency declaration, extending his extraordinary authority for an additional ninety days. (ECF No. 73-1). Again, absent an extraordinary veto-proof vote of the General Assembly, there is no limit on the number of times the Governor may renew the declaration and vest himself with extraordinary unilateral powers.

undermine our system of constitutional liberties or the system of checks and balances protecting those liberties.  Here, Defendants are statutorily permitted to act with little, if any, meaningful input from the legislature.  For the judiciary to apply an overly deferential standard would remove the only meaningful check on the exercise of power.

Using the normal levels of constitutional scrutiny in emergency circumstances does not prevent governments from taking extraordinary actions to face extraordinary situations.  Indeed, an element of each level of scrutiny is assessing and weighing the purpose and circumstances of the government's act.  The application of normal scrutiny will only require the government to respect the fact that the Constitution applies even in times of emergency.  As the Supreme Court has observed: "[t]he Constitution was adopted in a period of grave emergency.  Its grants of power to the federal government and its limitations of the power of the States were determined in the light of emergency, and they are not altered by emergency." *Home Building & Loan Ass'n. v. Blaisdell*, 290 U.S. 398, 425 (1934).[13]  Ordinary constitutional scrutiny will be applied.

### 2) The gathering limits imposed by Defendants' orders violate the First Amendment.

---

[13] In a recent case brought in the Middle District of Pennsylvania, plaintiffs brought suit against Governor Wolf and others, contending that their constitutional rights were violated as a result of the Governor's Orders, and to that extent, requested the district court to temporarily restrain the enforcement of the Orders. *Benner v. Wolf*, ___F. Supp. 3d ____, 2020 WL 2564920, at *1-3 (M.D. Pa. May 21, 2020).  The district court addressed, *inter alia*, whether the Governor's Orders exceeded the permissible scope of his police powers, and in doing so, applied the deferential *Jacobson* standard of review. *Id.* at *6.  The district court held that the plaintiffs had failed to establish that the Orders were not "reasonably necessary" or "unduly burdensome" because they could not provide evidentiary support to contradict the defendant's broad policy decisions. *Id.*  The immediate case, however, is readily distinguishable because the Court now has the benefit of a developed evidentiary record, which includes specific reasoning and testimony from the parties.  The Court also recognizes that the Pennsylvania Supreme Court's decision in *Friends of Danny DeVito v. Wolf*,  227 A.3d 872 (Pa. 2020), addresses some of the federal constitutional issues presented in this case and the court reviewed those issues through a more deferential standard.  While the Pennsylvania Supreme Court is final on questions of Pennsylvania law, it does not bind the Court on federal questions.

Defendants' July 15, 2020 Order imposes limitations on "events and gatherings" of 25 persons for indoor gatherings and 250 persons for outdoor gatherings. The Order defines "events and gatherings" as:

> ***A temporary grouping of individuals for defined purposes, that takes place over a limited timeframe, such as hours or days.*** For example, events and gatherings include fairs, festivals, concerts, or shows and groupings that occur within larger, more permanent businesses, such as shows or performances within amusement parks, individual showings of movies on a single screen/auditorium within a multiplex, business meetings or conferences, or each party or reception within a multi-room venue.
>
> The term does not include a discrete event or gathering in a business in the retail food services industry addressed by Section 1 [of the July 15, 2020, Order].
>
> The maximum occupancy limit includes staff.

(ECF No. 48-5, Section 2) (emphasis added). The Order has no end-date or other mechanism for expiration, but rather, purports to remain in effect "until further notice." (ECF No. 48-5, Section 8). By its own language, the congregate gathering limitation imposed is broad—applying to any gathering of individuals on public or private property for any purpose—including social gatherings.[14] The July 15, 2020 Order is an amendment to the May 27, 2020 Order setting forth the parameters of the "green phase" of Defendants' reopening plan. The difference between the two orders is that the May 29, 2020 Order did not include the 25 person indoor limit, but rather provided: "[a]ny gathering for a planned or spontaneous event of greater than 250 individuals is prohibited." (ECF No. 42-58).

The gathering limits specifically exempt religious gatherings and certain commercial operations set forth in the Order and previous orders. Section 1 of the July 15, 2020 Order

---

[14] For example, the Governor's "Process to Reopen Pennsylvania" classifies the congregate limits in the category of "social restrictions." (ECF 42-81, p. 4). Mr. Robinson confirmed that they apply to purely personal or social gatherings, like weddings. (ECF No. 75, p. 54).

imposes an occupancy limit of twenty-five percent (25%) of "stated fire code maximum occupancy" for bars and, apparently, restaurants.  (ECF No. 48-5, Section 1).  The May 27, 2020 Order permits businesses (other than businesses in the retail food industry, personal services, such as barbers and salons, and gyms—all of which are given other guidance) to operate at either fifty percent (50%) or seventy-five percent (75%) of their building occupancy limits.  (ECF No. 42-58, Section 1).  Mr. Robinson confirmed that the gathering limits do not apply to normal business operations:

> [T]he 25-person restriction that we were discussing previously does not apply in the course of general business operations.  So you could have more than 25 people in that store.  There's no restriction of that sort that would be applicable, and I think we've tried to clarify that in many different forms, the sort of applicability of the occupancy restrictions—sorry.  The discrete event limits.
>
> But to the extent—and this is just to provide an overly full answer.  To the extent that a store had a special sales event or something of that sort, a product demonstration, they would be limited to 25 people in that specific instance.  But in any other instance there would be no applicable limit within the store for their general business beyond the kind of occupancy limits that would be in place.

(ECF No. 75, pp. 139-40).

The record is unclear as to whether the orders limiting the size of gatherings apply to protests.  The plain language of the orders makes no exception for protests, which seemingly run directly contrary to the plain language of the May 27, 2020 Order that states, "[a]ny gathering for a planned or spontaneous event of greater than 250 individuals."  (ECF No. 42-58).  However, the record unequivocally shows that Defendants have permitted protests, and that the Governor participated in a protest which exceeded the limitation set forth in his order and did not comply with other restrictions mandating social distancing and mask wearing.  (ECF No. 42-101).

Finally, Plaintiffs make much of the fact that Defendants have provided an exception to the congregate gathering limit as applied to a major event in central Pennsylvania referred to as

"Spring Carlisle," which is an auto show and flea market. (ECF 64). After being sued in the Pennsylvania Commonwealth Court because of the impact of the congregate limits on the event, Secretary Levine settled the action by giving a substantial exception for the event. Specifically, indoor occupancy was permitted up to an occupancy of 250 individuals or 50% of the maximum building occupancy. (ECF 64-1, p. 1). Outdoor occupancy was permitted up to 20,000 individuals, which is 50% of the normal capacity. (ECF No. 64-1, p. 2).

Plaintiffs argue that the limits on gatherings imposed by Defendants violate their right of assembly and their related right of free speech. Specifically, the Political Plaintiffs (Metcalfe, Mustello, Bonner and Kelly) contend that the gathering limits unconstitutionally violate their right to hold campaign gatherings, fundraisers, and other events. Each argued that the congregate gathering limitations hindered their ability to campaign and limited their ability to meet and connect with voters. By way of example, Congressman Kelly stated:

> We were also forced to cancel multiple fundraisers and dinners. In the past, these fundraisers have financed a significant portion of my campaigns, yet for this election I had to entirely forgo holding them. My campaign was also forced to cancel a political rally for me to speak to constituents due to both travel prohibitions and congregate rules.

(ECF No. 27, p. 2). On a similar note, Representative Mustello testified that a planned fundraiser had to be scrapped after the July 15, 2020 Order decreased indoor capacity to twenty-five (25) people. (ECF No. 74, pp. 166-67). She testified that she intended to host it outside, but she was concerned about the weather. (ECF No. 74, p. 167). Political Plaintiffs contend that the gathering limits unfairly target some gatherings, while permitting others—such as commercial gatherings or protests.

Defendants contend that the gathering limits pass constitutional muster because they are legitimate exercises of Defendants' police power in an emergency situation and are content-

neutral. (ECF No. 66, p. 24). They contend that "[e]ven in a traditional public forum, the government may impose content-neutral time, place and manner restrictions provided that the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alterative channels for communication of the information." (ECF No. 66, pp. 24-25) (citing *Startzell v. City of Philadelphia*, 533 F.3d 183, 197 (3d Cir. 2008)). Defendants argue that the restrictions leave open many different avenues of campaigning and communication, such as internet, mailings, yard signs, speaking to the press, television and radio. (ECF No. 66, p. 25). Finally, Defendants reject the contention that the stated (although not in the orders themselves) permission to attend protests constituted impermissible content-based distinctions on the applicability of the limits. They point to the fact that some of the Plaintiffs attended rallies and protests against Defendants' measures and that neither they nor other protesters were subject to enforcement action, "even when social distancing protocols are not adhered to." (ECF No. 66, p. 27) (citing *Benner v. Wolf*, __ F. Supp. 3d __, 2020 WL 2564920, at *8 (M.D. Pa. May 21, 2020)).

### a) *The Court will apply intermediate scrutiny to Plaintiffs' challenges.*

The Court must first determine what standard of constitutional scrutiny to apply to the congregate limits set forth in Defendants' orders. The right of assembly is a fundamental right enshrined in the First Amendment: "Congress shall make no law . . . abridging the freedom of speech, or of the press, or the right of the people to peaceably assemble, and to petition the Government for a redress of grievances." U.S. CONST. AMEND. 1, *in relevant part*. The right of assembly has long been incorporated to the States. *See DeJonge v. Oregon*, 299 U.S. 353, 259-260 (1937). Although the right to peaceably assemble is not coterminous with the freedom of

speech, they have been afforded nearly identical analysis by courts for nearly a century. *See generally* Nicholas S. Brod, *Rethinking a Reinvigorated Right to Assemble*, 63 DUKE L.J. 155 (2013). *See also DeJonge*, 299 U.S. at 364 ("The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental."); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (applying speech analysis to a gathering on the National Mall); *Shuttlesworth v. Birmingham*, 394 U.S. 147, 152-53 (1969) (While not "speech" in the purest sense of the word, gathering, picketing, and parading constitute methods of expression, entitled to First Amendment protection.).

