1
2
3
4
5
6
7
8
9 **UNITED STATES DISTRICT COURT**

10 **SOUTHERN DISTRICT OF CALIFORNIA**

11

12 SOUTH BAY UNITED PENTECOSTAL
CHURCH, *et al.*,

13

14                                    Plaintiffs,

15         v.

16 GAVIN NEWSOM, in his official
capacity as the Governor of California, *et*

17 *al.*,

18                                    Defendants.

19

Case No. 20-cv-00865-BAS-AHG

**ORDER DENYING PLAINTIFFS'
RENEWED MOTION FOR A
TEMPORARY RESTRAINING
ORDER OR PRELIMINARY
INJUNCTION (ECF No. 53)**

20 **I.      INTRODUCTION**

21         This case arises from the State of California's efforts to limit the spread of the novel

22 severe acute respiratory syndrome-related coronavirus (SARS-CoV-2) that has upended

23 society.  The illness caused by the virus, coronavirus disease 2019 (COVID-19), has killed

24 more than ten thousand people in California and sickened many more.  There is no known

25 cure, widely available effective treatment, or approved vaccine for the disease.  And

26 because people infected with the virus may be asymptomatic, they may unintentionally

27 infect others around them.  Therefore, physical distancing that limits physical contact is

28 essential to slow the spread of the virus.

To ensure physical distancing, the Governor of California has issued a series of restrictions on public gatherings. This case centers on the restrictions for in-person, indoor religious worship services. Plaintiffs South Bay United Pentecostal Church and Bishop Arthur Hodges III allege these restrictions violate their constitutional rights by limiting their ability to freely exercise their religion.

An earlier version of California's restrictions prohibited Plaintiffs from holding any in-person worship services. In May 2020, Plaintiffs asked the Court to enjoin those restrictions while this case proceeded. After the Court denied Plaintiffs' request for extraordinary relief, they appealed to the Court of Appeals for the Ninth Circuit and concurrently requested an emergency injunction, which was denied. Plaintiffs next asked the Supreme Court for emergency relief, but it, too, denied their request. Plaintiffs later requested that their appeal be sent back to this Court to allow the Court to reconsider whether California's restrictions should be enjoined in light of new developments. The Ninth Circuit granted their request.

Now before the Court is Plaintiffs' renewed motion for a temporary restraining order or preliminary injunction. In San Diego County, California's restrictions currently limit Plaintiffs' indoor worship services to 25% of building capacity or 100 people, whichever is fewer. The restrictions also forbid group singing and chanting indoors. Thus, the challenged restrictions are more nuanced and lenient than the rules the Court previously considered in May. Plaintiffs now argue, however, that California's "scientific pronouncements" are "largely baseless," and that by "all reasonable scientific measurements," the COVID-19 health emergency "has ended." (ECF No. 61 at 1:12–15.) They also argue the State's restrictions treat certain secular businesses more favorably than religious organizations and have been enforced in a discriminatory manner. Consequently, Plaintiffs argue the restrictions regarding indoor worship services and singing are unconstitutional and should be enjoined before trial.

California paints a different picture of the current circumstances. It stresses the crisis is ongoing and filled with uncertainty. California highlights that COVID-19 infections and

deaths surged after the Court considered Plaintiffs' first request to enjoin the State's rules. And although Plaintiffs' renewed motion cites that "[a]s of July 14, 2020, California ha[s] only reported a total of 7,227 deaths from COVID-19," the State points out that this count had swelled to 12,407 as of August 31, 2020.  (State's Opp'n 9:18–21, ECF No. 57; *see also* Renewed Mot. 1:24–25, ECF No. 53-1.)   California argues "these numbers are enormous, far greater than the number of people killed in the 9/11 terrorist attacks and those who lost their lives in Hurricane Katrina." (State's Opp'n 9:21–23.)  The State also claims Plaintiffs "ignore the reason for why the State has been able to slow the spread of the disease: the imposition of the very types of public health restrictions that Plaintiffs ask the Court to enjoin." (*Id.* 10:14–17.)  "Enjoining restrictions because they have proven effective in curbing COVID-19 would be 'like throwing away your umbrella in a rainstorm because you are not getting wet,'" the State argues.  (*Id.* 10:26–28 (citing *Shelby Cty. v. Holder*, 570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting)).)  Therefore, both California and the County of San Diego urge the Court to again refuse Plaintiffs' request for extraordinary relief.

Ultimately, the Court concludes Plaintiffs have not met their burden to demonstrate they are entitled to a preliminary injunction—"an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Therefore, for the following reasons, the Court **DENIES** Plaintiffs' renewed motion for a temporary restraining order or preliminary injunction.

## II.   BACKGROUND

### A.   SARS-CoV-2

Transmission.   Although much remains uncertain about the novel coronavirus, "there is consensus among epidemiologists that the most common mode of transmission of SARS-CoV-2 is from person to person, through respiratory droplets such as those that are produced when an infected person coughs or sneezes, or projects his or her voice through

20cv0865

speaking, singing and other vocalization." (Dr. Watt Decl. ¶ 27, ECF No. 57-2[1]; *accord* Dr. Rutherford Decl. ¶ 28, ECF No. 57-3.[2])  The virus can also "live on certain surfaces for a period of time, suggesting that fomite transmission (through touching a surface where the live virus is present) is possible," but this method of transmission "is not believed to be a common method by which individuals can be infected by the virus." (Dr. Watt Decl. ¶ 29; *see also* Dr. Rutherford Decl. ¶ 30.)  There is also "broad consensus that people who are not experiencing symptoms can still spread SARS-CoV-2." (Watt Decl. ¶ 30; *see also id.* ¶ 31; Dr. Rutherford Decl. ¶¶ 20–32.)  "Therefore, individuals who themselves may have been unknowingly infected by others can themselves become unknowing transmitters of the virus." (Dr. Watt Decl. ¶ 32; *accord* Dr. Rutherford Decl. ¶ 27.)

---

[1]  Dr. James Watt is the Chief of the Division of Communicable Disease Control of the Center for Infectious Diseases at the California Department of Public Health ("CDPH").  (Dr. Watt Decl. ¶ 2.)  He received his doctor of medicine from the University of California, San Diego in 1993 and a master's degree in public health from the University of California, Berkeley in 1995.  (*Id.* ¶ 3.)  Dr. Watt previously worked for the Centers for Disease Control and Prevention ("CDC") as an Epidemic Intelligence Service Officer in the Respiratory Diseases Branch.  (*Id.* ¶ 4.)  He is also an Associate at the Johns Hopkins Bloomberg School of Public Health and a Clinical Professor at the University of California, San Francisco School of Medicine, where he teaches graduate students in public health and medical students about communicable disease control.  (*Id.* ¶ 5.)  His professional commendations include the U.S. Public Health Service Achievement medal in 2000, the National Center for Infectious Diseases Honor Award in 2001, and Outstanding Achievement Awards from the CDPH in 2015 and 2016.  (*Id.* ¶ 8.)  Dr. Watt has been "very involved" in the CDPH's response to the COVID-19 pandemic, "working full time for approximately 60–70 hours per week to address the pandemic" from January 2020 to the date of his declaration.  (*Id.* ¶ 15.)  The Court addresses Plaintiffs' objections to Dr. Watt's declaration and other evidence below.  *See infra* note 7.

