1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **SOUTHERN DISTRICT OF CALIFORNIA**
10

11  SOUTH BAY UNITED PENTECOSTAL          Case No. 20-cv-00865-BAS-AHG
    CHURCH, *et al.*,
12                                         **ORDER**
13                          Plaintiffs,      1. **GRANTING DEFENDANTS'**
                                                **REQUEST FOR JUDICIAL**
14        v.                                    **NOTICE (ECF No. 81-7);**
                                             2. **STRIKING EXHIBITS 4–7 TO**
15  GAVIN NEWSOM, in his official              **THE DECLARATION OF**
    capacity as Governor of California, *et al.*,   **TRISSEL AND DENYING AS**
16                                              **MOOT DEFENDANTS'**
                           Defendants.          **OBJECTION (ECF No. 86);**
17                                              **AND**
18                                           3. **DENYING PLAINTIFFS'**
                                                **RENEWED MOTION FOR A**
19                                              **TEMPORARY RESTRAINING**
20                                              **ORDER OR PRELIMINARY**
                                                **INJUNCTION (ECF No. 75).**
21
22
23
24

25         In this action brought by a San Diego church to challenge California's COVID-19
26  regulation, the Court is asked to draw a difficult balance between religious liberty and
27  public health.  The applicant church seeks to enjoin the regulation in order to provide indoor
28  worship for its congregation, and California seeks to preserve the regulation to curb the

- 1 -

community spread of the virus.  The Southern California region is now witnessing the pandemic at its peak: record number of new daily cases, skyrocketing deaths, and 0% of ICU hospital beds left to spare.  The stakes are high.  Religion is all the more essential when disease, desperation, and death surround us; at the same time, a unified effort to fight the spread of the virus is desperately needed like never before.

In drawing this difficult balance between religious liberty and public health, the Court must follow the higher courts' precedents, when the precedents seem to change course as quickly as the various pandemic restrictions.  Admittedly, this has been a rapidly evolving—and escalating—pandemic.  And in this very case, the Supreme Court declined to intervene after the Court refused to enjoin California's prior regulation.  Now, by all measures, the pandemic is worse and more out of control in Southern California than when that decision was made.  Nevertheless, the Court is tasked with deciding whether Chief Justice Roberts' rationale for not intervening in this case has now "expired," as Justice Gorsuch's recent concurrence in another case suggests.  *See Roman Catholic Diocese of Brooklyn v. Cuomo*, --- U.S. ---- (Nov. 25, 2020), 2020 WL 6948354, at *5 (Gorsuch, J., concurring).

This decision is the Court's best attempt to interpret and harmonize the recent decisions on the issue from the Supreme Court and the Ninth Circuit, in balancing the essential interests in religious liberty and public health.

## I.  BACKGROUND

The Court incorporates the background section from the Court's October 15, 2020 Order.  (Order at 3:21–15:2, ECF No. 71.)   In that Order, the Court denied Plaintiffs' renewed motion to enjoin California's restrictions in place at that time, in the form of a capacity limit on indoor worship services and a ban on singing, chanting, or shouting indoors.  *Id.*

//

//

- 2 -

20cv0865

**A.    Rulings Above**

    **1.    The Supreme Court's Prior Denial of Plaintiffs' Application**

In May, Plaintiffs sought emergency relief from the Supreme Court.[1]  After Justice Kagan referred Plaintiffs' application for injunctive relief to the Supreme Court, the Court denied it.  *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (mem.).  Chief Justice Roberts wrote an opinion concurring in the denial of the application.  *Id.* at 1613–14.  He reasoned:

> Although California's guidelines place restrictions on places of worship, those restrictions appear consistent with the Free Exercise Clause of the First Amendment.  Similar or more severe restrictions apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time.  And the Order exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods.

*Id.* at 1613.  The Chief Justice further explained:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement.  Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect."  *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905).  When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad."  *Marshall v. United States*, 414 U.S. 417, 427 (1974).  Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people.  *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985).

*Id.*

//

---

[1] Appl. for Inj. Relief, *S. Bay United Pentecostal v. Newsom* (No. 19A1044).

20cv0865

### 2.     *Roman Catholic Diocese of Brooklyn v. Cuomo* (2020)

In late November, the Supreme Court granted Roman Catholic Diocese of Brookyn's emergency application to enjoin New York's COVID-19 restrictions on houses of worship, which had limited in-person attendance to 10 persons in the red zone and 25 persons in the orange zone. *Roman Catholic Diocese of Brooklyn v. Cuomo*, --- U.S. ----, 2020 WL 6948354 (Nov. 25, 2020) (per curiam). The Court held that the 10- and 25-person capacity limits should be reviewed under strict scrutiny, finding that the challenged rules singled out houses of worship for "especially harsh treatment," which "effectively barr[ed] many from attending religious services." *Id.* at *1, 3. The Court opined that, although "[s]temming the spread of COVID–19 is unquestionably a compelling interest," New York's restrictions were not narrowly tailored to the state's interest. *Id.* at *2.

A week after, the Supreme Court vacated a district court's decision to not enjoin California's restriction on houses of worship as requested by the Harvest Rock Church in Los Angeles County,[2] and remanded to the Ninth Circuit with instructions to remand to the Central District of California for further consideration in light of the Court's ruling in *Roman Catholic Diocese*. *Harvest Rock Church v. Newsom*, --- S. Ct. ----, 2020 WL 7061630 (Dec. 3, 2020) (mem.).

