

**FILED**

Mar 15 2021

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY        s/ AKR        DEPUTY

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

MAR 15 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

SOUTH BAY UNITED
PENTECOSTAL CHURCH, a
California nonprofit corporation and
BISHOP ARTHUR HODGES III, an
individual,

                Plaintiffs - Appellants,

   v.

GAVIN NEWSOM, in his official
capacity as the Governor of California;
et al.,

                Defendants - Appellees.

No. 20-56358

D.C. No. 3:20-cv-00865-BAS-AHG
U.S. District Court for Southern
California, San Diego

**MANDATE**

      The judgment of this Court, entered January 22, 2021, takes effect this date.

      This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

                FOR THE COURT:

                MOLLY C. DWYER
                CLERK OF COURT

                By: Rebecca Lopez
                Deputy Clerk
                Ninth Circuit Rule 27-7

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SOUTH BAY UNITED PENTECOSTAL
CHURCH, a California nonprofit
corporation; BISHOP ARTHUR
HODGES III, an individual,
                    *Plaintiffs-Appellants*,

v.

GAVIN NEWSOM, in his official
capacity as the Governor of
California; XAVIER BECERRA, in his
official capacity as the Attorney
General of California; SONIA
ANGELL, in her official capacity as
California Public Health Officer;
WILMA J. WOOTEN, in her official
capacity as Public Health Officer,
County of San Diego; HELEN
ROBBINS-MEYER, in her official
capacity as Director of Emergency
Services; WILLIAM D. GORE, in his
official capacity as Sheriff of the
County of San Diego,
                    *Defendants-Appellees.*

No. 20-56358

D.C. No.
3:20-cv-00865-
BAS-AHG

OPINION

Appeal from the United States District Court
for the Southern District of California
Cynthia A. Bashant, District Judge, Presiding

Argued and Submitted January 15, 2021
Pasadena, California

Filed January 22, 2021

Before:  Kim McLane Wardlaw and Richard R. Clifton,
Circuit Judges, and Timothy Hillman,[*] District Judge.

Opinion by Judge Wardlaw

## SUMMARY[**]

## Civil Rights

The panel affirmed the district court's order denying a request for preliminary injunctive relief in an action brought by South Bay United Pentecostal Church challenging California's temporary restrictions, enacted in response to the COVID-19 pandemic, on congregate indoor activities, including indoor religious services, within portions of the state currently identified by objective measures as being at high risk.

The panel first addressed South Bay's challenge, brought pursuant to the Free Exercise Clause of the First Amendment, to the prohibition on indoor worship under California's December 3, 2020 Regional Stay at Home

_____

[*] The Honorable Timothy Hillman, United States District Judge for the District of Massachusetts, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Order and the State's Tier 1 of the Blueprint for a Safer Economy.  The panel held that given the strong evidentiary record before it, the district court did not abuse its discretion by denying South Bay's motion for a preliminary injunction and upholding the restrictions on indoor religious worship services.  Although South Bay had demonstrated irreparable harm, it had not demonstrated that the likelihood of success, the balance of equities, or the public interest weighed in its favor.

Applying strict scrutiny, the panel held California has a compelling interest in reducing community spread of COVID-19 and the district court's conclusions that California's restrictions were narrowly tailored to meet its compelling interest were fully supported by the record and not contradicted by any evidence submitted by South Bay. The panel agreed with the district court that while some may disagree with the local public health officials' assessments of what constitutes comparable activities based on the seven applied risk factors, such risk assessment—which necessarily reflects the local climate, infrastructure, and public health outcomes of prior policies—was a question of policy-making better deferred to the local public health officials.  The panel further noted that, in response to the State's mountain of scientific evidence, South Bay had not pointed to anything in the record to support the notion that the lesser restriction that it sought—100% occupancy with a reliance solely on mask-wearing, social distancing, and sanitation measures—would be effective to meet California's compelling interest in controlling community spread.

The panel rejected South Bay's contention that the decisions in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam), and *Calvary Chapel*

*Dayton Valley v. Sisolak*, 982 F.3d 1228 (9th Cir. 2020), compelled the conclusion that California's restrictions were not narrowly tailored.   The panel noted that California's restrictions differed markedly from the New York order under review in *Roman Catholic Diocese* and the Nevada directive at issue in *Dayton Valley*.  The panel held that given the contagiousness of this deadly virus and the dire circumstances facing Southern California's healthcare system at this moment in its history, there existed no less restrictive means to alleviate the situation.

The panel stated that where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge.  The panel concluded that the district court did not abuse its discretion in concluding that the public interest lay not with enjoining California's restrictions, but rather with the continued protection of the population as a whole so that all who desire to do so may once again return to worship indoors.

The panel held South Bay was likely to succeed on its challenge to the 100- and 200-person attendance caps under Tiers 2 and 3 of the Blueprint.  The State had not shown that less restrictive measures, such as basing attendance limits on the size of the church, synagogue, or mosque would cause any greater peril to the public.  Accordingly, the panel remanded to the district court with the instruction to enjoin the State from imposing the 100- and 200- person caps under Tiers 2 and 3 of the Blueprint.

Finally, the panel separately considered South Bay's claim that California's ban on indoor singing and chanting violates its First Amendment rights under the Free Exercise Clause. Although South Bay raised this challenge in its

renewed motion for injunctive relief, the district court did not specifically address it in its December 21 order. The panel found that the district court's failure to do so, if error, was harmless because the challenge lacked merit. The State's ban on singing and chanting was rationally related to controlling the spread of COVID-19, and South Bay had not demonstrated a likelihood of success on this claim.

## COUNSEL

Charles S. Limandri (argued), Paul M. Jonna, Jeffrey M. Trissell, Limandri & Jonna LLP, Rancho Santa Fe, California; Thomas Brejcha, Peter Breen, and Christopher A. Ferrara, Thomas More Society, Chicago, Illinois; Harmeet K. Dhillon and Mark P. Meuser, Dhillon Law Group, Inc., San Francisco, California; for Plaintiffs-Appellants.

Todd Grabarsky (argued) and Lisa J. Plank, Deputy Attorneys General; Paul Stein, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Los Angeles, California; for Defendants-Appellees Governor Gavin Newsom, Attorney General Xavier Becerra, and Public Health Officer Dr. Sonia Angell.

Jeffrey P. Michalowski (argued) and Timothy M. White, Senior Deputies; Thomas E. Montgomery, County Counsel; Office of County Counsel, San Diego, California; for Defendants-Appellees Dr. Wilma J. Wooten, Helen Robbins-Meyer, and William D. Gore.

## OPINION

WARDLAW, Circuit Judge:

The State of California is facing its darkest hour in its fight against the COVID-19 pandemic, with case counts so high that intensive care unit capacity is at 0% in most of Southern California. To slow the surging community spread, California's public health and epidemiological experts have crafted a complex set of regulations that restrict various activities based on their risk of transmitting the disease and the projected toll on the State's healthcare system. Under this framework, California permits unlimited attendance at outdoor worship services and deems clergy and faith-based streaming services "essential," but has temporarily halted all congregate indoor activities, including indoor religious services, within portions of the state currently identified by objective measures as being at high risk.

South Bay United Pentecostal Church challenged this restriction, along with others, under provisions of the United States and California Constitutions. In its challenge brought under the Free Exercise Clause of the First Amendment of the United States Constitution, South Bay argues that the current restrictions on indoor services prohibit its congregants' free exercise of their theology, which requires gathering indoors. The district court made multiple findings of fact on an extensive evidentiary record and concluded that California's restrictions on indoor worship are narrowly tailored to meet its compelling—and immediate—state interest in stopping the community spread of the deadly coronavirus. Because we conclude that the district court did not abuse its discretion, we affirm its denial of South Bay's request to enjoin California's temporary prohibition on indoor worship under the Regional Stay at Home Order and

Tier 1 of the Blueprint.  We also conclude that South Bay has not demonstrated a likelihood of success on the merits with respect to its challenge to California's state-wide ban on indoor singing and chanting.  We cannot, however, conclude that the 100- and 200-person attendance caps on indoor worship under Tiers 2 and 3 of the Blueprint survive strict scrutiny.[1]

## I.

### A.

#### 1.

*California's Early Response to COVID-19*

In March 2020, ordinary life came to a grinding halt when the severe respiratory syndrome coronavirus type-2 ("COVID-19") reached the United States and infections began popping up across the country.  Although much remains uncertain about this novel coronavirus, "there is consensus among epidemiologists that the most common mode of transmission of [COVID-19] is from person to person, through respiratory particles such as those that are produced when an infected person coughs or sneezes or projects his or her voice through speaking, singing, and other vocalization."  The scientific community also largely agrees

---

[1] We **GRANT** California's motion to take judicial notice of the updated county and state regulations and federal FAA regulations (ECF No. 26) because they are publicly available and neither party disputes their authenticity or accuracy.  *See Kater v. Church Downs Incorp.*, 886 F.3d 784, 788 n.3 (9th Cir. 2018) (taking judicial notice of government documents on government website).  We also **GRANT** the County of San Diego's partially opposed motion to file a supplemental brief (ECF No. 48).

that the virus can be "spread by individuals who are pre-symptomatic or asymptomatic," i.e., difficult to identify, making it particularly "difficult to control." But not all exposures to COVID-19 will cause an infection; an infection will occur only when there is a sufficient dose of the virus, known as a "viral load," to overcome the body's defenses.