In this case, some of the Plaintiffs seek to assemble relative to their campaigns for public office. This type of gathering is unquestionably expressive in nature and, therefore, neatly fits into the practice of looking at right of assembly challenges through the lens for free speech jurisprudence. This is the approach taken by the Eastern District of Kentucky in a recent case challenging COVID-19 congregate limits. *Ramsek v. Beshear*, ___F. Supp. 3d __, 2020 WL 3446249 (E.D. Ky. Jun. 24, 2020).[15]

*Ramsek*, like this case, was a challenge to the congregate limits imposed by the governor of Kentucky as applied to protests. Specifically, the plaintiffs argued that the limits violated their right to gather to protest elements of the governor's COVID-19 mitigation strategy. The *Ramsek* court explained that content-based time, place and manner restrictions on speech and gatherings are subject to strict scrutiny. *Id* at *7. "A content-based restriction on speech is one that singles out a specific subject matter for differential treatment." *Id.* (citing *Reed v. Town of*

---

[15] The congregate limits in question applied to "any event or convening that brings together groups of individuals, including, but not limited to, community, civic, public, leisure, faith-based, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities." *Ramsek*, at *8. The Order was subsequently amended to permit faith-based gatherings. *Id.* at *8 n.8.

*Gilbert, Ariz.*, 576 U.S. 155, 157 (2015)). Content-neutral time, place and manner restrictions, on the other hand, are afforded intermediate scrutiny. *Id.* (citing *Perry v. Educ. Ass'n v. Perry Local Educator's Ass'n.*, 460 U.S. 37, 46 (1983)) (content-neutral time, place and manner restrictions on speech are permissible to the extent that they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."). The *Ramsek* court ultimately decided to apply intermediate scrutiny—holding that the congregate restrictions were content-neutral because they applied to all gatherings for the purpose of speech, protest, and other expressive gathering. *Id.* at 9. In doing so, the *Ramsek* court rejected the argument that the restrictions were not content-neutral because people are permitted to gather in, for example, retail establishments, airports, and bus stations. It held that those activities were not apt comparisons because they do not constitute expressive conduct. *Id.* (citing *Dallas v. Stanglin*, 490 U.S. 19 (1989)).

The Court questions whether the *Ramsek* court, perhaps, conflated viewpoint neutrality and content neutrality or over-weighed the need for expression for assembly to fall under the First Amendment. Moreover, the instant Defendants' restrictions are more stringent than traditional time, place and manner restrictions in that they apply to all fora, not just public. Further, the Court wonders whether—in their breadth, the orders in question implicate the right of association—as a subbranch of First Amendment assembly jurisprudence. However, because it is an established trend, if not the rule, to apply speech jurisprudence in assembly cases, the Court will apply the same approach here.

The question before the Court is whether strict scrutiny or intermediate scrutiny should apply to Plaintiffs' challenge to the congregate gathering limits. Following free speech jurisprudence, Plaintiffs' challenge what are akin to time, place and manner restrictions. The

Court must determine whether the restrictions are content-based or content-neutral. To do so, the Court must first determine whether the limits ban certain types of expressive gathering (political and community meetings, gatherings, etc.), while permitting others (protests). To make that determination the Court must disentangle the language of Defendants' orders from their testimony. Sarah Boateng, the Executive Deputy Secretary of the Pennsylvania Department of Health, testified that protests are permitted under Defendants' orders: "the governor and the secretary did make some public comments about protests and religious services, you know, saying *that they have made those limited exceptions for those constitutionally protected speech, such as protests, and the individuals had the right to protest and demonstrate.*" (ECF No. 75, p. 176) (emphasis added). She was unable to specifically identify any specific statement or instrument amending the actual language of the orders. Having reviewed the record, the Court does not believe that the orders do, in fact, make allowance for protests. Their plain language makes no mention of protests and makes no distinction between expressive and other gatherings. The Court does not doubt Ms. Boateng's position, that the Governor and Secretary have made comments seemingly permitting protests or justifying the Governor's personal participation in them, but even under their broad emergency powers, Defendants cannot govern by comment. Rather, they are bound by the language of their orders. Those orders make no allowance for protests. As such, the orders apply to all expressive gatherings, across the board. To that end, they are content-neutral.

As in *Ramsek*, Plaintiffs make much of the fact that certain gatherings are limited by a specific quota, while people are free to congregate in stores and similar businesses based on a percentage of the occupancy limit. Does permitting people to gather for retail, dining, or other purposes based only upon a percentage of facility occupancy, while setting hard-and-fast caps on

other gatherings, constitute content-based restrictions?  The Supreme Court has explained that "the principle inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.*  Based on that definition, Defendants' orders are content-neutral.  Limiting people by number for the gatherings specified in the orders, while permitting commercial gatherings based only on occupancy percentage, is not content-based in that it has nothing to do with the "message" of any expressive behavior. *See Ramsek* at *9 (citing *Dallas,* 490 U.S. at 25) ("Unlike an individual protesting on the Capitol lawn, one who is grocery shopping or traveling is not, by that action, engaging in protected speech.").  Because the restrictions are content-neutral, Defendants' orders will be reviewed with intermediate scrutiny.

### b) *The congregate gathering restrictions fail intermediate scrutiny.*

Under First Amendment jurisprudence, a non-content-based restriction is not subjected to strict scrutiny, but still must be "narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." *Perry*, 460 U.S. at 45.  Here, the Court credits the fact that Defendants' actions were undertaken in support of a significant government interest—managing the effects of the COVID-19 pandemic in the Commonwealth. The congregate limitations fail scrutiny, however, because they are not narrowly tailored.

The Supreme Court explained that "the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 799 (quoting *United States v.*

*Albertini,* 472 U.S. 675, 689 (1985)) (citing *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 297 (1984)).  Further, "this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* Additionally, "a statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

Defendants' congregate limits are not narrowly tailored.  Rather, they place substantially more burdens on gatherings than needed to achieve their own stated purpose.  This is not a mere supposition of the Court, but rather, is highlighted by Defendants' own actions. While permitting commercial gatherings at a percentage of occupancy may not render the restrictions on other gatherings content-based, they do highlight the lack of narrow tailoring.  *See Ramsek*, at *10 ("retail stores, airports, churches and the like serve as an inconvenient example of how the Mass Gatherings Order fails at narrow tailoring.").   Indeed, hundreds of people may congregate in stores, malls, large restaurants and other businesses based only on the occupancy limit of the building.  Up to 20,000 people may attend the gathering in Carlisle (almost 100 times the approved outdoor limit!)—with Defendants' blessing.  Ostensibly, the occupancy restriction limits in Defendants' orders for those commercial purposes operate to the same end as the congregate gathering limits—to combat the spread of COVID-19.  However, they do so in a manner that is far less restrictive of the First Amendment right of assembly than the orders permit for activities that are more traditionally covered within the ambit of the Amendment— political, social, cultural, educational and other expressive gatherings.

Moreover, the record in this case failed to establish any evidence that the specific numeric congregate limits were necessary to achieve Defendants' ends, much less that "[they] target and eliminate no more than the exact source of the 'evil' [they] seek to remedy." *Frisby* 487 U.S.at 485. Mr. Robinson testified that the congregate limits were designed to prevent "mega-spreading events." (ECF No. 75, p. 56). However, when asked whether, for example, the large protests—often featuring numbers far in excess of the outdoor limit and without social distancing or masks—led to any known mega-spreading event, he was unable to point to a single mega-spreading instance. (ECF No. 75, p. 155) ("I am not aware specifically. I have not seen any sort of press coverage or, you know, CDC information about that. I have not seen information linking a spread to protests.").

Further, the limitations are not narrowly tailored in that they do not address the specific experience of the virus across the Commonwealth. Because all of Pennsylvania's counties are currently in the "green phase," the same restrictions apply to all. Pennsylvania has nearly fourteen million residents across sixty-seven counties. Pennsylvania has dense urban areas, commuter communities servicing the New York metropolitan area, small towns and vast expanses of rural communities. The virus's prevalence varies greatly over the vast diversity of the Commonwealth—as do the resources of the various regions to combat a population proportionate outbreak. Despite this diversity, Defendants' orders take a one-size fits all approach. The same limits apply in counties with a history of hundreds or thousands of cases as those with only a handful. The statewide approach is broadly, rather than narrowly, tailored.

The imposition of a cap on the *number* of people that may gather for political, social, cultural, educational and other expressive gatherings, while permitting a larger number for commercial gatherings limited only by a percentage of the occupancy capacity of the facility is

not narrowly tailored and does not pass constitutional muster. Moreover, it creates a topsy-turvy world where Plaintiffs are more restricted in areas traditionally protected by the First Amendment than in areas which usually receive far less, if any, protection. This inconsistency has been aptly noted in other COVID-19 cases. As recognized by the court in *Ramsek*, "it is the right to protest—through the freedom of speech and freedom of assembly clauses—that is constitutionally protected, not the right to dine out, work in an office setting, or attend an auction." *Id.* at *10. In an analogous situation examining restrictions on religious practice, while permitting retail operations, a court aptly observed that "[i]f social distancing is good enough for Home Depot and Kroger, it is good enough for in-person religious services which, unlike the foregoing, benefit from constitutional protection." *Tabernacle Baptist Church, Inc. v. Beshear*, __F. Supp. 3d__, 2020 WL 2305307, at *5 (E.D. Ky. May 8, 2020). The same applies here. The congregate limits in Defendants' orders are unconstitutional.