[2]  Dr. George Rutherford is the Salvatore Pablo Lucia Professor of Epidemiology, Preventive Medicine, Pediatrics, and History at the University of California, San Francisco School of Medicine.  (Dr. Rutherford Decl. ¶ 4.)  He also leads the Division of Infectious Disease and Global Epidemiology in the Department of Epidemiology and Biostatistics.  (*Id.*)  Further, Dr. Rutherford is an adjunct professor at the University of California, Berkeley School of Public Health.  (*Id.*)  He also serves as the "Director of Global Strategic Information Group in the Institute for Global Health Sciences at U.C. San Francisco." (*Id.*)  Dr. Rutherford received his doctor of medicine from the Duke University School of Medicine in 1978.  (*Id.* ¶ 2.)  He also received training in epidemiology in the CDC's Epidemic Intelligence Service and spent ten years in various public health positions before entering academia.  (*Id.* ¶ 3.)  Since the novel coronavirus emerged, Dr. Rutherford has "devoted substantial time to researching and studying the virus" as part of his epidemiology roles and has "spoken extensively on topics related to the novel coronavirus and the disease it causes during 2020," including through presentations to the California Medical Association and the California Health and Human Services Agency.  (*Id.* ¶ 14.)

Gatherings.  Group gatherings increase the risk of transmission of the virus.  (Dr. Watt Decl. ¶¶ 37–43; *see also* Dr. Rutherford Decl. ¶¶ 47–52.)  "The more people that gather, the higher the likelihood that an infected person will be present.  Also, the larger the gathering, the higher the number of people who may be secondarily infected by that infected person."  (Dr. Watt Decl. ¶ 42; *see also* Dr. Rutherford Decl. ¶ 47.)  "Evidence indicates the risk of transmission at a gathering increases when individuals are in close proximity to one another for an extended period."  (Dr. Watt Decl. ¶ 43.)  The transmission risk also "increases with both the length of time the gathering lasts and the proximity of people to each other at the gathering."  (*Id.*)

Indoor Gatherings and Singing.  Although gatherings increase the risk of transmission of the virus, this risk "is much higher when the gathering takes place indoors rather than outdoors."  (Dr. Watt Decl. ¶ 43; Dr. Rutherford Decl. ¶ 50 ("There is a lower risk of COVID-19 transmission when a group gathering takes place outdoors; there is a much decreased likelihood of aerosolized transmission of the virus outdoors because aerosolized particles will dissipate into the atmosphere.").)  There is also "scientific consensus that vocalization, even normal speech, produces aerosols, and that louder and more forceful expression such as singing and chanting produces more aerosols."  (Dr. Watt Decl. ¶ 45.)  "Most scientists believe that group singing, particularly when engaged in while in close proximity to others in an enclosed space, carries a high risk of spreading the COVID-19 virus through the emission of infected droplets (which typically travel <6 feet) and aerosols."  (*Id.*; *see also* Dr. Rutherford Decl. ¶ 54 (explaining that engaging in "singing, chanting, shouting, and speaking loudly . . . in an indoor or enclosed space" increases the risk of transmission).)

Given the foregoing, religious "services and similar cultural events, particularly those taking place in an enclosed space, involve a heightened level of risk of COVID-19 transmission."  (Dr. Watt Decl. ¶ 72; *accord* Dr. Rutherford Decl. ¶ 57.)  "The characteristics of such events that cause the increased risk of transmission include: being indoors, bringing together a large group of people, having close proximity between

individuals, gathering for an extended duration, and having substantial singing and vocalizing that generally takes place at the events."  (Dr. Watt Decl. ¶ 72; *see also* Dr. Rutherford Decl. ¶ 57 ("Based on my knowledge, experience and study of the relevant publications, attending indoor worship services (and similar cultural events, which are included in this discussion) presents an exceptionally high risk of COVID-19 transmission because they involve a combination of many high risk factors").)

COVID-19.  "The virus can cause severe disease and death in individuals of any age. Older adults and people of any age who have serious underlying medical conditions are at higher risk for severe illness or death from COVID-19."  (Dr. Watt Decl. ¶ 22; *see also* Dr. Rutherford Decl. ¶¶ 40, 51.)  "The symptoms of the disease are predominantly respiratory but many of those infected also experience non-respiratory symptoms."  (Dr. Rutherford Decl. ¶ 20; *see also* Dr. Watt Decl. ¶ 21.)  "The disease typically starts as a fever and cough that progresses to respiratory distress and pneumonia in some individuals.  In its most severe form it causes respiratory and/or myocardial failure."  (Dr. Rutherford Decl. ¶ 21.)  "Currently there is no vaccine available in the United States and no generally effective treatment for COVID-19."  (*Id.* ¶ 36; *see also id.* ¶ 37 (noting that "[w]e have learned a lot about treatment of the novel coronavirus since the beginning of the pandemic and treatments have improved," but "they are far from curative"); Dr. Watt Decl. ¶ 24.)

### B.    South Bay Pentecostal Church

Plaintiff South Bay Pentecostal Church "is a multi-national, multi-cultural congregation" located in Chula Vista in San Diego County, California.  (Bishop Hodges Decl. ¶ 3, ECF No. 12-2.)  Its congregation "represents a cross-section of society, from rich to poor and encompassing people of all ages."  (*Id.* ¶ 17.)  Plaintiff Bishop Art Hodges III has served as the senior pastor of the Church for thirty-five years.  (*Id.* ¶ 2.)

Typically, the Church holds "between three and five services each Sunday."  (Bishop Hodges Decl. ¶ 12, ECF No. 12-2.)  "The average attendance at some of these services lies between two-hundred (200) and three-hundred (300) congregants."  (*Id.*)  The Church's

"sanctuary can hold up to six-hundred (600) people."  (*Id.*)  The Church "also perform[s] baptisms, funerals, weddings, and other religious ceremonies."  (*Id.* ¶ 15.)

Bishop Hodges explains that "singing is at the heart of our worship services, and comprises 25–50% of our typical Pentecostal worship gathering experience at Church." (Bishop Hodges Decl. ¶ 3, ECF No. 53-2.)  "In a Pentecostal Church worship service, everyone is instructed and expected to sing praise to God, just as everyone is instructed and expected to pray to God.  In our worship services, praying, singing, and praising God is not for spectators, it is for participants."  (*Id.* ¶ 10.)  A service at the Church also "concludes with fellowship both inside and outside the sanctuary."  (Bishop Hodges Decl. ¶ 14, ECF No. 12-2.)  Bishop Hodges further explains: "'Zoom Meetings' and other tele-conferencing applications are inadequate substitutes [for in-person services] as they curtail a minister's ability to lay hands upon a congregant or perform a baptism.  They also curtail our congregation's ability to approach the altar, which is central to our experience of faith." (*Id.* ¶ 20.)