### 3.     *Dayton Valley v. Sisolak* (9th Cir. 2020)

On December 15, 2020, the Ninth Circuit issued a published decision reversing a district court's denial of a preliminary injunction barring enforcement of a Nevada directive against houses of worship. *Dayton Valley v. Sisolak*, No. 20-16169, 2020 WL 7350247 (9th Cir. Dec. 15, 2020). The Ninth Circuit held that the *Roman Catholic Diocese* decision compelled strict scrutiny review of Nevada's directive, which imposed a fifty-person cap on houses of worship but a 50% capacity cap on certain other businesses. *Dayton Valley*, 2020 WL 7350247, at *3. The panel held that *Roman Catholic Diocese* "arguably

---

[2] *Harvest Rock Church, Inc. v. Newsom*, No. LACV206414JGBKKX, 2020 WL 5265564 (C.D. Cal. Sept. 2, 2020).

- 4 -

represented a seismic shift in Free Exercise law" and Nevada's directive created "the same 'disparate treatment' of religion," thus triggering strict scrutiny review under *Roman Catholic Diocese*. *Id.* The panel found that Nevada held a compelling interest in slowing the spread of COVID-19 but concluded that the directive was not narrowly tailored to the compelling interest "because, for example, 'maximum attendance at a religious service could be tied to the size of the [house of worship].'" *Id.* at *4 (citing *Roman Catholic Diocese*, 2020 WL 6948354, at *2). Concluding that the plaintiff church has demonstrated a success on the merits of its Free Exercise claim, and finding other preliminary injunction factors to be in favor of an injunction, the Ninth Circuit reversed the district court with instructions that the district court "employ strict scrutiny review to its analysis of the Directive, and preliminarily enjoin the State from imposing attendance limitations on in-person services in houses of worship that are less favorable than 25% of the fire-code capacity." *Id.* at *4.

## B.   Winter Outbreak in California and the State's Response

Meanwhile, COVID-19 rampaged through California, quickly bringing the State into the worst phase of the pandemic since its inception in March. In just a month between mid-November and mid-December, the number of new cases per day in California increased from 8,743 a day to more than 35,000 a day.[3] The number of hospitalizations for COVID-19 in California grew from 777 on November 15 to 13,635 on December 14.[4] In Southern California, ICU bed capacity is now 0%.[5]

In response to the unprecedented surge in the virus infections and patients needing hospitalization, California's public health officials reinforced its response to reduce community spread of the virus, protect individuals at higher risk of severe illness or death,

---

[3] Declaration of Dr. George Rutherford, MD ("Rutherford Decl.") ¶ 66, ECF No. 81-4.
[4] *Id.*
[5] Current tier assignments as of December 15, 2020, https://covid19.ca.gov/state-dashboard/.

and prevent the state's health care delivery system from being overwhelmed.[6]  Community spread occurs when residents become infected with the virus in community settings, making it difficult to identify the source of exposure.[7]  California's response targets three factors that facilitate community spread of COVID-19: (1) prevalence of COVID-19 in the community, measured by the proportion of individuals infected at a given time, (2) the number of interactions between people during which the pathogen can be transmitted, and (3) the average likelihood of transmission per interaction.[8]  Wearing masks, frequent handwashing, and social distancing reduce the likelihood of transmission per interaction (factor 3).[9]  Stay at home orders and limiting the capacity of indoor operations reduce the number of interactions (factor 2).[10]

In devising its response to manage the second factor—reducing the number of interpersonal interactions—the State applies neutral risk criteria to determine the conditions in which a given activity may take place:

- ability to accommodate wearing masks at all times;

- ability to allow physical distancing;

- ability to limit duration of exposure;

- ability to limit amount of mixing of people from differing households and communities;

- ability to limit amount of physical interactions of visitors/patrons;

- ability to optimize ventilation; and

- ability to limit activities that are known to cause increased spread.

(Declaration of Todd Grabarsky ("Grabarsky Decl.") Ex. 6,  ECF No. 81-1 at 74–75; *Id.* Ex. 7, ECF No. 81-1 at 85–86.)

---

[6] Declaration of Dr. Michael A. Soto ("Soto Decl.") ¶ 9, ECF No. 81-5; Declaration of Dr. James Watt, MD, MPH ("Watt Decl.") ¶ 90, ECF No. 81-3.
[7] Watt Decl. ¶34.
[8] Stoto Decl. ¶ 10.
[9] *Id.*
[10] *Id.*

On December 3, 2020, California implemented a Regional Stay at Home Order applicable to any Regions for which the adult ICU bed capacity falls below 15%.[11]  The Order mandates "[a]ll individuals living in the Region [to] stay home or at their place of residence except as necessary to conduct activities associated with the operation, maintenance, or usage of critical infrastructure."[12]  When operative in a Region,  the Order supersedes the State's prior guidance including the Blueprint for a Safer Economy.[13]  For example, restaurants in the Purple Tier could operate outdoors before, but under the new Order, restaurants may only offer take-out or deliveries.[14]

The Regional Stay at Home Order allows Californians to engage in onsite operations in the critical infrastructure sector and to gather outdoors for religious worship and political expression.[15]  California designates as essential "[c]lergy for essential support and faith-based services that are provided outdoors, or through streaming or other technologies that support physical distancing and state public health guidelines," along with other designated essential workers in the critical infrastructure sector.[16]  The critical infrastructure sector also includes certain operations in health care; emergency services; food and agriculture; energy;  water  and  wastewater;  transportation  and  logistics;  communications  and information technology; government operations and other community-based essential functions; critical manufacturing; financial services; chemical and hazardous materials; defense industrial base; and industrial, commercial, residential, and sheltering facilities and

---

[11] Grabarsky Decl., Ex. 13, ECF No. 81-1 at 152–55.

[12] *Id.* at ¶ 2.a.

[13] *Id.* at ¶ 9.