California, in consultation with public health experts, has enacted an evolving series of restrictions on various activities and sectors as its understanding of the virus has improved and as the virus has spread throughout the state. On March 4, in an early attempt to limit the virus's reach in California, Governor Gavin Newsom proclaimed a State of Emergency, thereby allowing him to exercise extraordinary executive powers. *See* Cal. Gov't Code §§ 8625–8627.5. Two weeks later, within this authority, the Governor issued Executive Order N-33-20—the first Stay at Home Order—which required "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors."[2] California's Public Health Officer designated a list of "Essential Critical Infrastructure Workers," which included "[c]lergy for essential support and faith-based services that are provided through streaming or other technologies that support physical distancing and state public health guidelines." Accordingly, although the Stay at Home Order prohibited in-person worship services, the inclusion of clergy on the list of critical infrastructure workers allowed places of worship to conduct services by streaming them online.

---

[2] State of California, *Executive Order N-33-20* (Mar. 19, 2020) https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf.

In late April, California released a four-stage "Resilience Roadmap" for reopening various sectors of the economy based on the risk that any given "workplace" posed in transmitting the virus.   Stage 2 included "lower-risk workplaces," such as curbside retail, manufacturing, and dine-in restaurants.   In Stage 3, "higher-risk workplaces" were permitted to reopen, which included religious services and movie theaters.  The Roadmap also imposed guidelines that applied to *all* sectors (e.g., disinfecting protocols and physical distancing), as well as mandatory industry-specific guidance.  On May 25, California issued industry-specific guidance for places of worship and providers of religious services.  This initial guidance explained that "[e]ven with adherence to physical distancing, convening in a congregational setting of multiple different households to practice a personal faith carries a relatively higher risk for widespread transmission of the COVID-19 virus." Accordingly, in-person indoor worship services were limited to the lesser of 100 attendees or 25% of building capacity. On June 12, as scientific understanding of the virus revealed that transmission risk dropped significantly outdoors, California removed capacity restrictions on outdoor and drive-in religious services.[3]

In mid-June, California issued a state-wide mandate requiring face masks be worn in most public spaces, settings, and workplaces to reduce transmission risk.  The scientific community largely agrees that wearing a face covering reduces—but does not eliminate—the risk that a person infected with COVID-19 will infect others, and likely reduces the risk that the wearer will become infected by someone else.

---

[3] Identical restrictions were placed on political protests.

But the mask mandate and industry-specific guidance proved incapable of preventing a summer spike in cases, and California once again began to tighten restrictions.  In July, California prohibited singing and chanting at *all* indoor gatherings—including places of worship, protests, schools, and restaurants—because when a person sings or otherwise loudly vocalizes, droplets are expelled with greater force, travel farther, and thus present a greater danger of transmitting the virus.   But despite these additional restrictions, cases continued to rise.  On July 13, in light of the "significant increase in the spread of COVID-19," California issued an order reimposing many previously relaxed restrictions on indoor activities.   In addition, counties that demonstrated "concerning levels of disease transmission, hospitalizations, insufficient testing, or other critical epidemiological markers" were placed on a "County Monitoring List."   Counties on this list were required to close certain indoor activities, including worship services, protests, gyms, and personal care services.  Throughout the state, however, outdoor worship services continued without any restrictions on attendance or singing regardless of the individual county's case level.

*California's Current Restrictions:*
*The Blueprint & Regional Stay at Home Order*

On August 28, 2020, California enacted the Blueprint for a Safer Economy (the "Blueprint"), which serves as the current framework underlying California's COVID-19 restrictions and which South Bay challenges in this case. The Blueprint provides "revised criteria for loosening and tightening restrictions on activities" based on (1) the prevalence of COVID-19 in the relevant county, and (2) an activity's calculated risk level.

The Blueprint assigns each county to one of four tiers, ranging from Tier 1 ("Widespread") to Tier 4 ("Minimal"), which reflect COVID-19's transmission risk in each county. In assessing to which tier a county belongs, California analyzes a county's case rate (number of individuals who have the virus per 100,000) and the test positivity rate. California reevaluates each county's tier status on a weekly basis; as local conditions improve, counties are eligible to move to a less-restrictive tier with more permissive policies.

Within each tier, activities are subject to different restrictions based on the activity's risk level. Risk level is determined using seven objective criteria, including the ability to (1) accommodate face coverings at all times; (2) allow for physical distancing; (3) limit the duration of exposure; (4) limit the amount of mixing of people from differing households and communities; (5) limit physical interactions; (6) optimize ventilation; and (7) limit activities known to increase spread such as shouting, singing, and heavy breathing.

In any given tier, the greater the transmission risk an activity poses, the greater the restrictions California imposes on it. The Blueprint permits higher capacity limits and attendance caps for activities that present lower transmission risks—that is, do not involve a large number of people congregating in close proximity for sustained periods. Some sectors, such as retail and grocery stores, are permitted to operate with greater capacity limits indoors subject to the limitations imposed by statewide requirements (e.g., mask-wearing and social distancing) and industry-wide guidance (e.g., frequent disinfecting of shopping carts).

The Blueprint imposes "greater restrictions on congregate activities involving groups of people, and particularly indoor congregate activities, because, even after

applying precautions required by general and industry-specific guidelines, they pose greater transmission risk."  For example, indoor worship services, political protests, and movie theater attendance are prohibited in counties where COVID-19 is rampant (i.e., Tier 1), but permitted in Tiers 2, 3, and 4 counties, albeit subject to limitations on attendance. Notably, however, these activities are permitted to operate outdoors without attendance limits regardless of a county's tier because "transmission is significantly lower due to airflow and dissipation of any virus particles."  Certain activities—such as bars, live audience sports, and cardrooms—have been deemed to present so great a transmission risk that they are not permitted to reopen, even outdoors, until a county reaches Tier 3 or 4.

The Blueprint's assessment of indoor worship services reflects the widely shared consensus in the scientific community that this activity presents an "especially risky type of public gathering."  This is because worship services bring together (1) a large number of people from different households, (2) in the same place for an extended period of time, (3) to participate in a communal activity, which necessarily allows respiratory droplets exhaled by an infected, but asymptomatic, individual to accumulate in doses large enough to infect others.  Moreover, religious services often involve singing and chanting, which propel respiratory droplets farther thereby increasing transmission risk.  In other words, indoor worship services "involve large groups of people who are coming together for the purpose of being together."

Initially, the Blueprint appeared effective; new COVID-19 infection rates fell as summer came to a close.  But in late October, case rates began to climb, then to skyrocket exponentially.  In an attempt to curb the rising case numbers,

California's Department of Public Health issued additional guidance pertaining to private gatherings.[4]  The guidance prohibited gatherings that involved more than three households and prohibited indoor private gatherings in Tier 1 counties.  In all remaining tiers, indoor gatherings are "strongly discouraged."  The guidance also prohibited "singing, chanting, shouting, cheering, and similar activities" at indoor gatherings.

Recently, Southern California has been described as the epicenter of the global pandemic.[5]  From mid-November to mid-December, the number of new cases per day in California jumped from 8,743 to more than 35,000.  The number of COVID-19 patients hospitalized statewide grew from 777 on November 15 to 13,645 on December 14.  In the time since this appeal was filed, there have been reports that paramedics in Los Angeles County have been instructed to conserve oxygen in treating patients and not to bring

---

[4] Cal. Dep't of Pub. Health, *CDPH Guidance for the Prevention of COVID-19 Transmission for Gatherings* (Nov. 13, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Guidance-for-the-Prevention-of-COVID-19-Transmission-for-Gatherings-November-2020.aspx (last visited Jan. 21, 2021).

[5] New York Times, *'Our New York Moment': Southern California Reels as Virus Surges* (Jan. 9, 2021), https://www.nytimes.com/2021/01/09/us/california-coronavirus.html (last visited Jan. 21, 2021); L.A. Times, *1 in 3 L.A. County Residents Have Been Infected by Coronavirus Since Pandemic Began, New Estimate Shows* (Jan. 14, 2021) https://www.latimes.com/california/story/2021-01-14/one-in-three-la-county-residents-infected-coronavirus (last visited Jan. 21, 2021); Reuters, *For Los Angeles-Area Ambulance Crews, the COVID-19 Calls Never Stop* (Jan 15, 2021), https://www.reuters.com/article/health-coronavirus-los-angeles-ambulance/for-los-angeles-area-ambulance-crews-the-covid-19-calls-never-stop-idUSL1N2JP08D (last visited Jan. 21, 2021).

patients to the hospital who have little chance of survival.[6]
As of January 19, 2021, California became the first state to
record more than three million cases.[7]  On January 21, 2021,
the State recorded a record 736 deaths in a single day,[8]
bringing the total of Californians who have died from the
virus to 35,004.[9]

The strain on California's healthcare system is
undeniable.  Following the October case surge, intensive
care unit ("ICU") capacity decreased, then began to
disappear in many counties.  On December 3, in an attempt
to prevent the "overwhelm[ing of] the state's hospital
system," California implemented the Regional Stay at Home
Order.[10]  The new mandate divided the state into five

---

[6] National Public Radio, *LA County Paramedics Told Not To
Transport Some Patients With Low Chance of Survival* (Jan. 5, 2021),
https://www.npr.org/sections/coronavirus-live-updates/2021/01/05/
953444637/l-a-paramedics-told-not-to-transport-some-patients-with-
low-chance-of-survival (last visited Jan. 21, 2021).