### 3) Defendants' orders violated Plaintiffs' rights to substantive due process under the Fourteenth Amendment.

Plaintiffs assert that the components of Defendants' orders closing "non-life-sustaining" businesses and imposing a lockdown violated their liberties guaranteed by the Due Process Clause of the Fourteenth Amendment. Substantive due process is not an independent right, but rather, a recognition that the government may not infringe upon certain freedoms enjoyed by the people as a component of a system of ordered liberty. Here, Plaintiffs assert two grounds whereby Defendants' orders violated substantive due process—in the imposition of a lockdown and in their closure of all businesses that they deemed to be "non-life-sustaining." While both issues fall under the general ambit of substantive due process, they implicate different underlying rights. As such, the Court will address Plaintiffs' substantive due process claims in two stages, first examining whether the component of Defendants' orders imposing a lockdown passes

constitutional muster and, then, proceeding to an examination of the business shutdown component.

### a)   *The stay-at-home provisions.*

Governor Wolf issued the first stay-at-home Order on March 23, 2020, mandating in relevant part:

> All individuals residing in the Commonwealth are ordered to stay-at-home except as needed to access, support or provide life sustaining business, emergency, or government services.  For employees of life sustaining businesses that remain open, the following child care services may remain open: group and family child care providers in a residence; child care facilities operating under a waiver granted by the Department of Human Services Office of Child Development and Early Learning; and part-day school age programs operating under an exemption from the March 19, 2020, business closure Orders.
>
> A list of life sustaining businesses that remain open is attached to and incorporated into this Order.  In addition, businesses that are permitted to remain open include those granted exemptions prior to or following the issuance of this Order.
>
> Individuals leaving their home or place of residence to access, support, or provide life sustaining services for themselves, another person, or a pet must employ social distancing practices as defined by the Centers for Disease Control and Prevention.  Individuals are permitted to engage in outdoor activities; however, gatherings of individuals outside of the home are generally prohibited except as may be required to access, support or provide life sustaining services as outlined above.

(ECF No. 42-15).   On April 1, 2020, the Order was later extended to all counties in the Commonwealth.  (ECF 42-30).  Although the initial stay-at-home Order had an expiration date of two weeks, it was amended by subsequent orders to extend to later dates.  (ECF Nos. 42-48, 42-50).  Ultimately, upon the moving of specified counties, and later all counties, into the "green phase," the stay-at-home requirements were "suspended."  The suspension is not a rescission, in that Defendants may reinstate the stay-at-home requirements, *sua sponte*, at any time.  Finally, the currently applicable orders, which maintain the stay-at-home provisions, albeit in suspension

of operation, have no end date, applying "until further notice." (ECF Nos. 42-58, 42-59, 42-65 through 42-75, 48-5).

Plaintiffs argue that the lockdowns effectuated by the stay-at-home orders violate their substantive due process rights secured by the Fourteenth Amendment. They contend that the orders do not impose traditional disease control measures, such as quarantine or isolation, but rather involuntarily, and without due process, confine the entire population of the Commonwealth to their homes absent a specifically approved purpose. Plaintiffs contend that the lockdown violated their fundamental right to intrastate travel and their freedom of movement. Plaintiffs further argue that, while the power to involuntarily confine individuals is generally strictly limited by law, Defendants' lockdown was overbroad and far exceeded legitimate government need and authority. They conclude that even compelling state interests "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (ECF No. 56, p. 14) (citing *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).

Defendants first argue that the suspension of the stay-at-home orders render their consideration in this case moot. Moreover, Defendants argue that the stay-at-home orders were not actually orders at all, but merely recommendations.[16] On a substantive basis, they argue that the stay-at-home orders survive constitutional scrutiny because they do not shock the conscience. (ECF No. 66, p. 12 *et seq.* ("The Business Plaintiffs . . . have not established a violation of a fundamental liberty interest and the Business Closure Orders and stay-at-home orders do not shock the conscience.")). They contend that "the touchstone of due process is protection of the

---

[16] The Court rejects out-of-hand any suggestion that the stay-at-home provisions of Defendants' orders were merely recommendations. The plain language of the orders shows that these provisions were mandates. Further, the record contains evidence of citations issued to Pennsylvania residents for violating the orders.

individual against arbitrary action of government" and that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." (ECF No. 66, p. 16) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1988)). Essentially, Defendants argue that both the stay-at-home orders and the business closure orders were a legitimate exercise of their emergency authority in "very quickly responding to a public health emergency, a pandemic, the likes of which had . . . never been seen in the Commonwealth or nationally, internationally, in 100 years . . . ." (ECF No. 66, p. 17) (quoting ECF No. 75, p. 26)).

In examining this issue, the Court was faced with three major questions—1) whether it can, and/or should, consider the constitutionality of the suspended stay-at-home provisions; if so; 2) what a lockdown is, from a legal and constitutional perspective and what type of constitutional analysis should be applied; and finally 3) whether a lockdown is constitutional.

### i. The Court may, and should, consider Plaintiffs' arguments about the stay-at-home provisions.

Defendants argue that the question of whether the stay-at-home provisions of orders are unconstitutional is moot.[17] According to Defendants, stay-at-home orders have been suspended in operation. As such, the citizens of the Commonwealth are free to leave their homes for any purpose. Likewise, Defendants contend that their reopening plan has permitted nearly all businesses to reopen, has eliminated the distinction between "life-sustaining" and "non-life-sustaining" businesses, and have only imposed certain operational restrictions on ongoing operations. Plaintiffs counter that the issues remain ripe for review because, according to language of the orders, the earlier, more restrictive, provisions are merely suspended, rather than

---

[17] There is no question that the ongoing restrictions on gatherings are ripe for review. The mootness question is directed at issues surrounding the suspended "stay-at-home' orders and the substantially amended business closure orders.

rescinded and Defendants retain the authority to reimpose any and all restrictions *sua sponte* and at any time.

The doctrine of mootness is rooted in Article III of the Constitution, which gives federal courts jurisdiction over "cases" and "controversies." Federal courts can only entertain actions if they present live disputes. *Summers v. Earth Island Inst.*, 555 U.S. 488, 492-94 (2009). The plaintiff in a federal action has the initial burden of showing a ripe dispute, but the burden will shift if a defendant asserts that some development has mooted elements of the plaintiff's claim. *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305 (3d. Cir. 2020). "If the defendant . . . claims that some development has mooted the case, it bears the heavy burden of persuading the court that there is no longer a live controversy." *Id.* at 305-06 (citing *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC) Inc.,* 528 U.S. 167, 189 (2000)). Although a change in circumstance *may* render a case moot, it will not *always* do so. "So, sometimes a suit filed on Monday will be able to proceed even if, because of a development on Tuesday, the suit would have been dismissed for lack of standing if it had been filed on Wednesday. The Tuesday development does not necessarily moot the suit." *Hartnett*, 963 F.3d at 306.

The "voluntary cessation" doctrine may serve as an exception to mootness. *Friends of the Earth*, 528 U.S. at 189 ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.") (citation omitted). As the Third Circuit explained,

> [o]ne scenario in which we are reluctant to declare a case moot is when the defendant argues mootness because of some action it took unilaterally after the litigation began. This situation is often called "voluntary cessation," and it "will moot a case only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"

36

*Hartnett*, 963 F.3d at 306 (citations omitted). Thus, "[w]hen a plaintiff seeks declaratory relief, a defendant arguing mootness must show that there is ***no reasonable likelihood*** that a declaratory judgment would affect the parties' future conduct." *Id.* (emphasis added).

Federal courts have applied the voluntary cessation doctrine in COVID-19 litigation to examine issues in governors' mitigation orders that were, seemingly, rendered moot by subsequent amendments to the orders. In *Elim Romanian Pentecostal Church et al. v. Pritzker*, 962 F.3d 341 (7th Cir. 2020), the plaintiffs challenged an order of the governor of Illinois restricting in-person religious services. After the case was filed, the governor replaced the original order with one lifting the restrictions (at least as to religious organizations). The Seventh Circuit Court of Appeals rejected the argument that the superseding order rendered moot the question of whether the revoked order violated the First Amendment. It observed that the governor could move back to the more restrictive measures at will and that the new order specifically reserved the right to do so. As such, the voluntary cessation doctrine precluded finding that the constitutional issues posed by the initial order were moot. *Elim Romanian*, 962 F.3d at 344-45.

In *Acosta v. Wolf*, 2020 WL 3542329 (E.D. Pa. June 30, 2020), the plaintiff challenged elements of Governor Wolf's emergency orders arguing, *inter alia*, that they hindered his ability to obtain the requisite number of signatures needed to appear on the ballot for United States Congress and seek an order placing him on the ballot. The district court rejected the argument that the promulgation of other, less restrictive orders rendered moot the claims. It stated:

> The "alleged violation" alleged today is the Governor's enforcement of the Commonwealth's signature requirement in light of the executive emergency orders to mitigate the COVID-19 pandemic. But even though the executive emergency orders cease on Saturday, June 5, there is still a "reasonable expectation" the Governor could reinstate the executive emergency orders or issue similar restrictive measures before the November 2020 election.

*Acosta*, at *2 n.7. The district court, therefore, proceeded to examine the plaintiff's complaint, but ultimately found that it failed to state claim upon which relief could be granted and was frivolous.

Here, the application of the voluntary cessation doctrine precludes a determination that the loosening of restrictions in subsequent orders renders moot Plaintiffs' constitutional challenges to elements of Defendants' March 19, 2020 Business Closure Orders and the March 23, 2020 Stay-at-Home Orders. The language of all subsequent orders merely amends the operation of those orders. It does not completely abrogate them. They remain in place, incorporated into the existing orders and are only "suspended."[18] Mr. Robinson specifically testified:

> Q. As we sit here today, is there a stay-at-home order in place?