### C.    Stay-at-Home Order and First Motion for Injunctive Relief

Executive Order N-33-20.   On March 4, 2020, the Governor of California proclaimed a State of Emergency in California because of the threat of COVID-19. (Second Am. Compl. ("SAC") ¶ 18, ECF No. 47; *see also* SAC Ex. 1-1, ECF No. 47-1.) On March 19, 2020, the Governor issued Executive Order N-33-20, which states that to protect the public's health, "all individuals living in the State of California" are "to stay at home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors."  (SAC Ex. 1-1.)[3]  California's Public Health Officer designated a list of "Essential Critical Infrastructure Workers."  (SAC Ex. 1-2.) Included in that list were "[f]aith based services that are provided through streaming or

---

[3]   The Court considers the public records and government documents attached to the Second Amended Complaint because their authenticity is not questioned.  The Court similarly grants the State's and Plaintiffs' requests for judicial notice as to the contents of public records and government documents. (ECF Nos. 57-7, 69.)  *See, e.g.*, *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 969 n.4 (9th Cir. 2008).

other technology." (*Id.* at 16.)  Meaning, Plaintiffs could conduct services over online streaming video or teleconferencing, but not in person at the Church's sanctuary. (*See id.*)

The State later released a "Resilience Roadmap" that categorized workplaces into four stages.  (SAC Ex. 1-3.)  The roadmap placed "religious services" in Stage 3, along with movie theaters, museums, and bars—instead of Stage 2, which included retail stores and dine-in restaurants. (*Id.*)  The County of San Diego adopted the State's restrictions, list of essential workers, and roadmap through a series of public health orders and emergency regulations.  (*See* SAC Exs. 2-2, 2-3, 2-4.)

On May 8, 2020, Plaintiffs filed this action against various State and County officials.[4]  (ECF No. 1.)  On May 11, 2020, Plaintiffs filed a First Amended Complaint raising claims under the First Amendment's Free Exercise, Establishment, Free Speech, and Assembly Clauses; the Fourteenth Amendment's Due Process and Equal Protection Clauses; and rights enumerated in Article 1, sections 1 through 4, of the California Constitution.  (ECF No. 11.)  Plaintiffs then moved for a temporary restraining order and an order to show cause regarding a preliminary injunction. (ECF No. 12.)  Plaintiffs sought an injunction that would prevent the State and County "from enforcing . . . any prohibition on Plaintiffs' engagement in religious services, practices, or activities at which the County

---

[4]  After changes to the pleadings and personnel, the Defendants are:

| Name | Title |
|---|---|
| Gavin Newsom | Governor of California |
| Xavier Becerra | Attorney General of California |
| Sandra Shewry* | Acting Director of the CDPH |
| Wilma J. Wooten | Public Health Officer, County of San Diego |
| Helen Robbins-Meyer | Director of Emergency Services, County of San Diego |
| William D. Gore | Sheriff of the County of San Diego |

Plaintiffs sue all these Defendants in their official capacities.  (SAC ¶¶ 10–15.)  For simplicity, the Court collectively refers to the State of California officials as either "California" or the "State."  The Court also collectively refers to the County of San Diego officials as the "County" or "San Diego County."  *But see* U.S. Const. amend XI; 42 U.S.C. § 1983; *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

\* The Court substitutes Sandra Shewry, the Acting Director of the CDPH, in place of Sonia Angell, the former official, who resigned.  (*See* ECF No. 67 at n.1.)  *See* Fed. R. Civ. P. 25(d).

20cv0865

of San Diego's Social Distancing and Sanitation Protocol and Safe Reopening Plan is being followed." (ECF No. 12-1 at 25:10–14.)

Prior Ruling.   On May 15, 2020, the Court denied Plaintiffs' motion during a telephonic hearing. (ECF No. 32.)   The Court concluded Plaintiffs are unlikely to prevail on the merits of their claims for several reasons.   First, applying *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the Court found that the State "may limit an individual's right to freely exercise his religious beliefs when faced with a serious health crises" like that presented by COVID-19. (Mot. Hr'g Tr. 25:19–25, ECF No. 38.)   The Court reasoned: "The right to practice religion freely does not include the liberty to expose the community to communicable disease or to ill health or death." (*Id.* 26:1–3.)

Second, citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the Court reasoned that the then-operative restrictions did not place a burden on in-person worship services "because of a religious motivation, but because of the manner in which the service is held, which happens to pose a greater risk of exposure to the virus." (Mot. Hr'g Tr. 26:9–25.)   The Court highlighted that "the services involve people sitting together in a closed environment for long periods of time." (*Id.* 26:19–20.) The Court further determined that Plaintiffs had "not demonstrated arbitrary exceptions to [the] classification" level that included in-person worship services. (*Id.* 27:5–6.)   The Court also found the reopening restrictions were "rationally based on protecting safety and stopping" the spread of the virus. (*Id.* 27:10–11.)

Third, the Court reasoned that, even if the equivalent of strict scrutiny applied to Plaintiffs' state constitutional free exercise claim, the restrictions were narrowly tailored to further a compelling governmental interest—the State's interest in protecting public health. (Mot. Hr'g Tr. 27:12–28:17.)   Finally, the Court determined Plaintiffs were unlikely to succeed on their federal equal protection and due process claims. (*Id.* 29:18–30:2.)   And after further finding that neither the balance of equities nor the public interest supported issuing a temporary restraining order, the Court denied Plaintiffs' motion. (*Id.* 30:3–19.)

**D.     Appeal and Changing Landscape**

Ninth Circuit.   Plaintiffs appealed to the Ninth Circuit and filed an emergency motion for an injunction that would allow them to hold in-person religious services pending appeal.   (ECF Nos. 35, 41–42.)   On May 22, 2020, the Ninth Circuit denied Plaintiffs' request.   *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938 (9th Cir. 2020).   The Ninth Circuit concluded Plaintiffs had "not demonstrated a sufficient likelihood of success on appeal."   *Id.* at 939.   It explained:

> Where state action does not "infringe upon or restrict practices because of their religious motivation" and does not "in a selective manner impose burdens only on conduct motivated by religious belief," it does not violate the First Amendment.   *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 543, (1993).   We're dealing here with a highly contagious and often fatal disease for which there presently is no known cure. In the words of Justice Robert Jackson, if a "[c]ourt does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact."   *Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting).

*Id.* at 939.   The Ninth Circuit also determined the remaining injunction factors "do not counsel in favor of injunctive relief."   *Id.* at 940.   Judge Collins dissented.   *Id.* at 940–47. He reasoned the State's then-operative reopening plan is not facially neutral or generally applicable, is subject to strict scrutiny, and does not pass muster under this standard.   *Id.* at 943–46.   On the last point, Judge Collins reasoned California's "undeniably compelling interest in public health" could be achieved through narrower restrictions that regulated the "specific underlying risk-creating *behaviors*, rather than banning the particular *religious* setting within which they occur."   *Id.* at 946–47.