[14] *Compare* <u>California Health Officials Announce a Regional Stay at Home Order Triggered by ICU Capacity</u> (Dec. 3, 2020), https://www.gov.ca.gov/2020/12/03/california-health-officials-announce-a-regional-stay-at-home-order-triggered-by-icu-capacity/ *with* <u>Industry guidance to reduce risk—Restaurants, wineries, and bars</u> (Dec. 1, 2020) https://covid19.ca.gov/industry-guidance/#restaurants.

[15] Grabarsky Decl., Ex. 13 at ¶ 2.b,c , ECF No. 81-1 at 153.

[16] <u>Essential Workforce</u> at 8.16 (Dec. 3, 2020), https://covid19.ca.gov/essential-workforce/.

services.[17]  The essential workforce employed at the listed critical infrastructure is allowed to report to work "if remote working is not practical."[18]

The Regional Stay at Home Order became operative in San Diego after the ICU capacity for the Southern California Region fell below 15%.[19]  Accordingly, in San Diego, all gatherings at places of worship, weddings, and funerals, as well as for political expression must be held outdoors.[20]  Lectures and student gatherings at higher education institutions must be held outdoors, except for some courses like labs.[21]  Gyms and dance studios must operate outdoors, and indoor pools, hot tubs, saunas, and steam rooms must close.[22]  Amusement parks, museums, zoos, aquariums, overnight campgrounds must close, and so must convention centers, concert venues, movie theatres, family entertainment centers, and live performances.[23]  Entertainment production and professional sports may not take place with live audiences.[24]  Restaurants, wineries, bars, breweries, and distilleries must close for dine-in or on-site consumption.[25]  Tattoo shops, hair salons, barbershops, nail salons, and body waxing studios must close.[26]  Cardrooms and satellite wagering businesses must close.[27]  Hotels must not accept in-state reservations unless used for listed exceptions such as mitigating COVID-19, and out-of-state reservations must be

---

[17] Essential Workforce (Dec. 3, 2020), https://covid19.ca.gov/essential-workforce/.

[18] Id.

[19] Current tier assignments as of December 15, 2020 (Dec. 15, 2020), https://covid19.ca.gov/stay-home-except-for-essential-needs.

[20] Grabarsky Decl., Ex. 13 at ¶ 2.c; Industry guidance to reduce risk—Places of worship and cultural ceremonies (Dec. 8, 2020 at 1:39 p.m.), https://covid19.ca.gov/industry-guidance/#worship.

[21] Industry guidance to reduce risk—Higher education (Oct. 1, 2020), https://covid19.ca.gov/industry-guidance/#higher-education.

[22] Industry guidance to reduce risk—Gyms and fitness centers (Dec. 3, 2020), https://covid19.ca.gov/industry-guidance/#fitness-guidance.

[23] Find the status for activities in your county, https://covid19.ca.gov/safer-economy/.

[24] Id.; California Health Officials Announce a Regional Stay at Home Order Triggered by ICU Capacity (Dec. 3, 2020), https://www.gov.ca.gov/2020/12/03/california-health-officials-announce-a-regional-stay-at-home-order-triggered-by-icu-capacity/.

[25] Find the status for activities in your county, https://covid19.ca.gov/safer-economy/.

[26] Id.

[27] Id.

at least the minimum time period required for quarantine.[28]  Schools may not reopen fully for in-person instruction with some exceptions.[29]

Grocery stores can operate at 35% of capacity.[30]  Clothing stores, convenience stores, home and furnishing stores, and other retail stores, in addition to libraries, can operate at 20% of capacity.[31]  Laundromats and limited service providers that do not require close contact may remain open with modifications.[32]  Essential workers in public transit,[33] manufacturing plants,[34] logistics and warehousing facilities,[35] and non-urgent medical and dental care offices[36] may conduct on-site operations with mandatory precautions.

The following table summarizes the restrictions in place in the San Diego County, where Plaintiffs' church is located:

|  | Regional Stay at Home Order Capacity Restrictions |
| --- | --- |
| **Places of worship** | Outdoor only. |
| **Political expression** | Outdoor only. |
| **Weddings and Funerals** | Outdoor only. |
| **Cultural ceremonies** | Outdoor only. |
| **Outdoor Recreational Facilities** | Allow outdoor operation only without any food, drink or alcohol sales. Additionally, overnight stays at campgrounds will not be permitted. |
| **Entertainment production and professional sports** | No live audience. |
| **Amusement parks** | Closed. |
| **Museums, zoos, and aquariums** | Closed. |

---

[28] *Id.*

[29] *Id.* ("Local school and health officials may decide to open elementary schools, and school officials may decide to conduct in-person instruction for a limited set of students in small cohorts.")

[30] *Id.*; CDPH, Supplement to Regional Stay at Home Order (Dec. 6, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/supplement-regional-stay-at-home-order.aspx.

[31] Find the status for activities in your county, https://covid19.ca.gov/safer-economy/.

[32] *Id.*; Industry guidance to reduce risk—Limited services, https://covid19.ca.gov/industry-guidance/#limited-services.

[33] Industry guidance to reduce risk—Public transit and intercity passenger rail (Oct. 20, 2020), https://covid19.ca.gov/industry-guidance/#public-transit.

[34] Industry guidance to reduce risk—Manufacturing, https://covid19.ca.gov/industry-guidance/#manufacturing.

[35] Industry guidance to reduce risk—Logistics and warehousing facilities, https://covid19.ca.gov/industry-guidance/#logistics.