[7] New York Times, *California Coronavirus Map and Case Count*,
https://www.nytimes.com/interactive/2020/us/california-coronavirus-
cases.html (last updated Jan. 21, 2021).

[8] L.A. Times, *California Sees Record-Breaking COVID-19 Deaths,
a Lagging Indicator of Winter Surge* (Jan. 22, 2021)
https://www.latimes.com/california/story/2021-01-22/california-sees-
record-breaking-covid-19-deaths-a-lagging-indicator-of-winter-surge
(last visited Jan. 22, 2021).

[9] Update for January 21, 2021, *Tracking COVID-19 in California*,
https://covid19.ca.gov/state-dashboard/.

[10] Cal. Dep't of Pub. Health, *Regional Stay at Home Order* (Dec. 3,
2020),   https://www.gov.ca.gov/wp-content/uploads/2020/12/12.3.20-
Stay-at-Home-Order-ICU-Scenario.pdf.

hospital regions.[11]   For any region in which adult ICU bed capacity has fallen below 15%, the Regional Stay at Home Order requires "[a]ll individuals living in the Region [to] stay home or at their place of residence except as necessary to conduct activities associated with the operation, maintenance, or usage of critical infrastructure."   When operative in a region, the Regional Stay at Home Order supersedes any prior guidance from the State, including the Blueprint.

The Regional Stay at Home Order shutters many businesses that were previously allowed to operate with restrictions under Tier 1 of the Blueprint, such as outdoor dining, barbershops, and nail salons.[12]   Retail and grocery stores may continue operating at 20% and 35% of capacity, respectively.   Outdoor worship services and political protests may continue without capacity restrictions.   Once triggered, the Regional Stay at Home Order is effective for a minimum of three weeks, only to be lifted when projected ICU capacity meets or exceeds 15%.   Currently, the Regional Stay at Home Order remains in effect in three of California's five hospital regions, including the Southern

---

[11]   Because hospitals draw resources from regional areas that necessarily cross county lines, the Regional Stay at Home Order is premised on five hospital regions, rather than individual counties.   The five regions are: Northern California, Bay Area, Greater Sacramento, San Joaquin Valley, and Southern California.   *See About COVID-19 Restrictions*,   https://covid19.ca.gov/stay-home-except-for-essential-needs (last updated Jan. 15, 2021).

[12]   Attached as Appendix A is a chart comparing the restrictions imposed on various activities and sectors under the Regional Stay at Home Order and the Blueprint.

California region, which encompasses both San Diego County and Los Angeles County.[13]

2.

South Bay United Pentecostal Church is located in the City of Chula Vista, County of San Diego, within the hard-hit Southern California region. Bishop Arthur Hodges III has served as Senior Pastor and Bishop of South Bay for the past thirty-five years. South Bay's "model is the New Testament church founded and described in the book of the Acts of the Apostles: 'And when the day of Pentecost was fully come, they were *all with one accord in one place*.' (Acts: 2:1) (emphasis added)." Thus, fundamental to the church's creed is that all gather together in one place to worship.

Pre-COVID-19, South Bay held five to seven services each Sunday, with average attendance at some services reaching between 200 and 300 congregants. These services are focused on worshiping together "both spiritually and physically," including gathering around the altar, the laying of the hands around the altar, anointment of the sick, and baptism by immersion. South Bay's services conclude with preaching, "followed by a challenge to physical action, where the congregation is challenged to approach the altar to 'come believing, come praying.'" Congregants then participate in "fellowship both inside and outside the sanctuary . . . 'in the breaking of bread, and in prayers.' (Acts 2:42)."

---

[13] Current Tier Assignments as of January 19, 2021, *Tracking COVID-19 in California*, https://covid19.ca.gov/state-dashboard/.

According to Bishop Hodges, "singing is at the heart" of South Bay's services, and to ban singing in Pentecostal worship "has the effect of banning those worship services outright." Thus, given the particular religious doctrine and practices of the church, South Bay asserts that California's orders prohibiting indoor religious worship and singing and chanting in indoor venues has "dramatically curtailed" its ability to carry out its ministry.

### B.

On May 11, 2020, Plaintiffs South Bay United Pentecostal Church and Bishop Hodges (collectively, "South Bay") filed a complaint alleging that the four-stage Resilience Roadmap violated the First Amendment's Free Exercise, Establishment, Free Speech, and Assembly Clauses; the Fourteenth Amendment's Due Process and Equal Protection Clauses; and rights enumerated in Article 1, sections 1 through 4, of the California Constitution. South Bay then moved for a temporary restraining order and an order to show cause regarding a preliminary injunction, seeking to prevent enforcement of "any prohibition on Plaintiffs' engagement in religious services, practices, or activities at which the County of San Diego's Social Distancing and Sanitation Protocol and Safe Reopening Plan is being followed." Then followed a series of rulings at every rung of the federal judiciary denying South Bay's request for preliminary injunctive relief.

Initially, the district court denied the motion, concluding that South Bay was unlikely to prevail on the merits of its claims. South Bay quickly appealed and filed an emergency motion for an injunction that would allow it to hold in-person religious services pending appeal. On May 22, a motions panel of our court denied South Bay's request, observing that "[w]here state action does not 'infringe upon or restrict

practices because of their religious motivation' and does not 'in a selective manner impose burdens only on conduct motivated by religious belief,' it does not violate the First Amendment."   *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939 (9th Cir. 2020) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 543 (1993)).

The Supreme Court also denied South Bay's application for injunctive relief. *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020). Chief Justice Roberts concurred in the denial of the application, writing that the Roadmap "appear[ed] consistent with the Free Exercise Clause of the First Amendment." *Id.* at 1613 (Roberts, C.J., concurring). The Chief Justice emphasized that:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people.

*Id.* at 1613–14 (internal citations omitted).

On July 10, while South Bay's interlocutory appeal was pending before us, South Bay moved in the district court for an indicative ruling to revisit the denial of its first motion. South Bay had amended its complaint to challenge California's revised restrictions, and it sought to present additional evidence to the district court. The district court granted the request, reasoning that South Bay had raised a substantial issue. We, in turn, remanded the case "for the limited purpose of permitting the district court to consider [South Bay's] request in light of the events and case law that have developed since May 15, 2020."

On October 15, the district court issued an order again denying South Bay's motion for preliminary injunctive relief, concluding that South Bay remained unlikely to succeed on its Free Exercise claim. The district court observed that "the evidence shows the [Blueprint] [is] based on the elevated risk of transmission of the novel coronavirus in indoor settings, particularly congregate activities and those involving singing and chanting." In reaching this conclusion, the court relied heavily on the State's experts—

Dr. Rutherford[14] and Dr. Watt[15]—whose qualifications and expertise in epidemiology and public health are undisputed.

---

[14] As recapped by the district court: "Dr. George Rutherford is the Salvatore Pablo Lucia Professor of Epidemiology, Preventive Medicine, Pediatrics, and History at the University of California, San Francisco School of Medicine.  He also leads the Division of Infectious Disease and Global Epidemiology in the Department of Epidemiology and Biostatistics.  Further, Dr. Rutherford is an adjunct professor at the University of California, Berkeley School of Public Health. He also serves as the 'Director of Global Strategic Information Group in the Institute for Global Health Sciences at U.C. San Francisco.' Dr. Rutherford received his doctor of medicine from the Duke University School of Medicine in 1978.  He also received training in epidemiology in the CDC's Epidemic Intelligence Service and spent ten years in various public health positions before entering academia.  Since the novel coronavirus emerged, Dr. Rutherford has 'devoted substantial time to researching and studying the virus' as part of his epidemiology roles and has 'spoken extensively on topics related to the novel coronavirus and the disease it causes during 2020,' including through presentations to the California Medical Association and the California Health and Human Services Agency."