> A. There is—there is a stay-at-home order in place, but it has been modified by the subsequent orders that have been put out.

(ECF No. 75, p. 144). He testified, regarding both the stay-at-home and the business closure provisions of Defendants' orders that "it is possible that some of these [provisions] could be reinstated." (ECF No. 75, p. 38). The language of the orders and the explanation offered by Defendants' witnesses makes clear that the people of the Commonwealth remain subject to a stay-at-home order. Although that order is suspended in operation, it remains incorporated into the most recent mitigation orders issued by Defendants and can, at their will, be reinstated to full

---

[18]     Q.     So in the green phase, which all of Pennsylvania is in today—in the green phase here is not an elimination of the stay-at-home order but, rather, a suspension of the stay-at-home order; is that correct?
         A.     That is correct.

(ECF No. 75, pp. 36-37).

effect.  There is no question that under the voluntary cessation doctrine the Court can examine the issue, which remains fully ripe for review.

The Court is cognizant that the voluntary cessation doctrine may create some tension with a principle of judicial restraint—that courts should generally, when possible, avoid constitutional issues.   However, courts have a duty to fully examine and address issues legitimately brought to them by the parties and failure to do so in the name of restraint may very well constitute a dereliction of duty.  *See Citizens United v. FEC*, 558 U.S. 310, 329 (2010) ("It is not judicial restraint to accept an unsound, narrow argument just so the Court can avoid another argument with broader implications.  Indeed, a court would be remiss in performing its duties were it to accept an unsound principle merely to avoid the necessity of making a broader ruling.").

Here, the Court cannot, consistent with its most fundamental duties, avoid addressing the issues raised by Plaintiffs relating to the stay-at-home orders.  The record is unequivocal that those orders, albeit suspended, remain in place.  In other words, all of Plaintiffs and, indeed, all of the citizens of the Commonwealth continue to be subject to stay-at-home orders that can be reinstated at the will of Defendants.  Moreover, the specter of future, reinstated lockdowns remains a concern for Plaintiffs and continues to hang over the public consciousness.  The Court is compelled, therefore, to address whether such lockdowns comply with the United States Constitution.

### ii. Broad population lockdowns are unprecedented in American law.

To determine whether Defendants' stay-at-home orders are constitutional the Court must, as in all cases, determine which level of scrutiny should apply. To do so, the Court has to determine what a population lockdown, the effect of the stay-at-home orders, is from a legal perspective. This is not necessarily an easy task. Although this nation has faced many epidemics and pandemics and state and local governments have employed a variety of interventions in response, there have never previously been lockdowns of entire populations—much less for lengthy and indefinite periods of time.

One term that has frequently been employed to describe the lockdowns is "quarantine." Quarantines have been used throughout history to slow the spread of infectious diseases by isolating the infected and others exposed to the disease. Statutes enabling quarantine in times of disease date to colonial times. *See* Laura K. Donohue, *Biodefense and Constitutional Constraints*, 4 U. MIAMI NAT'L SEC. & ARMED CONFLICT L. REV. 82, 94 (2013-2014). Pennsylvania employed quarantine provisions from the time of William Penn—mainly directed at passengers and cargo from incoming ships. *Id.* at 104-106.[19] Following independence, the states, including Pennsylvania, continued to maintain and, when necessary, employ quarantine powers. Those powers are currently set forth in the Pennsylvania Disease Prevention and Control Law of 1955. The statute empowers the state board of health to issue rules and regulations regarding quarantine and for the state, as well as local boards or departments of

---

[19] Interestingly, William Penn ensured that Pennsylvania's use of quarantine was less severe than he had witnessed in London where, he observed, the effects of quarantine were disproportionately harmful to the poor. *Id.* at 104-06, (quoting CATHERINE UWENS PEARE, WILLIAM PENN: A BIOGRAPHY, 48-51 (1957)) ("[In London] Families with plague cases were boarded up into their houses for forty days without sufficient resources. Door upon door bore the great placard with its red cross and the plea, 'Lord have mercy upon us!'").

health, to impose a quarantine, when necessary.  35 P.S. 521.3, 521.5, 521.16.   The statute

defines "quarantine" as:

> **Quarantine.** The limitation of freedom of movement of persons or animals who
> have been exposed to a communicable disease for a period of time equal to the
> longest usual incubation period of the disease in such manner as to prevent
> effective contact with those not so exposed. Quarantine may be complete, or, as
> defined below, it may be modified, or it may consist merely of surveillance or
> segregation.
>
> (1) Modified quarantine is a selected, partial limitation of freedom of movement,
> determined on the basis of differences in susceptibility or danger of disease
> transmission, which is designed to meet particular situations. Modified
> quarantine includes, but is not limited to, the exclusion of children from
> school and the prohibition or the restriction of those exposed to a
> communicable disease from engaging in particular occupations.
>
> (2) Surveillance is the close supervision of persons and animals exposed to a
> communicable disease without restricting their movement.
>
> (3) Segregation is the separation for special control or observation of one or more
> persons or animals from other persons or animals to facilitate the control of a
> communicable disease.

35 P.S. 521.2.

The plain language of the statute makes clear that the lockdown effectuated by the stay-

at-home orders is not a quarantine.  A quarantine requires, as a threshold matter, that the person

subject to the "limitation of freedom of movement" be "exposed to a communicable disease."

*Id.*  Moreover, critically, the duration of a quarantine is statutorily limited to "a period of time

equal to the longest usual incubation period of the disease."  The lockdown plainly exceeded that

period.  Indeed, Defendants' witnesses, particularly Ms. Boateng, conceded upon examination

that the lockdown cannot be considered a quarantine.  (ECF No. 75, p. 209) (Q: "And you agree

with me that the governor's order and the secretary's stay-at-home orders are not isolation orders

and are not quarantine orders?" A: "I would agree with that."). Rather, Defendants simply classify the order as "public health mitigation." (ECF No. 75, p. 209).[20]

Defendants attempt to justify their extraordinary "mitigation" efforts by pointing to actions taken to combat the Spanish Flu pandemic a century ago. Ms. Boateng testified that, in response to the Spanish Flu, "much of the same mitigation steps were taken then, the closing of bars, saloons, cancellation of vaudeville shows, as they called them, and cabarets, the prohibition of large events. So some of these same actions that we're taking now had been taken in the past." (ECF No. 75, pp. 203-04). But an examination of the history of mitigation efforts in response to the Spanish Flu—by far the deadliest pandemic in American history—reveals that nothing remotely approximating lockdowns were imposed.

Records show that on October 4, 1918, Pennsylvania Health Commissioner B. Franklin Royer imposed an order which closed "all public places of entertainment, including theaters, moving picture establishments, saloons and dance halls and prohibit[ed] all meetings of every

---

[20] Even if the lockdown effectuated by the stay-at-home order could be classified as a quarantine, it would nevertheless far exceed the traditional understanding of a state's quarantine power. State quarantine power, "although broad, is subject to significant constitutional restraints." Wendy E. Parmet, *Quarantining the Law of Quarantine: Why Quarantine Law Does Not Reflect Contemporary Constitutional Law*, 9 WAKE FOREST J.L. & POL'Y 1, 4 (2018). The power to subject a citizen to quarantine is subject to both procedural and substantive due process restraints. "At a minimum, these include the requirement that quarantine be imposed only when it is necessary for public health (or is the least-restrictive alternative) and only when it is accompanied by procedural due process protections, including notice, the right to a hearing before an independent decision-maker either before or shortly after confinement, the right to counsel, and the requirement that the state prove its case with clear and convincing evidence." *Id.* at 4 (internal citations omitted). Defendants' stay-at-home orders imposed a statewide lockdown on every resident of the Commonwealth that included none of these basic constitutional safeguards.

description until further notice."[21]  The order left to local officials the decision on whether to cancel school and/or religious services.  The restrictions were lifted on November 9, 1918.[22]  A comparative study of nonpharmaceutical interventions used in various U.S. cities in 1918-19 shows that state and local mitigation measures were of similarly short durations across the nation.[23]  While, unquestionably, states and local governments restricted certain activities for a limited period of time to mitigate the Spanish Flu, there is no record of any imposition of a population lockdown in response to that disease or any other in our history.[24]

Not only are lockdowns like the one imposed by Defendants' stay-at-home orders unknown in response to any previous pandemic or epidemic, they are not as much as mentioned in recent guidance offered by the Centers for Disease Control and Prevention ("CDC").  For example, the *Community Mitigation Guidelines to Prevent Pandemic Influenza—United States, 2017* offers guidelines "to help state, tribal, local, and territorial health departments with pre-

---

[21] *Sweeping Order Issued by State Health Director*, PITTSBURGH POST, Oct. 4, 1918, at 1, https://newscomwc.newspapers.com/image/87692411; https://newscomwc.newspapers.com/image/14397438.

[22] *See* Edwin Kiester Jr., *Drowning in their Own Blood*, PITTMED, Jan. 2003, at 23, https://www.pittmed.health.pitt.edu/Jan_2003/PITTMED_Jan03.pdf.

[23] Howard Markel et al., *Nonpharmaceutical Interventions Implemented by US Cities During the 1918-1919 Influenza Pandemic*, 298 JAMA 644, 647 (2007).  The total duration of nonpharmaceutical interventions imposed by state and local mandate for Philadelphia and Pittsburgh were 51 and 53 days, respectively. *Id.* at 647, Table 1.  This length was, generally, representative of the duration of interventions in most cities. *Id.*  Seattle had the longest period of restrictions, nationwide, at 168 days from start to finish.