On May 25, 2020, California issued guidelines that allow places of worship to resume in-person services with limitations.   (SAC Ex. 1-5.)   The guidelines contain instructions and recommendations for physical distancing during worship services as well as cleaning and disinfection protocols, training for employees and volunteers, and individual screening.   (*Id.*)   Further, while citing the increased risk of transmission of the virus in an indoor setting, the guidelines limit attendance for in-person worship services

- 10 -

"to 25% of building capacity or a maximum of 100 attendees, whichever is fewer." (*Id.* at 3.)

    <u>Supreme Court</u>.  When California relaxed its restrictions, Plaintiffs were seeking emergency relief from the Supreme Court.  (Grabarsky Decl. Ex. 6, ECF No. 57-1.)  They filed a supplemental brief to challenge the State's May 25 guidelines.  (*Id.* Ex. 7.)  After Justice Kagan referred Plaintiffs' application for injunctive relief to the Supreme Court, the Court denied it.  *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020).  Chief Justice Roberts wrote an opinion concurring in the denial of the application.  *Id.* at 1613–14.  He reasoned:

> Although California's guidelines place restrictions on places of worship, those restrictions appear consistent with the Free Exercise Clause of the First Amendment.  Similar or more severe restrictions apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time.  And the Order exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods.

*Id.* at 1613.  The Chief Justice further explained:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement.  Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect."  *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905).  When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad."  *Marshall v. United States*, 414 U.S. 417, 427 (1974).  Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people.  *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985).

*Id.*  Justice Kavanaugh dissented.  He reasoned that indoor worship services are comparable to "factories, offices, supermarkets," and various other secular establishments that were

- 11 -

20cv0865

not subject to the same occupancy cap. *Id.* at 1614.  And although "California undoubtedly has a compelling interest in combating the spread of COVID–19 and protecting the health of its citizens," Justice Kavanaugh reasoned California's restrictions discriminate against religion because the State lacks a compelling justification for distinguishing between worship services and the aforementioned secular businesses. *Id.* at 1615.

### E.      Continued Developments and Limited Remand

Singing Restrictions.  After the Supreme Court's decision, the State and County officials continued to "actively shap[e] their response to changing facts on the ground." *See* 140 S. Ct. at 1614 (Roberts, C.J.).  In early July, the State issued revised guidance that requires places of worship to "discontinue indoor singing and chanting activities" because such activities "negate the risk reduction achieved through six feet of physical distancing." (SAC Ex. 1-9.)   This prohibition on indoor group singing and chanting similarly applies to political protests, schools, and restaurants.[5]  (*See* Dr. Watt Decl. ¶¶ 88–90 (explaining why the State imposed restrictions on these activities and noting that other gatherings that involve "an elevated risk of COVID-19 virus spread through singing, chanting or similar activities, such as those at live concerts, live music venues, live theatrical performances, spectator sports, recreational team sports, theme parks and indoor protests, remain prohibited throughout the State").)

July 13 Closure Order.  Then, on July 13, 2020, due to the "significant increase in the spread of COVID-19," the State issued an order re-imposing many previously relaxed restrictions on indoor activities.  (SAC Ex. 1-13.)  In addition, for those counties on the State's "County Monitoring List," which are those the State believed showed "concerning levels of disease transmission, hospitalizations, insufficient testing, or other critical

---

[5]  (Gabrasky Decl. Ex. 14 (providing "singing and chanting activities are discontinued" for "indoor protests"); Ex. 15 (providing "[a]ctivities where there is increased likelihood for transmission from contaminated exhaled droplets such as band and choir practice and performances are not permitted" and any activities "that involve singing must only take place outdoors"); Ex. 16 (providing restaurants "must discontinue" concert or performance-like entertainment "until these types of activities are allowed to resume").)

epidemiological markers," the order closed various indoor businesses, as well as "places of worship." (*Id.*)

Limited Remand.  Meanwhile, on July 10, 2020, while Plaintiffs' interlocutory appeal was pending, Plaintiffs moved this Court for an indicative ruling to revisit its denial of their initial motion. (ECF No. 45.)  The Court granted their request, reasoning it raised a substantial issue. (ECF No. 46.)  Plaintiffs then filed their Second Amended Complaint. (ECF No. 47.)  And on July 29, 2020, the Ninth Circuit remanded the appeal "for the limited purpose of permitting the district court to consider Plaintiffs' request in light of the events and case law that have developed since May 15, 2020." (ECF No. 49.)

Four-Tier System.  On August 10, 2020, Plaintiffs filed their renewed motion for a temporary restraining order or a preliminary injunction. (Renewed Mot., ECF No. 53.) While the motion was being briefed, circumstances again changed.  On August 28, 2020, due to "increased knowledge of disease transmission vulnerabilities and risk factors," the State established a new four-tier system for reopening, which superseded the State's July 13 order. (Grabarsky Decl. Exs. 50–53.)  Under this four-tier system, which is more nuanced than the State's prior restrictions, lower-risk activities and sectors are permitted to resume sooner than higher-risk ones based on a series of "risk criteria."  These criteria include the ability "to physically distance between individuals from different households," "to limit the number of people per square foot," "to limit duration of exposure," "to optimize ventilation (e.g. indoor vs outdoor, air exchange and filtration)," and "to limit activities that are known to cause increased spread" like singing and shouting. (*Id.* Ex. 51; *see also* Dr. Rutherford Decl. ¶¶ 57–71 (discussing risks of indoor religious worship and cultural events, grocery shopping, restaurant dining, and factories and whether those environments involve the "heightened risk created by group singing")).)

Counties are assigned to a tier based on their reported COVID-19 case rate and percentage of positive COVID-19 tests. (Grabarsky Decl. Ex. 50.)  For example, Tier 2 is the red-colored tier, which marks "substantial" risk of community disease transmission. (*Id.*)  The State placed San Diego County into this tier when Plaintiffs' motion was being

briefed, and the County remains there now.  (*Id.* Ex. 52-1.)[6]  In this tier, Plaintiffs again may hold indoor worship services up to 25% of building capacity or 100 persons, whichever is fewer.  (*Id.* Exs. 52–23.)  Indoor restaurants and movie theaters in the County are subject to the same attendance restrictions as worship services, but bars, wineries, cardrooms, concerts, sporting events, family entertainment centers, and theatrical performances remain either closed entirely or restricted to outdoor activities only.  (*Id.* Ex. 53.)  Retail stores—except standalone grocers—are limited to 50% capacity indoors with modifications.  (*Id.*)  Non-critical office spaces are designated "remote," and gyms are limited to 10% capacity indoors.  (*Id.*)

The State and County filed oppositions to Plaintiffs' renewed motion, and Plaintiffs filed a reply to each opposition.  (State's Opp'n, ECF No. 57; County's Opp'n, ECF No. 58; County's Joinder, ECF No. 59; Reply to State's Opp'n, ECF No. 61; Reply to County's Opp'n, ECF No. 61-1.)[7]  Further, on September 4, 10, 11, and 14, and on October 1, 6, 7,

---

[6]  Although the facts underlying the State's decision making with respect to its four-tier system may be subject to dispute, the fact that the State has placed and kept San Diego County in Tier 2 is not subject to reasonable dispute.  *See* Blueprint for a Safer Economy—Current Tier Assignments as of October 13, 2020, https://covid19.ca.gov/safer-economy/; *see also* Fed. R. Evid. 201(b); *King v. Cty. of Los Angeles*, 885 F.3d 548, 555 (9th Cir. 2018) (taking judicial notice of "undisputed and publicly available information displayed on government websites").