[36] Find the status for activities in your county, https://covid19.ca.gov/safer-economy/.

| | |
|---|---|
| **Restaurants** | Take-out only. |
| **Wineries** | Closed for on-site consumption. |
| **Bars, Breweries, Distilleries** | Closed for on-site consumption. |
| **Higher education** | Outdoor only (closed for indoor lectures and student gatherings). |
| **Convention Centers** | Closed. |
| **Concert venues** | Closed. |
| **Movies** | Closed. |
| **Family Entertainment Centers** | Closed. |
| **Musical, theatrical, and artistic performances** | Closed. |
| **Cardrooms and satellite wagering** | Closed. |
| **Tattoo shops** | Closed. |
| **Hair salons and barbershops** | Closed. |
| **Nail salons** | Closed. |
| **Body waxing studios** | Closed. |
| **Dance studios** | Outdoor only. |
| **Gyms** | Outdoor only. |
| **Indoor pools, hot tubs, saunas** | Closed. |
| **Hotels** | Closed for in-state reservations unless used for listed exceptions. Open for non-essential, out-of-state reservations so long as reservation is at least the minimum time period required for quarantine. |
| **Music, film, and TV production** | May resume subject to approval by county public health officers. |
| **Public Transit** | Open with safety precautions. |
| **Office workspaces** | Allow remote only except for critical infrastructure sectors where remote working is not possible. |
| **Libraries** | 20% of capacity. |
| **Retail stores / Shopping malls** | 20% of capacity. |
| **Grocery stores** | 35% of capacity. |
| **Laundromats** | Open with modifications. |
| **Critical infrastructure** | Essential workers may work on site, if remote work not practicable. |
| **Non-urgent medical and dental** | Open with safety precautions. |
| **Schools** | Schools may not reopen fully for in-person instruction until the county has been in the Substantial (Red) Tier for two weeks. Local school and health officials may decide to open elementary schools, and school officials may decide to conduct in-person instruction for a limited set of students in small cohorts. |
| **Child care** | Open with safety precautions. |
| **Day camps** | Open with modifications. |

//

- 10 -

## C.    The Present Motion

Plaintiffs filed the present renewed motion for a temporary restraining order and application for an injunction pending appeal on December 3, 2020.  (ECF No. 75.) Plaintiffs concurrently filed a parallel application with the Ninth Circuit.  (Emergency Mot., *S. Bay United Pentecostal Church v. Newsom*, No. 20-55533 (9th Cir. Dec. 3, 2020), ECF No. 96.)  The Ninth Circuit vacated this Court's October 15, 2020 Order, remanded the case for further consideration, and denied without prejudice Plaintiffs' emergency motion for an injunction pending appeal.  (Mandate and Order, ECF No. 84.)

Plaintiffs filed a supplemental brief.  (ECF No. 80.)  California Defendants filed an Opposition (ECF No. 81), and San Diego Defendants filed a Joinder and Opposition  (ECF Nos. 82, 83).  Plaintiffs filed a Reply.  (ECF No. 85.)  The Court held a hearing on December 18, 2020.  The Motion is now ripe for decision.

## II.    PRELIMINARY MATTERS

Because the case has been remanded, the Court construes Plaintiffs' application for a stay pending appeal (ECF No. 75) as a renewed motion for a temporary restraining order or preliminary injunction.

California Defendants' request for judicial notice (ECF No. 81-7), to which Plaintiffs have not objected, is granted.[37]

---

[37] To the extent that any exhibit does not satisfy the requirements of summary judgment or trial evidence, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  This flexibility exists because "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination."  *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). A district court therefore "may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm."  *Id.*  District courts have exercised this discretion to consider a variety of evidence at the preliminary injunction stage that may otherwise be inadmissible.  *See, e.g.*, *Flynt Distrib. Co.*, 734 F.2d at 1394 (holding that it was within the district court's discretion to rely on hearsay statements); *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1225 n.4 (C.D. Cal. 2004) (considering internet materials that were not individually authenticated).

20cv0865

At the hearing, Plaintiffs withdrew exhibits 4 through 7 accompanying Plaintiffs' counsel's declaration, which consist of evidence submitted to the Kern County Superior Court in a separate action.  (Exs. 4–7 to the Declaration of Jeffrey M. Trissell, ECF No. 85-2 at 76–222.)  The withdrawn exhibits are stricken from the record, and California Defendants' objection (ECF No. 86) is denied as moot.

## III.   LEGAL STANDARD

The standard for a temporary restraining order and preliminary injunction are "substantially identical."  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The party seeking the injunction bears the burden of proving these elements.  *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).  "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'"  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

## IV.   ANALYSIS

### A.   Irreparable Harm

The Supreme Court has made clear that capacity restrictions at houses of worship will cause irreparable harm without temporary or preliminary relief.  *See Roman Catholic Diocese,* 2020 WL 6948354, at *3.  The Court finds that Plaintiffs have shown irreparable harm.

//

//

20cv0865

**B.     Likelihood of Success on the Merits**

The issue is whether Plaintiffs' Free Exercise Clause claim as applied to the current restrictions in place is likely to succeed on the merits at a final hearing.  Ordinarily, a party seeking preliminary injunction must establish that it will prevail on the merits with a "reasonable certainty." *Sierra Club v. Hickel*, 433 F.2d 24, 33 (9th Cir. 1970), *aff'd sub nom. Sierra Club v. Morton*, 405 U.S. 727 (1972).  In this circuit, the burden is lessened to a fair chance of success on the merits in cases in which the harm that may occur to the plaintiff is sufficiently serious.  *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 526 F.2d 86, 88  (9th Cir. 1975).

The Court limits its analysis to Plaintiffs' Free Exercise Clause claim because the Ninth Circuit has remanded the present action "[i]n light of the Supreme Court's orders in *Harvest Rock Church, Inc. v. Newsom*, No. 20A94, 592 U.S. ___ (Dec. 3, 2020) and *Roman Catholic Diocese of Brooklyn v. Cuomo*, No. 20A87, 592 U.S. ___ (Nov. 25, 2020)."