[15] Dr. James Watt is similarly highly qualified in epidemiology.  He "is the Chief of the Division of Communicable Disease Control of the Center for Infectious Diseases at the California Department of Public Health ('CDPH').  He received his doctor of medicine from the University of California, San Diego in 1993 and a master's degree in public health from the University of California, Berkeley in 1995.  Dr. Watt previously worked for the Centers for Disease Control and Prevention ('CDC') as an Epidemic Intelligence Service Officer in the Respiratory Diseases Branch.  He is also an Associate at the Johns Hopkins Bloomberg School of Public Health and a Clinical Professor at the University of California, San Francisco School of Medicine, where he teaches graduate students in public health and medical students about communicable disease control.  His professional commendations include the U.S. Public Health Service Achievement medal in 2000, the National Center for Infectious Diseases Honor Award in 2001, and Outstanding Achievement Awards from the CDPH in 2015 and 2016.  Dr. Watt has been 'very involved' in the CDPH's response to the COVID-19 pandemic, 'working full time for approximately 60–70 hours per week

"[M]inimal weight," however, was assigned to South Bay's expert Dr. George Delgado, a family medicine doctor with no purported training, credentials, or experience in public health or epidemiology.  The district court was troubled by Dr. Delgado's "lack[] [of] significant experience in epidemiology," his failure to explain the basis for his comparative risk model, and his failure to "provide any supporting data for his conclusions."  Accordingly, the court dismissed Dr. Delgado's comparative risk assessment as likely inadmissible under *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993).

Meanwhile, as scientific understanding of the virus evolved, the legal landscape for resolving COVID-19-related First Amendment issues also shifted.  On November 25, the Supreme Court issued its decision in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam), which elevated the level of scrutiny that courts are to apply to Free Exercise claims.  In light of the Supreme Court's decision, South Bay again moved this court for an injunction pending appeal.  We denied the request but vacated the district court's October 15 order and remanded the case for further consideration.  *S. Bay United Pentecostal Church v. Newsom*, 981 F.3d 765 (9th Cir. 2020).[16]

On remand, the district court again denied South Bay's request for preliminary injunctive relief, this time applying

_____

to address the pandemic' from January 2020 to the date of his declaration."

[16] On November 24, South Bay also filed a petition for a writ of certiorari before judgment with the Supreme Court.  Petition for Writ of Certiorari, *S. Bay United Pentecostal Church*, 959 F.3d 938 (No. 20-746).  On January 14, 2021, the Supreme Court ordered California to file a response.

the higher level of scrutiny as required by the Supreme Court. The district court concluded that under *Roman Catholic Diocese* and *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228 (9th Cir. 2020), the Regional Stay at Home Order was not a neutral, generally applicable regulation because its burden on indoor religious services differed from retail establishments.[17] Applying strict scrutiny, it nonetheless found that South Bay was "not likely to show that the Regional Stay at Home Order restricts more than is necessary to advance California's compelling interest in reducing community spread." The court noted that to the extent South Bay sought a 20% capacity limitation like that applicable to retail,[18] California had already tried percentage of capacity restrictions, which had "proved insufficient to prevent outbreaks at houses of worship in the San Diego County and the Southern California Region." Accordingly, the district court denied South Bay's motion.

On December 22, South Bay appealed and filed an emergency motion for an injunction pending appeal. We denied the emergency request without prejudice and expedited the appeal. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), and we affirm the denial of the requested injunction.

---

[17] The district court limited its analysis to the Regional Stay at Home Order then in effect in San Diego County.

[18] South Bay no longer seeks the lesser restriction of 20% capacity for its indoor services. On appeal, South Bay seeks an injunction allowing churches to hold indoor worship services at "100% occupancy with social distancing and the other health protocols."

## II.

Our review of the district court's denial of a preliminary injunction is "limited and deferential." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc). We review such denials for abuse of discretion. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014). "[A] district court abuses its discretion if the court rests its decision on a clearly erroneous finding of fact." *Id.* "To determine whether a district court abused its discretion in this way, we review factual findings for clear error." *Id.* "Clear error results 'from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'" *Id.* (quoting *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012)).

## III.

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). To make this showing, South Bay must demonstrate "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

We turn first to South Bay's challenge to the prohibition on indoor worship under the Regional Stay at Home Order and Tier 1 of the Blueprint under the Free Exercise Clause

of the First Amendment.[19]   Given the strong evidentiary record before it, we conclude that the district court did not abuse its discretion by denying South Bay's motion for a preliminary injunction and upholding the restrictions on indoor religious worship services under the Regional Stay at Home Order and Tier 1 of the Blueprint.[20]   Although South Bay has demonstrated irreparable harm, it has not demonstrated that the likelihood of success, the balance of equities, or the public interest weigh in its favor.

A.

The Free Exercise Clause of the First Amendment provides that the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I; *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (incorporating the Free Exercise Clause against the states). "In determining whether a law prohibits the free exercise of religion, courts ask whether the law 'is neutral and of general applicability.'" *Dayton Valley*, 982 F.3d at 1232 (quoting *Church of Lukumi*, 508 U.S. at 531). If the law is neutral and of general applicability—that is, the law does not "single out houses of worship for especially harsh treatment," *Roman Catholic Diocese*,

---

[19] The district court did not consider the likelihood of success of South Bay's other claims brought under provisions of the United States and California Constitutions, and we decline to do so in the first instance here.

[20] We note that the district court's analysis was confined to the Regional Stay at Home Order. Because the State considered the same neutral risk criteria in formulating both the Regional Stay at Home Order and the Blueprint, however, we consider the framework as a whole. The parties have briefed, and seek a determination on the validity of, both restriction regimes.

141 S. Ct. at 66—then the law need only survive rational basis review, even if it "has the incidental effect of burdening a particular religious practice," *Church of Lukumi*, 508 U.S. at 531. Any law burdening religious practices that is not neutral or of general application, however, "must undergo the most rigorous of scrutiny." *Id.* at 546.

1.

Accordingly, we must first determine whether the Blueprint and the Regional Stay at Home Order are neutral laws of general application. California contends that its framework employs neutral, generally applicable risk criteria, such as the ability to allow physical distancing and limit the number of people mixing from different households, to calculate an activity's transmission risk, and that these risk criteria apply to religious and non-religious activities alike. Thus, in the State's view, because the restrictions do not single out religious practices for harsh treatment, but rather only incidentally affect indoor worship, they are subject to rational basis review.

But the Supreme Court has recently instructed that we apply strict scrutiny review whenever a state imposes different capacity restrictions on religious services relative to non-religious activities and sectors. *Roman Catholic Diocese*, 141 S. Ct. at 66–67. In *Roman Catholic Diocese*, two houses of worship in New York City sought relief from Governor Cuomo's executive order that placed attendance caps on religious services. *Id.* at 65–66. In designated "red zones," religious services were limited to 10 people, and in orange zones, services were limited to 25. *Id.* at 66. However, the order allowed "essential businesses" in both zones to "admit as many people as they wish[ed]." *Id.* Included in the list of businesses deemed "essential" were

"acupuncture facilities, camp grounds, garages, . . . plants manufacturing chemicals and microelectronics and all transportation facilities." *Id.* Moreover, in "orange zones," "*non*-essential businesses [could] decide for themselves how many persons to admit." *Id.* (emphasis added).

New York's restrictions thus created circumstances in which "hundreds of people" could shop at "a large store in Brooklyn" on any given day, but a "nearby church or synagogue would be prohibited from allowing more than 10 or 25 people inside for a worship service." *Id.* at 67. Such dichotomous and "troubling results" led the Court to conclude that the challenged restrictions were "not 'neutral' and of 'general applicability,'" and therefore subject to strict scrutiny. *Id.* at 66–67 (quoting *Church of Lukumi*, 508 U.S. at 546).

We recently applied the Supreme Court's directive in *Calvary Chapel Dayton Valley v. Sisolack*, 982 F.3d at 1233, where we considered whether Nevada's COVID-related restrictions violated the Free Exercise Clause. Under the Nevada directive, "indoor in-person [religious] services" were capped at 50 people. *Id.* at 1230–31. Nevada's directive also imposed a 50% attendance cap on other activities, including casinos, retail, bowling alleys, gyms, restaurants, and body-art and piercing facilities. *Id.* We held that strict scrutiny review applied because, like the New York order at issue in *Roman Catholic Diocese*, the Nevada directive "treats numerous secular activities and entities significantly better than religious worship services." *Id.* at 1233. For example, "[c]asinos, bowling alleys, retail businesses, restaurants, arcades, and other similar secular entities are limited to 50% of fire-code capacity, yet houses of worship are limited to fifty people regardless of their fire-code capacities." *Id.*

Here, under California's Regional Stay at Home Order and Tier 1 of the Blueprint, religious services are permitted only outdoors. Although these restrictions do not allow casinos, bowling alleys, or restaurants to operate at greater capacity limits than religious services, the restrictions do permit grocery stores and retail establishments to operate at 35% and 20% of capacity, respectively, under the Regional Stay at Home Order and at 50% and 25% of capacity, respectively, under Tier 1 of the Blueprint. Tier 1 also permits certain personal care services, such as hair and nail salons, to open indoors subject to additional modifications and strict industry guidance. This "'disparate treatment' of religion triggers strict scrutiny review." *Dayton Valley*, 982 F.3d at 1233 (quoting *Roman Catholic Diocese*, 141 S. Ct. at 66).[21]

## 2.

To satisfy strict scrutiny, California must demonstrate that the Regional Stay at Home Order and the Blueprint are "'narrowly tailored' to serve a 'compelling' state interest."