[24] *See also* Greg Ip, *New Thinking on Covid Lockdowns: They're Overly Blunt and Costly*, WALL ST. J., Aug. 24, 2020 ("Prior to Covid-19, lockdowns weren't part of the standard epidemic tool kit, which was primarily designed with flu in mind.  During the 1918-1919 flu pandemic, some American cities closed schools, churches and theaters, banned large gatherings and funerals and restricted store hours.  But none imposed stay-at-home orders or closed all nonessential businesses.  No such measures were imposed during the 1957 flu pandemic, the next-deadliest one; even schools stayed open.").

pandemic planning and decision-making by providing updated recommendations on the use of NPIs [non-pharmaceutical interventions]."[25] It recommends an array of personal protective measures (i.e. staying home when sick, hand hygiene and routine cleaning) and community level NPI measures that may be taken by state and local authorities. *Id.* at 2. The community level interventions include "temporary school closures and dismissals, social distancing in workplaces and the community, and cancellation of mass gatherings." *Id.* There are no recommendations in the document that even approximate the imposition of statewide (or even community wide) stay-at-home orders or the closure of all "non-life-sustaining" businesses. Indeed, even for a "Very High Severity" pandemic (defined as one comparable to the Spanish Flu), the guidelines provide only that "CDC recommends *voluntary* home isolation of ill persons," and "CDC might recommend *voluntary* home quarantine of exposed household members in areas where novel influenza circulates." *Id.* at 32, Table 10 (emphasis added). This is a far, far cry from a statewide lockdown such as the one imposed by Defendants' stay-at-home orders.

The fact is that the lockdowns imposed across the United States in early 2020 in response to the COVID-19 pandemic are unprecedented in the history of our Commonwealth and our Country. They have never been used in response to any other disease in our history. They were not recommendations made by the CDC. They were unheard of by the people this nation until just this year. It appears as though the imposition of lockdowns in Wuhan and other areas of China—a nation unconstrained by concern for civil liberties and constitutional norms—started a domino effect where one country, and state, after another imposed draconian and hitherto untried measures on their citizens. The lockdowns are, therefore, truly unprecedented from a legal perspective. But just because something is novel does not mean that it is unconstitutional. The

---

[25] Noreen Qualls et al., *Community Mitigation Guidelines to Prevent Pandemic Influenza—United States, 2017* 2 (Sonja A. Rasmussen et al. eds., 2017).

Court will next attempt to apply established constitutional principles to examine this unfamiliar situation.

### iii. The stay-at-home provisions of Defendants' orders are unconstitutional.

Plaintiffs argue that the lockdown implemented by the stay-at-home provisions of Defendants' orders violated the substantive due process guarantees of the Fourteenth Amendment. Specifically, they contend that it infringes upon the right to intrastate travel that has been suggested by precedent of the Supreme Court[26] and specifically adopted by the Third Circuit in *Lutz v. City of York*, 899 F.2d 255 (3d Cir. 1990). In *Lutz*, the Third Circuit examined a municipal ordinance regulating car cruising and unequivocally held that "the right to move freely about one's neighborhood or town, even by automobile, is indeed, 'implicit in the concept of ordered liberty' and 'deeply rooted in the Nation's history.'" *Id.* at 268.

The Third Circuit considered what level of scrutiny should be applied to the right to intrastate travel and rejected the argument that strict, rather than intermediate scrutiny should apply:

> Not every governmental burden on fundamental rights must survive strict scrutiny, however. We believe that reviewing all infringements on the right to travel under strict scrutiny is just as inappropriate as applying no heightened scrutiny to any infringement on the right to travel not implicating the structural or federalism-based concerns of the more well-established precedents.

*Id.* at 269. By applying intermediate scrutiny, it allowed for the right to travel, like speech, to be subject to reasonable time, place and manner restrictions. *Id.*

---

[26] *Williams v. Fears*, 179 U.S. 270, 274 (1900) ("Undoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any state is a right secured by the 14th Amendment and by other provisions of the Constitution.").

The Court wonders whether the lockdown effectuated by the stay-at-home provisions of Defendants' orders are of such a different character than the municipal car cruising ordinance as would warrant the imposition of strict scrutiny. There is no question that requiring all citizens of the Commonwealth to stay-at-home unless they have a reason to go out approved by Defendants' orders is a far greater burden on personal autonomy than the situation in *Lutz*. In that case, the drivers were not precluded from leaving home and driving around town, but they were merely restricted from certain practices at certain times, not unlike many other traffic control policies. Herein, the stay-at-home orders strictly limited the right of movement, confining citizens to their homes unless they had a specific permissible reason to leave enumerated in Defendants' orders. Thus, the stay-at-home orders impacted liberties not merely limited to the act of traveling, but the very liberty interests arising from the fruits of travel, such as the right of association and even the right to privacy—i.e., the right simply to be left alone while otherwise acting in a lawful manner. Our Courts have long recognized that beyond the right of travel, there is a fundamental right to simply be out and about in public. *City of Chicago v. Morale*, 527 U.S. 41, 53-54 (1999) (striking down an antiloitering ordinance aimed at combatting street gangs and observing that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment."). *See also Papachristou v. Jacksonville*, 405 U.S. 156, 164-65 (1972) (citing a Walt Whitman poem in extolling the fundamental right to loiter, wander, walk or saunter about the community); *Bykofsly v. Borough of Middletown*, 429 U.S. 964 (1976) (Marshall, J., dissenting) ("The freedom to leave one's house and move about at will is of the very essence of a scheme of ordered liberty, . . . and hence is protected against state intrusions by the Due Process Clause of the Fourteenth Amendment.") (internal citation and quotation marks omitted)); *Waters v. Barry*, 711 F. Supp. 1125, 1134 (D.D.C. 1989) (referencing *Papachristou*

and stating "[t]he right to walk the streets, or to meet publicly with one's friends for a noble purpose or for no purpose at all—and to do so whenever one pleases—is an integral component of life in a free and ordered society.").

While the Third Circuit applied intermediate level scrutiny to the limited time, place and manner restrictions on the right to intrastate travel imposed by the ordinance at issue, there are substantial grounds to hold that strict scrutiny should apply to the stay-at-home provisions of Defendants' orders. The intrusions into the fundamental liberties of the people of this Commonwealth effectuated by these orders are of an order of magnitude greater than any of the ordinances examined in right to travel cases, loitering and vagrancy cases or even curfew cases. Defendants' stay-at-home and business closure orders subjected every Pennsylvanian to a lockdown where he or she was involuntarily committed to stay-at-home unless he or she was going about an activity approved as an exception by the orders. This is, quite simply, unprecedented in the American constitutional experience.

The orders are such an inversion of the usual American experience that the Court believes that no less than the highest scrutiny should be used. However, the Court holds that the stay-at-home orders would even fail scrutiny under the lesser intermediate scrutiny used by the Third Circuit in *Lutz*. A critical element of intermediate scrutiny is that the challenged law be narrowly tailored so that it does "not burden more conduct than is reasonably necessary." *Assoc. of New Jersey Rifle and Pistol Clubs, Inc. v. Attorney General New Jersey*, 910 F.3d 106, 119 (3d. Cir. 2018). The stay-at-home orders far exceeded any reasonable claim to be narrowly tailored. Defendants' orders subjected every Pennsylvanian to a lockdown where he or she was involuntarily committed to stay-at-home unless he or she was going about an activity approved as an exception by the orders. Even in the most recent, and currently applicable, iteration of

Defendants' orders, while the operation of the stay-at-home provisions is "suspended," it is not rescinded and may be re-imposed at any time at the sole discretion of Defendants. Thus, Defendants' orders have created a situation where the *default* position is lockdown unless suspended at their will. When in place, the stay-at-home order requires a *default* of confinement at home, unless the citizen is out for a purpose approved by Defendants' orders. Moreover, this situation applied for an indefinite period of time. This broad restructuring of the default concept of liberty of movement in a free society eschews any claim to narrow tailoring.

In addition, the lack of narrow tailoring is highlighted by the fact that broad, open-ended population lockdowns have *never* been used to combat any other disease. In other words, in response to *every* prior epidemic and pandemic (even more serious pandemics, such as the Spanish Flu) states and local governments have been able to employ other tools that did not involve locking down their citizens. Although it is the role of the political branches to determine which tools are suitable to address COVID-19, the 2017 CDC guidance highlights the fact that governments have access to a full menu of individual and community interventions that are not as intrusive and burdensome as a lockdown of a state's population. Finally, the Court observes that the suspension of the operation of the stay-at-home order highlights that it "burdens more conduct than is reasonably necessary." In other words, Defendants are currently using means that are less burdensome to the rights of a free people.

The Court declares, therefore, that the stay-at-home components of Defendants' orders were and are unconstitutional. Broad population-wide lockdowns are such a dramatic inversion of the concept of liberty in a free society as to be nearly presumptively unconstitutional unless the government can truly demonstrate that they burden no more liberty than is reasonably

necessary to achieve an important government end. The draconian nature of a lockdown may render this a high bar, indeed.

### b) The business shutdown components of Defendants' orders violate the Due Process clause of the Fourteenth Amendment.

The Business Plaintiffs further argue that the business closure orders violated the Due Process Clause. The Order states, in relevant part: "[n]o person or entity shall operate a place of business in the Commonwealth that is not a life-sustaining business regardless of whether the business is open to members of the public." (ECF No. 42-3, Section 1). The Order attached a list of "life-sustaining" businesses that were permitted to stay open. Defendants also set up a waiver system, whereby a business deemed to be "non-life-sustaining" could request permission to continue operations. (ECF No. 38, p. 2). Defendants decided to close the waiver process on April 3, 2020, largely because of an overwhelming number of requests. (ECF No. 38, p. 4; ECF No. 75, pp. 227-31). The record shows that Defendants never had a set definition in writing for what constituted a "life-sustaining" business. Rather, their view of what was, or was not, "life-sustaining" remained in flux. (ECF No. 75, pp. 97-98). Finally, the record shows that the definition of "life-sustaining" continued to change, even after the waiver process closed. The Business Plaintiffs argue that all of these facts highlight the constitutional infirmity of the business shutdown.