[7]  Plaintiffs lodge 142 evidentiary objections to the evidence submitted by California and the County.  (ECF No. 61-6.)  Among raising other objections, Plaintiffs argue certain evidence is hearsay, irrelevant, "more prejudicial than probative," or lacks foundation.  (*Id.* at 1:12–142.)  The State responds. (ECF No. 65.)

The Court overrules these objections.  Evidence submitted in connection with a request for a preliminary injunction is not subject to the same requirements that would apply at trial.  *See Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984); *see also, e.g.*, *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) ("A district court may, however, consider hearsay in deciding whether to issue a preliminary injunction."); *Nat'l Rifle Ass'n of Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 926 (C.D. Cal. 2019) ("Because of the extraordinary nature of injunctive relief . . . a district court may consider evidence outside the normal rules of evidence, including: hearsay, exhibits, declarations, and pleadings."); *Rosen Entm't Sys., LP v. Eiger Vision*, 343 F. Supp. 2d 908, 912 (C.D. Cal. 2004) (applying the Ninth Circuit's reasoning in *Flynt* to objections to the defendant's evidence).  Rather, the evidence's form impacts the weight it is given when the court assesses the merits of equitable relief.  *Rosen*, 343 F. Supp. 2d at 912.  Indeed, the Court notes that both parties, including their proposed experts, routinely rely on various reported statistics for COVID-19.  (*See, e.g.*, SAC ¶¶ 105–112 (citing statistics prepared by California and the County); Cicchetti Decl. ¶¶ 17–19 (citing data from *Politico* and *The New York Times*); Dr. Delgado Decl. ¶¶ 7–14 (relying on CDC and non-governmental website data); *Lyons-Weiler* Decl. ¶¶

and 13, 2020, the parties filed notices of supplemental authority, all of which the Court has considered.  (ECF Nos. 60, 62–64, 66–68, 70.)

## III.  LEGAL STANDARD

The standard for a temporary restraining order and preliminary injunction are "substantially identical."  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  The party seeking the injunction bears the burden of proving these elements.  *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).  "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'"  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

## IV.  ANALYSIS

Against this backdrop, the Court considers Plaintiffs' renewed request for injunctive relief against the State and County officials.  Plaintiffs tailor their renewed motion to their "Free Exercise Claims under the U.S. and California Constitutions."  (Renewed Mot. 8 n.4.)  Therefore, the Court focuses its analysis on these claims.

Further, the Court analyzes these claims in light of the current restrictions that apply to the Church.  As summarized above, San Diego County is in the State's "red" tier—Tier 2.  Thus, worship services may be held outdoors and include singing and chanting outdoors.  Indoor worship services, however, are limited to up to 100 people or 25% of building capacity, whichever is fewer, and may not include singing or chanting.  *See supra* Part II.E.

---

10–18, 27 (citing information from the European CDC and an assortment of news sources like *Bloomberg* and *US News and World Report*); Trissell Decl. Exs. A–C (appending CDC and County statistics); Dr. Watt Decl. ¶¶ 93–103; Dr. Rutherford Decl. ¶ 25.)  To the extent the Court cites to evidence that Plaintiffs object to, the Court has determined Plaintiffs' objections are meritless or the evidence deserves some weight at this stage notwithstanding concerns over its admissibility at trial.

20cv0865

Because Plaintiffs wish to hold indoor worship services that include group singing and exceed the Tier 2 limit on attendees, the Court considers whether Plaintiffs have demonstrated a likelihood of success on their claims that these restrictions violate their federal and state constitutional free exercise rights.  (*See* Renewed Mot. 6:25–7:6.)

At bottom, Plaintiffs' renewed motion asks the Court to second guess decisions made by California officials concerning whether COVID-19 continues to present a health emergency and whether large indoor gatherings with singing pose a risk to public health. Although not binding, the Court finds Chief Justice Roberts's reasoning in this case to be compelling.  The background set forth above shows the State and County "are actively shaping their response to changing facts on the ground."  *See* 140 S. Ct. at 1614 (Roberts, C.J.).   And the evidence demonstrates the COVID-19 pandemic remains an area "fraught with medical and scientific uncertainties," where the State and County's latitude "must be especially broad." *See id.* at 1613 (quoting *Marshall*, 414 U.S. at 427).

Moreover, neither Plaintiffs' evidence nor their arguments convincingly show that the current restrictions exceed "those broad limits."  *See* 140 S. Ct. at 1613.  Hence, the Court finds Plaintiffs have not demonstrated a likelihood of success on the merits of their free exercise claims.  *See id.* at 1614 ("Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." (quoting *Garcia*, 469 U.S. at 545)).  Consequently, Plaintiffs are not entitled to the "extraordinary and drastic remedy" that is injunctive relief before trial.  *See Lopez*, 680 F.3d at 1072 (providing the court should not issue a preliminary injunction "unless the movant, *by a clear showing*, carries the burden of persuasion"); *accord City & Cty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 789 (9th Cir. 2019).

The Court further expands upon its analysis below while addressing Plaintiffs' claims that (i) COVID-19 no longer presents a public health emergency, (ii) the State's restrictions discriminate against places of worship, and (iii) the State's restrictions have been discriminatorily enforced.

- 16 -

20cv0865

### A.    Public Health Emergency

The Court previously reasoned that the State "may limit an individual's right to freely exercise his religious beliefs when faced with a serious health crises" like that presented by COVID-19.   (Mot. Hr'g Tr. 25:19–25, ECF No. 38 (citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905).)   In Plaintiffs' renewed motion, they argue the COVID-19 pandemic has stabilized in California, as the State "had only reported a total of 7,227 deaths" as of July 14, 2020.   (Renewed Mot. 1:24–25 (citing COVID-19 Statewide Update for July 15, 2020, SAC Ex. 5-3).)   They also argue curbing the virus is no longer "a compelling interest" given "the flattening of the death and hospitalization rates, regardless of the infection rate," as "numerous experts have concluded that the worst of the pandemic is absolutely over."   (*Id.* 11:3–5.)   Plaintiffs later argue that California's "scientific pronouncements" are "largely baseless," and that by "all reasonable scientific measurements," the COVID-19 health emergency "has ended."   (Reply to State's Opp'n 1:12–15.)