**1.     Applicable Tier of Scrutiny**

The Free Exercise Clause of the First Amendment disallows a State from enacting a law that prohibits the free exercise of religion.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah* ("*Lukumi*"), 508 U.S. 520, 531 (1993).  Any "law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Id.* at 546.

California argues that the Regional Stay at Home Order is a neutral law of general applicability, thus triggering only a rational basis review.  Plaintiffs argue that the Regional Stay at Home Order's goal is "to infringe upon or restrict practices because of their religious motivation," as evidenced by the California governor's statements and by the fact that the Regional Stay at Home Order treats religious institutions differently from certain other non-religious entities.  *Lukumi*, 508 U.S. at 533.  Plaintiffs point to the following statement by the Governor of California:

- 13 -

Q: Thank you Governor. Can you clarify why churches and salons are in Stage 3 and not Stage 2. Um, what makes them more high risk than schools, for example? Uh, what factors are you weighing here when you decide what goes into what phase?

A: Yeah, we're, we're looking at the science, epidemiology, looking again at frequency, duration, time, uh, and looking at low risk-high reward, low risk-low reward, looking at a series of conditions and criteria, as well as best practices uh from other states and nations.

(Pls.' Br. at 19:8–16 (citing ECF No. 47 at 13–14).)

The Court cannot draw a reasonable inference from this exchange that the Governor implied that religion is a "low reward" activity, as Plaintiffs suggest.[38]  The Court would have to make multiple assumptions and leaps in logic to so interpret the statement.  A more plausible interpretation of the statement is that the State considered a cost-benefit analysis in addition to "science, epidemiology, frequency, duration, [and] time" in formulating its COVID-19 restrictions.  Plaintiffs also fail to mention that, in the same exchange, the Governor stated that the State was "very sensitive to those that want to get back into church" and that the State was going to "see what [it] can do to accommodate that."[39]  The Court finds no evidence of statements made in connection with the challenged rule that can be viewed as targeting Plaintiffs' faith or singling out any other religion.  In this regard, Plaintiffs have not shown that California's Regional Stay at Home Order harbors "an official purpose to disapprove of a particular religion or of religion in general."  *See Lukumi*, 508 U.S. at 532.

The Court is nonetheless bound by precedent in this circuit to conclude that the Regional Stay at Home Order is subject to strict scrutiny review.  *See Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) (holding that all courts within a circuit are bound by

---

[38] The Court also notes that this statement is from May 2020, before the current Regional Stay at Home Order was implemented.

[39] Press Conference Tr. 50:58-51:23, 53:25-54:20 (May 7, 2020), https://www.rev.com/blog/transcripts/gov-gavin-newsom-california-covid-19-briefing-transcript-may-7.

vertical *stare decisis* authority of a circuit panel's precedential opinion).   A Ninth Circuit panel, in a published opinion, has held that *Roman Catholic Diocese* mandates strict scrutiny review when a state imposes different capacity restrictions on religious worship services as compared to non-religious activities and entities, like retail stores, in response to the pandemic.   *Dayton Valley*, 2020 WL 7350247, at *4.   There, the panel found that strict scrutiny review was triggered because a Nevada directive imposed a fifty-person cap on houses of worship, and only a 50% cap on other activities and entities including casinos, bowling alleys, and restaurants.   *Id.*   Although California's Regional Stay at Home Order does not allow casinos, bowling alleys, and restaurants to open at a greater capacity than religious services, it does allow retail establishments to do so.   Thus, the Court is bound to analyze the Order under strict scrutiny.

### 2.      Strict Scrutiny Analysis

Strict scrutiny review requires that the challenged restriction "be 'narrowly tailored' to serve a 'compelling' state interest."   *Dayton Valley*, 2020 WL 7350247, at *4 (citing *Roman Catholic Diocese*, 2020 WL 6948354, at *2).   Although strict scrutiny imposes a high bar, courts have "upheld laws—even under strict scrutiny."   *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015) (collecting cases); *cf.* Adam Winkler, *Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts*, 59 Vand. L. Rev. 793, 809 (2006) (explaining that the Supreme Court, applying strict scrutiny review, has frequently upheld free exercise challenges to religious exemptions from generally applicable laws).

### i.      Compelling Interest

Plaintiffs argue that California's goal of reducing community spread of COVID-19 is "not even a *rational*" interest, much less a compelling one.   (Pls.' Reply at 7:14–24, ECF No. 85.)   Contrary to Plaintiffs' position, the Supreme Court has clarified that "[s]temming the spread of COVID–19 is unquestionably a compelling interest."   *Roman Catholic*

*Diocese,* 2020 WL 6948354, at *2.  Although Plaintiffs urge this Court to find that focusing on community spread would not serve the ultimate promotion of public health and safety, courts lack both the expertise and the authority to make such determination.  *See id.* at *8 (Kavanaugh, J., concurring) ("The Constitution 'principally entrusts the safety and the health of the people to the politically accountable officials of the States.'"); *cf. Williams-Yulee*, 575 U.S. at 449 ("[P]olicymakers may focus on their most pressing concerns.").

Following the precedents, the Court concludes that California has a compelling interest in reducing the community spread of COVID-19.  *See Roman Catholic Diocese,* 2020 WL 6948354, at *2;  *Dayton Valley*, 2020 WL 7350247, at *4 ("[S]lowing the spread of COVID-19 is a compelling interest.").