---

[21] In finding that strict scrutiny applies, we note that we, like the district court, find no record evidence of animus toward religious groups. *Cf. Roman Catholic Diocese*, 141 S. Ct. at 66 (noting "a variety of remarks made by the Governor" that the restrictions were intended to "specifically target[] the Orthodox Jewish community"). In repeating Governor Newsom's answer to why "churches and salons are in Stage 3 and not Stage 2" of the Resilience Roadmap, South Bay again cites only the Governor's statement that "we're looking at the science, epidemiology, looking again at frequency, duration time, uh, and low risk-high reward, low risk-low reward." In the same exchange, however, the Governor also explained that the State was "very sensitive to those that want to get back into church" and that the State planned to "see what [it] can do to accommodate that."

*Roman Catholic Diocese*, 141 S. Ct. at 67 (quoting *Church of Lukumi*, 508 U.S. at 546).

California asserts a compelling state interest in reducing community spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of its healthcare system as a result of increased hospitalizations. South Bay disputes the veracity of these interests, arguing that the allegedly underinclusive nature of the restrictions undermines the State's proffered purposes.

This argument is foreclosed by *Roman Catholic Diocese*, where the Supreme Court held that "[s]temming the spread of COVID-19 is unquestionably a compelling interest." 141 S. Ct. at 67; *accord Dayton Valley*, 982 F.3d at 1234. This is especially true in California, where the State leads the nation with its seven-day average of total new cases.[22] As of January 19, the State's test positivity rate sat at 15.2% and ICU capacity has disappeared.[23]

South Bay's attempt to minimize the deaths of 35,004 Californians to COVID-19[24] in the face of the 62,000 Californians who die each year from heart disease is unavailing. There is a vast difference between the non-contagious nature of heart disease, which poses no greater

---

[22] New York Times, *Coronavirus in the U.S.: Latest Map and Case Count*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last updated Jan. 22, 2021).

[23] Current Tier Assignments as of January 19, 2021, *Tracking COVID-19 in California*, https://covid19.ca.gov/state-dashboard/.

[24] Update for January 21, 2021, *Tracking COVID-19 in California*, https://covid19.ca.gov/state-dashboard/.

risk when large groups are permitted to congregate, and COVID-19, which is lethal for precisely that reason.

Because we conclude that California has a compelling interest in reducing community spread of COVID-19, South Bay's likelihood of success on its Free Exercise claim turns on whether California can demonstrate that its restrictions on indoor worship are narrowly tailored to achieve that compelling interest. Narrow tailoring requires that the State employ the "least restrictive means" to advance its objective of stemming the virus's spread. *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981); *see also Roman Catholic Diocese*, 141 S. Ct. at 67.

Relying on the declarations submitted by California's public health and epidemiological experts, the district court concluded that the Stay at Home Order was narrowly tailored to achieve its compelling interest in stemming the recent case surge. California presented evidence that its public health officials considered seven objective risk criteria in assessing the transmission risk of *all* activities and sectors: (1) the ability to accommodate face coverings at all times; (2) the ability to allow for physical distancing; (3) the ability to limit the duration of exposure; (4) the ability to limit the amount of mixing of people from differing households and communities; (5) the ability to limit physical interactions between individuals; (6) the ability to optimize ventilation; and (7) the ability to limit activities known to increase spread such as shouting, singing, and heavy breathing.

The district court found that by "[a]pplying these factors, California assigns a similar risk profile for religious gatherings, as it does for weddings, funerals, college lectures, and political expression." Indeed, the State treats religious services more favorably than several of these

comparable secular activities. For although the Regional Stay at Home Order generally prohibits "all gatherings with members of other households," it specifically exempts *outdoor* religious worship from this prohibition. Only activities involving political expression or the use of outdoor recreation facilities receive a similar exemption. The Regional Stay at Home Order does *not* grant an exemption for other activities that similarly involve congregating *outdoors* for a prolonged period. For instance, restaurants must cease dine-in operations, both indoor and outdoor, and overnight stays at campgrounds are prohibited. Museums, zoos, and aquariums, which were previously permitted to operate outdoors under Tier 1 of the Blueprint, must close.

The Regional Stay at Home Order also permits essential workers in critical infrastructure to work on-site when remote work is not feasible. However, even these digitally unconvertable workplaces are subject to modifications furnished by the State's strict and mandatory industry-specific guidance. The State has issued industry-specific guidance for every activity and workplace specifying measures designed to deal with the unique risks posed by each environment.[25] For example, factories are required to screen workers, develop safety plans, and, where individuals must work in close proximity, install engineering controls such as plexiglass or other impermeable partitions.[26] Houses of worship are encouraged to "[c]onsider modifying" certain

---

[25] *See* Cal. Dep't of Pub. Health, *Industry Guidance to Reduce Risk*, https://covid19.ca.gov/industry-guidance/ (last updated Jan. 19, 2021).

[26] Cal. Dep't of Pub. Health, *COVID-19 Industry Guidance: Manufacturing* (July 29, 2020), https://files.covid19.ca.gov/pdf/guidance-manufacturing--en.pdf.

religious traditions that pose increased transmission risks, such as kissing ritual objects and sharing a communal cup.[27]

As it did before the district court, South Bay does not dispute that the challenged restrictions treat worship services more favorably than those non-exempted activities with respect to gathering *outdoors*.  Rather, because of the importance that the Pentecostal religion places on worshipping "in the temple," South Bay's argument centers on activities and sectors that are permitted to operate indoors while worship services remain confined to outdoor operation.  South Bay contends that the Regional Stay at Home Order and the Blueprint are underinclusive because they "give[] numerous exemptions" for activities that involve large groups of people in close proximity for long durations (e.g., factories, warehouses, transportation[28]), that are impossible to conduct outdoors (e.g., retail) or that require loud vocalizations (e.g., professional sports and film production).

The district court carefully examined each activity and sector permitted to operate at greater capacity limits indoors than houses of worship, how those activities compared under the seven risk criteria, and concluded that California's

---

[27] Cal. Dep't of Pub. Health, *COVID-19 Industry Guidance: Places of Worship and Providers of Religious Services and Cultural Ceremonies* (July 29, 2020), https://files.covid19.ca.gov/pdf/guidance-places-of-worship--en.pdf.

[28] Although South Bay included "political protests" in this category of allegedly "exempted" activities, the record evidence establishes that California imposes the same restrictions on political expression as it does on religious gatherings.  Both are permitted only outdoors under the Regional Stay at Home Order and Tier 1 of the Blueprint, and are subject to the same indoor capacity restrictions in Tiers 2, 3, and 4.

restrictions are indeed narrowly tailored to meet its compelling interest in reducing community spread of COVID-19. The district court's thorough analysis and conclusions, which we examine below, are fully supported by the record and not contradicted by any evidence submitted by South Bay. We first describe the restrictions applicable to each activity and sector under California's framework, then assess whether the restriction is in fact the least restrictive means for regulating the activity.

*Religious Services*: To determine whether the restrictions are narrowly tailored, the district court began by assessing the risk profile of religious gatherings. California's public health officials deemed religious services to "involve[] an exceptionally high risk of COVID-19 transmission" because they involve a "combination of many high risk factors." As noted, indoor worship services typically bring together individuals from many different households, assembled in a series of rows or pews that are physically close together, making close proximity highly likely (Risk Factors 2, 4, 5). Moreover, services last for at least one hour, which increases the risk of a viral load sufficient to infect an individual (Risk Factor 3). Finally, religious services usually involve singing, chanting, and responsive reading, activities known to increase the spread by "negat[ing] the risk-reduction achieved through six feet of physical distancing" (Risk Factor 7). The risky nature of this activity can, however, be mitigated when there is increased ventilation, such as when services occur outdoors, because aerosolized particles will dissipate into the atmosphere (Risk Factor 6). This explains why the State permits singing and chanting to occur during outdoor services, but prohibits such behaviors during indoor worship.

*Retail Establishments & Grocery Stores:*   While only outdoor religious services are permitted under the Regional Stay at Home Order and Tier 1 of the Blueprint, retail and grocery stores may operate indoors at 20% and 35% capacity, respectively, under the Regional Stay at Home Order, and 25% and 50% capacity, respectively, under Tier 1.

To justify this disparate treatment, California presented evidence that retail and grocery stores pose a lower transmission risk than indoor worship, primarily because these establishments do not involve individuals congregating to participate in a group activity.  For example, patrons typically have the intention of getting in and out of grocery and retail stores as quickly as possible (Risk Factors 3, 5), whereas the very purpose of a worship service is to congregate as a community.   To preserve perishable products and comply with applicable health and safety codes, grocery stores are "almost always" equipped with high-functioning air-conditioning systems that increase ventilation and air flow (Risk Factor 6).  Singing, chanting, and shouting is uncommon in these establishments (Risk Factor 7).

Moreover, as California explains, these entities can only operate "with modifications," which appear in the mandatory industry guidance designed to reduce the transmission risk posed by the particular activity.[29] Mandatory industry guidance for retail and grocery stores requires additional precautions such as plexiglass at checkout, frequent disinfection of commonly used surfaces such as shopping carts, and the closure of any areas that

---

[29] Cal. Dep't of Pub. Health, *COVID-19 Industry Guidance: Retail* (Oct. 20, 2020), https://files.covid19.ca.gov/pdf/guidance-retail--en.pdf.

encourage congregating, such as in-store bars, seating areas, and product sampling (Risk Factors 2, 3, 5). Thus, taking into account these risk criteria, California's public health officials have concluded that retail, grocery, and big box stores present a lower risk profile than indoor worship services, and allow these establishments to operate indoors subject to strict capacity limits and mandatory industry guidance.