As with the lockdown, Defendants' shutdown of all "non-life-sustaining" businesses is unprecedented in the history of the Commonwealth and, indeed, the nation. While historical records show that certain economic activities were curtailed in response to the Spanish Flu pandemic, there has never been an instance where a government or agent thereof has *sua sponte* divided every business in the Commonwealth into two camps—"life-sustaining" and "non-life-sustaining"—and closed all of the businesses deemed "non-life-sustaining" (unless that business

obtained a discretionary waiver). The unprecedented nature of the business closure—even in light of historic emergency situations—makes its examination difficult from a constitutional perspective. It simply does not neatly fit with any precedent ever addressed by our courts. Never before has the government exercised such vast and immediate power over every business, business owner, and employee in the Commonwealth. Never before has the government taken a direct action which shuttered so many businesses and sidelined so many employees and rendered their ability to operate, and to work, solely dependent on government discretion. As with the analysis of lockdowns, the unprecedented nature of the business shutdowns poses a challenge to its review. Nevertheless, having reviewed this novel issue in light of established Due Process principles, the Court holds that the business closure orders violated the Fourteenth Amendment.

### i. *The challenges to the business closures remain ripe for review.*

As with the stay-at-home component of Defendants' orders, the business closure provisions remain reviewable under the voluntary cessation doctrine. The business closure orders were never rescinded. Rather, they are merely suspended. Specifically, the May 7, 2020 Order outlining the movement of certain counties from the "red phase" to the "yellow phase" provides: "[m]y order directing the 'Closure of All Businesses That are not Life Sustaining' issued March 19, 2020, as subsequently amended, is *suspended* for the following counties . . . ." (ECF No. 42-52, Section 1:A) (emphasis added). The language of the Order makes clear that it provides no guarantee of permanence in that it states: "[w]hereas, it is necessary to relax some of the requirements of the aforementioned orders *for a period of time* as part of a gradual and strategic return to work." (ECF No. 42-52) (emphasis added). Following orders moving counties into the "green phase," likewise, state that the orders closing "non-life-sustaining" businesses are "suspended." (*See* e.g. ECF No. 42-58, Section 1:A). Mr. Robinson confirmed

50

that the orders remain suspended and "it is possible that some of these provisions could be reinstated." (ECF No. 75, p. 38). Thus, Defendants' orders closing all "non-life-sustaining" businesses, imposed by them *sua sponte*, suspended by them *sua sponte*, and susceptible to *sua sponte* re-imposition at any time are appropriately before the Court.

> ii.    **The Fourteenth Amendment guarantees a citizen's right to support himself by pursuing a chosen occupation.**

The Business Plaintiffs argue that the business shutdown orders violated their right to substantive due process under the Fourteenth Amendment. Specifically, they contend that the designation of some businesses—including all of their businesses—as "non-life-sustaining" and closing them violated their right to "engage in the common occupations of life" and to engage in the pursuit of his or her "chosen profession free from unreasonable governmental interference." (ECF No. 56, p. 7 *et seq.*) (citing *McCool v. City of Philadelphia*, 497 F. Supp. 2d 307, 328 (E.D. Pa. 2007)). Defendants counter that the Fourteenth Amendment does not guarantee "any fundamental right to earn a living." (ECF No. 66, p. 15). They argue that Plaintiffs read too much into precedent that generally references the right of citizens to pursue their chosen occupations, that mere economic regulation is given little scrutiny and, that Plaintiffs were not deprived of any protected liberty interest, but rather, just temporarily prevented from operating their businesses. (ECF No. 66, pp. 14-16). Thus, Defendants argue that Plaintiffs' substantive due process claims should be rejected.

The Due Process Clause of the Fourteenth Amendment includes a substantive component that bars arbitrary, wrongful, government action "regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Contrary to Defendants' argument, the right of citizens to support themselves by engaging in a chosen occupation is deeply rooted in our nation's legal and cultural history and has long been

recognized as a component of the liberties protected by the Fourteenth Amendment. Over a century ago, the Supreme Court recognized that "[i]t requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax v. Raich*, 239 U.S. 33, 41 (1915) (holding that a state anti-alien labor statute violated both equal protection and due process). Later, in striking down a law banning the teaching of foreign languages in school, the Supreme Court observed that the Fourteenth Amendment guaranteed the right, *inter alia*, "to engage in any of the common occupations of life . . . ." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). The emphasis given to economic substantive due process reached its apex in the *Lochner* era, *Lochner v. New York*, 198 U.S. 45 (1905), and was considerably recalibrated and de-emphasized by the New Deal Supreme Court and later jurisprudence. Nevertheless, our Supreme Court has never repudiated the recognition that a citizen has the right to work for a living and pursue his or her chosen occupation.

The Third Circuit has recognized "[t]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within both the 'liberty' and the 'property' concepts of the Fifth and Fourteenth Amendments." *Piecknick v. Comm. of Pa.*, 36 F.3d 1250, 1259 (3d. Cir. 1994) (citing *Green v. McElroy*, 360 U.S. 474, 492 (1959); *Truax*, 239 U.S. at 41). However,

> [t]he Constitution only protects this liberty from state actions that threaten to deprive persons of the right to pursue their chosen occupation. State actions that exclude a person from one particular job are not actionable in suits . . . brought directly under the due process clause. It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment.

*Id.* (internal citations and quotation marks omitted). There is no question, then, that the Fourteenth Amendment recognizes a liberty interest in citizens—the Business Plaintiffs here—to

pursue their chosen occupation.  The dispositive question is not whether such a right exists, but rather, the level of infringement upon the right that may be tolerated.

Although federal courts have recognized the existence of a substantive due process right of a citizen to pursue a chosen occupation for over a century, there is little specific analysis on how that right should be weighed and what sort of test should be applied to allegedly infringing conduct.  As a matter of general consensus, courts generally treat government action purportedly violating the right to pursue an occupation in the same light as economic legislation and use the general standard of review applied to substantive due process claims.  In reviewing a substantive due process claim, the "criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a government officer that is at issue."  *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998).  "Specific acts" are also known as "executive acts" in substantive due process jurisprudence.  The Third Circuit has explained that "executive acts, such as employment decisions, typically apply to one person or to a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society."  *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 n.1 (3d. Cir. 2000).  Substantive due process challenges to a legislative act are reviewed under the rational basis test.  *Am. Exp. Travel Related Serv's., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d. Cir. 2012).[27]

---

[27] In recent years, a growing chorus of cases and commentators have questioned whether the general deference afforded to economic regulations of the right to pursue one's occupation should be reexamined, and that governmental action be subjected to greater scrutiny.  *See generally*, Rebecca Haw Allensworth, *The (Limited) Constitutional Right to Compete in an Occupation*, 60 WM. & MARY L. REV. 1111 (2019); *see also* Timothy Sandefur, *The Right to Earn a Living*, 6 CHAP. L. REV. 207, 208 (2003).  The latest focus on governmental action impacting the right to earn a living centers upon occupational licensing schemes.  Professor Allensworth observed, "[w]ithin the movement [to reinvigorate protections on the right to pursue an occupation] there is disagreement about what doctrinal changes are needed to resurrect this once-vibrant right.  Some call for a revision of the rational basis test that would place a heavier burden on the government to justify economic regulation as 'rational.'  Others see the rational

Before proceeding to applicable constitutional scrutiny, the Court will address the fact that, as Defendants point out, the closures of "non-life-sustaining" businesses was only temporary. Defendants hold that this precludes a claim that the closures violated the Fourteenth Amendment. Although the closures were ultimately "suspended" after a period of approximately two months (for businesses in some counties and longer for businesses in other counties), the March 19, 2020 Order has no end date. Rather, it is open-ended, remaining "in effect until further notice." (ECF No. 42-3). Moreover, even the subsequent orders suspending (not rescinding) the shutdown of "non-life-sustaining" businesses recognize only that "it is necessary to relax some of the requirements of the aforementioned orders *for a period of time* as part of a gradual and strategic return to work." (ECF No. 42-52). A total shutdown of a business with no end-date and with the specter of additional, future shutdowns can cause critical damage to a business's ability to survive, to an employee's ability to support him/herself, and adds a government-induced cloud of uncertainty to the usual unpredictability of nature and life.

Evidence of record shows that the impact of the shutdown, even though temporary, was immediate and severe on the Business Plaintiffs. For example, R.W. McDonald & Sons, a small business, estimates that it "lost approximately $300,000 in revenue[,]" and that its business has been "financially devastated." (ECF No. 30, p. 2). R.W. McDonald expressed ongoing concern that the restrictions may be re-imposed, which could be fatal. Plaintiffs Chris and Jody

---

basis test as beyond salvation and call for a different tier of review, such as intermediate scrutiny, for economic rights such as the right to be free from unreasonable licensing laws." Allensworth, *supra,* at 1128. *See also* Alexandra L. Klein, *The Freedom to Pursue a Common Calling: Applying Intermediate Scrutiny to Occupational Licensing Statutes,* 73 WASH. & LEE L. REV. 411 (2016). There is no question that occupational licensing requirements and other, similar, restrictions on the right to pursue one's occupation are considerably different than a state-wide shutdown of all businesses deemed to be "non-life-sustaining." This is, perhaps, a case where the level of interference with the citizens' right to earn a living was so immediate and severe as to warrant a heightened level of scrutiny.