Plaintiffs' position is not convincing.   For one,  arguments of counsel are not evidence.  *See, e.g.*, *Carrillo-Gonzalez v. I.N.S.*, 353 F.3d 1077, 1079 (9th Cir. 2003). In determining whether to grant extraordinary relief, this Court is not bound by Plaintiffs' counsel's interpretation of CDC statistics or what they believe is an acceptable death rate for COVID-19 compared to other causes of death—many of which are not contagious and are well-understood by the scientific community.   (*See* Renewed Mot. 1:13–3:4; Reply to State's Opp'n 1:13–25; *see also* Dr. Watt Decl. ¶¶ 101–02.)[8] Second, the State's evidence

---

[8]   Plaintiffs highlight that "the CDC updated its coronavirus statistics to reveal that for 94% of coronavirus related deaths, 'in addition to COVID-19, on average, there were 2.6 additional' comorbidities."   (Reply to State Opp'n 1:15–22 (citing Trissell Decl. Ex. NN, ECF No. 61-5).)   They extrapolate this 94% statistic to determine a much smaller infection-fatality rate for those who "are healthy and have no other comorbidities."   (*Id.* 1:21–22.)   That characterization is problematic.   The "comorbidities" listed in the CDC's data include not only common health conditions like obesity, diabetes, and hypertension, but also conditions that COVID-19 *itself* can cause *before* death—like "pneumonia" and "respiratory failure."   (Trissell Decl. Ex. NN at 5–6; *see also* Dr. Watt Decl. ¶ 21; Dr. Rutherford Decl. ¶ 21 ("The disease typically starts as a fever and cough that progresses to respiratory distress and pneumonia in some individuals.  In its most severe form it causes respiratory and/or myocardial failure.").)

- 17 -

20cv0865

regarding infections and deaths amply demonstrates that SARS-CoV-2 and COVID-19 continue to present a public health emergency in California, including in the County of San Diego.  (Dr. Watt Decl. ¶¶ 16–103; Dr. Rutherford Decl. ¶¶ 16–46.)  Third, Plaintiffs' contrary evidence is not compelling.  At best, Plaintiffs' evidence confirms that "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement."[9] *See S. Bay Church*, 140 S. Ct. at 1613 (Roberts, C.J.).  And because Plaintiffs do not show "the broad limits" of the State and County's discretion in this context are being exceeded, second guessing their decisions is not appropriate.  *See id.*; *see also San Francisco*, 944 F.3d at 789 (providing the court should not issue a preliminary injunction "unless the movant, *by a clear showing*, carries the burden of persuasion").  Accordingly, the Court

---

The State, of course, has a compelling interest in protecting all of its residents from a communicable disease—including those residents with conditions like obesity and diabetes that may ultimately be "comorbidities" along with COVID-19.

[9]  *Compare* Cicchetti Decl. ¶ 20, ECF No. 53-5 (claiming, as an economist, that there "is no scientific evidence that supports California continuing to restrict religious worship"), *and* Kauffman Decl. ¶ 14, ECF No. 53-6 (expressing that "[d]espite the state's claim, there is no rational and legitimate scientific or public health basis supporting the sweeping breadth and scope of the State of California's above-described closure mandate"), *and* Lyons-Weiler Decl. ¶ 29, ECF No. 53-7 (opining that the increasing cases in the United States "are not as large of a concern as they were in the beginning of the pandemic" because the "infection case fatality rate . . . is falling fast" and "COVID-19 is not the monster we initially thought it was"), *and* Dr. Bhattacharya Decl. ¶ 28, ECF No. 53-8 (estimating the "infection fatality rate is less than 0.2%" for "the non-elderly congregants," whereas the mortality risk for those over seventy who contract the disease is "still small, with 98.7% of infected elderly people surviving the infection"), *and* Trissell Decl. Exs. D–F, ECF No. 69-1 (arguing that current lockdown policies are producing detrimental effects on short and long-term public health and "[t]he most compassionate approach that balances the risks and benefits of reaching herd immunity, is to allow those who are at minimal risk of death to live their lives normally to build up immunity to the virus through natural infection, while better protecting those who are at highest risk"), *with* Watt Decl. ¶¶ 93–103, ECF No. 57-2 (explaining that having "a single infectious disease as a top ranking cause of death signals a serious change" because "[i]nfectious diseases were commonly the top causes of death decades ago, but they have been replaced with chronic diseases more recently because our public health efforts have led to reductions in infectious disease"), *and* Dr. Rutherford Decl. ¶¶ 38–46, ECF No. 57-3 (opining that "the novel coronavirus pandemic calls for extraordinary measures to protect the population" not only because it causes serious illness or death, but also because there is "emerging evidence that the virus has serious lasting, and possibly long-term, effects on some individuals"), *and* Imrey Decl. ¶ 50, ECF No. 57-4 (opining that "Dr. Bhattacharya's seroprevalence-survey based claims of very low overall and age-specific COVD-19 infection fatality rates, generally and specifically in California, remain matters on which, for good reasons, there is no scientific consensus").

rejects Plaintiffs' claim that the State's restrictions are unconstitutional because the COVID-19 public health emergency has ended.

### B.    Discriminatory Restrictions

"Where state action does not 'infringe upon or restrict practices because of their religious motivation' and does not 'in a selective manner impose burdens only on conduct motivated by religious belief,' it does not violate the First Amendment." *S. Bay Church*, 959 F.3d at 939 (quoting *Lukumi*, 508 U.S. at 532).   In determining whether a law discriminates against religion, courts compare the treatment of religious conduct and "analogous non-religious conduct" and consider whether the governmental interests "could be achieved by narrower ordinances that burden[] religion to a far lesser degree." *Lukumi*, 508 U.S. at 546.

As mentioned, the Court's decision to deny Plaintiffs' initial request for injunctive relief also rested on the Court's determination that the then-operative restrictions did not place a burden on in-person worship services "because of a religious motivation, but because of the manner in which the service is held, which happens to pose a greater risk of exposure to the virus." (Mot. Hr'g Tr. 26:9–25.)   The Court further determined that Plaintiffs had "not demonstrated arbitrary exceptions to [the] classification" of restrictions that included in-person worship services.   (*Id.* 27:5–6.)   Plaintiffs argue the revised restrictions do not pass muster under Free Exercise Clause standards for an assortment of reasons, including that the State's four-tier system gives preferential treatment to secular businesses like supermarkets, retail stores, and factories.   (*See* Renewed Mot. 8:11–17:22.)