### ii.     Narrow Tailoring

Having found that California has a compelling interest in reducing community spread of COVID-19, the Court turns to determining whether California's Regional Stay at Home Order is narrowly tailored to the compelling interest.  Narrow tailoring requires that the law restrict no more than is necessary to advance the government's compelling interest.  *See Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest.").  California explains that the Regional Stay at Home Order narrowly tailors the restrictions to its objective of slowing the community spread, by assessing the risk profile of an activity based on seven-factor risk criteria, which consider: an activity's (1) ability to accommodate wearing masks at all times; (2) ability to allow physical distancing; (3) ability to limit the duration of exposure; (4) ability to limit the amount of mixing of people from differing households and communities; (5) ability to limit the amount of physical interactions of visitors/patrons; (6) ability to optimize ventilation; and (7) ability to limit activities that are known to cause increased spread.  (Grabarsky Decl. Ex. 7, ECF No. 81-1 at 85–86.)

Applying these factors,  California assigns a similar risk profile for religious gatherings, as it does for weddings, funerals, college lectures, and political expression. California requires those activities to take place outdoors.  Dance studios and gyms must also only operate outdoors.  The Regional Stay at Home Order does not grant an exemption for other activities that similarly may involve gathering in groups for a prolonged period. All operations at amusement parks, museums, zoos, aquariums, campgrounds must stop, and so must convention centers, concert venues, movie theatres, family entertainment centers, live performances, and live audience participation in professional sports. [40] Restaurants may not open for dine-in.[41]  Plaintiffs do not dispute that California treats a church more favorably than those non-exempted activities with respect to gathering outdoors.  Plaintiffs direct the Court's focus on other exempted activities that can proceed indoors.

A law's underinclusiveness—its failure to reach all activities that implicate the interest—can constitute evidence that "raise[s] doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."  *See Williams-Yulee*, 575 U.S. at 448 (citing *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011)).  For example, in *Lukumi*, "[i]n a textbook illustration of that principle, [the Court] invalidated a city's ban on ritual animal sacrifices because the city failed to regulate vast swaths of conduct that similarly diminished its asserted interests in public health and animal welfare."  *Id.* (citing  *Lukumi*, at 543–47).  "Underinclusiveness can also reveal that a law does not actually advance a compelling interest."  *Id.* at 449.  For this reason, the Supreme Court deemed unconstitutional a restriction that "prohibit[ed] newspapers, but not electronic media, from releasing the names of juvenile defendants." *Id.*  (citing *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 104–05 (1979)).

---

[40] Find the status for activities in your county, https://covid19.ca.gov/safer-economy/.
[41] *Id.*

1   The court turns to analyze each exemption to determine whether the Regional Stay

2   at Home Order  disfavors religious entities or fails to advance California's goal to reduce

3   community spread.

### a.      Religious Gatherings

5   California explains that religious gatherings, weddings, funerals, college lectures,

6   and political expression involve features that raise the risks associated with the second

7   through fifth factors in California's risk criteria: many people gathering at one time and

8   socializing with each other; people from different households gathering nearby each other

9   for a prolonged time; and vocalizing, conversing, or singing in groups.  (Watt Decl. ¶¶ 39–

10  43, 45–46; Rutherford Decl. ¶¶ 90–92, 101–10.)  California explains that these risks can

11  be mitigated when the gatherings take place outdoors because aerosolized transmission is

12  slowed in open air.  (Rutherford Decl. ¶ 93.)

13  As to the seventh factor, California has shown that there have been known COVID-

14  19 outbreaks tied to religious gatherings in the San Diego County[42] and in the Southern

15  California Region.[43]  Both outbreaks occurred when religious gatherings could take place

16  indoors at limited capacity.[44]  Plaintiffs do not deny the existence of these outbreaks.

17  California's health experts also considered reports and studies of known outbreaks tied to

18  religious gatherings in other states.  (Watt Decl. ¶¶ 46.i (Washington), 46.ii (Arkansas);

19  Rutherford Decl. ¶ 108 (West Virginia).)

### b.      Retail, Limited Services, and Transportation

22  Grocery stores and retail shops can operate indoors at fixed capacity.[45] Limited

23  services, including laundromats, that do not require close contact may remain open with

---

[42] Grabarsky Decl. Ex. 17, ECF No. 81-1 at 174 (County of San Diego's letter to Awaken Church, COVID-19 Outbreak Notification).

[43] Grabarsky Decl. Ex. 21, ECF No. 81-1 at 187–91 (Grace Community Church outbreak in Los Angeles).

[44] The outbreak in San Diego County occurred on or around November 23, 2020, and the outbreak in Los Angeles County occurred on or around October 22, 2020.  *See supra* n.43 and 44.

[45] Find the status for activities in your county, https://covid19.ca.gov/safer-economy/.

modifications.[46]  The transportation sector, such as airports and train stations, may also remain open with modifications.[47]  California explains that these activities have a lower risk profile because interactions between patrons in these places are typically asocial, distanced, and short in time—with patrons generally seeking to leave the store as soon as possible.  (Rutherford Decl. ¶¶ 62, 117, 126.)  Singing, recitation, or speaking in unison, such as reciting a prayer together, is not common in retail, limited services, or transportation settings.  (*Id.* ¶¶ 119, 127.)  These assumptions lower the third through fifth risk factors.  The record before the Court does not include known cases of an outbreak tied to retail, grocery shopping, laundromats, or transportation hubs.