*Personal Care Services*: Like indoor worship, personal care services, such as barbershops, nail salons, and body waxing studios, must close completely under the Regional Stay at Home Order. Under Tier 1 of the Blueprint, however, indoor personal care services may reopen subject to mandatory industry guidance while indoor worship remains prohibited.[30]

In assessing the risk profile of these services, California's public health experts explain that although personal care services may bring together people in close contact with one another, they "involve small numbers of individuals interacting," in contrast to "the numbers of individuals commonly present at indoor worship services" (Risk Factor 4). These sectors are also subject to additional mandatory hygienic requirements. For example, workers that are consistently within six feet of customers or coworkers are required to wear a secondary barrier in addition to a face mask (e.g., face shield or safety goggles).

---

[30] Cal. Dep't of Pub. Health, *COVID-19 Industry Guidance: Expanded Personal Care Services* (Oct. 20, 2020), https://files.covid19.ca.gov/pdf/guidance-expanded-personal-care-services--en.pdf.

*Public Transportation*:   Under the Regional Stay at Home Order and the Blueprint, public transit is permitted subject to modifications such as reduced occupancy and increased sanitation (Risk Factor 2).   But unlike worship services, interactions in a transit setting are likely to be asocial, brief and distant (Risk Factors 3, 5).   Furthermore, chanting or yelling is uncommon—perhaps even alarming—in these environments (Risk Factor 7).

*Worksites in Critical Infrastructure Sectors*:   The Regional Stay at Home Order allows critical infrastructure employers to designate essential workers to perform on-site tasks that cannot be done remotely, subject to mandatory industry-specific guidelines.   Under the Blueprint, these sectors may operate indoors but are subject to strict modifications.   The district court credited the statements of California's experts and public health officials who explained that

> job sites present a lower risk profile than non-employment situations because the State has greater control over enforcing specific industry guidelines applicable to each industry: factories must screen workers, develop safety plans, and install engineering controls such as plexiglass barriers, to protect individuals who work near each other. The employers are also subject to various health and safety requirements enforced by State labor authorities.   Binding labor agreements in certain industries impose other mandatory measures such as routine testing of on-site staff.   Work shifts may be grouped to control personnel to whom the employees are regularly exposed, thus diluting the risk

presented by likelihood of strangers from
different bubbles randomly mixing at each
gathering.

Thus, while we agree with South Bay's argument that "[t]he State cannot 'assume the worst when people go to worship but assume the best when people go to work,'" *S. Bay United Pentecostal Church*, 140 S. Ct. at 1615 (Kavanaugh, J., dissenting in denial of application for injunctive relief) (citation omitted), California is not "assuming" anything by enacting these regulations.   Instead, it is *mandating* additional restrictions through "detailed, workplace-specific COVID prevention plans subject to enforcement by State labor authorities."

South Bay nonetheless misguidedly asserts that California's seven risk factors are not applied to sectors deemed essential critical infrastructure.   Again, the challenged restrictions do cover critical infrastructure, which can only operate with significant mandatory modifications—industry-specific guidance designed to reduce the transmission risk posed by the specific sector. The industry-specific guidelines applicable to religious gatherings do not impose nearly as stringent requirements in comparison to many other sectors.   There are no labor agreements or other strictures mandating testing or contact tracing to combat the spread of the disease through religious worship.   Nor do we see how mandated testing would be practicable for those who participate in weekly or daily in-person worship.

Finally, South Bay makes much of an alleged "Hollywood Exemption."   But there is absolutely no record evidence to support its assertions.   Although film and production studios are permitted to continue operations

under the Regional Stay at Home Order and the Blueprint, record evidence demonstrates that Hollywood is not "exempt" from restrictions. In fact, this sector is *more strictly* regulated than many others. For example, the Executive Director of the California Film Commission attested that filming in the state resumed only after the studios and unions reached an agreement concerning safety guidelines. The agreement requires tri-weekly testing and special protocols for makeup, hair styling, costumes, and props. Moreover, although singing and chanting is permitted outdoors for all activities (as with religious services), the Executive Director stated that she was "unaware of any current film or television productions involving large groups of people singing." South Bay has pointed to no specific evidence to support its assertion that the film industry is permitted to allow singing indoors, and we are unable to find any in the record.

South Bay's analogous arguments with respect to professional sports teams, which it raises for the first time on appeal, fail for similar reasons. Like the film industry, professional sports may resume training and competition subject to approval by county health officers, which has not always been granted.[31] Live audiences—even outdoors—are prohibited.[32] Unlike religious gatherings, professional sports teams are subject to labor agreements that impose

---

[31] S.F. Chronicle, *49ers Won't Return to Levi's Stadium This Season After Coronavirus Ban Extended* (Dec. 18, 2020), https://www.sfchronicle.com/ 49ers/article/49ers-won-t-return-to-Levi-Stadium-this-season-15814361.php (last visited Jan. 21, 2021).

[32] Cal. Dep't of Pub. Health, *COVID-19 Industry Guidance: Sporting Events at Outdoor Stadiums and Racetracks* (Oct. 20, 2020), https://files.covid19.ca.gov/pdf/guidance-outdoor-live-professional-sports--en.pdf.

38   S. BAY UNITED PENTECOSTAL CHURCH V. NEWSOM

stringent regulations on players, including daily testing and penalties such as suspension if a player fails to follow the rules.[33]

\* \* \*

Dissecting the risk profile California assigned to each of these activities and sectors is a highly technical affair, and the district court's factual findings based on the scientific evidence before it confirms that it correctly concluded that the framework's restrictions on religious worship are narrowly tailored. California "seriously undertook to address the problem with [the] less intrusive tools readily available to it." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014). The State tailored its "restrictions to the specific mechanism of Covid-19 transmission: viral droplets which travel through the air from person to person." *Harvest Rock Church, Inc. v. Newsom*, 2020 WL 7639584, at \*7 (C.D. Cal. Dec. 21, 2020).

We therefore agree with the district court that while some "may disagree with the local public health officials' assessments of what constitutes comparable activities based on the seven risk factors, . . . such risk assessment—which necessarily reflects the local climate, infrastructure, and public health outcomes of prior policies—is a question of policy-making better deferred to the local public health officials." *See also Roman Catholic Diocese*, 141 S. Ct. at 74 (Kavanaugh, J., concurring) ("Federal courts [] must

---

[33] *See, e.g.*, *NFL-NFLPA COVID-19 Protocols for 2020 Season*, 61 (Oct. 16, 2020), https://static.www.nfl.com/image/upload/v1604923568/league/qj8bnhpzrnjevze2pmc9.pdf; NBA, *NBA Outlines Health and Safety Protocols for 2020-21 Season* (Dec. 5, 2020), https://www.nba.com/news/nba-establishes-health-and-safety-protocol-for-2020-21-season (last visited Jan. 21, 2021).

afford substantial deference to state and local authorities about how best to balance competing policy considerations during the pandemic."); *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring) ("When [politically accountable] officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.' Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974) and then quoting *Garcia v. San Antonio Met. Trans. Auth.*, 469 U.S. 528, 545 (1985))).

Notably, in response to the State's mountain of scientific evidence, South Bay has not pointed to *anything* in the record to support the notion that the lesser restriction that it seeks—100% occupancy with a reliance solely on mask-wearing, social distancing, and sanitation measures[34]—would be effective to meet California's compelling interest

---

[34] South Bay has made repeated misrepresentations on appeal regarding the status of a Los Angeles County ordinance enacted in the wake of the Supreme Court's ruling in *Roman Catholic Diocese*. On December 19, Los Angeles County passed an ordinance allowing houses of worship to hold indoor services without numerical limits or percentage caps provided that congregants wear masks and adhere to physical distancing. The ordinance was quickly rescinded on December 29—two days before South Bay filed its Opening Brief—to bring the county back into compliance with the State's Regional Stay at Home Order, which then permitted only outdoor worship. Nonetheless, South Bay continues to cite to the ordinance as if it were still in effect, even after the State filed a motion for judicial notice confirming it was repealed. When asked about this discrepancy during oral argument, South Bay continued to represent that the ordinance had not been rescinded.

in controlling community spread. South Bay's self-serving assertion that it has experienced no incidence of the virus among its worshipers is entirely anecdotal and undermined by evidence of outbreaks in similarly situated places of worship.

And to the extent that South Bay seeks to be treated like grocery stores under the Regional Stay at Home Order, with indoor capacity capped at 35%, we note that similar percentage caps have applied to indoor worship at various times over the last ten months. In both May and October, indoor worship services were permitted up to the lesser of 100 attendees or 25% of building capacity. But as the district court correctly found, these less restrictive measures proved inadequate in reducing community spread as evidenced by increasing case numbers and overfilled ICUs, and, as such, failed to meet California's compelling state interest here.