Bertoncello-Young explained that the losses to their small salon exceeded $150,000 and that they depleted their entire emergency fund to pay expenses that came due when their business was required to remain closed. (ECF No. 32, p. 3). The Bertoncello-Youngs also expressed concern about re-imposition of the restrictions. (ECF No. 30, p. 4). It matters little to a business owner or employee that Defendants intended for the restrictions to be temporary. They were, and remain, open-ended and subject to imposition at the sole discretion of Defendants. The fact that Plaintiffs' businesses were only temporarily shutdown does not preclude a finding that the shutdown violated their liberty interests. The nature of a state-wide shut down of "non-life-sustaining" business is such an immediate and unprecedented disruption to businesses and their employees as to warrant constitutional review.

The Supreme Court has recognized that the "core of the concept" of substantive due process is the protection against arbitrary government action. *Lewis*, 523 U.S. at 845 (citing *Hurtado v. California*, 110 U.S. 516, 527 (1884)).[28] Indeed, "the touchstone of due process is protection of the individual against arbitrary actions of government . . . ." *Id.* Rational basis review is a forgiving standard for government acts, but it "is not a toothless one . . . ." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). As a general matter, the rational basis test requires only that the governmental action "bear[] a rational relationship to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Conversely, actions which are irrational, arbitrary or capricious do not bear a rational relationship to any end. *Cty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 169 (3d. Cir. 2006) (quoting *Pace Resources, Inc., v. Shrewsbury Twp.*, 808 F.2d 1023,

---

[28] "As to the words from Magna Charta, incorporated into the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at last settled down to this: that they were intended to secure the individual from the arbitrary exercise of powers of government, unrestrained by the established principles of private right and distributive justice." *Lewis*, 523 U.S. at 845.

1035 (3d Cir. 1987)) ("Thus, for appellants' facial substantive due process challenge to the Ordinance to be successful, they must 'allege facts that would support a finding of arbitrary or irrational legislative action by the Township.'"). Even with this forgiving standard as its guide, the Court nevertheless holds that the March 19, 2020 Order closing all "non-life-sustaining" businesses was so arbitrary in its creation, scope and administration as to fail constitutional scrutiny.

The record shows that the Governor's advisory team, which designated the Business Plaintiffs and countless other businesses throughout the Commonwealth as "non-life-sustaining" and, thereby, closing them, did so with no set policy as to the designation and, indeed, without ever formulating a set definition for "life-sustaining" and, conversely "non-life-sustaining." The terms "life-sustaining" and "non-life-sustaining" relative to businesses are not defined in any Pennsylvania statute or regulation. Mr. Robinson explained that Defendants' policy team used the North American Industry Classification System (NAICS) as a component of their determination of how to classify businesses. (ECF. No. 39, p. 2). The NAICS is a manual used by federal statistical agencies in classifying businesses for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. economy. (ECF. No. 39, p. 2). The NAICS does not classify businesses into "life-sustaining" and "non-life-sustaining" categories. It does not even use the terms. Rather, it merely divides the economy into "20 broad sectors and 316 industry groups." (ECF No. 39, p. 2). It was the policy team that made the decision as to which businesses would be deemed "life-sustaining," and which would be closed. (ECF No. 75, p. 96).

The record demonstrates that the policy team's unilateral determination as to which classes of businesses would be classified as "life-sustaining" was never formalized and the team never settled on a specific definition of "life-sustaining":

Q.      Well, I'd ask you if you'd do me a favor.  Would you please tell me where I could find the definition of "life-sustaining?"  Because I couldn't find it—I looked—Judge, I looked in 956 pages of the NAICS document, I couldn't find it there.  So where would I find it, Mr. Robinson?

A.      I believe that it's driven by the categorization and the determination—*I'm not sure that we wrote down anywhere what "life-sustaining" meant*.  It was policy decisions that were made by our team as to whether they considered, you know, an energy production location or utility or supermarket to be life-sustaining as distinguished from others that they did not believe.  *We didn't I believe, write down a definition specifically but just translated the sort of common understanding of life sustaining or not into that business list*.

(ECF No. 75, pp. 95-96).  Mr. Robinson further testified about the lack of any set, formalized,

definition for "life-sustaining":

Q.      So there's nowhere—you can't point me to anywhere where I could read the definition of life-sustaining?

A.      I do not believe that we ever wrote down what the definition of life-sustaining was.  It was, again, just developed through the list.  So the meaning is in some sense determined by what was on the list.

(ECF No. 75, p. 97).  When further pressed, about a definition,  Mr. Robinson testified:

A.      We—the policy team that developed the list spent time discussing for each category whether they believed that it was essential for life; and in cases where they made that determination, it was, yes, allowed to remain open.  In categories where they particularly did not believe that the classification of the business type was that level of criticality, it was no, and those businesses were required to close.

        *I don't believe that we spent a lot of time around the formality of kind of enshrining a definition somewhere*.  We were working quickly to provide clarity to the public as to how to prevent the spread of the disease and protect public health.

(ECF No. 75, p. 98) (emphasis added).

The explanation for how Defendants' policy team chose which businesses were "life-sustaining" and which were "non-life-sustaining" is circuitous, at best.  Mr. Robinson said that they used the NAICS system to determine which businesses were "life-sustaining," although the

57

NAICS does not actually use that categorization. He acknowledged that the team simply applied their common-sense judgment as to what was, or was not, "life-sustaining." In doing so, they did not confine themselves to "the formality of kind of enshrining a definition somewhere." So, without a definition, how can one determine which businesses can stay open and which must close? Mr. Robinson said that one should look to the policy team's list (of "life-sustaining" businesses). Essentially, a class of business is "life-sustaining" if it is on the list and it is on the list because it is "life-sustaining."

To add to the arbitrary nature of the list of "life-sustaining" businesses being the definition of what is, in fact, "life-sustaining" is the fact that the list of what businesses are considered "life-sustaining" changed ten times between March 19, 2020 and May 28, 2020:

> Q.    Mr. Weaver, the chart that we've referred to you've indicated is the definition of life-sustaining and non-life-sustaining. That chart has changed ten times; is that correct?
>
> A.    It has, yes.

(ECF No. 75, p 226).[29] Even though, however, the classification of "life-sustaining" was never formally reduced to an objective definition in writing and Defendants' list of business types that they considered to be "life-sustaining" remained in flux, changing ten times, Defendants eliminated the ability of a business to obtain a waiver as of April 3, 2020. (ECF. No. 38, p. 4). The waiver process allowed a business that believed it had been mistakenly classified as "non-life-sustaining" to submit information to show that it should have been classified as "life-sustaining" and, thus, permitted to operate. Once the waiver process closed, a business that had

---

[29] The initial list was published on March 19, 2020. Amendments to the list were published on March 21, March 24, April 1, April 20, April 27, April 28, May 8, May 11 and May 28. (ECF No. 75, p. 226).

been wrongly categorized had no recourse—even though the list of "life-sustaining" business

continued to fluctuate:

> Q.  So if I have a business and I've changed my business operations and I was previously categorized as non-life-sustaining but I've changed my business model, I've changed my way of doing business, I've got the best plan that the CDC has ever seen, I can't get my name changed—or I can't get reclassified as non-life-sustaining (sic) despite the fact that you've changed the definition of life-sustaining post closing down the waiver process; is that correct?

> A.  Could you repeat that?

> Q.  Sure.  You've acknowledged that the definition of life-sustaining changed after the waiver process was closed?

> A.  Correct.

> Q.  Based upon those changes, if I looked at all those charts and I said, "wow, I'm now life-sustaining" or "I think I can meet the definition of life-sustaining."  I don't have a vehicle for you to approve my waiver?

> A.  Correct.

(ECF No. 75, pp. 230-31).  To add to the arbitrary nature of the entire situation surrounding the

business closures, Defendants closed the waiver process because the backlog of requests slowed

the process down.  (ECF No. 75, pp. 227-31).  Defendants decided to go "from a slowed process

to no process."  (ECF No. 75, p. 230).

The manner in which Defendants, through their policy team, designed, implemented, and

administered the business closures is shockingly arbitrary.  The policy team was not tasked with

formulating a theoretical policy paper or standard to categorize abstract classes of business or

NAICS codes.  Rather, it had the authority to craft a policy, adopted wholesale by Defendants,

that had an immediate impact on the Business Plaintiffs and countless other businesses,

employers, and employees across the Commonwealth.  Despite the fact that their decisions had

the potential (and in many cases the actual effect) of destroying businesses and putting

employees out of work, Defendants and their advisors never formulated a set, objective definition in writing of what constitutes "life-sustaining." The Court recognizes that Defendants were acting in haste to address a public health situation. But to the extent that Defendants were exercising raw governmental authority in a way that could (and did) critically wound or destroy the livelihoods of so many, the people of the Commonwealth at least deserved an objective plan, the ability to determine with certainty how the critical classifications were to be made, and a mechanism to challenge an alleged misclassification. The arbitrary design, implementation, and administration of the business shutdowns deprived the Business Plaintiffs and their fellow citizens of all three.

Another layer of arbitrariness inherent in the business shutdown components of Defendants' orders are that many "non-life-sustaining" businesses sell the *same products* or perform the *same services* that were available in stores that were deemed "life-sustaining." For example, Plaintiff R.W. McDonald & Sons is a small appliance and furniture store that was deemed a "non-life-sustaining" business and required to close. (ECF No. 30, p. 1). But larger retailers selling the same products, such as Lowes, The Home Depot, Walmart and others remained opened. Mr. McDonald stated that his business "lost approximately $300,000 in revenue" and that his business has been "financially devastated." (ECF No. 30, p. 2). He also averred that he lost business to the big-box retailers that were permitted to remain in operation.[30] Plaintiffs Mike and Nancy Gifford and Chris and Jody Bertoncello-Young, each in the salon business, attempted to remain open to sell hair and other styling products, but were advised that as "non-life-sustaining" businesses they had to close. (ECF Nos. 31 and 32). But those products could be purchased at "life-sustaining" big box retailers and drug stores. It is paradoxical that in

---

[30] R.W. McDonald & Sons applied for a waiver twice. The first request was denied. There was no follow up communication relating to the second. (ECF No. 30; ECF No. 74, pp. 138-39).

an effort to keep people apart, Defendants' business closure orders permitted to remain in business the largest retailers with the highest occupancy limits.