In resolving Plaintiffs' free exercise arguments, the Court finds persuasive Judge Bernal's decision from the Central District of California that considered the same four-tier system in *Harvest Rock Church, Inc. v. Newsom*, No. LACV 20-6414 JGB (KKx), 2020 WL 5265564 (C.D. Cal. Sept. 2, 2020), and the Ninth Circuit's subsequent opinion, No. 20-55907, 2020 WL 5835219 (9th Cir. Oct. 1, 2020).   Judge Bernal denied Harvest International Ministry and Harvest Rock Church's comparable request for injunctive relief, reasoning in part that they had not shown a likelihood of success on the merits of their free

exercise claims.    2020 WL 5265564, at *2–3.  The plaintiffs appealed, and the Ninth Circuit similarly denied their emergency motion to enjoin "California Governor Gavin Newsom's COVID-19 Executive Orders and related restrictions (Orders) as they apply to in-person worship services."  2020 WL 5835219, at *2.  The Ninth Circuit explained:

> We find that Harvest Rock has not shown a likelihood of success on its argument that the district court abused its discretion by declining to enjoin the Orders.  The evidence that was before the district court does not support Harvest Rock's arguments that the Orders accord comparable secular activity more favorable treatment than religious activity.  The Orders apply the same restrictions to worship services as they do to other indoor congregate events, such as lectures and movie theaters.  Some congregate activities are completely prohibited in every county, such as attending concerts and spectating sporting events.  The dissent states that the restrictions applicable to places of worship 'do not apply broadly to all activities that might appear to be conducted in a manner similar to religious services,' but does not provide support for this point. By our read the restrictions on theaters and higher education are virtually identical.
>
> Harvest Rock also contends that the Governor failed to provide a rationale for the more lenient treatment of certain secular activities, such as shopping in a large store.  However, the Governor offered the declaration of an expert, Dr. James Watt, in support of the claim that the risk of COVID-19 is elevated in indoor congregate activities, including in-person worship services.  Harvest Rock did not offer a competing expert or any other evidence to rebut Dr. Watt's opinion that congregate events like worship services are particularly risky.  Because the district court based its order on the only evidence in the record as to the risk of spreading COVID-19 in different settings, Harvest Rock is unlikely to show that the district court abused its discretion.

*Id.* at *1.

The question, then, is whether the evidence before the Court points to a different outcome than in *Harvest Rock*.  It does not.  As set forth above, the evidence shows that the State's restrictions are based on the elevated risk of transmission of the novel coronavirus in indoor settings, particularly congregate activities and those involving singing and chanting.  *See supra* Part II.A, E.  The restrictions are tailored to the State's understanding of the risk of certain activities and the potential spread of SARS-CoV-2, not

the targeted conduct's religious motivation.  *See S. Bay Church*, 959 F.3d at 939 (citing *Lukumi*, 508 U.S. at 532); *see supra* Part II.E.  And the State has continued to fine tune its restrictions "to changing facts on the ground."  *See S. Bay Church*, 140 S. Ct. at 1614 (Roberts, C.J.).  (*See also* Dr. Watt Decl. ¶¶ 47–106.)

That said, unlike the *Harvest Rock* plaintiffs, Plaintiffs here submit evidence that includes a declaration from the medical director of a family medical group, Dr. George Delgado, who has "been intimately involved in planning for the current coronavirus disease . . . for [his] family medical group and hospice."  (Dr. Delgado Decl. ¶¶ 2–5, ECF No. 53-4.)  Among other things, Dr. Delgado states, "I feel that going to one's church, synagogue or mosque should be much safer than going to the grocery store, participating in a protest, or working at a manufacturing facility."  (*Id.* ¶ 14.)  To support this statement in his supplemental declaration,[10] Dr. Delgado sets forth a "comparative risk analysis" that states the risk of contracting COVID-19 at a house of worship is "0.125 or 12.5% the risk at the grocery store," "0.01 or 1% the risk at public protests," and "0.25 or 25% the risk at [a] manufacturing facility."  (Dr. Delgado Decl. ¶¶ 25, 33, 43.)[11]

The State argues Dr. Delgado's comparative risk assessment is both baseless and inadmissible for a litany of reasons.  (State's Opp'n 18:5–20:17.)  The State also supplies the opinion of Peter B. Imrey, Ph.D., a Professor of Medicine at Cleveland Clinic and Case Western Reserve University.  Imray explains why Dr. Delgado's broad-brushed assessment that leads to precise probabilities of the risk of COVID-19 spread is not accepted as reliable in the relevant scientific community.  (Imrey Decl. ¶¶ 31–40 (explaining that Dr. Delgado's incomplete model "is unscientific" because it does not include supporting data and there is no "practical scientific basis" for "assessing the reliability of such numbers").  *See also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–94 (1993) (providing the court

---

[10] Dr. Delgado provided a similar declaration in support of Plaintiffs' initial motion for injunctive relief.  (*See* Dr. Delgado Decl. ¶¶ 14–23, ECF No. 12-3.)

[11] Although Plaintiffs' other declarants make statements about the danger of COVID-19 to religious congregants and the broader public as part of the debate referenced above, *see supra* note 9, they do not provide this type of comparative risk assessment.

can consider whether a technique is acceptable in the relevant scientific community).  In rebuttal to Imrey's detailed critique, Dr. Delgado states that "there are presently no adequate models or methodologies to compare risks, and so I cite none" and that his assessment is based "on common scientific sense."  (Dr. Delgado Decl. ¶ 36, ECF No. 61-3.)  *But see Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) (explaining that when peer review scrutiny is unavailable, experts should "explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in" the relevant field).

The Court assigns Dr. Delgado's declaration minimal weight.  Although he may have treated "people with infectious diseases including viral illnesses such as influenza which tend to occur in epidemics," Dr. Delgado lacks significant experience in epidemiology.  (Dr. Delgado Decl. ¶¶ 2–5.)  Moreover, he does not explain the basis for his model used to assess the precise comparative risk of religious services and other activities—nor does he provide any supporting data for his conclusions.  (*See id.* ¶¶ 25, 31, 41 (broadly assigning values for "relative risk" factors like "touching objects" and being in "[c]lose contact with others" for various different environments without offering any data to support them); *see also* Imrey Decl. ¶¶ 31–40 (dissecting Dr. Delgado's comparative risk model).)  Therefore, although the Court has opted to not strictly apply the Rules of Evidence to the parties' submissions, *see supra* note 7, the Court does not believe Dr. Delgado's comparative risk assessment survives scrutiny under *Daubert*.  *See* 509 U.S. 579; *see also* Fed. R. Evid. 702 (providing expert testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods").

And finally, aside from being unreliable, Dr. Delgado's comparative risk assessment is simply not convincing in light of the evidence before the Court.  The COVID-19 pandemic remains an area "fraught with medical and scientific uncertainties."  *See S. Bay*

*Church*, 140 S. Ct. at 1613 (Roberts, C.J.).  It is one thing for an expert to explain why epidemiologists believe there is a higher risk of transmission of SARS-CoV-2 in large gatherings, indoor spaces, and where groups are singing indoors, it is quite another for someone to purport to calculate—without data—that the risk of contracting COVID-19 at a house of worship is "12.5% the risk at the grocery store" or "1% the risk at public protests." (*See* Dr. Watt Decl. ¶¶ 27–45; Dr. Delgado Decl. ¶¶ 25, 33, 43.)  *See also supra* note 7.  Probabilities are not derived from only "common scientific sense."  (*See* Dr. Delgado Decl. ¶ 36, ECF No. 61-3.)  Hence, the Court assigns some weight to Dr. Delgado's opinions about COVID-19, but the Court assigns no weight to the conclusions of his comparative risk assessment.