### c.    Worksites in Critical Infrastructure Sectors

The Regional Stay at Home Order allows employers in the critical infrastructure to designate essential workers to perform on-site tasks that cannot be done remotely—subject to specific industry guidelines.  (Grabarsky Decl. Ex. 13 at ¶ 2.d, ECF No. 81-1 at 153.)  California explains that job sites present a lower risk profile than in non-employment situations because the State has greater control over enforcing specific industry guidelines applicable to each industry: factories must screen workers, develop safety plans, and install engineering controls such as plexiglass barriers, to protect individuals who work near each other. (*Id.* Ex. 30, ECF No. 81-1 at 264–73.)  The employers are also subject to various health and safety requirements enforced by State labor authorities.  (Rutherford Decl. ¶ 121, ECF No. 81-4.)   Binding labor agreements in certain industries impose other mandatory measures such as routine testing of on-site staff.  (Grabarsky Decl. Ex. 33 at ¶ 4, ECF No. 81-2 at 5 (describing testing requirements in work protocols implemented by Screen Actors Guild); *Id*. Ex. 34 at ¶¶ 6–7 (describing testing requirements of "COVID-19

---

[46] *Id.*;  Industry guidance to reduce risk—Limited services,  https://covid19.ca.gov/industry-guidance/#limited-services.

[47] Industry guidance to reduce risk—Public transit and intercity passenger rail (Oct. 20, 2020) https://covid19.ca.gov/industry-guidance/#public-transit.

Return-to-Work Agreement" binding the movie studios and unions)).  Work shifts may be grouped to control personnel to whom the employees are regularly exposed, thus diluting the risk presented by likelihood of strangers from different bubbles randomly mixing at each gathering.  (Rutherford Decl. Ex. 19 (CDC guidance for employers), ECF No. 81-4 at 549.)  Besides, an employer is better positioned to control its employees' behavior affecting the risk factors. (Watt Decl. ¶¶ 87, 104.) [48]  The record lacks evidence of known outbreaks associated with jobsites in Southern California.

In sum, California assigns different risk profiles to different sectors based on a neutral, seven-factor risk analysis, which explains the different restrictions that apply to various exempt sectors.  While some courts may disagree with the local public health officials' assessment of what constitutes comparable activities based on the seven risk factors, the Court finds that such risk assessment—which necessarily reflects the local climate, infrastructure, and public health outcomes of prior policies—is a question of policy-making better deferred to the local public health officials.   California applied a neutral seven-factor risk criteria and concluded that the risk profile of religious gatherings, college lectures, political expression, weddings and funerals, cultural ceremonies, dance studios, and gyms, called for outdoor restriction but not an entire closure order.  California applied the same risk factors and concluded that activities with a higher risk profile,

---

[48] Our legal system already recognizes that "[c]ontrol or right of control by the employer . . . characterizes the relation of the employer and employee."  *See Metcalf & Eddy v. Mitchell*, 269 U.S. 514, 521 (1926)). And our legal system imposes certain obligations on employers that are not imposed on other entities. For example, strict liability is only imposed on employers in workers compensation law. *See* Lawrence M. Friedman & Jack Ladinsky, Social Change and the Law of Industrial Accidents, 67 Colum. L. Rev. 50, 71 (1967) (explaining the development of a workers compensation system that "fix[es] liability upon the employer regardless of fault" in industrial accidents).  In torts, the strict-liability principle of *respondeat superior* may hold an employer liable for a negligent act of its employee committed during the course of performing the job. *See generally* David Jacks Achtenberg, Taking History Seriously: Municipal Liability Under 42 U.S.C. S 1983 and the Debate over Respondeat Superior, 73 Fordham L. Rev. 2183, 2204 (2005) (explaining that the *respondeat superior* doctrine is traditionally explained by (1) an employer's power to control the direct tortfeasor, (2) the legal unity between the tortfeasor and his employer, (3) the master's implied warranty of the servant's fitness, or (4) the need for reciprocity between benefits and responsibility).  There is no equivalent legal doctrine recognizing a house of worship's control over its congregation.

including amusement parks, museums, zoos, aquariums, dine-in restaurants, on-site consumption at wineries, convention centers, concert venues, movies, family entertainment centers, live performances, cardrooms, tattoo shops, hair salons, barbershops, nail salons, body waxing studios, indoor pools, hot tubs, saunas, and hotels (for in-state reservations or out-of-state reservations not exceeding the minimum quarantine period) should be closed. Based on the same risk factors, California concluded that retail, transportation, and limited services activities—with better ability to limit duration of exposure, amount of mixing of people from differing households, amount of physical interactions of visitors, and limit activities that are known to cause increased spread—could proceed indoors with specific limitations.

The Court concludes that California did exactly what the narrow tailoring requirement mandates—that is, California has carefully designed the different exemptions to match its goal of reducing community spread, based on a neutral, seven-factor risk analysis. The Court does not find that California's Regional Stay at Home Order is underinclusive as to exceed the boundaries drawn by the First Amendment. Therefore, based on the record before the Court, Plaintiffs are not likely to show that the Regional Stay at Home Order restricts more than is necessary to advance the California's compelling interest in reducing community spread.

### 3.   Consistency with Precedents

The Court's strict scrutiny analysis does not conflict with the recent decisions issued by the higher courts. In *Roman Catholic Diocese*, the Supreme Court found that the 10- or 25-person ban instituted by New York was an effective ban on all religious activities in the applicable zones. *See* 2020 WL 6948354, at *3 ("The restrictions at issue here, by effectively barring many from attending religious services, strike at the very heart of the First Amendment's guarantee of religious liberty."). The same cannot be said about the Regional Stay at Home Order's exemption allowing outdoor religious gatherings, given that the climate in Southern California Region is warm year-round. The record does not

- 21 -

contain evidence that various entities that had been limited to operate outdoors in the past versions of California's COVID-19 response, such as gyms and restaurants, have not been able to follow the outdoor mandate. Further, no capacity limit is placed on outdoor worship. Based on the above, the Court does not find that the Regional Stay at Home Order, as applied to San Diego County and the Southern California Region, places an effective ban on religious services. *But see Burfitt v. Newsom*, BCV-20-102267 (Cal. Sup. Ct. Dec. 10, 2020).