South Bay also contends that the total prohibition on indoor worship under the Regional Stay at Home Order and Tier 1 of the Blueprint is invalid because it is imposed without regard to the size of the place of worship. Notably, however, a percentage cap on attendance based on size is not the relief South Bay seeks. Rather, South Bay would have us enjoin California's restrictions such that it may return to "100% occupancy with social distancing and the other health protocols." Moreover, even when a percentage of capacity is permitted under Tiers 2, 3, and 4 of the Blueprint, South Bay would still be bound by the mandatory state-wide and industry-specific guidelines, including six feet of physical distancing, which would preclude certain religious practices, such as altar calls, the laying of the hands, and fellowship.

And even if an individual congregant is willing to accept the risk of contracting the virus by partaking in such conduct, the risk is not an individual's risk to take. The risk is also to

the lives of others with whom an asymptomatic person may come into close contact, to the healthcare workers who must care for the person one infects, and to California's overwhelmed healthcare system as a whole. California's experts cited studies published by the Centers of Disease Control that estimate, on average, one individual infected with COVID-19 goes on to infect an additional 2.5 people, and each of those persons infects 2.5 more. Thus, the risk of community spread grows exponentially with each additional infected person.

3.

Finally, we turn to South Bay's contention that *Roman Catholic Diocese* and *Dayton Valley* compel the conclusion that California's restrictions are not narrowly tailored. We disagree. California's restrictions differ markedly from the New York order under review in *Roman Catholic Diocese* and the Nevada directive at issue in *Dayton Valley*.

To begin, New York's restrictions were "especially harsh" towards religion, *Roman Catholic Diocese*, 141 S. Ct. at 66, whereas California's objective risk assessment treats all communal gatherings the same across activities and sectors. The Supreme Court seemed to observe as much when describing the New York executive order as "far more restrictive" than a previous iteration of the California restrictions, which have been incorporated into Tier 2 of the Blueprint. *Id.* at 67 n.2 (citing *S. Bay United Pentecostal Church*, 140 S. Ct. 1613); *see also id.* at 74 (Kavanaugh, J., concurring) ("New York's restrictions on houses of worship are much more severe than the California and Nevada restrictions at issue in *South Bay* and [*Dayton Valley*] . . . ."); *id.* at 75 (Roberts, C.J., dissenting) (observing that the New York restrictions are "distinguishable from those we considered in [*South Bay*]").

Moreover, that the Regional Stay at Home Order and Tier 1 of the Blueprint do not tether maximum indoor worship attendance to the building size, as the Supreme Court suggested in *Roman Catholic Diocese*, does not automatically render the restrictions unconstitutional. Tying maximum attendance to the size of the church, synagogue, or mosque is one "[a]mong other things" that the Supreme Court suggested would be more narrowly tailored than New York's strict numerical caps. *Id.* at 67. California's framework is narrowly tailored to stopping the viral spread in each type of endeavor within the state. And, as test positivity rates drop in a given county—and the State's interest in restricting indoor religious services in that locale lessens—California permits congregations in the county to expand the size of their indoor services. This sliding scale demonstrates California's careful calibration in its effort to impinge on its inhabitants' Free Exercise rights no more than is required by a once-in-a-lifetime global pandemic.

Finally, we note that the evidentiary record before the Supreme Court in *Roman Catholic Diocese* appears to have been quite different than the one before us. The Court's suggestion that the "maximum attendance at a religious service *could* be tied to the size of the church or synagogue," *id.* (emphasis added), does not appear to be supported by the extensive testimony of public health officials and the studies they relied upon, which we have before us now, *see also id.* ("*It is hard to believe* that admitting more than 10 people to a 1,000-seat church or 400-seat synagogue would create a more serious health risk than the many other activities that the State allows." (emphasis added)).

In *Dayton Valley*, we were faced with a similarly lean record—each party submitted just one expert declaration. There was certainly no indication that Nevada employed a

risk-based, activity-tailored analysis in assigning restrictions to different sectors under the challenged directive. Instead, the State enacted regulations that allowed potentially hundreds of individuals to congregate indoors at casinos, but limited religious services to a strict 50-person cap regardless of the size of the church or whether the service was held indoors or out. *See Dayton Valley*, 982 F.3d at 1233. Here, by contrast, California has closed cardrooms under the Regional Stay at Home Order and requires outdoor operation under Tiers 1 and 2 of the Blueprint. Outdoor worship services are permitted without any attendance limitations.

As we have previously observed, we recognize that the issues before us "strike at the very heart of the First Amendment's guarantee of religious liberty," *S. Bay United Pentecostal Church v. Newsom*, 982 F.3d 1239 (9th Cir. 2020) (quoting *Roman Catholic Diocese*, 141 S. Ct. at 68); indeed, we appreciate our "duty to conduct a serious examination of the need for such a drastic measure," *Roman Catholic Diocese*, 141 S. Ct. at 68. But it is precisely this careful examination that leads us to the conclusion we reach today: given the contagiousness of this deadly virus and the dire circumstances facing Southern California's healthcare system at this moment in its history, there exist no less restrictive means to alleviate the situation.

### B.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 67 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). The district court found that South Bay demonstrated irreparable harm, and the government does not challenge this finding on appeal. We agree that South Bay is suffering irreparable

harm by not being able to hold worship services in the Pentecostal model to which it subscribes.

## C.

Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The district court did not abuse its discretion in concluding that the public interest lay not with enjoining California's restrictions, but rather with the continued protection of the population as a whole so that all who desire to do so may once again return to worship indoors.

To be sure, without its requested injunctive relief, South Bay will continue to be deprived of the ability to engage in indoor worship. But unlike the plaintiffs in *Roman Catholic Diocese*, South Bay is permitted to hold in-person services outdoors in unlimited numbers under both the Regional Stay at Home Order and Tier 1 of the Blueprint. Thus, "personal attendance," with which the Supreme Court was principally concerned, is not an issue here. *See Roman Catholic Diocese*, 141 S. Ct. at 68. During this time, many Catholic churches throughout California have provided the Sacrament of Communion on a drive-through basis, following the live stream of the Mass to parishioners at home.[35] *Cf. id.* (observing that in New York, "Catholics who

---

[35] Orange County Register, *Drive-through Communion, Online Sermons: Venerable Tustin Church Adapts to Pandemic* (Aug. 4, 2020), https://www.ocregister.com/2020/08/02/drive-through-communion-online-sermons-venerable-tustin-church-adapts-to-pandemic/ (last visited Jan. 21, 2021); Sierra Star, *Mountain Area Church Gets Face-time With Parishioners in Drive-thru Communion* (May 2, 2020),

watch a Mass at home cannot receive communion"). Other faiths have similarly held regular outdoor services. For example, many Los Angeles-based synagogues held in-person outdoor High Holy Days services in their parking lots.[36]

And, as we have just explained, the Regional Stay at Home Order and the Blueprint permit these outdoor religious services without restrictions on attendance or singing and chanting. San Diego County benefits from a year-round warm climate[37] and is full of outdoor spaces that could plausibly accommodate outdoor religious services, such as parks and parking lots. Given the obvious climatic differences between San Diego in the winter and say, New York, the Regional Stay at Home Order's allowance for outdoor services is much more than "lip service" to the demands of the First Amendment. Moreover, although the

_____

https://www.sierrastar.com/living/religion/article242454861.html (last visited Jan. 21, 2021).

[36] L.A. Magazine, *To Survive COVID-19, the Jewish High Holidays Go Virtual—or Outdoors—Across L.A.* (Aug. 28, 2020), https://www.lamag.com/citythinkblog/high-holidays-covid-19/ (last visited Jan. 21, 2021); *see also* East Bay Times, *Coronavirus: Drive Right up and Confess Your Sins from a Safe Distance* (Apr. 3, 2020), https://www.eastbaytimes.com/2020/04/03/coronavirus-drive-right-up-and-confess-your-sins-from-a-safe-distance/ (last visited Jan. 19, 2021); NBC Bay Area, *Santa Clara County Mosques Find Ways to Continue Services* (July 19, 2020), https://www.nbcbayarea.com/news/local/south-bay/santa-clara-county-mosques-find-ways-to-continue-services/2328779/ (last visited Jan. 21, 2021).

[37] According to the National Oceanic and Atmospheric Administration (NOAA), the average temperature in San Diego for the month of December 2020 was 69 °F. *See* National Centers for Environmental Information, *Record of Climatological Observations: San Diego Int'l Airport*, https://www.ncdc.noaa.gov.

limitations on indoor worship services are of grave concern, they will be in effect only until ICU availability increases beyond a 15% threshold and test positivity rates drop below 8%.