The Court recognizes that Defendants were facing a pressing situation to formulate a plan to address the nascent COVID-19 pandemic when they took the unprecedented step of *sua sponte* determining which businesses were "life-sustaining" and which were "non-life-sustaining." But in making that choice, they were not merely coming up with a draft of some theoretical white paper, but rather, determining who could work and who could not, who would earn a paycheck and who would be unemployed—and for some—which businesses would live, and which would die. This was truly unprecedented.

An economy is not a machine that can be shut down and restarted at will by government. It is an organic system made up of free people each pursuing their dreams. The ability to support oneself is essential to free people in a free economy. The late Justice William O. Douglas observed:

> The right to work, I had assumed, was the most precious liberty that man possesses. Man has indeed as much right to work as he has to live, to be free, to own property. The American ideal was stated by Emerson in his essay on Politics, 'A man has a right to be employed, to be trusted, to be loved, to be revered.' It does many men little good to stay alive and free and propertied, if they cannot work. To work means to eat. It also means to live. For many it would be better to work in jail, than to sit idle on the curb. The great values of freedom are in the opportunities afforded man to press to new horizons, to pit his strength against the forces of nature, to match skills with his fellow man.

*Barsky v. Board of Regents of University of State of New York*, 347 U.S. 442, 472 (1954) (Douglas, J, dissenting). In a free state, the ability to earn a living by pursing one's calling and to support oneself and one's family is not an economic good, it is a human good. Although jurisprudence may not afford the right to pursue one's occupation the same weight as others in our hierarchy of liberties, it cannot be given such short shrift as to allow it to be completely

subordinated to an *ad hoc* and arbitrary regimen that cannot even be reduced to an objective, written definition—even where that regimen is based on good intent. Here, Defendants took the unprecedented step of closing *all* businesses that they self-deemed to be "non-life-sustaining." The record shows that in doing so and in their manner of doing so, Defendants' actions were so arbitrary as to violate the Business Plaintiffs' substantive due process rights guaranteed by the Fourteenth Amendment.

### 4. The business closure provisions of Defendants' orders violated the Equal Protection Clause of the Fourteenth Amendment.

Finally, the Court examines whether the business closure provisions of Defendants' orders violated the Equal Protection Clause of the Fourteenth Amendment. The Business Plaintiffs contend that Defendants' orders violated equal protection in two ways. They contend that the division of the Commonwealth into regions (on the county level) wrongly treated them dissimilarly from businesses in other similarly situated counties. They also argue that the distinction between them and other businesses that were permitted to operate was arbitrary and fails equal protection scrutiny. Defendants counter the first point by arguing that distinctions are commonly made based on county boundaries. They further argue that their decision to distinguish between "life-sustaining" and "non-life-sustaining" businesses (closing the latter) was rationally related to a legitimate government end, and, thus survives constitutional scrutiny.

The Equal Protection Clause of the Fourteenth Amendment forbids the states to "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. 14th Amend. Where a plaintiff in an equal protection claim does not allege that distinctions were made on the basis of a suspect classification such as race, nationality, gender or religion, the claim arises under the "class of one" theory. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To prevail on such a claim, the plaintiff must demonstrate: 1) the defendant treated him differently

than others similarly situated, 2) the defendant did so intentionally, and 3) there was no rational basis for the difference in treatment. *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d. Cir. 2006). As explained above, the rational basis test is forgiving, but not without limits in its deference. Distinctions cannot be arbitrary or irrational and pass scrutiny. "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985)

The Business Plaintiffs have demonstrated they were treated differently than other businesses that are similarly situated. For example, R.W. McDonald & Sons is a retailer that sells furniture and appliances—so is Walmart, Lowes and The Home Depot. The only difference is the extent of their offerings—Walmart, Lowes and The Home Depot are larger and offer more products. However, in essence, they are the same—retailers selling consumer goods. Likewise, the Salon Plaintiffs (in their role as retailers of health and beauty products, rather than performing personal services) are similarly situated to the big box retailers and drug stores in that they sell the same health and beauty products. Again, the only distinction is size. Nevertheless, Defendants' orders treated these retailers differently than their larger competitors, which were permitted to remain open and continue offering the same products that Plaintiffs were forbidden from selling. The record unequivocally establishes that the distinction was made intentionally. Thus, the final question is whether there was a rational basis for the difference in treatment.

Defendants are correct that the provisions of their reopening plan, which made distinctions between different regions of the Commonwealth, passes constitutional scrutiny. It is well established that states and local governments may impose requirements or restrictions that apply in one region and not in others. *See Cty. Bd. Of Arlington Cty., Va. v. Richards*, 434 U.S.

5, 6-8 (1977). The Court holds that Defendants had a rational basis for rolling out their reopening plan on a regional basis based on counties. Doing so recognized and respected the differences in population density, infrastructure and other factors relevant to the effort to address the virus. The Business Plaintiffs point to similarity between their area and neighboring counties permitted to open earlier, but rational basis does not require the granularity of a neighborhood by neighborhood plan. Distinctions between counties are a historically accepted manner of statewide administration and pass scrutiny here.

However, the manner in which Defendants' orders divided businesses into "life-sustaining" and "non-life-sustaining" classifications, permitting the former to remain open and requiring the latter to close, fails rational basis scrutiny. The Court outlined at length above the facts of record demonstrating that Defendants' determination as to which businesses they would deem "life-sustaining" and which would be deemed "non-life-sustaining" was an arbitrary, *ad hoc*, process that they were never able to reduce to a set, objective and measurable definition. As stated above in reference to the Business Plaintiffs' due process challenge, to the extent that Defendants were going to exercise an unprecedented degree of immediate power over businesses and livelihoods; to the extent that they were going to singlehandedly pick which businesses could stay open and which must close; and to the extent that they were picking winners and losers, they had an obligation to do so based on objective definitions and measurable criteria. The Equal Protection Clause cannot countenance the exercise of such raw authority to make critical determinations where the government could not, at least, "enshrine a definition somewhere." (ECF No. 75 p. 95).

Finally, the record shows that Defendants' shutdown of "non-life-sustaining" businesses did not rationally relate to Defendants' stated purpose. The purpose of closing the "non-life-

sustaining" businesses was to limit personal interactions.  Ms. Boateng averred: "[i]n an effort to minimize the spread of COVID-19 throughout Pennsylvania, the Department [of Health] sought to limit the scale and scope of personal interaction as much as possible in order to reduce the number of new infections." (ECF No. 37, p. 2).  "Accordingly, it was determined that the most effective way to limit personal interactions was to allow only businesses that provide life-sustaining services or products to remain open and to issue stay-at-home orders directing that people leave their homes only when necessary." (ECF No. 37, p. 3).  But Defendants' actions did not rationally relate to this end.  Closing R.W. McDonald & Sons did not keep at home a consumer looking to buy a new chair or lamp, it just sent him to Walmart.  Refusing to allow the Salon Plaintiffs to sell shampoo or hairbrushes did not eliminate the demand for those products, it just sent the consumer to Walgreens or Target.  In fact, while attempting to limit interactions, the arbitrary method of distinction used by Defendants almost universally favored businesses which offered more, rather than fewer products.  As such, the largest retailers remained open to attract large crowds, while smaller specialty retailers—like some of the Business Plaintiffs here—were required to close.  The distinctions were arbitrary in origin and application.  They do not rationally relate to Defendants' own stated goal.  They violate the Equal Protection Clause of the Fourteenth Amendment.

## IV.  CONCLUSION

The Court closes this Opinion as it began, by recognizing that Defendants' actions at issue here were undertaken with the good intention of addressing a public health emergency.  But even in an emergency, the authority of government is not unfettered.  The liberties protected by the Constitution are not fair-weather freedoms—in place when times are good but able to be cast aside in times of trouble.  There is no question that this Country has faced, and will face,

emergencies of every sort. But the solution to a national crisis can never be permitted to supersede the commitment to individual liberty that stands as the foundation of the American experiment. The Constitution cannot accept the concept of a "new normal" where the basic liberties of the people can be subordinated to open-ended emergency mitigation measures. Rather, the Constitution sets certain lines that may not be crossed, even in an emergency. Actions taken by Defendants crossed those lines. It is the duty of the Court to declare those actions unconstitutional. Thus, consistent with the reasons set forth above, the Court will enter judgment in favor of Plaintiffs.

BY THE COURT:

_____

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

*South Bay United Pentecostal Church, et al. v. Gavin Newsom, et al.*
USDC, Southern District Case No.: 3:20-cv-00865-BAS-AHG

I hereby certify that I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

- **NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF SOUTH BAY UNITED PENTECOSTAL CHURCH'S RENEWED MOTION FOR A TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION.**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

[X]   BY ELECTRONIC TRANSMISSION: I electronically filed the above document(s) with the Clerk of the Court using the CM/ECF system. The CM/ECF system will send notification of this filing to the person(s).

[ ]   BY MAIL: By placing a copy of the same in the United States Mail, postage prepaid, and sent to their last known address(es).

[X ]   BY ELECTRONIC MAIL:  I served a true copy, electronically on designated recipients via electronic transmission of said documents.

I declare under penalty of perjury, under the laws of the State of California, that the above is true and correct.

Executed on September 14, 2020, at Rancho Santa Fe, California.

_____
Kathy Denworth

1