On balance, having reviewed the parties' evidence, the Court finds Plaintiffs have not shown they are likely to succeed in demonstrating the State and County's restrictions "infringe upon or restrict practices because of their religious motivation" or "in a selective manner impose burdens only on conduct motivated by religious belief."  *See S. Bay Church*, 959 F.3d at 939 (quoting *Lukumi*, 508 U.S. at 533, 543); *see also Harvest Rock Church*, 2020 WL 5835219, at \*1–2.  This determination does not mean Plaintiffs could not prevail at a trial on the merits.  Rather, they merely have not shown they are entitled to the extraordinary remedy that is injunctive relief before trial.  *See San Francisco*, 944 F.3d at 789 (providing the court should not issue a preliminary injunction "unless the movant, *by a clear showing*, carries the burden of persuasion").

## C. Discriminatory Enforcement

Last, the Court addresses Plaintiffs' argument that California's restrictions "have been enforced discriminatorily."  (Renewed Mot. 9:13–28; *see also id.* 20:16–23:9.)  Plaintiffs argue that "despite enforcing its restrictions against houses of worship, California has steadfastly refused to enforce its restrictions against political protests," making "places of worship" ultimately "pay for the sins of protestors . . . a palpable violation of Plaintiffs' rights." (*Id.* 21:11–12, 23:8–9.) *See also Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1083–84 (9th Cir. 2015) (analyzing a claim of whether Washington's Pharmacy Quality

Assurance Commission selectively enforced rules concerning emergency contraceptives "against religiously motivated violations but not against secularly motivated violations" in contravention of the Free Exercise Clause).

The Court is unconvinced. Plaintiffs are challenging the State and County's restrictions on indoor worship and group singing—not outdoor gatherings or protests. The operative restrictions do not limit attendance for outdoor religious services or outdoor protests. (*See* SAC Ex. 1-7; Grabarsky Decl. Ex. 14.) And the challenged restriction on group singing applies equally to indoor religious services and indoor protests. *See supra* Part II.E. Further, as described above, the distinction between indoor and outdoor gatherings is based on the State's understanding of the increased risk of transmission of the novel coronavirus indoors. The same is true for the distinction between indoor and outdoor group singing. *See supra* Part II.A, E. Hence, the Court agrees that by focusing on outdoor protests, "Plaintiffs are comparing apples and oranges." (State's Opp'n 28:3–4.) Indeed, Judge Bernal rejected a similar argument in *Harvest Rock Church*. *See* 2020 WL 5265564, at *2 (reasoning that "how the Orders treat outdoor protests is irrelevant to whether the Orders' restriction on indoor religious services is constitutional" and "whether the Governor encouraged outdoor protests that violated earlier stay-at-home orders is" likewise "irrelevant").[12] The evidence in this case leads the Court to the same conclusion.

Moreover, the Court agrees that Plaintiffs do not otherwise demonstrate a pattern of discriminatory enforcement. On this point, the County shows that as of August 26, 2020, it "had issued 144 citations for violations of the County's COVID-19 public health orders." (Jordan Decl. ¶ 2, Ex. A, ECF No. 58-1.) None of those 144 citations was issued to places of worship or persons engaged in religious services. (*Id.* ¶ 3.)

---

[12] For this same reason, the Court finds distinguishable the district court's discussion of protests in *Capital Hill Baptist Church v. Muriel Bowser*, No. 20-CV-02710 (TNM), 2020 WL 5995126 (D.D.C. Oct. 9, 2020). (*See* ECF No. 70.) In that case, the District of Colombia contended it "has a compelling interest in capping the number of attendees at the Church's *outdoor services*." *Id.* at *8 (emphasis added). Here, by contrast, the State and County are not limiting the attendees at outdoor religious services, and the State's restrictions are based on its understanding of the increased risk posed by large *indoor* gatherings that include group singing.

- 24 -

In addition, through August 26, 2020, the County had served ten cease-and-desist orders or compliance letters to businesses and other entities with respect to reported violations of the County's public health orders.  (Johnston Decl. ¶ 7, Ex. B, ECF No. 58-2.)  Only three of those items were issued to places of worship.  (*Id.*)  The remaining seven were issued to businesses—including gyms and a restaurant with a bar—as well as a college and a public school district.  (*Id.*)

Finally, aside from issuing citations and cease-and-desist orders, the County has issued health officer orders that require a business or other organization to immediately close down and cease operations.  (Jordan Decl. ¶ 9, Ex. C.)  As of August 26, 2020, the County had issued only five of these orders—none to places of worship.  (*Id.*)  Three of the five immediate-closure orders were served on gyms that continued indoor operations in violation of the applicable rules, and the other two were issued to restaurants with bars for repeated violations of social distancing, sanitation, and facial covering requirements.  (*Id.*)  The County submits that this evidence shows its "enforcement of COVID-19 public health orders and regulations has been uniform, evenhanded, and in no way has treated secular businesses or activities more favorably than religious organizations or services."  (County's Opp'n 10:11–16.)

In response, Plaintiffs claim the County "misses the point" because the County "treats protestors as first-class citizens."  (Reply to County Opp'n 8:16–9:12.)  The Court disagrees.  The manner in which the County is enforcing the State's COVID-19 restrictions goes to the heart of whether there has been discriminatory enforcement.  The evidence does not show a pattern of discriminatory enforcement against religious organizations.  Nor does the evidence show the County has treated comparable secular businesses or activities more favorably than religious organizations.  Therefore, Plaintiffs do not meet their burden on this point.  *See Stormans*, 794 F.3d at 1083–84 (concluding there was no evidence of selective enforcement by the state commission against religiously motivated violations).

Overall, the Court finds that Plaintiffs have not shown they are likely to succeed on their claim that the challenged restrictions are unconstitutional in light of discriminatory

enforcement.  Hence, injunctive relief is similarly not appropriate on this basis.  *See San Francisco*, 944 F.3d at 789 (providing the court should not issue a preliminary injunction "unless the movant, *by a clear showing*, carries the burden of persuasion").

## V.    CONCLUSION

In sum, Plaintiffs have not demonstrated that new developments mean they are likely to succeed on their free exercise claims under the federal and state constitutions.  The Court's analysis of the remaining injunctive relief factors remains the same.  (*See* Mot. Hr'g Tr. 30:3–19.)  Plaintiffs thus have not shown they are entitled to injunctive relief before a trial on the merits.  Consequently, the Court confirms its prior conclusions and **DENIES** Plaintiffs' renewed motion for a temporary restraining order or preliminary injunction (ECF No. 53).  For the same reasons, the Court also confirms that an injunction pending appeal is not appropriate.

IT IS SO ORDERED.

DATED: October 14, 2020

Hon. Cynthia Bashant
United States District Judge

20cv0865