In *Dayton Valley*, the Ninth Circuit considered the State of Nevada's regulatory scheme and concluded that Nevada's restrictions were not narrowly tailored to the State's proffered interest. Nevada "ha[d] not explained why a 50% occupancy cap is good enough for secular businesses where people congregate in large groups or remain in close proximity for extended periods—such as at restaurants, bars, casinos, and gyms—but is not good enough for places of worship." *See Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2613 (2020) (Mem.) (Kavanaugh, J., dissenting). Here, California places similar or greater limits on restaurants, bars, card rooms, gyms, and other activities that share a similar risk profile with religious entities. *See supra* Part I.B. Many other activities with heightened risk profiles are entirely closed. Retail stores, manufacturing plants, and certain other activities are allowed to operate indoors with additional limitations and industry-specific measures to reduce the risks, but California explains that those activities have dissimilar risk profiles compared to houses of worship. Because California has shown that it applied a neutral, multi-factor risk analysis to place each activity on a risk spectrum and imposed no more restriction on houses of worship than necessary, the Court finds that *Dayton Valley* is factually distinguishable.

Plaintiffs have not shown that a lesser restriction—for example, allowing indoor worship relying only on mask wearing, social distancing, and sanitization measures— would have achieved California's compelling interest in curbing the community spread of the virus. Mask wearing, social distancing, and sanitization reduces the likelihood of transmission per interaction, whereas stay-at-home orders and capacity regulations reduce

- 22 -

the number of interactions of people from different households.  (Soto Decl. ¶ 9, ECF No. 81-5.)  To the extent that Plaintiffs seek to hold indoor worship services at 20% of the church's maximum capacity,[49] the Court notes that California has already tried a similar measure, which allowed indoor worship at 25% capacity. That restriction proved insufficient to prevent outbreaks at houses of worship in the San Diego County[50] and the Southern California Region.[51]  If the dire trend of COVID-19 in Southern California—which has left the Region's ICU capacity at 0%[52]—proves anything, it is that the State's efforts to implement curfews and less restrictive restrictions were not enough.

Plaintiffs do not dispute the existence of these outbreaks or the unavailability of hospital beds in the Southern California Region.  Plaintiffs merely proffer that they are not aware of any confirmed COVID-19 cases tied to Plaintiffs' church.  In general,  a local government is not required to prove that a particular individual has contributed to a known social harm, before implementing a law that seeks to prevent the harm.  Just as a restaurant with no known COVID-19 cases tied to it is bound by a valid public health regulation, so must a house of worship that has no known COVID-19 cases tied to it.  This is especially so when the social harm sought to be mitigated is community spread of a deadly virus, whose exact path of contagion is hard to trace.

The Court concludes that Plaintiffs are not likely to succeed on their Free Exercise Clause claim at a final hearing.

//

//

//

---

[49] At the hearing held on December 18, 2020, Plaintiffs requested that the Court match the restrictions in place for the retail sector, which is currently capped at 20% of maximum capacity under the Regional Stay at Home Order.  *See* Find the status for activities in your county, https://covid19. ca. gov/ safer-economy/.

[50] Grabarsky Decl. Ex. 17, ECF No. 81-1 at 174 (County of San Diego's letter to Awaken Church, COVID-19 Outbreak Notification).

[51] *Id.* Ex. 21, ECF No. 81-1 at 187–91 (Grace Community Church outbreak in Los Angeles).

[52] Current tier assignments as of December 15, 2020, https://covid19.ca.gov/state-dashboard/.

20cv0865

### C.    Balance of Equities and Public Interest

COVID-19 poses a significant health risk to everyone in Southern California, the nation, and in fact, the world.  In San Diego, emergency rooms are having to turn patients away, and the hospitals are being quickly overwhelmed with the most recent surge of patients infected with COVID-19.

The Court is mindful that a San Diego Superior Court judge recently enjoined enforcement of the Regional Stay at Home Order, as applied to strip clubs and restaurants, based in part on the finding that the plaintiff strip clubs "have done nothing to contribute to the spread of COVID."  *See Midway Venture LLC v Co. of San Diego*, No. 37-2020-00038194-CU-CR-CTL (Cal. Sup. Ct. Dec. 16, 2020).  The injunction is now stayed,[53] but it is worth highlighting the dichotomy between that ruling and this one as an example of the dangers of having individual judges make public health policy. *See Roman Catholic Diocese*, 2020 WL 6948354, at *3 (holding that, although the Court needs to conduct "serious examination" of restrictions placed on religion, "[m]embers of this Court are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area"); *Id.* at *8 (Kavanaugh, J., concurring) (recognizing that "[f]ederal courts . . . must afford substantial deference to state and local authorities about how best to balance competing policy considerations during the pandemic" while not abdicating the courts' responsibility to assess the constitutionality of a challenged law); *S. Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C. J., concurring in the denial of application for injunctive relief) ("Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'").  It is for that reason that this Court gives "substantial deference" to the California public health officials' attempt to protect the safety of its people.

The Court does not doubt that not being able congregate indoors imposes a burden on Plaintiffs' religion.  Nevertheless, the Court also recognizes that the burden is a

---

[53] *Midway Venture LLC v Newsom*, No. D078375 (Cal. Ct. App. Dec. 18, 2020).

20cv0865

temporary one, with widespread vaccination in close sight.  The Court concludes that it serves the public interest to continue to protect the population as a whole, in this dire phase of the pandemic.

## V.    CONCLUSION

Plaintiffs have not shown that they are entitled to injunctive relief before a trial on the merits. Consequently, the Court **DENIES** Plaintiffs' renewed motion for a temporary restraining order or preliminary injunction (ECF No. 75).


**IT IS SO ORDERED.**


**DATED: December 21, 2020**

**Hon. Cynthia Bashant**
**United States District Judge**

- 25 -

20cv0865