On the other hand, if the requested injunctive relief is granted, the record evidence points to the conclusion that the public will be further endangered by both the virus and the collapse of the State's healthcare system. Although there is no record evidence that attendance at South Bay's services in particular has contributed to the spread of the virus, the record does evidence outbreaks tied to religious gatherings in San Diego County and in the Southern California region. And, certainly, California's public health experts have concluded that indoor gatherings of any kind are exactly what magnifies the risk of exposure. Accordingly, unlike in *Roman Catholic Diocese*, there is strong evidence to conclude that enjoining California's restrictions on indoor worship services to permit gatherings for indoor religious services will in fact harm the public. *Cf. id.* Indeed, it is difficult to see how allowing more people to congregate indoors will do anything other than lead to more cases, more deaths, and more strains on California's already overburdened healthcare system.

## IV.

We next assess South Bay's claim that the 100- and 200-person attendance limits on indoor worship under Tiers 2 and 3 of the Blueprint, respectively, violate the Free Exercise Clause.[38] Although South Bay raised this challenge in its

---

[38] South Bay also purports to challenge the 25% limitation on capacity in Tier 2 of the Blueprint, and the 50% limitation on capacity under Tiers 3 and 4 of the Blueprint. However, the district court did not

renewed motion for injunctive relief, the district court did not address it in its December 21 order. The parties have nonetheless briefed the issue on appeal. We believe that the *Winter* factors counsel enjoining these attendance caps.

We conclude that South Bay is likely to succeed on its challenge to the 100- and 200-person attendance caps under Tiers 2 and 3 of the Blueprint. As with the prohibition on indoor worship under the Regional Stay at Home Order and Tier 1 of the Blueprint, after *Roman Catholic Diocese*, we apply strict scrutiny to these attendance caps because California has imposed different capacity restrictions on religious services relative to non-religious activities and sectors. *See Roman Catholic Diocese*, 141 S. Ct. at 66–67. Specifically, in Tier 2, indoor worship services are limited to the lesser of 25% capacity or 100 people, whereas retail may operate at 25% capacity and grocery stores may operate at 50% capacity, both without attendance caps. In Tier 3, indoor worship services are limited to the lesser of 50% capacity or 200 people, whereas retail and grocery stores may operate without capacity limits subject to mandatory industry guidance.

Whereas the State has submitted substantial evidence as to why indoor worship is unsafe at any level in counties where COVID-19 is "widespread" and ICU capacity is non-existent, we cannot find record evidence to support its

---

rule on this challenge, nor did the parties present specific evidence regarding the narrowly tailored inquiry with respect to the percentage limitations below or make meaningful arguments here. If South Bay desires to challenge these percentage limitations, it must return to the district court. *See Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010) (per curiam) ("[W]e won't consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief." (internal quotations and citations omitted)).

assertion that the 100-person cap in Tier 2 and the 200-person cap in Tier 3 are necessary to achieve its goal in further slowing community spread.  As in *Roman Catholic Diocese*, "there are many other less restrictive rules that could be adopted to minimize the risk to those attending religious services." *Id.* at 67.  And while 100 or 200 people could overwhelm a small chapel, a large church the size of South Bay could easily implement social distancing with much higher numbers.  Accordingly, we conclude that South Bay is likely to succeed on the merits of its Free Exercise claim with respect to the numerical caps in Tiers 2 and 3.

When San Diego County reaches Tiers 2 and 3 of the Blueprint, the numerical attendance caps will undeniably unconstitutionally deprive some of South Bay's worshippers of participation in its worship services, causing irreparable harm.  *See Roman Catholic Diocese*, 141 S. Ct. at 67.  Moreover, the untethered nature of the caps, at least on the record before us, will tip the balance of the equities and public interest in South Bay's favor.  *See Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) ("[T]he injunction serves the interests of the general public by ensuring that the government's . . . procedures comply with the Constitution.  Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." (internal quotation marks omitted)).  The State has not shown that less restrictive measures, such as basing attendance limits on the size of the church, synagogue, or mosque would cause any greater peril to the public.  Accordingly, we remand to the district court with the instruction to enjoin the State from imposing the 100- and 200- person caps under Tiers 2 and 3 of the Blueprint.

## V.

Finally, we separately consider South Bay's claim that California's ban on indoor singing and chanting violates its First Amendment rights under the Free Exercise Clause. Although South Bay raised this challenge in its renewed motion for injunctive relief, the district court did not specifically address it in its December 21 order. We find that the district court's failure to do so, if error, is harmless because the challenge lacks merit.

California's ban on indoor singing and chanting applies to *all* indoor activities, sectors, and private gatherings. South Bay has not pointed to any record evidence demonstrating that this ban results in disparate treatment of religious gatherings, and we cannot find any. Thus, our analysis of the singing and chanting ban is subject to the deferential rational basis review, not strict scrutiny.

California's public health officials explain that "[s]inging, chanting, [and] shouting . . . significantly increase the risk of COVID-19 transmission because these activities increase the release of respiratory droplets and fine aerosols into the air."[39]  Such conduct propels respiratory droplets farther and thus mitigates the effects achieved by social distancing.  Moreover, mask-wearing cannot completely impede the risk of transmission because of the forceful nature of the expulsion. The State's ban on singing and chanting is therefore rationally related to controlling the

---

[39] Cal. Dep't of Pub. Health, *Guidance for the Prevention of COVID-19 Transmission for Gatherings* (Nov. 13, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Guidance-for-the-Prevention-of-COVID-19-Transmission-for-Gatherings-November-2020.aspx (last visited Jan. 21, 2021).

spread of COVID-19, and South Bay has not demonstrated a likelihood of success on this claim.

## VI.

We are mindful that "even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese*, 141 S. Ct. at 68.  But we do not think this is what California has done.  Although South Bay may not be able to hold indoor worship services, California has left open other avenues for worship that pose substantially less risk for further spread of COVID-19.  Accordingly, having evaluated the likelihood of success on the merits, the potential for irreparable injury, the balance of equities, and the public interests implicated by this case, we cannot conclude that the district court abused its discretion in refusing to grant South Bay's requested injunction.  We therefore AFFIRM the district court's denial of South Bay's motion for preliminary injunctive relief.

**AFFIRMED.**

S. Bay United Pentecostal Church v. Newsom   51

**APPENDIX A**

|  | Regional Stay at Home Order, Dec. 3, 2020 | Blueprint for a Safer Economy, Aug. 28, 2020 | | | |
|---|---|---|---|---|---|
|  |  | Tier 1: Widespread | Tier 2: Substantial | Tier 3: Moderate | Tier 4: Minimal |
| **Places of Worship** | Outdoor only | Outdoor only | Lesser of: 25% capacity or 100 people + mandatory industry guidance | Lesser of: 50% capacity or 200 people + mandatory industry guidance | 50% capacity + mandatory industry guidance |
| **Political Protests** | Outdoor only | Outdoor only | Lesser of: 25% capacity or 100 people + mandatory industry guidance | Lesser of: 50% capacity or 200 people + mandatory industry guidance | 50% capacity + mandatory industry guidance |
| **Movie Theaters** | Closed (drive-in OK) | Closed (drive-in OK) | Lesser of: 25% capacity or 100 people + mandatory industry guidance | Lesser of: 50% capacity or 200 people + mandatory industry guidance | 50% capacity + mandatory industry guidance |
| **Restaurants** | Take-out or delivery only | Outdoor only | Lesser of 25% capacity or 100 people + mandatory industry guidance | Lesser of 50% capacity or 200 people + mandatory industry guidance | 50% capacity + mandatory industry guidance |
| **Museums, Zoos, Aquariums** | Closed | Outdoor only | 25% capacity + mandatory industry guidance | 50% capacity + mandatory industry guidance | Open + mandatory industry guidance |
| **Retail, Shopping Malls** | 20% capacity + mandatory industry guidance | 25% capacity + mandatory industry guidance | 50% capacity + mandatory industry guidance | Open + mandatory industry guidance | Open + mandatory industry guidance |
| **Grocery Stores** | 35% capacity + mandatory industry guidance | 50% capacity + mandatory industry guidance | Open indoors + mandatory industry guidance | Open indoors + mandatory industry guidance | Open indoors + mandatory industry guidance |
| **Gyms, Fitness Centers** | Outdoor only | Outdoor only | 10% capacity + mandatory industry guidance | 25% capacity + mandatory industry guidance | 50% capacity + mandatory industry guidance |
| **Cardrooms** | Closed | Outdoor only | Outdoor only | 25% capacity + mandatory industry guidance | 50% capacity + mandatory industry guidance |
| **Hair Salons, Barbershops** | Closed | Open indoors + mandatory industry guidance | Open indoors + mandatory industry guidance | Open indoors + mandatory industry guidance | Open indoors + mandatory industry guidance |

| | | | | | |
|---|---|---|---|---|---|
| **Music, Film, TV Production** | Approval by county health officials + mandatory industry guidance | Open indoors + mandatory industry guidance | Open indoors + mandatory industry guidance | Open indoors + mandatory industry guidance | Open indoors + mandatory industry guidance |
| **Critical Infrastructure** | Essential workers may work on-site when remote work not feasible + mandatory industry guidance | Open indoors + mandatory industry guidance | Open indoors + mandatory industry guidance | Open indoors + mandatory industry guidance | Open indoors + mandatory industry guidance |
| **Bars, Breweries, Distilleries** | Closed | Closed | Closed | Outdoor only | 50% capacity indoors + mandatory industry guidance |